ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
          – and –
DAVID C. WALTON (167268)
DANIEL S. DROSMAN (200643)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
davew@rgrdlaw.com
dand@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DORIS SHENWICK, as Trustee for the DORIS SHENWICK TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>    vs.<br><br>TWITTER, INC., RICHARD COSTOLO and ANTHONY NOTO,<br><br>               Defendants. | Case No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Twitter, Inc. ("Twitter" or the "Company"), as well as Company press releases and conference call transcripts and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION AND OVERVIEW

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired Twitter common stock between February 6, 2015 and July 28, 2015, inclusive (the "Class Period"), against Twitter and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").  These claims are asserted against Twitter and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases and filings with the SEC and in oral statements to the media, securities analysts and investors.

2.      Twitter is a global platform for public self-expression and conversation in real time, where any user can create a Tweet and any user can follow other users.  The Company's main source of revenue is advertising.  Because advertising revenue is driven by the total number of users on the platform and, equally as important, the level of engagement of such users, the Company and analysts have focused closely on metrics measuring total users and user engagement.  Twitter reported two primary user metrics: Monthly Active Users or "MAUs" (a measure of the total user base) and timeline views (a measure of user engagement).

3.      Prior to the beginning of the Class Period, at an all-day meeting with analysts on November 12, 2014, defendants reported that the number of MAUs was expected to increase significantly "to over 550 million [MAUs] in the intermediate term and . . . over a billion . . . [MAUs] over the longer term."  Defendants announced  several new product initiatives designed to

drive growth in MAUs and user engagement. Defendants also announced that Twitter would discontinue reporting its primary user engagement metric, timeline views, stating the reason for the change was that the metric was an unrepresentative measure of user engagement and no longer reflective of Twitter's business.

4.      The Class Period starts on February 6, 2015. The previous day, after the market closed, Twitter released its fourth quarter and fiscal year 2014 financial results. The Company reported non-GAAP net income of $79 million, or non-GAAP earnings per share ("EPS") of $0.12, and revenue of $479 million for the fourth quarter ended December 31, 2014. Additionally, the Company reported non-GAAP net income of $101 million, or non-GAAP EPS of $0.14, and revenue of $1.4 billion for the fiscal year ended December 31, 2014. The Company blamed lower than expected MAU growth on "quarter-specific factors . . . which include seasonality and a couple of issues related to the launch of iOS 8." Furthermore, the Company reiterated its outlook for strong MAU growth going forward and emphasized the success of the new product initiatives designed to "drive [MAU] growth." Defendants also reiterated that Twitter would discontinue reporting its primary user engagement metric, timeline views.

5.      Following defendants' statements on February 5, 2015, Twitter's stock price increased nearly 17% in one day to close at $48.01 per share on February 6, 2015, on volume of 102 million shares.

6.      On April 28, 2015, Twitter released its first quarter 2015 financial results. The Company reported non-GAAP income of $47 million, or $0.07 non-GAAP EPS, and revenue of $436 million for the first quarter ended March 31, 2015. Additionally, the Company provided its outlook for the second quarter of 2015, projecting second quarter revenue of $470 million to $485 million. Twitter also lowered its full year 2015 revenue forecast to between $2.17 billion and $2.27 billion from prior guidance of $2.30 billion to $2.35 billion. Furthermore, the Company reported that Twitter's MAUs only increased 5% over the prior quarter.

7.      As a result of this news, the price of Twitter stock dropped $9.39 per share to close at $42.27 per share on April 28, 2015, a decline of 18% on volume of over 77 million shares. On the following day, April 29, 2015, the price of Twitter stock dropped gain, falling $3.78 per share to

close at $38.49 per share, a one-day decline of nearly 9% on volume of over 120 million shares. However, the stock continued to trade at artificially inflated levels as defendants assured investors that new initiatives to drive user growth and engagement were still in the early stages.

8.       Then, on July 28, 2015, after the market closed, Twitter issued a press release announcing its second quarter 2015 financial results.  The Company reported non-GAAP income of $49 million, or $0.07 non-GAAP EPS, and revenue of $502 million for the second quarter ended June 30, 2015.  Additionally, the Company provided its outlook for the third quarter of 2015, projecting third quarter revenue of $545 million to $560 million.  Twitter also provided its outlook for the 2015 full year, projecting revenue in the range of $2.20 billion to $2.27 billion.

9.       As a result of this news, the price of Twitter stock plummeted $5.30 per share to close at $31.24 per share on July 29, 2015, a one-day decline of nearly 15% on volume of nearly 93 million shares.  The stock has not recovered and presently trades at less than $20 per share.

10.       As a result of defendants' false statements, Twitter common stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's stock was hammered by massive sales, sending Twitter's stock price down 40% from its Class Period high of $52.87 per share on April 7, 2015, and causing economic harm and damages to plaintiff and members of the Class (as defined below).

## JURISDICTION AND VENUE

11.       The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

12.       This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

13.       Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Twitter maintains its headquarters in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                               - 3 -

14.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

**THE PARTIES**

15.     Plaintiff Doris Shenwick, as Trustee for the Doris Shenwick Trust, purchased Twitter common stock during the Class Period as set forth in the attached certification and was damaged thereby.

16.     Defendant Twitter operates as a global platform for public self-expression and conversation in real time.  Twitter maintains its headquarters at 1355 Market Street, Suite 900, San Francisco, California.  Twitter common stock is traded under the ticker "TWTR" on the NYSE, an efficient market.

17.     Defendant Richard Costolo ("Costolo") was, until his resignation on July 1, 2015, Chief Executive Officer ("CEO") and a director of Twitter.

18.     Defendant Anthony Noto ("Noto") is, and at all relevant times was, Chief Financial Officer ("CFO") of Twitter.

19.     The defendants referenced above in ¶¶17-18 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false statements that caused the price of Twitter common stock to be artificially inflated during the Class Period.

20.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Twitter's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then

1  materially false and misleading.  The Individual Defendants are liable for the false and misleading

2  statements pleaded herein.

### FRAUDULENT SCHEME AND COURSE OF BUSINESS

4      21.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose

5  adverse facts known to them about Twitter.  Defendants' fraudulent scheme and course of business

6  that operated as a fraud or deceit on purchasers of Twitter common stock was a success, as it: (i)

7  deceived the investing public regarding Twitter's prospects and business; (ii) artificially inflated the

8  price of Twitter common stock; and (iii) caused plaintiff and other members of the Class to purchase

9  Twitter common stock at artificially inflated prices.

### SCIENTER ALLEGATIONS

11      22.    During the Class Period, the defendants had the motive and opportunity to commit the

12  alleged fraud.  Defendants also had actual knowledge of the misleading statements they made and/or

13  acted in reckless disregard of the true information known to them at the time.  In doing so, the

14  defendants participated in a scheme to defraud and committed acts, practices and participated in a

15  course of business that operated as a fraud or deceit on purchasers of Twitter common stock during

16  the Class Period.

### BACKGROUND

18      23.    Twitter operates as a global platform for public self-expression and conversation in

19  real time.  It offers various products and services that allow users to create, distribute and discover

20  content.  The Company also provides promoted products and services – such as promoted tweets,

21  promoted accounts and promoted trends – that enable its advertisers to promote their brands,

22  products and services, and subscription access to its data feed for data partners.

23      24.    Following its November 2013 initial public offering ("IPO"), Twitter's stock price

24  increased significantly to as high as $70 per share in late 2013.  A key to the Company's successful

25  IPO was substantial growth in its two primary user metrics: MAUs (a measure of the total user base)

26  and timeline views (a measure of user engagement).  For example, the Company had doubled its

27  MAUs in the 24 months preceding the IPO to 232 million and the trajectory was expected to

28  continue. As noted by one analyst, "'[t]he company has kind of pitched itself as a billion-user

business long term.'"  User metrics, including user engagement, were highlighted over fifty times in Twitter's S-1 Registration Statement filed in connection with its IPO, including:

- "Growth in our user base and user engagement is a fundamental driver to the growth of our business."

- "User growth trends reflected in the number of MAUs, user engagement trends reflected in timeline views and timeline views per MAU . . . are key factors that affect our revenue."

- "The size of our user base and our users' level of engagement are critical to our success."

25.  User engagement metrics were particularly important to analysts and investors because more engaged users would lead to higher MAU growth and higher advertising revenues. Twitter's primary user engagement metrics were timeline views and timeline views per MAU.[1]  As the Company itself indicated prior to the Class Period, "[t]imeline views are kind of proxy for the amount of content our users consume."  Defendants closely tracked user engagement metrics, including timeline views.[2]  User engagement became even more important to analysts and investors starting in the second half of 2014 when Twitter's MAU growth began to decelerate.  As the Company has acknowledged, "as your MAU growth slows, engagement becomes a much bigger factor." (*See also, e.g.*, "To the extent our user growth rate slows, our success will become increasingly dependent on our ability to increase levels of user engagement . . . .").[3]

---

[1]  Twitter S-1 Registration Statement:

- "We broadly measure user engagement on our platform through timeline views and the number of timeline views per MAU."

- "We believe that timeline views and timeline views per MAU are measures of user engagement."

[2]  Twitter Form 10-K for the year ended December 31, 2014:

NOTE REGARDING **KEY METRICS**

We review a number of metrics, including monthly active users, or MAUs, **timeline views, timeline views per MAU** and advertising revenue per timeline view, to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions.

(Here as elsewhere, emphasis has been added unless otherwise noted.)

[3]  Twitter S-1 Registration Statement.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS               - 6 -

26.     On November 12, 2014, Twitter held an all-day meeting with analysts ("Analyst Day").  Twitter executives emphasized new initiatives to drive user engagement and reinvigorate MAU growth.   Twitter also abruptly announced that it would cease reporting its sole user engagement metric, timeline views, going forward.  Twitter reassured investors that the recent trend of declining timeline views was not indicative of an actual declining trend in user engagement.  Twitter did not provide any alternative user engagement metrics to investors despite acknowledgment that such alternative metrics were tracked internally by management.  For example:

> [Analyst:] So, Bob Pecks, SunTrust. . . .  And then as analyst at Wall Street, *how should [we] gauge your progress, what metrics should we be looking at and once we see those metrics pop up so we can see that you're actually getting traction with the products*? Thanks.
>
> *               *               *
>
> [Trevor O'Brien, Twitter Director of Product Management:]  And then the last part of your question Bob, on how do you measure us in metrics, I mean ultimately, we want to drive shareholder value that's going to be tied to our financials. We're not naive to think that you're not going to focus on the leading indicators of financials, long-term growth potential.  And so there are going to be non-financial metrics to look at. . . .
>
> . . . *We constantly evaluate a number of different metrics and [debate] what we should be disclosing, what we're not disclosing*.
>
> *               *               *
>
> [Noto:]  I'll tell you, we struggle with the measure [of] engagement not because we're not smart, but because *there's a lot of measurements of engagement* . . . .

27.     The Analyst Day comments also included a discussion of new product initiatives that defendants represented would grow the user base and improve user engagement.[4]  Defendant Noto described the impact of the new initiatives on user growth as follows:

> We think we have a significant product roadmap, much of which hasn't been launched yet that *[we] believe positions us to grow our monthly active users by 2x to over 550 million in the intermediate term* and 3-4x to over a billion core users, monthly active users over the longer term.

---

[4]     For example: "Today, you will hear about a number of initiatives we have underway to grow our core of monthly active users . . . ."; "[W]e've launched things in the past year, or recently that have demonstrated key results, where we have tested the work, they're also showing positive results."; "[W]e've been testing this for a while and [have] seen very positive results."

28. The accompanying slide described the expected MAU growth:



**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
ISSUED DURING THE CLASS PERIOD**

**Fourth Quarter 2014 Earnings: February 5, 2015**

29. On February 5, 2015, after the market closed, Twitter issued a press release announcing its fourth quarter and fiscal year 2014 financial results. The Company reported non-GAAP net income of $79 million, or non-GAAP EPS of $0.12, and revenue of $479 million for the fourth quarter ended December 31, 2014. Additionally, the Company reported non-GAAP net income of $101 million, or non-GAAP EPS of $0.14, and revenue of $1.4 billion for the fiscal year ended December 31, 2014. Twitter's revenue was higher than projected, but MAU growth was less than expected and the timeline views metric (the last time Twitter would report it) was flat. In the conference call later that day, the low MAU growth was blamed on "quarter-specific factors that impacted our net adds in Q4, which include seasonality and a couple of issues related to the launch of iOS 8." Furthermore, the release provided the Company's outlook for strong MAU growth in the first quarter of 2015, stating in part:

> "We closed out the year with our business advancing at a great pace. Revenue growth accelerated again for the full year, and we had record quarterly profits on an adjusted EBITDA basis," said Dick Costolo, CEO of Twitter. "In addition, the trend thus far in Q1 leads us to believe that the absolute number of net users added in Q1 will be similar to what we saw during the first three quarters of 2014."

30.     After releasing its fourth quarter and fiscal year 2014 financial results, on February 5, 2015, Twitter held a conference call for analysts, media representatives and investors during which defendant Noto represented the following:

> In terms of engagement metrics, as I mentioned, we're no longer going to provide the metric of timeline view.  And the reason for that is it's really a measurement that doesn't reflect the initiatives that we're doing. In fact, if anything, we're taking specific initiatives and product changes that will hurt timeline view. . . .
>
> And so that's why we decided to eliminate the timeline view metric, given that we have specific product changes that will hurt that metric. More broadly, as we think about engagement, there are a number of different ways that we measure engagement – there's no one perfect way. When it comes to advertising, it's going to be click-through rate.  And it's actually different by each format. A mobile app download click-through rate is very different than a regular Promoted Tweet that could be either re-tweeted or favorited as a measurement of payment.
>
> *          *          *
>
> And so as we get to a point where we have a metric that's going to really reflect what we're trying to do, we'll share that with you.  But, at this point, there's a number of them that we look at, and no one metric to share.

31.     Defendants also emphasized the success of the new product initiatives that the Company had previously introduced at its Analyst Day.  For example:

> [Analyst:]  On the MAU number . . . I'm curious as to the acceleration [in MAU growth] there, if that's seasonality or something else?
>
> *          *          *
>
> [Costolo:]   Sure. Thanks, Paul, this is Dick. In Q1, I would say it's a combination of seasonality, a return to organic growth, and ***the set of product initiatives we've created to drive growth***. Again, at a high level, I'd like to say that I'm thinking about growth and our product as, these changes we're making now as helping us grow across logged-in, logged-out, and our syndicated audience across the web and third-party mobile apps.
>
> ***The user numbers we saw on January, again, indicate that our MAU trend has already turned around***, and that Q1 trend is likely to be back in the range of absolute net ads that we saw during the first three quarters of 2014. So we're in a great place there. And, again, I would stress that it's seasonality, a return to organic growth, ***and product initiatives***, all taken together.

32.     Following defendants' statements on February 5, 2015, Twitter's stock price increased nearly 17% in one day to close at $48.01 per share on February 6, 2015, on volume of 102 million shares.  Analysts viewed these results favorably.  For example, J.P. Morgan raised its price target to $67.00 per share, stating:

Twitter reported strong 4Q results as both revenue and EBITDA came in well above our and Street estimates despite MAU net adds of 4M Q/Q that came in 3M light vs. the Street and below our 6M due to a 4M negative impact related to the iOS 8 update.  *More importantly, the company believes it is on track to return to 13-16M Q/Q MAU net adds in 1Q15 and we think the strong cadence of product launches/enhancements should drive improving MAU growth through 2015*.  Ad revenue of $432M increased 97% Y/Y, well above our $411.1M driven by revenue/1,000 TLVs which increased 49% Y/Y as TWTR continues to show strength in monetization. We note that Twitter's ad load remains well below industry peers such as Facebook. EBITDA of $142M was well above our $110M, with margins increasing more than 11% points Y/Y to nearly 29.5% in 4Q. We believe the 1Q and 2015 guide could be conservative, despite tougher Y/Y comps due to the Olympics, FIFA World Cup and FX headwinds, as we expect ad demand to continue increasing. *We believe the pace and quality of execution at the company continues to improve and that onboarding improvements, rich content (i.e. video), & better timeline organization can drive user growth going forward*.

(Emphasis in original.)

33.    Defendants' February 5, 2015 statements were materially false and misleading. Defendants concealed adverse facts they knew or deliberately disregarded, including the following:

(a)    By early 2015, daily active users ("DAUs") had replaced the timeline views metric as the primary user engagement metric tracked internally by Twitter management.

(b)    By early 2015, the trend in user engagement growth (*i.e.*, DAUs) was flat or declining.

(c)    New product initiatives were not having a meaningful impact on MAUs or user engagement.

(d)    The "acceleration [in MAU growth]" was the result of low-quality MAU growth (in which new users were not as engaged as existing users).

(e)    Defendants lacked a basis for their previously issued projections of approximately 20% MAU growth and 550 million MAUs in the immediate term.

**Fiscal Year 2014 Form 10-K: March 2, 2015**

34.    On March 2, 2015, Twitter filed its Form 10-K for the year ended December 31, 2014, which incorporated the financial statements previously reported.  The Form 10-K also discussed timeline views:

We present and discuss timeline views in this Annual Report on Form 10-K. . . .  Additionally, the ongoing optimization of our products has reduced the number of times a user needs to request a timeline view.  As a result, our management team believes timeline views have become an unrepresentative measure

of, and will not use them internally to measure for, user engagement on our platform. As we announced on November 12, 2014, we do not intend to disclose timeline views for any future period.  They are presented here only for historical purposes.

35.     The disclosures in the Form 10-K about the elimination of the timeline view metric would later lead to an April 13, 2015 inquiry from the SEC requesting alternative metrics to explain trends in user engagement.  The SEC letter stated:

We note your disclosures relating to Timeline Views, Timeline Views per Monthly Active User (MAU), and Advertising Revenue Per Timeline. We also note on page 46 that going forward you intend to cease presenting timeline views in future filings. Please address the following:

- ***Please describe the alternative metric(s)*** you anticipate presenting in future filings ***to explain trends in user engagement*** and advertising services revenue. Also, please describe your reasons for choosing such metric(s).

*          *          *

We refer you to Section III.B of SEC Release 33-8350.

36.     Twitter's response to the SEC included alternative user engagement metrics that were purportedly used internally by defendants:

The Company respectfully advises the Staff that it has included two metrics, changes in ad engagements and changes in cost per ad engagement, on page 25 in the Key Metrics section of its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015, filed on May 11, 2015 (the "Form 10-Q"). These metrics are intended to serve as a measure of user engagement and demand, respectively, on the Company's platform. . . .   [C]hanges in ad engagements indicate trends in user engagement and, in particular, user engagement with ads, which affects revenue. . . .

The Company's management internally tracks changes in ad engagements . . . on the Twitter platform to monitor trends in user engagement . . . and believes th[is] metric[] [is] helpful to investors to understand the same.

37.     Defendants' March 2, 2015 statements were materially false and misleading. Defendants concealed adverse facts they knew or deliberately disregarded, including the following:

(a)     DAUs had become the primary user engagement metric tracked internally by Twitter management.   The trend in user engagement growth (*i.e.*, DAU growth) was flat or declining.   As noted by the SEC, MD&A disclosure  rules required the disclosure of key internal metrics used by management.[5]

---

[5]   In particular, SEC Release 33-8350 states that "one of the principal objectives of MD&A is to give readers a view of the company through the eyes of management . . . .   [C]ompanies should

1          (b)     The ad engagement metric, which defendants intended to be "helpful to

2 investors to understand" and "monitor trends in user engagement," was a ***monetization*** metric rather

3 than a user engagement metric.   The trend in "ad engagements" was not indicative of trends in user

4 engagement.   In fact, the trend in "ad engagements" was moving in the opposite direction (*i.e.*,

5 increasing) from the trend in user engagement.

6 **First Quarter 2015 Earnings: April 28, 2015**

7          38.     On April 28, 2015, Twitter issued a press release announcing its first quarter 2015

8 financial results.[6]   The Company reported non-GAAP income of $47 million, or $0.07 non-GAAP

9 EPS, and revenue of $436 million for the first quarter ended March 31, 2015.   Additionally, the

10 Company provided its outlook for the second quarter of 2015, projecting second quarter revenue of

11 $470 million to $485 million.   Twitter also lowered its full year 2015 revenue forecast to between

12 $2.17 billion and $2.27 billion, from prior guidance of $2.30 billion to $2.35 billion.   Furthermore,

13 the Company reported that Twitter's MAUs only increased 5% over the prior quarter, including 3%

14 growth in U.S. MAUs.

15          39.     After releasing its first quarter 2015 financial results on April 28, 2015, Twitter held a

16 conference call for analysts, media representatives and investors during which defendant Noto

17 stated:

18       ***[W]e expect the factors which led to our marginally slower growth in Q1 to***
       ***continue for the full year of 2015***.

19

20                    *      *      *

21       In Q2 . . . there's also some headwinds. . . .

22       We're off to a slow start in April and . . . the trend is not similar to Q1 . . . .

23 'identify and address those key variables and other qualitative and quantitative factors which are
24 peculiar to and necessary for an understanding and evaluation of the individual company.'"
*Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition*
25 *and Results of Operations*, Release Nos. 33-8350, 34-48960, 2003 SEC LEXIS 3034, at *25 (Dec.
19, 2003).

26 [6]   This earnings release was mistakenly released at 3pm EST before the market closed. Twitter
27 confirmed the unintentional release, which led to the NYSE halting trading in the Company's stock.
Trading resumed before the market closed.   The Company held its earnings call with analysts as
28 originally scheduled after the market closed.

40.     Defendant Noto also commented on user engagement metrics:

In terms of engagement metrics, *there's a lot of different metrics that we look at internally*. There's not one metric for engagement. And so I can give you a sense of some of them and quite frankly, *we would like to be able to give you more visibility on this*, but there's just a number of different measurements.

\*          \*          \*

[W]e continue to look for metrics that could be helpful to you and we will try to give you color from time to time across these different metrics . . . .

41.     As a result of this news, the price of Twitter stock dropped $9.39 per share to close at $42.27 per share on April 28, 2015, a decline of 18%.  On the following day, April 29, 2015,  the price of Twitter stock dropped again, falling $3.78 per share to close at $38.49 per share, a one-day decline of nearly 9% on volume of more than 119 million shares.

42.     However, defendants' positive statements about active users and Twitter's new initiatives kept the stock from dropping further. For example, defendants represented the following on the conference call:

[Costolo:] I talked last quarter about the experiments we were running to test *instant timelines*.

\*          \*          \*

*The results during our experiment were quite positive in terms of engagement* . . . .

\*          \*          \*

[Noto:] *We are very encouraged by the growth we've experienced thus far*, but as often is the case with new products, we have a great deal of iterating and fine-tuning to do as we scale in order to maximize the effectiveness of these products in our complex marketplaces.

43.     Defendants' April 28, 2015 statements were materially false and misleading. Defendants concealed adverse facts they knew or deliberately disregarded, including the following:

(a)     DAUs had become the primary user engagement metric tracked internally by Twitter management.   The trend in user engagement growth (*i.e.*, DAU growth) was flat or declining.

(b)     New product initiatives were not effective at increasing user engagement or MAU growth.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                                - 13

**First Quarter 2015 Form 10-Q: May 11, 2015**

44.     On May 11, 2015, Twitter filed its Form 10-Q for the first quarter of 2015, which incorporated the financial statements previously reported.  In the 10-Q, Twitter stated the following regarding user metrics:

NOTE REGARDING KEY METRICS

We review a number of metrics, including monthly active users, or MAUs, changes in ad engagements and changes in cost per ad engagement, to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions.

45.     Defendants' May 11, 2015 statements were materially false and misleading. Defendants concealed adverse facts they knew or deliberately disregarded, including that DAUs had become the primary user engagement metric tracked internally by Twitter management, and the trend in user engagement growth (*i.e.*, DAU growth) was flat or declining.  SEC MD&A disclosure rules required the disclosure of key internal metrics used by management.[7]

46.     On June 11, 2015, Twitter announced the resignation of CEO Costolo.  Media attributed his departure to the Company's struggles with growth in MAUs and user engagement.

47.     On July 28, 2015, Twitter's stock closed at $36.54 per share.

48.     Then after the market closed on July 28, 2015, Twitter issued a press release announcing its second quarter 2015 financial results.  The Company reported non-GAAP income of $49 million, or $0.07 non-GAAP EPS, and revenue of $502 million for the second quarter ended June 30, 2015.  Additionally, the Company provided its outlook for the third quarter of 2015, projecting third quarter revenue of $545 million to $560 million.  Twitter also provided its outlook for the 2015 full year, projecting revenue in the range of $2.20 billion to $2.27 billion.  Furthermore, the Company reported that Twitter's MAUs had increased by only 2 million users over the prior quarter, representing growth of less than 1%.  After releasing its second quarter 2015 financial results, on July 28, 2015, Twitter held a conference call for analysts, media representatives and investors during which it represented the following:

---

[7]     *See, e.g.,* SEC Release 33-8350.

[Jack Dorsey, Twitter's Interim CEO:]  ***Product initiatives we've mentioned in previous earnings calls***, like instant timelines and logged-out experiences, ***have not yet had meaningful impact*** on growing our audience or participation.  ***This is unacceptable, and we're not happy about it***.

\*        \*        \*

[Noto:] To be clear, however, ***we do not expect to see sustained meaningful growth in MAUs until we start to reach the mass market. We expect that will take a considerable period of time***. . . .

. . . I wanted to provide an update and some key data points as it relates to the long-term opportunities we discussed at our Analysts Day.  First, the ratio of DAU to MAU for our top 20 markets in Q2 2015 was ***approximately 44% versus the 48% we shared with you at our Analysts Day***, which is for the first three quarters of 2014.

\*        \*        \*

[I]n the near term, ***our organic growth is going to be very low***, as it was this quarter and as I think about Q3, it's marginally better.  But ***I wouldn't want you to – or anyone else to expect a change in our growth rate relative to what you are seeing in this quarter***.  I think you'll see that for a while and that was my point.

49.     As a result of this news, the price of Twitter stock plummeted $5.30 per share to close at $31.24 per share on July 29, 2015, a one-day decline of nearly 15% on volume of more than 92 million shares.

50.     As a result of defendants' false statements, Twitter common stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending the price of the Company's stock down 40% from its Class Period high and causing economic harm and damages to Class members.

## LOSS CAUSATION/ECONOMIC LOSS

51.     During the Class Period, defendants made false and misleading statements by misrepresenting Twitter's user engagement metrics and engaged in a scheme to deceive the market.  Defendants' conduct artificially inflated the price of Twitter common stock and operated as a fraud or deceit on members of the Class.  Later, when defendants' prior misrepresentations were disclosed to market participants, the price of Twitter common stock plummeted, as the prior artificial inflation came out of the price.  As a result of their purchases of Twitter stock during the Class Period,

plaintiff and members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE
## AND FRAUD ON THE MARKET

52.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Plaintiff and other members of the Class purchased Twitter common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

53.    At all relevant times, the market for Twitter common stock was efficient for the following reasons, among others:

(a)    Twitter stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b)    As a regulated issuer, Twitter filed periodic public reports with the SEC; and

(c)    Twitter regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## NO SAFE HARBOR

54.    Many (if not all) of defendants' false and misleading statements during the Class Period were not forward-looking statements ("FLS") and/or were not identified as such by defendants, and thus did not fall within any "Safe Harbor."

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                          - 16 -

55.    Twitter's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

56.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Twitter who knew that the FLS was false. Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

### CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Twitter common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

58.    The members of the Class are so numerous that joinder of all members is impracticable.  The Company's stock is actively traded on the NYSE and there are more than 700 million shares of Twitter common stock outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Twitter or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

59.    Common questions of law and fact predominate and include: (i) whether defendants violated the 1934 Act; (ii) whether defendants omitted and/or misrepresented material facts; (iii) whether defendants knew or recklessly disregarded that their statements were false; (iv) whether

defendants' statements and/or omissions artificially inflated the price of Twitter common stock; and (v) the extent and appropriate measure of damages.

60.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

61.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

63.     Plaintiff incorporates ¶¶1-62 by reference.

64.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

65.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Twitter common stock during the Class Period.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 18 -

66.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Twitter common stock.  Plaintiff and the Class would not have purchased Twitter common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

67.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Twitter common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934
### Act Against All Defendants

68.    Plaintiff incorporates ¶¶1-67 by reference.

69.    During the Class Period, defendants acted as controlling persons of Twitter within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about Twitter, the Individual Defendants had the power and ability to control the actions of Twitter and its employees.  Twitter controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding plaintiff and the members of the Class damages and interest;

C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

1

**JURY DEMAND**

2

Plaintiff demands a trial by jury.

3

DATED:  September 16, 2016

ROBBINS GELLER RUDMAN
 & DOWD LLP
SHAWN A. WILLIAMS

4

5

6

*s/ Shawn A. Williams*

SHAWN A. WILLIAMS

7

8

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

9

10

ROBBINS GELLER RUDMAN
 & DOWD LLP
DAVID C. WALTON
DANIEL S. DROSMAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

11

12

13

14

15

ABRAHAM, FRUCHTER & TWERSKY, LLP
JEFFREY S. ABRAHAM
One Pennsylvania Plaza, Suite 2805
New York, NY  10119
Telephone:  212/279-5050
212/279-3655 (fax)

16

17

18

Attorneys for Plaintiff

19

I:\Admin\CptDraft\Securities\Cpt Twitter.docx

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

Doris Shenwick, a trustee of the Doris Shenwick Trust (the "Trust") hereby certifies under penalties of perjury that the following is true and correct to the best of my knowledge, information and belief:

1.   I have reviewed the attached Class Action Complaint For Violations of the Federal Securities Laws and have authorized counsel to file the complaint on behalf of the Trust.

2.   The Trust did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this private action.

3.   The Trust is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   To the best of my knowledge, the following are all of the Trust's transactions in the securities of Twitter Inc. during the period from February 6, 2015 and July 28, 2015, inclusive: purchased 75 shares on May 1, 2015 at $38.60 per share.

5.   Neither I nor the Trust have sought to serve as a class representative in any case brought under a provision of the federal securities laws within the last three years.

6.   Neither I nor the Trust will accept any payment for serving as class representative on behalf of the class beyond the Trust's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

Dated: September 26, 2016

_____
**Doris Shenwick, as Trustee for the Doris
Shenwick Trust**