BLEICHMAR FONTI & AULD LLP
LESLEY E. WEAVER (191305)
1999 Harrison Street, Suite 670
Oakland, CA 94612
Telephone:  (415) 445-4003
Facsimile:  (415) 445-4020
Email:        lweaver@bfalaw.com

Liaison Counsel for Lead Plaintiff and the Class

MOTLEY RICE LLC
GREGG S. LEVIN (admitted *pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450
Email:        glevin@motleyrice.com

Lead Counsel for Lead Plaintiff and the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DORIS SHENWICK, as Trustee for the DORIS SHENWICK TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>TWITTER, INC., et al.,<br><br>                              Defendants. | Case No. 3:16-cv-05314-JST<br><br>**(Consolidated)**<br><br><u>CLASS ACTION</u><br><br>LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

1

## TABLE OF CONTENTS

2

**Page**

3  I.      INTRODUCTION ......................................................................................................1

4  II.     JURISDICTION AND VENUE .............................................................................5

   III.    THE PARTIES ..........................................................................................................5

5  IV.     SUMMARY OF DEFENDANTS' FRAUD.........................................................6

6          A.    Twitter's Key Metrics .................................................................................6

7          B.    Before the Class Period, Investors Are Probing About Declining User
                 Engagement, but Defendants Offer Reassurances .................................9

8
9          C.    At Analyst Day, Defendants Say with "Successful Execution," Twitter's
                 User Base Can Double by 2018 ................................................................10

10         D.    At Analyst Day, Twitter Emphasized a New Engagement Metric Called
                 "Daily Active Users" (DAU) ....................................................................11

11
12         E.    Despite Its Emphasis on User Engagement, Twitter Failed to Identify
                 DAU as Its Primary Engagement Metric and Failed to Provide Accurate
                 Updates on User Engagement During the Class Period.........................14

13         F.    Defendants Concealed Adverse Trends in User Engagement ..............17

14         G.    Defendants Also Made False and Misleading Statements About MAU
                 Growth .......................................................................................................18

15
16         H.    At the End of the Class Period, Defendants Finally Reveal Adverse User
                 Engagement and MAU Growth Trends, Sending the Stock Price Down .............19

17 V.      WITNESS ACCOUNTS.........................................................................................21

18         A.    Confidential Witnesses .............................................................................21

           B.    The *Vanity Fair* Article............................................................................28

19 VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
20         ISSUED DURING THE CLASS PERIOD .........................................................29

21         A.    Q4 2014 Earnings (February 5, 2015) ....................................................29

22               1.    Q4 Earnings:  Defendants Failed to Disclose a Reliable User
                       Engagement Metric and Concealed Daily Active Users (DAU) ..............30

23               2.    Q4 Earnings:  Defendants Concealed Adverse Trends in User
                       Engagement.................................................................................................38

24               3.    Q4 Earnings:  Defendants Misrepresented MAU and MAU Growth........44

25         B.    March 2, 2015:  Form 10-K ......................................................................50

26               1.    2014 Form 10-K:  Defendants Concealed Key User Engagement
                       Metrics, Including Daily Active Users (DAU), in Violation of SEC
27                     Disclosures Rules .......................................................................................50

28

**Page**

      2.     Defendants Failed to Disclose an Adverse Change in the MAU Growth Trend in Violation of SEC Disclosures Rules ............................52

C.     April 28, 2015:  Q1 2015 Earnings .........................................................55

      1.     Q1 2015 Earnings:  Defendants Falsely Stated that DAU Was "Similar" to DAU at Analyst Day; in Fact It Had Substantially Declined ........................................................................................56

      2.     Q1 2015 Earnings:  Defendants Failed to Disclose a Reliable User Engagement Metric and Concealed Adverse Trends in User Engagement ........................................................................................58

      3.     Q1 2015:  Defendants Misrepresented MAU and MAU Growth Trends ..............................................................................................63

D.     May 11, 2015:  Form 10-Q ....................................................................65

      1.     Q1 2015 10-Q:  Defendants Concealed Key User Engagement Metrics, Including Daily Active Users (DAU), in Violation of SEC Disclosure Rules ..............................................................................65

      2.     Q1 2015 10-Q:  Defendants Failed to Disclose an Adverse Change in MAU Trends in Violation of SEC Disclosure Rules ..........................66

VII.    DEFENDANTS' CLASS-PERIOD FINANCIAL STATEMENTS VIOLATED SEC DISCLOSURE RULES ....................................................................................67

A.     SEC MD&A Disclosure Rules Required Disclosure of Key Operating Metrics ....................................................................................................67

      1.     SEC Comment Letter ..................................................................67

      2.     The MAU Metric Without Further Context Was Misleading...................68

B.     SEC MD&A Disclosure Rules Required Disclosure of Adverse MAU Trends ....................................................................................................71

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ...............................................72

A.     Defendants Knew of Facts Critical to Twitter's Core Operations .........................72

B.     The Departure of Key Executives Supports an Inference of Scienter ..................73

IX.     LOSS CAUSATION..............................................................................74

X.      APPLICABILITY OF THE PRESUMPTION OF RELIANCE ......................................76

XI.     THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS...............................................................77

XII.    CONTROL PERSONS .......................................................................79

XIII.   CLASS ACTION ALLEGATIONS .........................................................80

1.     Lead Plaintiff, KBC Asset Management NV ("KBC" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys. Lead Plaintiff's investigation included, among other things, a review and analysis of United States Securities and Exchange Commission ("SEC") filings by Twitter, Inc. ("Twitter" or the "Company"), transcripts of Twitter's public conference calls, press releases issued by the Company, media reports about the Company, and interviews with former employees of the Company conducted by attorneys and/or investigators retained by attorneys.  Lead Plaintiff's investigation of the facts underlying this action continues, and Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     INTRODUCTION

2.     This is a securities class action on behalf of all persons who purchased or otherwise acquired Twitter common stock between February 6, 2015 and July 28, 2015, inclusive (the "Class Period"), against Twitter and certain of its officers and/or directors for violations of §§ 10 and 20(a) of the Securities Exchange Act of 1934 ("1934 Act").[1]  These claims are asserted against Twitter and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases and filings with the SEC and in oral statements to the media, securities analysts and investors.

3.     Immediately prior to the Class Period, Defendants faced a dilemma regarding the disclosure of Twitter's two most closely tracked metrics:  Monthly Active Users ("MAU," a measure of the total number of users on the Twitter platform) and Timeline Views (a measure of "user engagement," i.e., how frequently MAUs interacted with the Twitter platform).  Both metrics, and in particular the growth of the metrics, were closely tracked by analysts and investors.  Both metrics had been featured prominently in the Company's Initial Public Offering ("IPO") just a year earlier

---

[1]     Excluded from the Class are Defendants; members of the immediate families of the Individual Defendants; Twitter's subsidiaries and affiliates; any person who is or was an officer or director of Twitter during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

and in each quarterly earnings call since.  In the months leading up to the Class Period, however, both metrics were weakening, causing investors to worry that the unthinkable had happened:  Twitter had stopped growing.  To buoy investor confidence, in November 2014 Defendants held an all-day pep rally with analysts ("Analyst Day") to promote their vision to reinvigorate Twitter's user growth. The strategy worked.  By providing unrealistic growth projections at Analyst Day, calling for MAUs to double to over 550 million users and for revenue to grow by $4.6 billion by 2018, Defendants were able to calm investors' skepticism and keep the Company's stock price propped up heading into the Class Period.  Despite his boast at the May 2014 Annual Shareholder's meeting that "*at the board level you haven't seen a single share sold, as of or since the IPO*," immediately after Analyst Day, Defendant Richard Costolo ("Costolo") and other insiders unloaded over $100 million of their stock over the next 60 days.

4.      Having set an extraordinarily high MAU target, Defendants had little choice but to embark on a "shell game" to conceal the other key piece of the growth puzzle, "user engagement," from investors.  Defendants' motive for the cover-up was clear: as numerous confidential witnesses have confirmed, user engagement was a key driver of MAU growth.  As a result, stagnant user engagement growth would portend the same fate for MAU growth.  Thus, had Defendants provided investors with complete and accurate information regarding user engagement, investors would have learned that Twitter's MAU growth – and with it, the Company's ability to increase revenue – had also stalled.

5.      Defendants' shell game was an effort to conceal the true state of the key metrics. Defendants' efforts started when they abruptly stopped reporting Twitter's primary user engagement metric, Timeline Views, at Analyst Day in November 2014.  At the start of the Class Period, in February 2015, Defendants continued their deception, dodging question after question from analysts as to how investors should track user engagement in the absence of the recently pulled Timeline Views metric.  As the Company itself had described user engagement as a "critical success factor," "major growth driver," and "key operating metric," investors naturally wanted to know whether Twitter's users were, in fact, engaged.  By early April 2015, the SEC had also picked up on the absence of user engagement data from Twitter's periodic filings.  In a letter to the Company, the

1   SEC warned Twitter of its obligation to disclose "**metric(s) . . . to explain trends in user**

2   **engagement**."[2]   Rather than heed the SEC's admonition, the shell game continued:  Defendants

3   misleadingly pointed the SEC to other operating metrics that had almost nothing to do with user

4   engagement.  Then, later in April 2015, as part of the Company's Q1 earnings release, Defendants

5   again dodged analysts' direct questioning and concealed Twitter's primary user engagement metric.

6   In reality, however, given the critical importance of user engagement, witnesses and Defendants

7   themselves have since acknowledged that Twitter **did** have a primary, undisclosed, user engagement

8   metric during the Class Period: Daily Active Users ("DAU").

9           6.       Defendants' deception did not end with simply hiding the Company's primary user

10   engagement metric, DAU, from investors; they also hid adverse trends in user engagement.  As

11   noted in a July 29, 2015 article in *The Wall Street Journal* commenting on the prior two quarters:

12   "Twitter has not introduced a measure of engagement to replace timeline views.  Instead, it has

13   largely offered general statements that "**user engagement was rising**."   For example, on the

14   February 2015 Q4 earnings call, Defendants led analysts to conclude that "**engagement is**

15   **improving**," JMP Securities (Feb. 6, 2015), and that the "**engagement rate growth accelerated**,"

16   FBN Securities (Feb. 7, 2015).  Similarly, on the April 2015 Q1 earnings call, Defendants told

17   investors that user engagement was stable and the Company was seeing increased levels of user

18   engagement from certain product improvements.  In May 2015, Defendants even misled the SEC,

19   suggesting that the trend in user engagement was steadily improving by pointing to an inapplicable

20   metric that was in fact rising.  Meanwhile, according to numerous witness accounts as well as a

21   disclosure made by the Company over a year after the Class Period ended, user engagement was

22   either stagnant or declining during the Class Period.

23           7.       By concealing adverse trends in user engagement, Defendants were able to convince

24   investors that MAU was growing.  However, by the start of the Class Period, the stagnant MAU

25   growth trend was becoming harder and harder to hide.  Numerous witness accounts have described

26   ────────────────
     [2]    Yoree Koh, *Twitter Shares Fall Day After Report Revives Questions About User Base*, Wall
27   St. J. (July 29, 2015), https://www.wsj.com/articles/twitter-shares-fall-day-after-report-revives-
     questions-about-user-base-1438213551 [hereinafter "Koh, *Twitter Shares Fall*"].  All emphases
28   added unless otherwise indicated.

1  widespread acknowledgment within the Company that by late 2014 MAU growth was flat.  By early

2  2015, Defendants stopped reporting MAU growth trends at internal weekly meetings known as "Tea

3  Time."  According to *Vanity Fair*:  "The gap between reality [i.e., actual MAU growth] and hope

4  [i.e., MAU growth projections] grew so extreme that this section of Tea Time was quietly phased

5  out."[3]  But because Defendants had promised investors that MAUs would "doubl[e] by 2018,"

6  Defendants attempted to prop up the publicly reported MAU growth trend with what witnesses have

7  described as "low-quality growth."  This included using automated messages to contact previous

8  users who had become inactive and prompting them to login to the platform, even if just to change

9  their password, so that Twitter could count them as an "active" user (MAU).  In other words, as

10  described by the *Vanity Fair* Article, "***they kind of faked it***."  The addition of low-quality,

11  unengaged users was the opposite of the high-quality organic growth that Defendants had promised

12  would lead to meaningful long-term gains in Twitter's reported MAU.  Defendants' motive to

13  conceal low-quality MAU growth during the Class Period, similar to its concealment of user

14  engagement, was obvious: both pieces of information would have portended the fallacy of the MAU

15  growth story.

16      8.      Finally, after CEO Costolo's failure to improve user growth led to his departure from

17  the Company in June 2015, the shell game came to an abrupt end – to the detriment of investors.

18  Prompted by Twitter's Chief Communications Officer to "come clean" about its "stagnant [user]

19  growth," Defendants finally did.  Less than six months from the start of the Class Period when the

20  first misrepresentations were made, and only three months after the Q1 2015 misrepresentations,

21  investors were blindsided with the news that Twitter's growth story was a fiction.  In fact, the

22  numerous revelations on the Q2 2015 earnings call matched precisely what Defendants had been

23  concealing during the Class Period:  MAU growth was stagnant and ***no*** growth was expected for a

24  considerable period of time; user engagement was declining; new MAUs were lower quality and less

25  engaged than existing users; and new initiatives were not effective at driving MAU growth or

26

---

27  [3]  Nick Bilton, *Twitter Is Betting Everything on Jack Dorsey.  Will It Work?*, Vanity Fair (June 1,
2016),        http://www.vanityfair.com/news/2016/06/twitter-is-betting-everything-on-jack-dorsey

28  [hereinafter "*Vanity Fair* Article"].

1   engagement growth.  Twitter's stock price was hammered, dropping 15% to $31.24 per share.  This

2   followed a 25% decline in April after Defendants partially revealed Twitter's stagnant growth during

3   Twitter's Q1 2015 earnings call.  In total, Twitter's stock declined by over 40% from its Class Period

4   high.  Twitter's MAU growth, and its stock price, have never recovered.  Twitter has generated

5   MAU growth of less than 1% per quarter since the Class Period, and its stock currently trades at

6   under $17 per share.

7   **II.      JURISDICTION AND VENUE**

8          9.      The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the 1934

9   Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R.

10  § 240.10b 5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

11  § 1331 and § 27 of the 1934 Act.

12         10.     Venue is proper in this District pursuant to § 27 of the 1934 Act and 28 U.S.C.

13  § 1391(b).  Many of the acts charged herein, including the preparation and dissemination of

14  materially false and misleading information, occurred in substantial part in this District.

15         11.     In connection with the acts alleged in this complaint, Defendants, directly or

16  indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

17  the mails, interstate telephone communications and the facilities of the New York Stock Exchange

18  ("NYSE").

19  **III.     THE PARTIES**

20         12.     Lead Plaintiff KBC's funds purchased Twitter common stock during the Class Period

21  and were damaged by the conduct alleged herein.[4]

22         13.     Defendant Twitter operates as a global social media platform.  Twitter maintains its

23  headquarters at 1355 Market Street, Suite 900, San Francisco, California.  During the Class Period,

24  Twitter common stock traded on the NYSE under the ticker symbol "TWTR."

25         14.     During the Class Period and until his resignation on July 1, 2015, Defendant Costolo

26  was Chief Executive Officer ("CEO") and a director of Twitter.  Costolo made or had authority over

27

28  _____
    [4]    KBC's funds' purchases are detailed in Dkt. No. 21-1.

1    the content and dissemination of the false statements and omissions identified in Part VII below at

2    ¶¶ 79-111, and is liable for those false statements and omissions.  Costolo also was a control person

3    of Twitter within the meaning of § 20(a) of the 1934 Act.

4          15.    Defendant Anthony Noto ("Noto") was, at all relevant times, the Chief Financial

5    Officer ("CFO") of Twitter.  Noto made or had authority over the content and dissemination of the

6    false statements and omissions identified in Part VII below at ¶¶ 79-111, and is liable for those false

7    statements and omissions.  Noto also was a control person of Twitter within the meaning of § 20(a)

8    of the 1934 Act.

9          16.    Defendants Costolo and Noto are referred to herein, collectively, as the "Individual

10   Defendants."

11         17.    The Individual Defendants made, or caused to be made, false statements that caused

12   the price of Twitter common stock to be artificially inflated during the Class Period.

13         18.    Defendants Twitter, Costolo, and Noto are referred to herein, collectively, as

14   "Defendants."

15   **IV.   SUMMARY OF DEFENDANTS' FRAUD**

16        **A.    Twitter's Key Metrics**

17         19.    Twitter is a social media company that provides a platform where any user can create

18   a "tweet" and any user can follow other users.

19         20.    Historically, the Company measured its financial health and growth prospects using

20   three categories of metrics: monthly active users or "MAU" (the number of users on the platform in

21   a given month), those users' daily activity (user engagement), and advertising engagements (the

22   ability of the Company to turn user activity into advertising revenue).[5]  Twitter called its user

23   engagement metric "timeline views," which it described as "kind of a proxy for the amount of

24   content our users consume."  4Q 2013 Earnings Call.

25

26   _____

     [5]    Though advertising engagement was a measure of profitability, it did not correlate with user
27   engagement trends.  That is because Twitter could control the amount of advertisements that would
     appear on the platform (called "ad load") and, by increasing ad load, could inflate the advertising
28   engagement number without a corresponding increase in user engagement.

1    21.    Although Twitter's two primary user metrics (MAU and timeline views) were

2   interrelated, they were used to measure distinctly different user characteristics and were both

3   considered key metrics by the Company.  *See* Twitter Inc., Registration Statement (Form S-1)

4   (Oct. 3, 2013) ("S-1 Registration Statement") ("The size of our user base **and** our users' level of

5   engagement are critical to our success.").

6    22.    Information about Twitter's user engagement is essential to understanding its MAU

7   growth prospects.  Twitter, similar to other social media companies, describes its user base as a

8   funnel with new users signing up for the service each month (entering the top of the funnel) and

9   percentage of those existing users quitting the service each month (exiting the bottom of the funnel).

10  User attrition from the Company (or users exiting the bottom of the funnel) is referred to internally

11  as "churn."  The net difference is reflected in MAU growth.  As new users become harder to find and

12  MAU growth slows, user engagement helps increase user retention and reduce churn which has a

13  direct impact on MAU growth.  Stagnant DAU growth will eventually cause MAU growth to stall.

14   23.    Information about user engagement is also essential to understanding the Company's

15  potential to grow revenues.  Twitter's main source of revenue is advertising.  Advertising revenue is

16  driven by the total number of users on the platform and, even more importantly, the level of

17  engagement of such users.  Thus, the more often users are on the platform to view advertisements

18  (the more engaged users are), the higher Twitter's advertising revenues.  Twitter emphasized this

19  fact in the S-1 Registration Statement:

> User growth trends reflected in the number of MAUs [and] ***user engagement trends***
> . . . are ***key factors that affect our revenue***.

User engagement was highlighted during the Company's November 12, 2014 Analyst Day as one of

the Company's four primary "***revenue growth***" "***opportunities***."  In fact, according to the Company,

an increase in Twitter's user engagement correlated with a projected $500 million of revenue

growth.  As *The Wall Street Journal* noted on July 29, 2015:

> The share of Twitter users who take advantage of the service daily is
> important because the more the service is used, the more ads it can serve each day,
> which is the primary way the company generates revenue.  While revenue beat

expectations in the latest quarter, Twitter's difficulty in boosting the bases of regular users could eventually limit its growth potential.[6]

24.     In isolation, neither MAU nor user engagement provides a complete picture of the business.  In Twitter's case, the platform could have millions of users sign up (i.e., high MAU) but if those users logged in to the platform only once a month (i.e., low engagement), the business would suffer because fewer ads can be sold.  Alternatively, the platform could have very active users who logged in multiple times a day (i.e., high engagement) but if the total number of users on the platform was limited (i.e., low MAU), the business would suffer for the same reason.  The interplay between the two metrics also meant that user engagement data became more important if MAU was flat or declining, as Defendants acknowledged:  "To the extent our user growth rate slows, *our success will become increasingly dependent on our ability to increase levels of user engagement*."[7]

25.     Thus, *each* of these metrics provided a vital piece of the puzzle for analysts and investors to evaluate the Company's current financial condition and future prospects, including its MAU growth trends and ability to drive revenue through advertising dollars.  Leading up to the Class Period, Twitter and its executives acknowledged the importance of *both* metrics:

- "Growth in our user base *and* user engagement is a fundamental driver to the growth of our business . . . ."  S-1 Reg. Stmt.

- "The size of our user base *and* our users' level of engagement are critical to our success."  *Id.*

- "*User growth trends reflected in the number of MAUs, user engagement trends* reflected in timeline views and timeline views per MAU and monetization trends reflected in advertising revenue per timeline view *are key factors that affect our revenue*."  *Id.*

- "We had a great first quarter.  Revenue growth accelerated . . . fueled by *two things*: increased engagement *and* user growth."  Q 2014 Earnings Call.

---

[6]     Koh, *Twitter Shares Fall*, *supra* note 2.

[7]     S-1 Reg. Stmt.  After the Class Period, Defendant Noto again acknowledged that "*as your MAU growth slows, engagement becomes a much bigger factor*."   Deutsche Bank Technology Conference (Sept. 16, 2015).

LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - **3:16-cv-05314-JST**                                                                          - 8 -

**B.    Before the Class Period, Investors Are Probing About Declining User Engagement, but Defendants Offer Reassurances**

26.    During the second and third quarters of 2014 (prior to the start of the Class Period), Twitter's public filings revealed a trend of declining timeline views reflecting a decrease in user engagement.  Defendants identified the "predominant driver" of the declines as "changes" to the platform that "allow[ed] users to more efficiently access our content."  2Q 2014 Earnings Call; 3Q 2014 Earnings Call.  Defendants explained that the same product improvements that had resulted in fewer timeline views ultimately would lead to more satisfied users, which in turn would lead to higher user engagement and MAU growth.  As reported by analysts, Defendants reassured investors that they were "pleased with the level of engagement."  RBC Capital Markets (Oct. 3, 2014). Shortly before the beginning of the Class Period, on November 12, 2014, Twitter hosted an "Analyst Day" for investors and analysts and again represented that the decline in timeline views did not represent a decline in user engagement.  In sum, Defendants reassured investors that the negative effect of changes to the platform on user engagement would be temporary and that new product initiatives would drive increased user engagement and accelerate MAU growth.

27.    Prior to the Class Period, Defendants likewise reassured analysts and investors that there was little difference in user engagement among new users (which is strongly correlated to user retention or the "churn rate") compared to that of seasoned users.  For example, Costolo stated during the Q1 2014 earnings call:  "[O]n average *[these] new users are just as engaged*."  Likewise, on the Q3 2014 earnings call, Noto emphasized that new user engagement was "encouraging."

28.    High user engagement among new users was an indication that new MAUs were of the same quality as Twitter's base of seasoned users.  This was important to investors because low quality MAUs were less likely to become DAUs (i.e., engaged users) and thus less likely to contribute to meaningful long-term MAU growth.[8]

---

[8]    Noto admitted during the Class Period that Defendants were very focused on increasing engagement among new users to increase user retention and to reduce churn:  "It's by far our number one opportunity . . . *something we remain very focused on, it's a number we all look at everyday as an operating committee*."  Morgan Stanley Investor Conference (Mar. 3, 2015).

**C.     At Analyst Day, Defendants Say with "Successful Execution,"
Twitter's User Base Can Double by 2018**

29.     During the November 12, 2014 Analyst Day presentation, Twitter's executives, including Costolo and Noto, announced an aggressive growth forecast:  Twitter would double, growing from 284 million MAU to *over 550 million MAU in the* "*intermediate term*."   The Company further announced that in the longer term, Twitter's MAUs would balloon to *over a billion – four times* the then-current number.  At Analyst Day, Twitter presented three different MAU growth projections with the most conservative projection at 15% annual growth and over 500 million MAUs by 2018.  The top projection called for 40% annual growth and over 1.2 billion MAUs by 2018.



30.     According to Noto, the way to achieve this outsized MAU goal was to "***build an engaging experience . . . to have those users be engaged [and] stay engaged***."  In other words, in order to grow MAU, Twitter had to increase user engagement.  And, by "driv[ing] engagement," each of those users could be "monetized," resulting in an incremental increase in revenue of $4.6 billion.

31.     Also at Analyst Day, Defendants unveiled an "operational goal of building the world's **largest daily audience**."  Noto explained that "to aspire for **anything less than daily** . . . **would not** be putting ourselves in a position to **maximize value for you**."  In "service" to the "goal," of "having the largest **daily** audience in the world," Defendants identified three objectives, the first of which was "to strengthen the core," meaning to increase "the number of logged-in users and their **daily** twitter use" by "increasing engagement and improving retention."  Indeed, Defendants identified user engagement as a "**major growth driver**" and a "**critical component of Twitter's strategy**."  A related goal was to "be one of the top revenue-generating internet companies in the world."  The importance of user engagement is depicted in a slide presented by Defendants at Analyst Day:



32.     Buoyed by Defendants' positive statements at Analyst Day, Twitter's stock price gained 6% on November 12, 2014.  Analyst reports issued following Analyst Day highlighted Defendants' MAU projections, noting that the doubling of Twitter's MAUs was a "key driver" of the Company's "aspirational" revenue targets.  "Highlights from Analyst Day," Wedbush Securities (Nov. 13, 2014).  One analyst concluded that "user growth remains the #1 issue for the stock." BMO Capital Markets (Nov. 14, 2014).

**D.     At Analyst Day, Twitter Emphasized a New Engagement Metric Called "Daily Active Users" (DAU)**

33.     At Analyst Day and throughout the Class Period, Defendants repeatedly referred to their "objective" of "strengthen[ing] the core" as the Company's top priority.  Defendants defined this objective as:  "increasing the number of logged-in users and their daily twitter use by **increasing engagement** and improving retention."  Thus, despite discontinuing the reporting of Timeline Views, Defendants still emphasized that user engagement was a key operating metric and vital to the

Company's success.  In fact, Defendants emphasized that user engagement was even more important than MAU growth:

> [Q:]  *Should people still focus on monthly active users*?  Is that what you look at *on the inside, is that the number-one metric you want to drive growth on*?
>
> [A:]  *Our number-one priority is* to strengthen the core and *make Twitter an increasingly daily use case* for the people who come to Twitter . . . .[9]

34.     Industry analysts agreed, stating that "[w]hile new user contributions to MAU growth have been a focus, we think *retaining and engaging existing users is key to Twitter's future growth*," JP Morgan (Nov. 13, 2014), and that "TWTR's ability to drive usage growth [i.e., engagement] . . . *is critical*," Rosenblatt Securities (Nov. 12, 2014).

35.     As one analyst reporting on the Company's Analyst Day presentation noted, the "Company has a stated goal of wanting to become the largest daily user base.  *If daily users are what the mission is, daily or daily/monthly metrics should be key to proving our success*." Barclays (Nov. 13, 2014).  Likewise, Evan Williams, Twitter's co-founder and member of its board of directors, voiced that daily user engagement and user activity on a particular platform provided a more reliable indicator of growth than MAU, which Williams deemed "abstract" and "meaningless."

36.     Against this backdrop and following two quarters of declining user engagement numbers, Defendants abruptly stopped reporting "timeline views" – the very metric that represented users' daily use and engagement – at the beginning of the Class Period.  Internally, Defendants focused on a user engagement metric called "DAU," or Daily Active Users, which measured frequency of use.[10]

---

[9]     Jay Yarow, *Twitter CEO Dick Costolo Tells Us What It Feels Like to Have People Calling for His Head, and How Twitter Is Gaining New Users*, Bus. Insider (Feb. 5, 2015), http://www.businessinsider.com/dick-costolo-interview-on-q4-2014-earnings-2015-2 [hereinafter "Yarow, *What It Feels Like*"].

[10]    "DAU" and "DAU metric," as used herein, refer generally to DAU as a measure of user engagement.  This includes the various formats in which DAU was expressed internally and externally by Twitter.  For example, at Analyst Day, the DAU metric was expressed as a ratio of the number of daily active users compared to the number of monthly active users in Twitter's top twenty markets (referred to as the DAU/MAU ratio).  Before, during and after the Class Period, Twitter presented DAUs in different formats to prevent historical comparisons and to obscure trends in user engagement.  For example, in its S-1 Registration Statement, Twitter referred to the approximate

1      37.      Throughout Analyst Day, Defendants made several statements highlighting the

2   importance of user engagement and the DAU metric to Twitter's growth.  For example, in a slide

3   they presented, Defendants emphasized that the DAU metric was one of the Company's "***major***

4   ***growth drivers***":

5



6

7

8

9

10

11

12

13

14      38.      DAU was further highlighted on Analyst Day as one of the Company's four primary

15   revenue growth opportunities.  Twitter presented the following slides and spent significant time

16   discussing $500 million of projected revenue growth tied to increasing DAU.  Defendants noted that

17   the figures were based on "what we believe we can achieve if we're able to execute successfully."

18

19

20

21

22

23   number of aggregate DAUs: "We have . . . more than 100 million daily active users."  At Analyst
     Day, DAUs were expressed as a three-quarter average of the DAU/MAU ratio among the top twenty
24   markets ("year-to-date, 2014 DAU to MAU ratio for our top 20 markets").  After the Class Period,
     Twitter stopped reporting the DAU/MAU ratio and only reported DAU growth as a percentage –
25   without providing the number of DAUs ("DAU grew 7% year-over-year" . . . "we're not going to
     give you specific DAU numbers.  We are giving you the percent growth.").  Q3 2016 Shareholder
26   Letter and Earnings Call (Oct. 27, 2016).  Regardless of the format it was expressed in, DAU was
     always a measure of user engagement.  As described in ¶ 124, DAU was a common user engagement
27   metric disclosed by social media companies.

28

39.    Not surprisingly, nearly every analyst reporting on Analyst Day highlighted Defendants' DAU growth projections.  For example:

- "DAU as a % of MAU is currently 48%, but management thinks this can increase to 51% as users become more engaged with the platform, particularly in the top 20 markets.  This would yield an additional $500M in revenue."  Sterne Agee (Nov. 13, 2014).

- "TWTR set some ambitious goals as it aims to have the largest DAU in [the] world with over $14 billion of annual revenue . . . ."  Janney Capital Markets (Nov. 13, 2014).

**E.    Despite Its Emphasis on User Engagement, Twitter Failed to Identify DAU as Its Primary Engagement Metric and Failed to Provide Accurate Updates on User Engagement During the Class Period**

40.    After discarding the Timeline Views measure of engagement and placing heavy emphasis on DAU at Analyst Day, starting at the beginning of the Class Period, the Company failed to tell investors that DAU was its primary user engagement metric.  Further, Twitter did not provide meaningful updates on user engagement trends, in particular DAU, throughout the Class Period.

41.    On February 5, 2015, at the start of the Class Period, Twitter released its financial results for the fourth quarter of 2014 and held a conference call with investors and analysts to discuss those results.  The Company failed to provide a meaningful update on user engagement – a surprise to investors, since Defendants repeatedly stressed the importance of user engagement in assessing the Company's financial health and growth prospects.

42.     Analysts sought more information on user engagement.  "If timeline views are out then analysts naturally want a replacement."[11]  RBC Capital Markets analyst Mark Mahaney stated: "Less disclosure is always a bad thing especially for something that's important like engagement . . . . I am totally open to the argument that [Timeline Views is] not a useful metric.  The question is: What's that new metric?"  On the February 5, 2015 earnings conference call, when asked:  "[W]hat [metric] should we be able to look at in order *to track what's happening to engagement [and] whether it's improving or declining?*", Defendant Noto misled analysts, stating that "there are a number of different ways that we measure engagement" and the Company had "*no one metric to share*."

43.     During that same conference call, Defendant Costolo highlighted new product initiatives that would improve user engagement by "mak[ing] Twitter better for existing users."

44.     Twitter's 2014 Form 10-K, filed March 2, 2015, also omitted material user engagement information despite the fact that in the same public filing Twitter admitted:  "[O]ur future revenue growth will depend on . . . our ability to . . . increase user engagement."  By early April, unknown to investors during the Class Period, the SEC had noticed the glaring omission in Twitter's Form 10-K and in a letter reminded Twitter of its obligation to disclose "metric(s) . . . to explain trends in user engagement."  In that correspondence, the SEC cited its disclosure rules that required Twitter to "identify and discuss key performance indicators . . . that . . . management uses to manage the business and that would be material to investors."

45.     Despite being advised by the SEC that Twitter was obligated to "*explain trends in user engagement*," Twitter's failure to do so continued throughout the Class Period.  During the April 28, 2015 earnings call, Defendant Noto continued to tell investors that the Company could not provide "visibility" on user engagement:  "We continue to look for metrics that could be helpful to you and *we will try to give you color from time to time* across these different metrics . . . ."

---

[11]   Yoree Koh, *RIP Twitter's 'Timeline Views' – What Metric Will Replace It?*, Wall St. J. (Apr. 27, 2015), http://blogs.wsj.com/digits/2015/04/27/rip-twitters-timeline-views-what-metric-will-replace-it/.

46.     Defendants' representations that there was no relevant, reliable user engagement metric to disclose to investors were false and misleading.  Former Company insiders have confirmed that during the Class Period, Twitter management relied on DAU and closely tracked the metric to assess user engagement.  In fact, as discussed below (¶ 85(a)) employees at Twitter tracked DAU on a daily basis and discussed DAU growth at weekly Product Leadership meetings.  Moreover, after the Class Period, while noting that Twitter had "a number of factors that we look at as it relates to engagement," Noto acknowledged that the "***most important***" one "that we ***continue to focus*** on" is DAU.  *See* ¶ 85(b).

47.     Noto's post-Class Period admission was confirmed by former Twitter employees (CW-1, CW-2, CW-5, and CW-6[12]) who reported that DAU was the primary engagement metric Twitter tracked internally during the Class Period and, together with MAU, was monitored closely by the Company's management.   According to CW-1, DAUs were a "much better proxy for engagement" than Timeline Views, and it was a "mistake" for the Company not to disclose that number to investors.

48.     User engagement metrics, in particular DAU, were also critical in estimating the Company's potential to grow revenues.  "The share of Twitter users who take advantage of the service daily is important because the more the service is used, the more ads it can serve each day, which is the primary way the company generates revenue."[13]  As the Company stated: "User growth trends reflected in the number of MAUs [and] user engagement trends . . . are key factors that affect our revenue."  S-1 Reg. Stmt.

49.     Analysts expressed frustration with Twitter's failure to provide any meaningful information about user engagement during the Class Period:

- "Usage is the Key Underlying Growth Driver, But Lacking Real Metrics. . . . ***MAUs don't tell the whole story*** . . . . Given that, ***we would also like to see Twitter report DAUs (Daily Active Users) on a regular basis*** at some point, since that seems to be the closest indication of usage frequency that could be externally reported in the near term."  Rosenblatt Securities (June 17, 2015).

---

[12]   These and other CWs are described in greater detail below at ¶¶ 67-77.

[13]   Koh, *Twitter Shares Fall*, *supra* note 2.

- "The core symptom of Twitter's problem is the need to drive user growth (MAUs) **and even more importantly to drive usage** (frequency, **engagement**, etc.) . . . ." *Id.*

- "While we agree with the importance of 'user' growth, **we continue to be relatively more focused on 'usage' growth**." Rosenblatt Securities (June 10, 2015).

50.     Nevertheless, Defendants elected not to disclose any meaningful information on user engagement – admittedly one of the Company's most important metrics – for the duration of the Class Period.

**F.     Defendants Concealed Adverse Trends in User Engagement**

51.     Defendants' deliberate decision not to report meaningful user engagement metrics during the Class Period coincided with increasingly adverse trends in user engagement. Rather than disclose these adverse trends, Defendants did just the opposite. As explained by *The Wall Street Journal* on July 29, 2015, "Twitter ha[d] not introduced a measure of engagement to replace timeline views. Instead, it . . . largely offered general statements that **user engagement was rising**."[14]

52.     When asked during the February 5, 2015 earnings call if user engagement was "improving or declining," instead of answering directly, Noto suggested that user engagement was trending higher. *See* ¶ 86. Following Twitter's Q1 2014 earnings report, analysts were led to believe user engagement had improved since Analyst Day. For example, a February 5, 2015 Canaccord Genuity report noted, "Twitter reported solid Q4 results . . . **engagement improved**." A February 6, 2015 Janney Capital Markets report stated: "[S]lower MAU growth is more than offset by **improvements in engagement** and pricing. . . . We maintain our Buy rating and increase estimates." A February 7, 2015 FBN Securities report stated: "MAU Growth about to Pick Up as **Engagement Improves** – Raising PT to $65 . . . **engagement rate growth accelerated**."

53.     During the Q1 2015 earnings call on April 28, 2015, Noto falsely represented that "DAU to MAU ratios in the quarter were similar to what they were" at Analyst Day. In fact, as revealed at the end of the Class Period and afterwards, DAU had declined significantly as of this date. *See* ¶ 102.

---

[14]   *Id.*

54.     Costolo also gave positive reassurances during the April 28, 2015 earnings call that new product initiatives designed to increase growth and user engagement "were *quite positive in terms of engagement*."  Costolo further represented that the Company was "seeing . . . *exciting results*" from those initiatives, which were "*helping*" *to* "*drive[] continuous improvements in engagement*."

55.     In truth, during the Class Period, Twitter was experiencing adverse trends in user engagement, as confirmed by CW-1, CW-2, CW-5, CW-7, and CW-11.  In fact, according to CW-5, Twitter's management was scrambling to come up with alternative user engagement metrics that would impress investors and "turn Wall Street's view" away from DAU and MAU, which were both flat or declining.  By early 2015, it was "inescapable" that there was a "lack of engagement" by users with the platform, according to CW-11, who described the "picture" of engagement as "bleak."  As *Forbes* later observed, "engagement on the site has been declining since last fall."[15]

### G.     Defendants Also Made False and Misleading Statements About MAU Growth

56.     User engagement is a key driver of MAU growth, because, as explained by CW-1, stagnant DAU growth will eventually cause MAU to stall.  Likewise, as noted by a Rosenblatt Securities analyst on April 29, 2015: "Usage is [Twitter's] Key Underlying Growth Driver."  Thus, as user engagement trends became increasingly negative during the Class Period, Twitter's MAU growth also stalled, as confirmed by CW-5 and CW-6.  Yet, Defendants continued to report inflated MAU numbers, falsely reassuring investors that MAU growth trends were on track.

57.     For example, according to CW-1, Twitter inflated its MAU numbers by including low-quality users who were unlikely to become meaningfully active on the platform.  CW-8 confirmed that, internally, Twitter differentiated between organic growth and "paid growth" (additional users gained through efforts by Twitter's marketing team).  According to other witness accounts, in some instances, the MAU numbers were "faked."  Defendants also concealed that these new, low-quality users were less engaged than more seasoned users and were more susceptible to

---

[15]    Kathleen Chaykowski, *Twitter Stock Rises, Then Drops, After Second-Quarter Results Beat Analysts' Estimates*, Forbes (July 28, 2015), https://www.forbes.com/sites/kathleenchaykowski/2015/07/28/twitter-stock-rises-after-second-quarter-sales-beat-analysts-estimates/#2d9d09963b86.

1    "churn" – i.e., more likely to drop out of the bottom of the funnel.  CW-1 explained that the

2    Company could increase its MAU in a given month by prompting users whose accounts had become

3    inactive to log in; these users were far less likely to stay on the platform (thereby adding to Twitter's

4    total users in the long term) than users who signed on to Twitter unprompted.  Referred to as

5    "zombie users" by CW-3, users who merely responded to a log-in prompt were nevertheless

6    included in MAU.  Likewise, CW-8 explained that "paid growth" MAUs that signed up as a result of

7    Twitter's marketing campaigns were not as engaged as organic growth MAUs and were more likely

8    to drop off the platform.

9          58.    Had Twitter disclosed user engagement data, it would have been apparent that MAU

10   included low-quality growth.  But because Twitter concealed adverse trends in user engagement,

11   investors could not gauge the quality of MAU growth and were misled as to MAU growth trends.

12         59.    Twitter's disclosure of inflated MAU numbers also misled the market as to the

13   Company's potential to earn advertising revenues.  As the number of users on the platform on a daily

14   basis increases, the more ads Twitter could publish per day (called "ad load").  According to CW-7,

15   Twitter increased the number of ads shown to each user to compensate for the lack of user (MAU)

16   and user engagement (DAU) growth.  Without truly expanding its user base though, Twitter would

17   reach a plateau in its revenue growth potential.  As explained by an RBC Capital Markets analyst on

18   October 13, 2015:  "By themselves, monetization improvements (including rising ad loads) can't

19   sustain premium [revenue] growth rates.  That's why MAU growth matters.  That's why User and

20   Usage metrics matter.  And that's why hitting Metrics Growth Walls REALLY MATTERS."

21   **H.    At the End of the Class Period, Defendants Finally Reveal Adverse**
     **User Engagement and MAU Growth Trends, Sending the Stock Price**
22   **Down**

23         60.    The truth about Twitter's stagnant user engagement and inability to grow MAU was

24   finally revealed to the market on July 28, 2015, when, after the market closed, Twitter hosted a call

25   with analysts and investors to discuss the Company's second-quarter results.  As witnesses later

26   recounted, shortly before this call, Defendants acknowledged the need to "***come clean***" about the

27   Company's "stagnant growth numbers."  During the call, Noto and the Company's new CEO, Jack

28

LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - **3:16-cv-05314-JST**                                                    - 19 -

1  Dorsey ("Dorsey"), did just that.  Noto shocked investors by stating:  "*[W]e do not expect to see*

2  *sustained meaningful growth in MAUs . . . [for] a considerable period of time*."  Defendants also

3  warned that "our growth rate in users is slowing quite dramatically" and that investors should not

4  "expect a change in our growth rate . . . for a while."

5        61.  The numerous revelations on the Q2 2015 earnings call matched precisely what

6  Defendants had been concealing during the Class Period:  MAU growth was stagnant and *no* growth

7  was expected for a considerable period of time; user engagement was declining; new MAUs were

8  lower quality and less engaged than existing users; and new initiatives were not effective at driving

9  MAU growth or engagement growth.  For example, Noto reported that, contrary to Defendants'

10  Class Period statements, user engagement had significantly declined since Analyst Day, with the

11  DAU to MAU ratio falling from 48% to 44%.  Defendants also reported that "we did not see organic

12  growth" in the second quarter, and was unable to "reach[]" the "mass market."

13        62.  During the call, Noto acknowledged that new product initiatives "*ha[d] not yet had a*

14  *meaningful impact on growing our audience [i.e., MAU] or participation [i.e., user engagement]*."

15  The lack of MAU growth was a direct result of the Company's failure to drive user engagement:

16  "[I]t's a combination of *those that have tried and haven't stayed with the service* and those that

17  have never used it."

18        63.  One analyst summarized the news from Twitter on July 28, 2015, as follows:  "*User*

19  *growth is vanishing and engagement is declining*."  RBC Capital Markets (July 28, 2015).

20  Investors responded to this news by selling off their shares, and by July 29, 2015, Twitter's stock

21  price dropped 15% from the previous day's closing price, on heavy trading volume.

22        64.  As reported by *The Wall Street Journal* on July 29, 2015, *shares closed 15% lower*

23  *after a metric showed regular users were signing in less often*:

24             Investors in Twitter Inc. drove down the company's share price nearly 15%
         on Wednesday after a disappointing earnings report a day earlier.

25

26             Persistent questions regarding the size of Twitter's user base came back into
         full view after the company *reported its worst three-month growth rate to date* . . . .

27

28

But a less frequently disclosed metric added to Twitter's woes: Regular users are signing in less often.[16]

65.    As a result of Defendants' false and misleading statements and omissions, Twitter common stock traded at artificially inflated prices during the Class Period. Following the above revelations, the Company's share price declined precipitously.

## V.    WITNESS ACCOUNTS

### A.    Confidential Witnesses

66.    Several former Twitter employees have provided information demonstrating that Defendants' Class Period statements were false and misleading and that Defendants knew or recklessly disregarded the falsity or misleading nature of their statements. The confidential witnesses ("CWs") include individuals formerly employed at Twitter during the Class Period, whose accounts corroborate one another and facts now admitted by Twitter. The witnesses provided information on a confidential basis and are particularly described by job description and responsibility, and duration of employment, thereby providing sufficient detail to establish their reliability and personal knowledge. As set forth below, the information provided by the CWs supports a strong inference that Defendants acted with scienter.

67.    Confidential Witness No. 1 ("CW-1") was employed by Twitter from 2011 through late 2015 in its San Francisco headquarters as a senior manager of the Growth and Engineering teams. During CW-1's four years at Twitter, CW-1 spearheaded several user growth initiatives and was involved with projects that were designed to drive MAU growth. According to CW-1, there was a distinct difference in engagement and churn among prior inactive users who Twitter prompted to return to the site as opposed to new users who signed up "on their own." Returning prior inactive users were far more likely to drop back off (churn) within a short period of time because they already had done so in the past. CW-1 noted that the MAU growth achieved during 2014 mostly involved "bringing back low-quality MAU" and that low-quality MAUs were less likely to become DAUs. When Noto provided investors MAU growth projections of 550 million users at the November 2014 Analyst Day conference, CW-1 said that he was unaware of the basis for these

[16]    Koh, *Twitter Shares Fall*, *supra* note 2.

1  projections and would not have provided a number as high as 550 million users because MAU

2  growth over the prior six to 12 months would not be repeatable.  This was because at least some of

3  that MAU growth was driven by actions Twitter took to re-engage old users – or low-quality growth.

4  CW-1 said that DAUs were a "much better proxy for engagement" than the Timeline Views metric,

5  which Twitter stopped reporting in November 2014, and that it was a "mistake to not disclose DAU"

6  after Twitter stopped reporting Timeline Views.  CW-1 reported that DAU was the primary

7  engagement metric that Twitter tracked internally after Timeline Views were no longer being

8  reported.  During 2014 and early 2015, CW-1's team "talked about DAUs constantly," including

9  ways to drive DAU growth.  According to CW-1, the Company was concerned over the lack of DAU

10  growth and was "pushing pretty hard" to increase DAUs.  Along with the engineering leads, CW-1

11  attended the Product Leadership meeting every Tuesday.  This meeting typically lasted one to two

12  hours, and the attendees discussed DAU growth.  CW-1 explained that user engagement was directly

13  related to MAU growth:  "[U]ser engagement is a key driver of MAU growth."  CW-1 observed that

14  the DAU trajectory was generally flat during early 2015; without DAU growth, Twitter could not

15  achieve meaningful MAU.  According to CW-1, stagnant DAU growth would eventually cause

16  MAU growth to stall, and that is generally what occurred at Twitter during the first half of 2015.

17  According to CW-1, this lack of growth led to Costolo's ouster.  While Twitter told the public that

18  Costolo was voluntarily leaving Twitter to move on to new things, it was "internally thought" that

19  Costolo was asked to leave because "growth was not happening" as planned.

20         68.  Confidential Witness No. 2 ("CW-2") was employed by Twitter from the summer of

21  2014 through the summer of 2015 as an engineer in the advertising "ecosystem" and part of the

22  business development department.  CW-2 was responsible for managing partnership integration of

23  third-party data into the Twitter dashboard.  CW-2 was knowledgeable about MAUs because of how

24  important this metric was to Twitter.  CW-2 said that the growth of MAU was "paramount to

25  Twitter's success."  CW-2 explained that everyone at the Company with whom he spoke understood

26  the growth was flat during CW-2's year-long tenure at Twitter.  CW-2 regularly attended Tea Time

27  meetings while he worked at Twitter.  During the Tea Time meetings, Twitter's senior management

28  presented MAU and MAU projections.  In late January or early February 2015, Twitter's senior

1  management abruptly stopped presenting MAU and MAU projections at these meetings.  CW-2 said

2  that DAUs were calculated daily to monitor user engagement and that this metric was talked about

3  on a daily basis by Twitter employees.   DAUs were tracked internally throughout CW-2's

4  employment.  CW-2 explained that there was concern in CW-2's department over the trajectory of

5  DAUs during late 2014 and early 2015.  According to CW-2, user engagement was important

6  because the "lack of eyes" on the Twitter platform meant a "lack of ad dollars."  CW-2 said that the

7  people with whom he spoke at Twitter understood that Costolo was pushed out of the Company due

8  to a lack of user growth.

9         69.     Confidential Witness No. 3 ("CW-3") was senior manager of marketing at Twitter

10  from 2013 to early 2015.  CW-3 was aware of the MAU numbers and kept track of this metric

11  through Company earnings reports.  According to CW-3, MAU was "not a good metric" in isolation

12  because the MAU metric could be easily manipulated to make the growth or user base appear

13  inflated.  For example, CW-3 believed that "zombie users" and robot users contributed to Twitter's

14  overall MAU metric.  "Zombie users" are users who signed onto Twitter once a month because they

15  were prompted to sign in through an email or other services that require a Twitter login.  These

16  "zombie users" were not actively engaged in Twitter.  Likewise, fraudulent users who utilized robot

17  accounts were also an issue at Twitter.  These robot accounts could easily have been created or

18  bought, and CW-3 noted that some companies in the tech industry bought robot accounts in order to

19  inflate their MAU numbers.

20         70.     Confidential Witness No. 4 ("CW-4") was employed by Twitter as a staff technical

21  program manager from spring 2014 to fall 2014 and built source code management tools for

22  engineers.  CW-4 was aware of the MAU and DAU metrics because they were very important to

23  Twitter.   CW-4 attended bi-weekly companywide meetings known as "Tea Time."   At these

24  meetings, company executives discussed MAU and DAU metrics and metric trends to the entire

25  Company.  At Tea Time meetings CW-4 attended, Twitter executives reported that MAU and DAU

26  trends were flattening out.  According to CW-4, MAU and DAU metrics are fairly correlated.

27         71.     Confidential Witness No. 5 ("CW-5") was employed by Twitter from 2013 to the end

28  of 2015.  Initially, he worked as a data center engineer and then was promoted in early 2015 to a

1    senior position overseeing data center engineering.  CW-5 was responsible for the improvement of

2    Twitter's data center engineering, including the increase in data center capacity in order to

3    accommodate Twitter's user growth.  As part of CW-5's responsibilities, CW-5 was privy to metrics

4    that indicated how much the user base was growing in order to see how much capacity needed to be

5    added to the data center.  CW-5 noted that, although the Company looked at numerous metrics, the

6    most important metrics to Twitter were MAU and DAU, which were monitored closely by Twitter's

7    management.  CW-5 did not know why the projected user growth was always so high, since the

8    results were always disappointing.  CW-5 attended "capacity meetings" every two weeks during

9    CW-5's employment at Twitter.  These capacity meetings were attended by engineering leadership,

10   including the Vice President of Engineering and other senior engineering employees.  During these

11   meetings, metrics such as MAU and DAU were heavily discussed and analyzed.  CW-5 "absolutely"

12   saw metrics that showed user base was flat or declining leading up to and continuing through the

13   Class Period.  CW-5 recalled "big discussion" during these meetings regarding why the engineering

14   team was continuing to build server capacity to accommodate additional users when there was no

15   real user growth.  CW-5 also observed that DAU trends were declining during the Class Period.  As

16   a result, Twitter management was scrambling to come up with other metrics that would impress

17   investors and "turn Wall Street's view" away from the flat or decreasing DAU and MAU.

18       72.     Confidential Witness No. 6 ("CW-6") was employed as a contract employee for

19   Twitter from the end of 2014 until the fall of 2015.  In that role, CW-6 worked as a language lead in

20   the Trust and Safety Department.  CW-6 – who has a background in quantitative data research – was

21   tasked with identifying patterns of abuse in different regions where Twitter was active.  CW-6

22   managed complaints from users regarding issues like harassment, impersonations, copyright

23   infringement and privacy rights.  CW-6 also monitored MAU and DAU on a regional scale, as part

24   of CW-6's duties was to compare MAU and DAU trends in different regions around the world.

25   CW-6 also authored reports regarding DAU on a weekly and monthly basis.  CW-6 said that the

26   Company "absolutely" should have disclosed to the public earlier that MAU growth was flat and

27   said that, internally, Twitter management knew that the MAU growth was weak and could not match

28   its predictions.  During the Class Period, CW-6 had numerous private conversations with several

LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - **3:16-cv-05314-JST**                                          - 24 -

1    "department heads" who were well respected within the Company regarding concerns over MAU

2    growth, and these managers similarly did not believe that user growth was sustainable.  In addition,

3    CW-6 said that the fake accounts contributed greatly to the number of "new" users and active users.

4    These numbers were misleading because they reflected users who were not authentic users, and it

5    falsely inflated Twitter's overall metrics.  According to CW-6, the MAU and DAU trends that were

6    reported by Twitter during CW-6's employment were "not realistic."  CW-6 observed regions that

7    had an unrealistically high number of Twitter accounts where the internet infrastructure was poor,

8    and was not set up to support that many Twitter users.  CW-6 also observed regions where there

9    were more Twitter accounts than there were potential Twitter users in the area.  CW-6 identified

10   numerous users that used automated programs (or "bot programs") to spam other Twitter users

11   thousands of times.  According to CW-6, Twitter management knew the fake accounts were an

12   ongoing problem and chose to ignore it because it contributed to the Company's overall user metrics.

13   In early spring 2015, CW-6 created a "business case" in Excel that logged how many duplicate

14   accounts Twitter users had, how many automated robot programs there were, and analyzed Twitter

15   users' complaints of fake accounts.  CW-6 also ran internal tests that examined how these fake

16   accounts contributed to Twitter's overall metrics.  When CW-6 reported the issue of the fake

17   accounts and presented the business case to CW-6's manager, he was told to "do your job and be

18   quiet."  According to CW-6, DAU metrics were significant to Twitter and were discussed every

19   week during manager meetings in CW-6's department, where CW-6 and other managers evaluated

20   staffing needs.  Twitter closely monitored its DAU numbers in order to manage its staffing and

21   hiring needs.

22        73.    Confidential Witness No. 7 ("CW-7") was employed by Twitter from early 2014 to

23   early 2015 as product manager in the Company's Advertising Department.  In that role, CW-7 was

24   responsible for developing advertising formats, as well as "promoted trends" and "promoted

25   accounts."  Promoted trends are tweets or relevant information promoted by Twitter's advertising

26   partners, and promoted accounts are suggested accounts for Twitter users to follow.  While at

27   Twitter, CW-7 was aware of the MAU trends, noting that from early 2014 to early 2015, the

28   Company's MAU growth was only around 5% month-to-month and mostly flat.  In addition to

1   MAU, CW-7 observed that by late 2014, DAU growth was also mostly flat.  CW-7 worked on the

2   advertisement side, where there was a direct relationship between the number of ads displayed and

3   DAU.  CW-7 explained that Twitter's advertisement system did not display an ad for every viewer,

4   and instead it used an algorithm to calculate how many advertisements to send to a user.  When a

5   user launched the Twitter app, it made a request to Twitter's back-end server to request a timeline,

6   and each of these timeline requests also sent a request to Twitter's ad server, which filled the

7   timeline with a certain number of ads.  Accordingly, there was a direct correlation between daily

8   usage and the number of advertisements sent to a user.  Twitter used "Ad Load" to determine how

9   many advertisements to send to a user.  Early in CW-7's tenure, the directive at Twitter was that

10   each user should not see more than roughly 2.5 advertisements in a certain time frame.  In late 2014,

11   Twitter's management changed the directive and increased the number of advertisements a user

12   could see in the same time frame.  CW-7 explained that because there was flat user engagement

13   growth and no increase in DAU metrics, the total number of advertisements that Twitter sent also

14   remained stagnant.  Therefore, in order to improve the advertisement metrics and the number of

15   advertisements sent to users, the "Ad Load" had to be increased to compensate for the lack of user

16   (MAU) growth and user engagement (DAU) growth.  According to CW-7, MAU and user

17   engagement trends were flat around late 2014, and the growth team had difficulty getting the metrics

18   to go up.  Various growth projects at the time were also stalled or deprioritized.

19          74.     Confidential Witness No. 8 (CW-8) was employed by Twitter as a manager in its data

20   center from 2011 until early 2015.  In that role, CW-8 participated in some regular operations and

21   capacity planning meetings.  CW-8 was aware of Twitter's growth problems from the various

22   capacity planning meetings CW-8 attended.  According to CW-8, Twitter employees from the

23   systems team would project what server capacity would be needed over the next month or quarter.

24   Server capacity was calculated by adding up expected growth and expected attrition.  Growth was a

25   positive number that represented the number of users that would join Twitter, and attrition was a

26   negative number that represented the expected number of users that would leave Twitter.  CW-8 said

27   that growth included organic growth and "paid growth."  "Paid growth" users were not users that

28   Twitter paid to use its service, but rather additional users gained through efforts by Twitter's

LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - **3:16-cv-05314-JST**        - 26 -

1  marketing team.  CW-8 said that paid growth users that signed up as a result of Twitter's marketing

2  campaigns were not engaged and did not remain Twitter users.  CW-8 said that towards the end of

3  CW-8's tenure in early 2015, growth was "really dying down."

4       75.     Confidential Witness No. 9 ("CW-9") worked at Twitter from 2013 until late 2014 as

5  a senior manager of Twitter's mobile-ad business.  CW-9 said there had been an "internal

6  dashboard" at Twitter by which "anybody could pull up" engagement metrics.  Furthermore, selling

7  to advertisers, which was what CW-9 had been doing while at Twitter, involved touting user

8  numbers so such data was "broadly available" within the Company.  CW-9 said that "MAU says

9  nothing about frequency" of use and therefore does not provide "sufficient detail to measure an

10 advertising opportunity."

11      76.     Confidential Witness No. 10 ("CW-10") worked at Twitter as a senior manager in the

12 Engineering Department from 2010 to the spring of 2015.  In that role, CW-10 built the main

13 infrastructure for serving tweets, timelines, users and the social graph to developers inside and

14 outside of Twitter.  According to CW-10, "MAU was a terrible metric" and there is no way you

15 could "judge the health of the company using MAU alone."  MAU was also flawed because it

16 required a significant delay for an update:  "You had to wait a month to get an updated metric."

17 Because of this delay, the metric was not current enough to "use in making strategic decisions."

18 CW-10 described a "metric dashboard" that was available to Company employees.  This internal

19 dashboard included the DAU metric as well as other metrics.

20      77.     Confidential Witness No. 11 ("CW-11") was employed by Twitter as a senior

21 manager on the Global Ads Yield Management team from spring 2014 until the end of 2015.  In that

22 role, CW-11 was responsible for developing an advertising market place in order to ensure that both

23 short-term and long-term revenue goals could be achieved.  As part of CW-11's advertising-related

24 work, CW-11 determined the number of Twitter advertisers and levels of customer engagement.  As

25 CW-11 got "deeper" into these metrics, by the end of 2014 it was apparent that Twitter's user

26 engagement rates were "not great."  According to CW-11, these metrics "were readily available [to

27 other Twitter employees] and calculable."  CW-11 said that any way one looked at the engagement

28 of users, it was "inescapable" in late 2014 and early 2015 that there was "a lack of engagement" by

1   users with the platform.  CW-11 explained that the metrics presented "a very bleak picture of user

2   engagement."  CW-11 noted that there is no direct correlation between advertising engagement, on

3   the one hand, and MAU or DAU, on the other.  Instead, advertising engagement measures the

4   effectiveness of ads and the frequency with which customers are using ads.

5          **B.      The *Vanity Fair* Article**

6          78.      In the summer of 2016, the *Vanity Fair* published the article, "Twitter is Betting

7   Everything on Jack Dorsey.  Will It Work?"[17]  The article was written by Nick Bilton, who had

8   previously written a *New York Times* best-selling book about Twitter and had numerous contacts

9   with senior management inside the Company, including the co-founder and current CEO, Dorsey,

10  who was interviewed for the article.  The witness accounts and information provided by Twitter

11  employees in that article corroborate the accounts of the CWs cited herein and further support a

12  strong inference that Defendants acted with scienter.  In July 2015, when Dorsey returned to Twitter

13  as its interim CEO, he met with his executive team to craft a message to investors about Twitter's

14  user growth problem.  The message to Dorsey:  "***We have to come clean***."  As this blunt admission

15  confirms, Twitter had concealed its stagnant growth from investors during the Class Period:

16              One of the first meetings Dorsey organized regarded what he, as interim
                C.E.O., was going to say to investors at Twitter's upcoming quarterly-earnings call,
17              which was just a few weeks away.  This would require some delicate choreography.
                Dorsey couldn't exactly criticize everything Costolo had done.  Since 2010, after all,
18              Dorsey, as a board member, had technically overseen Costolo's performance.

19              This conundrum led to a tempestuous discussion among members of the
20          Staff.  "We have zero credibility with Wall Street right now," Gabriel Stricker, the
            director of communications, said in a meeting with Dorsey and top managers.  ***"We***
21          ***have to come clean" about the company's stagnant growth numbers***.

22              ***Anthony Noto, the chief financial officer, agreed***, but he had another
23          solution.  He wanted to blame the current state of the company on marketing and
            messaging, essentially throwing Stricker under the bus.  When Stricker threatened to
24          quit over the verdict, he was fired.[18]

25

26

----

27  [17]   *See Vanity Fair* Article, *supra* note 3.

28  [18]   *Id.*

LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - **3:16-cv-05314-JST**                                              - 28 -

Corroborating the accounts of CW-1 and CW-3, the article draws from sources to describe how Twitter falsified its MAU metric:

> I have been told by people close to the company that, in the face of mounting pressure from Wall Street, Twitter occasionally resorted to what most start-ups do when they need to goose the numbers: *they kind of faked it*. This happens at virtually all social networks; the company sends an e-mail to inactive users who haven't been on the service in a few months, informing them there is a problem with their username or account, which leads people to log in to fix the situation. *Magically, those people become monthly active users even if they were not*.[19]

Finally, during the first half of 2015, senior management, including defendant Costolo, viewed a graphic presentation at weekly "Tea Time" meetings showing that actual MAU growth was not only failing to meet publicly disclosed growth projections, but was "almost flat." The solution? Eliminate the presentation:

> For a while, under Costolo, part of the Tea Time ritual included a show-and-tell to the employees about the current state of the business. A projection on a screen would show an animated bird wing, and the words "We Measure Things" would appear. One notable chart showed the number of people who were logging in to Twitter each month. On the chart there were two important lines: a solid line showed the actual number of people on the platform, and a dotted line depicted the projected number of new users in the future. That dotted line stretched up past 400 million active users and pointed toward an imaginary half-a-billion number. But each week, as the slides went up in front of the employees at Tea Time, the solid line remained almost flat, stagnating around 300 million users. *The gap between reality and hope grew so extreme that this section of Tea Time was quietly phased out*.[20]

## VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.   Q4 2014 Earnings (February 5, 2015)

79.   On February 5, 2015, Twitter filed a Form 8-K with the SEC containing a press release announcing the Company's fourth quarter and fiscal year 2014 financial results. The Company reported non-GAAP net income of $79 million, or non-GAAP earnings per share ("EPS") of $0.12, and revenue of $479 million for the fourth quarter ended December 31, 2014. Twitter blamed lower than expected MAU growth on "*quarter-specific factors that impacted our net ads in*

---

[19]   *Id.*

[20]   *Id.*

1    *Q4, which include seasonality and a couple of issues related to the launch of iOS8*." Furthermore,

2    the Company forecast strong MAU growth in the first quarter of 2015.

3         80.    That same day, Twitter held a conference call for analysts, media representatives and

4    investors, during which Costolo and Noto repeated and discussed the quarterly results.

5         81.    Following Defendants' statements on February 5, 2015, Twitter's stock price

6    increased 17% to close at $48.01 per share on February 6, 2015, on heavy volume of 102 million

7    shares.

8         82.    Analysts viewed these results favorably.  For example, in a report issued February 6,

9    2015, J.P. Morgan raised its price target to $67 per share and stated:

10            Twitter reported strong 4Q results as both revenue and EBITDA came in well
              above our and Street estimates. . . . More importantly, the company believes it is on
11            track to return to 13-16M Q/Q MAU net adds in 1Q15 and *we think the strong
              cadence of product launches/enhancements should drive improving MAU growth*
12            *through 2015*.

13        83.    Defendants made materially false and misleading statements and failed to disclose

14   material information on the Q4 2014 earnings call as set forth below:

15        •    Defendants failed to disclose a reliable user engagement metric and concealed Daily
16             Active Users (DAUs);

17        •    Defendants concealed adverse trends in user engagement; and

18        •    Defendants misrepresented MAUs and MAU growth trends.

19        **1.    Q4 Earnings:  Defendants Failed to Disclose a Reliable User
               Engagement Metric and Concealed Daily Active Users (DAU)**
20

21        84.    In order to conceal the underlying trend in user engagement (which had a direct

22   correlation to MAU growth trends as described herein), Twitter, for the first time as a public

23   company, refused to disclose a relevant and reliable user engagement metric to investors as part of

24   its Q4 2014 earnings announcement.[21]   In doing so, Defendants concealed Daily Active Users

25   _____

26   [21]   Although the Company disclosed the Timeline Views metric for the final time at Q4 2014,
     Defendants minimized it, telling investors that "*our management team believes timeline views have*
27   *become an unrepresentative measure of . . . user engagement on our platform*."  Twitter Form
     10-K (Mar. 2, 2105).  During the Class Period, the Company did not provide investors with a
28   reliable – or representative – metric to measure current user engagement.

1   (DAU), a key user engagement metric tracked internally at the Company.  Compounding these

2   material omissions, Defendants also made misleading statements regarding user engagement metrics.

3   Even though Company management primarily relied on DAU to assess user engagement, Noto

4   provided the following misleading response as to what metrics were tracked internally by Twitter

5   management:

6           [Mark Mahaney-RBC Capital Markets]: And then on the engagement metrics
        going forward Anthony, ***what should we be able to look at in order to track what's***
7       ***happening to engagement – whether it's improving or declining*** – if you're no
        longer disclosing timeline views?  Thank you.
8

9           [Anthony Noto-Twitter CFO]:  Sure, Mark. . . . In terms of engagement
        metrics, as I mentioned, we're no longer going to provide the metric of timeline
10      view.  And the reason for that is it's really a measurement that doesn't reflect the
        initiatives that we're doing.  In fact, if anything, we're taking specific initiatives and
11      product changes that will hurt timeline view.  As an example, the recently launched
        product, While You Were Away, will cause you not [to] have to go through many
12      timeline views to find something that was really important to you eight hours ago.

13          And so that's why we decided to eliminate the timeline view metric, given
        that we have specific product changes that will hurt that metric.  More broadly, ***as we***
14      ***think about engagement, there are a number of different ways that we measure***
        ***engagement*** – there's no one perfect way.  When it comes to advertising, it's going
15      to be click-through rate.  And it's actually different by each format.  A mobile app
        download click-through rate is very different than a regular Promoted Tweet that
16      could be either re-tweeted or favorited as a measurement of payment.

17          Additionally, on the consumer side, many companies use DAU to MAU.
18      And while that is a long-term goal of ours, to become a daily product, today we have
        great variance in DAU to MAU across geographies.  In our more mature markets, we
19      have very high DAU to MAU, 50% plus.  In the emerging markets, we have very
        low DAU to MAU, at 20% range.  They all migrate up to a higher rate over time.
20

21          And so as we get to a point where we have a metric that's going to really
        reflect what we're trying to do, we'll share that with you.  But, ***at this point, there's***
22      ***a number of them that we look at it, and no one metric to share***.

23      85.     For the following reasons, Defendants' refusal to admit that DAU was the Company's

24  primary engagement metric and their refusal to quantify DAU, were omissions of material

25  information.  In addition, Defendant Noto's response (¶ 84) was a materially misleading statement

26  for the same reasons:

27

28

(a)     According to various CWs, Twitter management relied on DAU as its primary user engagement metric during the Class Period and closely tracked DAU to assess user engagement trends.  For example, CW-1, a senior manager on the Growth and Engineering team, said that DAU was the primary engagement metric that Twitter tracked internally after Timeline Views were no longer being reported.  CW-1 continued: DAUs were a "much better proxy for engagement" than the Timeline Views metric, which Twitter stopped reporting in November 2014, and that it was a "mistake to not disclose DAU" after Twitter stopped reporting Timeline Views.  During 2014 and early 2015, CW-1's team "talked about DAUs constantly," including ways to drive DAU growth.  According to CW-1, the Company was concerned over the lack of DAU growth and was "pushing pretty hard" to increase DAUs.  Along with the engineering leads, CW-1 attended the Product Leadership meeting every Tuesday.  This meeting typically lasted one to two hours, and the attendees discussed DAU growth.  Similarly, CW-2 said that DAUs were calculated daily to monitor user engagement and that this metric was discussed on a daily basis by Twitter employees.  CW-5 said that the most important metrics to Twitter were MAU and DAU, which were monitored closely by Twitter's management.  CW-5 described capacity meetings that were attended by engineering leadership, including the Vice President of Engineering and other senior engineering employees.  During these meetings, metrics such as MAU and DAU were heavily discussed and analyzed.  *See* ¶¶ 67-68, 71.

(b)     In addition to the CW accounts described above, the Company admitted that DAU was the primary user engagement metric tracked internally by management both immediately ***prior to the Class Period and*** immediately ***after the Class Period***.  Immediately prior to the Class Period, Twitter had emphasized the DAU metric at Analyst Day as one of the Company's "***major growth drivers***" and a key "***component of Twitter's strategy***."  *See* ¶¶ 33-39 for further detail. Defendants also acknowledged:  "The best way to quantify the impact of engagement . . . was . . . DAU to MAU."  Then, after the Class Period, Defendant Noto admitted on several occasions that DAU was the primary engagement metric tracked internally.  For example:

- "*[I]nvestors are constantly asking us for an update on engagement of our users.  And there are a lot of different measurements on Twitter of*

> *engagement . . . but ultimately the thing that we have found probably is the best encapsulation of engagement is DAU*."  Barclays Global Technology Brokers Conference (Dec. 8, 2015).

- "*The one engagement metric that we look at holistically is daily active users*."  Q4 2015 Earnings Call (Feb. 10, 2016).

- "[A]s it relates to engagement, we have a number of factors that we look at as it relates to engagement.  The one that is probably the most important is daily active users, and it's the one that we continue to focus on . . . ."  Q1 2016 Earnings Call (Apr. 26, 2016).

During the Class Period, a period of six months between the end points described above, Defendants concealed the DAU metric.  Defendants' failure to disclose DAU represented a material omission and rendered Noto's statements materially misleading.

(c)     As described in detail herein, user engagement was clearly material information.  User engagement was a critical operating metric that was closely tracked externally by investors as well as internally by Company management.  *See, e.g.*, ¶¶ 19-25, 33-39.  In fact, the Company's 2014 Form 10-K dated March 2, 2015, filed shortly after the 4Q earnings announcement (and signed by both Costolo and Noto), contained dozens of references to the importance of user engagement to Twitter's business prospects and growth.  For example:

- "We believe that our future revenue growth will depend, among other factors, our ability to attract new users, *increase user engagement* and ad engagement . . . ."

- "We focus on product innovation and *user engagement* rather than short-term operating results."

- "As our user base and *the level of engagement of our users* grow, we believe the potential to increase our revenue grows."

- "Our operating results in any given quarter can be influenced by numerous factors . . . including . . . *our ability to grow* our user base and *user engagement*."

Defendants' failure to disclose any user engagement metrics, much less DAU, in light of their own admissions as to their critical importance, represented a material omission.

(d)     As described above at ¶¶ 20-25, user engagement became even more important to analysts and investors when Twitter's MAU growth began to decelerate.  Twitter

admitted in the S-1 Registration Statement: "To the extent our user growth rate slows, ***our success will become increasingly dependent on our ability to increase levels of user engagement*** . . . ." After the Class Period, Defendant Noto again admitted that "***as your MAU growth slows, engagement becomes a much bigger factor***." Deutsche Bank Technology Conference (Sept. 16, 2015). This was precisely the case as of February 2015 as MAU growth had considerably slowed.[22] Thus, just when user engagement data was most important to the Company and investors (according to the Company's own admissions), Defendants abruptly stopped reporting a reliable user engagement metric.

(e)     As described below at ¶¶ 112-24, SEC disclosure rules required Twitter to disclose key operating metrics including metrics "to explain trends in user engagement." User engagement, and the DAU metric in particular, was clearly a "key metric monitored by management"[23] and was therefore required to be disclosed in accordance with SEC rules.

(f)     As described below at ¶¶ 86-87, Twitter was experiencing negative trends in user engagement at the time of the Q4 2014 earnings announcement. Defendants' failure to disclose a reliable user engagement metric, in light of the existing negative trends in user engagement, represented a material omission and rendered Noto's statements materially misleading.

(g)     As described above at ¶ 23, Twitter's main source of revenue is advertising. Advertising revenue is driven by the total number of users on the platform and, even more importantly, the level of engagement of such users (i.e., how often the users are on the platform to view advertisements). CW-7, who worked as a product manager in the Advertising Department, said there was a direct relationship between the number of ads displayed and DAU. Likewise, according to CW-2, user engagement was important because the "lack of eyes" on the Twitter platform meant a

---

[22]   Twitter added only four million MAUs as of 4Q 2014. Analysts noted the slowdown in MAU growth, but also highlighted the purported uptick in user engagement. For example: "MAU growth decelerated a bit but engagement accelerated," FBN Securities (Feb. 7, 2015); "slower MAU growth is more than offset by improvements in engagement," Janney Capital Markets (Feb. 6, 2015).

[23]   "SEC Comments and Trends: An analysis of current reporting issues," Ernst & Young (Sept. 2015) ("The SEC has increased its focus on performance metrics, including whether registrants have disclosed key metrics monitored by management and how those metrics correlate to material changes in the results of operations.").

"lack of ad dollars."  Therefore, user engagement metrics were particularly important to analysts and investors in projecting the Company's revenue growth because more engaged users would lead to higher advertising revenues.  Twitter emphasized this fact in its SEC filings; for example:

- "User growth trends reflected in the number of MAUs [and] *user engagement trends . . . are key factors that affect our revenue*."  S-1 Reg. Stmt.

- "We believe that our future revenue growth will depend on, among other factors, our ability to attract new users, *increase user engagement* and ad engagement . . . ."  *Id.*

- "As our user base and *the level of engagement of our users* grow, we believe the potential to increase our revenue grows."  *Id.*

- "Our operating results in any given quarter can be influenced by numerous factors . . . including . . . *our ability to grow* our user base and *user engagement*."  *Id.*

Defendants' failure to disclose a reliable user engagement metric, in light of their own admissions that user engagement remained one of the most important drivers of the Company's revenue performance, represented a material omission.

(h)     The Company has admitted that management was focused on tracking and growing *daily use* among Twitter users.  For example, at Analyst Day, Defendants made representations that *a key component of the Company's strategy* was to attract the "largest *daily audience* in the world."  Then, in an interview immediately following the start of the Class Period, defendant Costolo described how growing "*daily use*" was the *top priority at Twitter* – even more important than growing the number of MAUs:

[Q:]  *Should people still focus on monthly active users*?  Is that what you look at *on the inside, is that the number-one metric you want to drive growth on*?

[A:]  *Our number-one priority is* to strengthen the core and *make Twitter an increasingly daily use case* for the people who come to Twitter and are already logged in.[24]

---

[24]   Yarow, *What It Feels Like*, *supra* note 9.

1   Defendants' failure to disclose DAU – especially in light of the fact that Twitter's "number-one

2   priority" was to increase daily use – represented a material omission and rendered Noto's statements

3   materially misleading.

4           (i)       Rather than identify the DAU metric, Noto referred to "*a number of different*

5   *ways that we measure engagement*."  For example, Twitter told the SEC that one particular metric,

6   ad engagements, was "***helpful to investors to understand***" ***and*** "***monitor trends in user***

7   ***engagement***."[25]   But ad engagements were only part of the engagement story, and as CW-11

8   explained, there is no direct correlation between advertising engagement and MAU or DAU.

9   Instead, advertising engagement measures the effectiveness of ads and the frequency with which

10  customers are using ads.   Linking user engagement with ad engagement was itself false and

11  misleading.   It was also false and misleading because the trend in ad engagements (a monetization

12  metric) was moving in the opposite direction from the trend in user engagement during the Class

13  Period.   As depicted in the chart below, the ad engagements trend was overwhelmingly positive

14  leading up to and during the Class Period.   Defendants emphasized this positive trend in each of its

15  quarterly conference calls.

| Q1 2014 | "We continue to see very strong growth in ad engagements, up almost 700% year over year . . . ." |
| Q2 2014 | "[T]otal ad engagements . . . grew more than 250% year over year . . . ." |
| Q3 2014 | "[T]otal ad engagements . . . grew more than 150% year over year . . . ." |
| Q4 2014 | "Ad engagements grew 70% year over year . . . ." |
| Q1 2015 | "Ad engagements grew 32% year over year . . . ." |

24  The failure to disclose DAU, instead pointing to other metrics like ad engagement, render

25  Defendants' statements false and misleading.

---

[25]   Defendants also falsely represented to the SEC that "changes in ad engagements . . . [is] intended to serve as a measure of user engagement" and "[t]he Company's management internally tracks changes in ad engagements . . . to monitor trends in user engagement."  *See* ¶¶ 113-17 for further detail.

1        (j)    Noto's failure to discuss the DAU metric was also misleading because Twitter

2    had emphasized DAU growth at Analyst Day and had a duty to update those growth initiatives and

3    projections when questioned directly by analysts.  At Analyst Day, Twitter emphasized that DAU

4    growth metric was one of the Company's "***major growth drivers***."  Twitter presented the following

5    slide at Analyst Day.  Tellingly, in February 2015, Twitter updated investors on ***all*** of these major

6    growth drivers ***except for*** the DAU metric.



DAU was further highlighted on Analyst Day as one of the Company's four primary revenue growth

opportunities.  Twitter presented the following slides and spent significant time discussing the

$500 million of revenue growth tied to increasing DAU.  Not surprisingly, nearly every analyst

report issued following Analyst Day highlighted management's DAU growth initiative and the

projected $500 million of incremental revenue.

In presenting the above slide on DAU growth projections, Defendants noted that the figures were based on "*what we believe we can achieve if we're able to execute successfully*."  By failing to update the DAU metric in February 2015, Defendants concealed the fact that *DAU was not growing* according to plan (i.e., Defendants were not "*execut[ing] successfully*").  Once again, in February 2015, Twitter updated investors on *all* of the other revenue growth opportunities shown on the slide above *except for* DAU.

### 2.   Q4 Earnings:  Defendants Concealed Adverse Trends in User Engagement

86.   On the Q4 earnings call, Defendants concealed adverse trends in user engagement, including the fact that DAU growth had stalled and that new users were less engaged than existing users.  In addition to the omission of the adverse trends in user engagement, Defendants also made false and misleading statements.  As *The Wall Street Journal* reported in July 2015, "Twitter has not introduced a measure of engagement to replace Timeline Views.  Instead, it has largely offered general statements that user engagement was rising."[26]  For example, when asked directly by analysts whether "*engagement was improving or declining*," Defendant Noto concealed the fact that user engagement (i.e., DAU) growth was at best flat.  In fact, Noto suggested that the DAU metric had actually *increased* since Analyst Day.  At Analyst Day, Defendants provided a DAU/MAU ratio of 48% for the Company's top twenty markets.  These top twenty markets accounted for 80% of Twitter's users and 90% of Twitter's revenue.  On the Q4 2014 earnings call, Noto said:  "*In our more mature markets we have very high DAU to MAU, 50% plus*."  Further supporting Noto's representation that user engagement was improving, Twitter reported Timeline Views for a final time.  The trend in the Timeline Views metric showed improving user engagement as of Q4 2014.  Specifically, Noto stated that Timeline Views-per-MAU were "up 3% year over year, and *better than our outlook for Timeline-views-per-MAU to be flat*."  Defendants' disclosure of this engagement trend, in combination with Noto's response referenced above, undeniably left analysts and investors under the impression that user engagement was improving as of Q4 2014.  For example:

---

[26]   Koh, *Twitter Shares Fall*, *supra* note 2.

- "Twitter reported solid Q4 results . . . *engagement improved*." Canaccord Genuity (Feb. 5, 2015).

- "[S]lower MAU growth is more than offset by *improvements in engagement* and pricing. . . . We maintain our Buy rating and increase estimates." Janney Capital Markets (Feb. 6, 2015).

- "*[H]igher engagement on the platform . . . Future Outlook Looks Strong*." TREFIS (Feb. 9, 2015).

- "*MAU Growth about to Pick Up as Engagement Improves – Raising PT to $65 . . . engagement rate growth accelerated*." FBN Securities (Feb. 7, 2015).

- "Strong 4Q:14 . . . Reiterate BUY. . . . While MAU growth was light due to a glitch in a software integration rollout, *engagement was up vs. our expectations* . . . . *Engagement and monetization exceeded expectations*." Cantor Fitzgerald (Feb. 6, 2015).

- "We reiterate our Market Outperform rating on Twitter and raise our price target to $52 from $49 following 4Q14 results. . . . *Engagement is improving* as new products launch." JMP Securities (Feb. 6, 2015).

87.     For the following reasons, Defendants' concealment of adverse trends in user engagement was an omission of material information. In addition, Noto's statements (¶ 86) were materially misleading for the same reasons.

(a)     Defendants falsely represented that user engagement had improved since Analyst Day and was trending higher. In doing so, Defendants concealed the adverse trend in user engagement. According to CW-1, the DAU trajectory was generally flat during early 2015. Flat DAU was considered a negative trend. As CW-1 acknowledged, without DAU growth, Twitter could not achieve meaningful MAU growth. CW-1 explained that user engagement was directly related to MAU growth: "User engagement is a key driver of MAU growth." According to CW-1, stagnant DAU growth would eventually cause MAU growth to stall, and that is generally what occurred at Twitter during the first half of 2015. CW-1 also explained that the Company was concerned over the lack of DAU growth and was "pushing pretty hard" to increase DAUs. Along with the engineering leads, CW-1 attended the Product Leadership meeting every Tuesday. This meeting typically lasted one to two hours, and the attendees discussed DAU growth. In addition, CW-2 stated: "There was concern . . . over the trajectory of DAUs during late 2014 and early 2015."

1   Likewise, CW-4 stated that at the Tea Time meetings CW-4 attended in late 2014, Twitter

2   executives reported that DAU trends were "mostly flat."  CW-7 also observed that by late 2014,

3   DAU growth was mostly flat and the growth team had difficulty getting the metrics to go up.  CW-5

4   observed that DAU trends were declining during the Class Period.  According to CW-5, Twitter

5   management was scrambling to come up with other metrics that would impress investors and "turn

6   Wall Street's view" away from the flat or decreasing DAU and MAU.  According to CW-11, by the

7   end of 2014, it was apparent that Twitter's user engagement rates were "not great."  CW-11 said that

8   any way one looked at the engagement of users it was "inescapable" in late 2014 and early 2015 that

9   there was "a lack of engagement" by users with the platform.  CW-11 explained that the metrics

10  presented "a very bleak picture of user engagement."

11          (b)      At the end of the Class Period, *Forbes* noted that "engagement on the

12  [analyst] site has been declining since last fall."  ¶ 55 & n.15.  In late July, *The Wall Street Journal*

13  noted that user engagement had "gone south" since Analyst Day.  Koh, *Twitter Shares Fall*.

14  Likewise, on August 10, 2015, Susquehanna Financial Group also noted the adverse trend in user

15  engagement that existed during the Class Period:

16  

FIGURE 5.

Source: comScore, SFG Research

23          (c)      Defendants also concealed the impact of "automated third party users" on user

24  engagement trends.  Automated third party users "used third party applications that may have

25  ***automatically contacted [Twitter's] servers*** for regular updates ***without any discernible additional***

26  ***user-initiated action***."  Twitter 2014 Form 10-K.  These "users" did not actually log in to Twitter

27  and use the platform, but were still counted as MAUs as the result of a third party application

28  automatically pinging Twitter's servers for updates ("this activity can cause our system to count the

1   users associated with such applications as active users on the day or days such contact occurs"). *Id.*

2   Because these third party applications automatically contacted Twitter servers on a "regular basis,"

3   these automated users also inflated Twitter's user engagement metrics, including DAU.  After the

4   Class Period, Twitter was forced to change its definition of DAU to exclude these automated users

5   from the calculation and count only actual human users who were truly logging in and engaging with

6   the platform on a regular basis.[27]

7           (d)     In 4Q 2014, Twitter lost several million of the automated users described

8   above due to an iPhone software update issued by Apple that caused automated users to stop pinging

9   Twitter's servers for regular updates.[28]  Defendant Noto confirmed on February 5, 2015, that the

10  Apple software update cost Twitter "3 million [users]" and "[w]e don't expect to get [those users]

11  back."  Noto's admission that the users were permanently lost demonstrates that these users were not

12  actual users and had previously been counted as engaged users simply because of the automated

13  activity under the old Apple software.  A non-automated user who was using the prior Apple

14  software to access Twitter could easily transition to a manual user under the new Apple software in

15  which case Twitter would "get [those users] back."  The loss of three million automated users

16  necessarily caused a significant decline in Twitter's user engagement metric as each of these users

17  had previously been counted as a highly engaged DAU in the prior period.  Twitter concealed that

18  previously-disclosed DAUs included these and many other automated users.

19

---

20  [27]   "Daily active users (DAUs) are Twitter users who logged in or were otherwise authenticated and

21  accessed ***Twitter through our website, mobile website or mobile applications*** on any given day. . . .
In the past, . . . DAUs also included users who accessed Twitter through our desktop applications

22  and ***third-party properties***."  *See* Twitter Oct. 25, 2016 Form 8-K.

23  [28]   "Apple first integrated Twitter with its mobile operating system, known as iOS, with the fifth
version in 2011, a deal that helped boost user growth by exposing the service to more people.  Two

24  years later, with iOS7, Apple made the connection deeper by adding shared links.  To make the
feature speedy, ***Apple would periodically check Twitter for the latest links shared by people you***

25  ***follow.  It didn't matter if you were a Twitter addict or just signed up for an account one day,***
***connected it to your iPhone, and promptly forgot about it.  Because Apple kept checking your***

26  ***account for data, you would count as a monthly active user [and a daily active user] in Twitter's***
***statistics***."  Zachary M. Seward, *How a Small Change by Apple Cost Twitter Millions of Users*,

27  *Quartz*, (Feb. 5, 2015), https://qz.com/339950/how-a-small-change-by-apple-cost-twitter-millions-

28  of-users/.  In iOS8, that changed and Apple no longer pinged Twitter's servers for regular updates.

1        (e)     Failing to disclose adverse trends in user engagement was further misleading because it allowed Twitter to conceal a true picture of its MAU growth trends. As described at ¶¶ 7, 57, 67, 78, during the Class Period, Twitter was heavily relying on low-quality MAU growth to prop up its MAU numbers (in certain instances the MAU number was even being "faked"). This low-quality MAU growth would have been apparent if Twitter disclosed reliable user engagement data. This would have revealed that new users were less engaged than existing users and, therefore, would not contribute to meaningful long-term MAU growth. As CW-1 explained, user engagement was directly related to MAU growth: "[U]ser engagement is a key driver of MAU growth." CW-1 observed that without DAU growth, Twitter could not achieve meaningful MAU. According to CW-1, stagnant DAU growth will eventually cause MAU growth to stall, and that is generally what occurred at Twitter during the first half of 2015. Because Twitter concealed adverse trends in user engagement, investors could not gauge the quality of MAU growth and were misled as to MAU growth trends.

        (f)     As described above at ¶ 85(i), Twitter told the SEC that one particular metric, ad engagements, was "***helpful to investors to understand***" and "***monitor trends in user engagement***." However, this representation was misleading because the trend in ad engagements (a monetization metric not an engagement metric) was moving in the opposite direction from the trend in user engagement during the Class Period. In reality, the Company was experiencing adverse trends in user engagement. The failure to disclose adverse trends in user engagement, highlighting instead other positive metrics such as ad engagements, was materially misleading.

        (g)     Failing to disclose adverse engagement trends concealed the risk of advertising supply constraints faced by the Company. Twitter's ability to sell ads, its primary source of revenue, was dependent on both advertiser demand for its ads and also the supply of ads it could place on its platform. The supply of ads was heavily contingent on the level of user engagement. CW-7, who worked as a product manager in the Advertising Department, said there was a direct relationship between the number of ads displayed and DAU. CW-7 explained that Twitter's advertisement system did not display an ad for every viewer, and instead it used an algorithm to calculate how many advertisements to send to a user. When a user launched the Twitter app, it made

a request to Twitter's back-end server to request a timeline, and each of these timeline requests also sent a request to Twitter's ad server, which filled the timeline with a certain number of ads. Accordingly, there was a direct correlation between daily usage and the number of advertisements sent to a user.  According to *The Wall Street Journal* article on July 29, 2015:

> The share of Twitter users who take advantage of the service daily is important because the more the service is used, the more ads it can serve each day, which is the primary way the company generates revenue.  While revenue beat expectations in the latest quarter, Twitter's difficulty in boosting the bases of regular users could eventually limit its growth potential.[29]

During the 4Q 2014 earnings call, Defendants assured investors that its revenue outlook for 2015 was only dependent on advertiser demand and that supply would not come into play:  "[O]ur forecast reflects the demand side of the equation relative to the supply, ***given we have such excess supply compared to demand***."  However, less than six months later, on July 28, 2015, the Company was forced to admit that the lack of user engagement was restricting advertising supply:

> ***[I]f we do not grow audience, drive increased engagement*** or begin to monetize other areas such as Logged Out, it is possible that on some days ***our revenue could be impacted by limited availability for specific ad types***.  Q2 2015 Earnings Call (July 28, 2015).

One commentator noted:

> [I]n a disclosure that clearly spooked the market, [CFO] Noto noted that ***Twitter could soon be in danger of not having sufficient inventory – because of a lack of engaged users – for all of the ads it was selling***."[30]

By failing to disclose negative user engagement trends at 4Q 2014, Defendants concealed the risk of advertising supply constraints faced by the Company.

        (h)      Finally, Defendants concealed the fact that new MAUs (reported as MAU growth and/or "net additions") were less engaged than existing users and were, therefore, more likely to drop off the platform quicker (a higher "churn rate").  One reason new users were less engaged was due to low-quality MAU growth.  CW-1 noted that the MAU growth achieved during 2014 mostly involved "bringing back low quality MAU" and that low quality MAUs were less likely

---

[29]   Koh, *Twitter Shares Fall*, *supra* note 2.

[30]   Ben Thompson, *The Case for Jack Dorsey, Twitter CEO*, *Stratechery* (July 29, 2015), https://stratechery.com/2015/the-case-for-jack-dorsey-twitter-ceo/.

LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - **3:16-cv-05314-JST**        **- 43**

to become DAUs.  According to CW-1, there was a distinct difference in engagement and churn among prior inactive users who Twitter prompted to return to the site as opposed to new users who signed up "on their own."   Returning prior inactive users were far more likely to drop back off (churn) within a short period of time because they had already done so in the past.  In addition, CW-8 said that "paid growth," MAUs that signed up as a result of Twitter's marketing campaigns, were not as engaged as organic growth MAUs and were more likely to drop off the platform.  Defendants admitted during the Class Period that they were very focused on new user retention and churn rate:  "It is by far our number one opportunity . . . something we remain very focused on.  It's a number we all look at every day as an operating committee."  Anthony Noto, Morgan Stanley Investor Conference (Mar. 3, 2015).  Less than six months later, at the end of the Class Period, Defendants admitted that MAU growth had stopped completely, primarily because newer users were not as engaged as existing users.  For example, at post-Class Period investor conferences, Defendant Noto stated:

- "*[T]he newer MAUs that we are acquiring were not as engaged as our existing MAUs*."  Barclays Global Technology Brokers Conference (Dec. 8, 2015).

- "[T]he more recent MAUs that we've acquired. . . . *They're lower quality or lower conversion to DAU*.  And [we] just wanted to be transparent about that."  Deutsche Bank Technology Conference (Sept. 16, 2015).

Thus, according to CWs and Defendants' own admissions, Defendants concealed that new users were less engaged than existing users from investors during the Class Period.

### 3.   Q4 Earnings:  Defendants Misrepresented MAU and MAU Growth

88.   On the Q4 2014 earnings call, Defendants misrepresented MAU and MAU growth.  Specifically, Defendants concealed the fact that the *disclosed MAU was artificially inflated and that new MAU growth was dependent on low quality and unsustainable growth*.  Defendants made the following false and misleading statements:

- Twitter reported 288 million MAUs as of Q4 2014.

- Twitter reported MAU growth of four million additional users.  Defendants blamed MAU growth that was below expectations on "quarter-specific

factors that impacted our net ads in Q4, which include seasonality and a couple issues related to the launch of iOS8." Defendants emphasized that despite the "quarter specific factors," **MAU growth was accelerating**.

- Defendants also represented that the acceleration of MAU growth was the result of high quality "organic growth"[31] as opposed to low quality and unsustainable MAU additions. When CEO Costolo was asked about the purported acceleration in MAU growth, he emphasized the impact of organic growth.

- Defendants also misrepresented the success of the new product initiatives in driving MAU growth.

- When CEO Costolo was asked about the purported acceleration in MAU growth, he emphasized the impact of organic growth and new product initiatives.

> Q: [Paul Vogel – Barclays] . . . [O]n the MAU number . . . **I'm curious as to the acceleration [in MAU growth]** there, if that's seasonality or something else??
>
> A: [Dick Costolo – CEO]: Sure. Thanks, Paul, this is Dick. In Q1, I would say it's a combination of seasonality, **a return to organic growth**, and the **set of product initiatives we've created to drive growth**. Again, at a high level, I'd like to say that I'm thinking about growth and our product as, these changes we're making now as helping us grow across logged-in, logged-out, and our syndicated audience across the web and third-party mobile apps. The user numbers we saw on January, again, indicate that our MAU trend has already turned around, and that Q1 trend is likely to be back in the range of absolute net ads that we saw during the first three quarters of 2014. **So we're in a great place there**. And, again, **I would stress that it's** seasonality, **a return to organic growth**, and **product initiatives**, all taken together.[32]

---

[31]   Organic growth was a concept routinely cited by Defendants in the context of new users coming to the Twitter platform and joining on their own. For example, organic growth was used at Analyst Day in the following context: "500 million monthly unique visitors, they come to our properties organically." Defendants frequently emphasized that organic growth resulted in high-quality growth in which new users were more likely to stick with the platform and become engaged long-term users.

[32]   Costolo repeated this representation the following week, on February 12, 2015, at the Goldman Sachs Technology & Internet Conference:

> [Heath Terry – Goldman Sachs – Analyst]: So, last week [on the Q4 earnings call] you talked about starting off this year in a position to grow users at the same rate that you did during the first three quarters of last year. . . . **What gives you confidence in seeing that kind of acceleration [in MAU growth]**?

1     89.     Defendants' above statements regarding MAU and MAU growth were materially

2 false and misleading for the following reasons:

3          (a)     According to multiple CWs, Defendants falsified the MAU number and

4 concealed low-quality growth.  According to CW-1, this was because at least some of the MAU

5 growth was driven by actions Twitter took to re-engage old users – or low-quality growth.  There

6 was a distinct difference in engagement and churn among prior inactive users who Twitter prompted

7 to return to the site as opposed to new users who signed up "on their own."  Returning prior inactive

8 users were far more likely to drop back off (churn) within a short period of time because they had

9 already done so in the past.  CW-1 noted that the MAU growth achieved during 2014 mostly

10 involved "bringing back low quality MAU" and that low quality MAUs were less likely to become

11 DAUs.  In addition, CW-3 said that the MAU metric could have easily been manipulated to make the

12 growth or user base appear inflated and believed that "zombie users" contributed to Twitter's overall

13 MAU metric.  "Zombie users" are users who signed onto Twitter once a month because they were

14 prompted to sign in through an email or other services that require a Twitter login.  These "zombie

15 users" were not actively engaged in Twitter.  Likewise, CW-6 had numerous private conversations

16 with several well-respected "department heads" within Twitter during the Class Period regarding

17 concerns over MAU growth, and these managers similarly did not believe that user growth was

18 sustainable.  According to CW-6, several of these managers left the Company in mid-2015 because

19 they did not believe the Company could reach the growth that executives were touting.  CW-8

20 confirmed that, internally, Twitter differentiated between organic growth and "paid growth"

21 (additional users gained through efforts by Twitter's marketing team).  "Paid growth" MAUs that

22 signed up as a result of Twitter's marketing campaigns were not as engaged as organic growth

23 MAUs and were more likely to drop off the platform.  The low quality MAU growth described by

24 the CWs was the opposite of the "organic MAU growth" touted by Costolo on the Q4 2014 earnings

25 call.

26

27          [Dick Costolo – Twitter – CEO]:  It's three things.  ***It's a return to organic
growth***.  ***It's growth initiatives that we've created inside the Company to grow the
28  user base*** and then thirdly, seasonality.

1       (b)      According to other witness accounts, "in the face of mounting pressure from

2 Wall Street, Twitter occasionally resorted to what most start-ups do when they need to goose the

3 numbers: *they kind of faked it*. . . . [T]he company sends an e-mail to inactive users who haven't

4 been on the service in a few months, informing them there is a problem with their username or

5 account, which leads people to log in to fix the situation. *Magically, those people become monthly*

6 *active users even if they were not*." ¶ 78.

7       (c)      According to other witness accounts from inside the Company, Defendants

8 were ultimately forced to come clean.  In July 2015, Gabriel Stricker, the Company's director of

9 communications, told Dorsey, Noto, and other top managers: "'We have zero credibility with Wall

10 Street right now . . . . *We have to come clean*' *about the company's stagnant growth numbers*."[33]

11 Noto agreed with Stricker.  The need to "come clean" about MAU growth confirmed that

12 Defendants' misleading Class Period statements had given investors a false picture of Twitter's

13 MAU growth prospects.  On the Company's July 2015 earnings call, Defendants ultimately "came

14 clean," conceding, "*we do not expect to see sustained meaningful growth in MAUs . . . [for] . . . a*

15 *considerable period of time*." ¶ 105.

16       (d)      The reported MAU number and reported MAU growth trends were materially

17 misleading because Defendants concealed the fact that new MAUs were less engaged than existing

18 users and were therefore more likely to drop off the platform quicker (a higher "churn rate").

19 Following the end of the Class Period, Defendants admitted that MAU growth had stopped

20 completely because newer users were not as engaged as existing users:

21       •    "*[T]he newer MAUs that we're acquiring were not as engaged as our*
              *existing MAUs*."  Barclays Global Technology Brokers Conference (Dec. 8,
22              2015).

23       •    "[T]he more recent MAUs that we've acquired. . . . *They're lower quality or*
              *lower conversion to DAU*.  And [we] just wanted to be transparent about
24              that." Deutsche Bank Technology Conference (Sept. 16, 2015).

25       (e)      A subset of Twitter's reported MAUs were low quality, fully automated users

26 who "used third party applications that may have *automatically contacted [Twitter's] servers* for

27

---

28 [33]   *Vanity Fair* Article, *supra* note 3.

LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - **3:16-cv-05314-JST**        - 47 -

1   regular updates *without any discernible additional user-initiated action*."[34]  These "users" did not

2   actually log in to Twitter and use the platform, but were still counted as MAUs as the result of a

3   third-party application automatically pinging Twitter's servers for updates ("this activity can cause

4   our system to count the users associated with such applications as active users on the day or days

5   such contact occurs").  *See* ¶ 87(c).  Acknowledging the automated nature of these users, Defendants

6   also referred to these users as "auto-pulling."   As noted by one media report, "their level of

7   engagement seems passive.  It's not clear whether those users are actually reading the tweets or

8   whether their apps and devices are just pinging the system for updates even though the users aren't

9   seeing them."[35]   Automated third-party MAUs were "a point of interest . . . as it means a large

10  amount of the . . . active monthly users Twitter reported . . . are not real consumers that have the

11  potential to view and interact with their advertising and organic content."[36]  In fact, Twitter Co-

12  Founder and Director, Evan Williams, questioned whether users who only accessed a social media

13  site/platform via a third-party application should be counted as MAUs at all.  During the Class

14  Period, Williams questioned in a post on his blog whether Facebook, a Twitter competitor, should

15  count as MAUs those users who did not log in directly to the Facebook platform (i.e., the Facebook

16  mobile app or website), but had some level of activity on a third-party application that registered on

17  Facebook's servers.  Williams stated:

18          No one ever talks about, "What *is* a [monthly active user]?"  I believe it's the case
            that if you use Facebook Connect – if you use an app that you logged into with
19          Facebook Connect – you're considered a Facebook user whether or not you ever
            launched the Facebook app or went to Facebook.com.  So what does that mean?  ***It's***
20          ***become so abstract to be meaningless.  Something you did caused some data in***
            ***their servers to be recorded for the month.  So I think we're on the wrong path***.[37]
21

22

23  [34]   *See* Twitter Q3 2014 earnings call:  "Really, there were two things we disclosed.  The first was
        registered MAUs, coming solely through third-party clients, was approximately 11.5%.  And third-
24      party client MAUs that may be auto-pulling was approximately 8.5."

25  [35]   Jim Edwards, *Twitter's User Growth Problem May Be Worse Than You Think*, Bus. Insider (Feb.
        5, 2015), http://www.businessinsider.com/twitter-user-growth-is-worse-than-you-think-2015-2.

26  [36]   Lara O'Reilly, *Twitter Admits 8.5% of Its Users Are Bots*, Marketing Week (Aug. 12, 2014),
27      https://www.marketingweek.com/2014/08/12/twitter-admits-8-5-of-its-users-are-bots/.

28  [37]   Erin Griffith, *Twitter Co-founder Evan Williams:  'I Don't Give a Sh\*t' If Instagram Has More*
        *Users*, Fortune (Dec. 11, 2014), http://fortune.com/2014/12/11/twitter-evan-williams-instagram/

1      (f)     According to CW-3, users who utilized robot accounts were also an issue at

2   Twitter.  These robot accounts could have easily been created or bought, and CW-3 noted that some

3   companies in the tech industry bought robot accounts in order to inflate their MAU numbers.  On the

4   Q4 earnings call, Defendants blamed slow Q4 MAU growth on the loss of certain of these fully

5   automated users.  *See* ¶ 87(d) & nn.27 & 28.  As a result of an Apple iOS update, Noto confirmed

6   that Twitter lost "3 million" users and "[w]e don't expect to get . . . [them] back."  Separately,

7   Twitter also revealed that the total number of automated third-party MAUs actually increased in Q4

8   2014 from the prior period, from 24.1 million MAUs to 24.5 million MAUs.  The fact that

9   automated third-party MAUs increased during the quarter, despite Twitter losing three million of

10  these MAUs as a result of an iOS update transition, indicates that ***Twitter added 3.4 million***

11  ***automated third party MAUs*** (i.e., users who did not actually log in and use the platform on their

12  own, but were counted as users due to an application automatically pinging Twitter's servers).

13  Meanwhile, Twitter disclosed that total Q4 2014 MAU growth was "four million net [MAU]

14  additions."  Therefore, ***Defendants concealed that a significant portion of Twitter's MAU growth***

15  ***in Q4 2014 was inflated by adding low quality automated MAUs***.

16      (g)     Despite Defendants' assurances to the contrary, new product initiatives ***were***

17  ***not*** having a meaningful impact on driving MAU growth.  On July 28, 2015, Defendants revealed

18  that the exact same product initiatives discussed on the Q4 earnings call had, in fact, not been

19  successful in driving growth in audience (i.e., MAUs) or participation (i.e., user engagement):

20          However, ***product initiatives we've mentioned in previous earnings calls*** like instant
            timelines and logged out experiences ***have not yet had meaningful impact on***
21          ***growing our audience or participation***.

22  In September 2015, at the Deutsche Bank Technology Conference, Defendants again admitted that

23  the same product initiatives referenced on prior earnings calls had not been impactful to the user

24  metrics and meaningful growth would require a fundamental product change:

25          What we've seen in the last year+, which we talked about on the call, is
            things like while you're away, instant timeline, they're good initiatives.  Some of

26

27  _____

28  (first emphasis in original) (alteration in original) [hereinafter "Griffith, *Instagram Has More
    Users*"].

LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - **3:16-cv-05314-JST**                                      - 49 -

them have statistically shown positive results, but they haven't been impactful to the numbers.  And the reality is, is for us to reach that next cohort of users, we have to appeal to their needs, and we have to make the product simple and easy enough.  That requires a fundamental product change.

**B.     March 2, 2015:  Form 10-K**

90.     On March 2, 2015, Twitter filed its Form 10-K for fiscal year 2014.  That public filing was signed by both Noto and Costolo.  Defendants made the following false and misleading statements and omissions of material information in the 2014 Form 10-K:

- Defendants concealed key user engagement metrics, including DAU, in violation of SEC disclosure rules.

- Defendants failed to disclose a change in the MAU growth in violation of SEC disclosure rules.

**1.     2014 Form 10-K:  Defendants Concealed Key User Engagement Metrics, Including Daily Active Users (DAU), in Violation of SEC Disclosures Rules**

91.     In its 2014 Form 10-K, Twitter stated the following related to the key metrics tracked internally by management:

NOTE REGARDING KEY METRICS

We review a number of metrics, including monthly active users, or MAUs, timeline views, timeline views per MAU and advertising revenue per timeline view, to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions.

92.     Twitter also disclosed that "we recently announced that we do not intend to disclose timeline views for any future period as we do not believe that metric is helpful in measuring engagement on our platform going forward."

93.     Twitter's statements were materially false and misleading for the following reasons:

(a)     Because Twitter no longer viewed Timeline Views as a relevant and reliable measure of user engagement, Twitter was required to update this disclosure with the actual metric it used to track user engagement DAU.  In order to conceal the adverse trend in user engagement, however, Twitter failed to identify or disclose its actual engagement metrics to investors.

1        (b)       As described in further detail at ¶¶ 112-17, Twitter's failure to disclose user

2    engagement metrics including DAU was a material omission because SEC rules required the

3    Company to disclose user engagement metrics.  In fact, the SEC sent Twitter a comment letter, in

4    response to its 2014 Form 10-K, reminding it of its obligation to disclose user engagement.  SEC

5    Comment Letter (April 13, 2015).  The SEC Comment Letter stated:  "***Please describe the***

6    ***alternative metric(s)*** you anticipate presenting in future filings ***to explain trends in user***

7    ***engagement*** and advertising services revenue.  Also, please describe your reasons for choosing such

8    metric(s). . . . We refer you to § III.B of SEC Release 33-8350."  As noted by the SEC, MD&A

9    disclosure rules require the disclosure of key internal metrics used by management.  In particular,

10   SEC Release 33-8350 states: "[O]ne of the principal objectives of MD&A is to give readers a view

11   of the company through the eyes of management . . . companies should 'identify and address those

12   key variables and other qualitative and quantitative factors which are peculiar to and necessary for an

13   understanding and evaluation of the individual company.'"  As described in detail herein, Twitter

14   management clearly considered user engagement a key indicator of financial performance.  *See, e.g.*,

15   ¶¶ 23-25.  Defendants' failure to identify DAU as its primary user engagement metric and to disclose

16   that metric was a material omission and a violation of SEC disclosure rules.  Twitter's failure to

17   disclose a reliable user engagement metric was rendered further misleading because Defendants

18   pointed the SEC to metrics like ad engagement that did not accurately portray the underlying trends

19   in user engagement.  *See* ¶¶ 114-17.

20        (c)       Defendants admitted the importance of user engagement in Twitter's 2014

21   Form 10-K:

- "We believe that our future revenue growth will depend on, among other factors, our ability to attract new users, ***increase user engagement*** and ad engagement . . . ."

- "We focus on product innovation and ***user engagement*** rather than short-term operating results."

- "As our user base and ***the level of engagement of our users*** grow, we believe the potential to increase our revenue grows."

- • "Our operating results in any given quarter can be influenced by numerous factors . . . including . . . *our ability to grow* our user base and *user engagement*."

In light of these admissions, Defendants' failure to disclose any user engagement metrics represented a material omission.

### 2. Defendants Failed to Disclose an Adverse Change in the MAU Growth Trend in Violation of SEC Disclosures Rules

94. As described below at ¶¶ 125-26, Defendants were required to disclose an adverse change in the MAU growth trend in accordance with SEC disclosure rules. As described above at ¶ 29, the Company provided MAU growth projections at Analyst Day that were based on the recent trend in MAU growth and the expectation for that MAU growth trend to continue, and even accelerate, over the next few years.[38] For example, Noto stated:

> IDC forecasted social mobile users growing at approximately 19% from 2013 to 2018 and I made the statement that we think we can grow as fast, if not faster than that rate.
>
> . . . .
>
> [W]e're growing slightly less than 25% year over year on a year-to-date basis in MAUs.
>
> . . . .
>
> [We] believe [we are] position[ed] . . . to grow our monthly active users by 2x to over 550 million in the intermediate term.

95. As depicted below, by the time Defendants spoke on February 5, 2015, the MAU growth trend had changed directions and leveled off. The flat growth trend that existed at the start of the Class Period has continued through the present day. In fact, Twitter has added just two million U.S. MAUs over the last twenty-one months. As further explained below, Defendants did not "come clean" on the long-term MAU growth trend until the last day of the Class Period.

---

[38] Strikingly, contemporaneous with Defendants' projection at Analyst Day, Twitter insiders were dumping massive amounts of their holdings of Company stock.

1
2
3
4
5
6
7
8
9
10
11
12



96.     According to CWs, as of February 2015, it was already apparent internally that the MAU growth trend was flat.  For example, CW-6 stated that the Company "absolutely" should have disclosed to the public earlier that MAU growth was flat and said that, internally, Twitter management knew that the MAU growth was weak and could not match its predictions.  CW-6 had numerous private conversations with several well-respected "department heads" within Twitter during the Class Period regarding concerns over MAU growth, and these managers similarly did not believe that user growth was sustainable.  According to CW-6, the MAU and DAU trends that were reported by Twitter during CW-6's employment were "not realistic."   CW-2 explained that "everyone internally" understood the MAU growth was flat during CW-2's year-long tenure at Twitter (mid-2014 through mid-2015).  Likewise, CW-1 said that MAU growth stalled, and that is generally what occurred at Twitter during the first half of 2015.  CW-4's account is consistent with the foregoing.  At weekly Tea Time meetings CW-4 attended in late 2014, Twitter executives reported that MAU and DAU trends were "mostly flat."  Similarly, CW-5 "absolutely" saw metrics that showed MAU was flat or declining leading up to and continuing through the Class Period.  CW-5 recalled "big discussion" during these meetings regarding why the engineering team was continuing to build server capacity to accommodate additional users when there was no real user

growth.  CW-7 was aware of the MAU trends, noting that from early 2014 to early 2015, the Company's MAU growth was only around 5% month-to-month and mostly flat.  According to CW-7, MAU and user engagement trends were flat around late 2014, and the growth team had difficulty getting the metrics to go up.  Various growth projects at the time were also stalled or deprioritized.  According to CW-8, MAU growth was "really dying down" towards the end of CW-8's tenure in early 2015.

97.     According to other witness accounts, in the first half of 2015, senior management, including Costolo, viewed a graphic presentation at weekly internal meetings showing that actual MAU growth was not only failing to meet publicly disclosed growth projections, but was "almost flat."  The solution?  Eliminate the presentation:

> For a while, under Costolo, part of the Tea Time ritual included a show-and-tell to the employees about the current state of the business.  A projection on a screen would show an animated bird wing, and the words "We Measure Things" would appear.  One notable chart showed the number of people who were logging in to Twitter each month.  On the chart there were two important lines:  a solid line showed the actual number of people on the platform, and a dotted line depicted the projected number of new users in the future.  That dotted line stretched up past 400 million active users and pointed toward an imaginary half-a-billion number.  But each week, as the slides went up in front of the employees at Tea Time, the solid line remained almost flat, stagnating around 300 million users.  ***The gap between reality and hope grew so extreme that this section of Tea Time was quietly phased out***.[39]

Thus, unbeknownst to investors, Twitter management already had acknowledged internally that the MAU growth trend had changed and flattened as of the beginning of the Class Period.  Defendants were required under MD&A disclosure rules to update the disclosure with the negative change to the MAU growth trend in its Class Period financial statements.  Instead, they concealed the trend, finally admitting at the end of the Class Period that they needed to ***"come clean" about the Company's stagnant growth numbers***.  *See* ¶ 78 for more detail.

---

[39]   *Vanity Fair* Article, *supra* note 3.

C.     **April 28, 2015:  Q1 2015 Earnings**

98.     On April 28, 2015, Twitter issued a press release announcing its first quarter 2015 financial results.[40]  The Company reported non-GAAP income of $47 million, or $0.07 non-GAAP EPS, and revenue of $436 million for the first quarter ended March 31, 2015.  Additionally, the Company provided its outlook for the second quarter of 2015, projecting second quarter revenues of $470 million to $485 million.   Twitter also lowered its full-year revenue forecast to between $2.17 billion and $2.27 billion, from prior guidance of $2.30 billion to $2.35 billion.

99.     After releasing its first quarter 2015 financial results, on April 28, 2015, Twitter held a conference call for analysts, media representatives and investors, during which Costolo and Noto repeated and discussed these results.  At that time, the Company noted that current DAU was "similar" to DAU as of Analyst Day.

100.     As described below at ¶ 136, the price of Twitter stock dropped as a result of the Q1 earnings announcement and a partial revelation regarding Twitter's MAU and user engagement problems.  Despite the partial revelations, Defendants' positive statements about user metrics and Twitter's new initiatives kept the stock price from dropping further.  For example, based on Defendants' commentary, a Morgan Stanley analyst reduced MAU growth targets, but still expected very strong growth for the remainder of 2015:  "We are reducing our full year 2015 core TWTR MAU expectations by 12mn (now modeling 16mn, 9mn and 6mn net additions the next 3 qtrs)."

101.     Defendants made false and misleading statements and failed to disclose material information on its Q1 2015 earnings call as set forth below:

- Defendants falsely stated that DAU was "similar" to the DAU at Analyst Day; in fact, DAU had substantially declined;

- Defendants failed to disclose a reliable user engagement metric and concealed adverse trends in user engagement; and

- Defendants misrepresented MAU and MAU growth trends.

---

[40]   The earnings release was mistakenly released at 3:00 p.m. EST before the market closed. Twitter confirmed the unintentional release which led to a halt in trading in the Company's stock. Trading resumed before the market closed.  The Company held its earnings call with analysts as originally scheduled after the market closed.

1

      1.      **Q1 2015 Earnings:  Defendants Falsely Stated that DAU Was "Similar" to DAU at Analyst Day; in Fact It Had Substantially Declined**

2

3          102.      Defendant Noto falsely told investors during the Q1 2015 call that "DAU to MAU

4 ratios in the quarter were *similar* to what they were by market relative to Analyst Day."  Defendant

5 Noto's statement was materially false and misleading for the following reasons:

6          (a)      In fact, DAU was not "similar" to Analyst Day.  This statement was materially

7 false and misleading because Twitter's subsequent disclosures reveal that DAU had significantly

8 declined from Analyst Day in November 2014 through the Q1 2015 earnings call.  On October 27,

9 2016, nearly 18 months after the Q1 2015 earnings call, Defendants disclosed DAU growth for Q1

10 2016 versus Q1 2015.[41]   In so doing, Defendants revealed that DAU as of Q1 2015 was

11 approximately 105.8 million and the DAU/MAU ratio was approximately 43.8%.  In contrast, DAU

12 as of the November 2014 Analyst Day was 109 million and the DAU/MAU ratio was 48%.[42]  Thus,

13

14 _____

15 [41]   To further obscure historical DAU trends, the Company changed how the DAU metric was calculated at Q3 2016.  The two changes were as follows:  1) DAU now referenced the entire user

16 base (all markets) rather than the top 20 markets previously emphasized; and 2) DAUs no longer counted users who accessed Twitter through the Company's desktop applications or third-party

17 properties (i.e., only users who accessed Twitter through the Twitter website, mobile website or mobile applications were counted).  However, because the impact of these two changes was

18 consistent across all relevant periods, reliable year-over-year comparisons can still be made (i.e., the trend line of the DAU metric calculated under the old criteria moves in tandem with the trend line of

19 the DAU metric calculated under the new criteria).  Defendants have acknowledged that the impact of these two changes was consistent across all relevant periods.  For example, Twitter publicly

20 disclosed that the percentage of users who accessed Twitter through third-party applications remained stable every quarter from Q2 2014 through Q4 2016.  In addition, Twitter publicly

21 disclosed comparable DAU updates (concerning the DAU/MAU ratio in the top 20 markets) every quarter from Q3 2014 through Q2 2016 without any representation that the user base being described

22 (i.e., the percentage of users in the top 20 markets) had materially changed.

23 [42]   The approximate number of DAUs at Q1 2015 can be calculated as follows:  At Q2 2015, DAUs were approximately 107 million (DAU to MAU ratio for top 20 markets: approximately 44%; Total

24 MAU: 304 million; Total estimated DAU (top 20 markets) = 107 million).  At Q3 2015, DAUs were approximately 108 million (DAU to MAU ratio for top 20 markets: approximately 44%; Total

25 MAU: 307 million; Total estimated DAU (top 20 markets) = 108 million).  At Q4 2015, DAUs were approximately 108 million ("DAUs were flat in the fourth quarter"; Total estimated DAU (top 20

26 markets) = 108 million).  At Q1 2016, DAUs were approximately 109 million (DAU to MAU ratio for top 20 markets: approximately 44%; Total MAU: 310 million; Total estimated DAU (top 20

27 markets) = 109 million).  On October 27, 2016, Twitter disclosed that DAUs had increased in Q1

28

1   DAU at Q1 2015 had decreased by approximately three million since Analyst Day and the

2   DAU/MAU ratio had declined by approximately 4%.  This was a material decline.  After all, the 4%

3   drop in the DAU/MAU matched the 4% decline in the ratio that Defendants ultimately disclosed in

4   July 2015 at the conclusion of the Class Period, which caused Twitter's stock price to decline

5   precipitously.

6          (b)     CW-5 observed that DAU trends were declining during the Class Period.

7   According to CW-5, Twitter management was scrambling to come up with other metrics that would

8   impress investors and "turn Wall Street's view" away from the flat or decreasing DAU and MAU.

9   According to CW-11, by the end of 2014, it was apparent that Twitter's user engagement rates were

10  "not great."  CW-11 said that any way one looked at the engagement of users it was "inescapable" in

11  late 2014 and early 2015 that there was "a lack of engagement" by users with the platform.  CW-11

12  explained that the metrics presented "a very bleak picture of user engagement."

13         (c)     On August 10, 2015, just two weeks after the end of the Class Period, the

14  Susquehanna Financial Group also noted the adverse trend in user engagement that existed during

15  the Class Period:

16

17

18  

19

20

21

22

23

24

25

26

27  _____

2016 by 3% over Q1 2015.  Using a 3% growth rate, Q1 2015 DAUs were approximately

28  105.9 million.

**2.     Q1 2015 Earnings:  Defendants Failed to Disclose a Reliable User Engagement Metric and Concealed Adverse Trends in User Engagement**

103.    Defendants failed to identify DAU as Twitter's primary user engagement metric. Rather, Defendants said the following:

Peter Stabler – Wells Fargo Securities – Analyst:

Just wondering if you have any thoughts on how we should be thinking about monitoring engagement going forward? . . .

Anthony Noto – Twitter, Inc. – CFO:

In terms of engagement metrics, there's a lot of different metrics that we look at internally.  There's not one metric for engagement.  And so I can give you a sense of some of them and quite frankly, we would like to be able to give you more visibility on this, but there's just a number of different measurements.  DAU is one measurement of engagement.

We talked about that at Analyst Day.  It's a measurement that is dependent by market and you could have a mix shift so that could be a little bit misleading, but DAU to MAU ratios in the quarter were similar to what they were by market relative to Analyst Day.

Other engagement metrics that we look at are tweets per day, favorites and retweets, direct messages, searches.  Our number of searches actually accelerated on a year-over-year growth basis in the quarter.  Direct messages also accelerated on a year-over-year basis in the quarter.  Favorite and retweets had strong growth and we had growth in tweets per day, as well.  Those metrics all were generally positive.

The timeline view metric, we don't look at internally.  It is a metric that we're doing things that actually hurt it, and that was one of the reasons why we eliminated it.  We continue to look for metrics that could be helpful to you and we will try to give you color from time to time across these different metrics, but there's not one be all and end all metric.

Defendants also concealed adverse trends in user engagement, including that:  1) user engagement had substantially declined; and 2) new users were less engaged than existing users (due to the fact new users were low quality).  Defendants also misrepresented the success of new product initiatives in driving increased user engagement:

I talked last quarter about the experiments we were running to test instant timeliness.

. . . .

1

The results during our experiment were quite positive in terms of engagement.

2

3

. . . .

4

I'll start with an update on the While You Were Away function, which we call Recap internally for short. **We're seeing perhaps the most exciting results here**. Recap brings to the top of your timeline some of the best Tweets you missed from accounts you follow while you were away from Twitter.

5

6

7

These tweets are not only seeing high engagement, they're bringing people back to Twitter more frequently.  Importantly, the machine learning work we're doing for Recap is helping us make these algorithms better and driving continuous improvements in engagement, so we're going to double down on Recap because of the success were having here.[43]

8

9

10

104.    For the following reasons, Defendants' failure to identify DAU as its primary user

11

engagement metric and concealment of adverse trends in user engagement were material omissions.

12

Defendants' statements regarding user engagement metrics and product initiatives were materially

13

misleading for the same reasons.

14

(a)     As described in detail herein, user engagement was clearly material

15

information.  User engagement was a vital operating metric that was closely tracked externally by

16

investors as well as internally by Company management.  *See, e.g.*, ¶¶ 19-25, 33-39.  In fact, the

17

Company's Q1 2015 Form 10-Q, dated May 11, 2015, filed shortly after the Q1 earnings call,

18

19

---

20

[43]  Defendant Noto confirmed the success of the same new product initiative at an investor conference less than one month later, at the JP Morgan Global Technology, Media & Telecom Conference on May 20, 2015, "Dick talked about While You Were Away on the earnings call and that **we have seen an improvement in engagement** . . . ."  Adding further context to the representations made on the Q1 earnings call, defendant Noto – at the March 3, 2015 Morgan Stanley Technology Media & Telecom Conference – confirmed that the product initiatives already were successful in driving increased user engagement and retention:

21

22

23

24

[Benjamin Swinburne – Morgan Stanley – Analyst:]  I know these initiatives should help both bringing new people to Twitter but also hopefully help churn and retention as well.  Have you seen any benefit to churn and retention from what you've launched so far and where do you see the biggest move from improvement on that front as you focus on the user growth?

25

26

27

[Anthony Noto – Twitter, Inc. – CFO:]  Yes on the earnings call I mentioned that in November/December we did see an improvement in . . . retention . . . .

28

contained dozens of references to the importance of user engagement to Twitter's business prospects and growth, including:

- "We believe that our future revenue growth will depend, among other factors, our ability to attract new users, *increase user engagement* and ad engagement . . . ."

- "We focus on product innovation and *user engagement* rather than short-term operating results."

- "Our operating results in any given quarter can be influenced by numerous factors . . . including . . . *our ability to grow* our user base and *user engagement*."

Despite their own admissions as to the critical importance of user engagement, Defendants failed to identify DAU as the primary user engagement metric and failed to accurately quantify DAU. This represented a material omission and rendered their other statements identified above materially misleading.

(b)     User engagement became even more material to investors when Twitter's MAU growth began to decelerate. Twitter admitted in its S-1 Registration Statement: "To the extent our user growth rate slows, *our success will become increasingly dependent on our ability to increase levels of user engagement* . . . ." After the Class Period, Defendant Noto again admitted that "*as your MAU growth slows, engagement becomes a much bigger factor*." Deutsche Bank Technology Conference (Sept. 16, 2015). Because Twitter disclosed slowing MAU growth on April 28, 2015, user engagement was particularly important (according to the Company's own admissions). Yet, Defendants concealed it from investors. As noted by Rosenblatt Securities: "Usage is the Key Underlying Growth Driver, But [Twitter is] Lacking Real Metrics." Rosenblatt Securities (Apr. 29, 2015).

(c)     As described above at ¶¶ 23, 73, Twitter's main source of revenue, advertising, was dependent on the level of user engagement (i.e., how often the users are on the platform to view advertisements). Twitter emphasized this fact in its SEC filings. *See* ¶ 23.

1        (d)     According to CWs, Twitter management relied on DAU as its primary user

2  engagement metric during the Class Period and closely tracked DAU to assess user engagement

3  trends.  ¶¶ 67, 68, 70, 71.

4        (e)     In addition to the CW accounts, the Company admitted that DAU was the

5  primary user engagement metric tracked internally by management both immediately ***prior to the***

6  ***Class Period and*** immediately ***after the Class Period***.  *See* ¶ 85(b).

7        (f)     Rather than identify the DAU metric during the April 28, 2015 call, Noto

8  referred to "a lot of different metrics that we look at internally."  Noto added "quite frankly, we

9  would like to be able to give you more visibility on this, but there's just a number of different

10  measurements. . . . We continue to look for ***metrics that could be helpful to you***."  ¶ 103.  As

11  described at ¶ 114, Twitter told the SEC that one particular metric, ad engagements, was "***helpful to***

12  ***investors to understand***" and "***monitor trends in user engagement***."[44]  However, as described

13  elsewhere herein (*see, e.g.*, ¶ 85(i)), this representation was misleading because the trend in ad

14  engagements (a monetization metric not an engagement metric) was moving in the opposite direction

15  as the trend in user engagement during the Class Period.  The failure to identify and disclose a

16  reliable user engagement metric, in particular DAU, and instead point to other positive metrics, such

17  as ad engagements, was materially misleading.

18        (g)     As described below at ¶¶ 125-26, SEC disclosure rules required Twitter to

19  disclose updated user engagement metrics, and the DAU metric in particular.

20        (h)     As described above at ¶¶ 87(e), (h), Defendants concealed the fact that new

21  MAUs (MAU growth expressed as "net additions") were far less engaged than existing users and

22  were therefore more likely to drop off the platform quicker (a higher "churn rate").

23        (i)     As described above at ¶ 87(c), among the adverse trends in user engagement

24  concealed by Defendants was the fact that "automated users" were counted as highly engaged users

25  despite the fact that they did not actually use the Twitter platform.  Twitter concealed the number of

26

---

27  [44]  Defendants also falsely represented to the SEC that "changes in ad engagements . . . [is] intended
to serve as a measure of user engagement" and "[t]he Company's management internally tracks

28  changes in ad engagements . . . to monitor trends in user engagement."  *See* ¶ 114 for further detail.

1   automated third-party users at Q1 2015.  Tellingly, Twitter changed its definition of DAU after the

2   Class Period to exclude these automated users from the calculation and only count actual human

3   users who were truly logging in and engaging with the platform.[45]

4          (j)       As described above at ¶¶ 67, 87(e), failing to disclose adverse trends in user

5   engagement was further misleading because it allowed Twitter to conceal a true picture of its MAU

6   growth trends.  As described herein, during the Class Period, Twitter was heavily relying on low

7   quality MAU growth to prop up its MAU numbers (in certain instances the MAU number was even

8   being "faked").  This low-quality MAU growth would have been apparent if Twitter disclosed

9   reliable user engagement data.  Because Twitter concealed adverse trends in user engagement,

10  investors could not gauge the quality of MAU growth and were misled as to MAU growth trends.

11         (k)       New product initiatives **were not** having a meaningful impact on increasing

12  user engagement.  Only a few months later, at the end of the Class Period, Defendants revealed that

13  the exact same product initiatives discussed on the Q1 earnings call had, in fact, not been successful

14  in driving growth in audience (i.e., MAUs) or participation (i.e., user engagement):

15         However, ***product initiatives we've mentioned in previous earnings calls***, like
           instant timelines and logged-out experiences, ***have not yet had meaningful impact***
16         ***on growing our audience or participation***.

17  In September 2015, Defendants again confirmed that these same product initiatives mentioned on

18  previous calls had not been successful in driving MAU or engagement growth (¶ 89(g)):

19         What we've seen in the last year+, which we've talked about in the call, is
20         ***things like while you're away, instant timeline, they're good initiatives***.  Some of
           them have statistically shown positive results, ***but they haven't been impactful to the***
21         ***numbers***.  And the reality is, is for us to reach that next cohort of users, we have to
           appeal to their needs, and we have to make the product simple and easy enough.
22         ***That requires a fundamental product change***.

23

24

_____

25  [45]   "Daily active users (DAUs) are Twitter users who logged in or were otherwise authenticated and
    accessed Twitter through our website, mobile website or mobile applications on any given day.

26  Average DAUs for a period represent the average of the DAUs at the end of such period.  In the past,
    Twitter has discussed DAUs and the ratio of monthly active users (MAUs) to DAUs.  In those

27  instances, for comparability and consistency with MAUs, DAUs also included users who accessed
    Twitter through our desktop applications and third-party properties."

28

1    (l)    As described above at ¶ 87(g), failing to disclose negative engagement trends

2   concealed the risk of advertising supply constraints faced by the Company.  Twitter's ability to sell

3   ads, its primary source of revenue, was dependent on both advertiser demand for its ads and also

4   supply of ads it could place on its platform.  The supply of ads was heavily contingent on the level of

5   user engagement.  Less than three months later, at the end of the Class Period, an analyst noted:

6      [I]n a disclosure that clearly spooked the market, [CFO] Noto noted that *Twitter*
       *could soon be in danger of not having sufficient inventory – because of a lack of*

7      *engaged users – for all of the ads it was selling*.

8   *See* ¶ 87(g).  By failing to disclose negative user engagement trends at Q1 2015, Defendants

9   concealed the risk of advertising supply constraints faced by the Company.

10    **3.    Q1 2015:  Defendants Misrepresented MAU and MAU Growth**
            **Trends**

11

12    105.    During the Q1 2015 earnings call, Defendants disappointed investors by lowering

13   their MAU growth guidance for the coming quarter.  Despite this lower guidance, Defendants failed

14   to "come clean" about Twitter's MAUs and MAU growth trends.  Defendants' guidance for short-

15   term MAU growth was a far cry from the announcement that shocked investors at the end of the

16   Class Period:  "[W]e do not expect to see sustained meaningful growth in MAUs . . . [for] a

17   considerable period of time."  For example, Defendants blamed seasonality for lower MAU growth

18   in Q2.  But this recurring impact on MAUs told investors very little about long-term changes to the

19   Company's growth trends.  Defendants also emphasized their excitement surrounding new product

20   initiatives to drive MAU growth going forward.  As a result of Defendants' misleading statements,

21   most analysts maintained their high MAU growth targets beyond Q2 2015.  For example, based on

22   Defendants' misleading commentary, a Morgan Stanley analyst reduced MAU growth targets but

23   still expected very strong growth for the remainder of 2015:  "We are reducing our full year 2015

24   core TWTR MAU expectations by 12mn (now modeling 16mn, 9mn and 6mn net additions the next

25   3 qtrs)."

26    106.    Defendants' statements regarding MAUs and MAU growth trends were materially

27   misleading for the following reasons:

28

(a)      As described above at ¶¶ 7, 57, 67, the MAU number was inflated by low quality MAUs.  According to multiple CWs, Defendants falsified the MAU number and concealed low quality growth.  *See, e.g.*, ¶ 89(a).

(b)      According to other witness accounts from inside the Company, Defendants were forced to come clean.  Less than three months later, Gabriel Stricker, Twitter's director of communications, told Dorsey, Noto, and other top managers:  "'We have zero credibility with Wall Street right now . . . . ***We have to come clean*** ' *about the company's stagnant growth numbers*."[46] Defendant Noto agreed with Stricker.  The need to "come clean" about MAU growth confirmed that Defendants' misleading Class Period statements had given investors a false picture of Twitter's MAU growth prospects.  Less than three months later, on the July 2015 earnings call, Defendants ultimately "came clean," conceding, "***we do not expect to see sustained meaningful growth in MAUs . . . [for] a considerable period of time***."

107.    Defendants' statements regarding MAUs and MAU growth trends were also misleading because Defendants concealed the number of low quality "automated" users, as described above at ¶¶ 7, 87(c).  As depicted below, prior to the Class Period, Twitter reported both the total number of third-party MAUs as well as the number of fully automated third-party MAUs every quarter.  In its Q1 2015 earnings announcement, Twitter failed to disclose both of these MAU populations.[47]

---

[46] *Vanity Fair* Article, *supra* note 3.

[47] In fact, the Q1 2015 earnings presentation misleadingly included a disclosure of the number of third-party automated MAUs ***from the prior quarter*** (i.e., as of December 31, 2014) without an updated number of MAUs for Q1 2015, despite the acknowledgement that the quarter was in fact impacted by automated users ("***the calculations of MAUs presented in presented in our earnings materials may be affected as a result of this activity***").

Failing to disclose the impact of low quality MAUs on its reported total MAU figure and MAU growth trends represented a material omission and rendered Defendants' MAU statements materially misleading.

**D.    May 11, 2015:  Form 10-Q**

108.    On May 11, 2015, Twitter filed with the SEC its Form 10-Q for the first quarter of 2015.  This document was signed by Costolo and Noto.  Defendants were responsible for the following false and misleading statements and omissions of material information in the Q1 2015 10-Q:

- Defendants concealed key user engagement metrics, including Daily Active Users (DAU), in violation of SEC disclosure rules.

- Defendants failed to disclose negative MAU trends in violation of SEC disclosure rules.

**1.    Q1 2015 10-Q:  Defendants Concealed Key User Engagement Metrics, Including Daily Active Users (DAU), in Violation of SEC Disclosure Rules**

109.    In its Q1 2015 10-Q, Twitter stated the following related to user metrics:

NOTE REGARDING KEY METRICS

We review a number of metrics, including monthly active users, or MAUs, changes in ad engagements and changes in cost per ad engagement, to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions.

1    110.    This statement, along with the failure to identify or disclose reliable user engagement

2    data, was materially false and misleading for the following reasons:

3            (a)    Conspicuously missing from its "note regarding key metrics" is any reference

4    to DAU.  As described above at ¶¶ 46-47, DAU was the primary user engagement metric and among

5    the most critical operating metrics at the Company.

6            (b)    The Q1 2015 10-Q also contained several references to the importance of user

7    engagement to Twitter's business prospects and growth, but not a single user engagement metric was

8    provided.  For example:

9       •    "We believe that our future revenue growth will depend on, among other
             factors, our ability to attract new users, *increase user engagement* and ad
10           engagement . . . ."

11      •    "We focus on product innovation and *user engagement* rather than short-
             term operating results."
12

13      •    "Our operating results in any given quarter can be influenced by numerous
             factors . . . including . . . *our ability to grow* our user base and *user*
14           *engagement*."

15   Defendants' failure to disclose any user engagement metrics, and in particular DAU, in light of the

16   statements they made regarding the importance of user engagement, represented a material omission.

17           (c)    Defendants' failure to identify and disclose a reliable user engagement metric,

18   including DAU, was in violation of SEC disclosure rules.  As described below at ¶ 113, Twitter

19   received an SEC Comment Letter in response to its 2014 Form 10-K.  Twitter's response referenced

20   its disclosures in its 10-Q for Q1 2015 ("The Company respectfully advises the Staff that it has

21   included two metrics, changes in ad engagements and changes in cost per ad engagement, on page

22   25 in the Key Metrics section of its *Quarterly Report on Form 10-Q for the quarter ended*

23   *March 31, 2015, filed on May 11, 2015*.").  Twitter's response to the SEC was inaccurate.  *See*

24   ¶¶ 114-17.

25           **2.    Q1 2015 10-Q:  Defendants Failed to Disclose an Adverse**
                     **Change in MAU Trends in Violation of SEC Disclosure Rules**
26

27   111.    As described below at ¶¶ 125-26, SEC disclosure rules required the disclosure of

28   negative MAU growth trends.

LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - **3:16-cv-05314-JST**                                              - 66 -

1    **VII.    DEFENDANTS' CLASS-PERIOD FINANCIAL STATEMENTS**
2    **        VIOLATED SEC DISCLOSURE RULES**

3        **A.    SEC MD&A Disclosure Rules Required Disclosure of Key Operating**
     **            Metrics**

4        112.    Twitter was required by SEC rules to disclose user engagement as a key operating

5    metric.   SEC MD&A disclosure rules require the disclosure of key internal metrics used by

6    management since such metrics provide insight to investors regarding how management evaluates

7    and measures a company's performance.  In particular, SEC Release 33-8350 states:

8            [O]ne of the principal objectives of MD&A is to give readers a view of the
9            company through the eyes of management. . . . [C]ompanies should "identify and
             address those key variables and other qualitative and quantitative factors which are
10           peculiar to and necessary for an understanding and evaluation of the individual
             company."
11

12           Financial measures generally are the starting point in ascertaining these key
             variables and other factors.  However, financial measures often tell only part of how
13           a company manages its business.  Therefore, when preparing MD&A, ***companies***
             ***should consider whether disclosure of all key variables and other factors that***
14           ***management uses to manage the business would be material to investors, and***
             ***therefore required***.  These key variables and other factors may be non-financial, and
15           companies should consider whether that non-financial information should be
             disclosed.
16

17           **1.    SEC Comment Letter**

18       113.    The SEC sent Twitter a comment letter in response to its 2014 Form 10-K, requesting

19   that the Company provide metrics to explain trends in user engagement to comply with the SEC's

20   MD&A disclosure rules.  *See* SEC Comment Letter (Apr. 13, 2015).  The SEC Letter stated:

21           ***Please describe the alternative metric(s)*** you anticipate presenting in future
             filings ***to explain trends in user engagement*** and advertising services revenue.  Also,
22           please describe your reasons for choosing such metric(s).

23           . . . .

24           We refer you to Section III.B of SEC Release 33-8350.

25       114.    Twitter responded as follows:

26           The Company respectfully advises the Staff that it has included two metrics,
27           ***changes in ad engagements*** and changes in cost per ad engagement, on page 25 in
             the Key Metrics section of its Quarterly Report on Form 10-Q for the quarter ended
28           March 31, 2015, filed on May 11, 2015 (the "Form 10-Q").  ***These metrics are***

*intended to serve as a measure of user engagement* and demand, respectively, on the Company's platform. . . . *[C]hanges in ad engagements indicate trends in user engagement* and, in particular, user engagement with ads, which affects revenue. . . .

The Company's management internally tracks changes in ad engagements . . . on the Twitter platform to monitor trends in user engagement . . . and believes th[is] metric[] [is] helpful to investors to understand the same.  (Twitter's May 11, 2015 Response Letter.)

115.    Twitter's response to the SEC was not accurate.  Ad engagements were not a measure of user engagement.  On multiple occasions, Defendants specifically referenced ad engagements as a *monetization* metric.  For example:

*Turning now to monetization metrics*, . . . year-over-year ad revenue growth . . . was driven by both an increase in *ad engagements* and [cost per ad engagement].  1Q 2015 Earnings Call (Apr. 28, 2015).

116.    In addition, "[t]he Company's management" *did not* "track changes in ad engagements . . . to *monitor trends in user engagement*."  Twitter internally tracked DAU as its primary user engagement metric.  *See* ¶¶ 46-47.  Twitter management clearly was aware that monetization metrics, such as ad engagements, were used for a distinctly different purpose than user engagement metrics.  *See* ¶ 85(i).

117.    Finally, Defendants' representation that the trend in ad engagements, was "*helpful to investors to understand*" *and* "*monitor trends in user engagement*" was misleading because the trend in ad engagements was moving in the opposite direction as the trend in user engagement during the Class Period.  *See id.*

## 2.    The MAU Metric Without Further Context Was Misleading

118.    During the Class Period, Twitter only provided one user metric:  total users (MAU).  The SEC has warned companies that choose to provide user metrics that providing user numbers "*to illustrate the size and growth of their businesses*" without necessary context is misleading.  Without necessary context, investors cannot evaluate the "*true meaning of the number of users*" or the "*meaning of user growth rates*."  In a November 2013 speech, SEC Chair Mary Jo White stated:

[I]n recent years, a number of technology companies have relied on unique financial or operational *metrics to illustrate the size and growth of their businesses*.

These metrics track numbers important to the company that often ***reflect their very fast pace of growth*** – ***like the number of users of the service***, the number of players of an online game, or the number people who quote "liked" the company or something the company does.  And these metrics usually total in the millions.

Our staff's concern has been the impact on investors of the sheer magnitude of some of these metrics – investors for whom the true meaning of the metric (or more importantly the link from metric to income and eventual profitability) may not be clear or even identified.  In the absence of a clear description, ***it can be hard not to think that these big numbers will inevitably translate into big profits for the company***.  But the connection may not necessarily be there.

Consider a company that correctly claims it has a hundred million users, and that the rate of user growth is expected to continue to grow at double digit rates.  That certainly sounds good and it would seem to bode well for the prospects of the company – information that certainly could influence an investment decision.

But what if only a fraction of those users are paying customers?  What does that mean for future financial results?  What if the bulk of the growth in the number of users is in an area where the company has not yet figured out how to turn those users into paying customers?  What does that then say about the meaning of user growth rates?

119.    Here, Twitter engaged in the very conduct that the SEC said is misleading.  Twitter disclosed its total users (MAU's) and expected growth in total users without necessary context such as 1) how engaged those users were; and 2) the quality of those users.  Without this context, Twitter's MAU metric presented a misleading picture to investors in violation of SEC's disclosure rules.

120.    Several CWs agreed that the MAU metric alone, without necessary context, was misleading.  For example, according to CW-10, "MAU was a terrible metric" and there is no way you could "judge the health of the company using MAU alone."

121.    Because Twitter's MAU metric included any user who logged in to the platform only once every thirty days, that number was not a meaningful predictor of profitability without additional information about how engaged those users were.  According to Jan Dawson, chief analyst and founder of the tech research firm Jackdaw:

Monthly usage metrics [MAUs] indicate "very little about true engagement on a platform, because using an app every 30 days isn't that much different from never

using it at all." . . . "For social and communication apps, the key is daily usage . . . because it tells you how people are really engaging."[48]

122.   In fact, Twitter co-founder and board member, Evan Williams, also voiced his concern over the MAU metric being used without additional context on underlying user activity or engagement.  In a December 2014 *Fortune* article, after Instagram announced 300 million MAUs, effectively jumping Twitter in size, Williams stated that focusing solely on MAU is misleading:

> [The MAU metric] has become so abstract to be meaningless. . . . Something you did caused some data in their servers to be recorded for the month.  So I think we're on the wrong path.[49]

123.   Williams followed the *Fortune* article with his own blog post in January 2015, immediately prior to the start of the Class Period, in which he expanded upon his criticisms of the MAU metric and described why he felt metrics measuring user engagement and user activity on a particular platform were more valuable metrics.[50]  Williams provided an example from his new company, Medium.  That site had recently attracted a record number of new users, but the reported user numbers were misleading because many of the new users were less engaged than average users.  Williams argued that a user engagement metric, which measured how active users were on the Medium site, was a superior measure.  *See id.*

124.   Unsurprisingly, Twitter's direct peers reported both total users ***and*** user engagement.  The chart below shows user metrics disclosed by other social media/networking companies:

| *Company* | *Metrics measuring Total Users?* | *Metrics measuring User Engagement?* |
|---|---|---|
| Facebook | Yes:<br>Monthly Active User (MAUs) | Yes:<br>Daily Active Users (DAUs) |
| LinkedIn | Yes:<br>Number of Registered Members | Yes:<br>Page Views |
| Snapchat | Yes:<br>Monthly Active User (MAUs) | Yes:<br>Daily Active Users (DAUs) |

---

[48]   Matt Kapko, *Instagram Daily Use Nearly Equals Twitter's Monthly Use*, CIO (June 22, 2016), http://www.cio.com/article/3086881/social-networking/instagram-daily-use-nearly-equals-twitters-monthly-rate.html.

[49]   Griffith, *Instagram Has More Users*, *supra* note 37.

[50]   *See* Ev Williams, *A Mile Wide, an Inch Deep*, Medium (Jan. 5, 2015), https://medium.com/@ev/a-mile-wide-an-inch-deep-48f36e48d4cb#.hrbnoyy5c.

| Company | Metrics measuring Total Users? | Metrics measuring User Engagement? |
|---|---|---|
| Instagram | Yes:<br>Monthly Active User (MAUs) | Yes:<br>Daily Active Users (DAUs) |
| Medium | Yes:<br>number of unique visitors | Yes:<br>Total Time Reading (TTR) |
| Pandora | Yes:<br>Active Users | Yes:<br>Listener Hours |
| Yelp | Yes:<br>number of monthly unique visitors | Yes:<br>Number of reviews |
| *Twitter* | Yes:<br>Monthly Active User (MAUs) | *NO* |

### B.    SEC MD&A Disclosure Rules Required Disclosure of Adverse MAU Trends

125.    SEC disclosure rules also require the disclosure of material trends.  In particular, SEC Release 33-8350 states:

> *One of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results, is the discussion and analysis of known trends*, demands, commitments, events and uncertainties.  Disclosure decisions concerning trends, demands, commitments, events, and uncertainties generally should involve the:
>
> - consideration of financial, operational and other information known to the company;
>
> - identification, based on this information, of known trends and uncertainties; and
>
> - *assessment of whether these trends* and uncertainties will have, or *are reasonably likely to have, a material impact on the company's* liquidity, capital resources or *results of operations*.
>
> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.
>
> . . . .
>
> One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain the likelihood that past performance is indicative of future performance. *Ascertaining this indicative value depends to a significant degree on*

*the quality of disclosure about the facts and circumstances surrounding known material trends* and uncertainties in MD&A.

126.    As described above at ¶¶ 95-97, Defendants knew that the MAU growth trend had changed as of February 2015.  Therefore, past performance (i.e., the historical MAU growth trend) was not indicative of future results (i.e., the existing MAU growth trend).  Defendants were required under MD&A disclosure rules to disclose adverse change in the MAU growth trend in its Class Period financial statements.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    Defendants Knew of Facts Critical to Twitter's Core Operations

127.    The Individual Defendants were the CEO and CFO of Twitter.  They were responsible for, and remained well informed of, issues critical to the Company's success.  The Individual Defendants identified increasing the level of user engagement on the platform as one such critical issue.  Throughout the Class Period, Defendants named three "objectives" they were executing on, the first of which was "strengthen[ing] Twitter's core," which "represents our focus to *increase the number of logged-in users and their daily twitter use by increasing engagement and improving retention*."  Conference Call (Apr. 28, 2015); *see also* Conference Call (Feb. 12, 2015) ("The *first priority* as we've talked about repeatedly is to strengthen the core . . . .").  Defendants set a "goal" of "*build[ing] the largest daily audience that we can*."  Conference Call (Mar. 3, 2015).  Noto acknowledged that user retention was also "*something we remain very focused on.  It's a number we all look at every day as an operating committee* . . . ."  *Id.*

128.    Given their admission of the importance of "strengthening Twitter's core" to the Company's overall business strategy, the Individual Defendants, Twitter's most senior executives, can be presumed to have knowledge of adverse facts impacting this strategy.  The Company's stagnant growth doomed Defendants' "goal" of building "the largest daily audience we can," and the Individual Defendants' repeated and specific statements to the investing public regarding their focus on user engagement demonstrates their knowledge of these adverse facts.  Indeed, in light of the fact that "increasing engagement and improving retention" was the "first" strategic objective for the

1   Company, it would be absurd to suggest the Individual Defendants were not aware that engagement

2   on the platform was decreasing throughout the Class Period.

3       **B.      The Departure of Key Executives Supports an Inference of Scienter**

4       129.    The departure of several key executives from Twitter during and after the Class

5   Period is indicative of scienter.  Defendant Costolo was forced from his position as CEO on July 1,

6   2015, just weeks before the disastrous Q2 2015 financial results were disclosed to the market.

7       130.    Analysts and tech industry media attributed the departure to the Company's struggles

8   with growth in MAUs and user engagement.  For example, "Virtually every story about Costolo's

9   resignation *cited the same factor – user growth struggles* – as one of the major reasons for his

10  departure, and for Wall Street's dissatisfaction with his performance."[51]

11      131.    According to CW-1, this lack of growth led to CEO Costolo's ouster.  While Twitter

12  told the public that Twitter's CEO Costolo was voluntarily leaving Twitter to move on to new

13  things, it was "internally thought" that Costolo was asked to leave because "growth was not

14  happening" as planned.

15      132.    Two weeks later, on July 16, 2015, Twitter's chief of corporate communications,

16  Gabriel Stricker, announced that he, too, was leaving the Company.  Though Stricker's departure

17  appeared voluntary, according to the *Vanity Fair* Article, he was ousted after urging management to

18  "come clean" about the dismal user engagement data at a tense meeting with the new CEO, Jack

19  Dorsey, and other members of management.

20      133.    Twitter's Vice President of Corporate Development and Strategy, Rishi Garg, also

21  resigned, effective in late June 2015.  And, immediately before the Company's second-quarter

22  earnings announcement on July 28, 2015, Christian Oestlien, Vice President of Product

23  Management, and Todd Jackson, a product director, left the Company.  (Another director of product

24  management, April Underwood, left in February 2015.)  The steady exodus of key executives from

25  the Company – particularly those focused on growth and development, like Oestlien, who oversaw

26

---

27  [51]  Christopher Bargo, *Twitter, Dick Costolo and the Myth of Perpetual Growth*, Voce Commc'ns
    (June 12, 2015), http://vocecommunications.com/blog/2015/06/twitter-dick-costolo-and-the-myth-
28  of-perpetual-growth/.

LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - **3:16-cv-05314-JST**                                              - 73

the Company's strategic growth initiatives – led one analyst to observe that "*only 9 of the 13 @Twitter execs that presented at their Nov 2014 analyst day are left*."[52]   Media commentators called the timing "curious," and warned that these departures "wouldn't be the last."[53]

## IX.   LOSS CAUSATION

134.   During the Class Period, Defendants made false and misleading statements by misrepresenting Twitter's user base and user engagement metrics trends.   Defendants' misrepresentations and material omissions artificially inflated the price of Twitter common stock and operated as a fraud or deceit on members of the Class.   Later, as the true facts were revealed, the price of Twitter common stock fell significantly, as the prior artificial inflation came out of the price over time.   As a result of their purchases of Twitter common stock during the Class Period (or, in the case of KBC, its funds' purchases), Lead Plaintiff's funds and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

135.   On April 28, 2015, the Company issued an earnings press release for the first quarter of 2015 and held a conference call with analysts.[54]   The earnings press release stated:   "Twitter Reports First Quarter 2015 Results; Lowers Full-Year 2015 Expectations."   On the earnings call, defendant Noto stated:   "[O]ur visibility is actually limited as it relates to Q2 MAU ads. . . . [T]he visibility is not as strong as it was in Q1 and the trend is not similar to Q1."

136.   As a direct result of the disclosures on April 28, 2015, Twitter's stock price suffered a significant decline.   As set forth in the chart below, on April 28, 2015, the price of Twitter stock plunged $9.39 per share, to close at $42.27 per share – a decline of 18% on volume of 77 million shares.   On the following trading day, April 29, 2015, the price of Twitter stock dropped again, by

---

[52]   Drew Olanoff, *Twitter Loses Two Employees Focused on Growth and Discovery*, *techcrunch.com* (July 28, 2015), https://techcrunch.com/2015/07/28/twitter-loses-two-employees-focused-on-growth-and-discovery/.

[53]   *Id.*; *see also* JP Mangalindan, *Twitter Loses 2 Top Employees to YouTube and Dropbox*, *mashable.com* (July 28, 2015), http://mashable.com/2015/07/28/twitter-loses-christian-oestlien/#HdDtekcx8PqA.

[54]   The earnings press release was issued prior to the close of the stock market.   The conference call with analysts was held after the market closed.

1    9% or $3.78 per share, closing at $38.49 per share on volume of more than 120 million shares.

2    Commentators linked these declines to investors' concern about MAU growth.

3          137.    Twitter's stock price remained artificially inflated, however, because Defendants

4    continued to conceal adverse trends in user engagement and MAU growth, as detailed at ¶¶ 51, 55-

5    59, 67, 86, 87(c), (d), (e), (h), 103.

6          138.    On July 28, 2015, after the market closed, the Company issued  an earnings press

7    release for the second quarter of 2015 and held a conference call with analysts.  On the earnings call,

8    which is detailed at ¶¶ 98-107, Defendants revealed that MAU growth was stagnant and that ***no***

9    growth was expected for a considerable period of time; user engagement was declining; new MAUs

10   were lower quality and less engaged than existing users; new initiatives were not effective at driving

11   MAU growth or engagement; and the Company faced advertising revenue constraints as result of

12   stagnant user engagement and MAU growth.

13         139.    The disclosures on July 28, 2015, detailed in ¶¶ 60-62, also had a direct impact on

14   Twitter's stock price.  As set forth in the chart below, the price of Twitter stock fell $5.30 per share,

15   to close at $31.24 per share on July 29, 2015, a one-day decline of nearly 15% on volume of nearly

16   93 million shares.  Commentators, including securities analysts, linked this decline to investors'

17   concern about adverse trends in user engagement and MAU growth.

18         140.    Twitter's stock price continued to fall on high trading volumes in the days following

19   Defendants' July 28, 2015 announcement as the market absorbed the news, dropping another 13% to

20   $27.04 by August 7, 2015.

21         141.    The declines in Twitter's stock price on April 28-29, 2015 and July 29, 2015, were a

22   direct result of the nature and extent of Defendants' prior misstatements and omissions being

23   revealed to investors and the market.  The timing and magnitude of Twitter's stock price declines

24   negates any inference that the losses suffered by Lead Plaintiff's funds and other Class members

25   were caused by changed market conditions, macroeconomic or industry factors, or by Company-

26   specific factors unrelated to Defendants' misrepresentations.

27         142.    The economic losses suffered by Lead Plaintiff's funds and other members of the

28   Class were a direct result of Defendants' misrepresentations that inflated Twitter's stock price and

LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - **3:16-cv-05314-JST**                                              - 75 -

1   the subsequent decline in the value of that stock when Defendants' prior misrepresentations and
2   omissions were revealed.



X.   **APPLICABILITY OF THE PRESUMPTION OF RELIANCE**

143.   Lead Plaintiff and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because, during the Class Period, the material misstatements and omissions alleged herein would induce a reasonable investor to misjudge the value of Twitter stock and without knowledge of the misrepresented or omitted material facts, Lead Plaintiff's funds and other members of the Class purchased or acquired Twitter stock between the time Defendants misrepresented and failed to disclose material facts about their business operations and financial prospects, and the time the true facts were disclosed. Accordingly, Lead Plaintiff's funds and the other members of the Class relied, and were entitled to have relied, upon the integrity of the market for Twitter common stock, and are entitled to a

1    presumption of reliance on Defendants' materially false and misleading statements during the Class

2    Period.

3        144.    At all relevant times, the market for Twitter common stock was efficient for the

4    following reasons, among others:

5            (a)    Twitter stock met the requirements for listing, and was listed and actively

6    traded on the NYSE, a highly efficient market;

7            (b)    As a regulated issuer, Twitter filed periodic public reports with the SEC; and

8            (c)    Twitter regularly communicated with public investors via established market

9    communication mechanisms, including through regular dissemination of press releases on the major

10   news wire services and through other wide-ranging public disclosures, such as communications with

11   the financial press, securities analysts and other similar reporting services.

12       145.    Lead Plaintiff and the Class are also entitled to a presumption of reliance under

13   *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein

14   against Defendants are predicated upon omissions of material fact for which there was a duty to

15   disclose.

16   **XI.    THE STATUTORY SAFE HARBOR DOES NOT APPLY TO
         DEFENDANTS' FALSE AND MISLEADING STATEMENTS**
17

18       146.    The statements alleged herein to be false and misleading are not subject to the

19   protections of the PSLRA's statutory Safe Harbor for forward-looking statements because: (a) they

20   are not forward looking; (b) they are subject to exclusion; or (c) even if purportedly forward-looking,

21   Defendants cannot meet the requirements for invoking the protection, i.e., identifying the statements

22   as forward looking and demonstrating that the statements were accompanied by meaningful

23   cautionary language.  Many of the statements were misleading in light of omissions of material

24   present or historical facts and cannot be considered forward-looking.

25       147.    Under the PSLRA's statutory Safe Harbor for written statements, a forward-looking

26   statement is protected if it is:  (a) identified as such; and (b) "accompanied by meaningful cautionary

27   language." 15 U.S.C. § 78u-5(c)(1)(A)(i).  An oral forward-looking statement must be accompanied

28   by a cautionary statement that it is forward-looking, that actual results may differ materially and that

1   additional information concerning risk factors is contained in a readily available written document.

2   In addition, the oral statement must:  (a) identify the written document, or portion thereof, that

3   contains such factor; and (b) the referenced written documents must contain meaningful cautionary

4   language.  15 U.S.C. § 78u-5(c)(2)(B).

5        148.    The Safe Harbor excludes from protection all forward-looking statements that are

6   included in financial statements purportedly prepared in compliance with Generally Accepted

7   Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K.  15 U.S.C.

8   § 78u-5(b)(2)(A).

9        149.    Statements of historical fact, current condition or a mixture thereof are not "forward-

10   looking" and thus not protected by the Safe Harbor.

11        150.    For example, among the false statements at issue herein, the following false oral and

12   written statements alleged herein are actionable because they are statements of current or historical

13   fact:

14        •    "*We're in a great place*" with respect to MAU growth;

15        •    "DAU to MAU ratios in the quarter *were* similar to what they were by market
16           relative to Analyst Day";

17        •    "Other engagement metrics . . . *were* generally positive";

18        •    "*We're seeing* perhaps the most exciting results here . . . those tweets *are* not
      only *seeing* high engagement, *they're bringing* people back to Twitter more
19           frequently";

20        •    "We're going to double down on Recap because of the success *we're*
21           *having*"; and

22        •    "We *have seen* an improvement in engagement."

23        151.    To the extent any of the statements were identified as forward-looking statements,

24   they do not fall within the protections of the Safe Harbor because they lacked specific, meaningful

25   cautionary statements identifying important factors that could cause actual results to differ materially

26   from those in the purportedly forward-looking statements.  A warning that identifies a potential risk,

27   but implies that such risks had not materialized, i.e., states that something might occur but does not

28

1  state that something actually has already occurred, is not meaningful and does not fall within the

2  protections of the Safe Harbor.

3       152.    Meaningful risk disclosures must also be substantive and tailored to the forward-

4  looking statement they accompany.  Many of Defendants' purported risk disclosures remained

5  unchanged over the course of the Class Period, despite the fact that such risks had in fact

6  materialized, which change in circumstance was material to the reasonable investor.  Defendants'

7  risk disclosures were therefore neither substantive nor tailored and do not satisfy the requirements of

8  the Safe Harbor.

9       153.    Nor were the historic or present-tense statements made by Defendants assumptions

10 underlying or relating to any plan, projection or statement of future economic performance, as they

11 were not stated to be such assumptions when made, nor were any of the projections or forecasts

12 made by Defendants expressly related to or stated to be dependent on those historic or present-tense

13 statements when made.

14      154.    Defendants' forward-looking statements also do not fall within the protections of the

15 Safe Harbor because they had no reasonable basis.  Defendants are liable for those false forward-

16 looking statements because, at the time each of those forward-looking statements was made, the

17 particular speaker knew that the particular forward-looking statement was false or misleading and/or

18 the forward-looking statement was authorized and/or approved by an executive officer of Twitter,

19 who knew that those statements were false or misleading when made.

20 **XII.    CONTROL PERSONS**

21      155.    As alleged herein, the Individual Defendants were responsible for drafting, producing,

22 reviewing and/or disseminating the false and misleading statements, information and omissions

23 alleged herein; were aware of, or recklessly disregarded, the fact that the false and misleading

24 statements and omissions were being issued by the Company; and approved or ratified these

25 statements, all in violation of the federal securities laws.

26      156.    As officers and controlling persons of a publicly held company whose shares are

27 registered with the SEC and traded on the NYSE, the Individual Defendants had a duty to

28 disseminate prompt, accurate and truthful information with respect to Twitter and to correct any

1  previously issued statements that had become materially misleading or untrue so that the market

2  price of the Company's common stock would be based upon truthful and accurate information. The

3  Individual Defendants each violated these specific requirements and obligations during the Class

4  Period.

5      157.  The Individual Defendants are liable for disseminating materially false and

6  misleading statements and/or concealing material adverse facts with respect to the Company's user

7  engagement and growth prospects. The Individual Defendants' wrongful course of conduct

8  (a) deceived the investing public regarding the Company's business, operations, management and

9  the intrinsic value of Twitter's common stock; (b) materially misrepresented and omitted to disclose;

10  (c) caused Lead Plaintiff's funds and other members of the Class to purchase Twitter common stock

11  at artificially inflated prices; and (d) caused Lead Plaintiff's funds and other members of the Class to

12  suffer damages when Twitter finally disclosed the truth about its failure to attract new users and to

13  keep those users engaged on the platform.

14  **XIII.  CLASS ACTION ALLEGATIONS**

15      158.  Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

16  Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Twitter

17  common stock during the Class Period (the "Class"). Excluded from the Class are Defendants;

18  members of the immediate families of the Individual Defendants; Twitter's subsidiaries and

19  affiliates; any person who is or was an officer or director of Twitter during the Class Period; any

20  entity in which any Defendant has a controlling interest; and the legal representatives, heirs,

21  successors and assigns of any such excluded person or entity.

22      159.  The members of the Class are so numerous that joinder of all members is

23  impracticable. The Company's stock is actively traded on the NYSE and there are more than

24  700 million shares of Twitter common stock outstanding. While the exact number of Class members

25  is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, Lead

26  Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record

27  owners and other members of the Class may be identified from records maintained by Twitter or its

28

1    transfer agent and may be notified of the pendency of this action by mail, using the form of notice

2    similar to that customarily used in securities class actions.

3          160.    Common questions of law and fact predominate and include: (i) whether Defendants

4    violated the 1934 Act; (ii) whether Defendants omitted and/or misrepresented material facts;

5    (iii) whether Defendants knew or recklessly disregarded that their statements were false; (iv) whether

6    Defendants' statements and/or omissions artificially inflated the price of Twitter common stock; and

7    (v) the extent and appropriate measure of damages.

8          161.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as all

9    members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal

10   law that is complained of herein.

11         162.    Lead Plaintiff will fairly and adequately protect the interests of the members of the

12   Class and has retained counsel competent and experienced in class and securities litigation.

13         163.    A class action is superior to all other available methods for the fair and efficient

14   adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

15   damages suffered by individual Class members may be relatively small, the expense and burden of

16   individual litigation make it impossible for members of the Class to individually redress the wrongs

17   done to them.  There will be no difficulty in the management of this action as a class action.

18                                              **COUNT I**
                          **For Violation of § 10(b) of the 1934 Act and Rule 10b-5**
19                                      **Against All Defendants**

20         164.    Lead Plaintiff incorporates ¶¶ 1-163 by reference.

21         165.    During the Class Period, Defendants disseminated or approved the false statements

22   specified above, which they knew or recklessly disregarded were misleading in that they contained

23   misrepresentations and failed to disclose material facts necessary in order to make the statements

24   made, in light of the circumstances under which they were made, not misleading.

25         166.    Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

26              (a)    Employed devices, schemes, and artifices to defraud;

27

28

LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - **3:16-cv-05314-JST**                                    - 81 -

1          (b)     Made untrue statements of material fact or omitted to state material facts

2 necessary in order to make the statements made, in light of the circumstances under which they were

3 made, not misleading; or

4          (c)     Engaged in acts, practices and a course of business that operated as a fraud or

5 deceit upon Lead Plaintiff's funds and others similarly situated in connection with their purchases of

6 Twitter common stock during the Class Period.

7      167.    Lead Plaintiff's funds and the Class have suffered damages in that, in reliance on the

8 integrity of the market, they paid artificially inflated prices for Twitter common stock. Lead

9 Plaintiff's funds and the Class would not have purchased Twitter common stock at the prices they

10 paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated

11 by Defendants' misleading statements.

12      168.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff's

13 funds and the other members of the Class suffered damages in connection with their purchases of

14 Twitter common stock during the Class Period.

15 **COUNT II**<br>**For Violation of § 20(a) of the 1934 Act**
16 **Against All Defendants**

17      169.    Lead Plaintiff incorporates ¶¶ 1-168 by reference.

18      170.    During the Class Period, Defendants acted as controlling persons of Twitter within

19 the meaning of § 20(a) of the 1934 Act. By virtue of their positions and their power to control public

20 statements about Twitter, the Individual Defendants had the power and ability to control the actions

21 of Twitter and its employees. Twitter controlled the Individual Defendants and its other officers and

22 employees. By reason of such conduct, Defendants are liable pursuant to § 20(a) of the 1934 Act.

23 **PRAYER FOR RELIEF**

24     WHEREFORE, Lead Plaintiff prays for judgment as follows:

25     A.    Determining that this action is a proper class action, certifying Lead Plaintiff as a

26 class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's

27 counsel as Class Counsel;

28     B.    Awarding Lead Plaintiff and the members of the Class damages and interest;

1    C.    Awarding Lead Plaintiff's reasonable costs, including attorneys' fees; and

2    D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

3  proper.

4                          **JURY DEMAND**

5    Lead Plaintiff demands a trial by jury.

6  DATED:  March 2, 2017

7                                          */s/ Lesley E. Weaver*

8                                          LESLEY E. WEAVER (191305)
                                           BLEICHMAR FONTI & AULD LLP
9                                          1999 Harrison Street, Suite 670
                                           Oakland, CA  94612
10                                         Telephone: (415) 445-4003
                                           Facsimile:  (415) 445-4020
11

12                                         Liaison Counsel for Lead Plaintiff and the Class

13                                         MOTLEY RICE LLC
                                           GREGG S. LEVIN (admitted *pro hac vice*)
14                                         28 Bridgeside Blvd.
                                           Mt. Pleasant, SC  29464
15                                         Telephone: (843) 216-9000
                                           Facsimile:  (843) 216-9450
16

17                                         Lead Counsel for Lead Plaintiff and the Class

18                                         ROBBINS GELLER RUDMAN
                                             & DOWD LLP
19                                         DANIEL S. DROSMAN (200643)
                                           SUSANNAH R. CONN (205085)
20                                         655 West Broadway, Suite 1900
                                           San Diego, CA  92101-8498
21                                         Telephone: (619) 231-1058
                                           Facsimile:  (619) 231-7423
22

23                                         Additional Counsel for the Class

24

25

26

27

28

LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - **3:16-cv-05314-JST**                              - 83 -