JAMES G. KREISSMAN (Bar No. 206740)
jkreissman@stblaw.com
SIMONA G. STRAUSS (Bar No. 203062)
sstrauss@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California  94304
Telephone: (650) 251-5000
Facsimile:  (650) 251-5002

JONATHAN K. YOUNGWOOD (admitted *pro hac vice*)
jyoungwood@stblaw.com
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
Telephone: (212) 455-2000
Facsimile:  (212) 455-2502

*Attorneys for Defendants*
*Twitter, Inc., Richard Costolo and Anthony Noto*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DORIS SHENWICK, as Trustee for the DORIS SHENWICK TRUST, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:16-CV-05314-JST |
| | (Consolidated with 3:16-cv-05439-JST) |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TWITTER DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED COMPLAINT** |
| TWITTER, INC., RICHARD COSTOLO and ANTHONY NOTO, | |
| Defendants. | **Judge:  Jon S. Tigar** |
| | **Courtroom: 9** |
| | **Hearing Date:  Sept. 14, 2017** |
| | **Hearing Time:  2:00 P.M.** |
| | **Date Action Filed: Sept. 16, 2016** |
| | Filed Jointly With:  Request for Judicial Notice; [Proposed] Order; Notice of Motion and Motion |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..............................................................................................iv

PRELIMINARY STATEMENT ....................................................................................... 1

ISSUES TO BE DECIDED............................................................................................... 3

STATEMENT OF RELEVANT FACTS ......................................................................... 3

ARGUMENT ..................................................................................................................... 6

I.       **PLAINTIFF FAILS TO STATE A SECTION 10(b) CLAIM BASED ON OMISSION OF DAU METRICS**................................................................ 6

    A.     Defendants Had No Duty To Disclose Or Characterize DAU Metrics................... 7

        1.     No Independent Duty to Disclose DAU Metrics ...................................... 7

            (a)     No duty to disclose material, interesting, or important information ................................................................. 7

            (b)     Any duty imposed by Item 303 cannot support 10(b) liability................................................................. 7

        2.     No Duty to Disclose DAU Metrics to Prevent Misleading Statements ................................................................................................ 8

            (a)     Plaintiff does not explain *why* statements are misleading .............................................................................. 9

            (b)     Plaintiff fails to show DAU was a "primary" or reliable metric .......................................................................... 10

    B.     Plaintiff Fails To Plead Scienter With Respect To The DAU Metrics ................. 12

        1.     The CWs Do Not Support Scienter with Respect to the DAU Metrics ............................................................................................... 13

        2.     Allegations Support a Far More Compelling – and Innocent – Inference .................................................................................................. 13

        3.     Stock *Purchases* during Class Period Negate Any Inference of Scienter ............................................................................................ 14

II.      **PLAINTIFF FAILS TO PLEAD A VIOLATION OF SECTION 10(b) WITH RESPECT TO USER ENGAGEMENT TRENDS** ................................. 14

    A.     Plaintiff Fails To Identify False Statements About User Engagement Trends............................................................................................ 15

    B.     Defendants Had No Duty To Disclose User Engagement Trends ....................... 16

i

MP&A ISO Twitter Defendants' Motion to Dismiss Consol. Compl.      Case No. 3:16-CV-05314-JST

1. No Independent Duty to Disclose User Engagement Trends .......................................................... 16

2. No Duty to Update Prior Statements about User Engagement Growth ........................................ 16

3. No Duty to Disclose DAU Trends to Prevent Misleading Statements ........................................ 16

C. Plaintiff Fails To Plead An Adverse User Engagement Trend ........................... 18

D. Plaintiff Fails To Plead Scienter With Respect To Adverse Trends ................... 20

1. *None* of the CWs Provide Any Relevant Statements as to Scienter ...................................... 20

2. Allegations Regarding Executive Departures Do Not Support Scienter .................................. 20

3. Plaintiff's Core Operations Allegations Fail to Support Scienter ............................................ 21

III. **PLAINTIFF FAILS TO STATE A SECTION 10(b) CLAIM BASED ON MAU** ............................................................. 23

A. Plaintiff Fails To Identify Any *False* Statements About MAUs .......................... 23

B. Plaintiff Fails To Identify Any *Misleading* Statements About Reported MAU ........................................... 24

1. No Misleading Statement with Respect to Automated Users ........................................ 24

2. No Misleading Statement with Respect to Robot or Spam Users .................................. 25

3. No Misleading Statement with Respect to Product Initiatives .................................... 25

4. No Misleading Statement with Respect to "Paid Growth Users" ................................ 27

C. Plaintiff Fails To Allege Any Duty To Disclose Adverse MAU Growth Trends ........................................ 28

D. Plaintiff Fails To Plead Scienter With Regard To MAU ...................... 29

IV. **PLAINTIFF FAILS TO STATE A SECTION 10(b) CLAIM BASED ON USER AD ENGAGEMENT STATEMENTS** ......................................... 30

A. Plaintiff Fails To Identify Any False Statement About User Ad Engagements ........................................ 30

B. Plaintiff Fails To Identify Any Misleading Statements ........................................ 31

C.   Plaintiff Fails To Plead Facts Sufficient To Raise A Strong
Inference Of Scienter With Regard To Ad Engagement Trends .......................... 32

**V.   BECAUSE PLAINTIFF HAS NOT PLEADED AN UNDERLYING
VIOLATION, PLAINTIFF FAILS TO PLEAD A SECTION 20(a)
CONTROL PERSON CLAIM** .................................................................................. 32

CONCLUSION ................................................................................................................. 32

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*3226701 Canada, Inc. v. Qualcomm, Inc.*,
    No. 15CV2678-MMA (WVG), 2017 WL 971846,
    (S.D. Cal. Jan. 27, 2017) ................................................................................. 18

*Altayyar v. Etsy, Inc.*,
    No. 15-cv-2785, 2017 WL 1157193,
    (S.D.N.Y. Mar. 16, 2017)................................................................................ 25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................................... 6

*Bodri v. GoPro, Inc.*,
    No. 16-cv-00232-JST,
    (N.D. Cal. May 1, 2017)* ............................ 6, 14, 15-16, 17, 18, 19-20, 23, 27, 32

*Brodsky v. Yahoo! Inc.*,
    630 F. Supp. 2d 1104 (N.D. Cal. 2009) .......................................................10-11

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002)........................................................................ 9, 10

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
    964 F. Supp. 2d 1128 (N.D. Cal. 2013) .......................................................... 15

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013) .......................................... 12, 13, 19, 21

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) .......................................................... 10

*Colyer v. AcelRx Pharms.*,
    No. 14-cv-04416-LHK, 2015 WL 7566809,
    (N.D. Cal. Nov. 25, 2015) .............................................................................. 22

*Fialkov v. Microsoft Corp.*,
    72 F. Supp. 3d 1220 (W.D. Wash. 2014) ........................................................ 14

*In re Accuray, Inc. Sec. Litig.*,
    757 F. Supp. 2d 936 (N.D. Cal. 2010) ............................................................ 13

*In re A-Power Energy Generation Sys. Ltd. Sec. Litig.*,
    No. MDL 11-2302-GW(CWx), 2012 WL 1983341,
    (C.D. Cal. May 31, 2012)................................................................................ 13

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989)........................................................................ 14

---

* Because *Bodri* is not yet available on Westlaw, a copy is attached hereto as Appendix II.

*In re Aspeon, Inc. Sec. Litig.*,
    168 F. App'x 836 (9th Cir. 2006) .......................................................................... 14

*In re ChinaCast Educ. Corp. Sec. Litig.*,
    809 F.3d 471 (9th Cir. 2015) ................................................................................. 12

*In re Dot Hill Sys. Corp. Sec. Litig.*,
    594 F. Supp. 2d 1150 (S.D. Cal. 2008) ............................................................. 11, 20

*In re Downey Sec. Litig.*,
    No. CV 08-3261-JFW (RZx), 2009 WL 736802,
    (C.D. Cal. Mar. 18, 2009) ............................................................................ 10, 19, 20

*In re FoxHollow Tech., Inc., Sec. Litig.*,
    No. C 06-4595 PJH, 2008 WL 2220600,
    (N.D. Cal. May 27, 2008) ...................................................................................... 16

*In re Fusion-io, Inc. Sec. Litig.*,
    No. 13-cv-05368-LHK, 2015 WL 661869,
    (N.D. Cal. Feb. 12, 2015) ......................................................................................... 8

*In re LeapFrog Enters., Inc. Sec. Litig.*,
    527 F. Supp. 2d 1033 (N.D. Cal. 2007) ................................................................ 16

*In re Mellanox Tech. Ltd. Sec. Litig.*,
    No. 13-cv-04909-JST, 2014 WL 12650991,
    (N.D. Cal. Mar. 31, 2014) ............................................................... 6, 7, 27, 31, 32

*In re Netflix, Inc. Sec. Litig.*,
    No. C 04-2978-WHA, 2005 WL 3096209,
    (N.D. Cal. Nov. 18, 2005) ...................................................................................... 24

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) .................................................................................. 8

*In re Rigel Pharms. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) .................................................................................. 14

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
    No. C-05-0295-PJH, 2007 WL 760535,
    (N.D. Cal. Mar. 9, 2007) .................................................................................. 11, 19

*In re Syntex Corp. Sec. Litig.*,
    95 F.3d 922 (9th Cir. 1996) .................................................................................... 26

*In re Tibco Software, Inc. Sec. Litig.*,
    No. C 05-2146-SBA, 2006 WL 1469654,
    (N.D. Cal. May 25, 2006) ...................................................................................... 27

*In re Velti PLC Sec. Litig.*,
    No. 13-cv-03889-WHO, 2015 WL 5736589,
    (N.D. Cal. Oct. 1, 2015) ......................................................................................... 31

*In re Yahoo! Inc. Sec. Litig.*,
   No. C 11-02732-CRB, 2012 WL 3282819,
   (N.D. Cal. Aug. 10, 2012) ................................................................... 9

*Knox v. Yingli Green Energy Holding Co.*,
   No. 2:15-cv-04003-ODW(MRWx), 2017 WL 1013293,
   (C.D. Cal. Mar. 15, 2017) ................................................................... 22

*Mauss v. Nuvavsive, Inc.*,
   No. 13-cv-2005 JM (JLB), 2014 WL 6980441,
   (S.D. Cal. Dec. 9, 2014) ..................................................................... 11

*Mauss v. Nuvavsive, Inc.*,
   No. 13-cv-2005 JM (JLB), 2015 WL 10857519,
   (S.D. Cal. Aug. 28, 2015) ................................................................... 22

*Melot v. JAKKS Pac., Inc.*,
   No. LA Cv 13-05388 JAK (SSX), 2016 WL 6902093,
   (C.D. Cal. Nov. 18, 2016) ................................................................... 18

*N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp.*,
   No. 2:07-cv-5756-FMC-FFMx, 2009 WL 3112574,
   (C.D. Cal. Sept. 25, 2009) .................................................................. 18

*Navarro v. Block*,
   250 F.3d 729 (9th Cir. 2001) .............................................................. 6

*Omnicare, Inc. v. Labs. Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ....................................................................... 31

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ................................................. 13, 21, 22

*S. Ferry LP, #2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) .............................................................. 22

*Seaman v. Cal. Bus. Bank*,
   No. 13-cv-02031-JST, 2014 WL 1339649,
   (N.D. Cal. Apr. 2, 2014) ..................................................................... 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................... 12

*Wenger v. Lumisys, Inc.*,
   2 F. Supp. 2d 1231 (N.D. Cal. 1998) .................................................. 17

*Wozniak v. Align Tech., Inc.*,
   850 F. Supp. 2d 1029 (N.D. Cal. 2012) .............................................. 18

*Xu v. ChinaCache Int'l Holdings Ltd.*,
   No. CV15-07952-CAS(RAOx), 2017 WL 114401,
   (C.D. Cal. Jan. 9, 2017) ..................................................................... 14

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ..............................................6, 12, 20-21, 23

**Statutes, Rules, Regulations, and Publications**                                                            **Page**

15 U.S.C. § 78u–4(b) ................................................................................ 9, 12

17 C.F.R. § 229.303 ..................................................................................... 8

Fed. R. Civ. P. 9(b)................................................................................... 6, 13

SEC Release No. 33-8350,
    2003 WL 22996757
    (Dec. 19, 2003) ...................................................................................... 8

## PRELIMINARY STATEMENT

KBC Asset Management ("Plaintiff") drafted a lengthy complaint, likely hoping that its sheer volume would allow it to withstand a motion to dismiss.  When Plaintiff's voluminous allegations are analyzed, however, it becomes clear that while Plaintiff bases its securities fraud claim on the withholding of certain alleged "facts," Plaintiff not only fails to adequately plead the existence of these facts or any disclosure obligation, but also fails to meet its burden of pleading that each Defendant acted knowingly or recklessly in making the allegedly misleading statements. The Complaint should be dismissed because Plaintiff fails to satisfy these pleading burdens.

Defendant Twitter, Inc. ("Twitter") is a social media platform that allows its users to distribute and consume content online.  Unlike most companies, which derive revenue from the sale of goods or services, Twitter generates substantially all of its revenue from advertisements on its platform.  Twitter tracks various activities on its platform through numerous metrics, including metrics that seek to monitor the number of users and their level of engagement.  Because it operates in a rapidly evolving market and has a limited history, Twitter has had to identify, develop and refine many of the metrics it uses to measure the performance of its business.  Twitter has tracked various metrics, replacing or abandoning them when they stop accurately capturing Twitter's performance.  As a publicly traded company, Twitter has disclosed metrics it believed investors would find helpful and reliable, stopped providing metrics it believed were less helpful or reliable, and candidly disclosed to investors that there were metrics that it was not providing.

Plaintiff sued Twitter and two of its executives for securities fraud based on disclosures regarding certain Twitter metrics.  Specifically, Plaintiff claims that for almost six months, Defendants did not disclose that (i) Twitter's "Daily Active User" ("DAU") metric was Twitter's primary metric for measuring user engagement with the platform; (ii) the level of user engagement had stalled or was declining; (iii) Twitter's "Monthly Active User" ("MAU") metric (measuring the number of Twitter users in a given month) was flat or declining and included unengaged users; and (iv) user ad engagements, a metric that Twitter claimed measured user engagement, was instead used to measure something else.

Plaintiff's claims fail for a number of independent reasons:

1

*DAU Data Disclosure*.  Defendants repeatedly advised investors that DAU was one of many measures of user engagement Twitter tracked, that there was no perfect or single metric that fully captured Twitter user engagement, and that as a result, providing specific DAU data for specific markets where Twitter operated could mislead investors.  For all of these reasons, Twitter indicated it would (and thereafter did) only provide general updates about DAU trends for Twitter's top geographic markets.  Defendants cannot be liable for fraud for declining to disclose more granular DAU data when, at the time, those disclosures could mislead investors.

*Adverse User Engagement Trends*.  Plaintiff argues that Defendants failed to disclose an adverse user engagement trend, but Plaintiff fails to adequately allege that such a trend existed during the class period.  Even if Plaintiff could plead such a trend, its claim would still fail because Plaintiff cannot establish a duty to disclose such a trend or point to any affirmative statements rendered misleading absent disclosure of the trend.

*MAU Data Disclosures*.  Twitter publicly disclosed current and historical MAU data every quarter, and this data squarely contradicts Plaintiff's allegation that MAU growth was flat or decreased during the class period.  Plaintiff's allegation that MAU data was misleading because it included allegedly unengaged or "low quality" users similarly fails because Twitter disclosed that its MAU calculation included the very users Plaintiff characterizes as "low quality."

*User Ad Engagement Disclosures*.  Plaintiff claims that Twitter tracked ad engagement (measuring how frequently Twitter users interacted with advertisements on the platform) to measure monetization on its platform, and therefore did not use that metric to track user engagement.  That claim is fatally flawed—measuring ad engagement for one purpose (monetization) in no way precludes its simultaneous use for another purpose (user engagement).  Indeed, a metric that tracks how users engage with advertisements on Twitter's platform is an obvious measure of user engagement.

In addition, this action should be dismissed for Plaintiff's failure to plead particularized facts giving rise to a strong inference that any Defendant acted with the scienter required to support a securities fraud violation.  None of Plaintiff's Confidential Witnesses ("CWs") claim to have met or communicated with either Individual Defendant.  Moreover, while failing to allege

1   any relevant stock sales, Plaintiff ignores stock *purchases* made by Defendant Noto during the

2   class period, when Twitter's stock price was allegedly inflated—a fact that weighs heavily against

3   any inference of scienter.  Taking the Complaint's well-pleaded allegations as true, the most

4   compelling inference is *not* that Defendants made any of the challenged statements with the intent

5   to deceive, but rather that Defendants made these statements (and refrained from disclosing other

6   information) to ensure that investors received accurate, reliable, and helpful information.

7          Given the Complaint's multiple and glaring shortcomings, Defendants respectfully request

8   that the Court dismiss the Complaint.

9                              **ISSUES TO BE DECIDED**

10  1.      **Falsity**. Should the claim brought under Section 10(b) of the Securities Exchange Act of

11  1934 and Rule 10b-5 (collectively "Section 10(b)") be dismissed given Plaintiff's failure to plead

12  particularized facts showing that any statement was false or misleading when made?

13  2.      **Duty**. Should the Section 10(b) claim be dismissed given Plaintiff's failure to show any

14  duty to disclose the information that it alleges was not disclosed?

15  3.      **Scienter**. Should the Section 10(b) claim be dismissed given Plaintiff's failure to plead

16  particularized facts giving rise to a strong inference that Defendants made any challenged public

17  statements or failed to provide information with the requisite mental state?

18  4.      **Control Person Liability**. Should the Section 20(a) control person claims be dismissed

19  given Plaintiff's failure to plead a primary Section 10(b) violation?

20                          **STATEMENT OF RELEVANT FACTS**

21         **Defendants**:  Twitter is a global platform for public self-expression and conversation in

22  real time, allowing people to consume, create, distribute, and discover content.  Ex. A at 1.[1]  Users

23  can post short messages, known as "Tweets," that can be read by others.  Millions of users

24  routinely Tweet on a wide range of matters of public concern.

25         Twitter derives substantially all of its revenue from advertisements.  Compl. ¶ 23.

26  Twitter's advertising revenue depends on a number of factors, including, *inter alia*, Twitter's

27  ability to (i) increase the size and engagement of its user base and (ii) "monetize" its users (*e.g.*, to

28  ────────────────────────
    [1] "Ex. __" refers to the Exhibits in the Request for Judicial Notice submitted herewith.

1    have users engage or interact with advertisements on Twitter's platform). *Id.*

2         During most of the "Class Period" (February 6, 2015 to July 28, 2015), Richard Costolo

3    was Twitter's CEO.  Anthony Noto, Twitter's current CFO and COO, was CFO.  *Id.* ¶¶ 14-15.

4         **User growth**:  During the Class Period, Twitter measured the growth of its user base by

5    tracking MAUs.  *Id.* ¶ 20.  MAU measures the number of unique users that accessed Twitter's

6    platform in any given month, without regard to how users interact with the platform.  Twitter

7    measured a number of MAU-derived statistics, including "average MAUs" (the average of the

8    MAUs at the end of each month during a particular period) and MAUs for particular geographic

9    markets.  During the Class Period, Twitter publicly reported the average MAUs for each quarter

10   and for the prior eight quarters.  Ex. D at 45 (2014 Form 10-K); Ex. E at 24 (Q1 2015 Form 10-Q).

11        **User engagement**:  In addition to "user growth," Twitter monitored "user engagement,"

12   *i.e.*, how engaged its users were on its platform.  Compl. ¶ 20.  Leading up to the Class Period,

13   Twitter tracked and reported "Timeline Views," *id.*, which referred to the number of times Twitter

14   users refreshed their home Twitter pages, consisting of a "timeline" of chronologically ordered

15   Tweets.  Ex. D at 46 (2014 Form 10-K).  Twitter stopped reporting Timeline Views early in the

16   Class Period, explaining that "timeline views going forward will not be a helpful metric for

17   measuring user engagement because the ongoing optimization of our products has reduced the

18   number of times a user needs to request a timeline view." *Id.*; *see also* Compl. ¶ 36.  As a result of

19   Twitter's refinements to its product, the number of times that users refreshed their timelines no

20   longer reflected how engaged users were.  Instead of Timeline Views, Twitter began identifying

21   user ad engagements and changes thereto, which measured the frequency with which users

22   engaged with Twitter's "Promoted" products.  Compl. ¶ 114.

23        Twitter also sought to track user engagement during the Class Period through a variety of

24   other measures, including various DAU-related metrics, calculated in different ways, which sought

25   to measure the number of users that logged in and accessed Twitter's platform on any given day,

26   *id.* ¶ 36, as well as "tweets per day, favorites and re-tweets, direct messages, [and] searches."  Ex.

27   H at 14 (Q1 2015 earnings call).  Defendants readily and repeatedly acknowledged that there was

28   "no one perfect way" to measure user engagement, and Defendants therefore provided general

4

updates about user engagement trends rather than specific data points that could confuse or mislead investors.  Ex. G at 7 (Q4 2014 earnings call).  With regard to DAU-related metrics, Defendants told investors that Twitter's usage rates varied widely by geographic market because Twitter was a very new product in many countries at the time, often competing with other messaging platforms.  *See, e.g.*, Ex. C at 46, 51 (Q3 2014 Form 10-K); Ex. F at 10 (Q3 2014 earnings call).  As a result, Defendants disclosed that Twitter was "not going to continue to update DAU to MAU until [it] [had] a specific strategy behind driving this measurement," and instead provided general updates about DAU trends for its top (and more mature) markets when asked by analysts.  Ex. F at 10.  During the Class Period, Defendants continued to disclose general DAU trends they observed in Twitter's top markets that they believed might be useful to investors, while repeating that they would not disclose total DAU or the DAU to MAU ratio across all markets or for specific markets as it did not "really reflect what [Twitter was] trying to do" in its newer markets, Ex. G at 7 (Q4 2014 earnings call), and this information "could be a little bit misleading," Ex. H at 14 (Q1 2015 earnings call).  Defendants did not want to provide information that could invite unwarranted comparisons of daily usage rates across different markets where Twitter was not yet a daily product and management was more focused on simply growing brand awareness and the user base.[2]  Plaintiff does not dispute that Defendants honestly and reasonably believed their articulated reasons for providing only general DAU updates.

**The CWs**:  Plaintiff relies on statements from eleven former Twitter employees.  Compl. ¶¶ 67-77.  Two CWs (CW-4, CW-9) left Twitter in 2014, clearly before the start of the Class Period.  *Id.* ¶¶ 70, 75.  Three other confidential witnesses (CW-3, CW-7, CW-8) left Twitter in "early 2015," *id.* ¶¶ 69, 73, 74, and Plaintiff does not allege that they were Twitter employees on February 6, 2015, when the Class Period began.  All of the CWs provide only general information about discussions and meetings, but fail to identify the participants, timing, or content of those alleged interactions.  None of the CWs are alleged to have communicated with the Individual Defendants or ***any*** Twitter executive, and none claim to have any personal knowledge of what the

---

[2] Defendants repeated these points even at the end of the Class Period, telling analysts and investors that Twitter "h[as] not historically focused on daily active user growth," which was "something in 2016 that [it] [would] consider more."  Ex. I at 11 (Q2 2015 earnings call).

1   Individual Defendants knew about Twitter's user growth and engagement metrics during the Class

2   Period or whether they believed those metrics should have been disclosed.[3]

3                                        **ARGUMENT**

4          To plead securities fraud under Section 10(b), a plaintiff must allege six elements:  "(1) a

5   material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

6   the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

7   misrepresentation or omission; (5) economic loss; and (6) causation."[4]  *Bodri v. GoPro, Inc.*, No.

8   16-cv-00232-JST, slip op. at 8 (N.D. Cal. May 1, 2017) (Tigar, J.) ("*Bodri*") (attached as App. II).

9          To survive a motion to dismiss, Plaintiff must satisfy the heightened pleading obligations

10  of Federal Rule of Civil Procedure 9(b), which requires that plaintiffs "state with particularity the

11  circumstances constituting fraud or mistake."  Plaintiff must also meet "the more exacting"

12  requirements of the Private Securities Litigation Reform Act ("PSLRA"), which requires that

13  securities fraud plaintiffs plead both scienter and falsity with particularity, *Zucco Partners, LLC v.*

14  *Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), and was "designed to end the practice of

15  pleading 'fraud by hindsight.'"  *In re Mellanox Tech. Ltd. Sec. Litig.*, 2014 WL 12650991, at *6

16  (N.D. Cal. Mar. 31, 2014) (Tigar, J.).  While courts reviewing motions to dismiss accept as true

17  the *well-pleaded* facts alleged in the complaint, *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.

18  2001), Plaintiff cannot survive a motion to dismiss with conclusory statements unsupported by

19  factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  As discussed below, Plaintiff's

20  Complaint should be dismissed for failure to meet its pleading burdens.

21  **I.      PLAINTIFF FAILS TO STATE A SECTION 10(b) CLAIM BASED ON OMISSION**
22  **OF DAU METRICS**

23         Plaintiff cannot plead a Section 10(b) claim based on omission of DAU metrics.  The

24  gravamen of Plaintiff's claim is that, throughout the Class Period, Defendants "concealed" DAU

25  metric data while "Twitter management relied on DAU as its primary user engagement metric."

26  ───────────────

27  [3] For the Court's convenience, Appendix I summarizes statements attributed to the CWs and the arguments made herein as to why those statements should be disregarded.

28  [4] Unless specified, all internal citations and quotations are omitted, and all emphasis is added.

1   *See, e.g.*, Compl. ¶ 85(a); *see also id.* ¶¶ 93(b), 103-04, 110(a).  However, to plead an actionable

2   omissions claim, Plaintiff must either allege an independent legal duty to disclose DAU metrics or

3   identify a statement rendered misleading by the omission.  *See In re Mellanox*, 2014 WL

4   12650991, at *6.  Plaintiff falls short on both counts.  And, as an independent basis for dismissal,

5   Plaintiff fails to plead scienter.

6       **A.      Defendants Had No Duty To Disclose Or Characterize DAU Metrics**

7              **1.      No Independent Duty to Disclose DAU Metrics**

8              Plaintiff alleges that Defendants were obligated to disclose specific DAU metric data and

9   to describe DAU as Twitter's primary measure of user engagement because (i) such metrics were

10  of "critical importance" to investors, *see* Compl. ¶¶ 85(b)-(d), (g), (h), 93(c), 104(a)-(c), 110(a)-

11  (b), and (ii) Item 303 of Regulation S-K ("Item 303") (as interpreted by SEC Release 33-8350)

12  mandated disclosure, *id.* ¶¶ 85(e), 93(b), 104(g), 110(c), 112-24.  Both arguments fail.

13             *a.      No duty to disclose material, interesting, or important information*

14             "Section 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all

15  material information."  *In re Mellanox*, 2014 WL 12650991, at *17.  "Consequently, '[e]ven with

16  respect to information that a reasonable investor might consider material, companies can control

17  what they have to disclose under these provisions by controlling what they say to the market,'"

18  such that the failure to disclose such material or important information cannot by itself form the

19  basis of a securities fraud claim.  *Id.* (quoting *Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 45

20  (2011)).  Thus, Defendants had no duty to disclose the specific number of DAU (or the specific

21  DAU to MAU ratio) for each or all of Twitter's specific markets, even if such data were a "key

22  component of Twitter's growth strategy," a "critical operating metric," or otherwise "particularly

23  important to analysts and investors."  Compl. ¶¶ 85(b)-(d), (g), (h), 93(c), 104(a)-(c), 110(a)-(b).

24             *b.      Any duty imposed by Item 303 cannot support 10(b) liability*

25             Plaintiff relies on SEC Release 33-8350, which provides interpretative guidance on Item

26  303, to argue that Defendants were obligated to disclose Twitter's DAU metrics.  Compl. ¶¶ 85(e),

27  93(b), 104(g), 110(c), 112-24.  That reliance is misplaced because a failure to comply with Item

28

303 **cannot** serve as the basis for a Section 10(b) claim in this Circuit.[5]  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) ("In sum, we hold that Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5."); *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *16 (N.D. Cal. Feb. 12, 2015) ("In the Ninth Circuit, it is well established that violation of an exchange rule will not support a Section 10(b) or Rule 10b-5 claim.  This includes alleged violations of Item 303.").[6]

## 2.    No Duty to Disclose DAU Metrics to Prevent Misleading Statements

Plaintiff challenges two statements about user engagement metrics as misleading:

- "[T]here are a number of different ways that we measure engagement—there's no one perfect way. . . .  And so as we get to a point where we have a metric that's going to really reflect what we're trying to do, we'll share that with you.  But, ***at this point there's a number of them that we look at it, and no one metric to share***."  Compl. ¶ 84.

- "[T]here's a lot of different metrics that we look at internally.  There's not one metric for engagement.  And so I can give you a sense of some of them and quite frankly, we would like to be able to give you more visibility on this, but there's just a number of different measurements.  DAU is one measurement of engagement. . . .  We continue to look for metrics that could be helpful to you and we will try to give you color from time to time across these different metrics, but there's not one be all and end all metric."  *Id.* ¶ 103; *see also id.* ¶¶ 91, 109 (stating that Twitter reviews "a number of metrics," with examples).

Plaintiff alleges that these statements were misleading because "Twitter management relied on DAU as its primary user engagement metric during the Class Period."  *Id.* ¶¶ 85(a), 104(d); *see also id.* ¶¶ 85(b), 93, 110(a).  Plaintiff also suggests that Twitter needed to disclose DAU or other

---

[5] The Supreme Court has granted *certiorari* to consider a Circuit split on this issue.

[6] Moreover, Item 303 did not require Twitter to disclose or characterize any user engagement metric.  Item 303 sets forth standards for the portion of SEC-filed reports (and *not* earnings calls) concerning "Management's discussion and analysis of financial condition and results of operations."  17 C.F.R. § 229.303.  It says nothing about the necessity of disclosing any "operating metrics" that a reporting company may use.  Further, the interpretative guidance for Item 303 states only that "companies should identify and discuss ***key performance indicators*** . . . that their management uses to manage the business and that would be material to investors."  SEC Release No. 33-8350, 2003 WL 22996757, at *3 (Dec. 19, 2003).  Accordingly, because "Twitter management clearly considered user engagement a key indicator of financial performance," Compl. ¶ 93(b), Twitter discussed user engagement in its SEC filings, *see, e.g.*, Ex. D at 46, 48, and also discussed general DAU trends for its top markets on earnings calls.  As Plaintiff acknowledges, however, DAU is not itself a key performance indicator, but only a metric used to measure such an indicator.  *See* Compl. ¶ 93(b) (distinguishing between user engagement, a "key indicator of financial performance," and DAU, Twitter's alleged "primary user engagement metric").

user engagement data to provide "necessary context" for its disclosed MAU data to show "how engaged those users were." *Id.* ¶ 119.  Plaintiff fails to state an actionable omissions claim because (i) the statements made were not misleading and (ii) Plaintiff fails to adequately allege that DAU was the primary metric for user engagement during the Class Period.

### a. *Plaintiff does not explain **why** statements are misleading*

To plead that a statement is misleading, a plaintiff must specify "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1)(B).  Plaintiff fails to explain how the existence of DAU metrics rendered the challenged statements *misleading*, *i.e.*, that they "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *Bodri* at 9 (same).  With regard to the statements indicating that Twitter looked at a number of different metrics to assess user engagement, Plaintiff identifies nothing in those statements suggesting or implying that Twitter did not consider DAU at all, or that there was a measure other than DAU that was a sole or primary measure of user engagement.  Defendants cannot be held liable for making true statements about the existence of various user engagement metrics, particularly where Defendants made clear that they collected and considered DAU data, and provided investors with general updates regarding DAU trends across Twitter's top markets during the Class Period, *supra* p. 4-5.  *See In re Yahoo! Inc. Sec. Litig.*, 2012 WL 3282819, at *8-10 (N.D. Cal. Aug. 10, 2012) (press release that "does not include any affirmative statement on the issue of value" did not create false impression about value that rendered it misleading for failing to disclose value), *aff'd*, 661 Fed. App'x 387 (9th Cir. 2015).  More generally, Plaintiff cannot seriously contend that these statements were materially misleading, particularly when Defendants themselves believed (and Plaintiff does not challenge) that reporting anything other than general DAU trends for Twitter's top markets (which Defendants did) "could be a little bit misleading" and did not "really reflect what [Twitter was] trying to do." *Supra* p. 5.

While Plaintiff claims that DAU was required to provide "context" for MAU data, Defendants have no independent legal duty to provide "context."  Any argument that Defendants committed fraud by failing to provide granular DAU data alongside MAU data runs afoul of the

9

principle that the securities laws "do[] not impose a duty of completeness," *City of Royal Oak Ret.*

*Sys. v. Juniper Networks*, 880 F. Supp. 2d 1045, 1066 (N.D. Cal. 2012), and liability does not

attach simply because the challenged statements are, in Plaintiff's view, "incomplete," *Brody*, 280

F.3d at 1006 (a "complaint must specify the . . . reasons why the statements made . . . were

misleading or untrue, not simply why the statements were incomplete"). Although a duty to

disclose could attach if MAU data was misleading absent DAU disclosure, Plaintiff has no basis

for making such an assertion because MAU data measures ***user growth***, not ***user engagement***, and

thus does not imply any particular level of engagement. *See* Compl. ¶ 21 ("Although Twitter's

two primary user metrics (MAU and timeline views) were interrelated, they were used to measure

distinctly different user characteristics . . . .").

### b.  *Plaintiff fails to show DAU was a "primary" or reliable metric*

As a separate basis for dismissal, Plaintiff cannot base an omissions claim on Defendants'

failure to identify DAU as Twitter's "primary" user engagement metric because Plaintiff does not

adequately plead that DAU *was* Twitter's "primary" user engagement metric (let alone what

"primary" means in this context) during the Class Period. The statements attributed to four CWs,

Compl. ¶ 47, do not support the premise, as the CWs either do not state that DAU was the primary

metric or do not provide specific facts demonstrating their personal knowledge or overall

reliability on that issue. *In re Downey Sec. Litig.*, 2009 WL 736802, at *9 (C.D. Cal. Mar. 18,

2009) ("[S]tatements of a confidential witness are disregarded if lacking in specificity . . . .").

***CW-1***:  According to CW-1, "DAU was the primary engagement metric that Twitter

tracked internally after Timeline Views were no longer being reported," his team "talked about

DAUs constantly," and he attended meetings at which "attendees discussed DAU growth."

Compl. ¶ 67. CW-1's statements must be disregarded because the following key facts are missing:

- CW-1's *basis to believe* that DAU was the "primary" engagement metric being tracked.

- *When* CW-1 believed DAU was the primary user engagement metric. His statement that
  this occurred after "Timeline Views were no longer being reported" suggests that it was at
  some point after March 2015 (when Twitter's 2014 10-K last provided Timeline Views
  data) but does not specify whether or not it occurred within the Class Period.[7]

---

[7] *See Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009) (rejecting CW

- How DAU was tracked (*e.g.*, total DAU, DAU by particular markets, DAU to MAU ratio), who tracked it, when it was tracked, and whether the resulting data were deemed reliable.

- Who on CW-1's "team" "talked about DAUs constantly," what specifically was discussed, and when these discussions took place.  Indeed, CW-1 suggests they took place in "2014 and early 2015," suggesting they took place prior to the Class Period.[8]

  *CW-2*:  Although Plaintiff identifies CW-2 as stating that DAU was Twitter's "primary [user] engagement metric," Compl. ¶ 47, the Complaint alleges only that "CW-2 said that DAUs were calculated daily" and that "this metric was talked about on a daily basis."  *Id.* ¶ 68.  CW-2's statements also should be disregarded because the Complaint does not allege *when* any discussions occurred, who was involved in those discussions, or even what was discussed.

  *CW-5*:  CW-5 identified MAU and DAU as "the most important metrics to Twitter" that were "heavily discussed and analyzed."  Compl. ¶ 71.  Again, no specific factual allegations are provided as to who was involved in these discussions, whether the conversations took place during the Class Period (CW-5 is alleged to have worked at Twitter before, during, and after the Class Period), or what about DAU was discussed, let alone whether DAU was considered a reliable metric of user engagement during the Class Period.

  *CW-6*:  According to CW-6, a "contract employee" who served as "a language lead," DAU metrics were "significant to Twitter and were discussed every week during manager meetings in CW-6's department, where CW-6 and other managers evaluated staffing needs."  Compl. ¶ 72.  Plaintiff again fails to plead specific facts explaining how "DAU metrics were significant," which "DAU metrics" were discussed, when, or by whom.  Finally, CW-6 does not suggest that anyone told him that DAU was Twitter's "primary" user engagement metric or that it was reliable.

---

observations because court could not "determine temporal relationship" between observations and challenged statements); *In re Silicon Storage Tech. Sec. Litig.*, 2007 WL 760535, at *18-20 (N.D. Cal. Mar. 9, 2007) (CW statements about how price of product fell in pre-class period "cannot be used to support a claim that SST's prices were falling during the class period").  Indeed, CW-1's statement that Twitter stopped reporting Timeline Views in November 2014 (when it occurred more than four months later) reflects his lack of familiarity with the reported metrics.

[8] *See In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1162-63 (S.D. Cal. 2008) (rejecting vague CW allegations that give no confidence that CW "knows what he/she is talking about"); *Mauss v. Nuvasive, Inc.*, 2014 WL 6980441, at *8 (S.D. Cal. Dec. 9, 2014) (discounting CW statements that "only state in a general fashion" that company acted illegally without "particulars on the purported violations").

Plaintiff also relies on statements Noto made in December 2015 and April 2016 (both well after the Class Period) that "there are a lot of different measurements . . . of engagement . . . but ultimately the thing we have found probably is the best encapsulation of engagement is DAU," and that "[t]he one that is probably the most important [for engagement] is daily active users." Compl. ¶ 85(b).  But those post-Class Period statements say nothing about **when** Noto came to that view, and "[i]nherent in the concept of falsity is the requirement of contemporaneousness." *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1109 (E.D. Wash. 2013).  Moreover, the most reasonable inference from those statements, coupled with Noto's earlier statements that reporting specific DAU data rather than overall trends "could be a little bit misleading" given the immaturity of many of Twitter's markets, is that Twitter was ultimately successful in establishing its brand in other countries such that reporting daily active usage made sense and would not be misleading.  *See supra* p. 5.

### B.   Plaintiff Fails To Plead Scienter With Respect To The DAU Metrics

Plaintiff fails to meet its burden of pleading specific facts that give rise to a strong inference that Defendants acted with scienter, which provides an independent basis for dismissing the DAU metric-related fraud claim.  To plead scienter under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2)(A).  An inference of scienter is "strong" only if "a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged"; and all plausible opposing inferences, omissions, and ambiguities count against an inference of scienter.  *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 324, 326 (2007).  The "required state of mind" is "a mental state embracing intent to deceive, manipulate, or defraud."  *Id.* at 319.  To support scienter, "a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness."  *Zucco*, 552 F.3d at 992.

A plaintiff may plead scienter against a corporate defendant by first pleading it against a senior corporate officer whose state of mind can be imputed to the company.  *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015).  Scienter against each individual

defendant must be alleged and evaluated on a defendant-by-defendant basis.  *In re A-Power Energy Generation Sys. Sec. Litig.*, 2012 WL 1983341, at \*12 (C.D. Cal. May 31, 2012) (Rule 9(b) requires plaintiffs to "differentiate their allegations when suing more than one defendant").

### 1.    The CWs Do Not Support Scienter with Respect to the DAU Metrics

With respect to the alleged concealment of DAU metrics, Plaintiff's CW allegations cannot support a strong inference of scienter because none of the CWs claim to have communicated or otherwise interacted with the Individual Defendants.[9]  CWs who have not spoken with a defendant "cannot offer any insight into the knowledge or culpability of" that defendant.  *City of Roseville*, 963 F. Supp. 2d at 1136.  Indeed, when a CW fails to report any personal interactions with a defendant, "it is difficult to surmise how the opinions and observations of [that witness] could support a reasonable inference about what these individual Defendants knew or did not know at the time each of the challenged statements was made."  *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 948-49 (N.D. Cal. 2010).[10]

### 2.    Allegations Support a Far More Compelling – and Innocent – Inference

Plaintiff's allegations support an innocent inference:  the Individual Defendants and Twitter's management generally did not believe that DAU metrics during the Class Period were useful information for investors.  As Defendants disclosed, Twitter was in a period of expansion into new geographic markets, some of which had more limited access to the Internet, and where the focus was driving brand awareness and user growth rather than daily engagement.  Ex. D at 17, 23-24 (2014 Form 10-K); Ex. G at 7 (Q4 2014 earnings call); Ex. I at 10 (Q2 2015 earnings call).  Moreover, in any given period, Twitter's mix of users between its various geographic markets could shift.  Ex. H at 14 (Q1 2015 earnings call).  Reporting DAU data thus would have exposed Twitter's investors to information that could create the impression that user engagement trends were developing when, in reality, the data in question simply reflected a shifting geographical

---

[9] The CWs' general, passive statements that DAU metrics "were tracked," "were discussed," or "were available," Compl. ¶¶ 68, 72, 75, 76, 77, are unlinked to anything the Individual Defendants did, saw, or believed.  *Police Ret. v. Intuitive Surgical*, 759 F.3d 1051, 1063 (9th Cir. 2014) ("Missing are allegations linking specific reports and their contents to the executives . . . .").

[10] Plaintiff also fails to identify facts that would reflect the state of mind of *any* individual whose mental state can be imputed to Twitter (with respect to *any* of the challenged disclosures).

1   mix.  Accordingly, the far more compelling inference, which contradicts a strong inference of

2   scienter, is that Defendants did not disclose DAU data during the Class Period because they

3   believed at that time that DAU data could present a misleading picture of user engagement.

### 3.   Stock *Purchases* during Class Period Negate Any Inference of Scienter

4

5          Supporting the more compelling innocent inference is the absence of allegations of

6   relevant stock sales and, more importantly, the fact of stock *purchases* during the Class Period.

7          Plaintiff's reliance on stock sales *before* the Class Period, Compl. ¶ 3, is entirely

8   misplaced, as "large sales of stock before the class period are inconsistent with plaintiffs' theory

9   that defendants attempted to drive up the price of [company] stock during the class period."  *In re*

10  *Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989).  Further cutting against an

11  inference of scienter is the absence of any allegations of stock sales *during* the Class Period.  *See,*

12  *e.g.*, *In re Rigel Pharms. Sec. Litig.*, 697 F.3d 869, 884-85 (9th Cir. 2012) (noting that lack of

13  stock sales undercut inference of scienter); *Bodri* at 23 (viewing absence of alleged stock sales to

14  "cut against a finding of scienter"); *Fialkov v. Microsoft*, 72 F. Supp. 3d 1220, 1233 (W.D. Wash.

15  2014) ("[T]he inference of motive is particularly weak here, where there are no allegations of

16  stock sales by corporate insiders"); *Xu v. ChinaCache Int'l Holdings*, 2017 WL 114401, at *12

17  (C.D. Cal. Jan. 9, 2017) (relying on absence of stock sale allegations to reject scienter).

18         And perhaps most damning for purposes of scienter (and ignored by Plaintiff) is the fact

19  that Defendant Noto *purchased* Twitter stock during the Class Period.  *See* Ex. N (Form 4).  That

20  "purchase of stock . . . tends to negate the inference of scienter."  *In re Aspeon, Inc. Sec. Litig.*,

21  168 F. App'x 836, 840 (9th Cir. 2006); *see also Bodri* at 24 (reasoning that purchase of shares

22  during class period would be "illogical" if defendant has awareness of stock's artificial inflation).

## II.   PLAINTIFF FAILS TO PLEAD A VIOLATION OF SECTION 10(b) WITH RESPECT TO USER ENGAGEMENT TRENDS

23

24

25         Plaintiff next attempts to base a claim on the "concealment" of "adverse trends in user

26  engagement," "including the fact that DAU growth had stalled" during the Class Period.  Compl.

27  ¶ 86, *see also id.* ¶ 103.  Once again, Plaintiff fails to plead that Defendants made any false or

28  misleading statements about user engagement trends, that they had any duty to disclose such

14

1    trends, or that such trends even existed.  And again, Plaintiff fails to plead scienter.

2         **A.      Plaintiff Fails To Identify False Statements About User Engagement Trends**

3         Plaintiff challenges as "false" one statement related to supposedly adverse DAU trends:

4    during the Q1 2015 earnings call, Noto said that "DAU to MAU ratios in the quarter were similar

5    to what they were by market relative to Analyst Day."  Compl. ¶ 102.  Plaintiff claims that "DAU

6    was not 'similar' to Analyst Day."  *Id.* ¶ 102(a).  Plaintiff fails to plead falsity.

7         The characterization of ratios as "similar" is not actionable.  To plead falsity, Plaintiff must

8    demonstrate that the challenged statement is "capable of objective verification."  *Cement &*

9    *Concrete Workers v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1138-39 (N.D. Cal. 2013)

10   (Tigar, J.) (statements "that are not capable of objective verification or lack a standard against

11   which a reasonable investor could expect them to be pegged" are not actionable), *aff'd sub nom*

12   *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d

13   1268 (9th Cir. 2017).  A statement that two figures are "similar" is too vague to be capable of

14   objective verification, particularly where, as here, Plaintiff claims that the DAU to MAU ratio

15   changed from 48% to 44%.  These percentages are certainly close enough that it was not securities

16   fraud to call them "similar."

17        Moreover, Plaintiff fails to allege any well-pleaded facts to support its claim of an

18   "adverse" DAU trend at the time of Noto's statement.  Plaintiff attempts to rely on an August

19   2015 analyst report that identifies a 4% decline in the DAU to MAU ratio for Twitter's top 20

20   markets from an *average* of 48% (for the first three quarters of 2014) to an *average* of 44% (for

21   Q2 2015).  Compl. ¶¶ 87(b), 102(c).  This analyst report about an alleged decline was issued four

22   months after Noto's April 2015 statement, and cannot be used to establish that Noto's statement

23   about a DAU to MAU ratio was false when made.  Moreover, the analyst report compares a ratio

24   for the first three quarters of 2014 with a ratio for the second quarter of 2015, and thus reflects a

25   different comparison than that made by Noto in the statement at issue.  Finally, there is no reason

26   to believe that Noto's challenged April 2015 statement referred to the DAU to MAU ratio for the

27   top 20 markets referenced in the analyst report (as opposed to a broader or narrower group of

28   markets).  Because "Plaintiff does not identify any specific report or state the particular facts

1   available to Defendants that would make any of their statements false," *Bodri* at 13,[11] Plaintiff's

2   attempt to allege a false statement about user engagement trends necessarily fails.

3       **B.      Defendants Had No Duty To Disclose User Engagement Trends**

4           **1.      No Independent Duty to Disclose User Engagement Trends**

5       Plaintiff cannot show that Defendants had a duty to disclose trends in user engagement

6   based on Item 303 or because that information was important to investors.  *See supra* pp. 7-8.

7           **2.      No Duty to Update Prior Statements about User Engagement Growth**

8       Plaintiff wrongly suggests that Defendants had a "duty to update" statements made months

9   before the beginning of the Class Period about DAU metrics.  Specifically, Plaintiff relies on a

10  handful of slides from a 500+ slide presentation from a November 2014 Analyst Day that showed

11  how ***hypothetical*** growth in the DAU to MAU ratio for Twitter's top 20 markets ***could*** lead to

12  revenue growth.  Compl. ¶ 85(j).  Plaintiff concludes that Defendants were required to update

13  these statements during the February 2015 Q1 2015 earnings call because they "concealed the fact

14  that DAU was not growing according to plan."  *Id.*  However, the growth scenarios discussed in

15  November 2014 were clearly marked as hypothetical and disclaimed from being projections.

16  Indeed, Plaintiff misleadingly cropped the slides to exclude the explicit disclaimer that the

17  "presentation should not be treated as a forecast, projection or financial guidance."  Ex. J at 8-10.[12]

18          **3.      No Duty to Disclose DAU Trends to Prevent Misleading Statements**

19      Plaintiff claims that Defendants' "concealment" of supposedly adverse DAU trends

20  rendered three statements "misleading" because they gave the false impression that engagement

21  was improving when it was either flat or declining.  These claims also fail.

22      **"Very high DAU to MAU" statement not misleading**.  Plaintiff suggests that Noto's

23  statement on February 5, 2015 that "[i]n our more mature markets we have very high DAU to

---

[11] Plaintiff's heavy reliance on statements made by analysts rather than Defendants, Compl. ¶ 52, is misplaced.  *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1051 (N.D. Cal. 2007) (defendants not liable for analyst statements that "repackaged" defendants' statement).

[12] Even if they had been projections, Defendants had no duty to update them.  *In re FoxHollow Tech., Inc., Sec. Litig.*, 2008 WL 2220600, at *17-20 (N.D. Cal. May 27, 2008) (no duty to update pre-class statements that either reflected accurate historical facts or were forward-looking statements that did not "contain some factual representation that remain[ed] 'alive' in the minds of investors as a continuing representation"), *aff'd*, 359 Fed. App'x 802 (9th Cir. 2009).

MAU, 50% plus," Compl. ¶ 86, misleadingly gave the impression of user engagement growth because Twitter's "top twenty markets accounted for 80% of Twitter's users and 90% of Twitter's revenue." *Id.* Plaintiff fails to plead, however, that Noto's reference to "more mature markets" meant Twitter's "top 20" markets.[13]

Moreover, nothing about the statement (which was limited to historical fact) implies anything about how engagement might change in the future. *Bodri* at 16 ("[T]he Court cannot conclude that any reasonable investor would take the statement about past and present ASPs as an objective assurance of future ASP stability."); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) ("Disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.").

**Timeline-views-per-MAU statement not misleading**.  Plaintiff also challenges Noto's statement on February 5, 2015 that "Timeline Views-per-MAU were 'up 3% year over year, and ***better than our outlook for Timeline-views-per-MAU to be flat***'" relative to Q4 2013.  Compl. ¶ 86.  Plaintiff suggests that this statement gave the "impression that user engagement was improving as of Q4 2014." *Id.*  Again, statements of historical fact do not imply anything about the ***future*** prospects of DAU growth.

**Product initiatives statements not misleading**.  Finally, Plaintiff challenges as misleading the following statement Noto made on April 28, 2015, claiming that Defendants "misrepresented the success of new product initiatives in driving increased user engagement":

> I talked last quarter about the experiments we were running to test instant timeliness [sic]. . . .  The results during our experiment were quite positive in terms of engagement. . . .  I'll start with an update on the While You Were Away function, which we call Recap internally for short.  ***We're seeing perhaps the most exciting results here***. . . .  These tweets are not only seeing higher engagement, they're bringing people back to Twitter more frequently.  Importantly, the machine learning work we're doing for Recap is helping us make these algorithms better and driving continuous improvements in engagement, so we're going to double down on Recap because of the success we're having here.

---

[13] On the Q3 2014 earnings call three months earlier, Defendant Noto said, "if you look at our top five markets in the second quarter and third quarter . . . you'll see that in our top five markets the DAU to MAU ratio is in the low-50% range." Ex. F at 10.  This statement strongly suggests that Noto's February reference to "more mature markets" was to these "top five" markets, not to Twitter's top 20 markets.

1    Compl. ¶ 103 (emphasis original) ("timeliness" should read "timelines").

2            Plaintiff never alleges what part of this statement (and more not quoted above) it claims is

3    misleading, thus failing to meet its burden to plead with particularity.  *See 3226701 Canada, Inc.*

4    *v. Qualcomm, Inc.*, 2017 WL 971846, at *14 (S.D. Cal. Jan. 27, 2017) (PSLRA not satisfied where

5    complaint fails to identify specific statement claimed to be misleading and basis for that claim).

6    Plaintiff appears to take issue with the statement that "[w]e're seeing perhaps the most exciting

7    results here."  Compl. ¶ 103.  However, that statement, and those that accompany it, are classic

8    examples of corporate optimism that courts routinely dismiss as non-actionable puffery.  *See*

9    *Bodri* at 11-12 (rejecting corporate optimism as non-actionable puffery); *Melot v. JAKKS Pac.,*

10   *Inc.*, 2016 WL 6902093, at *19 (C.D. Cal. Nov. 18, 2016) (statements that product was off to

11   "positive start" and that management was "excited about" product launch were not actionable

12   statements of "corporate optimism"); *Wozniak v. Align Tech.*, 850 F. Supp. 2d 1029, 1036 (N.D.

13   Cal. 2012) (statements that "'we are very pleased with the learning from our pilot launch,'" and

14   "'so far we're getting really great feedback'" deemed non-actionable puffery).  Moreover, Plaintiff

15   fails to explain how the quoted passage suggests anything about user engagement trends.  While it

16   expresses excitement about the results of experimental ***tests*** on new products, it does not promise

17   that user engagement would improve outside of these tests.[14]

18           **C.      Plaintiff Fails To Plead An Adverse User Engagement Trend**

19           Plaintiff's failure to allege an adverse user engagement trend during the Class Period

20   means Plaintiff necessarily cannot plead a duty to disclose such a trend.  The only information

21   Plaintiff identifies to suggest a decline in user engagement is an August 2015 analyst report, which

22   states that Twitter's DAU to MAU ratio for its top 20 markets declined from an average of 48%

23

_____

24   [14] Plaintiff points to statements made in July and September 2015 that these product initiatives
     "haven't been impactful to the numbers," Compl. ¶¶ 89(g), 104(k), as proof that Noto's statement

25   was misleading, but fails to explain why that is so.  Any *post hoc* determination that the results of
     new product initiatives were not as good as predicted does not render the earlier statement false

26   when made.  *N.Y. Teachers' Ret. Sys. v. Fremont Gen. Corp.*, 2009 WL 3112574, at *10 (C.D.
     Cal. Sept. 25, 2009) ("[F]act that subsequent disclosures revealed that the remedial measures were

27   not sufficient does not render false the individual Defendants' contemporaneous statements about
     those measures.").  Moreover, the September 2015 statements that these were "good initiatives"

28   and that "some of them have statistically shown positive results," Compl. ¶ 89(g), are entirely
     consistent with Noto's earlier positive but measured statement that Plaintiff challenges.

over the first three quarters of Q3 2014 to an average of 44% for the three months of 2Q 2015. Compl. ¶¶ 87(b), 102(c).  But the report says nothing about the *timing* of that decline, which could have occurred in the three months before the Class Period began.  Moreover, the analyst report is silent as to whether total DAU increased or decreased during the Class Period.  Because Twitter added 32 million MAUs during that time, total DAU may have increased, but not as quickly as MAU.  *Bodri* at 14 (statements that sales were "improving" were not false when made where plaintiff failed to "present any evidence that an alternate state of affairs is more plausible").[15]

Plaintiff's attempt to allege adverse user engagement trends based on CWs fares no better:

| Witness | Allegation | Weaknesses |
|---|---|---|
| CW-1 | DAU trajectory "generally flat during early 2015" Compl. ¶ 67 | • Unclear if relates to before or during Class Period<br>• Unclear which DAU metric was involved<br>• Unclear as to meaning of "generally flat" |
| CW-2 | "[C]oncern . . . over the trajectory of DAUs during late 2014 and early 2015." *Id.* ¶ 68 | • Unclear who was concerned or what concern was<br>• Unclear if concern relates to Class Period<br>• Complaint does not allege that CW-2 had knowledge of DAU as part of job responsibilities |
| CW-4 | "DAU trends were flattening out." *Id.* ¶ 70 | • Not at Twitter during Class Period[16]<br>• Alleges that DAU was "flattening," not flat |
| CW-5 | "DAU trends were declining during the Class Period." *Id.* ¶ 71 | • Extent and timing of alleged decline not disclosed; no specifics of alleged trend provided |
| CW-7 | DAU growth "mostly flat" by late 2014; growth team had difficulty obtaining growth. *Id.* ¶ 73 | • Not alleged to be at Twitter during Class Period<br>• Statement clearly does not relate to Class Period<br>• "Mostly flat" growth is vague |
| CW-11 | By the end of 2014, "user engagement rates were 'not great,'" and "in late 2014 and early 2015," "the metrics presented 'a very bleak picture.'" *Id.* ¶ 77 | • Statement does not appear to relate to Class Period<br>• Statement is vague (*e.g.*, which "user engagement rates," which "metrics")<br>• No statement about overall trend of user engagement, using any metric |

Whether taken separately or together, the CWs' vague claims that DAU growth was "mostly flat"

---

[15] Plaintiff attempts to divine Twitter's Q1 2015 DAU number by reverse engineering certain subsequently disclosed numbers, concluding that DAU fell from 109 million in Q3 2014 to approximately 106 million in Q1 2015. Compl. ¶ 102(a).  This calculation is inherently unreliable because, as Plaintiff acknowledges, Twitter "changed how the DAU metric was calculated at Q3 2016." *Id.* ¶ 102(a) n.41.  Plaintiff improperly assumes that these changes had no impact. *City of Roseville*, 963 F. Supp. 2d at 1112 (refusing to credit similar attempt to "'back[ ] in'" to undisclosed financial figures).

[16] *See In re Downey*, 2009 WL 2767670, at *10 (CWs who left company before start of class period had "no basis to opine about [company's] underwriting or lending practices after they left the company"); *In re Silicon*, 2007 WL 760535, at *19-20 (discrediting statements from CWs who did not "occup[y] positions at [company] during the relevant period that would have provided them with personal knowledge" of allegedly fraudulent conduct).

"are a far cry" from a particularized pleading setting forth "exact numbers" or other concrete data reflecting the alleged trend. *Bodri* at 13.

### D.    Plaintiff Fails To Plead Scienter With Respect To Adverse Trends

Any claim based on non-disclosure of adverse user engagement trends also fails because Plaintiff has not alleged any facts to support a strong inference of scienter.  The CWs provide no information to support scienter.  Instead, Plaintiff relies on a handful of executive departures and a hollow core operations theory.  Those scant allegations cannot satisfy the PSLRA's demanding standards.

### 1.    *None* of the CWs Provide Any Relevant Statements as to Scienter

The CWs do not support *any* inference of scienter with respect to DAU or other user engagement trends.  Not only are the CWs' generic statements that user engagement trajectories were flat or declining inadequately pleaded, but they also fail to give rise to an inference of scienter.  The CWs do not specify what, if any, information about declining user engagement was provided to the Individual Defendants.  Nor do they suggest that the Individual Defendants attended any meetings or participated in any discussions described by the CWs.  In short, the CWs say nothing about either Individual Defendant's knowledge of user engagement trends, let alone their state of mind when it came to investor disclosures on this topic.  *See also supra* p. 13.[17]

### 2.    Allegations Regarding Executive Departures Do Not Support Scienter

Plaintiff's threadbare allegations regarding a handful of executive departures during and after the Class Period, Compl. ¶¶ 129-133, fail to support scienter because "resignations or terminations by themselves do not support a strong inference of scienter . . . .  Instead, a resignation or termination provides evidence of scienter **only when** it is accompanied by additional evidence of the defendant's wrongdoing."  *In re Downey*, 2009 WL 2767670, at *13.  "[A] plaintiff must allege sufficient information to differentiate between a suspicious change in

---

[17] CW-5's statement that "Twitter management was scrambling to come up with other metrics that would impress investors and 'turn Wall Street's view' away from the flat or decreasing DAU and MAU," Compl. ¶ 71, is uncorroborated and is merely a bald, conclusory statement that lacks particularity.  At most, CW-5 is "merely regurgitating gossip and innuendo," which does not give rise to a strong inference of scienter.  *In re Dot Hill*, 594 F. Supp. 2d at 1163.

1   personnel and a benign one." *Zucco*, 552 F.3d at 1002.  Thus, if a complaint fails to allege that

2   "the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and

3   termination patterns or was accompanied by suspicious circumstances," then "the inference that

4   the defendant corporation forced certain employees to resign because of its knowledge of the

5   employee's role in the fraudulent representations will never be as cogent or as compelling as the

6   inference that the employees resigned or were terminated for unrelated personal or business

7   reasons." *Id.*

8        The Complaint does nothing to compare the five or six referenced departures during the

9   Class Period with typical attrition patterns at young technology companies, in Silicon Valley

10  generally, or even at Twitter specifically.  Instead, Plaintiff relies on speculation that Costolo was

11  forced to leave because of low growth.[18]  And even if that gossip were well-founded, the departure

12  would be a result of a failure to achieve certain growth goals, a far cry from fraudulent

13  concealment of growth metrics.[19]

14              **3.    Plaintiff's Core Operations Allegations Fail to Support Scienter**

15       Having failed to otherwise plead a strong inference of scienter, the Complaint includes two

16  paragraphs in an attempt to invoke the "core operations doctrine," Compl. ¶¶ 127-128, which

17  permits an inference that "corporate officers have knowledge of the critical core operation of their

18  companies" and therefore have knowledge of facts "critical to" those core operations.  *Police Ret.*,

19  759 F.3d at 1062.  That inference allows, at most, a conclusion that a defendant had ***knowledge*** of

20  a particular fact; it does not mean that the defendant acted with ***scienter*** with regard to statements

---

[18] CW-1's statement that it was "internally thought" (by unspecified people), and CW-2's statement that "the [undisclosed] people with whom he spoke at Twitter understood," that Costolo was asked to leave because of low user growth (Compl. ¶¶ 67-68) should be rejected as unsubstantiated. *See City of Roseville*, 963 F. Supp. 2d at 1136 ("generic allegations that 'everyone knew' are insufficient" to support inference of scienter).

[19] Plaintiff offers no allegations to support any inference regarding why several executives left, merely stating that the timing was "curious." Compl. ¶ 133.  As to the post-Class Period departure of Gabriel Stricker, Twitter's chief of corporate communications, Plaintiff alleges that, according to a *Vanity Fair* article, Stricker "was ousted after urging management to 'come clean' about the dismal user engagement data." *Id.* ¶ 132.  But in its discussion of scienter, Plaintiff omits the very next sentence, which states that Defendant Noto agreed that the data should be disclosed but disagreed with Stricker as to the messaging strategy. Ex. M at 4.  Because the article suggests the firing related to a disagreement about how to message the disclosure, not whether to make it at all, it cannot provide support for any inference of scienter.

1    about that fact. *See id.* ("At best, these facts support a mere inference of the defendants'

2    knowledge of all core operations, not scienter."); *Colyer v. AcelRx Pharms.*, 2015 WL 7566809, at

3    *13 (N.D. Cal. Nov. 25, 2015).  As a result, the core operations doctrine is primarily "used to

4    buttress the strength of other allegations," and cannot by itself provide a strong inference of

5    scienter except in rare circumstances inapplicable here.  *Mauss v. Nuvavsive, Inc.*, 2015 WL

6    10857519, at *12 (S.D. Cal. Aug. 28, 2015).  Proving scienter by invoking the doctrine "is not

7    easy" and requires a plaintiff to "produce either specific admissions by one or more corporate

8    executives of detailed involvement in the minutia of a company's operations, such as data

9    monitoring; or witness accounts demonstrating that executives had actual involvement in creating

10   false reports." *Police Ret.*, 759 F.3d at 1062.[20]  The core operations doctrine is inapplicable here.

11       **First**, Plaintiff misapplies this doctrine.  Plaintiff contends that the Individual Defendants

12   had the objective of "strengthening Twitter's core" (*i.e.*, increasing Twitter's user base and user

13   engagement).  Compl. ¶¶ 127-28.  Plaintiff claims that by stating this objective, the Individual

14   Defendants must be charged with knowledge of all adverse facts that could impact their ability to

15   achieve the objective.  This overstates the reach of the core operations doctrine.  The doctrine

16   provides no support for Plaintiff's assumption that the Individual Defendants had knowledge of

17   specific DAU data or other user engagement metrics at particular points in time during the Class

18   Period simply because they had a goal of improving user engagement.

19       **Second**, even if the Individual Defendants can be presumed to have reviewed data

20   suggesting that certain metrics used to track user engagement reflected flat or declining trends,

21   Plaintiff has not alleged that the Individual Defendants believed (or even should have believed)

22   that those metrics properly measured user engagement or that any trends reflected in such data

23   were real.  Plaintiff ignores the fact that Twitter during the Class Period was a company creating—

24   and attempting to measure—a very new type of product.  *See supra* pp. 4-5.  Moreover, the

---

25

26   [20] Any attempt to fit within the "exceedingly rare category of cases in which the core operations inference, without more, is sufficient under the PSLRA," *S. Ferry LP v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008), fails, as those cases "are usually based on concrete numbers, not majestic

27   generalities," *Knox v. Yingli Green Energy*, 2017 WL 1013293, at *10 (C.D. Cal. Mar. 15, 2017), and involve "distinct 'red flags . . . that made the facts so prominent that they would have been

28   patently obvious to a person in the officer's position," *Mauss*, 2015 WL 10857519, at *13.

1   Individual Defendants' statements quoted in the Complaint support the inference that they did not

2   consider any of the metrics being used during the Class Period to be capable of reliably and

3   accurately measuring engagement.  *See, e.g.*, Compl. ¶ 84 n.21 (explaining decision to stop

4   reporting timeline views because metric had "become an unrepresentative measure of . . . user

5   engagement on our platform").  Significantly, Plaintiff has not challenged the contention that the

6   Individual Defendants reasonably believed the available metrics were misleading.

7       **Finally**, even if the Individual Defendants **had** received adverse user engagement data that

8   they considered reliable, Plaintiff fails to plead that there was anything that would have made it

9   "patently obvious" to them that this information needed to be disclosed.  *Zucco*, 552 F.3d at 1001.

10      In short, Plaintiff fails to meet its burden to plead scienter with particularity—"the who,

11  what, where, when and how regarding each Defendant's access to the relevant information that

12  belies fraudulent intent."  *Bodri* at 23 (rejecting application of core operations theory).

13  **III.   PLAINTIFF FAILS TO STATE A SECTION 10(b) CLAIM BASED ON MAU**

14      Plaintiff next attempts to base a fraud claim on Defendants' alleged concealment of the

15  following: (i) reported MAU figures were artificially inflated through the inclusion of "low

16  quality" users; (ii) future MAU growth was similarly dependent on such users and thus

17  unsustainable; and (iii) MAU trends were flat or declining.  *See, e.g.*, Compl. ¶¶ 88-89, 94-95,

18  101, 105, 106(a), 111-26.  These allegations fail on both falsity and scienter grounds.

19      **A.    Plaintiff Fails To Identify Any *False* Statements About MAUs**

20      Plaintiff claims that Twitter's statements about "MAU and MAU growth" were "false and

21  misleading" because Defendants included in the MAU calculation "low-quality" users that Twitter

22  allegedly brought back to the platform through marketing efforts designed to increase MAU.

23  Compl. ¶ 89(a).[21]  Even if true, that inclusion could not render any reports of MAU *false* because

24  Defendants never claimed that MAUs ***excluded*** such purportedly "low-quality" users.  Indeed,

25  Twitter defined MAU broadly to include "Twitter users who logged in or were otherwise

26  authenticated and accessed Twitter through our website, mobile website, desktop or mobile

27

28  [21] The bald assertion that Twitter "kind of faked it," as "most start-ups do when they need to goose the numbers," Compl. ¶ 78, is utterly vague as to what was "faked," let alone when and how.

23

1   applications, SMS or registered third-party applications or websites in the 30-day period ending on

2   the date of measurement," *see, e.g.*, Ex. D at 45 (2014 Form 10-K), which is exactly how MAU

3   was defined in the pre-Class Period, *see, e.g.*, Ex. C at 25 (Q3 2014 Form 10-Q), such that these

4   purportedly "low-quality" users were counted in MAU at all times.  *See In re Netflix, Inc. Sec.*

5   *Litig.*, 2005 WL 3096209, at *10 (N.D. Cal. Nov. 18, 2005) (where defendant built and defined

6   particular financial metric, plaintiff's allegation that metric should have been defined differently to

7   be more accurate and informative to investors failed to state disclosure claim).

8       **B.       Plaintiff Fails To Identify Any *Misleading* Statements About Reported MAU**

9           Plaintiff alleges that Defendants concealed the existence of trends and phenomena that

10  impacted MAU.  Plaintiff broadly claims that as a result of these trends and phenomena,

11  Defendants' statements during earnings calls regarding "MAU and MAU growth trends" were

12  misleading.  Compl. ¶¶ 88-89, 105-06.  Plaintiff's theories do not state a claim.

13      **1.       No Misleading Statement with Respect to Automated Users**

14          Plaintiff claims that Twitter's MAU disclosures on earnings calls were misleading because

15  "[a] subset of Twitter's reported MAUs were low quality, fully automated users who 'used third

16  party applications that may have automatically contacted [Twitter's] servers for regular updates

17  without any discernible additional user-initiated action.'"  Compl. ¶ 89(e); *see also id.* ¶¶ 87(c)-

18  (d), 107.  *Well before* any of these statements, however, Twitter prominently disclosed this fact:

19  
20          Our metrics are also affected by third-party applications that automatically contact
            our servers for regular updates with no user action involved, and this activity can
21          cause our system to count the users associated with such applications as active
            users on the day or days such contact occurs. . . .  In the three months ended June
22          30, 2014, approximately 11% of all active users solely used third-party
            applications to access Twitter.  However, only up to approximately 8.5% of all
23          active users used third party applications that may have automatically contacted
            our servers for regular updates without any discernible additional user-initiated
24          action.  The calculations of MAUs presented in this Quarterly Report on Form 10-
            Q may be affected as a result of automated activity.

25  Ex. B at 4 (Q2 2014 Form 10-Q).  Twitter made substantially similar disclosures in every SEC-

26  filed report thereafter.  *See* Ex. C at 4 (Q3 2014 Form 10-Q); Ex. D at 4 (2014 Form 10-K); Ex. E

27  at 4 (Q1 2015 Form 10-Q).  Indeed, the phenomenon was widely reported in the press as early as

28

August 2014.  *See* Compl. ¶¶ 87(d) n.28, 89(e) nn.35 & 36 (Exs. P-R).[22]  In short, the phenomenon that Plaintiff raises was in fact disclosed and well known, thus defeating any non-disclosure claim. *See Altayyar v. Etsy*, 2017 WL 1157193, at *13 (S.D.N.Y. Mar. 16, 2017) ("The defendants cannot be held liable for failing to disclose something that they disclosed.").

### 2.    No Misleading Statement with Respect to Robot or Spam Users

Plaintiff also claims that Defendants' earnings call statements about MAU were misleading because "users [were] utiliz[ing] robot accounts," that is, fake or spam accounts that "could have easily been created or bought."  Compl. ¶ 89(f); *see also id.* ¶ 69.  However, once again, Twitter fully disclosed (both before and during the Class Period) that some portion of its user base consisted of fraudulent or spam accounts and that although it had made efforts to eliminate those users from its reported MAUs, there was no guarantee that its efforts were successful:

> The numbers of active users and timeline views presented in this Quarterly Report on Form 10-Q are based on internal company data.  While these numbers are based on what we believe to be reasonable estimates for the applicable period of measurement, there are inherent challenges in measuring usage and user engagement across our large user base around the world.  For example, there are a number of false or spam accounts in existence on our platform.  We have performed an internal review of a sample of accounts and estimate that false or spam accounts represented less than 5% of our MAUs.  In making this determination, we applied significant judgment, so our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated.  We are continually seeking to improve our ability to estimate the number of spam accounts and eliminate them from the calculation of our active users. . . . Spam accounts that we have identified are not included in the active user numbers presented in this Quarterly Report on Form 10-Q.

Ex. B at 4 (Q2 2014 Form 10-Q); *see also* Ex. C at 4; Ex. D at 4; Ex. E at 4; Exs. K & L (articles reporting existence of fraudulent or "spam" accounts and difficulty in eliminating the accounts).[23]

### 3.    No Misleading Statement with Respect to Product Initiatives

Plaintiff alleges that Defendants' earnings call statements about MAU growth were also misleading because Twitter's "new product initiatives were not having a meaningful impact on

---

[22] Plaintiff claims that MAU also was misleading because it was presented "without necessary context," including "the quality of those users," Compl. ¶ 119, but never explains why that is so. Nor could it, as Twitter never suggested that MAU implied any particular level of user quality.

[23] Neither of the CWs who discuss this issue says anything beyond what Twitter already disclosed. *See* Compl. ¶ 69 (CW-3 noting unquantified impact of robot accounts on MAU); *id.* ¶ 72 (CW-6 stating that "fake accounts contributed greatly to the number of 'new' and active users").

1   driving MAU growth." Compl. ¶ 89(g). This claim fails because Plaintiff points to no statement

2   claiming that new product initiatives *were* having a meaningful impact on MAU growth.

3        Plaintiff first challenges a statement made on the February 5, 2015 Q4 2014 earnings call,

4   during which Twitter personnel explained certain new initiatives introduced in an effort to drive

5   user growth. Ex. G at 2-5 (Q4 2014 Earnings Call). After those initiatives had been discussed, an

6   analyst inquired about anticipated Q1 2015 MAU trends. *Id.* at 7. Costolo projected that the "Q1

7   trend is likely to be back in the range of absolute net adds that we saw during the first three

8   quarters of 2014." *Id.* at 8. He further opined that these trends would be shaped by "a

9   combination of seasonality or return to organic growth and the set of product initiatives we've

10  created to drive growth." *Id.* at 7. Costolo's statement followed a comment by Noto that

11  "[a]lthough we don't expect the product launches and tests announced over the last two weeks [to]

12  have a meaningful impact on Q1 user growth, we're ***hopeful*** that these product initiatives will

13  contribute in subsequent quarters." *Id.* at 5. The statements in question were not misleading.

14       First, Costolo's forward-looking statement about "net adds" being in the range of the first

15  three quarters of 2014 proved to be true.[24] Moreover, Costolo's and Noto's statements about the

16  expected impact of new product initiatives on future MAU growth reflected their belief that the

17  product initiatives would have some positive impact. Neither Defendant stated that these

18  initiatives would have any immediate meaningful impact on user growth. Plaintiff's reliance on

19  Noto's post-Class Period statement that "product initiatives . . . have not yet had [a] meaningful

20  impact" on driving MAU growth, Compl. ¶ 89(g), is an impermissible attempt to plead "fraud by

21  hindsight." *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996) (that statement

22  "prove[d] to be wrong in hindsight does not render the statement untrue when made"). In

23  addition, such general statements of corporate optimism are non-actionable puffery. *Supra* p. 18.

24       Further, Costolo's statement about the potential drivers for Q1 2015 MAU growth is non-

25  actionable because it was accompanied by meaningful cautionary language, and falls squarely

26

27  _____

28  [24] Twitter added 14 million users to its MAU metric for Q1 2015 from the prior quarter, compared to a range of 13-16 million users in the first three quarters of 2014. Ex. E at 24.

1   within the PSLRA's "safe harbor" provision.[25] *In re Mellanox*, 2014 WL 12650991, at *14 (CEO

2   statement that he expected new product "to remain a high percentage of revenue" in future fell

3   within PSLRA safe harbor); *Bodri* at 18-22 (applying safe harbor "immunity").

4          Finally, Plaintiff's attempt to challenge statements about MAU growth initiatives on the

5   Q1 2015 earnings call, *see* Compl. ¶ 106, fails because Plaintiff does not identify any allegedly

6   misleading statement. *See Seaman v. Cal. Bus. Bank*, 2014 WL 1339649, at *4 (N.D. Cal. Apr. 2,

7   2014) (Tigar, J.) ("To plead falsity, the complaint must specify each statement alleged to have

8   been misleading, [and] the reason or reasons why the statement is misleading.").

9                  **4.       No Misleading Statement with Respect to "Paid Growth Users"**

10          Plaintiff claims that Defendants' statements about MAU growth were misleading because

11   some of Twitter's MAU growth was "'paid growth' (additional users gained through efforts by

12   Twitter's marketing team)." Compl. ¶ 57. Plaintiff further alleges that Twitter distinguished

13   internally between "paid growth" and "organic growth," and, although it determined that "paid

14   growth" users were "not as engaged" and more likely to "more likely to drop off the platform," it

15   did not share this information with investors. *Id.* ¶¶ 57, 88 n.31, 89(a). Plaintiff claims that the

16   MAU figures and discussions of MAU growth were therefore misleading. *Id.* ¶¶ 87(h), 89(a).

17          Once again, Plaintiff fails to plead that any of Defendants' statements were rendered

18   misleading as a result of paid user growth. Plaintiff focuses on a single statement made by

19   Costolo on the Q4 2014 earnings call that he expected future MAU growth over the next quarter to

20   be attributable, ***in part***, to "organic" growth, *id.* ¶¶ 88, 89(a). As discussed, *supra* p. 27, that

21   statement was a non-actionable forward-looking statement. Moreover, nothing in that statement

22   suggested how much of the future MAU growth would be organic or sought to dispel the notion

23   that some portion of future MAU growth could come from other means, including those alleged in

24   the Complaint. Further, nothing in this statement attempted to characterize the quality of future

25   _____

26   [25] At the outset of the Q4 2014 earnings call, Twitter told investors that: "we will be making forward-looking statements on this call, such as our outlook for Q1 and 2015 and our operational plans and strategies. Actual results could differ materially from those contemplated by our

27   forward-looking statements and reported results should not be considered as an indication of future performance." Ex. G at 1. *See In re Tibco Software, Inc. Sec. Litig.*, 2006 WL 1469654, at

28   *26 (N.D. Cal. May 25, 2006) (finding similar disclosures sufficient for PSLRA safe harbor).

1    MAU growth or to compare that quality to past MAU growth.

2          Plaintiff's allegations about paid users also fail because the Complaint lacks well-pleaded

3    facts that Twitter contacted existing users to change their passwords to increase MAUs, much less

4    that such "paid growth users" contributed in any meaningful way to MAUs. *CW-1* stated that "at

5    least some of [the] MAU growth" achieved "during 2014" involved "'bringing back low-quality

6    MAU.'" Compl. ¶¶ 67, 89(a). Because CW-1 spoke only of 2014 growth before the Class Period,

7    these statements are irrelevant to Plaintiff's claims. *CW-3* "believed that . . . 'users who signed

8    onto Twitter once a month because they were prompted to sign in'" contributed to Twitter's

9    overall MAU metric. *Id.* ¶ 69. However, CW-3 does not provide the basis for this belief or how

10   much these alleged users contributed to MAU, at any time. (Indeed, Plaintiff fails to allege that

11   CW-3 worked at Twitter during the Class Period.) And *CW-8* allegedly stated that "paid growth

12   users that signed up as a result of Twitter's marketing campaigns were not engaged and did not

13   remain Twitter users." *Id.* ¶ 74. Like CW-3, CW-8 is not alleged to have been employed at

14   Twitter during the Class Period, rendering his or her observations irrelevant.[26]

15          **C.        Plaintiff Fails To Allege Any Duty To Disclose Adverse MAU Growth Trends**

16          Plaintiff claims that Defendants were obligated to disclose "an adverse change in the MAU

17   growth trend," Compl. ¶¶ 94, 111, 125-26, which Plaintiff alleges was "flat" by the start of the

18   Class Period and not anticipated to increase in the long term. This claim fails as well.[27]

19          First, Defendants *disclosed* historical MAU growth trend information, rendering Plaintiff's

20   non-disclosure claim nonsensical. Twitter not only disclosed MAUs, *see, e.g.*, Ex. G at 2, 5 (Q4

21   2014 earnings call), but it also provided investors with a chart showing the change in MAUs over

22   the prior *eight quarters*. Ex. D at 45 (2014 Form 10-K); Ex. E at 24 (Q1 2015 Form 10-Q). And

23   while those charts showed an MAU increase every quarter, Twitter further cautioned investors that

24   _____

25   [26] The *Vanity Fair* article (Compl. ¶ 78; Ex. M) includes similar allegations but is based entirely
     on hearsay and lacks any form of quantification or any other specificity.

26   [27] Plaintiff argues that the disclosed MAU data was misleading (for the automated and "low-
27   quality user" reasons discussed above) and thus masked the fact that "true" MAU growth was flat
     during the Class Period. *Id.* ¶ 87(e). However, because Defendants disclosed how they calculated
28   MAU metrics and the fact that they included automated, robot, and spam users, Plaintiff cannot
     allege an undisclosed MAU trend.

such historical growth should not imply future MAU growth because it "anticipate[d] that [its] user growth rate will slow over time as the size of [its] user base increases." Ex. D at 11 (2014 Form 10-K); Ex. E at 36 (Q1 2015 Form 10-Q).[28]

Second, vague and unreliable CW statements fail to support any such undisclosed trend:

- o  __CW-1__ discusses "MAU growth achieved during 2014," Compl. ¶ 67, which predates the Class Period and is thus irrelevant.  *See supra* p. 11 & n.7.

- o  __CW-2__ states that "everyone at the Company with whom he spoke understood that growth was flat," Compl. ¶ 68, thus repeating impermissible and vague hearsay.  *See supra* p. 11 & n.8.

- o  __CW-4__ was not employed at Twitter during the Class Period, Compl. ¶ 70, and provides irrelevant allegations that relate to 2014.  *See supra* p. 11 & n.7.

- o  __CW-5__ alleges that he "'absolutely' saw metrics showing [MAU] was flat or declining leading up to and continuing through the Class Period," Compl. ¶ 71, but fails to specify what these metrics were, what exact trends he saw and when, or how those trends differed from what Defendants reported at any given time.

- o  __CW-6__ claims that management knew MAU growth was "weak" and, in "private conversations" with "department heads" about MAU trends, managers "did not believe that user growth was sustainable," but these claims are too vague to be credited and also are based on impermissible hearsay.  Comp. ¶ 72.

- o  __CW-7__ claims that "from early 2014 to early 2015, the Company's MAU growth was only 5% month-to-month and mostly flat."  Compl. ¶ 73.  These allegations are irrelevant based on the time period, *supra* p. 11 & n.7, and fail to describe MAU trends with specificity.  (Moreover, while 5% growth is semi-specific (although not as to time), it contradicts the conclusion of "mostly flat" growth.)

- o  __CW-8__ is not alleged to have worked at Twitter during the Class Period.  The claim that growth was "'really dying down,'" Compl. ¶ 74, is vague at best.

### D.  Plaintiff Fails To Plead Scienter With Regard To MAU

In an attempt to plead scienter, Plaintiff again relies on poorly pleaded and irrelevant

---

[28] Moreover, Plaintiff's own allegations defeat any suggestion that Defendants made a misleading statement about MAU growth trends.  As Plaintiff explains, "[d]uring the Q1 . . . earnings call, Defendants disappointed investors by lowering their MAU growth guidance for the coming quarter."  Compl. ¶ 105.  On the call, Defendant Noto stated that "[i]n Q2, we're not seeing the benefit from those three factors [growth initiatives, a return to organic growth and seasonal growth] as much and there is also some headwinds.  So, at this point, our visibility is actually limited as it relates to Q2 MAU adds.  We're off to a slow start in April and so the visibility is not as strong as it was in Q1 and the trend is not similar to Q1."  Ex. H at 8 (Q1 2015 earnings call).  None of these statements touted or suggested future MAU growth.

allegations from CWs.  None of the CWs allege they met or spoke with the Individual Defendants, and the CWs never purport to have anything to say about either Individual Defendant's state of mind.  Many of the CWs' allegations address periods largely or wholly **before** the Class Period and therefore cannot address scienter **during** the Class Period.  *See supra* p. 11 & n.7.  And CW-6's statement that "Twitter management knew the fake accounts were an ongoing problem and chose to ignore it because it contributed to the Company's overall user metrics," Compl. ¶ 72, also does not support scienter.  Indeed, CW-6 provides no information as to *who* in management knew about fake accounts but ignored them, what CW-6 considered to be a fake account, or how a contract employee at Twitter for less than a year would possibly have access to such information. And as with the other issues, Plaintiff offers nothing to meet its burden of pleading scienter.

## IV.     PLAINTIFF FAILS TO STATE A SECTION 10(b) CLAIM BASED ON USER AD ENGAGEMENT STATEMENTS

Plaintiff challenges Defendants' identification, in a letter to the SEC, of "changes in ad engagements" as a metric that was "intended to serve as a measure of user engagement" during the Class Period.  Compl. ¶ 114; Ex. O.  Plaintiff also challenges the statement that "management internally tracked [this metric] . . . to monitor trends in user engagement" and "believe[d] [it] [wa]s helpful to investors to understand the same."  *Id.*  Plaintiff fails to state a disclosure claim or plead facts supporting scienter as to the user ad engagement statements.

### A.      Plaintiff Fails To Identify Any False Statement About User Ad Engagements

Plaintiff claims that Defendants' identification of user ad engagements as a measure of user engagement was false because ad engagements in fact "were not a measure of user engagement."  Compl. ¶ 115.  Plaintiff fails to support that premise.  At the time the challenged statements were made, Twitter defined ad engagements as "user interaction[s] with [Twitter's] pay-for-performance Promoted Products [that] include expanding, retweeting, favoriting or replying to a Promoted Tweet, playing an embedded video, downloading a promoted mobile application or opting in to further communications from an advertiser in a Promoted Tweet, or following the account that tweets a Promoted Tweet."  Ex. E at 25 (Q1 2015 Form 10-Q).  Accordingly, ad engagements measured users' engagement with Twitter's platform and, more

specifically, their engagement with advertisements, Twitter's primary source of revenue.  *Id.*

Plaintiff alleges that Defendants, in prior SEC disclosures, had "specifically referenced ad engagement[s] as a monetization metric" rather than a user engagement metric.  Compl. ¶ 115.  However, this disclosure is inapposite.  Defendants did not represent—and Plaintiff does not allege—that those two categories were mutually exclusive such that ad engagements could not measure both user engagement and monetization.  Plaintiff's bald contention that "Twitter management clearly was aware that monetization metrics . . . were used for distinctly different purposes than user engagement metrics," *id.* ¶ 116, is unsupported.  Plaintiff references only CW-11's statement that "there is no direct correlation between advertising engagement, on the one hand, and MAU or DAU, on the other," *see id.* ¶ 77.  But that statement is irrelevant.  Defendants did not state that changes in ad engagements would or would not be "directly" correlated with any other metric, only that they were one way that Twitter measured user engagement.

Plaintiff also fails to plead falsity with respect to the statement that Twitter management "internally tracks changes in ad engagements . . . to measure trends in user engagement."  *Id.* ¶ 114.  Plaintiff claims this statement is false because "Twitter internally tracked DAU as its primary user engagement metric."  *Id.* ¶ 116.  However, the challenged statement said nothing about whether Twitter relies on any other metrics, including DAU metrics, to track user engagement.  It also neither stated nor implied that changes in ad engagements was Twitter's only or primary user engagement metric.[29]

## B.    Plaintiff Fails To Identify Any Misleading Statements

Plaintiff claims that Defendants' statement that they "believe[d]" that the changes in ad engagements metric was "helpful to investors to understand" user engagement trends was

---

[29] The statement that Twitter "intended [changes in ad engagements] to serve as a measure of user engagement," Compl. ¶ 114, is clearly a subjective statement of belief that is not actionable absent specific factual allegations that either Defendants did not sincerely hold that belief, or that they lacked a reasonable basis for the opinion.  *Omnicare, Inc. v. Labs. Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1326, 1333 (2015); *accord In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *19 (N.D. Cal. Oct. 1, 2015).  As to that statement, Plaintiff does not (and cannot) contend that Defendants did not reasonably believe that changes in ad engagements could serve as a measure of user engagement.  *See In re Mellanox*, 2014 WL 12650991, at *16 (dismissing claim based on opinion for failing to plead with particularity "subjective falsity—that [defendant] actually disbelieved his own projection" when made).

1   misleading because "the trend in ad engagements was moving in the opposite direction as the

2   trend in user engagement." *Id.* ¶¶ 114, 117.  As discussed *supra* pp. 19-20, the premise that ad

3   engagement metrics were moving in the opposite direction of DAU or other user engagement

4   trends is not well-pleaded because Plaintiff fails to set forth the supposed "trend in user

5   engagement" through well-pleaded facts.  Moreover, Plaintiff fails to allege through well-pleaded

6   facts that measures of user engagement other than DAU did not provide relevant information

7   about user engagement.  Thus, the fact that any user engagement trend based on ad engagement-

8   related data may have differed with any such trend based on DAU-related metrics does not mean

9   that the ad engagement based trend is inaccurate; it simply means that two different measures of

10  user engagement produced divergent results.

11              **C.      Plaintiff Fails To Plead Facts Sufficient To Raise A Strong Inference Of**

12                      **Scienter With Regard To Ad Engagement Trends**

13             Plaintiff cannot state a fraud claim with regard to ad engagement trends because it pleads

14  no facts giving rise to a strong inference of scienter.  The bald assertion that "Twitter management

15  clearly was aware that monetization metrics . . . were used for a distinctly different purpose than

16  user engagement metrics" is not well-pleaded and does not support scienter any more than it

17  supports falsity.  And Plaintiff fails to allege any facts suggesting that either Individual Defendant

18  ever believed or should have believed that the disclosures were false or misleading in any way.

19  **V.     BECAUSE PLAINTIFF HAS NOT PLEADED AN UNDERLYING VIOLATION,**

20          **PLAINTIFF FAILS TO PLEAD A SECTION 20(a) CONTROL PERSON CLAIM**

21             Because Plaintiff fails to plead an underlying violation of the Exchange Act, it fails to state

22  a claim for control person liability under Section 20(a).  *See In re Mellanox*, 2014 WL 12650991,

23  at *19 ("[B]ecause Plaintiffs have not sufficiently pled a violation of Section 10(b), all claims

24  under Section 20(a) must also be dismissed."); *Bodri* at 25 (same).

25                                            **CONCLUSION**

26             The Twitter Defendants respectfully submit that the Complaint should be dismissed.

27

28

32

MP&A ISO Twitter Defendants' Motion to Dismiss Consol. Compl.                    Case No. 3:16-cv-05314-JST

1    May 2, 2017                         SIMPSON THACHER & BARTLETT LLP

2                                        /s/ James G. Kreissman
                                         James G. Kreissman (Bar No. 206740)
3
                                         *Attorneys for Defendants*
4                                        *Twitter, Inc., Richard Costolo and Anthony Noto*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28