BLEICHMAR FONTI & AULD LLP
LESLEY E. WEAVER (191305)
1999 Harrison Street, Suite 670
Oakland, CA  94612
Telephone:  (415) 445-4003
Facsimile:  (415) 445-4020
Email:     lweaver@bfalaw.com

*Liaison Counsel for Lead Plaintiff and the Class*

MOTLEY RICE LLC
GREGG S. LEVIN (admitted *pro hac vice*)
MEGHAN S. B. OLIVER (admitted *pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450
Emails:     glevin@motleyrice.com
            moliver@motleyrice.com

*Lead Counsel for Lead Plaintiff and the Class*

[Additional counsel appear on signature page.]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| DORIS SHENWICK, as Trustee for the DORIS SHENWICK TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br> vs.<br><br>TWITTER, INC., RICHARD COSTOLO and ANTHONY NOTO,<br><br>     Defendants. | Case No. 3:16-cv-05314-JST<br><br>(Consolidated with 3:16-cv-05439-JST)<br><br><u>CLASS ACTION</u><br><br>**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**<br><br>JUDGE:  Jon S. Tigar<br>DATE:  September 14, 2017<br>TIME:  2:00 P.M.<br>DEPT.:  Courtroom 9, 19th Floor |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND .........................................................................................3

ARGUMENT ...............................................................................................................6

I.    Legal Standards on a Motion to Dismiss ................................................6

II.    Defendants Had a Duty to Disclose User Engagement and DAU to Prevent Their Statements from Being Misleading ...................................7

    A.    Defendants Made Misleading Statements Through Their Omissions...................................................................................8

    B.    Defendants' Arguments Regarding Actionable Omissions Fail...............13

III.    Defendants Made Affirmative False and Misleading Statements of Material Fact During the Class Period....................................................14

    A.    CW Testimony Confirms that MAU and User Engagement Trends, Reflected by DAUs, Were Flat or Declining During the Class Period ............................................................................16

        1.    Each CW allegation is described with sufficient detail and is reliable................................................................17

        2.    The corroborative nature of the CW allegations supports their reliability..............................................20

        3.    At this point CW testimony may not be disregarded as hearsay. ...................................................................20

        4.    Pre-class-period information is probative of falsity......................21

    B.    Temporal Proximity Supports a Finding of Falsity .................21

    C.    Defendants' Statements Were Not Puffery...............................22

    D.    The PSLRA's Safe Harbor Does Not Protect Defendants' Statements ...............................................................................24

        1.    Defendants' mixed statements of present fact and future prediction are not protected. ........................................24

        2.    Any cautionary language was not meaningful..............................24

IV.    Plaintiff Adequately Pleads Scienter ....................................................25

    A.    Direct and Circumstantial Evidence, Including Reliable CW Testimony, Provides Strong Evidence of Scienter ...................25

    B.    The Core Operations Doctrine Further Supports a Strong Inference of Scienter ..............................................................28

    C.    The Temporal Proximity of Defendants' Misrepresentations and the Revelation of the Fraud Supports Scienter .........................29

1                    D.      Scienter Is Not Negated by a Lack of Class Period Stock Sales ...............30

2                    E.      The Inference of Scienter Outweighs Any Competing Inference.............31

3          V.      Plaintiff States a Claim for Control Person Liability..............................................32

CONCLUSION..........................................................................................................................32

1

# TABLE OF AUTHORITIES

2

<u>CASES</u>

3

*Berson v. Applied Signal Technology, Inc.*,
        527 F.3d 982 (9th Cir. 2008) ...................................................................... 8, 30

4

*Bodri v. GoPro, Inc.*,
        No. 16-CV-00232-JST, 2017 WL 1732022 (N.D. Cal. May 1, 2017) ............................ 10

5

*Brody v. Transitional Hospitals Corp.*,
        280 F.3d 997 (9th Cir. 2002) ...................................................................... 8, 11

6

*Brown v. China Integrated Energy, Inc.*,
        875 F. Supp. 2d 1096 (C.D. Cal. 2012) ........................................................... 30

7

8

*Cox v. Aurora Electronics, Inc.*,
        No. CV 93-3292 DT (JG), 1993 WL 652792 (C.D. Cal. Oct. 18, 1993) ....................... 23

9

*Fadia v. FireEye, Inc.*,
        No. 5:14-cv-05204-EJD, 2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ...................... 17

10

*Feyko v. Yuhe International, Inc.*,
        No. CV 11-05511 DDP (PJWX), 2013 WL 816409 (C.D. Cal. Mar. 5,
        2013) ....................................................................................................... 14

11

12

*Gammel v. Hewlett-Packard Co.*,
        No. SACV 11-1404 AG (RNBx), 2013 WL 1947525 (C.D. Cal. May 8,
        2013) ....................................................................................................... 32

13

14

*Gauquie v. Albany Molecular Research, Inc.*,
        No. 14 CV 6637 (FB) (SMG), 2016 WL 4007591 (E.D.N.Y. July 26, 2016) ................. 27

15

16

*Hatamian v. Advanced Micro Devices, Inc.*,
        87 F. Supp. 3d 1149 (N.D. Cal. 2015) ......................................................... 20, 27

17

*In re BofI Holding, Inc. Securities Litigation*,
        No. 3:15-CV-02324-GPC-KSC, 2017 WL 2257980 (S.D. Cal. May 23,
        2017) ........................................................................................... 8, 16, 21, 27

18

19

*In re Cadence Design Systems, Inc. Securities Litigation*,
        692 F. Supp. 2d 1181 (N.D. Cal. 2010) ......................................................... 20

20

21

*In re Coinstar Inc. Securities Litigation*,
        No. C11-133 MJP, 2011 WL 4712206 (W.D. Wash. Oct. 6, 2011) ........................... 30

22

*In re Convergent Technologies Securities Litigation*,
        948 F.2d 507 (9th Cir. 1991) ...................................................................... 16

23

24

*In re Countrywide Financial Corp. Derivative Litigation*,
        554 F. Supp. 2d 1044 (C.D. Cal. 2008) ......................................................... 32

25

*In re Daou Systems, Inc., Securities Litigation*,
        411 F.3d 1006 (9th Cir. 2005) .................................................................... 26

26

*In re Finisar Corp. Securities Litigation*,
        No. 5:11-cv-01252-EJD, 2017 WL 1549485 (N.D. Cal. May 1, 2017) ...................... 26

27

28

*In re Galena Biopharma, Inc. Securities Litigation*,
  117 F. Supp. 3d 1145 (D. Or. 2015) ............................................................ 26

*In re Immune Response Securities Litigation*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005) ............................................................ 8

*In re Impac Mortgage Holdings, Inc. Securities Litigation*,
  554 F. Supp. 2d 1083 (C.D. Cal. 2008) ......................................................... 22

*In re Initial Public Offering Securities Litigation*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ........................................................... 20

*In re Invision Technologies, Inc. Securities Litigation*,
  No. C04-03181 MJJ, 2006 WL 538752 (N.D. Cal. Jan. 24, 2006) ................. 10

*In re Juno Therapeutics, Inc.*,
  No. C16-1069RSM, 2017 WL 2574009 (W.D. Wash. June 14, 2017) ....... 9, 14

*In re LDK Solar Securities Litigation*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008) ............................................... 6, 17, 20

*In re LendingClub Securities Litigation*,
  No. C 16-02627 WHA, 2017 WL 2289186 (N.D. Cal. May 25, 2017) ...... 9, 12

*In re McKesson HBOC, Inc. Securities Litigation*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ......................................................... 20

*In re MRV Communications, Inc. Derivative Litigation*,
  No. CV 08-03800 GAF (RCx), 2010 WL 5313442 (C.D. Cal. Dec. 27,
  2010) ............................................................................................................... 7

*In re Network Associates, Inc., Securities Litigation*,
  No. C 99-01729WHA, 2000 WL 33376577 (N.D. Cal. Sept. 5, 2000) .......... 25

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) ......................................................... 27

*In re NVIDIA Corp. Securities Litigation*,
  768 F.3d 1046 (9th Cir. 2014) ....................................................................... 12

*In re Read-Rite Corp. Securities Litigation*,
  335 F.3d 843 (9th Cir. 2003) ......................................................................... 30

*In re STEC Inc. Securities Litigation*,
  No. SACV 09-1304 JVS (MLGx), 2011 WL 2669217 (C.D. Cal. June 17,
  2011) .............................................................................................................. 23

*In re Stratosphere Corp. Securities Litigation*,
  1 F. Supp. 2d 1096 (D. Nev. 1998) ............................................................... 21

*In re SupportSoft, Inc. Securities Litigation*,
  No. C 04-5222 SI, 2005 WL 3113082 (N.D. Cal. Nov. 21, 2005) ................. 28

*Johnson v. Knapp*,
  No. CV 02-9262-DSF (PJW), 2009 WL 764521 (C.D. Cal. Mar. 16, 2009) ..... 6

*Lopez v. Smith*,
  203 F.3d 1122 (9th Cir. 2000) ....................................................................... 32

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) .................................................. 31

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) .................................................. 14

*Mulligan v. Impax Laboratories, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................ 24

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West*
    *Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) .................................................. 24

*Ong v. Chipotle Mexican Grill, Inc.*,
    No. 16 Civ. 141 (KPF), 2017 WL 933108 (S.D.N.Y. Mar. 8, 2017) ............... 12

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ................................................ 23

*Reese v. BP Exploration (Alaska), Inc.*,
    643 F.3d 681 (9th Cir. 2011) .................................................. 14

*Roberti v. OSI Systems, Inc.*,
    No. CV 13-9174-MWF (VBKx), 2015 WL 1985562 (C.D. Cal. Feb. 27,
    2015) .......................................................................... 27

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) .................................................. 30

*Schueneman v. Arena Pharmaceuticals, Inc.*,
    840 F.3d 698 (9th Cir. 2016) ............................................... 9, 11

*Securities & Exchange Commission v. Currency Trading International, Inc.*,
    No. CV 02-05143PA, 2004 WL 2753128 (C.D. Cal. Feb. 2, 2004).................. 8

*Sharenow v. Impac Mortgage Holdings, Inc.*,
    385 F. App'x 714 (9th Cir. 2010) ............................................. 30

*Slayton v. American Express Co.*,
    604 F.3d 758 (2d Cir. 2009)................................................... 24

*South Ferry LP # 2 v. Killinger*,
    399 F. Supp. 2d 1121 (W.D. Wash. 2005)....................................... 24

*South Ferry LP # 2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009)....................................... 29

*South Ferry LP, #2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ............................................ passim

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) .............................................. 6, 16

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ................................................. 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).......................................................... 6, 25

*Think Village-Kiwi, LLC v. Adobe Systems, Inc.*,
  No. C 08-04166 SI, 2009 WL 3837270 (N.D. Cal. Nov. 16, 2009) ................................ 17

*Thomas v. Magnachip Semiconductor Corp.*,
  167 F. Supp. 3d 1029 (N.D. Cal. 2016) .................................................................... 25, 30

*Tracinda v. DaimlerChrysler AG*,
  197 F. Supp. 2d 42 (D. Del. 2002) .......................................................................... 20

*United States v. Hernandez-Escarsega*,
  886 F.2d 1560 (9th Cir. 1989) ............................................................................... 20

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991) ........................................................................................... 24

*Washtenaw County Employees Retirement System v. Celera Corp.*,
  No. 5:10-cv-02604 EJD, 2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) .................... 25, 26

*Wenger v. Lumisys, Inc.*,
  2 F. Supp. 2d 1231 (N.D. Cal. 1998) ...................................................................... 10

*Zelman v. JDS Uniphase Corp.*,
  376 F. Supp. 2d 956 (N.D. Cal. 2005) .................................................................... 21

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ........................................................................... 14, 16

STATUTES
15 U.S.C. § 78u-5(c) ............................................................................................. 24

REGULATIONS
17 C.F.R. § 229 .................................................................................................... 11
17 C.F.R. § 240.10b-5(b) ........................................................................................ 8

OTHER AUTHORITIES
SEC Release 33-8350 ............................................................................................ 11

1

**INTRODUCTION**

2      At its core, this case is about a gamble.  In late 2014, a year after Twitter, Inc. ("Twitter"

3   or the "Company") went public, its executives faced disgruntled investors dissatisfied with the

4   Company's performance.  ¶ 3.[1]  So, on November 14, 2014, Twitter hosted Analyst Day, an all-

5   day pep rally to buoy sentiment among analysts and investors.  *Id.*  At Analyst Day, Twitter

6   executives made ambitious predictions for the Company's future:  the Company's user population

7   would double in the intermediate term and quadruple in the long term, reaching over a billion

8   users.  ¶ 29.  To get there, Twitter promised investors that the Company's "number-one priority

9   [was] to strengthen the core and make Twitter an increasingly daily use case for the people who

10  come to Twitter."  ¶ 33.  Building a base of users who frequently log in and use the service would

11  drive advertising revenue and finally make the business profitable.

12      But hope is not a plan, and in early 2015 Twitter executives faced stalled user growth and

13  weakening user engagement, metrics that showed the impossibility of their Analyst Day

14  projections.  ¶¶ 6, 7.  Internally, executives stopped reporting Monthly Active Users ("MAU")

15  numbers at Twitter's regular company-wide "Tea Time" meetings.  ¶ 78.  Historically, these

16  meetings, attended by executives (including then-CEO Costolo), involved "a show-and-tell to the

17  employees about the current state of the business," including a chart with "a solid line show[ing]

18  the actual number of people on the platform, and a dotted line depict[ing] the projected number of

19  new users."  *Id.*  As the solid line flattened out, though, "[t]he gap between reality and hope grew

20  so extreme that this section of Tea Time was quietly phased out."  *Id.*

21      Defendants had a choice:  disclose the Company's struggles, or gamble that things would

22  turn around and, at the same time, reassure investors that everything was on track even if it was

23  not.  They chose the latter course.  ¶ 4.  Consistent with their vision—but in stark contrast to

24  reality—Defendants told investors that user growth and engagement were accelerating.  ¶¶ 6, 7.

25

26

27   _____
     [1]    All citations to "¶ _" are to Lead Plaintiff's Consolidated Amended Complaint for Violations
     of the Federal Securities Laws ("CAC").  As used herein, the term "Defendants" refers collectively
28   to Twitter, Richard Costolo ("Costolo"), and Anthony Noto ("Noto").

1   When pressed on user engagement at the start of the Class Period, they refused to provide any

2   meaningful data, but analysts still were convinced that the Company was on the right track.  ¶ 86.

3        This shell game continued throughout the Class Period.  Defendants continued to mislead

4   investors, refusing to disclose Daily Active Users ("DAUs") or any other reliable user engagement

5   metric.  They described a thriving company, positioned to meet its lofty user growth and

6   engagement goals, while the true picture inside the Company was quite different.  Finally, less

7   than six months after the start of the Class Period, following the urging of their Chief

8   Communications Officer, the Company decided to "come clean" about its "stagnant [user]

9   growth," effectively admitting that it had been concealing the truth all along.  ¶ 8.

10       Defendants ignore these allegations, instead impermissibly offering their own counter-

11   narrative, complete with "facts" from sources outside the CAC, and alternative inferences

12   purportedly drawn from those "facts."  They do not mention Plaintiff's allegation that senior

13   management, including Costolo, displayed the size of Twitter's user base at company-wide Tea

14   Time meetings that occurred at least every other week.  ¶¶ 68, 70, 78.  Nor do they reference

15   Noto's acknowledgment that "increasing engagement among new users" was "a number we all

16   look at everyday as an operating committee."  ¶ 28 n.8.  Instead, they argue that a handful of stock

17   purchases by Noto, which are not alleged in the CAC, negate any inference of scienter.

18       Defendants' challenge to the CAC ignores the well-established principle that securities

19   fraud complaints must be considered holistically, not one allegation at a time.  They examine

20   alleged false and misleading statements and omissions on a metric-by-metric basis, refusing to

21   acknowledge Plaintiff's allegations—and Defendants' own statements—that individual user

22   metrics could not be viewed in isolation.  ¶¶ 23-25.  Indeed, the entire fraud depended on the

23   interplay of the various metrics at the heart of Twitter's business.  Defendants also attack the

24   Confidential Witnesses (CWs) one at a time, statement by statement, ignoring that the CWs

25   corroborate each other.

26       Defendants do not (and cannot within the confines of the CAC) establish that they made

27   no omissions or false and misleading statements during the Class Period.  Likewise, they cannot

28

1  establish that those omissions and misrepresentations were not made knowingly, or at least

2  recklessly.[2]  Accordingly, Defendants' Motion to Dismiss should be denied in its entirety.

3  **FACTUAL BACKGROUND**

4  At the start of the Class Period, Twitter executives faced stagnating growth, and had no

5  way to meet the extraordinarily high MAU target they had publicly set a few months earlier.  ¶ 4.

6  As Twitter had explained repeatedly, "[t]he size of our user base ***and*** our users' level of

7  engagement are critical to our success."  ¶ 25; *see also* ¶ 4.  Both were important because Twitter's

8  main source of revenue is advertising, and advertising revenue is driven by the total number of

9  users on the platform and the engagement level of those users.  ¶¶ 23, 48.  As a former engineer in

10  the "advertising ecosystem" at Twitter summarized, a "lack of eyes" meant "a lack of ad dollars."

11  ¶ 68; *see also* ¶¶ 48, 73.  While the total number of users and user engagement do not necessarily

12  move in lockstep, the two are fairly correlated, ¶ 70, and stagnant user engagement growth would

13  portend the same fate for MAU growth, ¶¶ 4, 56, 67.  This is because less engaged users will stop

14  using the service, reducing Twitter's user base.  ¶¶ 22, 74.  As Defendants acknowledged, "To the

15  extent our user growth rate slows, our success will become increasingly dependent on our ability

16  to increase levels of user engagement."  ¶ 24.

17  To meet the ambitious MAU target Defendants had set at Analyst Day in November 2014,

18  Noto told investors that Twitter would have to "build an engaging experience . . . to have those

19  users be engaged [and] stay engaged."  ¶ 30.  Consistent with this, Defendants identified the

20  "operational goal of building the world's largest daily audience," because user engagement was a

21  "major growth driver" and a "critical component of Twitter's strategy."  ¶ 31.

22  By the start of the Class Period it had become evident within the Company that both user

23  growth and user engagement were stalling.  ¶¶ 56, 67, 86.  During the first half of 2015, the Tea

24  Time presentations showed that actual MAU growth was not only failing to meet publicly

25  disclosed growth projections, but was "almost flat."  ¶ 78; *see also* ¶ 70.  Rather than come clean,

26

27

28  _____
   [2]   Defendants do not challenge materiality or loss causation.

1     though, Defendants began an elaborate shell game to mislead investors into thinking the Company

2     was thriving and well-positioned for future growth.  ¶ 4.

3          In particular, Defendants concealed information (DAUs and automated users) that

4     investors needed in order to determine that user engagement was declining, and that MAU growth

5     had stalled.  ¶¶ 40, 51, 57-58.  They also made affirmative misrepresentations that MAU growth

6     was accelerating despite knowing that recent growth had been built on low-quality, unsustainable

7     growth, ¶¶ 56-58, and that user engagement trends were positive despite knowing that they were

8     not, ¶¶ 51-52.

9          Historically, Defendants had disclosed to investors "Timeline Views" ("TLVs") as a user

10     engagement metric.  At the end of 2014, right around the time that Twitter's user engagement

11     trends began to decline, the Company informed investors that it would no longer report TLVs

12     because it did "not believe that metric is helpful in measuring engagement on our platform going

13     forward."  ¶¶ 84, 92.  Internally, at this point, Defendants were closely tracking DAUs as the

14     Company's primary user engagement metric.  *See, e.g.*, ¶¶ 40, 47.  But the Company did not

15     disclose to investors DAU or any other replacement metric for TLVs.  ¶ 41.  During the Class

16     Period, and for the first time since the Company's IPO, Defendants did not provide a user

17     engagement metric to investors.  ¶¶ 41, 45, 84.  An analyst asked Noto during a February 5, 2014

18     earnings call, "[W]hat should we be able to look at in order to track what's happening to

19     engagement—whether it's improving or declining—if you're no longer disclosing timeline

20     views"?  Noto was evasive, ¶ 84, opting to leave investors in the dark.

21          The omission was critical.  Without the data showing weak user engagement and user

22     growth, analysts had no reason to question the Company's representations that MAU growth had

23     "already turned around" and that user engagement was improving.  ¶ 88; *see also* ¶ 86 (analyst

24     reports announced:  "MAU [g]rowth about to [p]ick [u]p as [e]ngagement [i]mproves," and

25     "[e]ngagement is improving as new products launch.").  Defendants attributed the "acceleration"

26     in MAU growth and the improvement in user engagement to "seasonality, a return to organic

27     growth, and product initiatives."  ¶ 88.

28

Defendants persisted in their refusal to disclose any user engagement metrics, reiterating in the Company's Form 10-K filed on March 2, 2015 that they would not be disclosing TLVs because they did "not believe that metric is helpful in measuring engagement on our platform going forward." ¶¶ 92-93.

The SEC noticed the omission, and privately sent Twitter a comment letter on April 13, 2015 directing the Company to provide metrics to explain the trends in user engagement.  ¶ 113. Still they refused.  Rather than discuss DAU, a metric Noto would later refer to as "the best encapsulation of engagement," ¶ 85(b), the Company directed the SEC's attention to "changes in ad engagements," ¶¶ 110, 114.  Not only were these metrics *not* reflective of user engagement, but they also were trending upward, in the opposite direction of the Company's actual user engagement numbers.  ¶¶ 85, 116-17.

Even after receiving and responding to the SEC's comment letter, Defendants continued to refuse to disclose DAU and gave flimsy excuses for their refusal.  When the Company released its Q1 2015 earnings at the end of April 2015, Noto told investors that the Company's "DAU to MAU ratios in the quarter were similar to what they were by market relative to Analyst Day," but also stated that providing a DAU metric could be a "bit misleading," in part because DAU "is dependent by market."  ¶ 103.  That DAUs could vary by market was not misleading.  But Defendants' false characterization of the Company's DAU to MAU ratio as similar to that at Analyst Day, when it had actually declined, *was* misleading.  ¶ 53.

On July 28, 2015, during Twitter's Q2 2015 earnings call, Defendants finally "c[a]me clean," revealing to investors what had been known inside the Company for many months:  "[W]e do not expect to see sustained meaningful growth in MAUs . . . [for] a considerable period of time."  ¶ 60.  They admitted that new product initiatives "ha[d] not yet had a meaningful impact on growing our audience or participation," ¶ 62, despite having told investors the exact opposite just a few months earlier, ¶ 88.  In contrast to their Class Period statements, they also told investors that "user growth is vanishing and engagement is declining," "regular users are signing in less often," and DAU had fallen significantly since Analyst Day.  In response to this news, Twitter's stock price dropped 15% on July 29, 2015, on heavy trading volume.  ¶¶ 64, 139.

1

**ARGUMENT**

2

**I.    LEGAL STANDARDS ON A MOTION TO DISMISS**

3       In assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court

4   must consider the complaint in its entirety, "accept all factual allegations . . . as true," and construe

5   them in the light most favorable to the plaintiff.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

6   551 U.S. 308, 322-23 (2007).  The Ninth Circuit has cautioned that:

7           If there are two alternative explanations, one advanced by defendant and the other
            advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a
8           motion to dismiss under Rule 12(b)(6).  Plaintiff's complaint may be dismissed
            only when defendant's plausible alternative explanation is so convincing that
9           plaintiff's explanation is ***im***plausible.  The standard at this stage of the litigation is
            not that plaintiff's explanation must be true or even probable.
10

11   *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2101 (2012).

12       No matter how adamantly Defendants urge the Court to do so, it should not make "factual

13   determination[s]" at this stage of the proceedings.  *See* Twitter Defs.' Req. for Judicial Notice in

14   Supp. of Mot. to Dismiss Pl.'s Consolidated Compl. at 2 ("Opp'n RJN"), ECF No. 92.  *See also*

15   *Johnson v. Knapp*, No. CV 02-9262-DSF (PJW), 2009 WL 764521, at *4 (C.D. Cal. Mar. 16,

16   2009) ("[T]he Court ignores Defendants' version of the facts and relies, instead, on Plaintiff's

17   version.").  These principles apply with equal force to federal securities claims.  *See In re LDK*

18   *Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1260 (N.D. Cal. 2008) ("[T]he PLSRA in no way turns

19   FRCP 12 into a trial-type, papers-only proceeding.").  *See also* Opp'n RJN 2.

20       Defendants improperly argue that facts not pleaded in the CAC and inferences drawn from

21   those facts require dismissal of Plaintiff's claims.  *See, e.g.*, Mem. of P. & A. in Supp. of Twitter

22   Defs.' Mot. to Dismiss Pl.'s Consolidated Compl. at 4-5, 9, 14-16, 17 n.13, 19, 21, 24-26, 28, 30-

23   31 ("Def. Br."), ECF No. 91-1.  They cite eight documents outside the pleadings in their Statement

24   of Relevant Facts alone, and another ten elsewhere.  For example, in arguing that Defendants'

25   statements during the fourth quarter earnings call about product initiatives were forward-looking

26   and "general statements of corporate optimism," they ignore Plaintiff's allegations about specific,

27   present-tense statements and direct the Court instead to different quotations in the call transcript

28   that were not alleged in the CAC.  *See* Def. Br. 17-18, 26.  When arguing that Plaintiff did not

1    adequately plead scienter, Defendants do not cite to the CAC, but rather to four outside exhibits

2    (Exhibits D, G, H, and I) that form part of their judicial notice request.  *Id*. at 13; *see also* Opp'n

3    RJN 6.  While *Tellabs* allows courts to consider non-culpable competing scienter inferences, those

4    inferences must "arise from the facts alleged in the complaint."  *In re MRV Commc'ns, Inc.*

5    *Derivative Litig.*, No. CV 08-03800 GAF (RCx), 2010 WL 5313442, at *4 (C.D. Cal. Dec. 27,

6    2010).

7    **II.    DEFENDANTS HAD A DUTY TO DISCLOSE USER ENGAGEMENT AND DAU TO**
8    **PREVENT THEIR STATEMENTS FROM BEING MISLEADING**

9           User engagement was a critical metric at Twitter.  During the Class Period, Defendants

10    acknowledged: "user's level of engagement [is] critical to our ***success***," "user engagement trends

11    . . . are key factors that affect our ***revenue***," and to achieve Twitter's ***MAU projections***, users must

12    "be engaged [and] stay engaged."  ¶¶ 23, 25, 30.  As such, Defendants carefully monitored user

13    engagement before, during, and after the Class Period.  ¶¶ 20-25, 85(c).  After retiring TLVs,

14    Defendants closely tracked DAU to measure user engagement.  ¶¶ 36, 46-47, 85(a)-(b).

15           At Analyst Day, Defendants emphasized that user engagement—and DAU in particular—

16    was even more important than MAU growth, calling it their "number-one priority."  ¶ 33.  Not

17    surprisingly, therefore, analysts inquired about user engagement during the Class Period.  *E.g.*,

18    ¶¶ 42, 84, 103.  Notwithstanding that DAU was the "primary engagement metric that Twitter

19    tracked internally," that Twitter's Growth team "'talked about DAUs constantly,'" and that SEC

20    regulations required disclosure, Defendants concealed DAU from investors throughout the Class

21    Period.  ¶¶ 67, 85(a).

22           Through that concealment, Defendants were able to mislead investors that Twitter's growth

23    story was intact.  Indeed, without DAU, investors were led to believe that Defendants' outsized

24    MAU projections were viable, MAU growth was high quality (i.e., new users were just as engaged

25    as existing users), and new product features designed to increase growth were working.  ¶¶ 84-89,

26    102-107.  Analysts, too, were under that false impression, opining that "Future Outlook Looks

27    Strong. . . . MAU Growth about to Pick Up as Engagement Improves. . . . Engagement is

28    improving."  ¶ 86.

1    After Defendants had successfully misled investors and hidden the truth during the Class

2    Period, Noto and Dorsey, among others, were admonished by another executive to "'come clean'

3    about the company's stagnant growth numbers." ¶ 78.  When Defendants did just that, investors

4    were blindsided with the news that Twitter's growth story was a fiction.  ¶¶ 60-64.

5    **A.    Defendants Made Misleading Statements Through Their Omissions**

6    By omitting user engagement and DAU, Defendants' Class Period statements were

7    rendered misleading.  Omissions that "affirmatively create an impression of a state of affairs that

8    differs in a material way from the one that actually exists" are actionable.  *Brody v. Transitional*

9    *Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  Rule 10b-5 prohibits companies from omitting

10   information "'necessary . . . to make the statements made, in light of the circumstances under

11   which they were made, not misleading.'"  *In re BofI Holding, Inc. Sec. Litig.*, No. 3:15-CV-02324-

12   GPC-KSC, 2017 WL 2257980, at *5 (S.D. Cal. May 23, 2017) (quoting 17 C.F.R. § 240.10b-

13   5(b)).  When a defendant makes statements, "whether mandatory or volunteered," she must do so

14   in a manner that will not mislead.  *SEC v. Currency Trading Int'l, Inc.*, No. CV 02-05143PA, 2004

15   WL 2753128, at *8 (C.D. Cal. Feb. 2, 2004); *see also Berson v. Applied Signal Tech., Inc.*, 527

16   F.3d 982, 987 (9th Cir. 2008).  "[W]hether a statement is misleading and whether adverse facts are

17   adequately disclosed are generally questions that should be left to the trier of fact."  *In re Immune*

18   *Response Sec. Litig.*, 375 F. Supp. 2d 983, 1018 (S.D. Cal. 2005).

19   ***First***, Defendants' statements about accelerating MAU growth were misleading because

20   Defendants concealed deteriorating user engagement (i.e., DAU) among new users.  Without

21   DAU, investors believed that MAU growth consisted of high-quality engaged users that would

22   allow Twitter to make good on its promise to double MAUs.  ¶¶ 4-7, 27-29.  For example, at the

23   beginning of the Class Period, Defendants represented that high quality "organic growth" was

24   driving accelerating MAU growth. ¶ 88 n.31.  In reality, Defendants were "fak[ing] it."  ¶¶ 56-57,

25   78.  MAU growth at Twitter was predicated on low-quality, unengaged users.  ¶ 89(a)-(f).

26   Defendants ultimately admitted that MAU growth had stopped completely because "the newer

27   MAUs that we're acquiring were ***not as engaged*** as our existing MAUs."  *See* ¶ 89(d) ("[T]he

28   more recent MAUs that we've acquired. . . . ***They're lower quality or lower conversion to***

1   *DAU*.").[3]  "'[O]nce [D]efendants ch[o]se to tout' positive information [about MAU growth] to the

2   market, 'they [were] bound to do so in a manner that wouldn't mislead investors.'"  *Schueneman*

3   *v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016).  Judge Alsup recently found similar

4   omissions actionable, holding that statements about loan growth were misleading when they

5   concealed the low-quality nature of that growth.  *See In re LendingClub Sec. Litig.*, No. C 16-

6   02627 WHA, 2017 WL 2289186, at *8 (N.D. Cal. May 25, 2017); *see also In re Juno Therapeutics,*

7   *Inc.*, No. C16-1069RSM, 2017 WL 2574009, at *5 (W.D. Wash. June 14, 2017) (refusing to

8   dismiss case alleging that omission of critical information made other statements misleading

9   because "Defendants have failed to show that the statements could *not* have been materially

10  misleading").[4]

11        **Second**, Defendants' positive statements about user engagement trends were misleading

12  because Defendants concealed adverse trends in user engagement (i.e., DAU).  For example, when

13  asked during the February 5, 2015 earnings call if user engagement was "improving or declining,"

14  Noto suggested that user engagement had actually ***increased*** since Analyst Day, referring analysts

15  to an obsolete metric, TLVs, and noting that they were "up 3% year over year and better than our

16  outlook."  ¶ 86.  Not only did Noto create the impression that "engagement was improving," *id.*,

17  but he also misled investors by concealing that:  (i) unlike TLVs, actual user engagement (DAU),

18  was deteriorating;[5] (ii) new users were less engaged than existing users; and (iii) DAU, not TLV,

19

20

---

21  [3]    Defendants **concede** that "a duty to disclose could attach ***if MAU data was misleading absent***
22  ***DAU disclosure***."  Def. Br. 10.  Plaintiff has shown precisely that.

23  [4]    The SEC has opined that providing raw numbers (like MAU) without appropriate context is
    misleading.  ¶¶ 118-19; *see also Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1297 (9th Cir.
24  1998) ("[W]e must give substantial deference to the SEC's interpretation of the securities laws.").
    As noted by the SEC's chairperson, without necessary context, investors cannot evaluate the "true
25  meaning of the number of users" or the "meaning of user growth rates."  ¶ 118.  Twitter's co-
    founder and board member, Evan Williams, agrees that, without additional context, MAU is "so
26  abstract [as] to be meaningless."  ¶¶ 122-23.

27  [5]    DAU was flat or declining in early 2015.  Flat DAU was considered a negative trend; without
    DAU **growth**, Twitter could not achieve meaningful MAU growth.  ¶ 87(a); *see also* ¶¶ 37-39.

28

1   was the primary engagement metric tracked internally during the Class Period, *see, e.g.*, ¶¶ 61-62,

2   87, 102(a).[6]

3          ***Third***, Defendants' responses to analysts' questions regarding user engagement metrics

4   were misleading because Defendants concealed DAU, which was deteriorating during the Class

5   Period.  When asked during the April 28, 2015 earnings call what analysts "should be thinking

6   about monitoring engagement going forward," Noto fibbed:  "[T]here's a lot of different metrics

7   that we look at internally.  There's not one metric for engagement."  ¶ 103.  Noto's misleading

8   response allowed Defendants to conceal the adverse trend in DAU.  ¶ 104.  As numerous CWs

9   confirmed, DAU was Twitter's primary user engagement metric, and Company officials "talked

10  about DAUs constantly" during the Class Period.  *See* ¶¶ 67-68, 70-71.  The same was true both

11  before and after the Class Period.  At Analyst Day, Defendants underscored that DAU was one of

12  Twitter's "major growth drivers," and "the best way to quantify the impact of engagement."

13  ¶ 85(b).[7]  Following the Class Period, Noto admitted that "[t]he one engagement metric that we

14  look at holistically is daily active users," and "as it relates to engagement . . . , [t]he one that is

15  probably the ***most important is daily active users***."  ¶ 85(b).

16         ***Fourth***, as MAU began to slow during the Class Period, Defendants' failure to disclose

17  DAU was particularly problematic.  Numerous CWs observed that MAU growth was deteriorating.

18  *See, e.g.*, ¶¶ 67-68, 70-74.[8]  As Defendants themselves admitted, "To the extent our user growth

19

20  ───────────────────

    [6]   Defendants' cases are inapposite.  *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231 (N.D. Cal.
21  1998) is inapplicable because Plaintiff has not alleged that Noto failed to "predict[]" "less
    favorable results," *id.* at 1245, but rather that he affirmatively represented that user engagement
22  was trending upward when it was in fact deteriorating, ¶ 86; *see also infra* Part III.B.  Furthermore,
    Plaintiff cites no fewer than *six* analyst reports issued directly after this call reflecting analysts'
23  understanding that user "engagement [wa]s improving" at an "accelerated" rate.  ¶ 86.  This analyst
    reaction is in marked contrast to that in *Bodri v. GoPro, Inc.*, No. 16-CV-00232-JST, 2017 WL
24  1732022 (N.D. Cal. May 1, 2017), where there was nothing to suggest that "any reasonable
    investor" would have interpreted "statements about past and present" metrics "as an objective
25  assurance of future" metrics.  *Id.* at *10.

26  [7]   "To the extent that these [pre-Class Period] statements are used to demonstrate the truth or
    falsity of Class Period statements, they are relevant."  *In re Invision Techs., Inc. Sec. Litig.*, No.
27  C04-03181 MJJ, 2006 WL 538752, at *2 n.1 (N.D. Cal. Jan. 24, 2006).

28  [8]   Costolo recognized as much during the Class Period, which is why he stopped reporting MAU
    numbers internally at Twitter's regular company-wide Tea Time meetings.  *See* ¶ 78.

1    rate slows, our success will become increasingly dependent on our ability to increase levels of user

2    engagement." *See* ¶¶ 85(d),104(b); *see also* ¶¶ 22, 24-25. Thus, despite the increased significance

3    of user engagement (DAU) to Twitter's "success" during the Class Period, Defendants misled

4    investors by speaking about MAU while omitting DAU. *See, e.g.*, ¶¶ 79-82, 88.

5            ***Fifth***, Defendants' statements pointing investors to ad engagements as a proxy for user

6    engagement was particularly misleading.   Defendants stated that ad engagement trends were

7    "helpful to investors to understand" and "monitor trends in user engagement." *See, e.g.*, ¶ 85(i).

8    Then, throughout the Class Period, Defendants highlighted the positive trend in ad engagements,

9    the purported proxy for user engagement, stating, for example, "Ad engagements grew 70% year

10   over year." *Id.*  Defendants' reference to ad engagements was misleading because—unknown to

11   investors—the trend in ad engagements was moving in the opposite direction from the concealed

12   trend in actual user engagement (i.e., DAU).   *Id.*; *see also* ¶¶ 87(a)-(b), 102(a)-(c).[9]   This

13   "affirmatively create[d] an impression of a state of affairs" (i.e., user engagement was increasing)

14   "that differ[ed] in a material way from the one that actually exist[ed]" (i.e., user engagement was

15   deteriorating). *See Brody*, 280 F.3d at 1006.

16           ***Finally***, Defendants' failure to disclose DAU in its SEC filings violated SEC Regulation

17   S-K, which required disclosure of key operating metrics.   *See* ¶¶ 91-93 (referencing 17 C.F.R.

18   § 229 and SEC Release 33-8350).   DAU was Twitter's primary user engagement metric during the

19   Class Period and was unquestionably a key operating metric.   In its 2014 Form 10-K, Twitter

20   affirmed that its "future revenue growth" was dependent on the Company's "ability to . . . increase

21   user engagement."  ¶ 44; *see also* ¶ 31 (describing user engagement as a "***critical component*** of

22   Twitter's strategy"); ¶ 93(c).   Thus, Defendants had an affirmative obligation to disclose DAU to

23   comply with Regulation S-K.  ¶ 112; *see also* 17 C.F.R. § 229 and SEC Release 33-8350; *Ong v.*

24   ───────────────

25   [9]    In their brief, Defendants concede that ad engagement was provided as a measure of user
     engagement during the Class Period, Def. Br. 4, but contend that "it is an obvious measure of user
26   engagement" and that "measuring ad engagements for one purpose (monetization) in no way
     precludes its simultaneous use for another purpose (user engagement)," *id.* at 2.  Defendants miss
27   the point.  They are, in fact, precluded from providing ad engagement for "another purpose" (to
     describe user engagement) when that metric was moving in the opposite direction from user
28   engagement. *See Schueneman*, 840 F.3d at 705-06.

1   *Chipotle Mexican Grill, Inc.*, No. 16 Civ. 141 (KPF), 2017 WL 933108, at *8 (S.D.N.Y. Mar. 8,

2   2017) (noting "[a] duty to disclose can arise from 'statutes or regulations that obligate a party to

3   speak'" and identifying Regulation S-K as one such regulation).   In fact, after recognizing that

4   Twitter had not reported user engagement in its 2014 10-K, the SEC reminded Defendants of that

5   obligation under Regulation S-K and directed Twitter to disclose in future filings a metric "to

6   explain trends in user engagement and advertising services revenue."   ¶¶ 93(b), 113.   Yet,

7   Defendants continued to conceal DAU, omitting it from Twitter's very next filing, 2015's first-

8   quarter Form 10-Q.  ¶¶ 109, 110(a).[10]

9        Defendants' reliance on *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014), is

10   misplaced.    The *NVIDIA* court addressed a subsection of Regulation S-K, 17 C.F.R.

11   § 229.303(a)(3)(ii), which requires the disclosure of certain forward-looking information—

12   specifically, "known trends or uncertainties" that are "reasonably expect[ed]" to have a material

13   impact on the company's financial results.   768 F.3d at 1054 n.8.   The Ninth Circuit concluded

14   that because ***that part*** of Regulation S-K had a different materiality threshold than Rule 10b-5, it

15   could not independently give rise to a duty to disclose.  *Id.* at 1055.   The *NVIDIA* court never

16   considered any other provisions of Regulation S-K and thus its holding is limited to the provision

17   that "'mandates disclosure of specified ***forward-looking*** information.'"   *Id.* (emphasis added).

18   DAU is not forward looking.   Accordingly, *NVIDIA* does not apply here.

19        Significantly, after *NVIDIA*, a court in this District referenced another (non-forward-

20   looking) disclosure requirement contained in Regulation S-K (17 C.F.R § 229) in upholding a

21   disclosure violation.   Judge Alsup noted that "[b]oth sides agree that Section 229.404 of Title 17

22   of the Code of Federal Regulations requires disclosure of transactions with 'related parties.'"   *In

23   re LendingClub Sec. Litig.*, 2017 WL 2289186, at *7; *see also id.* at *11 (holding that same

24   omissions were material and actionable under 10(b)).   Just as the disclosure requirement for related

25

26

---

27   [10]   In addition to their affirmative duty to disclose under Regulation S-K, Defendants' failure to
disclose DAU rendered misleading its Class Period statements about its purported "key metrics."
28   *See* ¶¶ 91, 93, 109-10.

1  parties found in Regulation S-K is not forward looking, neither is the disclosure requirement cited

2  by the SEC in its direct correspondence to the Company.  *See* ¶¶ 93(b), 113.

3     **B.  Defendants' Arguments Regarding Actionable Omissions Fail**

4     Defendants make a series of scattershot arguments, all of which miss the mark.  Defendants

5  claim that they did not disclose DAU during the Class Period out of concern that the information

6  could "confuse or mislead investors" who might make "unwarranted comparisons of daily usage

7  rates across different markets."  Def. Br. 5.  Defendants are wrong.  DAU is a standard industry

8  metric that represents exactly what its name implies (daily active users) and is reported by most of

9  Twitter's social-media peers, including Facebook and Snapchat.  ¶¶ 36 n.10, 124.  Nor does

10 geographic variance render DAU misleading.  Defendants had no problem accounting for this

11 issue, both before and after the Class Period, by disclosing DAU in Twitter's "Top 20 Markets."

12 *See*, *e.g.*, ¶¶ 36 n.10, 102(a) n.41.  Likewise, Defendants fail to explain why Twitter's senior

13 executives were, throughout the Class Period, "monitor[ing] closely" what they now suggest was

14 an unreliable measure of user engagement.  *See* ¶¶ 47, 67-68, 71, 85(a).

15    Incredibly, Defendants assert that Plaintiff has not adequately pleaded that DAU is a

16 primary or reliable metric.  Def. Br. 10-12.  Of course, several CWs said that it was the "primary"

17 engagement metric, was closely "tracked internally" and discussed "on a daily basis," and was

18 "the most important metric to Twitter."  ¶¶ 67-68, 71-72.  This is consistent with Defendants' own

19 admissions before and after the Class Period that DAU is "the best encapsulation of engagement"

20 and "the best way to quantify the impact of engagement."  ¶ 85(b).  As the following chart shows,

21 the significance of DAU did not occur to Defendants only after the Class Period, as they suggest:

|  | IPO | Q1 14 | Q2 14 | Q3 14 | Analyst Day | Q4 14 | Q1 15 | Q2 15 | Q3 15 | Q1 16 | Q2 16 | Q3 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ds admit user engagement is material? | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Ds disclose user engagement metric? | Yes (TLV, DAU) | Yes (TLV) | Yes (TLV) | Yes (TLV, DAU) | Yes (DAU) | **NO** | **NO** | Yes (DAU) | Yes (DAU) | Yes (DAU) | Yes (DAU) | Yes (DAU) |

1   Finally, Defendants assert that low quality MAUs, including "automated users," were "in

2   fact disclosed and well known." Def. Br. 24-25.  While it is true that Defendants' Q1 2015 earnings

3   presentation included a disclosure of the number of third-party automated MAUs, that number was

4   *from the prior quarter* and was not updated—a practice that was out of the norm.  Once Defendants

5   began disclosing the number of automated users, they updated that number every quarter, except

6   during the first quarter of 2015—right in the middle of the Class Period.  ¶ 107.  The omission is

7   particularly glaring because Defendants also affirmatively acknowledged that the Company's first

8   quarter had been impacted by automated users: "the calculations of MAUs presented in our

9   earnings materials may be affected as a result of this activity."  ¶ 107 n.47.

10

11  III.   **DEFENDANTS MADE AFFIRMATIVE FALSE AND MISLEADING STATEMENTS OF MATERIAL FACT DURING THE CLASS PERIOD**

12   A statement is misleading "'if it would give a reasonable investor the "impression of a state

13  of affairs that differs in a material way from the one that actually exists."'"  *Reese v. BP*

14  *Exploration (Alaska), Inc.*, 643 F.3d 681, 691 (9th Cir. 2011).  Statements that are "literally true"

15  may be misleading due to "'their context and manner of presentation.'"  *Miller v. Thane Int'l, Inc.*,

16  519 F.3d 879, 886 (9th Cir. 2008).  Whether a statement is materially misleading is "an intensely

17  fact-specific inquiry," which is generally left to the trier of fact.  *In re Juno Therapeutics*, 2017

18  WL 2574009, at *5.  In the CAC, Plaintiff has "properly allege[d] falsity" by "'specify[ing] each

19  statement alleged to have been misleading, the reason or reasons why the statement is misleading,

20  and . . . stat[ing] with particularity all facts on which that belief is formed.'"  *Zucco Partners, LLC*

21  *v. Digimarc Corp.*, 552 F.3d 981, 990-91 (9th Cir. 2009).[11]

22   ***First***, Plaintiff alleges that Defendants affirmatively misrepresented that user engagement

23  trends were positive or "similar to" user engagement trends on Analyst Day, ¶¶ 86-87, 101-02,

24  even though user engagement was declining during the Class Period, ¶¶ 73, 77, 87(a), (b), 102.

25

26

27  [11]   A plaintiff "can survive a motion to dismiss by alleging a single material misrepresentation."
*Feyko v. Yuhe Int'l, Inc.*, No. CV 11-05511 DDP (PJWX), 2013 WL 816409, at *4 n.2 (C.D. Cal.

28  Mar. 5, 2013).

1      **Second**, Plaintiff alleges that Defendants affirmatively misrepresented that MAU growth

2  was accelerating, ¶ 88, even though it was stagnant, ¶¶ 67, 70-74, 78, 95-97.  Specifically, Costolo

3  told investors on the February 5, 2015 earnings call that "we're in a great place" because "[t]he

4  user numbers we saw [i]n January, again, indicate that our MAU trend has already turned around,"

5  ¶ 88, even though "by the time Defendants spoke . . . , the MAU growth trend had changed

6  direction and leveled off," ¶ 95.

7      **Third**, Plaintiff alleges that Defendants misleadingly attributed MAU growth in part to

8  "organic growth," ¶ 88, rather than what it actually was:  "low-quality" growth, consisting of paid

9  and automated users, ¶ 89.  In response to an analyst's inquiry about "the acceleration [in MAU

10 growth]," Costolo "stress[ed] that it's seasonality, a return to organic growth, and product

11 initiatives." ¶ 88.  The reality was that the Company's MAU growth was attributable to automated

12 users, ¶ 89(f), and that the Company had "kind of faked" its MAU growth, ¶ 78.

13     **Fourth**, Plaintiff alleges that Defendants affirmatively misrepresented that product

14 initiatives were contributing to accelerating MAU growth, ¶¶ 88, 105, even though they were not,

15 ¶¶ 89(g), 106-07.

16     **Fifth**, Plaintiff alleges that Defendants affirmatively misrepresented that product initiatives

17 were improving user engagement, ¶ 103, even though they were not, ¶¶ 73, 77, 89(g), 104(k).

18 Costolo falsely told investors on the Q1 2015 earnings call that the Company was "seeing perhaps

19 the most exciting results" from its new "While You Were Away" product initiative because "those

20 tweets are not only seeing high engagement, they're bringing people back to Twitter more

21 frequently."  ¶ 103.  Noto again falsely told investors at a conference a few weeks later, "[W]e

22 have seen an improvement in engagement."  ¶ 103 n.43.

23     Defendants make several arguments in response to these allegations: that certain

24 statements are too vague, Def. Br. 15; that the events did not happen as Plaintiff alleges, *id.* at 18,

25 23; that a more plausible inference exists, *id.* at 13-15, 32; and that some statements ended up

26 being true, *id.* at 26.  None of these arguments justifies dismissal of the CAC.

27     First, as explained in the legal standards section, a defendant's version of the facts is

28 irrelevant to the analysis.  What matters are the allegations in the complaint.  Second, at this stage

1    the Court may not decide which inferences it thinks are ***more*** plausible.  Instead, it may only

2    dismiss the complaint if plaintiff's suggested inferences are facially implausible.  *See Starr*, 652

3    F.3d at 1216-17.

4         Third, whether the Company's DAU to MAU ratio was "similar" to what it had been on

5    Analyst Day, as Defendants said, is not too vague to be false.  *See In re BofI Holding*, 2017 WL

6    2257980, at *7.  Had Defendants provided the actual numbers, investors would have been able to

7    tell for themselves whether the numbers were similar.   Courts have considered subjective

8    descriptors like "'good,' 'well-regarded,' [and] other feel good monikers'" to be too vague to be

9    actionable, but not objectively verifiable terms, such as "similar."  *Id.*

10        Fourth, whether Defendants' statements about "net adds" were actually true by the end of

11   the first quarter of 2015 is irrelevant because the statements were misleading at the time they were

12   made.  "'[T]he disclosure required by the securities laws is measured not by literal truth, but by

13   the ability of the material to accurately inform rather than mislead prospective buyers.'"  *In re*

14   *Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991).  Taken in context, Costolo's

15   statement about net adds[12] misleadingly implied that the adds were high-quality growth, driven by

16   product initiatives, even though they had been artificially inflated by low-quality, paid growth.

17   ¶ 88; *see also* ¶¶ 89(a), (e), (f), (g).

18

19   A.    **CW Testimony Confirms that MAU and User Engagement Trends,**
        **Reflected by DAUs, Were Flat or Declining During the Class Period**

20        CW testimony confirms the falsity and misleading nature of Defendants' Class Period

21   statements.   To meet the pleading standard of the PSLRA, confidential witnesses and their

22   testimony "must be described with sufficient particularity to establish their reliability and personal

23   knowledge."  *Zucco Partners*, 552 F.3d at 995.  "For pleading purposes, it is not necessary that the

24   ―――――――――――――――――

25   [12]   "Again, at a high level, I'd like to say that I'm thinking about growth and our product as, these
     changes we're making now as helping us grow . . . across the web and third-party mobile apps.

26   The user numbers we saw on January, again, indicate that our MAU trend has already turned
     around, and that Q1 trend is likely to be back in the range of absolute net adds that we saw during

27   the first three quarters of 2014.  So we're in a great place there.  ***And, again, I would stress that***
     ***it's seasonality, a return to organic growth, and product initiatives, all taken together***."  ¶ 88

28   (emphasis added).

1    source have personal firsthand knowledge in a strict evidentiary sense.  Rather, the source must be

2    one whose context and access to critical information makes him or her ***reasonably reliable***, such

3    that his or her conclusions about the inner workings of the company are not speculative but

4    ***reasonably informed***."  *In re LDK Solar*, 584 F. Supp. 2d at 1243 (emphasis added); *Fadia v.*

5    *FireEye, Inc.*, No. 5:14-cv-05204-EJD, 2016 WL 6679806, at *5 (N.D. Cal. Nov. 14, 2016)

6    (finding pleading requirements satisfied when complaint alleged each "witness's job title [and]

7    length of time employed," "statements made [we]re described with adequate specificity," and

8    "witnesses were in a position to know the alleged information with reasonable probability").

9        In a fourteen-page exhibit designed to skirt the page-limits agreed to by the parties,[13]

10   Defendants attack the testimony of every single CW on at least two grounds, including that every

11   challenged statement "lacks specificity."  None of Defendants' objections warrant disregarding

12   the CW testimony alleged, and most of Defendants' contentions are frivolous.  For example,

13   Defendants argue that CW-6's testimony that DAU metrics were discussed every week during

14   manager meetings in his department in connection with staffing and hiring decisions lacks

15   specificity.  Def. App'x I at 9.  The law does not require the "specificity" Defendants demand.  *See*

16   *In re LDK Solar*, 584 F. Supp. at 1243 (requiring showing CW is "reasonably reliable").

17              **1.      Each CW allegation is described with sufficient detail and is reliable.**

18       Each confidential witness is described with sufficient particularity to support the

19   probability that a person in the position occupied would know the information alleged:

20       ***CW-1*** was employed by Twitter from 2011 through late 2015 at headquarters as a "senior

21   manager of the Growth and Engineering teams."  ¶ 67.  He[14] was personally involved with projects

22   designed to drive MAU growth, and attended weekly Product Leadership meetings with the

23   engineering leads during which DAU growth was discussed.  *Id.*  Therefore, CW-1 was in a

24   position to know that MAU growth during 2014 would not be repeatable, that MAU growth stalled

25   in the first half of 2015, and that the DAU trajectory was generally flat during early 2015.

26   _____

27   [13]   Defendants' chart is improper and should be stricken.  *See, e.g.*, *Think Village-Kiwi, LLC v.*
     *Adobe Sys., Inc.*, No. C 08-04166 SI, 2009 WL 3837270, at *7 (N.D. Cal. Nov. 16, 2009).

28   [14]   Plaintiff refers to all CWs, regardless of their gender, as "he" in this brief.

1   **CW-2** worked at Twitter from the summer of 2014 through the summer of 2015 as an

2   engineer in the advertising "ecosystem," and as part of the business development department.  ¶ 68.

3   He was responsible for managing partnership integration of third-party data in the Twitter

4   dashboard, *id.*, which several CWs testified was widely available within the Company and

5   contained several metrics tracked by the Company, including DAU, ¶¶ 68, 75-76.  He therefore

6   was in a position to know that DAUs were tracked and calculated daily within the Company.  ¶ 68.

7   He also regularly attended the Tea Time meetings.  As such, he was in a position to know what

8   information senior management, ***including Costolo***, presented at Tea Time, and also that

9   management abruptly stopped presenting MAU and MAU projections at these meetings in late

10  January or early February 2015.  ¶ 68.[15]

11  **CW-4** was in a position to know that Twitter executives reported that MAU and DAU

12  trends were flattening out.  He was a staff technical program manager from the spring of 2014 to

13  the fall of 2014 who attended the bi-weekly Tea Time meetings.  ¶ 70.

14  **CW-5** worked in data center engineering from 2013 until the end of 2015.  ¶ 71.  He was

15  promoted in early 2015 to a senior position overseeing data center engineering, responsible for an

16  increase in data center capacity to accommodate Twitter's user growth.  *Id.*  He was privy to

17  metrics showing user growth, and every two weeks during his employment attended capacity

18  meetings with the VP of Engineering and other senior engineering employees during which MAU

19  and DAU were discussed and analyzed.  *Id.*  Because the amount of users and their use of the

20  service was so closely tied to Twitter's data center capacity, CW-5 was in a position to know that

21  user growth was flat and DAUs were declining during the Class Period.  *Id.*

22  **CW-8** also worked in Twitter's data center from 2011 until early 2015.  ¶ 74.  He described

23  the same capacity planning meetings as CW-5, during which they discussed what server capacity

24  would be needed over the coming month or quarter, based on expected growth and expected

25

26  _____

    [15]   That certain CWs attended Tea Time meetings with Costolo and other executives renders

27  erroneous Defendants' assertion that "[n]one of the CWs are alleged to have communicated with
    the Individual Defendants or any Twitter executive, and none claim to have any personal

28  knowledge of what the Individual Defendants knew about Twitter's user growth."  Def. Br. 5-6.

1    attrition.  *Id.*  He was therefore in a position to know of the declining growth trends in early 2015
2    that he described.  *Id.*  Given this focus on growth and attrition, he was also in a position to know
3    that users that signed up as a result of Twitter's marketing, rather than organically, did not remain
4    users and contributed to greater attrition.  *Id.*

5         **CW-3** worked as a senior manager of marketing at Twitter from 2013 to early 2015.  ¶ 69.
6    As an employee in marketing department, CW-3 would have been in a position to know of
7    Twitter's marketing efforts, including the efforts made by the Company to increase user growth.
8    *Id.*  He was therefore in a position to understand how zombie and robot users impacted MAU
9    growth and contributed to Twitter's overall MAU metric.  *Id.*

10        **CW-6** was a contract employee at Twitter from the end of 2014 until the fall of 2015.  ¶ 72.
11   Part of his job was to compare MAU and DAU trends in different regions, including drafting
12   monthly and weekly reports on DAU.  *Id.*  As such, he was in a position to know that MAU growth
13   had stalled and DAUs were declining during the Class Period.  *Id.*

14        **CW-7** was a product manager in the advertising department from early 2014 to early 2015.
15   ¶ 73.  As such, he was in a position to know how Twitter's advertising system worked.  *Id.*  He
16   explained that in late 2014 just before the start of the Class Period, the total number of ads Twitter
17   sent was stagnant because user engagement and user growth trends were flat.  *Id.*

18        **CW-11** was in a position to know of Twitter's user engagement levels at the end of 2014
19   and in early 2015.  ¶ 77.  He was a senior manager on the Global Ads Yield Management team
20   from the spring of 2014 until the end of 2015.  *Id.*  As part of his role, he determined the number
21   of Twitter advertisers and levels of customer engagement.  *Id.*

22        **CW-9** also worked in advertising at Twitter, as a senior manager of Twitter's mobile-ad
23   business from 2013 until late 2014.  ¶ 75.  Significantly, he described the same internal dashboard
24   as did CW-2 and CW-10.  ¶¶ 68, 76.

25        **CW-10** worked in the engineering department at Twitter and described the same internal
26   metric dashboard addressed above.  ¶ 76.

27
28

1

2

          **2.**      **The corroborative nature of the CW allegations supports their reliability.**

3            Five CWs stated that MAU growth was flat during the Class Period, and six stated that user

4  engagement, or DAU, was flat or declining during the Class Period.  The *Vanity Fair* article cited

5  in the CAC, ¶ 78, also is consistent with statements from two CWs who attended the Tea Time

6  meetings that information shared during these meetings showed that MAU growth "stagnat[ed]"

7  in the first half of 2015.  That several CW accounts tell the same story further demonstrates the

8  reliability and credibility of the witnesses' statements that MAU growth was stagnating, DAU

9  trends were declining and senior Company management were closely monitoring these metrics

10  during the Class Period.  *See Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149,

11  1163 (N.D. Cal. 2015) (upholding securities fraud complaint when "CWs corroborate[d] one

12  another's statements"); *see also United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1566 (9th

13  Cir. 1989) (holding that "the interlocking nature of [CWs'] stories enhanced their credibility").

14           **3.**      **At this point CW testimony may not be disregarded as hearsay.**

15            Defendants further assert that the Court must disregard the testimony from CW-2 and CW-

16  6, as well as the *Vanity Fair* article, because they are impermissible hearsay.  Def. Br. 29; *see also*

17  *id.* at 28 n.26.  But, "[e]ven under the Reform Act, plaintiffs are only required to plead facts, ***not***

18  to produce admissible evidence."  *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248,

19  1272 (N.D. Cal. 2000) (emphasis added); *see also LDK Solar Sec. Litig.*, 584 F. Supp. 2d at 1243

20  ("For pleading purposes, it is not necessary that the source have personal firsthand knowledge in

21  a strict evidentiary sense."); *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181,

22  1189 (N.D. Cal. 2010) (finding hearsay learned from confidential witnesses "sufficiently plausible

23  and coherent to support" securities fraud allegations).

24            Many courts have held that reliance on a reputable media source meets applicable pleading

25  standards.  *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 355 n.89 (S.D.N.Y.

26  2003) (noting newspapers, magazines, Internet sources, and books "can plainly form a basis for

27  Plaintiffs' beliefs" to satisfy the PSLRA pleading standard) (collecting cases); *Tracinda v.*

28  *DaimlerChrysler AG*, 197 F. Supp. 2d 42, 81 (D. Del. 2002) ("[A]llegations derived from

1    reputable media sources . . . are sufficient to meet the [information and belief] requirement of the

2    PSLRA.").

3              **4.      Pre-class-period information is probative of falsity.**

4              Defendants argue that statements from CWs who were at Twitter prior to the Class Period,

5    or whose statements concerned the time period immediately preceding the Class Period, should be

6    disregarded.  *See, e.g.*, Def. Br. 5, 11, 19.  However, facts preceding Class Period statements

7    "would be among those knowable at the time of the statements."  *Zelman v. JDS Uniphase Corp.*,

8    376 F. Supp. 2d 956, 971 (N.D. Cal. 2005).  The *Zelman* court explained that the "proposed class

9    period dates function only to define the plaintiff class, not to restrict the universe of relevant or

10   actionable facts in this case."  *Id.* at 970; *see also In re U.S. Aggregates, Inc. Sec. Litig.*, 235

11   F. Supp. 2d 1063, 1065 n.1 (N.D. Cal. 2002) ("The allegations detailing Defendants' pre-class

12   period conduct are material to Plaintiff's contention that Defendants' [sic] knew the statements

13   made during the class period were false."); *In re BofI Holding*, 2017 WL 2257980, at *8 n.6

14   (finding testimony from CWs who worked at company prior to Class Period to be relevant).  Here,

15   information about MAU and user engagement trends at the end of 2014 and the very beginning of

16   2015 is relevant, particularly because it is consistent with testimony from several CWs about the

17   trends known or recklessly regarded by the Defendants during the Class Period.

18             **B.      Temporal Proximity Supports a Finding of Falsity**

19             Additionally, "[t]he shortness of time between later revealed truth and prior statements can

20   be circumstantial evidence that the optimistic statements were false or misleading when made."

21   *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1112 (D. Nev. 1998).  On July 28, 2015,

22   just a little more than six months after Defendants' initial misrepresentations about accelerations

23   in the MAU growth rate due to organic growth and successful product initiatives, Noto informed

24   investors, "[W]e do not expect to see sustained meaningful growth in MAUs . . . [for] a

25   considerable period of time," and that "our growth rate is slowing quite dramatically."  ¶ 60.  He

26   told investors that the new product initiatives that he had recently credited with driving MAU

27   growth "ha[d] not yet had a meaningful impact on growing our audience [i.e., MAU] or

28   participation [i.e., user engagement]."  ¶ 62.  When viewed alongside Plaintiff's other allegations,

1    the closeness in time between Defendants' Class Period misrepresentations and the revelation of

2    the truth helps establish that Defendants' statements were false and misleading when made.

3        **C.    Defendants' Statements Were Not Puffery**

4        Defendants claim that their statements about the success of "product initiatives" during the

5    Class Period constitute inactionable puffery.  Def. Br. 17-18, 26.   Only "forward-looking

6    statements of optimism that are 'not capable of objective verification' and 'lack a standard against

7    which a reasonable investor could expect them to be pegged'" are considered puffery.  *In re Impac*

8    *Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008).  "[T]he defining

9    question is 'whether the statement is so "exaggerated" or "vague" that no reasonable investor

10   would rely on it when considering the total mix of available information.'"  *Id.*

11       The product-initiative statements that Plaintiff alleges, which are different from the ones

12   cited by Defendants in their brief, referred to events that had occurred already (i.e., testing of

13   product initiatives, and trends "already turned around") and were tied to specific verifiable metrics

14   (i.e., "engagement" and "MAU trend"):

15   ▪    In response to an analyst question on the earnings call in early February
16        2015 about the acceleration in MAU growth, Costolo stated: "In Q1, [which
         has already begun], I would say it's a combination of seasonality, a return
17       to organic growth, and ***the set of product initiatives we[ ha]ve created to
         drive growth*** . . . . I'd like to say that I'm thinking about . . . ***these changes***
18       ***we're making now*** as helping us grow across logged-in, logged-out, and
         our syndicated audience across the web and third-party mobile apps.  ***The***
19       ***user numbers we saw on January, again, indicate that our MAU trend***
         ***has already turned around***, and that Q1 trend is likely to be back in the
20       range of absolute net adds that we saw during the first three quarters of
         2014.  So we're in a great place there . . . . I would stress that it's seasonality,
21       a return to organic growth, and product initiatives, all taken together."  ¶ 88.

22   ▪    "I'll start with an update on the While You Were Away function, which we
23        call Recap internally for short.  We're seeing perhaps the most exciting
         results here . . . . ***These tweets are not only seeing high engagement,***
24       ***they're bringing people back to Twitter more frequently***.  Importantly, ***the***
         ***machine learning work we're doing*** for Recap is helping us to make these
25       algorithms better and ***driving continuous improvements in engagement***."
26       ¶ 103.

27       Rather than argue that the foregoing statements by Costolo, ***as pleaded***, are forward-

28   looking and not capable of objective verification, ¶¶ 88, 103, Defendants set up a straw man to

1    knock down.  They argue that a different statement by Noto—a statement that was not pleaded and

2    appears to be about different product initiatives—was puffery:  "Although we don't expect the

3    product launches and tests announced over the last two weeks [to] have a meaningful impact on

4    Q1 user growth, we're hopeful that these product initiatives will contribute in subsequent

5    quarters."  Def. Br. 26.  Since the statement does not appear in the CAC, any discussion of it is

6    beyond the scope of the Rule 12(b)(6) analysis.

7            Defendants also claim that one part of a quotation, "We're seeing perhaps the most exciting

8    results here," is corporate optimism and non-actionable puffery, Def. Br. 18, yet ignore the next

9    part of the quotation, "These tweets are not only seeing high engagement, they're bringing people

10   back to Twitter more frequently," ¶ 103.  In assessing puffery, "the context in which the statements

11   were made is key."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060

12   (9th Cir. 2014).   Costolo's statement is actionable because "high engagement" and "more

13   frequent[]" usage is measurable and objectively verifiable.

14           Defendants further contend that the statements about product initiatives are not actionable

15   because they merely "express[] excitement about the results of experimental tests."  Def. Br. 18.

16   Here again, Defendants take the pleaded statements out of context.  When viewed in their entirety,

17   as they must be, the statements created the impression that product initiatives were presently

18   driving user engagement.  *See Cox v. Aurora Elecs., Inc.*, No. CV 93-3292 DT (JG), 1993 WL

19   652792, at *4 (C.D. Cal. Oct. 18, 1993) ("Defendants' statements 'must be viewed as part of a

20   "mosaic" to see if those statements in the aggregate, create a misleading impression.'").  Based

21   upon Defendants' misrepresentations, at least one analyst understood that product initiatives

22   already were improving engagement.  ¶ 86 (JMP Securities analyst:  "Engagement is improving

23   as new products launch.").  What analysts believed upon hearing a defendant's statement is

24   probative of falsity.  *In re STEC Inc. Sec. Litig.*, No. SACV 09-1304 JVS (MLGx), 2011 WL

25   2669217, at *8 (C.D. Cal. June 17, 2011) ("[T]he third-party analyst statements comport with

26   Plaintiffs' mosaic and the Court's conclusion that Defendants' statements could have been

27   misleading to a reasonable investor.").

28

1

**D.     The PSLRA's Safe Harbor Does Not Protect Defendants' Statements**

2

**1.     Defendants' mixed statements of present fact and future prediction are not protected.**

3

4      Defendants contend that Costolo's statements about drivers of Q1 2015 MAU growth were

5    protected by the PSLRA's safe harbor.  Def. Br. 26-27.  In order to be so protected, a statement

6    must be forward-looking and be accompanied by meaningful cautionary language.  *See* 15 U.S.C.

7    § 78u-5(c); *No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,

8    320 F.3d 920, 936 (9th Cir. 2003).  Neither of those conditions is present here.

9      "[S]tatements about the future that also function as communications of current expectations

10    . . . are actionable as such."  *S. Ferry LP # 2 v. Killinger*, 399 F. Supp. 2d 1121, 1134 (W.D. Wash.

11    2005), *vacated in part on other grounds*, 542 F.3d 776 (9th Cir. 2008); *see also Mulligan v. Impax

12    Labs., Inc.*, 36 F. Supp. 3d 942, 965 (N.D. Cal. 2014) (similar).  Costolo's statements about

13    Q1 2015 MAU growth, which were made over a month into the first quarter, referred to events

14    that had already partially occurred, or were occurring.  *See* ¶¶ 150-54.  As explained above, such

15    statements are ***not*** protected by the PSLRA safe harbor.

16

**2.     Any cautionary language was not meaningful.**

17      Even if Costolo's statements were deemed entirely forward-looking, Defendants are unable

18    to show that they were accompanied by meaningful cautionary language.  *See Slayton v. Am.

19    Express Co.*, 604 F.3d 758, 772 (2d Cir. 2009) ("[D]efendants must demonstrate that their

20    cautionary language was not boilerplate.").  To warrant protection, the cautionary statement must

21    discredit the alleged misrepresentations to such an extent that "the risk of real deception drops to

22    nil."  *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991).  The only cautionary language

23    Defendants cite is the following generic disclaimer:   "[W]e will be making forward-looking

24    statements on this call, such as our outlook for Q1 and 2015 and our operational plans and

25    strategies.  Actual results could differ materially from those contemplated by our forward-looking

26    statements and reported results should not be considered as an indication of future performance."

27    Def. Br. 27 n.25.  This boilerplate is insufficiently specific and therefore fails to bring Costolo's

28    statements about Q1 2015 MAU growth within the PSLRA safe harbor.

1    To the extent Defendants' cautionary language warned of specific risks (which it did not),

2  the "safe harbor cannot protect cautionary statements made with superior knowledge that some of

3  the potential perils identified have in fact been realized." *Washtenaw Cty. Emps. Ret. Sys. v. Celera*

4  *Corp.*, No. 5:10-cv-02604 EJD, 2012 WL 3835078, at *4 (N.D. Cal. Sept. 4, 2012).  Defendants

5  knew well before Costolo made the statements in question that the MAU growth trend had changed

6  directions and leveled off.  *See, e.g.*, ¶¶ 95-97.

7  **IV.    PLAINTIFF ADEQUATELY PLEADS SCIENTER**

8    "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the

9  'smoking gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at

10  324.  "The PSLRA calls for a 'strong inference,' not an outright confession or an airtight case."

11  *In re Network Assocs., Inc., Sec. Litig*., No. C 99-01729WHA, 2000 WL 33376577, at *8 (N.D.

12  Cal. Sept. 5, 2000).  A complaint will survive if, "[w]hen the allegations are accepted as true and

13  taken collectively, . . . a reasonable person [would] deem the inference of scienter at least as strong

14  as any opposing inference."  *Tellabs*, 551 U.S. at 326.

15    The Court should "consider the totality of circumstances, rather than . . . develop separately

16  rules of thumb for each type of scienter allegation."  *S. Ferry LP, #2 v. Killinger*  (*S. Ferry II*), 542

17  F.3d 776, 784 (9th Cir. 2008).  Indeed, the relevant inquiry is "whether all of the facts alleged,

18  taken collectively, give rise to a strong inference of scienter, not whether any individual

19  allegations, scrutinized in isolation, meets that standard."  *Reese v. Malone*, 747 F.3d 557, 569 (9th

20  Cir. 2014); *see also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1045

21  (N.D. Cal. 2016) (Tigar, J.) ("While each of these allegations alone might be insufficient to plead

22  a 'cogent and compelling' claim of scienter, taken as a whole . . . they meet the standard.").

23  Viewed in its entirety, the CAC alleges a strong inference of scienter that is at least as plausible as

24  any other opposing inference.

25

26    **A.    Direct and Circumstantial Evidence, Including Reliable CW Testimony,**
     **Provides Strong Evidence of Scienter**

27    Noto told investors during the Class Period that increasing user engagement was "by far

28  [the Company's] number one opportunity . . . it's a number we all look at everyday as an operating

1    committee." ¶ 28 n.8.  "[S]pecific admissions from top executives that they are involved in every

2    detail of the company and that they monitored portions of the company's database are factors in

3    favor of inferring scienter." *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1022 (9th Cir. 2005).

4          Indeed, the Individual Defendants had to review these numbers regularly to prepare for the

5    Company's Tea Time meetings, which occurred at least every other week.  At Tea Time, Twitter's

6    senior management, including Costolo, delivered a presentation that displayed MAU and DAU

7    growth trends.  ¶¶ 68, 70, 78.  During the first half of 2015, this presentation showed that MAU

8    growth was not only failing to meet publicly disclosed growth projections, but was "almost flat."

9    ¶¶ 68, 78, 97.  Because these allegations "are particular and suggest that defendants had actual

10   access to the disputed information," they "independently satisfy the PSLRA." *S. Ferry II*, 542

11   F.3d at 786.  Numerous CWs reported that "anybody" at Twitter had access to growth and

12   engagement metrics, the data was "broadly available," and Twitter management closely monitored

13   MAU and DAU.  *See, e.g.*, ¶¶ 68, 71-72, 75-77.  This also bolsters an inference of scienter.  *See*

14   *S. Ferry II*, 542 F.3d at 785; *In re Finisar Corp. Sec. Litig.*, No. 5:11-cv-01252-EJD, 2017 WL

15   1549485, at *7 (N.D. Cal. May 1, 2017) ("[A]s the leaders of the company, both [individual

16   defendants] had access to [materially relevant business information] and could have sought it

17   out.").

18         Unable to deny that he personally tracked these metrics, when asked by analysts "what's

19   happening to engagement [and] whether it's improving or declining," Noto hedged, replying that

20   "there are a number of different ways that we measure engagement" and there was "no one metric

21   to share."  ¶¶ 42, 84.  The wording of this response "suggests [he] understood what was going on,"

22   and thus supports an inference of scienter.  *Washtenaw Cty. Emps. Ret. Sys.*, 2012 WL 3835078,

23   at *3.  Furthermore, Defendants' cover-up of the weakening of such critical metrics enhances the

24   otherwise strong inference of scienter.  *See, e.g.*, *In re Galena Biopharma, Inc. Sec. Litig.*, 117

25   F. Supp. 3d 1145, 1166 (D. Or. 2015) (evidence regarding defendant's "'cover-up'" constitutes

26   "'strong proof of scienter'") (collecting cases).

27         Defendants made this and other specific statements to the investing public concerning the

28   Company's user base and user engagement.  *See, e.g.*, ¶¶ 88, 93(c), 103, 104(a), (b), (f), 110(b).

1   As another example, Costolo told investors that "our MAU trend has already turned around,"

2   attributing the change to "seasonality, a return to organic growth, and product initiatives."  ¶ 88.

3   "[A]n inference of scienter can be established by the fact that the Defendants touched on the

4   specific issue . . . in their public statements." *Roberti v. OSI Sys., Inc.*, No. CV 13-9174-MWF

5   (VBKx), 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015); *see also Gauquie v. Albany*

6   *Molecular Research, Inc*., No. 14 CV 6637 (FB) (SMG), 2016 WL 4007591, at *2 (E.D.N.Y. July

7   26, 2016) ("Actively communicating with the public about this issue demonstrates defendants'

8   sensitivity to it." (citing *Reese*, 747 F.3d at 576)).   Because Noto and Costolo specifically

9   addressed the issue of user engagement with analysts and the investing public on numerous

10  occasions during the Class Period, *see, e.g.*, ¶¶ 42-43, 45, 52-54, scienter can be inferred.

11          Moreover, as discussed in detail above, Plaintiff also presents reliable, sufficiently detailed

12  testimony from several CWs that supports both a finding of falsity and scienter.  "The CWs are

13  described with sufficient specificity to establish reliability—their dates of employment and

14  professional roles are provided, and that information provides a sufficiently reliable basis for the

15  Court to determine that statements attributed to them are indicative of scienter." *Hatamian*, 87

16  F. Supp. 3d at 1162.   Specifically, multiple CWs corroborate each other, and assert that:

17  (a) Twitter executives knew that DAU and MAU growth was flat during the Class Period, ¶¶ 67-

18  68, 70-74, 77; (b) Nolo and Costolo had access to the MAU and DAU numbers on a daily basis,

19  like other Twitter employees, *see* ¶¶ 28 n.8, 68, 75-77; (c) senior corporate executives, including

20  Costolo, attended Tea Time meetings where DAU and MAU numbers were presented, ¶¶ 68, 70;

21  and (d) DAU and MAU metrics were discussed at other weekly or bi-weekly meetings attended

22  by senior management, ¶¶ 67, 71, 72.  At this stage of the proceedings, that is enough.  Confidential

23  witnesses do not need to provide "'smoking gun evidence' that establishes a clear intent to

24  deceive." *In re New Century*, 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008).   Instead, their

25  statements may support an inference of scienter if they describe a "deliberately reckless set of

26  statements telling the public one thing when [defendants were] doing something quite different."

27  *Id.*; *see also In re BofI Holding*, 2017 WL 2257980, at *9 (finding CW accounts probative when

28

1  they "ma[de] evident that the reality of BofI's loan underwriting practices, on the ground, in 2014,

2  differed materially from the representations made by BofI" in its November 2014 disclosures).

3      Additionally, here again, Defendants ignore Plaintiff's well-pled allegations.  *See* Def. Br.

4  22 ("[E]ven if the Individual Defendants can be presumed to have reviewed data . . . Plaintiff has

5  not alleged that the Individual Defendants believed (or even should have believed) that those

6  metrics properly measured user engagement or that any trends reflected in such data were real.").

7  "The problem with [D]efendants' position, however, is that it miscasts the allegations in

8  [P]laintiffs' complaint."  *In re SupportSoft, Inc. Sec. Litig.*, No. C 04-5222 SI, 2005 WL 3113082,

9  at *6 (N.D. Cal. Nov. 21, 2005).  Indeed, the allegations in the CAC support the precise inference

10 that Defendants claim is missing.  Why else would Defendants decide to "come clean" on the state

11 of user engagement, ¶¶ 8, 78, if they did not believe in the truth of what the metrics were showing?

12 And, why would they have eliminated a portion of Tea Time showing stagnant MAU growth

13 trends, ¶¶ 68, 78, 97, if they did not believe that the engagement "data [was] real"?

14     **B.    The Core Operations Doctrine Further Supports a Strong Inference of**
15            **Scienter**

16     This Court may also impute scienter to Twitter's key officers "based on the inference that

17 [they] have knowledge of the 'core operations' of the company."  *Reese*, 747 F.3d at 575; *see also*

18 *S. Ferry II*, 542 F.3d at 785-86.  When "the nature of the relevant fact is of such prominence that

19 it would be 'absurd' to suggest that management was without knowledge of the matter," scienter

20 may be inferred just on the basis of the core operations doctrine.  *S. Ferry II*, 542 F.3d at 786.  In

21 the case of Twitter, it would be "absurd" to imagine that senior management of a leading social

22 media company had no idea how many people were using their service, or how much they were

23 using it.

24     Defendants repeatedly emphasized that "[t]he size of our user base and our users' level of

25 engagement are critical to our success."   ¶ 25; *see also* ¶ 28 (Noto describing increasing

26 engagement among new users as "by far our number one opportunity"); ¶ 31 (identifying user

27 engagement as a "major growth driver" and a "critical component of Twitter's strategy"); ¶ 48

28 (S-1 Registration Statement stating, "[u]ser growth trends reflected in the number of MAUs [and]

1   user engagement trends . . . are key factors that affect our revenue.").  Costolo stated that the

2   Company's number-one priority was to "strengthen the core" and "make Twitter an increasingly

3   daily use case for the people to come to Twitter," *see, e.g.*, ¶¶ 33, 85(h), and represented that the

4   Company's "focus [was] to increase the number of logged-in users and their daily Twitter use by

5   increasing engagement and improving Twitter by increasing engagement and improving

6   retention," ¶ 127.  DAU also was highlighted on Analyst Day as one of Twitter's four primary

7   revenue growth opportunities, and Twitter's SEC documents listed MAU and user engagement

8   trends as key factors affecting the Company's revenues.  ¶¶ 38, 48.  Twitter even admitted that

9   "our future revenue growth will depend on . . . our ability to . . . increase user engagement."  ¶ 44.

10  It is reasonable and plausible to conclude that Noto and Costolo knew, or at least recklessly

11  disregarded, that the trends in metrics that lay at the heart of the business were stagnant during the

12  Class Period.  *See S. Ferry II*, 542 F.3d at 786.

13         Defendants do not—because they cannot—argue that user engagement and MAUs are not

14  sufficiently important to the Company's existence to support a core-operations inference.  And,

15  their arguments in response, *see* Def. Br. 21-23, misapprehend the doctrine.  Simply put, the

16  doctrine permits courts to infer scienter if a fact is critical to a business's core operations or to an

17  important transaction and other allegations also support scienter.  It is unfathomable that Noto and

18  Costolo did not know the details regarding and/or the problems surrounding user engagement at

19  Twitter since it was the focal point of (and was vital to) the Company's success, both in the present

20  and the future.  ¶¶ 25, 28, 31, 44, 48.  If they were not so aware when making the challenged

21  statements to investors, then making uninformed statements is *per se* reckless.  *See S. Ferry LP*

22  *# 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (noting when defendant speaks

23  and does not have actual knowledge about the subject, "it would be at least actionably reckless to

24  reassure the public about these matters at all").

25         **C.    The Temporal Proximity of Defendants' Misrepresentations and the**
26                 **Revelation of the Fraud Supports Scienter**

27         That only six months had passed between Defendants' initial lies and the revelation of the

28  fraud (and only three months between their first-quarter representations and the revelation)

1   "'bolster[s]' the inference that [D]efendants knew about [the problem] when they made the

2   [misleading] statement." *Berson*, 527 F.3d at 988 n.5 (quoting *Ronconi v. Larkin*, 253 F.3d 423,

3   437 (9th Cir. 2001)) (first alteration in original); *see also Reese*, 747 F.3d at 574 (finding a temporal

4   proximity of "three to six months" between a misrepresentation and a disclosure to be evidence of

5   scienter).[16]   Likewise, Defendants' post-Class Period admissions that DAU is "the best

6   encapsulation of engagement" and "the best way to quantify the impact of engagement," ¶ 85(b),

7   also support an inference of scienter.  *See In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th

8   Cir. 2003) ("A later statement may suggest that a defendant had contemporaneous knowledge of

9   the falsity of his statement, if the later statement directly contradicts or is inconsistent with the

10  earlier statement."), *abrogated on other grounds as recognized in S. Ferry II*, 542 F.3d at 782-84.

11         **D.      Scienter Is Not Negated by a Lack of Class Period Stock Sales**

12         Defendants assert that scienter is negated because of the lack of stock sales during the Class

13  Period, Def. Br. 14, even though motive allegations are not required in a scienter analysis, *see,*

14  *e.g.*, *In re Coinstar Inc. Sec. Litig.*, No. C11-133 MJP, 2011 WL 4712206, at *10 (W.D. Wash.

15  Oct. 6, 2011).  The Ninth Circuit "do[es] not draw a negative inference from the absence of stock

16  sales that benefitted the defendant [officers]."  *Sharenow v. Impac Mortg. Holdings, Inc.*, 385

17  F. App'x 714, 717 n.2 (9th Cir. 2010).  This is a sensible approach because there could be "several

18  explanations for why an individual defendant would not sell stock even if she knew about false

19  financial statements, such as a desire to avoid drawing the market's attention to the problem."

20  *Magnachip*, 167 F. Supp. 3d at 1044.

21         In fact, a desire to avoid drawing attention to the problem explains the lack of Class Period

22  stock sales at Twitter.  Leading up to the Class Period, Defendants and other insiders dumped over

23  $100 million of stock at inflated prices.  ¶ 3.  These massive insider sales caught the attention of

24  investors and analysts, and a backlash ensued.  On February 9, 2015, CNBC market analyst Jim

25  Cramer issued an open "[m]emo to the board of directors of Twitter (TWTR):  Someone suggest

26

27  ───────────────────
   [16]   Because the CAC adequately pleads scienter as to the Individual Defendants, scienter may be
   inferred as to the Company, as well.  *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d

28  1096, 1120 (C.D. Cal. 2012).

that there be a moratorium on selling stock for a bit, maybe six months, maybe a year, to show that

you believe in the company."  Jim Cramer, *Give the Insider Selling a Rest, Twitter*, Real Money

(Feb. 9, 2015) (copy attached as Ex. A to Decl. of Meghan S. B. Oliver ("Oliver Decl.")).  Cramer

continued, "If I were on the board I would simply say, 'Hey guys, could you give it a break for a

while because you are now telling a good narrative about user growth and engagement and you

are starting to get people excited again about the company and its stock and your selling makes

them feel foolish.'"  *Id.*  Twitter's Board of Directors then did exactly what Cramer suggested,

imposing a moratorium on insider selling effective February 2015.  *See* Dan Primack, *Exclusive:*

*Twitter Execs Put Stock Sales on Ice*, Fortune (Apr. 22, 2015) (attributing the story to "multiple

sources" at the Company, the article also revealed that Twitter had abruptly discontinued its

executives' 10b5-1 trading plans "after Twitter came under heavy criticism . . . for insider share

sales") (copy attached as Ex. B to Oliver Decl.).

 Finally, Noto's small stock purchases during the Class Period do not negate scienter.  Def.

Br. 14.  Such a conclusion would require the Court to accept as true the facts contained in SEC

Form 4s not attached to or relied upon in the CAC, which it should not do.  *See* Opp'n RJN 6-7.

Even if this Court were to take judicial notice of these stock purchases, which were only a tiny

fraction of his overall compensation, they cannot, without context, negate the strong inference of

scienter.  *See id.* at 7.

### E. The Inference of Scienter Outweighs Any Competing Inference

 As the CAC makes clear, Twitter's entire existence (including its ability to secure ad

revenue) depends on user growth and engagement.  *See* ¶¶ 23-24.  In November 2014, just a few

months before the start of the Class Period, Defendants made wildly ambitious projections

regarding the Company's future user base and user engagement.  ¶ 29.  When faced with mounting

difficulties, it became increasingly clear that these projections would be impossible to meet.

 It is therefore entirely plausible that senior corporate executives might recklessly

misrepresent the state of the Company's operations to the investing public while simultaneously

hoping for a miraculous turnaround that would eventually cause reality to catch up to their false

statements.  *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)

1   ("The fact that a gamble—concealing bad news in the hope that it will be overtaken by good

2   news—fails is not inconsistent with its having been a considered, though because of the risk a

3   reckless, gamble."); *Gammel v. Hewlett-Packard Co.*, No. SACV 11-1404 AG (RNBx), 2013 WL

4   1947525, at *21 (C.D. Cal. May 8, 2013) ("It is far from implausible that a corporate executive

5   who had spent months building excitement and momentum around important, new technology

6   products might recklessly misrepresent the inability to deliver on those promises.").

7       The contrary inference proffered by Defendants (that their failure to publicly disclose DAU

8   figures arose out of a concern that the metric could be "misleading" and might not be "useful,"

9   Def. Br. 13-14) is not at all compelling, resting as it does on irrational assumptions and conclusions

10  that are inconsistent with the CAC.  As noted earlier, DAU is a standard industry metric routinely

11  disclosed by many other social-media firms.  ¶ 124.  Thus, any assertion that the metric would

12  somehow be confusing to analysts and investors falls flat.  Moreover, Company insiders were

13  closely tracking DAUs as Twitter's primary user engagement metric, *see, e.g.*, ¶¶ 47, 67, 70, which

14  belies any contention that the metric was not "useful."  Finally, no rational actor would devote as

15  much effort as Twitter did to track a metric that could readily confuse.

16  **V.    PLAINTIFF STATES A CLAIM FOR CONTROL PERSON LIABILITY**

17      Since Plaintiff has sufficiently alleged a primary violation as to Defendant Twitter, the

18  control person claim should not be dismissed at this time.  *See, e.g.*, *In re Countrywide Fin. Corp.*

19  *Derivative Litig.*, 554 F. Supp. 2d 1044, 1074 (C.D. Cal. 2008).

20                                    **CONCLUSION**

21      Defendants' motion to dismiss should be denied in its entirety.  However, in the event the

22  Court grants Defendants' motion, or any part of it, Plaintiff respectfully requests leave to amend.

23  "'[A] district court should grant leave to amend even if no request to amend the pleading was

24  made, unless it determines that the pleading could not possibly be cured by the allegation of other

25  facts.'"  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

26

27

28

1   DATED:  June 21, 2017                    Respectfully submitted,

2

3                                                    /s/ Lesley E. Weaver
                                           LESLEY E. WEAVER (191305)
4                                          BLEICHMAR FONTI & AULD LLP 1999
                                           Harrison Street, Suite 670
5                                          Oakland, CA  94612
                                           Telephone: (415) 445-4003
6                                          Facsimile:  (415) 445-4020
                                           Email:      lweaver@bfalaw.com
7
8                                          *Liaison Counsel for Lead Plaintiff and the Class*

9                                          MOTLEY RICE LLC
                                           GREGG S. LEVIN (admitted *pro hac vice*)
10                                         MEGHAN S. B. OLIVER (admitted *pro hac vice*)
                                           28 Bridgeside Blvd.
11                                         Mt. Pleasant, SC  29464
                                           Telephone: (843) 216-9000
12                                         Facsimile:  (843) 216-9450
                                           Emails:     glevin@motleyrice.com
13                                                      moliver@motleyrice.com
14
                                           *Lead Counsel for Lead Plaintiff and the Class*
15
                                           ROBBINS GELLER RUDMAN
16                                            & DOWD LLP
                                           DANIEL S. DROSMAN (200643)
17                                         SUSANNAH R. CONN (205085)
                                           655 West Broadway, Suite 1900
18                                         San Diego, CA  92101-8498
                                           Telephone: (619) 231-1058
19                                         Facsimile:  (619) 231-7423
                                           Emails:     dand@rgrdlaw.com
20                                                      sconn@rgrdlaw.com
21
                                           *Additional Counsel for the Class*
22

23

24

25

26

27

28