JAMES G. KREISSMAN (Bar No. 206740)
jkreissman@stblaw.com
SIMONA G. STRAUSS (Bar No. 203062)
sstrauss@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California  94304
Telephone: (650) 251-5000
Facsimile:  (650) 251-5002

JONATHAN K. YOUNGWOOD (admitted *pro hac vice*)
jyoungwood@stblaw.com
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
Telephone: (212) 455-2000
Facsimile:  (212) 455-2502

*Attorneys for Defendants*
*Twitter, Inc., Richard Costolo and Anthony Noto*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DORIS SHENWICK, as Trustee for the DORIS SHENWICK TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TWITTER, INC., RICHARD COSTOLO and ANTHONY NOTO,<br><br>Defendants. | Case No. 3:16-CV-05314-JST<br><br>(Consolidated with 3:16-cv-05439-JST)<br><br><u>CLASS ACTION</u><br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TWITTER DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT**<br><br>**Judge:  Jon S. Tigar**<br>**Courtroom:  9**<br>**Hearing Date:  October 5, 2017**<br>**Hearing Time:  2:00 P.M.**<br>**Date Action Filed:  September 16, 2016**<br><br>Filed Jointly With:  Reply to Request for Judicial Notice; Supplemental Request for Judicial Notice |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ........................................................................................................................... 2

I.      **PLAINTIFF FAILS TO PLEAD ANY ADVERSE USER ENGAGEMENT TREND** ................................................................................ 2

      A.    Any Failure To Disclose A User Engagement Trend Did Not Render Other Statements Misleading .............................................. 4

II.     **PLAINTIFF'S DAU OMISSIONS THEORY FAILS TO STATE A CLAIM** .......................................................................................................... 6

      A.    Defendants Had No Independent Duty To Disclose Or Characterize DAU Data ......................................................................... 6

      B.    Any Failure To Label DAU Twitter's Primary User Engagement Metric Or To Disclose Additional DAU Data Did Not Render Other Statements Misleading ................................................ 7

III.    **THE MAU ALLEGATIONS FAIL TO STATE A CLAIM** ..................... 10

      A.    Defendants Made No False Or Misleading MAU Statements ............ 10

      B.    Plaintiff Fails To Plead An Adverse MAU Trend During The Class Period ........................................................................... 12

IV.    **THE AD ENGAGEMENT ALLEGATIONS FAIL TO STATE A CLAIM** ........................................................................................................ 12

V.     **THE VAGUE AND UNRELIABLE CW ALLEGATIONS SHOULD BE REJECTED** .......................................................................... 13

      A.    CWs Who Did Not Work For Twitter During The Class Period Provide No Relevant Information ..................................... 13

      B.    "Corroboration" Does Not Remedy The CWs' Statements Here ........ 14

      C.    Plaintiff's Unreliable Hearsay Allegations Should Be Disregarded .... 14

VI.    **PLAINTIFF FAILS TO ALLEGE FACTS SUPPORTING SCIENTER** ................. 15

      A.    The Individual Defendants' Stock Trades Militate Against Scienter ................... 15

      B.    Plaintiff Cannot Base Its Scienter Claims On CW Statements ............................ 16

      C.    Plaintiff Cannot Base Its Scienter Claims On Statements By Noto Or Costolo ..................................................................... 17

D.     Plaintiff's "Access" Allegations Do Not Support An Inference Of Scienter.................................................................................... 17

E.     Plaintiff's Core Operations Argument Fails To Establish Scienter ...................... 18

CONCLUSION ................................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

*Berson v. Applied Signal*,
    527 F.3d 982 (9th Cir. 2008) .................................................................................. 19

*Bodri v. GoPro, Inc.*,
    No. 16-cv-00232-JST, 2017 WL 1732022,
    (N.D. Cal. May 1, 2017) ...................................................................................3-4, 12, 18

*Cement Masons & Plasterers Joint Pension Tr. v. Equinix, Inc.*,
    No. 11-01016 SC, 2012 WL 685344,
    (N.D. Cal. Mar. 2, 2012) ........................................................................................ 15

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) .............................................................................. 17, 18

*Colyer v. AcelRx Pharms.*,
    No. 14-cv-04416-LHK, 2015 WL 7566809,
    (N.D. Cal. Nov. 25, 2015) ...................................................................................... 17

*Fadia v. FireEye, Inc.*,
    5:14-cv-05204-EJD, 2016 WL 6679806,
    (N.D. Cal. Nov. 14, 2016) ...................................................................................... 13

*Frenzel v. AliphCom*,
    76 F. Supp. 3d 999 (N.D. Cal. 2014) ...................................................................... 16

*Hatamian v. Advanced Micro Devices*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015) .................................................................... 14

*In re BofI Holdings*,
    No. 3:15-cv-02324-GPC-KSC, 2017 WL 2257980,
    (S.D. Cal. May 23, 2017) ..................................................................................... 3, 16

*In re Cadence Design Sys., Inc. Sec. Litig.*,
    692 F. Supp. 2d 1181 (N.D. Cal. 2010) .................................................................. 14

*In re Copper Mountain Sec. Litig.*,
    311 F. Supp. 2d 857 (N.D. Cal. 2004) .................................................................... 11

*In re Cytyc Corp.*,
    No. Civ.A. 02-12399-NMG, 2005 WL 3801468,
    (D. Mass. Mar. 2, 2005) ........................................................................................... 7

*In re Dot Hill Sys. Corp. Sec. Litig.*,
    594 F. Supp. 2d 1150 (S.D. Cal. 2008) ............................................................. 14, 15

*In re Finisar Corp. Sec. Litig.*,
    No. 5:11-cv-01252-EJD, 2017 WL 1549485,
    (N.D. Cal. May 1, 2017)........................................................................................... 18

*In re Harmonic Inc. Sec. Litig.*,
    163 F. Supp. 2d 1079 (N.D. Cal. 2001) .................................................................... 8

*In re LeapFrog Enters., Inc. Sec. Litig.*,
   527 F. Supp. 2d 1033 (N.D. Cal. 2007) ................................................................. 5

*In re LendingClub Sec. Litig.*,
   No. C 16-02627 WHA, 2017 WL 2289186,
   (N.D. Cal. May 25, 2017) .................................................................... 7, 8-9

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................................. 15

*In re Mellanox Tech. Ltd. Sec. Litig.*,
   No. 13-cv-04909-JST, 2014 WL 12650991,
   (N.D. Cal. Mar. 31, 2014) ................................................................. 11

*In re Netflix, Inc. Sec. Litig.*,
   923 F. Supp. 2d 1214 (N.D. Cal. 2013) ................................................................. 6

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ................................................................. 6-7

*In re Quality Sys. Sec. Litig.*
   No. 15-55173, 2017 WL 3203558,
   (9th Cir. July 28, 2017) ................................................................. 11

*In re STEC Inc. Sec. Litig.*,
   No. SACV 09-1304 JVS (MLGx), 2011 WL 2669217,
   (C.D. Cal. June 17, 2011) ................................................................. 5

*In re VeriFone Sec. Litig.*,
   11 F.3d 865 (9th Cir. 1993) ................................................................. 7

*Knox v. Yingli Green Energy Holding Co.*,
   No. 2:15-cv-04003-ODW(MRWx), 2016 WL 6609210,
   (C.D. Cal. May 10, 2016) ................................................................. 15

*Lloyd v. CVB Fin. Corp.*,
   No. CV 10-06256 MMM (PJWx), 2012 WL 12883522,
   (C.D. Cal. Jan. 12, 2012) ................................................................. 6

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) ................................................................. 13

*N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp.*,
   No. 2:07-cv-5756-FMC-FFMx, 2010 WL 1473265,
   (C.D. Cal. Mar. 29, 2010) ................................................................. 13

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ................................................................. 12

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ................................................................. 19

*S. Ferry LP, #2 v. Killinger*,
   399 F. Supp. 2d 1121 (W.D. Wash. 2005) ................................................................. 11

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ............................................................................. 13

*Sharenow v. Impac. Mortg. Hldgs.*,
    385 F. App'x 714 (9th Cir. 2010) ....................................................................... 16

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) .............................................................. 16

*U.S. v. Hernandez-Escarsega*,
    886 F.2d 1560 (9th Cir. 1989) ............................................................................ 14

*Washtenaw Cnty. Emps.' Ret. Sys. v. Celera Corp.*,
    No. 5:10-cv-02604 EJD, 2012 WL 3835078,
    (N.D. Cal. Sept. 4, 2012) ................................................................................... 11

*Welgus v. TriNet Grp.*,
    No. 15-cv-03625-BLF, 2017 WL 167708,
    (N.D. Cal. Jan. 17, 2017) ................................................................................... 18

*Wenger v. Lumisys, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................................................... 5

*West v. eHealth, Inc.*,
    No. 3:15-cv-00360-JD, 2016 WL 948116,
    (N.D. Cal. Mar. 14, 2016) ................................................................................... 3

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ............................................................... 5

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) ................................................................ 18

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .......................................................... 13, 14, 16, 19

**<u>Statutes, Rules, Regulations, and Publications</u>**                              **Page**

SEC Release No. 33-6835,
    1989 WL 1092885
    (May 18, 1989) ..................................................................................................... 7

### PRELIMINARY STATEMENT

Plaintiff's core theory is that Twitter experienced declining levels of user growth and engagement during the Class Period and that it hid that fact from investors.  When the challenged statements are viewed in context, the theory fails.  Allegations contained in the Complaint, as well as facts subject to judicial notice, demonstrate that not only were Defendants candid and open about the metrics they were reporting to the market during the Class Period, but they also explained why certain undisclosed metrics could be considered misleading to the market.

In late 2014, before the Class Period, Twitter announced that it would stop reporting Timeline Views as its primary measure of user engagement because product changes had rendered that metric less reliable.  Compl. ¶ 36; Ex. D at 31.  As a result, the Company began reporting user ad engagement, which measured how often users interacted with advertisements on the platform, which is Twitter's primary source of revenue.  Compl. ¶ 114.  Twitter internally evaluated several other potential user engagement metrics such as Daily Active Users ("DAUs"), "tweets per day, favorites and re-tweets, direct messages, [and] searches."  Ex. H at 14.  Twitter also disclosed, before the start of the Class Period, that it was "not going to continue to update DAU to MAU [Monthly Average Users] until [it had] a specific strategy behind driving this measurement," and instead would provide general updates for its larger and more mature markets when asked by analysts.  Ex. F at 10.

On February 5, 2015, the day before the start of the Class Period, Anthony Noto explained that, with the variability of DAU across its geographic markets, Twitter believed that the DAU to MAU metric could be misleading.  Ex. G at 7.  Noto went on to state that "as we sort of get to a point where we have a metric that's going to really reflect what we're trying to do, we'll share that with you.  But at this point, there's a number of them that we look at and no one metric to share."  *Id.*; Compl. ¶ 84.  Two months later, during the first quarter earnings call on April 28, 2015, the Company was again clear about what it was and was not disclosing:  "DAU is one measure of engagement.  We talked about that at Analyst Day.  It's a measurement that is dependent by market and you can have mixed shifts, so it could be a little misleading."  Ex. H at 14; *see also* Compl. ¶ 103.  In an effort to provide helpful guidance, Twitter disclosed DAU to MAU ratios in

1   its top markets both before and during the Class Period.  *See* Ex. H at 14; Compl. ¶ 87(b).  Further,

2   Twitter was transparent with investors regarding its user growth, cautioning on the April 28, 2015

3   earnings call that user growth for the quarter was off to a "slow start" and the company had less

4   visibility into Q2 than it had had into prior quarters.  MTD at 28-29 & n.28.

5          This context highlights the Company's history of candor with the market, and the

6   fundamental problems with Plaintiff's Complaint.  ***First***, the Complaint alleges no well-pleaded

7   facts showing that user engagement or user growth trends were "stalling" at the time of any

8   statements Plaintiff challenges as untrue or misleading.  ***Second***, Plaintiff fails to identify any

9   statement (whether or not misleading) by any Defendant suggesting that user engagement or user

10  growth was accelerating during the Class Period.  Plaintiff only points to statements of historical

11  fact that do not constitute projections as a matter of law.  ***Third***, Plaintiff fails to demonstrate that

12  Defendants had a duty to disclose more DAU data during the Class Period than what they actually

13  disclosed.  ***Finally***, Plaintiff fails to plead facts giving rise to a strong inference of scienter.

14  Plaintiff relies on CWs who allege no personal interaction with the Individual Defendants, points

15  to no documents that contradict any Class Period statements, and fails to plead any relevant stock

16  sales (while ignoring stock purchases during the Class Period).  Because Plaintiff fails to allege

17  well-pleaded facts to support either falsity or scienter, Defendants respectfully request that the

18  Court dismiss the Complaint with prejudice.

19                                            **<u>ARGUMENT</u>**

20  **I.      PLAINTIFF FAILS TO PLEAD ANY ADVERSE USER ENGAGEMENT TREND**

21         As an initial matter, the Complaint does not allege a single well-pleaded fact suggesting

22  that an adverse DAU or other user engagement trend existed at the time of any challenged

23  statement.  Plaintiff's Opposition relies principally on the decline in the DAU/MAU ratio for

24  Twitter's "top 20" markets from a 48% average for Q1-Q3 2014 to a 44% average for Q2 2015

25  (covering the April-June 2015 period).  However, the Complaint does not allege *when* the decline

26  occurred.  This failure is devastating to Plaintiff's claim because ***all*** of the allegedly false and

27  misleading user engagement trend statements occurred no later than April 28, 2015, at the start of

28  Q2 2015 and three months before Twitter reported the 44% DAU/MAU ratio for Q2, and

1    concerned periods prior to Q2 2015.  *See* MTD at 18-20; *West v. eHealth, Inc.*, 2016 WL 948116,

2    at *4 (N.D. Cal. Mar. 14, 2016) (plaintiff must specifically allege when trend occurred).

3        The primary statement Plaintiff claims is affirmatively false is the April 28, 2015 statement

4    that the DAU/MAU ratio in the first quarter of 2015 of 44% was similar to the 48% ratio reported

5    at the November 2014 Analyst Day.  Compl. ¶¶ 53, 102.  The support for Plaintiff's charge is that

6    the Company disclosed on July 28, 2015, at the close of the Class Period, that the average ratio

7    was 44% during the second quarter of 2015.  *Id.* ¶ 102.  The fact that the average ratio was 44%

8    for the three months spanning April to June 2015 sheds no light at all as to what the average ratio

9    was from January to March, the first quarter of 2015, and in no way negates the possibility of a

10   first quarter ratio of 48%.  Nor does it support an inference that the user engagement metric was

11   deteriorating in any way during the first quarter.  Also, the term "similar" here is not actionable

12   when used to compare 44% and 48%.  MTD at 15.  Plaintiff claims that the term "similar" is

13   objectively verifiable, but it offers neither precedent to support that argument nor criteria on which

14   similarity should be evaluated.  Opp. at 16.  Instead, Plaintiff cites *In re BofI Holdings*, 2017 WL

15   2257980, at *6-7 (S.D. Cal. May 23, 2017), which held a statement must be objectively verifiable

16   to be actionable, but does not say that describing two items as "similar" meets this standard.

17       Further, Plaintiff has not contested—and cannot contest—that a decrease in the

18   DAU/MAU ratio means that DAUs themselves were declining.  Simple math will not allow it to

19   do so.  As Noto told investors at the end of the Class Period, the Q2 2015 decline in DAU/MAU

20   ratio occurred because Twitter had "grown MAUs faster than DAUs."  Ex. I at 11.  It is entirely

21   reasonable that DAUs increased but at a slower rate than the MAU increase from Analyst Day to

22   the end of the Class Period.  Indeed, the 48% DAU/MAU ratio was based on averages over Q1-Q3

23   2014.  From the start of that period to the end of Q2 2015, Twitter increased its average MAUs

24   from 241 million to 316 million, or 31%.  Exs. S at 21; T at 24.  If average DAUs had declined

25   during the same period (as Plaintiff contends), the DAU/MAU ratio could not have remained as

26   high as 44% in Q2 2015.  Specifically, a 4% decline in the DAU/MAU ratio over that period

27   suggests that average DAUs must also have increased.  *Bodri v. GoPro*, 2017 WL 1732022, at

28   *12-13 & n.6 (N.D. Cal. May 1, 2017) (statement about "improving" sales not false where

1   plaintiff failed to "present any evidence that an alternate state of affairs is more plausible").

2       Plaintiff ignores both of these arguments, relying instead on vague and contradictory CW

3   statements that DAU growth was flat or declining prior to or during the Class Period.  Opp. at 16-

4   20.  The CW statements do not meet this Circuit's reliability test.  MTD at 10-12, 19; *infra* at 13-

5   15.  Of the six CWs who allegedly made statements related to user engagement trends, two (CWs

6   4 and 7) are not alleged to have worked at Twitter during the Class Period.  MTD at 19.  And even

7   if the CWs adequately alleged that their statements related to the Class Period (they do not), they

8   do not address whether DAUs were declining prior to the Company's disclosures on April 28 and

9   earlier.  If the CW allegations are based on declines in May, June, and July of 2015 (the last three

10  months of the six month Class Period), they simply shed no light on the veracity of Defendants'

11  earlier disclosures.  Further, even if certain CW allegations could be construed as relating to the

12  Class Period, the statements only vaguely purport to have observed "flat," flattening," or

13  "declining" trends without ever explaining what specific DAU information they observed (or even

14  whether they observed the same information), what markets were included in the DAU metric they

15  observed, what specific adverse DAU trend that information showed, when that trend occurred in

16  relation to Defendants' statements, or how that information contradicted Defendants' statements.

17  These vague statements by unreliable witnesses do not support a fraud claim.  *See infra* at 13-15.

18      **A.     Any Failure To Disclose A User Engagement Trend Did Not Render Other
            Statements Misleading**

19

20      Plaintiff fails to demonstrate that disclosing any adverse DAU trends was required to avoid

21  rendering other statements misleading.  While Plaintiff argues that Defendants misleadingly told

22  investors about a "thriving company, positioned to meet its lofty . . . engagement goals" and that

23  "engagement w[as] accelerating," Opp. at 1-2, a review of the Complaint makes clear that

24  Defendants made no such statements.

25      Plaintiff first contends that Noto's February 5, 2015 statement that "[i]n our more mature

26  markets, we have very high DAU to MAU, 50% plus" gave the misleading impression of user

27  engagement growth.  Compl. ¶ 86.  The Complaint, however, does not plead facts suggesting

28  either that this statement was false or that it said anything about ***growth*** in user engagement.

4

1   MTD at 16-17.  The Opposition fails to respond to this argument, effectively conceding this point.

2   Plaintiff also claims that Noto's February 5, 2015 statement that Timeline Views per MAU

3   were up 3% year-over-year "create[d] the impression that '***engagement was improving***.'"  Opp. at

4   9 (citing Compl. ¶ 86).  This emphasized quotation is the Complaint's own unsubstantiated

5   characterization of Noto's statement, not a quotation from Noto or any other Defendant.  In fact,

6   Noto limited his statement to ***historical*** Timeline Views-per-MAU.  As courts have repeatedly

7   held, reference to historical data is not an assertion that future trends will follow prior results.  *See*

8   MTD at 17.  Thus, Noto's statement could not give the impression of future user engagement or

9   DAU growth, particularly when he also said that the Timeline View metrics had become obsolete.[1]

10   Finally, the Complaint relies on Noto's statement on the Q1 2015 earnings call that, as to

11   testing of Twitter's While You Were Away (WYWA) function, "[w]e're seeing perhaps the most

12   exciting results here."  Compl. ¶ 103.  This statement is non-actionable puffery that says nothing

13   about user engagement trends.  MTD at 17-18.  Plaintiff does not challenge this argument but

14   instead now argues that Noto's follow-on statement that tweets from the WYWA function "are not

15   only seeing higher engagement, they're bringing people back to Twitter more frequently" created

16   a false impression of increased user engagement.  Opp. at 22-23.  That unquantified statement is

17   also puffery, *see, e.g.*, *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012)

18   (positive comments on feedback from pilot launch were puffery), and is also not actionable

19   because Plaintiff fails to allege facts showing it was false (*i.e.*, that the WYWA function did not

---

[1] Plaintiff notes that some analysts reported after the earnings call that "user 'engagement [wa]s improving,'" which it argues should be taken into account when assessing whether the statement was misleading.  Opp. at 10 n.6.  Because Noto provided no guidance and actually warned investors not to rely on Timeline View data, he cannot be held liable for analysts' "vague and impressionistic" (and unreasonable) "repackaging" of his actual statement, particularly absent any allegations of unusual engagement with analysts.  *See In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1051 (N.D. Cal. 2007) (no liability based on analysts' interpretations of defendants' actual statements); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1249-50 (N.D. Cal. 1998) (same).  While Plaintiff cites *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011), to support its position that Defendants can be held liable for statements in analyst reports, *STEC* held only that it was reasonable for analysts to draw conclusions from a ***specific*** positive statement about a concrete development.  It does not allow a plaintiff to rely on analysts' impressions about future trends based on statements of historical results.

cause some higher level of engagement or cause some users to return to Twitter more frequently).[2]

## II.     PLAINTIFF'S DAU OMISSIONS THEORY FAILS TO STATE A CLAIM

Plaintiff's claim that Twitter had to disclose more DAU data than it did and to describe DAU as its primary user engagement metric during the Class Period lacks merit.  Opp. at 7, 10.

### A.     Defendants Had No Independent Duty To Disclose Or Characterize DAU Data

Plaintiff fails to establish any regulatory duty requiring Defendants to disclose DAU-related information.  While Plaintiff points to Item 303 of Regulation S-K and SEC Release 33-8350, the Ninth Circuit held in *In re NVIDIA Corp.*, 768 F.3d 1046, 1056 (9th Cir. 2014), that "Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5." Plaintiff claims that *NVIDIA*'s holding was limited to the requirement to disclose known trends or uncertainties set forth in Subsection (a)(3)(ii) of Item 303.  Opp. at 12.  However, *NVIDIA* contains no such limitation and instead uses the broad language quoted above.  Moreover, courts in this Circuit have repeatedly held that alleged violations of other Item 303 subsections similarly fail to give rise to a securities fraud claim.  *See Lloyd v. CVB Fin. Corp.*, 2012 WL 12883522, at *24 (C.D. Cal. Jan. 12, 2012) (no claim for failure to disclose unusual transactions under Item 303(a)(3)(i)); *In re Netflix, Inc., Sec. Litig.*, 923 F. Supp. 2d 1214, 1221 (N.D. Cal. 2013) (no claim for failure to disclose "other significant components or revenue" under Item 303(a)(3)(i)).  Finally, Plaintiff never explains what other subsection of Item 303 allegedly requires the disclosure of DAU data.

Plaintiff argues that *NVIDIA*'s holding was limited to claims alleging a failure to disclose forward-looking information and thus does not limit its ability to rely on Item 303 for the proposition that Defendants had a duty to disclose historical performance indicators, such as DAU. Opp. at 12.  Nothing in *NVIDIA* limits its holding to forward-looking information.  Moreover, *NVIDIA* involved the alleged failure to disclose a "known trend" that defendant had manufactured

---

[2] Plaintiff also claims that several months after these statements were made, Twitter reported that "product initiatives . . . have not yet had meaningful impact on growing our audience" even though "[s]ome of them have statistically shown positive results."  Compl. ¶¶ 89(g), 104(k). These statements are consistent with the unquantified test results reported by Noto.  Moreover, Noto warned investors on the Q4 2014 earnings call that he did not expect the initiatives to "have a meaningful impact on Q1 user growth" and was merely "hopeful that these product initiatives will contribute in subsequent quarters."  Ex. F at 5.

defective products.  768 F.3d at 1049-51.  By definition, a known trend involves events that have already transpired and any such disclosure cannot be forward-looking.[3]  *In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) (instruction to Item 303(a) states that "forward-looking information need not be disclosed"); *In re Cytyc Corp.*, 2005 WL 3801468, at *18 (D. Mass. Mar. 2, 2005) (Item 303(a)(3)(ii) "has to be read in light of the SEC's instruction to this paragraph . . . that forward-looking information need not be disclosed."); SEC Release No. 33-6835, 1989 WL 1092885, at *3-4 (May 18, 1989) (providing Item 303 interpretative guidance and distinguishing between disclosure of "future impact of presently known trends" under Item 303(a)(3)(ii) and "optional forward-looking information [that] may involve some prediction or projection").[4]

**B.**   **Any Failure To Label DAU Twitter's Primary User Engagement Metric Or To Disclose Additional DAU Data Did Not Render Other Statements Misleading**

Plaintiff incorrectly claims that Defendants' purported failure to characterize DAU as Twitter's "primary" user engagement metric rendered the following statements misleading: (i) Twitter looks at user engagement in "a number of different ways," (ii) there is "no one perfect" user engagement metric, and (iii) there is "not one metric for engagement."  Compl. ¶¶ 84, 91, 93, 103, 109, 110.  None of these statements is inconsistent with DAU (or any other metric) serving as Twitter's primary user engagement metric.  *See* MTD at 8-10.  Moreover, in making those statements, Defendants provided investors with additional context about DAUs as a user engagement metric by telling investors that Twitter looked at DAU, providing investors with updates on the DAU/MAU ratio, and candidly stating that providing additional DAU data at that time could be misleading based on DAU fluctuations in various markets as Twitter expanded.  *See*

---

[3] Plaintiff cites *In re LendingClub*, 2017 WL 2289186 (N.D. Cal. May 25, 2017), to argue that violations of non-forward-looking disclosure rules give rise to Section 10(b) liability, Opp. at 12, but that case involved Item 404 disclosures of related party transactions, not Item 303 disclosures. It says nothing about whether Item 303 trends disclosures are forward-looking.

[4] For similar reasons, Plaintiff's claim that Defendants had an independent duty to disclose adverse DAU trend information fails.  Moreover, because the duty to disclose Item 303 adverse trends was the specific issue decided in *NVIDIA*, Plaintiff cannot distinguish this case from *NVIDIA*'s holding.  Further, while the Complaint pleads that Defendants had a duty to "update" MAU and DAU growth projections made at Analyst Day, Compl. ¶ 85(j), Twitter in fact made no such projections (its DAU slides were clearly marked hypothetical and illustrative) and, in any event, would have had no duty to update any projections had they been made.  MTD at 16.

1   *id.* at 5, 9, 12.  Plaintiff does not dispute any of this.  Opp. at 5.  Defendants are aware of no case,

2   and Plaintiff cites to none, where a court has held that a shareholder adequately alleges securities

3   fraud based on omission of information where defendants specifically and repeatedly stated that

4   they would not disclose the information at issue out of caution that it might misinform investors.

5   MTD at 5, 9, 12.  This Court should decline Plaintiff's request that it be the first.[5]

6          Further, Plaintiff's assertion that DAU was Twitter's primary user engagement metric

7   during the Class Period is not well-pleaded.  Plaintiff relies primarily on CW statements, but these

8   CWs either (i) are not alleged to have worked at Twitter during the Class Period and/or (ii) make

9   only vague, ill-defined claims (*e.g.*, DAU was an "important" or "primary" metric or DAU was

10  looked at "daily" or "constantly" without comparison to the frequency with which other metrics

11  were considered or an explanation of what specific data was reviewed or for what purpose).  *See*

12  MTD at 10-12.  Plaintiff responds that it has adequately pleaded each CW's title and role, but fails

13  to address Defendants' arguments that it is unclear whether some CWs worked at Twitter during

14  the Class Period and that the CW allegations are vague.  Opp. at 16-20, 27.  *See infra* at 13-15.[6]

15         Plaintiff next claims that Twitter's reported MAU data was misleading for lack of

16  "context" because Defendants did not provide DAU data in as much detail as Plaintiff would have

17  liked.  Opp. at 9-10 & n.4.  While the Opposition relies on *LendingClub* for the proposition that

18  omission of one metric can render another metric misleading, *id.* at 9, *LendingClub* contains no

19  ────────────────────

20  [5] Plaintiff asks why Twitter monitored DAU if it was unreliable.  Opp. at 13.  That Twitter
    monitored DAU (along with numerous other user engagement metrics, *see* MTD at 4-5), and then
21  reported only certain aspects of DAU to investors is entirely consistent both with Twitter's
    commitment to provide investors only with relevant and reliable information and with its pre- and
    post-Class Period DAU disclosures, which Plaintiff does not challenge.

22
    [6] Plaintiff also falsely claims Twitter made pre- and post-Class Period "admissions" that DAU was
23  its primary engagement metric.  Opp. at 13.  With respect to the pre-Class Period, Plaintiff points
    to ¶¶ 33-39, which merely allege that Twitter discussed the DAU/MAU ratio on Analyst Day, not
24  that it characterized DAU as its primary user engagement metric.  The post-Class Period
    statements relied on by Plaintiff, Compl. ¶ 85(b), are also unavailing because they do not address
25  Twitter's practices *during* the Class Period and thus provide no relevant information.  *See In re
    Harmonic, Inc. Sec. Litig.*, 163 F. Supp. 2d 1079, 1091 (N.D. Cal. 2001) (plaintiff cannot establish
26  falsity at a given time by "pointing to later inconsistent statements").  Finally, Plaintiff refers to a
    Class Period investor conference where it claims Noto said Twitter looked every day at
27  "increasing engagement among new users."  Opp. at 2, 28.  Plaintiff mischaracterizes the
    statement, which referred to user **retention**, not user **engagement**, and, contrary to Plaintiff's
28  claim, was made in response to a question about user **growth**, not user **engagement**.  Ex. AA.

1   such holding.  Instead, that court held that a defendant's failure to disclose that it was engaged in

2   self-dealing may be actionable.  2017 WL 2289186, at *8.  Contrary to Plaintiff's claim, the court

3   did **not** find that providing "loan growth" data obligates an issuer to also disclose "loan quality"

4   data, *id.*, and the case does not support Plaintiff's position that providing MAU data (reflecting

5   user growth), absent detailed DAU data (reflecting user engagement), is misleading.

6      Plaintiff responds that "[t]he SEC has opined that providing raw numbers (like MAU)

7   without appropriate context is misleading."  Opp. at 9 n.4.  However, Plaintiff refers to a 2013

8   speech by former-SEC Chairwoman White (not a binding rule) that says nothing about the need to

9   report DAU data along with MAU data and does not discuss user engagement at all.  Instead, the

10  speech asked companies to provide a "clear description" of how their growth metrics are "link[ed]

11  . . . to income and eventual profitability."  Ex. BB.  Here, Plaintiff does not dispute that Twitter

12  explained how both user growth and engagement are linked to income and profitability.  *See* Ex. D

13  at 12-13 (discussing impact of user growth and engagement on revenue); Ex. E at 38 (same).[7]

14     Finally, Plaintiff claims Twitter discussed user engagement and/or DAU data in quarterly

15  filings and on earnings calls pre- and post-Class Period but not during the Class Period.  Opp. at

16  13.  Plaintiff fails to explain the significance of this argument, as the fact that Defendants

17  discussed user engagement or DAUs in one period did not obligate them to do so in all periods.

18  Plaintiff's assertion is also demonstrably wrong.  Twitter provided similar user engagement

19  disclosures in all of its SEC reports, *see, e.g.*, Exs. D at 46-47 (reporting Timeline Views in Q4

20  2014, like prior quarters), E at 25 (reporting user ad engagements, like subsequent quarters), and

21  Defendants' DAU statements on Class Period earnings calls were as detailed as in other periods.[8]

---

22  [7] Plaintiff also argues that Twitter should have disclosed DAU data because "most" of its "social-
23  media peers" did so.  Opp. at 13.  However, (i) Plaintiff provides no basis to identify these
    "peers"; (ii) only three of the supposed "peers" reported DAU data; (iii) two of these peers defined
24  DAU in very different ways (Facebook and Snapchat use different definitions of who qualifies as
    a user and what qualifies as use, *compare* Exs. CC and DD *with* Ex. EE); and (iv) even if all of
25  Twitter's "peers" had disclosed DAU in the same way, Twitter would still have no obligation to
    do so, particularly given its concern that disclosing certain DAU detail could mislead investors.

26  [8] *Compare* Q2 2014 call, Ex. Y (no mention of DAU) and Q3 2015 call, Ex. Z at 12 (no DAU
27  update) *with* Ex. G at 7 ("In our more mature markets, we have very high DAU to MAU, 50%
    plus, and in emerging markets we have very low DAU to MAU at 20%"); Ex. H at 14 ("DAU . . .
28  is dependent by market and you can have mixed shifts, so it could be a little misleading, but DAU
    to MAU ratios in the quarter were similar to what they were by market relative to Analyst Day.").

### III.    THE MAU ALLEGATIONS FAIL TO STATE A CLAIM

Plaintiff also alleges that Defendants falsely or misleadingly reported artificially high MAU figures and covered up declining MAU trends.  Compl. ¶¶ 88-95, 105-106, 111-126.  This claim fails because Defendants made no such false or misleading statements and because Plaintiff fails to plead that an adverse trend existed during the Class Period.  *See* MTD at 23-29.

### A.    Defendants Made No False Or Misleading MAU Statements

The Complaint alleges that Twitter's reported MAU figures were false because they included "low quality" users.  Compl. ¶ 89(a).  However, Defendants never stated that Twitter excluded such purportedly "low-quality" users from its MAU figures and, in fact, used the same criteria for counting MAUs pre- and post-Class Period, which Plaintiff does not challenge. Defendants cannot be held liable just because Plaintiff believes that Twitter should have used different criteria for counting MAUs.  *See* MTD at 23.  The Opposition ignores this argument.

Plaintiff also alleges that the MAU statements were misleading because some portion of Twitter's MAU figures (and MAU growth) consisted of robot or "spam" users, "automated" users, and "paid" users, Compl. ¶¶ 57, 89(e), 89(f), and because, contrary to Defendants' claims, new product initiatives were not having a meaningful impact on MAU growth.  *Id*. ¶ 89(g).

However, the Opposition fails to contest the fact that Twitter disclosed the existence of robot, spam, and automated users.  MTD at 24-25.[9]  With respect to Plaintiff's claim regarding alleged "paid" users (*i.e.*, users obtained through marketing efforts), this claim fails because (i) Defendants never represented whether marketing efforts led to some MAU growth and (ii) Plaintiff failed to allege that Twitter's MAU was materially impacted by "paid" growth. Moreover, during the Q4 2014 earnings call, in response to a question about why Twitter expected an "acceleration" in MAU growth over the next quarter—Costolo said that such increased growth would be the result of a combination of "organic growth," "new product initiatives" and

---

[9] The Opposition argues that Twitter's Q1 2015 10-Q was "out of the norm" because it reported the percentage of its user base that consisted of automated users for Q4 2014, not the current quarter.  Opp. at 14.  However, Twitter clearly disclosed that it was providing Q4 2014 data. Moreover, in all of Twitter's 2015-16 quarterly reports, it disclosed automated user data as of the fourth quarter of the prior year.  *See* Exs. T at 4; U at 4; V at 4; W at 4; and X at 4.

1   "seasonality." Compl. ¶¶ 88, 89(a).  This statement cannot be misleading, as it did not attempt to

2   quantify the impact of any of those factors on the expected acceleration in user growth.  Further,

3   Plaintiff fails to allege that Costolo did not expect this growth, or that there was no such growth, in

4   Q1 2015.  MTD at 27-28.  Plaintiff does not respond to these arguments.

5   Plaintiff's next argument—that Defendants misrepresented that "new product initiatives"

6   would drive MAU growth—is similarly baseless.  Plaintiff again relies exclusively on Costolo's

7   statement that he expected an unquantified level of acceleration in MAU growth for Q1 2015

8   arising from a non-exclusive list of factors, including "new product initiatives." Compl. ¶ 89(a).

9   This claim fails because the Complaint never pleads that product initiatives played no role at all in

10   Q1 2015 MAU growth, and does not dispute the fact that Noto warned investors on the same

11   earnings call not to expect any immediate impact from the product initiatives.  MTD at 26-27.

12   Further, Costolo's statement about the expected success of initiatives is protected by the

13   PSLRA safe harbor.  *Id.*  Plaintiff argues that the safe harbor does not apply because the statement,

14   "which w[as] made over a month into the first quarter, referred to events that had already partially

15   occurred, or were occurring," and was therefore not forward looking, Opp. at 24, but that is wrong.

16   Costolo was discussing what the drivers of MAU growth would be over the entire quarter, which

17   had yet to be completed.  This is a classic forward-looking statement, *see In re Copper Mountain*

18   *Sec. Litig.*, 311 F. Supp. 2d 857, 877-80 (N.D. Cal. 2004) (April statement projecting full year

19   revenue is forward looking); *In re Mellanox Tech. Ltd. Sec. Litig.*, 2014 WL 12650991, at *14

20   (N.D. Cal. 2014) (statements about projected revenue and growth drivers issued in middle of

21   forecast period is forward looking),[10] that was accompanied by meaningful cautionary language.[11]

---

[10] Plaintiff's reliance on *S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121 (W.D. Wash. 2005), *vacated in part on other grounds*, 542 F.3d 776 (9th Cir. 2008), is misplaced, as that case did not exempt statements made in the middle of a period from the safe harbor, but merely held that some statements, while "grammatically about the future," were "firmly lodged in the present." *Id.* at 1131.  Costolo's statement is nothing of the sort.  Moreover, because Costolo's statement concerned the expected drivers of MAU acceleration for Q1 as a whole, it was not a "mixed" statement under *In re Quality Sys. Sec. Litig.*, 2017 WL 3203558, at *11 (9th Cir. July 28, 2017), and thus the safe harbor applies.  Plaintiff also argues that *Washtenaw Cnty. Emps.' Ret. Sys. v. Celera Corp.*, 2012 WL 3835078 (N.D. Cal. Sept. 4, 2012), holds that the safe harbor is inapplicable if Costolo knew his statement was false.  Opp. at 25.  The Ninth Circuit has rejected this precise argument and made clear that "actual knowledge" and "cautionary language" are two "disjunctive" safe harbor prongs.  *In re Quality Sys.*, 2017 WL 3203558, at *13.

### B.   Plaintiff Fails To Plead An Adverse MAU Trend During The Class Period

More generally, Plaintiff offers no well-pleaded facts to support its allegations that "MAU growth was deteriorating," "stagnant," or "declining" during the Class Period, Opp. at 10; Compl. ¶¶ 96, 106, or that Defendants concealed this trend while misleadingly "tout[ing]" positive MAU growth, Opp. at 9. In its Class Period SEC filings, Twitter disclosed the change in MAUs for the prior eight quarters, showing that Twitter hit its Q1 2015 MAU target (as discussed on the Q4 2014 earnings call) and further cautioned investors that any reported MAU growth would level off as its user base increased. MTD at 28-29. In addition, on the April 28, 2015 earnings call during the Class Period, Defendants cautioned investors that Q1 to Q2 2015 MAU growth was off to a "slow start" and would likely not be as high as previous quarters. *Id.* at 28 n.28. Plaintiff's contention that Defendants falsely touted MAU growth makes no sense where Twitter either met its target (Q1) or experienced slower growth, which it transparently disclosed (Q2). The Opposition fails to respond to these arguments, instead reiterating the vague and contradictory allegations of its CWs (many of whom left Twitter pre-Class Period) of a flat or declining MAU trend that, in the absence of specific factual allegations of what they observed, when they observed it, and how it compared to Defendants' actual statements, do nothing to support Plaintiff's claim.

## IV.   THE AD ENGAGEMENT ALLEGATIONS FAIL TO STATE A CLAIM

Plaintiff claims that Twitter falsely identified ad engagement as a user engagement metric that it tracked internally. Compl. ¶ 115. Plaintiff does not dispute, however, that ad engagement was (and is) a measure of user engagement, and that consideration of the metric does not exclude DAU as another measure of user engagement. MTD at 31. Plaintiff's real contention appears to be that user ad engagements was moving in the opposite direction of DAU and other, unidentified user engagement trends and that Defendants had a duty to disclose this fact. Opp. at 11. As an initial matter, the allegation that an adverse user engagement or DAU trend existed during the

---

[11] Plaintiff argues that Costolo's statement was not "accompanied by sufficient meaningful cautionary language" to invoke the safe-harbor, claiming that the cautionary language was "boilerplate [and] insufficiently specific." Opp. at 24. The Ninth Circuit and this Court, however, have approved of cautionary language that is nearly identical to the statements Twitter provided. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014); *Bodri*, 2017 WL 1732022, at *12-13 & n.6; MTD at 27 n.25.

Class Period is not well-pleaded.  Even if it were, the existence of other user engagement metrics providing different information does not render Twitter's ad engagement data misleading.  MTD at 32.  Implicit in Plaintiff's argument is the assumption that DAU is the ***only*** legitimate user engagement metric at Twitter and any metric that presents a different user engagement trend is misleading.  Because the Complaint does not allege that DAU was Twitter's sole legitimate user engagement metric or even that it was its most accurate user engagement metric, Plaintiff cannot establish that the accurate reporting of user ad engagement data was somehow misleading.  *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 708 (9th Cir. 2016) (duty to disclose all data arose only where defendants claimed all studies supported their position).

## V.   THE VAGUE AND UNRELIABLE CW ALLEGATIONS SHOULD BE REJECTED

While the Complaint relies heavily on CW allegations for falsity and scienter, the CWs are not described with sufficient specificity to demonstrate their reliability, and their statements are too vague or irrelevant to satisfy the PSLRA's heightened pleading standards.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009); MTD at 10-12; *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *13 (N.D. Cal. Nov. 14, 2016) (rejecting CWs who did not "support their allegations with concrete and readily verifiable figures or explanations"); *N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp.*, 2010 WL 1473265, at *3 (C.D. Cal. Mar. 29, 2010) (not crediting CW statements lacking detail).  The Opposition largely ignores these CW deficiencies, and the limited response it provides fails.[12]

### A.   CWs Who Did Not Work For Twitter During The Class Period Provide No Relevant Information

Courts routinely discount the testimony of CWs who do not work for a company during the class period because those witnesses inherently lack "personal knowledge" of any fraudulent conduct.  *See* MTD at 19 n.16; *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 980-81 (N.D. Cal. 2015) (CW allegations defective because timing of employment suggests CWs lacked reliable relevant information).  Indeed, 5 of the 11 CWs in this case are not adequately alleged to have

---

[12] Contrary to Plaintiff's claim, Opp. at 17 n.13, Appendix I to the MTD (which reflects the weaknesses of the CW statements) is not improper; it simply *summarizes* arguments made in the body of that brief for the Court's convenience but does not *add* any new arguments.

1   been employed at Twitter during any part of the Class Period.  MTD at 5.  Plaintiff argues that

2   pre-Class Period information is "relevant" to "trends . . . during the Class Period."  Opp. at 21.

3   Not so.  Statements about **pre-Class Period trends** (the subject of the CWs' statements) are not

4   relevant to whether Class Period statements relating to **Class Period trends** were misleading.

5             **B.**    **"Corroboration" Does Not Remedy The CWs' Statements Here**

6          In response to the argument that the CWs' statements are too vague or irrelevant, Plaintiff

7   argues that the statements should be credited because they corroborate each other and are

8   supported by a *Vanity Fair* article.  Opp. at 20.  However, weak and vague allegations do not

9   magically become strong and specific just because they are repeated multiple times.  Indeed, "a

10  shared opinion among confidential witnesses," no matter how many witnesses, and the "repetition

11  of the same vague allegation" "does not necessarily indicate either falsity or a strong inference of

12  scienter if the allegations themselves are not specific enough."[13]  *In re Dot Hill Sys. Corp. Sec.*

13  *Litig.*, 594 F. Supp. 2d 1150, 1163 (S.D. Cal. 2008) (collecting cases).[14]

14            **C.**    **Plaintiff's Unreliable Hearsay Allegations Should Be Disregarded**

15         Statements by CWs repeating what other unidentified individuals allegedly told them are

16  hearsay and should be disregarded.  MTD at 29.  Although Plaintiff argues it can rely on hearsay

17  at the motion to dismiss stage, Opp. at 20, courts have held that even at this stage, Plaintiff may

18  not rely on "**unreliable** hearsay."  *Zucco Partners*, 552 F.3d at 995.[15]  Here, Plaintiff's hearsay

19  allegations lack credibility.  CW-6, for example, reports "private conversations" with unidentified

20

---

21  [13] The CW statements are also not always corroborative.  For example, one CW "absolutely" saw "DAU trends" declining, while others claim they were merely "flattening out."  MTD at 19.

22

23  [14] Plaintiff's cases are inapposite.  The CWs in *Hatamian v. Advanced Micro Devices*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015), provided "specific allegations" that were not challenged, and

24  *U.S. v. Hernandez-Escarsega*, 886 F.2d 1560 (9th Cir. 1989), involved informant testimony used to obtain a search warrant and does not appear to have ever been cited in the securities context.

25  [15] The only case Plaintiff cites in which a court credited hearsay testimony from a CW, *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1188 (N.D. Cal. 2010), found such

26  testimony "problematic" but held it should not be "entirely discounted" in that case because it came from an industry consultant whose job was to collect information from other industry

27  sources.  Plaintiff also submitted a declaration revealing the identity of the CW and discussing his access to information.  On these specific facts, the court gave some consideration to the hearsay

28  allegations.  *Id.* at 1189 n.2.  Here, by contrast, Plaintiff has offered no such indicia of reliability.

persons about MAU.  Compl. ¶ 72.  Plaintiff offers no information about *who* spoke with this CW,
*when* the conversations occurred, *what* was said, or *why* those unidentified people would know
the information they purportedly shared.  Plaintiff thus fails to "give the Court the necessary
information to 'be able to tell whether a confidential witness is speaking from personal knowledge
or merely regurgitating gossip and innuendo.'"  *In re Dot Hill*, 594 F. Supp. 2d at 1163.[16]

## VI.    PLAINTIFF FAILS TO ALLEGE FACTS SUPPORTING SCIENTER

In an effort to establish scienter, the Opposition focuses on statements allegedly made by
Noto and Costolo, CW allegations, claims of "access" to information, and the core operations
doctrine.[17]  None of these arguments changes the fact that the Complaint fails to allege scienter.
Moreover, Plaintiff cannot overcome the fact that Noto *purchased* stock during the Class Period.

### A.    The Individual Defendants' Stock Trades Militate Against Scienter

The lack of stock sales by either Individual Defendant and the existence of stock *purchases*
by Noto during the Class Period cut against a strong inference of scienter.  MTD at 14.  Plaintiff
ignores the numerous cases cited for this proposition, including Ninth Circuit precedent and this
Court's recent decision, and instead relies on pre-Class Period stock sales in an effort to plead
scienter.  Opp. at 30.[18]  Plaintiff fails to cite a single case suggesting that such sales can support
scienter and ignores well-established precedent holding that pre-Class Period sales cut *against* any
inference of scienter.  MTD at 14; *see also Cement Masons & Plasterers Joint Pension Tr. v.
Equinix, Inc.*, 2012 WL 685344, at *8 (N.D. Cal. Mar. 2, 2012) (no scienter where defendants
"held on to [their] stock when its price was allegedly inflated and sold when it was not").[19]

---

[16] Plaintiff also cannot rely on the *Vanity Fair* article's claim of an MAU inflation scheme because
it provides no details about the source of the statements it reports.  MTD at 28 n.26.  As Plaintiff's
own cases explain, "newspaper articles should be credited only to the extent that other factual
allegations would be—if they are sufficiently particular and detailed to indicate their reliability."
*In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000); *Knox v.
Yingli Green Energy Holding Co.*, 2016 WL 6609210, at *9 (C.D. Cal. May 10, 2016) (same).

[17] The Opposition never addresses Defendants' argument that barebones allegations of executive
departures do not support scienter, apparently abandoning that assertion.  *See* MTD at 20-21.

[18] Plaintiff asks the Court to ignore the SEC Forms 4 reflecting Noto's stock purchases that courts,
including this Court, routinely examine when considering scienter.  *See* RJN Reply at 3-4.

[19] Plaintiff also relies on an out-of-context quotation from a footnote of a non-precedential opinion
to argue that the Ninth Circuit "do[es] not draw a negative inference from the absence of stock

Plaintiff also offers a new theory for **why** the Individual Defendants did not sell their shares during the Class Period, asserting that Twitter had "impos[ed] a moratorium on insider selling" at the start of the Class Period.  Opp. at 30-31.  As an initial matter, this theory is based on assertions that are **not alleged** in the Complaint and thus cannot be considered on a motion to dismiss.  *See Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1009 (N.D. Cal. 2014) ("axiomatic" that complaint "may not be amended by the briefs in opposition to a motion to dismiss").  Moreover, the articles on which Plaintiff now relies (and for which it failed to seek judicial notice) do not support the proposition that insiders were unable to sell during the Class Period.  At most, one article, dated halfway into the Class Period, suggests that certain 10b5-1 plans were not in effect during a portion of the Class Period.  Pl.'s Ex. B.  Even if true, this fact would not preclude a Defendant from selling earlier in the Class Period or outside of the confines of a 10b5-1 plan.

### B.     Plaintiff Cannot Base Its Scienter Claims On CW Statements

Plaintiff cannot rely on CWs for *scienter* purposes because **none** of the CWs reports a single interaction with either Individual Defendant or identifies information provided to the Individual Defendants that was inconsistent with their public statements.  MTD at 13.  The cases cited in the Opposition to rebut this argument only further establish the point, as each of them involves a situation where CWs had significant contact with defendants.  *See, e.g.*, *In re BofI Holdings*, 2017 WL 2257980, at*13 (CW "attended . . . meeting" with defendant who "brushed [the witness's] findings 'under the rug' [and] 'cleaned up' audit reports he disagreed with"); *Zucco Partners*, 552 F.3d at 992 (CWs were "personally instructed" by executives' direct reports to commit fraud and received emails from executives to same effect).

The "Tea Time" meeting allegations—to which Plaintiff devotes considerable ink— highlight the Complaint's shortcomings.  The Opposition claims that the Individual Defendants

---

sales that benefitted the defendant [officers]."  Opp. at 30 (quoting *Sharenow v. Impac. Mortg. Hldgs.*, 385 F. App'x 714 (9th Cir. 2010)).  *Sharenow*, however, involved defendants with large salaries but only modest stock holdings who were thus "motivated more . . . to keep the company going to get large salaries than by making sales of their modest stock holdings."  385 F. App'x at 717 n.2.  Plaintiff makes no such allegations here.  And its reliance on *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1044 (N.D. Cal. 2016), is misplaced because, unlike here, some of those defendants were alleged to have sold stock during the class period.

1   attended these company-wide meetings and that Costolo presented information during the

2   meetings about MAU and DAU.  Opp. at 26.  However, *the Complaint* fails to allege that either

3   Individual Defendant attended these meetings during the Class Period or at any other time.  While

4   two CWs claim that "senior management" and "executives" attended Tea Time meetings, Compl.

5   ¶¶ 68, 70, they do not identify either Noto or Costolo as attendees.  Similarly, while Paragraph 78

6   alleges that Costolo viewed Tea Time presentations, it relies exclusively on a *Vanity Fair* article

7   for this conclusion.  The relevant quote from that article, however, simply discussed Tea Time

8   meetings that took place "under Costolo" and did not state that he attended the meetings.  Ex. M.

9        In sum, the CWs show *neither* (i) that MAU and DAU were declining *nor* (ii) that the

10   Individual Defendants were aware of a decline.  Even if the CWs supported these points, Plaintiff

11   pleads no facts suggesting the Individual Defendants intentionally or recklessly concealed those

12   declines.  *See Colyer v. Acelrx Pharm., Inc.*, 2015 WL 7566809, at *13 (N.D. Cal. Nov. 25, 2015)

13   ("Knowing about the **existence** of [issues] and knowing that one should **report** [those issues] to the

14   public are two different things."); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v.*

15   *Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017) ("knowledge of negative factors . . . does not

16   of itself support" scienter).  That failure is fatal to its scienter allegations.

17        **C.**     **Plaintiff Cannot Base Its Scienter Claims On Statements By Noto Or Costolo**

18        Plaintiff claims Noto's scienter is established because he told investors during the Class

19   Period that increasing user engagement was "by far [the Company's] number one opportunity . . .

20   it's a number we all look at everyday as an operating committee."  Opp. at 25-26.  Noto never

21   made that claim.  Instead, he stated that **user retention** was the primary focus of management.  *See*

22   *supra* at 8 n.7.  Plaintiff also seeks to rely on Costolo's Class Period statement that "our MAU

23   trend has already turned around" and Noto's Class Period statement that there was no single user

24   engagement metric relied on by Twitter.  Opp. at 26-27.  These statements fail to support scienter

25   both because they are not false, *see supra* at 7-10, and because the mere fact that Noto and Costolo

26   had **some** knowledge of user engagement and growth metrics is insufficient to establish scienter.

27        **D.**     **Plaintiff's "Access" Allegations Do Not Support An Inference Of Scienter**

28        Plaintiff also cannot rely on allegations that all Twitter employees "had access to growth

and engagement metrics" to support a strong inference of scienter for at least two reasons.  Opp. at

26.  ***First***, as this Court recently stated, allegations "must consist of more than generalities about

management's access to data."  *Bodri*, 2017 WL 1732022, at *13; *see also City of Dearborn*, 856

F.3d at 620 (where plaintiff failed to allege defendants "personally accessed" data, court rejected

CW allegation that information would have been "readily apparent" from data).  Here, Plaintiff

has not alleged **when**, **where**, **how**, or—most importantly—***if*** either Individual Defendant actually

accessed *any* information.[20]  ***Second***, the information to which a defendant had "access" must

somehow contradict the challenged statements.  *Welgus v. TriNet Grp.*, 2017 WL 167708, at *11

(N.D. Cal. Jan. 17, 2017) (rejecting scienter where plaintiff had not alleged defendants had "access

to ***information contradicting these alleged falsities*** at the time the statements were made").

Plaintiff fails to allege with particularity what Twitter's database would have revealed had the

Individual Defendants accessed it.  "In the absence of such particularized allegations, the Court

cannot ascertain whether there is any basis for the allegations that the officers had actual or

constructive knowledge of [data], or equally importantly, whether that [data] was sufficient[] to

render their statements false or deliberately misleading."  *Bodri*, 2017 WL 1732022, at *13;

*Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 974 (N.D. Cal. 2005) (rejecting scienter

based on access to database where complaint silent on whether database contained information

inconsistent with challenged statements).

## E.    Plaintiff's Core Operations Argument Fails To Establish Scienter

Finally, having failed to allege scienter in any other way, Plaintiff falls back on its core

operations allegations, Compl. ¶¶ 127-128, arguing that because user engagement was critical to

Twitter's business, Defendants must have not only had knowledge of all user engagement-related

facts but also either had fraudulent intent or been deliberately reckless in choosing not to disclose

those facts.  Opp. at 28-29.  This argument fails for multiple reasons.  First, Plaintiff fails to even

articulate which facts Defendants must have known, instead referring vaguely only to "trends in

---

[20] Plaintiff quotes *In re Finisar Corp.* for the proposition that, "as leaders of the company, both
[individual defendants] had access to [materially relevant business information] and could have
sought it out," Opp. at 26, but omits two key words that begin that quote:  "***Plaintiff argues***."  *In
re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017).

1    metrics that lay at the heart of the business." *Id.* at 29.  Plaintiff's failure to identify even the facts

2    it claims Defendants should have known is fatal to the invocation of the core operations doctrine.

3         Second, Plaintiff argues that Defendants had a goal of increasing user growth and

4    engagement.  Opp. at 28-29.  Having such a goal does not equate to knowledge of precise DAU or

5    MAU metrics for specific markets and time periods.  MTD at 22.  And even if Defendants had

6    known specific metrics, that would not mean that they believed those metrics accurately reflected

7    reportable trends or that they deliberately or recklessly omitted information about those trends.  *Id.*

8    Indeed, scienter can be inferred only if the metrics made it "patently obvious" that the information

9    in question needed to be disclosed.  *See Zucco Partners*, 552 F.3d at 1001 ("[R]eporting false

10   information will only be indicative of scienter where the falsity is patently obvious . . . .").

11        Finally, a core operations inference typically only *supplements* other credible scienter

12   allegations.  MTD at 21-23.  As discussed, there are none here.  Plaintiff nonetheless suggests that

13   core operations alone is sufficient to establish scienter, arguing it would be "absurd to imagine"

14   that "senior management of a leading social media company had no idea how many people were

15   using their service, or how much they were using it."  Opp. at 28.  However, the very rare cases in

16   which core operations allegations alone were enough to support a strong inference of scienter

17   involved ***far*** stronger facts than those alleged here.  For example, in *Berson v. Applied Signal*, 527

18   F.3d 982, 987, 988 n.5 (9th Cir. 2008), the Ninth Circuit concluded that management must have

19   known about stop-work orders related to ***80%*** of a company's revenue that would have had "a

20   ***devastating*** effect."  And in *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014), the Ninth Circuit

21   found that a defendant in charge of pipeline safety information and who knew of a related accident

22   at a virtually identical company pipeline must have known that the pipeline in question faced the

23   same risks.  In contrast, the Complaint here involves only vague allegations that user engagement

24   and growth were flat or declining.  The core operations doctrine cannot form the sole basis for

25   scienter here; nor can it salvage Plaintiff's otherwise insufficient allegations.  *See* MTD at 22 n.20.

26                                    **CONCLUSION**

27        Because Plaintiff has failed to allege facts supporting either falsity or a strong inference of

28   scienter, Defendants respectfully request dismissal of the Complaint for failure to state a claim.

1

2

August 7, 2017                           SIMPSON THACHER & BARTLETT LLP

3                                         /s/ James G. Kreissman
                                          James G. Kreissman (Bar No. 206740)
4
                                          *Attorneys for Defendants*
5                                         *Twitter, Inc., Richard Costolo and Anthony Noto*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28