# EXHIBIT 2

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4                  -  -  -

5    DORIS SHENWICK, as Trustee

     for the DORIS SHENWICK

6    TRUST, Individually and on

     Behalf of All Others         NO. 3:16-CV-05314-JST

7    Similarly Situated,          (Consolidated with

8                Plaintiff,       3:16-CV-05439-JST)

9                                 Class Action

10          V.

11

12   TWITTER, INC., RICHARD

13   COSTOLO, and ANTHONY NOTO,

14              Defendants.

15   _____

16

              Videotaped deposition of ROBERT BETTS,

17   JR., held in the offices of Veritext Legal

     Solutions, 1801 Market Street, Suite 1800,

18   Philadelphia, Pennsylvania, commencing at 9:15

19   a.m., on THURSDAY, APRIL 5, 2018, before Deborah

20   L. Williams, a Certified LiveNote Reporter and a

21   Notary Public.

22

23

24   Job No. 2853815

25   Pages 1 - 163

                                        Page 1

```
 1    A P P E A R A N C E S :
 2    Representing the Plaintiff:
 3          ROBBINS GELLER RUDMAN & DOWD, LLP
 4          BY: SCOTT H. SAHAM, ESQUIRE
 5              ssaham@rgrdlaw.com
            BY: CHRISTOPHER KINNON, ESQUIRE
 6              ckinnon@rgrdlaw.com
 7          655 West Broadway, Suite 1900
 8          San Diego, California 92101
            (619) 231.1058
 9
10          ROBBINS GELLER RUDMAN & DOWD, LLP
11          BY: NANCY M. JUDA, ESQUIRE
12              nancyj@rgrdlaw.com
13          1701 K Street, NW, Suite 350
14          Washington, DC 20006
            (212) 822.2024
15
16          O'DONOGHUE & O'DONOGHUE, LLP
17          BY: JOHN McINTIRE, ESQUIRE
                jmcintire@odonoghuelaw.com
18          5301 Wisconsin Avenue, NW, Suite 800
            Washington, DC 20015
19          (202) 362.0041
20
            MOTLEY RICE, LLC
21          BY: CHRISTOPHER F. MORIARTY, ESQUIRE
22              cmoriarty@motleyrice.com
23          28 Bridgeside Boulevard
24          Mt. Pleasant, South Carolina 29464
25          (843) 216.9242
```

                                        Page 2

1           VIDEOTAPE TECHNICIAN:  Good morning.
2    We're going on the record at 9:15 a.m. April 5,
3    2018.
4           Please note that the microphones are
5    sensitive and may pick up whispering, private
6    conversations and cellular interference.
7    Please turn off all cell phones and place them
8    away from the microphones as they can interfere
9    with the deposition audio.
10          This is media unit one of the video
11   recorded deposition of Robert Betts taken by
12   counsel for defendant in the matter of Doris
13   Shenwick versus Twitter, et al., filed in the
14   United States District Court, Northern District
15   of California, Docket Number 16-CV-05314-JST.
16          This deposition is being held at the
17   offices of Veritext located at 1801 Market
18   Street, Philadelphia, PA.  My name is Matt
19   Sherr from the firm Veritext, and I'm the
20   videographer.  The court reporter is Debbey
21   Williams from the firm Veritext.  I'm not
22   authorized to administer an oath.  I'm not
23   related to any party in this action, nor am I
24   financially interested in the outcome.
25          Counsel and all present in the room

                                        Page 7

1    and everyone attending remotely will now state

2    their appearances and affiliations for the

3    record.

4              MR. McGEE:  Dean McGee from Simpson

5    Thacher & Bartlett on behalf of the defendants.

6              MR. BRUNO:  Joseph Bruno, Simpson

7    Thacher & Bartlett, on behalf of defendants.

8              MR. SAHAM:  Scott Saham, Robbins

9    Geller, for the plaintiffs.

10              MR. McINTIRE:  John McIntire,

11    O'Donoghue & O'Donoghue, for the plaintiffs.

12              MS. JUDA:  Nancy Juda, Robbins Geller,

13    for the plaintiffs.

14              MR. MORIARTY:  Christopher Moriarty,

15    Motley Rice, LLC, for the plaintiffs.

16              MR. KINNON:  Christopher Kinnon,

17    Robbins Geller, for the plaintiffs.

18              THE WITNESS:  Robert Betts, National

19    Elevator Industry Pension Fund, Plaintiff.

20              VIDEOTAPE TECHNICIAN:  Will the court

21    reporter please swear in the witness.

22                        -  -  -

23              ROBERT BETTS, JR., after having been

24    duly sworn, was examined and testified as

25    follows:

                                        Page 8

```
 1                      -   -   -
 2                   EXAMINATION
 3                      -   -   -
 4    BY MR. McGEE:
 5         Q.   Good morning.  My name is Dean McGee,
 6    and I'm an associate with Simpson Thacher &
 7    Bartlett.  With me here today is my colleague,
 8    Joe Bruno.  We represent the defendants in this
 9    action.
10              We issued an initial deposition
11    subpoena dated March 15, 2018, and we're
12    conducting this deposition today pursuant to a
13    revised deposition subpoena dated March 22, 2018.
14              Do you understand that you've sworn
15    under oath to tell the truth?
16         A.   I do.
17         Q.   And can you please state your full
18    name for the record again?
19         A.   Robert Betts, Jr.
20         Q.   And who do you represent here today,
21    or what do you represent?
22         A.   I represent the National Elevator
23    Industry Pension Fund.
24         Q.   And so if I refer to National Elevator
25    throughout this deposition, you'll understand I'm
```

Page 9

1        A.    It's a listing of employees in the
2    benefits office.
3        Q.    Does National Elevator have a formal
4    organizational chart?
5        A.    No.
6        Q.    How frequently are these documents
7    updated?
8        A.    Two, three times a year.
9        Q.    There's no set schedule for updating
10   them?
11       A.    No.
12       Q.    Would you expect there to be any
13   list -- withdrawn.
14            This list is dated February 9, 2015.
15   Would you expect there to be a different list
16   covering the period from November 1, 2014,
17   through this period?
18       A.    Probably.
19       Q.    What differences would you think there
20   would be between a list from November 2014 and
21   this list?  And you can take your time if you
22   need to review.
23       A.    There might be honestly one or two
24   people that are different on this list.  The
25   people in bold are the managers or whatnot

                                    Page 42

1    indicated throughout.  None of them would have

2    changed.

3        Q.   Does National Elevator have a general

4    counsel?

5        A.   Define general counsel.

6        Q.   I'll ask a different question.  Does

7    National Elevator employ any attorneys within its

8    organization?

9        A.   No.

10       Q.   Who is the individual, if any, that

11   provides regular legal advice to the operation of

12   the company?

13       A.   John McIntire of O'Donoghue &

14   O'Donoghue.

15       Q.   And was that true throughout the class

16   period as well?

17       A.   Yes.

18       Q.   So I want to walk through first the

19   different divisions on this list.  We could start

20   at the bottom with "Health Claims

21   Administration."

22            Can you describe, generally, what the

23   role of the health claims administration

24   employees are?

25       A.   So the National Elevator Health

1   Benefit Plan provides medical, dental, vision

2   claims, weekly income claims.  You know, we

3   receive life insurance claims.  We don't pay

4   them.  Through the staff they will process the

5   claims, take calls from members or providers

6   about the status of claims and the eligibility

7   of, you know, benefits, you know, work with

8   pricing providers.  We have a PPO network with

9   Blue Cross, work with them.

10       Q.   Do any of the employees under the

11  health claims administration heading on this

12  document play any role in National Elevator's

13  investment decisions?

14       A.   No.

15       Q.   What about in the selection of

16  investment consultants or investment managers?

17       A.   No.

18       Q.   And I just want to make sure you see

19  there's a back to the document.

20       A.   I do.

21       Q.   Moving up to "Systems Administration,"

22  can you explain, generally, what those employees

23  do?

24       A.   So we have a database, traditional

25  file servers, e-mail servers, document image

Page 44

1          Q.    You mentioned those individuals

2     process investment activity.

3               What do you mean by that?

4          A.    We receive monthly statements from the

5     custodian bank, Bank of New York Mellon, and they

6     would take that activity and record it on our

7     general ledger to reflect it, that activity.

8          Q.    Who specifically reviews those?

9          A.    Anne Connolly.   Excuse me, clarify

10    that.   She reviews the byproduct of that work.

11         Q.    What do you mean by that?

12         A.    So the person that actually does the

13    work, which would be Jeffrey Meitzler listed

14    there, he would do the actual work, and it would

15    be reviewed by Anne Connolly and Christine Coary.

16         Q.    I think it would be easier to walk

17    through each individual on this list and describe

18    what their roles are.

19               So let's start with Anne Connolly.   If

20    you could please tell me what her role is.

21         A.    She's the director of finance.   She's

22    responsible for staffing the department,

23    overseeing their operations, reviewing their

24    work, preparing information for quarterly

25    trustees meetings related to the financial status

Veritext Legal Solutions
866 299-5127

```
 1   of the plan.
 2        Q.   As part of her role, does she interact
 3   with any of the investment managers?
 4        A.   Yes.
 5        Q.   What are the nature of her duties with
 6   respect to the investment managers?
 7        A.   Periodically the trustees will make
 8   investment decisions that involve changes in
 9   allocations, and she will be involved in the
10   communications of letting the investment manager
11   know that they're going to be receiving extra
12   money or having money taken away from them in the
13   process of executing that change.
14        Q.   So by "allocations," you mean
15   allocations of money to specific investment
16   managers?
17        A.   Yes.
18        Q.   What is the nature -- so, what is the
19   difference, generally, between the role of an
20   investment manager and an investment consultant?
21        A.   So investment manager makes physical
22   investments.  They hold.  They're given an
23   allocation of money that's through a custodian
24   and allowed to make investments on behalf of the
25   Fund, you know, within their guidelines.  They're
```

Page 50

```
 1    given specific guidelines on what their expertise
 2    is allowed to invest.
 3         Q.    And an investment consultant?
 4         A.    They would review the work of the
 5    investment managers.  They help the trustees
 6    select investment managers, and on an ongoing
 7    basis review the performance of each of those
 8    investment managers and ensure compliance with
 9    their guidelines.
10         Q.    Just before you testified about Anne
11    Connolly's role with respect to the investment
12    managers.
13              What is her role with respect to the
14    investment consultants?
15         A.    Ongoing communications regarding the
16    same types of transactions.
17         Q.    And what about Christine Coary?
18              First, please tell me what her role is
19    at National Elevator.
20         A.    She's a controller.  She prepares
21    financial statements, prepares the 5500.
22         Q.    What's the 5500?
23         A.    Form 5500 is essentially the
24    equivalent of a tax return for a qualified
25    pension plan.
```

Page 51

1     Q.   And what is her role with respect to
2  National Elevator's investment managers?
3     A.   She will interact with mostly the
4  private equity managers and determining --
5  ensuring the financial statements accurately
6  reflect the value of those alternative
7  investments that I described earlier.
8     Q.   What is her role with respect to the
9  investment consultant?
10     A.   Investment consultants is -- the
11  investment consultant, she -- she will work, you
12  know, same to ensure the valuations are correct,
13  the financial statements.
14     Q.   What is Sonya R. -- Sonya R.
15  Gureghian.
16     A.   I think that's it.
17     Q.   What's her role at National Elevator?
18     A.   Accounting manager.  She oversees
19  accounts payable, cash management.
20     Q.   Would you expect her to receive
21  documents outlining National Elevator's specific
22  investments in specific securities?
23     A.   No.
24     Q.   Does she play any role in connection
25  with National Elevator's investment consultants

Page 52

1      Q.    And when you say the process wasn't in
2    place during the class period, does that mean
3    this review did not occur --
4      A.    Right.
5      Q.    -- during the class period?
6            Looking back at the document, a little
7    further towards the bottom there's a section that
8    states, "Every Fiduciary Shall," and then there's
9    a list of bullet points underneath.
10           Do you see that?
11     A.    Uh-huh.
12     Q.    Who are the fiduciaries referenced
13   there?
14     A.    Well, the trustees by definition are
15   fiduciaries.  All the investment managers are
16   fiduciaries.  The investment consultants are a
17   fiduciary.
18     Q.    If you turn to the next page, the top
19   bullet point states, "Evaluate investment
20   managers of the Fund relative to their respective
21   benchmark and the role they fill in the
22   portfolio."
23           Can you describe which -- please
24   describe which fiduciaries carry out that process
25   and how.

Veritext Legal Solutions
866 299-5127

1        A.    So Segal Rogerscasey would perform
2   that role and report on that to the trustees.
3        Q.    Would it provide written reports?
4        A.    Yes.
5        Q.    Would you expect those written reports
6   to reference individual securities?
7        A.    No.
8        Q.    Why not?
9        A.    Because the investment managers are
10  the ones that are hired to pick individual
11  securities.  The investment consultant is hired
12  to make sure that the manager performs as
13  expected and within their guidelines.
14       Q.    Would you expect the investment
15  consultant to dig a little bit into the specific
16  securities invested in?
17       A.    No.
18       Q.    Turn to page 3.  You should see a
19  heading that says, "Policy Asset Mix," and then
20  lists of different asset classes.
21             Do you see that?
22       A.    Yes.
23       Q.    Which asset class would Twitter common
24  stock fit into?
25       A.    Domestic equity.

Page 71

1      Q.   And how were these allocations

2  decided?

3      A.   Through the asset allocation studies

4  that I described.

5      Q.   Turn to page 4, please.  The top of

6  page four it states, "To diversify Fund assets so

7  as to minimize the risk associated with

8  dependence on the success of one investment

9  manager, the Fund has decided to employ a

10  multi-manager approach to investing Fund assets."

11           Please elaborate on what that means.

12      A.   If you go back to page 3, within these

13  asset classes they will hire, in most cases,

14  multiple asset managers within this investment

15  class.  So you're not just hiring one -- for

16  instance, 26.7 percent of domestic equity, that's

17  not one investment manager.  You hire multiple.

18      Q.   Whose decision is it to employ a

19  multi-manager approach?

20      A.   Trustees.

21      Q.   And was that true starting in

22  November 2014 and throughout the class period?

23      A.   Yes.

24      Q.   Page 4 also mentions the Fund's

25  commission recapture program.  That's in the last

Page 72

1    between page 9 and 10 is a list of domestic

2    equity investment managers.

3              Do you agree with that?

4         A.   Yes.

5         Q.   Were these all the domestic equity

6    investment managers employed from November 2014

7    to the end of the class period?

8         A.   Yes.

9         Q.   The right-hand column refers to the

10   benchmark.

11             Generally speaking, what is a

12   benchmark as it relates to the domestic equity

13   purchases or investments?

14        A.   So the benchmark -- benchmarks are

15   established by third parties to measure the

16   overall performance of the market or parts of the

17   market.  So based upon the strategy that the

18   investment manager has, you try to pick a

19   benchmark that accurately reflects the strategy

20   and that mandate they have.

21        Q.   The first manager listed appears to be

22   Mellon Equity Index.

23        A.   Yes.

24        Q.   Did Mellon Equity Index invest in

25   Twitter securities on behalf of the Fund?

Page 77

1          A.     If Twitter was a member of the S&P

2      500, they would have.  It's a pooled fund, so we

3      don't have direct holdings of the specific

4      securities in that.

5          Q.     Can you elaborate on a pooled fund,

6      please?

7          A.     Essentially, a mutual fund,

8      institutional mutual fund.

9          Q.     What about Clifton Group Enhanced

10     Equity Index?

11         A.     So they didn't actually hold

12     securities.  They would -- they would trade S&P

13     futures to generate a return that was in theory

14     slightly better than the S&P 500.

15         Q.     So you said they didn't hold

16     securities.

17                But would they trade in common stock?

18         A.     No, that's -- those are the

19     securities.  They would hold the -- just futures.

20         Q.     What about INTECH Low Volatility?

21         A.     So they were -- as low volatility,

22     they would have the components of the S&P 500,

23     but they would tweak the allocations slightly to

24     try to create a lower volatility portfolio

25     overall.  So every position would be within

Page 78

```
 1    50 basis points of the -- in the underlying
 2    securities within the index.
 3         Q.   Did they invest in Twitter common
 4    stock on behalf National Elevator?
 5         A.   Yes.
 6         Q.   When did they first invest in Twitter
 7    common stock?
 8         A.   I don't know.
 9              MR. SAHAM:  Objection to form.  You've
10       got the documents.  I mean, you can move this
11       along quite a bit more quickly, as opposed to
12       the deep dive into the background, and ask some
13       questions relevant to, you know, your 30(b)(6).
14    BY MR. McGEE:
15         Q.   You said you didn't know?
16         A.   I do not know.
17         Q.   And how was INTECH selected?
18         A.   Through the process I described
19    earlier.
20         Q.   Do you have any specific details as to
21    their selection?
22         A.   No.  Unremarkable.
23         Q.   What about Columbus Circle, and
24    specifically Columbus Circle Large Cap?
25         A.   Specifically what about them?
```

Page 79

1        Q.   So, did the Columbus Circle Large Cap

2   Fund invest in Twitter securities?

3        A.   Yes.

4        Q.   And if you turn to the next page,

5   there's also a Columbus Circle Mid Cap Fund?

6        A.   Right.

7        Q.   Can you describe the difference

8   between the two?

9        A.   So, generally, there's a sort of

10   borderline of about 10 billion dollars in market

11   capitalization which kind of defines mid cap and

12   large cap.  It's not a hard line.  So you try to

13   select managers that have expertise in each

14   space, and then they're limited to that allo --

15   that space, so large companies being above 10

16   billion and smaller companies -- you know, mid

17   might be 3 to 10 billion or something like that.

18        Q.   Columbus Circle is hired to handle

19   both portfolios?

20        A.   In separate -- separate mandates.

21        Q.   Were separate individuals managing

22   those investments?

23        A.   Yes.

24        Q.   Would -- did the Columbus Circle Mid

25   Cap Fund invest in Twitter securities?

Page 80

```
1              MR. SAHAM:  Objection.  Form.
2              THE WITNESS:  No.
3    BY MR. McGEE:
4         Q.   Did DePrince Race & Zollo invest in
5    Twitter securities on behalf of the Fund at any
6    point?
7         A.   No.
8         Q.   Did Lord Abbett?
9         A.   No.
10        Q.   Did the Boston Company Asset
11   Management Fund?
12        A.   No.
13        Q.   Did Foundry Partners?
14             MR. SAHAM:  Asked and answered.
15             MR. McGEE:  You can answer.
16             MR. SAHAM:  You can answer.
17             THE WITNESS:  Yes.
18   BY MR. McGEE:
19        Q.   Generally speaking, when was this
20   investment policy that we're looking at
21   developed?
22        A.   It was approved on May 14, 2014.  So
23   it would have been in the -- it's revised
24   annually.  So, you know, individual changes to it
25   are made annually.
```

Veritext Legal Solutions
866 299-5127

1          Q.   And who's involved in that process?

2          A.   The investment consultant, the

3    attorneys and trustees.

4          Q.   You can put that document away.

5    Actually a bit premature.

6               Does National Elevator's investment

7    policy apply to all of its investments?

8          A.   Yes.

9          Q.   Does National Elevator ever deviate

10   from its investment policy?

11         A.   No.

12         Q.   Does National Elevator permit managers

13   to deviate from its investment policy?

14         A.   No.

15         Q.   Does National Elevator maintain a

16   watch list of investments, that is a list of

17   specific securities being monitored, for

18   potential trading opportunities?

19         A.   No.

20         Q.   Does National Elevator have contracts

21   with all of its investment managers?

22         A.   Yes.

23         Q.   Are those contracts renewed

24   periodically?

25         A.   Generally, no.

Page 82

1   these allegations?

2       A.   In the fall of 2015, the Fund was

3   approached through counsel to be lead plaintiff.

4   We applied for lead plaintiff status and were

5   denied.

6       Q.   Which counsel?

7       A.   Robbins Geller.

8       Q.   What is National Elevator's role

9   currently in this case?

10      A.   We seek to be class representative

11  seeking to have class status certified.

12      Q.   Describe the process for seeking to be

13  appointed lead plaintiff.

14           MR. SAHAM:  Objection.  Form.

15    Foundation.  Calls for a legal conclusion.

16  BY MR. McGEE:

17      Q.   From your perspective.

18      A.   I'm not a lawyer.  I'm not a lawyer.

19      Q.   From National Elevator's perspective.

20      A.   So the process is that first you'd

21  have to identify a loss and a security that was

22  related to a specific action that was a violation

23  of the law and then determine whether or not in

24  this case the Fund or its representatives, the

25  investment managers, made decisions based on

Page 107

1  those false statements.  And then you'd have to

2  file suit.  The Court determines who's -- who

3  gets the lead plaintiff status based on the

4  largest loss.

5          MR. McGEE:  I'm handing you a document

6    for the court reporter to mark NEIPF-18.

7                    -  -  -

8          (Whereupon, the document was marked,

9    for identification purposes, as Defendants'

10   Exhibit NEIPF-18.)

11                   -  -  -

12         MR. McGEE:  Look up at me when you're

13   ready to discuss it, please.

14         THE WITNESS:  (Witness reviewing

15   document.)

16  BY MR. McGEE:

17     Q.   Have you seen this document before?

18     A.   I do not recall.

19     Q.   Was National Elevator consulted prior

20  to the filing of the lead plaintiff motion?

21     A.   Yes, they were through trustees and

22  counsel.  Absolutely, because we don't take every

23  case that we're offered.  So, yes, we were

24  absolutely consulted.

25     Q.   But you don't recall reviewing this

                                        Page 108

```
 1    document.
 2        A.    This document?
 3            MR. SAHAM:  First of all, it's
 4    multiple documents here.  I would object to the
 5    form of the question.  It's not a single
 6    document.
 7            THE WITNESS:  I don't recall whether I
 8    saw it prior to.  I'm familiar with the
 9    circumstances surrounding it.
10            MR. SAHAM:  Just so the record is
11    clear, this is two documents you've stapled
12    together and represented as one document.  I
13    don't know if it makes much difference, but --
14            MR. McGEE:  To clarify for the record,
15    these are -- you can see from the top these are
16    two documents that were filed together on the
17    Court's docket UCF number 29 and 29-1.
18            MR. SAHAM:  It's a motion and an
19    order.
20            MR. McGEE:  Just to ensure that we are
21    providing what we view as the complete
22    document.
23            MR. SAHAM:  I'm not complaining about
24    the document.  I'm just complaining -- you
25    said, Do you recognize this document?
```

Page 109

```
 1              And it's two documents.  So your
 2    question is vague, ambiguous, lacks foundation,
 3    and I'm objecting to the form of it.  But it's
 4    not a -- I'm not disputing what the document is
 5    or documents are.
 6              MR. McGEE:  You can put that aside.
 7    I'm handing you a document that we've marked
 8    NEIPF-19.
 9                      -  -  -
10              (Whereupon, the document was marked,
11    for identification purposes, as Defendants'
12    Exhibit NEIPF-19.)
13                      -  -  -
14              MR. McGEE:  You can look up at me
15    whenever you're ready to discuss it.
16              THE WITNESS:  (Witness reviewing
17    document.)
18    BY MR. McGEE:
19        Q.   Do you recall seeing this document
20    before?
21        A.   No.
22        Q.   I believe you testified earlier that
23    National Elevator did not have the greatest
24    financial interest in this case as determined by
25    the court.
```

Page 110

```
 1              Is that a fair summary of your
 2   testimony earlier?
 3        A.    When you say greatest
 4   financial interest, greatest loss.
 5        Q.    Greatest loss.
 6        A.    My understanding, yes.
 7        Q.    When did you come to understand that?
 8        A.    When we weren't appointed lead
 9   plaintiff.
10        Q.    How was that communicated to you?
11        A.    Through counsel at a trustees meeting,
12   I believe.
13        Q.    Which counsel?
14        A.    John McIntire or maybe in between
15   trustees meetings, but it would have come through
16   his office.
17              MR. McGEE:  To avoid any confusion,
18        we're going to hand you the documents
19        individually rather than in the collection they
20        were filed together.
21              MR. SAHAM:  I'm not objecting to you
22        marking them collectively.  It's just when you
23        said singular, I wanted to make sure the record
24        is clear.  So however you want to do it, but,
25        you know, just make sure the language matches
```

Page 111

```
 1   procedures National Elevator investment managers
 2   have in place?
 3              MR. SAHAM:  Objection to form.
 4              THE WITNESS:  I can't speak to that,
 5     no.
 6   BY MR. McGEE:
 7       Q.  Would you expect each investment
 8   manager as a fiduciary to have a due diligence
 9   process in place in connection with its purchases
10   of common stock?
11              MR. SAHAM:  Objection.  Form.
12     Foundation.  Calls for speculation.
13              THE WITNESS:  Yeah, it's speculative.
14     I mean, they all have a process they go
15     through.
16   BY MR. McGEE:
17       Q.  But you don't have any details on what
18   that process might be.  Is that your testimony?
19              MR. SAHAM:  Objection.  Form.
20     Foundation.  Misstates prior testimony.
21              THE WITNESS:  No.
22   BY MR. McGEE:
23       Q.  No, that's not your testimony or --
24   I'm just trying to be clear.  No, that's not your
25   testimony or -- I can rephrase the question.
```

Page 124

```
 1        A.    Rephrase it.
 2        Q.    Are you testifying that you don't have
 3   any details on what any investment manager's due
 4   diligence process might be?
 5        A.    I do not.
 6        Q.    Do you know whether National Elevator
 7   owns any shares of Twitter today?
 8        A.    I do not.
 9        Q.    What would you say have been the key
10   events of this litigation?
11             MR. SAHAM:  Objection.  Form.  Vague
12      as to -- I mean, that question -- key vents?
13      What do you mean by key?  What do you mean by
14      litigation?  That question is incredibly vague.
15   BY MR. McGEE:
16        Q.    You can answer.
17        A.    The consolidation of Doris Shenwick's
18   Complaint, the naming of KBC as named the lead
19   plaintiff, their appointment of Motley Rice
20   asking us to come in as a class representative.
21        Q.    Generally speaking, does National
22   Elevator have a process in place for deciding
23   whether to participate as a plaintiff in class
24   action lawsuits?
25        A.    All decisions are made on a
```

Page 125

1    case-by-case basis.  The process will go as -- we
2    have multiple firms that do securities
3    monitoring.  They will contact O'Donoghue &
4    O'Donoghue, which as you understand their role,
5    and they will review the case, and if it merits
6    some consideration, they will ask the trustees if
7    they want to pursue it.  The trustees do not
8    always pursue cases.  It's a combination of the
9    amount of the losses and the facts of the case
10   that determine that decision.
11        Q.   Who are the monitoring counsel?
12        A.   Robbins Geller, Leiff Cabraser, Cohen
13   Milstein.
14        Q.   You mentioned the trustees make the
15   decision; is that right?
16        A.   Yes.
17        Q.   Who makes a recommendation directly to
18   the trustees?
19             MR. SAHAM:  Objection.  Form.  I also
20        caution you, you can answer the question, but
21        don't reveal the content of any communications
22        you've had with counsel.  But you can answer --
23        I think his question is just asking you who.
24             MR. McGEE:  That's correct.

Page 126

```
 1      our investment positions and decisions.
 2    BY MR. McGEE:
 3        Q.   Is it fair to say that all or nearly
 4    all of National Elevator's knowledge concerning
 5    the alleged wrongdoing comes from counsel?
 6        A.   Yes.
 7        Q.   Who are your lawyers in this case?
 8        A.   Robbins Geller and O'Donoghue &
 9    O'Donoghue and Motley Rice, all representing the
10    case.
11        Q.   I was referring to National Elevator's
12    attorneys specifically.
13        A.   Robbins Geller and O'Donoghue &
14    O'Donoghue.
15        Q.   Which attorneys at O'Donoghue &
16    O'Donoghue are working on this matter?
17        A.   John McIntire.
18        Q.   Which attorneys at Robbins Geller are
19    working on this matter?
20        A.   Scott and Chris in this room, Nancy,
21    and those are the ones I've worked with.  I know
22    there are other attorneys that are working on it.
23    I have not worked with them.
24        Q.   Is National Elevator represented by
25    O'Donoghue & O'Donoghue in other litigations?
```

Page 129

1          A.    Yes.

2          Q.    How many?

3          A.    Enumerable.

4          Q.    Are there other securities litigation?

5          A.    Yes.

6          Q.    Can you identify those?

7                MR. SAHAM:   Again, I think there was

8     boundaries on that topic.  We're talking about

9     the last five years, correct?

10               MR. McGEE:   Yes.

11               MR. SAHAM:   And I think you agreed

12    that that was going to be the scope of that

13    request.

14               THE WITNESS:   We have not participated

15    in any securities litigation in the last five

16    years.

17    BY MR. McGEE:

18         Q.    Any other class actions?

19         A.    As a plaintiff?

20         Q.    Or a defendant.

21         A.    No.   As opposed to just filling out a

22    form and getting --

23         Q.    I'm not referring to filling out a

24    claims form.

25               Is there any familial, social and

                                        Page 130

1    professional relationship between National

2    Elevator and any of the attorneys at Robbins

3    Geller?

4          A.    No.

5          Q.    What about O'Donoghue and O'Donoghue?

6          A.    No.

7          Q.    Motley Rice?

8          A.    No.

9          Q.    Does National Elevator have an

10   engagement letter with Robbins Geller in

11   connection with this action?

12         A.    Yes.

13              MR. McGEE:  I'm handing you a document

14       that appears to be a letter from Robbins Geller

15       dated October 27, 2016.  This will be marked as

16       NEIPF-24.

17                      -  -  -

18              (Whereupon, the document was marked,

19       for identification purposes, as Defendants'

20       Exhibit NEIPF-24.)

21                      -  -  -

22              MR. McGEE:  You can look up at me

23       whenever you're ready to discuss the document.

24              THE WITNESS:  (Witness reviewing

25       document.)

                                    Page 131

```
 1      conclusion as well.
 2              THE WITNESS:  I am willing to
 3      cooperate, as I said.
 4   BY MR. McGEE:
 5      Q.   I'll just repeat the question.  Are
 6   you willing to travel outside of Pennsylvania for
 7   a deposition?
 8      A.   I would be willing.
 9      Q.   Are you willing to travel to New York
10   for today deposition, or would you have been
11   willing to travel to New York for today's
12   deposition?
13      A.   Preferred not to.
14      Q.   What about San Francisco?
15      A.   Really would have preferred not to.  I
16   would have preferred to go to San Francisco than
17   New York, actually.
18      Q.   Now I'm offended.
19              How are the attorneys at Robbins
20   Geller being compensated for their representation
21   of National Elevator in this matter?
22      A.   Contingency.
23      Q.   Can you elaborate on that?
24      A.   So as part of the settlement of this
25   case, whether it be through trial or a negotiated
```

Page 133

```
 1    settlement, assuming that there are some damages
 2    award, Robbins Geller would get a portion of that
 3    which would be certified by the Court.
 4    ███        ███      ████████████████████████
 5    ███    ████████████████████████████████████
 6    ███        ███      ██████████████████
 7        Q.   Did National Elevator ask for an
 8    estimate of the number of hours that attorneys
 9    would expend on this case?
10    ███        ███    ██████
11        Q.   Did National Elevator inquire as to
12    what their billing rates were?
13            MR. SAHAM:  I'm going to stop you
14       again.  You're asking directly for a
15       communication with counsel.  You couldn't have
16       something that's more attorney-client
17       privilege.  So, you know, to the extent he's
18       asking -- to the extent you can't -- if you can
19       answer the question without revealing
20       communications, either you to counsel or
21       counsel to you, you can answer it, but if not,
22       I would instruct you not to answer.
23            MR. McGEE:  I just want to state for
24       the record I think that's an overbroad
25       assertion of privilege because I don't think
```

Page 134

1    I'm asking for a question that in any way calls

2    for legal advice.

3            Regardless, are you directing your

4    witness not to answer this question?

5            MR. SAHAM:  Well, you're asking did he

6    ask how many hours, I mean, of his lawyers.

7    Did -- you know, if I asked Mr. Noto the same

8    question, I think you would object to it.  I

9    mean, there's -- you're calling for a

10   communication between counsel and a client, and

11   I can't understand what would be more

12   privileged.

13           I mean, I'm not exactly sure where

14   you're going, you know, or -- you know, if you

15   want to make a representation about that, we

16   can consider whether that -- if it's just one

17   question and that's it or if you're going to

18   ask a series of questions about communications

19   between counsel and a party or a potential

20   party to the litigation, you know, I think

21   that's improper.  But if it's just one or -- if

22   that's the only question --

23           MR. McGEE:  There are two questions.

24   I've already asked them.  I'm not seeking any

25   divulgence of legal advice and -- and so the

Page 135

```
 1      questions relate to whether he asked for an
 2      estimate of the number of hours his attorneys
 3      would spend.  I believe he's already answered
 4      that question.
 5             And the second is just whether
 6      National Elevator inquired as to the billing
 7      rates of the attorneys working on this case.
 8             MR. SAHAM:  And you want a yes/no
 9      response to that?
10             MR. McGEE:  I just want the witness to
11      answer the question.
12             THE WITNESS:  Since they're getting
13      paid a contingency, there is no hourly rate.
14   BY MR. McGEE:
15      Q.   Who will pay costs if this lawsuit is
16   eventually unsuccessful?
17      A.   Counsel, Robbins Geller and Motley
18   Rice.
19      Q.   Has anyone promised National Elevator
20   anything of value for being involved in this case
21   beyond the proportional share of any potential
22   settlement or recovery?
23      A.   No.
24      Q.   Have you been told that National
25   Elevator will recover more than other plaintiffs?
```

Page 136

1        A.    No.

2        Q.    Has National Elevator received

3   monetary compensation from its lawyers for any

4   reason?

5        A.    No.

6        Q.    What about non-monetary consideration?

7        A.    No.

8        Q.    Was National Elevator promised

9   anything of value to participate as a class

10  representative in this?

11       A.    No.

12       Q.    Who, if anyone, is the National

13  Elevator employee responsible for overseeing this

14  case?

15       A.    Myself.

16       Q.    Anyone else?

17       A.    No.

18       Q.    Any of the trustees?

19       A.    No.

20       Q.    What are your responsibilities with

21  respect to supervising this action?

22       A.    Clarify something.  When you say

23  supervise this action, trustees will be involved

24  in the ultimate approval of any settlements,

25  payments and fee payments.  My role right now is

Page 137

1  to work with Robbins Geller to provide documents

2  to your document subpoenas and document requests,

3  to appear here, to review, to participate in

4  preparation with them, to work with them to make

5  sure, you know, information is accurate that

6  we've provided to you.

7      Q.   Does National Elevator get feedback on

8  all decisions made by counsel?

9      A.   Define National Elevator.

10     Q.   You testified -- withdrawn.

11          Do you, in your role at National

12  Elevator with respect to this case, supervise all

13  decisions or only certain decisions made by

14  counsel?

15          MR. SAHAM:  Again, I would caution you

16    not to reveal communications between yourself

17    and counsel.  If you can answer the question

18    without doing so, you can, but don't reveal

19    communications with your counsel.

20          THE WITNESS:  Certain.  Certain items.

21  BY MR. McGEE:

22     Q.   Can you give us some examples to date?

23     A.   I will review things I sign to make

24  sure they're accurate.

25     Q.   How much time, approximately, have you

Page 138

1    spent supervising counsel in this case?

2         A.   That's hard to say.  Maybe 20 to

3    40 hours.

4         Q.   Have you taken steps to limit the cost

5    and expenses expended by your attorneys?

6         A.   No.

7         Q.   Aside from Robbins Geller and

8    O'Donoghue, you haven't directly supervised any

9    of their law firms in this action; is that right?

10        A.   That's correct.

11        Q.   How frequently have you communicated

12   with your attorneys about this action?

13        A.   Since this has resurfaced in the last

14   month or two, twice a week.

15        Q.   Prior to that?

16             MR. SAHAM:  Objection.  Vague as to

17     time.

18   BY MR. McGEE:

19        Q.   After your appointment as lead

20   plaintiff was denied.

21        A.   From the time we were denied lead

22   plaintiff and the time we were brought back in as

23   a potential class representative, we did not

24   communicate on this case.

25        Q.   Have you attended -- have you or

                                    Page 139

```
 1    anyone at National Elevator attended any court
 2    proceedings related to this case?
 3         A.   No.
 4         Q.   If this litigation proceeds, how much
 5    time do you anticipate National Elevator spending
 6    on this litigation?
 7         A.   Uncertain.  It depends on how long it
 8    goes, how much is asked of me by either side.  I
 9    really can't speculate.
10         Q.   Who would you say is responsible for
11    making strategic decisions in this litigation?
12              MR. SAHAM:  Objection.  Form.
13       Foundation.  Calls for a legal conclusion.
14              THE WITNESS:  That's what we hire
15       attorneys for.
16    BY MR. McGEE:
17         Q.   Could National Elevator decide to
18    settle or terminate this lawsuit now if it wanted
19    to?
20              MR. SAHAM:  Objection.  Calls for a
21       legal conclusion.
22              THE WITNESS:  Yeah, I don't know
23       enough about the court proceedings.
24    BY MR. McGEE:
25         Q.   Can National Elevator decide to settle
```

Veritext Legal Solutions
866 299-5127

1    even if we're class representative, there's a
2    lead plaintiff that probably would have more
3    weight in that decision than a class
4    representative.
5         Q.   Has National Elevator communicated
6    with other potential class members about this
7    litigation?
8         A.   Only the lead plaintiff.
9         Q.   What is your understanding what it
10   means to be a class representative?
11        A.   And I'm -- this is as a layman.
12        Q.   Yes, as a layman, as National Elevator
13   as it's currently situated?
14        A.   Right, as a non-lawyer speaking for
15   National Elevator.
16             Motley Rice is appointed as lead
17   counsel as a strictly investment firm not
18   domiciled in the United States.  So since Twitter
19   is a US-based company, a lot of the losses were
20   occurred here.  It's -- the jurisdiction is in
21   the United States.  It's in San Francisco.  I
22   think it's reasonable to say that an
23   institutional investor, such as the National
24   Elevator plan, is an appropriate representative
25   for other similarly situated clients that aren't

                                    Page 142

1   exactly the same structure as the lead plaintiff.

2       Q.   Can you describe the class that you're

3   seeking to represent?

4       A.   First of all, there's investors who

5   lost money by purchasing Twitter between June 6,

6   2015 and July 28, 2015, and it's -- that's really

7   all -- you know, and it's not just institutional.

8   It's individuals.  It's mutual funds.  It's

9   any -- it's everyone who held Twitter -- bought

10  Twitter in that period.

11      Q.   Who is Bart Elst?

12      A.   The name is familiar.  I don't recall.

13      Q.   What is KBC Asset Management NV?

14      A.   That is the firm that -- in the

15  Netherlands that had the largest loss, and they

16  were named lead plaintiff.

17      Q.   Have they done a good job so far

18  representing the interest of the class in this

19  litigation?

20          MR. SAHAM:  Objection.  Calls for a

21     legal conclusion.

22          THE WITNESS:  Yeah, I'm not qualified

23     to say that.

24  BY MR. McGEE:

25      Q.   You don't have an opinion on whether

                                        Page 143

```
 1   they've done a good job?
 2        A.   This case has been going on since --
 3   they were named lead plaintiff in late 2016, and
 4   I was just brought back into it a month or so
 5   ago.  And as I said earlier, I wasn't monitoring
 6   this case in any shape or form, so it's hard for
 7   me to make a conclusion at this point.
 8        Q.   Do you believe Motley Rice has done a
 9   good job representing the class in this action?
10        A.   Same answer.
11        Q.   Are you familiar with the firm?
12   Bleichmar Fonti & Auld?
13        A.   I know of them.
14        Q.   What do you understand their role to
15   be?
16        A.   They're local counsel in San
17   Francisco.
18        Q.   For?
19        A.   For Motley Rice and Robbins Geller to
20   file the documents that need to be filed in the
21   district court.
22        Q.   Prior to the beginning of this
23   litigation, did any member employee of National
24   Elevator have any relationship with KBC?
25        A.   No.
```

Page 144

1        Q.   So we touched on this a little bit

2   earlier, but for purposes of my next questions,

3   unless otherwise stated, do you understand that

4   the term documents includes hardcopy documents as

5   well as electronic documents and data?  Is that

6   clear?

7        A.   Yes.

8        Q.   Okay.  Was National Elevator ever told

9   they would need to preserve documents relating to

10  their claims in this case?

11       A.   Yes.

12       Q.   When were they told?

13       A.   On or about the time we filed for lead

14  plaintiff status.

15       Q.   Through what means was that

16  communicated?

17       A.   I communicated it through a staff

18  e-mail after I got the request.  It may have been

19  a phone call that I got.

20       Q.   How did you get --

21       A.   I don't recall.

22       Q.   What type of documents did National

23  Elevator save in connection with that request?

24            MR. SAHAM:  Objection.  Vague.  Form.

25            THE WITNESS:  When the request was

Page 145

```
 1              VIDEOTAPE TECHNICIAN:  The time is
 2     2:32.  This begins media unit four of the
 3     deposition of Robert Betts.
 4   BY MR. McGEE:
 5        Q.   Do you understand you're still under
 6   oath?
 7        A.   Yes.
 8              MR. McGEE:  I'm handing you a document
 9     the court reporter will mark NEIPF-25.
10                        -  -  -
11              (Whereupon, the document was marked,
12     for identification purposes, as Defendants'
13     Exhibit NEIPF-25.)
14                        -  -  -
15              MR. McGEE:  You can look up at me
16     whenever you're ready to discuss it.
17              THE WITNESS:  (Witness reviewing
18     document.)
19              All right.
20   BY MR. McGEE:
21        Q.   Have you seen this document before?
22        A.   Yes.
23        Q.   What is it?
24        A.   A subpoena for documents from the
25   National Elevator Industry Pension Fund by your
```

Page 151

 1   firm.
 2        Q.   Did National Elevator search for
 3   documents responsive to these requests?
 4        A.   Yes.
 5        Q.   How many documents did National
 6   Elevator collect as a result of this effort?
 7        A.   I didn't count the number of
 8   documents.  I just knew -- I just remember it was
 9   too big to e-mail.  So we --
10        Q.   Did just ballpark?
11        A.   I don't know.  I don't know.  It was a
12   large number of documents, large file size.
13        Q.   More than a thousand?
14        A.   Easily.
15        Q.   More than 10,000?
16        A.   Probably -- I don't know.  I don't
17   know.
18             MR. McGEE:  I'm handing you a document
19        the court reporter will mark NEIPF-26.
20                      -  -  -
21             (Whereupon, the document was marked,
22        for identification purposes, as Defendants'
23        Exhibit NEIPF-26.)
24                      -  -  -
25   BY MR. McGEE:

                                        Page 152

```
 1          Q.   Are you ready to discuss this?

 2          A.   Yes.

 3          Q.   Are you familiar with this document?

 4          A.   Actually, I need to review it.

 5          Q.   You can take your time.

 6          A.   (Witness reviewing document.)

 7               Yes.

 8          Q.   What is it?

 9          A.   Request for production of documents.

10          Q.   When did you first see this document?

11          A.   I would say after the trustees

12   meeting.  So March.

13          Q.   March?

14          A.   Yeah.

15          Q.   Can you describe generally what

16   damages you're seeking in this case?

17               MR. SAHAM:   Objection.  Calls for

18      expert testimony.

19   BY MR. McGEE:

20          Q.   You can answer.

21          A.   It's up to the -- I'm not qualified to

22   determine what the damages are.

23          Q.   Can you describe generally how

24   National Elevator was damaged?

25          A.   So the failure to disclose the number
```

Page 153

```
 1    of daily active users resulted ultimately in the
 2    stock price being higher than it otherwise would
 3    have been if that information had been disclosed.
 4    So we had investment managers buy 91,000 shares
 5    at a higher price than they otherwise would have
 6    assuming they still would have bought them to
 7    begin with.
 8        Q.   Has National Elevator taken a tax
 9    deduction or a credit for the losses from its
10    investment in Twitter?
11        A.   It's a nontaxable entity.
12        Q.   It being National Elevator?
13        A.   Yes.
14        Q.   Has National Elevator received or does
15    it expect to recover any portion of its losses --
16    alleged losses relating to its purchase of
17    Twitter by any means other than through this
18    lawsuit?
19        A.   No.
20        Q.   Going back to what you testified about
21    earlier in connection with the document
22    collection, were all of the documents National
23    Elevator collected turned over to counsel?
24        A.   Yes.
25        Q.   Did National Elevator search --
```

Page 154