UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re TWITTER INC. SECURITIES LITIGATION. | Case No. 16-cv-05314-JST<br><br>**ORDER GRANTING CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPROVAL OF CLASS COUNSEL**<br><br>Re: ECF No. 140 |

This is a securities class action on behalf of all persons who purchased or otherwise acquired Twitter common stock between February 6, 2015 and July 28, 2015 against Twitter and two of its officers for violations of §§ 10 and 20(a) of the Securities Exchange Act of 1934. ECF No. 81 ("Consolidated Amended Complaint" or "CAC") ¶ 2. Generally, Plaintiff Doris Shenwick alleges that the Defendants "made materially false and misleading statements during the Class Period in press releases and filings with the SEC and in oral statements to the media, securities analysts and investors." *Id*.

Before the Court is Plaintiffs' motion for class certification, appointment of class representatives, and approval of class counsel. The Court GRANTS the motion.

**I.   BACKGROUND**

**A.   Factual Background**[1]

Defendant Twitter ("Twitter," or "the Company") is a "global social media platform." CAC ¶ 13. Twitter provides a platform where any user can create a "tweet" and any user can follow other users. *Id.* ¶ 19. Defendant Richard Costolo served as Chief Executive Officer of

---

[1] The facts are taken from the allegations of the CAC unless otherwise indicated.

Twitter during the Class Period until his resignation on July 1, 2015. *Id.* ¶ 14. Defendant Anthony Noto was Twitter's Chief Financial Officer during the class period. *Id.* ¶ 15.

As with many social media companies, Twitter's main source of revenue is advertising. *Id.* ¶ 23. Accordingly, analysts focus on the number of users Twitter has and whether those users are engaged with Twitter's content. *Id.* Twitter uses three principal metrics to measure its financial health and growth prospects: (1) "monthly active users or 'MAU' (the number of users on the platform in a given month)," (2) "those users' daily activity (user engagement)," and (3) "advertising engagements (the ability of the Company to turn user activity into advertising revenue)." *Id.* ¶ 20. These three metrics are "interrelated." *Id.* ¶ 21. This interplay means that "neither MAU nor user engagement provides a complete picture of the business" without the other. *Id*. ¶ 24. Within the company, Twitter primarily measured user engagement through DAU.[2] *Id.* ¶ 67.

Despite a heavy internal focus on DAU and the Company's publicly stated goal of increasing daily use, Twitter did not "tell investors that DAU was its primary user engagement metric" or "provide meaningful updates on user engagement trends, in particular DAU." *Id*. ¶ 40. Instead, throughout the Class Period, Twitter kept its user engagement statements positive but vague, and highlighted MAU growth.

On February 5, 2015, Twitter filed a Form 8-K with the SEC containing a press release announcing the Company's fourth quarter and fiscal year 2014 financial results, and held an Earnings Call to explain the quarterly results. *Id.* ¶ 79. Twitter acknowledged lower than expected MAU growth at the end of 2014, but stated that its "MAU trend has already turned around and our Q1 trend is likely to be back in the range of absolute net adds that we saw during the first three quarters of 2014." *Id.* ¶ 88. The message analysts took away from the 4Q 2014 results was clear: user engagement had improved. *Id.* ¶ 52. ("[S]lower MAU growth is more than offset by improvements in engagement and pricing.")

On April 28, during Twitter's Q1 2015 Earnings Call, Noto continued to tell investors that

---

[2] DAU stands for "Daily Active Users," and includes any user who accesses the Twitter platform on a given day.

2

the Company could not provide "visibility" on user engagement. *Id.* ¶ 103. Noto gave the following explanation for Twitter's decision not to report specific DAU numbers: "It's a measurement that is dependent by market and you could have a mix shift so that could be a little bit misleading." *Id*. ¶ 103. Despite Twitter's positive statements about MAU and user engagement, the Company struggled during the Class Period with stalled MAU growth numbers and "increasingly adverse trends in user engagement." *Id*. ¶ 51.

On July 28, 2015, "Twitter hosted a call with analysts and investors to discuss the Company's second-quarter results." *Id*. ¶ 60. In contrast to prior, upbeat forecasts, Noto told investors: "[W]e do not expect to see sustained meaningful growth in MAUs . . . [for] a considerable period of time." *Id*. Generally, Twitter reported that its "growth rate in users is slowing quite dramatically" and that investors should not "expect a change in our growth rate . . . for a while." *Id*. After the earnings call, Twitter's share price dropped nearly 15%. *Id*. ¶ 64.

After the July 28 revelations, Twitter no longer wavered on the centrality of DAU to the Company's success. During the Q4 2015 Earnings Call, for example, Twitter explained that "[t]he one engagement metric that we look at holistically is daily active users." *Id*. ¶ 85(b). Two weeks after the close of the Class Period, the Susquehanna Financial Group published a chart showing a decline in the DAU/MAU ratio from an average of 48% during the first three quarters of 2014 to 44% during the first quarter of 2015. *Id*. ¶ 87(b).

B. **Procedural History**

On September 16, 2016, Shenwick brought a securities class action on behalf of all persons who purchased or otherwise acquired Twitter common stock between February 6, 2015 and July 28, 2015, inclusive (the "Class Period"), against Twitter and certain of its officers and/or directors for violations of §§ 10 and 20(a) of the Securities Exchange Act of 1934. ECF No. 1 ¶ 2. On December 22, 2016, the Court consolidated this case with a related case, and appointed KBC Asset Management NV ("KBC") as lead plaintiff, Motley Rice as lead counsel, and Bleichmar, Fonti & Audi ("BFA") as liaison counsel. ECF No. 72.

On October 16, 2016, this Court granted in part and denied in part Defendants' motion to dismiss. ECF No. 113. Specifically, the Court granted the motion to dismiss with respect to

3

1    Plaintiffs' claims based on Defendants' affirmative statements about MAU, but denied it as to
2    Plaintiffs' DAU omissions theory, and Plaintiffs' claims based on Defendants' affirmative
3    statements about positive user engagement trends.  *Id.*

4    Plaintiffs now move for (1) class certification pursuant to Federal Rule of Civil Procedure
5    23(a) and (b)(3), (2) appointment of KBC and National Elevator Industry Pension Fund ("National
6    Elevator") as co-class representatives, and (3) the appointment of Motley Rice and Robbins Geller
7    as co-class counsel pursuant to Federal Rule of Civil Procedure 23(g).  ECF No. 140 at 9.

## II.    LEGAL STANDARD

Class certification under Rule 23 is a two-step process.  First, a plaintiff must demonstrate that the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a) are met: "One or more members of a class may sue or be sued as representative parties on behalf of all members only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied."  *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542-43 (9th Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).

Second, a plaintiff must also establish that one of the bases for certification in Rule 23(b) is met.  Here, Plaintiffs invoke Rule 23(b)(3), which requires that Plaintiffs show that the presence of "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rule 23(a) and at least one of the three requirements under Rule 23(b) are met.  *See Dukes*, 564 U.S. at 350.  In ruling on class certification, courts should not consider the merits of the plaintiffs' claims.  *See Keilholtz v. Lennox Hearth Products Inc.*, 268 F.R.D. 330, 335 (N.D. Cal. 2010).  Courts "must take the substantive allegations of the

4

1  complaint as true" but "need not accept conclusory or generic allegations regarding the suitability

2  of the litigation for resolution through class action." *Id.* (citations omitted).

### III. PROPOSED CLASS DEFINITION

Plaintiffs seek to certify a class of "all persons and entities that, during the period from February 6, 2015, through July 28, 2015, inclusive [], purchased or otherwise acquired shares of the publicly traded common stock of Twitter, Inc. [], and were damaged thereby." ECF No. 140 at 9.[3]

Defendants argue the class definition should be modified to exclude in-and-out traders. ECF No. 161-4 at 26. "In-and-out traders are investors who bought their shares during the class period but sold their shares before the misrepresentation was revealed." *McGuire v. Dendreon Corp.*, 267 F.R.D. 690, 697 (W.D. Wash. 2010). Defendants contend that there are two groups of in-and-out traders who should be excluded from the class: (1) "investors who purchased their Twitter shares after the start of the alleged class period but sold Twitter shares prior to the April 28 alleged corrective disclosure," and (2) "investors who acquired Twitter shares for the first time after April 28, and divested before the alleged July 28, 2015 corrective disclosure." ECF No. 161-4 at 27.

Defendants rely on decisions from courts in this circuit that interpret the Supreme Court's decision in *Dura* to exclude in-and-out traders at the class certification stage. *See In re UTStarcom, Inc. Sec. Litig.*, No. C 04-04908 JW, 2010 WL 1945737, at *11 (N.D. Cal. May 12, 2010) ("[I]n order to determine whether in-and-out traders should remain part of the proposed class, it is necessary to demonstrate that they might be able to prove a loss, i.e., damages.") (quoting *BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 544 (E.D. Va. 2006) (discussing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)); *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009) (discussing *Dura*, 544 U.S. 336); *In re Cornerstone Propane Partners,*

---

[3] Excluded from the Class are Defendants; members of the Individual Defendants' immediate families; Twitter's subsidiaries and affiliates; any person who is or was an officer or director of Twitter during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity. ECF No. 140 at 9 n.1.

5

1    *L.P. Sec. Litig.*, No. C 03-2522 MHP, 2006 WL 1180267, at *9 (N.D. Cal. May 3, 2006)

2    ("Pursuant to the Supreme Court's holding in *Dura,* the Class may not include individuals who

3    purchased and sold . . . stock prior to any corrective disclosure by the company.").

4        In *Dura*, the Supreme Court reversed a Ninth Circuit decision holding that a plaintiff

5    adequately pleaded loss causation by alleging an inflated stock price at the time of purchase.

6    *Dura*, 544 U.S. at 340. The Court held that, because plaintiffs must eventually "*prove* proximate

7    causation and economic loss," the complaint must "adequately [] *allege* these requirements." *Id.*

8    at 346 (emphasis in original). The Court reasoned that alleging an inflated stock price at the time

9    of purchase was not adequate to plead loss causation because "at the moment the transaction takes

10   place, the plaintiff has suffered no loss." *Id.* at 342. Accordingly, a securities plaintiff must allege

11   "that [the defendant's] share price fell significantly after the truth became known" in order to

12   allege a cognizable loss. *Id.* at 347.

13       The Ninth Circuit has held that a class may properly include in-and-out traders, *Wool v.*

14   *Tandem Computers Inc.*, 818 F.2d 1433, 1437 (9th Cir. 1987), *overruled on other grounds by*

15   *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990), and "[i]t is unclear whether

16   *Dura*'s discussion of inflated purchase price as it relates to loss causation overturns the Ninth

17   Circuit's rule in *Wool*." *McGuire*, 267 F.R.D. at 698. "District courts in the Ninth Circuit have

18   been in conflict with each other over whether in-and-out traders are appropriately included." *See*

19   *id.* (discussing post-*Dura* case law in this circuit).

20       This court agrees with the district court in *McGuire* that "*Dura* only relates to how loss

21   causation needs to be pled in the complaint" and that "*Dura* does not affect the class definition at

22   the class certification stage." *Id.* at 699 (declining to exclude in-and-out traders at the class

23   certification stage after surveying the cases because "in-and-out traders could prove that they

24   suffered a loss when they sold their shares because they only purchased the stock due to the

25   misrepresentation"). Excluding in-and-out traders at this stage, prior to the completion of

26   discovery, would be "premature" because the plaintiffs "may prove that some of the truth leaked

27   out prior to the corrective disclosures and caused injury at an earlier date"). *In re Lendingclub*

28   *Sec. Litig.*, 282 F. Supp. 3d 1171, 1188 (N.D. Cal. 2017) (finding in-and-out traders appropriately

included at the class certification stage) (internal citations omitted).

Further, the Court retains the power to modify the class definition at a later stage in the proceedings. Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). Defendants may renew their request at a later stage, after discovery is complete. *See Buttonwood Tree Value Partners, LP v. Sweeney,* No. SACV1000537CJCMLGX, 2013 WL 12125980, at *15 (C.D. Cal. Sept. 12, 2013) ("If, following completion of discovery, Defendants successfully move for partial summary judgment on this issue, they may then renew their request to exclude in-and-out traders from the class.").

The Court therefore finds that in-and-out traders are appropriately included in the class definition, and approves the proposed class definition.

## IV. DISCUSSION

### A. Rule 23(a) Requirements

#### 1. Numerosity

The numerosity requirement is satisfied when a plaintiff shows that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs contend that "Twitter had an average of 659.2 million shares outstanding and actively trading on the New York Stock Exchange ('NYSE') during the Class Period." ECF No. 140 at 13. "The Court certainly may infer that, when a corporation has millions of shares trading on a national exchange," the numerosity requirement is met. *In re Cooper Companies Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009). Also, Twitter does not contest numerosity. Plaintiffs have satisfied their burden to show the number of putative class members is sufficiently numerous that their joinder would be impracticable.

#### 2. Commonality

The commonality requirement is satisfied when a plaintiff shows that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality exists when plaintiffs' claims "depend upon a common contention" of "a nature that is capable of classwide resolution," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

1    Plaintiffs contend, and Defendants do not dispute, that questions of law or fact common to
2 the putative class include: (1) "[w]hether Defendants' statements to the investing public during the
3 Class Period misrepresented material facts about Twitter"; (2) "[w]hether Defendants' statements
4 omitted material facts necessary to make the statements, in light of the circumstances under which
5 they were made, not misleading"; (3) "[w]hether Defendants acted with the requisite state of
6 mind"; and (4) "[w]hether Twitter's stock price was artificially inflated as a result of Defendants'
7 misrepresentations and/or omissions." ECF No. 140 at 14. These questions are sufficient to fulfill
8 the commonality requirement. *See Luna v. Marvell Tech. Grp., Ltd.*, No. C 15-05447 WHA, 2017
9 WL 4865559, at *2 (N.D. Cal. Oct. 27, 2017) (finding commonality satisfied when, as here,
10 plaintiffs alleged "that investors were defrauded by the same misleading statements over the same
11 period of time, and suffered similar losses as a result").

### 3.   Adequacy of Representation

13   "To determine whether named plaintiffs will adequately represent a class, courts must
14 resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest
15 with other class members and (2) will the named plaintiffs and their counsel prosecute the action
16 vigorously on behalf of the class?'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir.
17 2011) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)).

18   Plaintiffs argue KBC and National Elevator are adequate co-class representatives because
19 they were injured by Twitter's misstatements and omissions in the same way as other class
20 members, and will vigorously represent the class. ECF No. 140 at 15, 17 (citing Fed. R. Civ. P.
21 23(a)(4)). KBC is an asset management company which purchased 647,544 Twitter shares, held
22 344,410 shares on the date of Twitter's 1Q15 earnings call, and held 20,870 shares at the end of
23 the class period. *Id.* at 15-16. KBC suffered substantial losses as a result of Twitter's omissions
24 and misstatements. *Id.* KBC reviewed the complaint, did not purchase shares at the direction of
25 counsel, is willing to serve as a representative, and will not accept payment beyond that ordered by
26 the Court. ECF No. 21-1 at 2; *see also* ECF No. 130-3 (providing that KBC monitored the
27 progress of court proceedings, discussed case developments with counsel, evaluated status reports,
28 and produced documents). National Elevator provides retirement benefits for members for the

United States District Court
Northern District of California

1    International Union of Elevator Constructors. ECF No. 140 at 16. National Elevator purchased

2    and held 91,700 Twitter shares during the class period including during the 1Q15 earnings call,

3    then held 16,920 at the end of the class period. *Id.* at 16-17. National Elevator is similarly

4    involved in the case. ECF Nos. 30-2; 141-1.

5        National Elevator now seeks appointment as co-class representative and the appointment

6    of its law firm, Robbins Geller, as co-class counsel. Twitter argues that appointing National

7    Elevator would "contravene the PSLRA and harm the class." ECF No. 161-4 at 12. It notes that

8    when KBC moved for appointment as lead counsel, National Elevator also moved for

9    appointment, but withdrew after acknowledging KBC had the largest financial interest. ECF No.

10   20; ECF No. 72 at 3. The Court appointed KBC as lead plaintiff and approved KBC's choice of

11   lead counsel, Motley Rice, and liaison counsel, BFA. *Id.* Relying on "lead plaintiff" case law,

12   Twitter argues the Court should deny the Plaintiffs' proposed co-class representative structure. *Id.*

13   at 12-16 (citing, e.g., *Cohen v. U.S. Dist. Court for N. Dist. of California*, 586 F.3d 703, 711 n.4

14   (9th Cir. 2009) (suggesting in dicta "the district court should appoint only one lead plaintiff,

15   whether an individual or a group"); *Schriver v. Impac Mortg. Holdings, Inc.*, 2006 WL 6886020,

16   at *8 (C.D. Cal. May 2, 2006)). Because the PSLRA's lead plaintiff appointment process involves

17   a less searching inquiry than the Rule 23 class certification process, Twitter reasons that allowing

18   co-class representatives "would completely undermine the PSLRA's lead plaintiff evaluation and

19   appointment provisions." ECF No. 161-4 at 16. In other words, Twitter reasons, if National

20   Elevator wasn't good enough to be a PSLRA lead plaintiff, how can it pass muster as a co-class

21   representative?

22       Neither the text nor the underlying purposes of the PSLRA support Twitter's argument.

23   First, "[t]he PSLRA directs courts to 'appoint as lead plaintiff the member or members of the

24   purported plaintiff class that the court determines to be most capable of adequately representing

25   the interests of class members . . . .'" *In re Versata, Inc., Sec. Litig.*, No. C 01-1439 SI, 2001 WL

26   34012374, at *2 (N.D. Cal. Aug. 20, 2001) (citing 15 U.S.C. § 78u-4(a)(3)(B)(i)). In making that

27   determination, "the court shall adopt a presumption that the most adequate plaintiff . . . is the

28   person or group of persons that – (aa) has either filed the complaint or made a motion in response

to a notice . . . ; (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(i). The fact that one plaintiff might be the "*most capable*" does not mean that another plaintiff is not *also* capable, and nothing in the PSLRA appointment process sheds any light on that question.

Moreover, "[t]he lead plaintiff provisions were designed to encourage greater institutional investor participation in class action litigation by giving the lead plaintiff the power to control the course of the action, including the selection of lead counsel." Michael A. Perino, *Did the Private Securities Litigation Reform Act Work?*, 2003 U. ILL. L. REV. 913, 923 (2003) (citing S. Rep. No. 104-98 at 6 (1995), reprinted at 1995 U.S.C.C.A.N. 679, 1995 WL 372783).

The lead plaintiff has now come to the Court seeking the participation of another entity and its law firm as co-class representative and co-class counsel. Denying the lead plaintiff's request based on the defendant's argument does not enhance "the lead plaintiff['s] power to control the course of the action."

Lastly, and not surprisingly, "the PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class." *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 625 (S.D.N.Y. 2015) (quoting *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82–83 (2d Cir. 2004)). Rather, "[t]he proposed class and Class Representatives are to be reviewed according to the standards of Rule 23, without any deference to the earlier determinations made in the appointment of Lead Plaintiffs." *In re Chiron Corp. Sec. Litig.*, No. C-04-4293 VRW, 2007 WL 4249902, at *13 (N.D. Cal. Nov. 30, 2007) (citing 15 U.S.C. § 78u-4 (a)(3)(B) (iii)(I)(cc)). As a result, courts in this district and circuit regularly appoint both lead and additional plaintiffs as class representatives in PSLRA class actions. *See, e.g.*, *In re Silver Wheaton Corp. Sec. Litig.*, No. 215CV05146CASJEMX, 2017 WL 2039171, at *4 (C.D. Cal. May 11, 2017); *In re Intuitive Surgical Sec. Litig.*, No. 5:13-CV-01920-EJD, 2016 WL 7425926, at *1 (N.D. Cal. Dec. 22, 2016), *reconsideration denied*, No. 5:13-CV-01920-EJD, 2017 WL 4355072 (N.D. Cal. Sept. 29, 2017). *Compare Thomas v. Magnachip*, 14-cv-1160-JST, ECF No. 32, (N.D. Cal. July 3, 2014) *with Hayes v. MagnaChip Semiconductor Corp.*, No. 14-CV-01160-JST, 2016 WL 7406418, at

10

*10 (N.D. Cal. Dec. 22, 2016).[4]

Some additional points merit attention. Twitter contends National Elevator is inadequate because it has not been diligent and its statements to the contrary are not credible. ECF No. 161-4 at 16. Twitter points to National Elevator's testimony that it did not monitor the case until the filing of this motion within the "last month or two," and that it was unfamiliar with the key litigation events between the lead plaintiff appointment order and this motion for class certification. ECF No. 161-8 at 29, 40. To Twitter, this shows that National Elevator has been uninvolved and that it lacks credibility, given its Executive Director's written testimony that he has "regularly conferred with counsel to keep abreast of key events in the litigation." ECF No. 141-1 ¶ 3.

Taking these questions in reverse order, "the threshold of knowledge required to qualify a class representative is low; a party must be familiar with the basic elements of her claim [ ] and will be deemed inadequate only if she is 'startlingly unfamiliar' with the case." *In re Intuitive Surgical*, 2016 WL 7425926, at *7 (quoting *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004), *amended on other grounds*, 2012 WL 3070863 (N.D. Cal. 2012)); *see also Cryer v. Franklin Templeton Res., Inc.*, No. C 16-4265 CW, 2017 WL 4023149, at *6 (N.D. Cal. July 26, 2017), *reconsideration denied sub nom. Cryer v. Franklin Res., Inc.*, No. C 16-4265 CW, 2017 WL 4410103 (N.D. Cal. Oct. 4, 2017). Indeed, the Court has not uncovered any case in this circuit finding a plaintiff inadequate on this ground.

As to the remaining point, even crediting Twitter's gloss on the evidence, National Elevator is not an inadequate class representative. While some courts in other circuits have recognized, at the lead plaintiff stage, that a plaintiff may be inadequate if there are "serious questions" as to her credibility, *see In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 145 (S.D.N.Y. 2007) (finding adequacy "sufficiently in doubt" after credibility was called into question where complaint was not filed by the entity that actually purchased shares during class

---

[4] Plaintiffs also suggest that appointing National Elevator could protect against defenses, such as the standing defense against KBC that Twitter hints towards. ECF No. 174 at 15; ECF No. 161-4 at 6 n.2.

period, particularly in light of questions about plaintiff's integrity given his prior securities rules violations), this simply is not such a case.

Motley Rice and Robbins Geller seek appointment as co-class counsel. ECF No. 140 at 10, 29. In appointing class counsel, the Court considers counsel's work "in identifying or investigating potential claims in the action," "experience in handling class actions," "knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). Both firms have extensive class action securities litigation experience. ECF Nos. 140-6; 140-7. Motley Rice and Robbins Geller have both "vigorous[ly] prosecut[ed]" this case by investigating claims, preparing the complaint, defending the complaint against dismissal, conducting discovery, and pursuing class certification. ECF No. 140 at 30.

Twitter argues it is unnecessary to appoint Robbins Geller because Motley Rice is adequate on its own. ECF No. 161-4 at 23. This argument is not persuasive. First, Twitter cites an out-of-circuit district court case for the proposition that the Court should reject Plaintiffs' request for co-lead counsel. *Id.* (citing *Durigon v. Toronto-Dominion Bank*, 2017 WL 6388954, at *7 (D.N.J. Dec. 13, 2017)). Even that case, however, recognized that "[i]n certain situations, the appointment of multiple lead counsel may better protect the interests of the plaintiff class." *Durigon*, 2017 WL 6388954, at *7. Second, to state the obvious, Twitter's interests in this litigation are not aligned with those of the class. *See In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 48 (S.D.N.Y. 2012) ("It is in a defendant's best interests to object to class counsel who are, in fact, best suited to protect the class and represent its interests." (alterations in original) (internal citation omitted)). Thus, it is unlikely that Twitter has the class's interests in mind when it argues against the appointment of additional counsel. Lastly, courts in this district and circuit have appointed co-class counsel in PSLRA cases. *Compare Thomas*, 14-cv-1160-JST, ECF No. 32 *with Hayes*, 2016 WL 7406418, at *10; *see also Buttonwood*, 2013 WL 12125980, at *1,*16. This is a large securities case defended by experienced, knowledgeable counsel, and it is appropriate for Motley Rice to call upon additional resources. The appointment of co-class counsel is appropriate.[5]

---

[5] Twitter also complains that adding Robbins, Geller will increase the amount of attorneys' fees incurred in the case. Because plaintiffs' fees will be paid only if there is a recovery, and because

The Court finds that KBC and National Elevator are adequate class representatives, and Motley Rice and Robbins Geller are adequate class counsel.

### 4. Typicality

Typicality exists if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation and internal quotation marks omitted).

Plaintiffs contend that typicality is satisfied because both KBC's and National Elevator's "claims and injuries (i.e., the alleged artificial inflation and consequent market correction of the price of Twitter's stock caused by Defendants' allegedly fraudulent public statements and omissions) arise from the same events and conduct that gave rise to the claims of other Class members." ECF No. 140 at 15. Defendants do not contest typicality, nor does it appear that KBC and National Elevator are "subject to unique defenses which [would] threaten to become the focus of the litigation." *See Hanon,* 976 F.2d at 508 (internal citations omitted). Accordingly, the typicality requirement is satisfied.

## B.   Rule 23(b)(3) Requirements

This provision requires the court to find that: (1) "the questions of law or fact common to the class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1. Predominance

"The predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the common and individual issues' in the case" and tests whether the proposed class is "'sufficiently

---

any such fee will be determined as a percentage of the recovery, this fear is unfounded. Concerns about a potentially overstated lodestar that undermines a cross-check on a percentage-based fee can be addressed by review of the attorney billing. In any event, Twitter is not impacted by this issue because any fees will come from the class' recovery, and not from Twitter.

cohesive to warrant adjudication by representation.'" *Wang*, 737 F.3d at 545 (quoting *Hanlon*, 150 F.3d at 1022). Defendants contend that Plaintiffs fail to satisfy Rule 23(b)(3)'s predominance requirement because they have "not proffered a damages model—tied to the facts of this case— that can be applied on a class-wide basis as required by *Comcast v. Behrend*." ECF No. 161-4 at 7 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)).

In *Comcast*, the Court held that an antitrust action was improperly certified when the plaintiffs' damages model was "based on a methodology that identified damages unconnected to plaintiff's legal theory." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 251 (N.D. Cal. 2013) (citing *Comcast*, 569 U.S. at 27). The plaintiffs in *Comcast* alleged four theories of antitrust impact, but the district court accepted only one theory as "capable of classwide proof." *Comcast*, 569 U.S. at 31. The plaintiffs' proffered damages model, however, "did not isolate damages resulting from any one theory of antitrust impact." *Id.* at 32. The Court therefore found the model "[could not] show Rule 23(b)(3) predominance" because "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 34.

In contrast, Plaintiffs' proposed damages model is based on only one theory of liability: that Twitter's alleged misrepresentations about user engagement metrics "artificially inflated prices, resulting in price declines when the true nature of those [metrics] was revealed." *See Luna*, 2017 WL 4865559, at *6. Plaintiffs propose the following method to calculate class members' "out-of-pocket" damages:

> [F]or each share of Twitter common stock purchased or acquired during the Class Period and held through at least one of the disclosures of the fraud, the damages shall be the lesser of:
> (i) the purchase/acquisition price minus the statutory sales price; or
> (ii) the total inflation that was removed from the stock price following the disclosures of the fraud, as determined by the jury.

ECF No. 140 at 27.

Defendants attack not the methodology of the proposed model, but the fact that Plaintiffs' expert has not yet calculated damages for the Class's alleged claims. ECF No. 161-4 at 25 (pointing out that Plaintiffs' expert stated that he has "not conducted a loss causation analysis" and

14

1  has "not yet been asked to calculate damages for any of the claims alleged on behalf of the
2  Class"). But Plaintiffs' burden at this stage is only to demonstrate that "the questions of law or
3  fact common to the class members *predominate* over any questions affecting only individual
4  members." Fed. R. Civ. P. 23(b)(3) (emphasis added). Courts in this circuit have not interpreted
5  *Comcast* to "require certification proponents to rely on a class-wide damages model to
6  demonstrate predominance." *Hayes*, 2016 WL 7406418, at *9; *see, e.g.*, *Luna*, 2017 WL
7  4865559, at *6 ("That lead plaintiff has not yet provided a loss-causation model [at the class
8  certification stage] does not defeat predominance."). Rather, "[t]he Ninth Circuit reads *Comcast*
9  to demand only that plaintiffs 'be able to show that their damages stemmed from the defendant's
10 actions that created the legal liability.'" *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-CV-
11 00226 YGR, 2016 WL 1042502, at *8 (N.D. Cal. Mar. 16, 2016) (quoting *Leyva v. Medline Indus.*
12 *Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).

13     Defendants rely on *Ludlow v. BP*, but fail to mention that *two* damages models were at
14 issue in that case. *See Ludlow v. BP P.L.C.*, 800 F.3d 674 (5th Cir. 2015). In *Ludlow*, the Fifth
15 Circuit affirmed a district court's decision to certify a "Post-Spill" class of investors who
16 purchased British Petroleum ("BP") shares after the Deepwater Horizon oil spill, and to deny
17 certification to a "Pre-Spill" class who purchased BP shares before the oil spoil. *Ludlow*, 800 F.3d
18 at 677. The Pre-Spill class relied on a "materialization of the risk" damages theory, which the
19 court found was not "capable of class-wide determination." *Id.* at 690. The Post-Spill class,
20 however, relied on an "out-of-pocket losses" measure similar to Plaintiffs' damages model here,
21 which calculated "the difference between the inflated price at which the plaintiffs bought their
22 stock," and the "theoretical price that the . . . stock would have traded for had the relevant
23 information been properly disclosed." *Id.* at 683 (emphasis omitted). The Fifth Circuit found that
24 the Post-Spill class's measure of damages satisfied the requirements of *Comcast*, which "requires
25 a 'sound' methodology, not certainty." *Id.* at 685.

26     Similarly, the Plaintiffs' measure of damages here constitutes a "sound methodology," and

1  they have satisfied the predominance requirement of Rule 23(b)(3). *Id.* (citation omitted).[6]

### 2. Superiority

The second Rule 23(b)(3) requirement is superiority. In determining superiority, courts must consider the four factors of Rule 23(b)(3): (1) the class members' interests in individually controlling a separate action; (2) the extent and nature of litigation concerning the controversy already begun by or against class members; (3) the desirability of concentrating the litigation in the particular forum; and (4) the manageability of a class action. *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 270-71 (N.D. Cal. 2011) (citing *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001)). "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation," and is certainly superior "if no realistic alternative exists." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996).

Courts in this district have recognized the utility of the class action device in securities cases. *See e.g.*, *In re UTStarcom*, 2010 WL 1945737, at *10; *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584. Not only are all factors met here, ECF No. 140 at 28-29, but Defendants also do not contest superiority. The Court therefore concludes that a class action is superior to other methods for resolving this controversy.

## V. CONCLUSION

For the foregoing reasons, the Court hereby certifies a class defined as follows: "all persons and entities that, during the period from February 6, 2015, through July 28, 2015, inclusive [], purchased or otherwise acquired shares of the publicly traded common stock of Twitter, Inc. [], and were damaged thereby." ECF No. 140 at 9.[7]

---

[6] Plaintiffs devote a substantial portion of their brief to establishing a rebuttable presumption of class-wide reliance. *See* ECF No. 140 at 20-27. Defendants do not contest this presumption, and the Court does not address the issue further. *See Luna*, 2017 WL 4865559, at *5 (discussing only damages, which were contested, but not reliance, which was not).

[7] Excluded from the Class are Defendants; members of the Individual Defendants' immediate families; Twitter's subsidiaries and affiliates; any person who is or was an officer or director of Twitter during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity. ECF No. 140 at 9 n.1.

16

KBC Asset Management NV and National Elevator Industry Pension Fund are appointed as co-class representatives.

Plaintiffs' counsel, Motley Rice LLC and Robbins Geller Rudman & Dowd LLP, are appointed as co-class counsel.

**IT IS SO ORDERED.**

Dated: July 16, 2018

_____
JON S. TIGAR
United States District Judge

17