| | |
|---|---|
| ROBBINS GELLER RUDMAN<br>& DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA  92101-8498<br>Telephone:  619/231-1058 | SIMPSON THACHER & BARTLETT LLP<br>2475 Hanover Street<br>Palo Alto, CA 94304<br>Telephone:  650/251-5000 |

October 16, 2018

<u>VIA ECF</u>

The Honorable Sallie Kim
U.S.D.C., Northern District of California
San Francisco Courthouse, Courtroom A – 15th Floor
450 Golden Gate Avenue
San Francisco, CA  94102

  Re: *In re Twitter Inc. Sec. Litig.*, Case No. 3:16-cv-05314-JST (SK)

Dear Judge Kim:

   Pursuant to the Court's Standing Order and October 9, 2018 Administrative Order, the following is a cover page and joint letter concerning a discovery dispute in the matter captioned below.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re TWITTER INC. SECURITIES<br>LITIGATION<br>———————————————<br>This Document Relates To:<br><br>  ALL ACTIONS.<br>——————————————— | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:16-cv-05314-JST (SK)<br><br><u>CLASS ACTION</u> |

Counsel for the parties hereby attest that:

  1. We have met and conferred on more than one occasion about this dispute and have been unable to reach agreement; and

  2. We have complied with §9 of the Northern District's Guidelines for Professional Conduct.

**Plaintiffs' Position**

Defendants' July 27, 2018 privilege log (the "Log") abuses the attorney-client privilege by improperly withholding ***thousands*** of routine business documents and communications based on inaccurate and unsubstantiated blanket privilege claims.  Indeed, ***over half*** of the Log's 8,010 entries concern documents not authored by, sent to or received by a lawyer.  To present the Court with a manageable issue to resolve, plaintiffs have focused this dispute on 64 of the Log's most egregious entries, while reserving plaintiffs' right to seek other improperly withheld/redacted documents later.  *See* Ex. 1 attached hereto (excerpt of 64 Log entries at issue, referred to herein as the "Waived Investor Communication Materials").[1]

This case involves a few misleading statements about user engagement and user growth made on two earnings calls.  ECF No. 113 at 1 ("Plaintiffs allege that Twitter executives knowingly made inaccurate public statements regarding these metrics, and failed to disclose internal information about them").  The formulation of those statements, including the underlying documents at dispute here, in which defendants' carefully drafted responses to expected questions from analysts, goes to the heart of this case.

At the MTD hearing, Judge Tigar asked defendants about one such statement, stating:

> Do you think at the time the statement was made . . . that there was a lack of clarity within the company about exactly where user engagement was? . . . I'm pretty confident that based on that statement, I could have no idea what is happening in terms of user engagement. It doesn't tell me anything about the number of users.

---

[1]   This dispute initially concerned 84 entries, but at the last minute defendants conceded that 19 (***nearly 25%***) of the documents plaintiffs challenge had been inappropriately withheld.  This confirms the unreliable nature of defendants' Log and severely undermines the credibility of defendants' other privilege assertions, warranting heightened scrutiny of the Log.  *See Campidoglio LLC v. Wells Fargo & Co.*, 870 F.3d 963, 976 (9th Cir. 2017) (where a party has incorrectly designated some documents as privileged, "it is not irrational to infer that [they] also incorrectly designated as privileged other documents"); *see also Elan Microelectronics Corp. v. Apple, Inc.*, No. C 09-01531 RS (PSG) 2011 WL 3443923, at *5 (N.D. Cal. Aug. 8, 2011) (agreeing that "last-minute" revisions to a privilege log warrant skepticism).

. . .  There is so much left out of that statement that it's really impossible to know what's going on.  **Do you think within Twitter they didn't know what was going on**?

ECF No. 112 at 13:4-15.[2]  The answer to Judge Tigar's question lies in the exact documents at issue here.  What did defendants know when they carefully crafted their misleading statements about user engagement and user growth, and did the carefully chosen wording formulated in the drafting process render the statements misleading?  *See* ECF No. 113 at 23 ("a plaintiff can state a 10(b) claim based on a failure to provide 'context' where that failure 'affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists'"); *id*. at 26 ("As the Ninth Circuit has explained, '"once defendants cho[o]se to tout" positive information to the market, "they [are] bound to do so in a manner that wouldn't mislead investors," including disclosing adverse information that cuts against the positive information.'").

In response to Judge Tigar's questioning about two earnings calls at issue here, Defense counsel offered a more innocent explanation:

> **[T]hey are providing the information that they have**, and the lack of more detailed information reflects the fact that user engagement is not a plug-and-play kind of number.  It's something that the company struggled with repeatedly as a young, growing company trying to find its way in this industry.  **And that's why you have these lengthy answers by Mr. Noto throughout these conference calls** where he says, 'You know, we're struggling here.  We're trying to come up with this.'"

ECF No. 112 at 14:17-25.  In his order Judge Tigar disagreed, stating that "[p]articularly given that the actual DAU numbers would have upset Twitter's narrative of explosive growth, the Court finds Plaintiff's explanation for the omission of granular DAU data . . . to be the most plausible explanation for Defendants' statements."  ECF No. 113 at 38 n.40.  Thus, the disputed entries here are critical evidence of defendants' state of mind regarding the specific fraudulent

---

[2]   Citations are omitted and emphasis is added throughout, unless otherwise indicated.

misrepresentations at the heart of this case.[3]  And because the Waived Investor Communication Materials were *not* created for the primary purpose of obtaining or providing legal advice, they are not privileged.  Indeed, corporate defendants routinely produce such documents in securities litigation, rendering defendants' withholding of these materials highly suspicious.  Moreover, even if defendants could establish that any of the disputed communications were made for the primary purpose of obtaining or providing legal advice, defendants *waived* any purported attorney-client privilege associated by disclosing them to third parties.  These documents should be produced.

A.      **Applicable Legal Principles**

The attorney-client privilege protects *confidential* disclosures made to obtain *legal* advice and an attorney's responsive *legal* advice.  *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009).  "'Because it impedes full and free discovery of the truth, the attorney-client privilege is *strictly construed*,'" and "[t]he party asserting [it] bears the burden of proving each essential element."  *Id*. at 607-08.  In order to do so, "the proponent of the privilege must demonstrate that the '*primary purpose*' of the communication was securing legal advice."  *United States v. Chevron Texaco Corp*., 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2001) (emphasis in original and added).[4]  Further, communications involving in-house counsel "warrant *heightened scrutiny*" because

---

[3]    The discretionary events at issue in the Waived Investor Communication Materials are: (1) Twitter's November 12, 2014 "Analyst Day"; (2) Twitter's earnings calls and releases for the fourth quarter of 2014 ("Q4 2014") and the first two quarters of 2015 ("Q1 2015" and "Q2 2015"); and (3) a February 11, 2015 Goldman Sachs Technology Conference.

[4]    *See also MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 4:11-cv-05341 YGR (JSC), 2013 U.S. Dist. LEXIS 147032, at *7 (N.D. Cal. Oct. 10, 2013) ("the attorney-client privilege does *not* protect business communications and advice"); *Visa U.S.A., Inc. v. First Data Corp.*, No. C-02-1786 JSW (EMC), 2004 U.S. Dist. LEXIS 17117, at *32 (N.D. Cal. Aug. 23, 2004) (no privilege for documents with "a clear, readily separable business purpose," *even where* such documents "may have been submitted to . . . counsel for review"); *United States v. Chevron Corp.*, No. C 94-1885 SBA, 1996 U.S. Dist. LEXIS 8646, at *6 (N.D. Cal. May 30, 1996) (no privilege for documents "prepared for simultaneous review by both legal and nonlegal personnel").

"[i]n-house counsel may act as integral players in a company's business decisions or activities." *Oracle Am., Inc. v. Google, Inc.*, No. C-10-03561-WHA (DMR), 2011 U.S. Dist. LEXIS 96121, at *17-*18 (N.D. Cal. Aug. 26, 2011) (compelling discovery of emails and drafts). Moreover, "***any*** voluntary disclosure of information to a third party waives the attorney-client privilege." *Ruehle*, 583 F.3d at 612 (emphasis in original).

### B. The Waived Investor Communication Materials Were Not Created for the Primary Purpose of Obtaining or Providing Legal Advice

***None*** of the 64 Waived Investor Communication Materials were authored by or sent to an attorney who was not merely cc'd or included as part of a large group of non-lawyers.  Instead, these materials were created by Twitter's investor relations ("IR") department and only sent to Twitter's in-house counsel, ***if at all***, later.  For example, defendants' documents confirm that Twitter's IR department or third-party consultants created the Q2 2015 earnings call and press release materials with little or no involvement from Twitter's counsel.  *See, e.g.*, Ex. 2 at TWTR_SHEN_00342462 (email from Twitter's Senior IR Director to public relations ("PR") consultant Sard Verbinnen ("Sard") asking Sard to "take the very first stab using the high level structure Anthony [Noto] laid out on the call today"); Ex. 3 (meeting invite for "Review v1 of earning script" involving no lawyers).  And according to the Log, the first legal edits to Twitter's Q2 2015 earnings materials were submitted to IR on July 17, 2015; yet defendants have withheld ***more than 60 related communications*** that predate July 17, 2015, ten of which are at issue in this dispute.  *See* Ex. 1, Entry Nos. 2222-24, 4934-36, 5202-03, 5226, 5229.[5]

---

[5]   Likewise for the Q1 2015 earnings materials, where no legal edits were submitted until April 16, 2015; yet defendants have withheld more than ***80 related communications*** predating that review, 16 at issue here.  *See* Ex. 1, Entry Nos. 1201-08, 3003-10.  And documents produced by defendants confirm that the Q1 2015 earnings materials were created by Twitter's IR department or third-party consultants, with little or no involvement from Twitter's counsel.  *See, e.g.*, Ex. 4.

Accordingly, these business materials are not protected by the attorney-client privilege because they were **not** created for "the '**primary purpose**' of . . . securing legal advice." *Chevron Texaco*, 241 F. Supp. 2d at 1076.[6]   That the few communications involving attorneys were sent **simultaneously** to non-legal staff for substantive comments confirms this.  *See, e.g.*, Ex. 1, Entry No. 1234; *see also Chevron*, 1996 U.S. Dist. LEXIS 8646, at *6 (no privilege for documents "prepared for simultaneous review by both legal and non-legal personnel").[7]   Moreover, defendants present no evidence establishing that these disputed communications are privileged. *See Sony Computer Entm't Am., Inc. v. Great Am. Ins. Co.*, 229 F.R.D. 632, 634 (N.D. Cal. 2005).

Defendants' argument that its in-house counsel reviewed these business communications fails the primary purpose test and has been rejected soundly by this Court.  *See Visa U.S.A.*, 2004 U.S. Dist. LEXIS 17117, at *25-*26 (noting that "[a]t best, attorney involvement and the anticipation of attorney review for legal significance renders the drafts dual purpose documents" and finding drafts not privileged because it is "implausib[le]" that such dual purpose documents could have "an exclusive legal purpose"); *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1127 (N.D. Cal. 2003) (no privilege for "'legal advice  . . . "merely incidental to business advice"'").

---

And the same can be said for the preparation of similar materials in connection with the other key investor events at issue here.  *See, e.g.*, Ex. 5.

[6]   *See also Visa U.S.A.*, 2004 U.S. Dist. LEXIS 17117, at *32 (no privilege for documents with "a clear, readily separable business purpose," **even where** such documents "may have been submitted to . . . counsel for review").

[7]   *Accord Astiana v. Ben & Jerry's Homemade, Inc.*, No. C-10-04387 PJH (EDL), 2014 U.S. Dist. LEXIS 23195, at *18-*19 (N.D. Cal. Feb. 21, 2014) (no privilege when in-house counsel "is among a large group of people copied on the e-mails"); *In re CV Therapeutics, Inc. Sec. Litig.*, No. C-03-3709 SI (EMC), 2006 U.S. Dist. LEXIS 102112, at *9 (N.D. Cal. Aug. 30, 2006) (no attorney-client privilege for documents involving "an obvious substantive need for comments by nonattorneys"); *see also, e.g.*, Ex. 6 (demonstrating the need for substantive review from non-lawyers in connection with Q1 2015 earnings materials).

Defendants' reliance on out-of-circuit cases concerning mandatory SEC disclosures, such as Forms 10-K, is misplaced as this dispute concerns only ***discretionary*** investor communications. Moreover, business-related documents are not privileged merely because they consider "the legislative and regulatory environment" in which a business operates. *See Astiana*, 2014 U.S. Dist. LEXIS 23195, at *7, *17 (such considerations are not legal advice even "if the Legal Department may have to sign off at some point in the future" or if "there are legal implications to a decision").[8]

Because the only attorneys involved in the Waived Investor Communication Materials were Twitter's in-house counsel, defendants' privilege claims "warrant ***heightened scrutiny***." *Oracle*, 2011 U.S. Dist. LEXIS 96121, at *17.[9] But, as detailed above, defendants' privilege assertions over these primarily business-related materials do not withstand ***any*** degree of scrutiny, let alone heightened scrutiny.

**C.      Any Purported Privilege Was Waived by Defendants' Disclosure of the Waived Investor Communication Materials to Third Parties**

Even if defendants could establish that the primary purpose of the Waived Investor Communication Materials was to secure legal advice, any purported attorney-client privilege was waived by defendants' disclosure of the underlying communications to third-party consultants Sard, Goldman Sachs ("Goldman") and Joele Frank ("JF"), none of whom was a "functional employee" retained for the purpose of securing legal advice. *See, e.g.*, *MediaTek*, 2013 U.S. Dist.

---

[8]    *See also ChevronTexaco*, 241 F. Supp. 2d at 1076, 1078 (no privilege for factual information, even if "rooted virtually entirely in the law"); *In re Micropro Sec. Litig.*, No. C-85-7428 EFL (JSB), 1988 WL 109973, at *2 (N.D. Cal. Feb. 26, 1988) (compiling "business data for disclosure in order to comply with the requirements of the federal securities laws" demonstrates a business and not legal purpose).

[9]    Defendants' improper assertions of privilege over clearly unprivileged communications also warrants heightened scrutiny. *See, e.g.*, Ex. 7 (attaching redacted and unredacted versions of the same communication, both produced by defendants, confirming that the information redacted at TWTR_SHEN_00341776 is clearly not privileged).

LEXIS 147032, at *12 ("What is vital to the privilege is that the consultant was retained '***for the***

***purpose of obtaining legal advice***.'"); *Chevron Texaco*, 241 F. Supp. 2d at 1072 (a consultant's

advice must be "necessary" to effectuate legal advice).

46 of the Waived Investor Communication Materials are communications disclosed to

third-party consultant Sard.[10]  Twitter retained Sard "to provide public relations advice for the

Company," not to secure legal advice.[11]  Produced documents confirm that Sard communicated

almost exclusively with defendants' IR staff, not its in-house counsel, primarily sending IR non-

legal edits to scripts and Q&A documents. *See, e.g.*, Ex. 9.[12]  Similarly, 9 of the materials concern

communications disclosed to Goldman, and 9 of them concern communications disclosed to JF.[13]

Like Sard, neither Goldman nor JF were retained to facilitate legal advice.  *See, e.g.*, Ex. 10

---

[10]  *See* Ex. 1, Entry Nos. 1201-08, 1227-29, 1231, 1234-44, 2222-24, 3003-10, 4934-36, 4939-41, 4958-61, 5202-03, 5215-16, 5226, 5229-34, 5239, 6020, 6475.

[11]  August 7, 2018 letter from Alexis Coll-Very; *see also* Ex. 8 (letter showing Sard was hired "as communications consultant" to "[p]rovide public and investor relations advice").  That Twitter's General Counsel signed the engagement letter is irrelevant and does ***not***, as defendants contend, "show[] that Sard was retained by and acting at the direction of Twitter's counsel."

[12]  Sard's role of providing routine PR advice in the absence of pending litigation or regulatory action does not satisfy the standard for a functional employee.  *See Memry Corp. v. Ky. Oil Tech., N.V.*, No. C04-03843 RMW (HRL), 2007 WL 39373, at *3 (N.D. Cal. Jan. 4, 2007) (consultant gathered information for ongoing lawsuit); *see also United States v. Graf*, 610 F.3d 1148, 1159 (9th Cir. 2010) (consultant founded the company and was only a non-employee because he was prohibited from performing insurance work in California, represented it at meetings, managed company employees, and was its "primary agent"); *McCaugherty v. Siffermann*, 132 F.R.D. 234, 239 (N.D. Cal. 1990) (consultants possessed specialized expertise about the legal and regulatory environment in which the corporation was attempting a one-off sale of assets); *Schaeffer v. Gregory Vill. Partners, L.P.*, 78 F. Supp. 3d 1198, 1204 (N.D. Cal. 2015) (Tigar, J.) (consultants hired to interact with potential victims of the company's chemical spill (who became opponents in the litigation), to represent the company before an administrative board, and to find facts for the defendants' legal staff about the spill that were "necessary to evaluate legal strategy"); *Fine v. ESPN, Inc.*, No. 5:12-CV-0836 (LEK/DEP), 2015 WL 3447690 at *10-*11 (N.D.N.Y. May 28, 2015) (communications disclosed to Sard "did not relate to the provision of legal advice" and "were not entitled to protection from disclosure under the attorney-client privilege").

[13]  *See* Ex. 1, Entry Nos. 5115-16, 5780, 5817-18, 6308, 6367-69, 6470-72 (disclosures to Goldman); *id.*, Entry Nos. 5781-83, 5817-18, 6287-92, 6370-72, 6388-89 (disclosures to JF).

(meeting invites for "script review" with Goldman and JF involving no lawyers); Ex. 11 (emails with script edits from Goldman and JF showing no legal purpose).[14]

Because Sard, Goldman and JF were not retained to facilitate legal advice, any purported privilege for the Waived Investor Communication Materials was waived by defendants' disclosure to these third parties.  *See United States v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011); *see also Samuels v. Mitchell*, 155 F.R.D. 195, 199 (N.D. Cal. 1994) (privilege waived where disclosure was not to obtain "assistance in rendering legal advice"); *Chevron Texaco*, 241 F. Supp. 2d at 1078 (no privilege for communications with Goldman).[15]

### D.    Requested Relief

Plaintiffs respectfully ask the Court to compel defendants to produce the 64 documents identified on Ex. 1.  Moreover, given the significance of this issue, plaintiffs respectfully request the opportunity to present oral argument on this dispute.  Lastly, if the Court believes it would be helpful, plaintiffs offer to select ten representative documents from Ex. 1 for the Court to review *in camera* in order to aid the Court's analysis.

---

[14]   Defendants' claims that GS worked with "attorneys from Wilson Sonsini" on shareholder activism and JF provided advice about SEC disclosures are irrelevant, as none of those documents are at issue in this dispute.

[15]   *Accord United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (Friendly, J.) ("if the advice sought is the accountant's rather than the lawyer's, no privilege exists"); *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 54 (S.D.N.Y. 2000) (communications "simply providing ordinary public relations advice" not privileged even if such advice might help a company formulate a legal strategy).

**Defendants' Position**

Plaintiffs challenge Defendants withholding or redacting 64 attorney-client privileged documents (the "Challenged Documents").[16]  While the Challenged Documents defy sweeping categorization, they are mostly either (i) ***drafts*** of earnings-related documents containing, among other things, partial and/or non-final disclosures and figures about Twitter's business, or (ii) ***internal*** discussions among Twitter employees and, at times, its retained consultants, regarding those same disclosures.  These disclosures are the types of public communications that require detailed analysis and vetting by Twitter's in-house lawyers to ensure compliance with applicable disclosure regulations.[17]  Twitter lawyers are copied on the emails transmitting and/or discussing 29 Challenged Documents, which are squarely privileged.  For the remainder, the withheld draft documents were created at counsel's instruction, reflect legal advice, embody the request for legal advice, and/or were prepared for the purpose of seeking counsel's legal advice.  Such Challenged Documents are attorney-client privileged under applicable law, and Plaintiffs' arguments to the contrary are meritless.

### A.   Scope of Attorney-Client Privilege

As an initial matter, Plaintiffs advance an improperly narrow interpretation of the attorney-client privilege.  The privilege not only "extends both to the substance of a client's communication

---

[16] Defendants respectfully submit that this dispute is premature.  Plaintiffs served Defendants with an updated list of 84 challenged documents and declared impasse on the same day.  Defendants have since agreed to produce 19 withheld documents.  In producing these documents Defendants do not "concede[]" that they, or any other document, were "improperly withheld."  Defendants produced those documents to narrow the dispute in question and without admitting that they are not privileged, and without waiving the privilege as to any other documents.

[17] This includes SEC disclosure rules regarding the contents of quarterly and annual reports filed on forms 10-Q and 10-K, as well as Regulation FD (17 C.F.R. § 243.100 *et seq.*), Regulation G (17 C.F.R. § 244.100 *et seq.*), and Item 2.02 of Form 8-K, which regulate earnings disclosures.

as well as the attorney's advice in response thereto," but "also extends to those papers prepared by an attorney or at an attorney's request for the purpose of advising a client, provided the papers are based on and would tend to reveal the client's confidential communications." *Polaris Innovations Ltd. v. Kingston Tech. Co.*, 2017 WL 8220457, at *3 (C.D. Cal. Jun. 16, 2017)*.* The privilege further protects communications made within a corporation where they are made to secure legal advice, whether or not the communications directly involve attorneys. *Reinsdorf v. Skechers U.S.A., Inc.*, 2013 WL 12116416, at *4 (C.D. Cal. Sept. 9, 2013) ("Communications between non-attorneys within a corporation … may also be protected by the attorney-client privilege."); *Stevens v. CoreLogic, Inc.*, 2016 WL 397936, at *7 (S.D. Cal. Feb. 2, 2016) (privilege protects communications "necessary for a corporate client to collect information relevant to a legal problem from middle management or non-management personnel").

## B.  The Challenged Documents Are Plainly Privileged And Were Properly Withheld

The Challenged Documents were created for a primarily legal purpose, and the associated privilege log entries demonstrate that each Challenged Document: (i) reflects counsel's legal advice, (ii) was prepared at counsel's direction, (iii) reflects a non-attorney's intent to seek legal advice, and/or (iv) provides information to counsel to facilitate the rendering of legal advice.  All such communications and documents are attorney-client privileged. *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 322 F.R.D. 571, 583 (S.D. Cal. 2017) (privilege extends to sending lawyers information "to enable [the lawyer] to give sound and informed advice"); *see also Datel Holdings Ltd. v. Microsoft Corp*, 2011 WL 866993, at *5 (N.D. Cal. Mar. 11, 2011) (privilege attaches where employee discusses intent to seek legal advice).

More specifically, the Challenged Documents reflect Defendants' preparation and discussion of draft disclosures and other communications to the market about Twitter's financial

and non-financial metrics.  Twitter has a team of in-house attorneys whose function is to ensure compliance with the complex laws and regulations that govern these types of market disclosures. Not surprisingly, those in-house lawyers are frequently copied on communications between non-lawyers tasked with drafting those disclosures, to enable them to review those drafts for accuracy and compliance with applicable regulations.  As courts have recognized, such draft disclosures and related communications, reflect not only "extremely detailed financial, legal, and structural information" but also a "determination of what information should be disclosed for compliance", which is "a legal concern" that deserves attorney-client protection.  *Roth v. Aon Corp*, 254 F.R.D. 538, 541 (N.D. Ill. 2009) (denying motion to compel and finding that defendant's draft Form 10-K was protected by attorney-client privileged, as "[c]onsultation … as to language, and as to how best to legally comply with SEC regulations, for instance, are precisely the type of day-to-day guidance for which a corporation would likely rely on counsel"); *Smith v. Unilife Corp*., 2015 WL 667432, at *3-4 (E.D. Pa. Feb. 13, 2015) (draft disclosure documents protected by attorney-client privilege).[18]  The Challenged Documents merit the same protection.

### 1.  The Challenged Documents Were Created for a Primarily Legal Purpose

Plaintiffs argue that the Challenged Documents do not "primar[ily]" serve a "legal" purpose because the drafts in question were created outside Twitter's legal department and were circulated and discussed among non-lawyers and Twitter lawyers were not included or "merely cc'd" on the communications and purportedly did not expressly comment on particular drafts.  The determination whether a draft market disclosure and related communications are attorney-client

---

[18] Plaintiffs' attempt to distinguish the Challenged Documents as pertaining to "discretionary events" as opposed to "mandatory SEC disclosures" goes nowhere.  A corporation's earnings calls and releases are disclosures subject to "mandatory" regulations, *see supra* n.17, and can, like other SEC-required disclosures, lead to liability if materially false or misleading.

privileged cannot be reduced to formulaic tests based on what corporate department created the draft, what email field the lawyer appeared in when the draft was circulated, how many non-lawyers were on that email, or even whether or when the lawyer commented on the draft.  Indeed, a significant part of in-house counsel's job is reviewing drafts of business documents created by non-lawyers for potential legal risk to the corporation and reviewing business information generated by those non-lawyers to facilitate informed legal advice.  Courts routinely find that such communications and documents are privileged, even where non-lawyers are included on the communications for non-legal purposes.  *Phillips v. C.R. Bard, Inc.,* 290 F.R.D. 615, 629-30 (D. Nev. 2013) (extending privilege over communications send to both lawyers and non-lawyers for simultaneous review); *In re Bard IVC Filters Prod. Liab. Litig.*, 2016 WL 3970338, at *10 (D. Ariz. July 25, 2016) (privilege attached to communication seeking simultaneous legal and non-legal review given regulations applying to company).[19]  This is logical in the in-house context, where the corporation, as the client, often is in need of legal advice regarding the business activities of its non-legal employees.  *Rowe*, 96 F.3d at 1296 (principle that "attorney-client privilege will apply to confidential communications concerning legal matters made between a corporation and its house counsel … has been followed with virtual unanimity by American courts").

Plaintiffs' contention that the drafts related to the Challenged Documents are business documents is similarly irrelevant.  "The Ninth Circuit has rejected the notion that attorneys are not

---

[19] Plaintiffs are also mistaken that the privilege attaches only to documents with an "exclusive legal purpose;" indeed, Plaintiffs' own cases refute this assertion.  *See Visa U.S.A., Inc. v. First Data Corp*, 2004 WL 1878209, at *6 (N.D. Cal. Aug. 23, 2004); *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1127 (N.D. Cal. 2003) (legal advice may be implicated even where "nonlegal aspects of the consultation are integral to the legal assistance given").  Finally, Plaintiffs are wrong that in-house lawyers' communications "warrant heightened scrutiny".  *U.S. v. Rowe*, 96 F.3d 1, 1294, 1296 (9th Cir. 1996) ("[i]n determining the existence of a privilege, no attempt is made to distinguish between 'inside' and 'outside' counsel.") (quotations omitted).

acting as professional legal advisors when they are involved in business decision-making."
*Polaris*, 2017 WL 8220457, at *3 (privileged covered legal advice on business documents); *see also U.S. v. Chen*, 99 F.3d 1495, 1501-02 (9th Cir. 1996) (privilege applied because the "attorneys were employed for their legal knowledge, to bring their clients into compliance with the law", and "[t]hat the lawyers were involved in business decision-making … is irrelevant"); *FTC v. Qualcomm Inc.,* 2018 WL 2317835, at *4 (N.D. Cal. May 22, 2018) ("Privilege is not defeated merely because the client may in turn utilize that privileged legal advice to make real-world business decisions."). Here there is no question that Twitter in-house counsel—who perform legal functions and provide legal advice—were sent the draft disclosures and related discussions to keep them apprised of Twitter′s strategies to facilitate their legal advice. An order finding that the attorney-client privilege does not attach to the Challenged Documents because non-lawyers were copied and may have also been asked to comment on the disclosures would drastically strip the protections on which public corporations rely.[20] The privilege cannot be construed so narrowly.[21]

---

[20] A rule that the attorney-client privilege attaches only to those communications where no non-lawyers are copied, or where non-lawyers are copied but not for **any** business purpose, would ignore the reality of how corporate employees communicate, inject significant inefficiencies into the corporation's business and how its employees discuss matters, and chill attorney-client communications given the uncertainty around when the privilege attaches.

[21] Importantly, all but one of Plaintiffs' cases did not involve draft market disclosures and related communications, or the potential regulatory and legal risks around such public disclosures. *See, e.g.*, *Visa U.S.A.*, 2004 WL 1878209, at *2 (internal "Private Arrangement Analysis" that "summariz[ed] the risks to Visa from a large scale private arrangement"); *U.S. v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002) (internal emails and memos analyzing "tax consequences of a particular transaction"); *Astiana v. Ben & Jerry's Homemade, Inc.*, 201 U.S. Dist. LEXIS 23195, at *3-4 (internal email and memo about guidelines for labeling ingredients "natural" based on "food science"); *In re CV Therapeutics, Inc. Sec. Litig.*, No. C-03-3709 SI (EMC), 2006 U.S. Dist. LEXIS 102112, at *4 (N.D. Cal. Aug. 30, 2006) (documents "related to the FDA application process"); "). In *In re Micropro Sec. Litig.*, 1988 WL 109973, at *2 (N.D. Cal. Feb. 26, 1988), the Court held, after conducting an *in camera* review, that the challenged documents – drafts of public offering materials and communications reflecting edits to those drafts – were not privileged because they all "concern[ed] the addition or amendment of factual data

That some Challenged Documents were not directly sent by or to Twitter attorneys is also irrelevant. *See Brigham Young Univ. v. Pfizer, Inc.*, 2011 WL 2795892, at *3 (D. Utah July 14, 2011) (holding that protection extends to "documents where neither the creators, senders, nor the recipients are lawyers"); *Robinson v. Cty. of San Joaquin*, 2014 WL 5473049, at *7 (E.D. Cal. Oct. 28, 2014) (same). It is inevitable in a large corporation like Twitter that there are a number of individuals "who should properly be kept informed of communications to and from counsel on a particular subject matter." *In re Buspirone Antitrust Litig.*, 211 F.R.D. 249, 253 (S.D.N.Y. 2002). Thus, the privilege protects communications between non-attorneys within a corporation that were made for the purpose of obtaining, or relaying onward, particular legal advice, *see MGA Entm't, Inc. v. Nat'l Prod. Ltd.*, 2012 WL 3150532, at *4 (C.D. Cal. Aug, 2012) ("privileged communications may be shared by non-attorney employees in order to relay information requested by attorneys."); *see also Williams v. Sprint/United Mgmt. Co.*, 238 F.R.D. 633, 640 (D. Kan. 2006) (privilege attached to communications exclusively between human resources personnel); or gathering facts to facilitate informed legal advice; *see AT&T Corp. v. Microsoft Corp.*, 2003 WL 21212614, at *3 (N.D. Cal. Apr. 19, 2003) (extending privilege to communications containing information compiled by corporate employees and later communicated to counsel to obtain legal advice). Here, the 36 Challenged Documents sent solely to or from non-lawyers either reflect legal advice from counsel or were made in furtherance of that advice. For example, entries 3003, 3005-07, and 3009-10 were produced with one sentence redacted, which reflected the legal advice of Vijaya Gadde, the Company's Chief Legal Officer. *See* Pls.' Ex. 1, Entries 3003, 3005-07, 3009-

---

contained in the draft offering materials" and thus the attorneys were "essentially serving as a conduit for factual data, and … not acting primarily as lawyers." *Id.* at *2. That reasoning does not apply where, where Twitter in-house counsel were not compiling factual data, but being sent drafts and communications to provide their informed legal advice.

10.[22]  This underscores that the Challenged Documents reflect legal advice, and are privileged.

### C. Twitter's Consultants Did Not Break Attorney-Client Privilege

Plaintiffs' separate argument that Defendants waived attorney-client privilege by sharing documents with consultants Sard Verbinnen, Goldman Sachs, or Joele Frank is also meritless.  It is well-established that where a third-party agent or consultant is involved in, or facilitates, the provision of legal advice, the attorney-client privilege attaches.  *In re CV Therapeutics, Inc. Sec. Litig.*, 2006 WL 1699536, at *9 (N.D. Cal. June 16, 2006); *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 476-77 (E.D. Pa. 2005). Accordingly, documents created by or shared with a third party, such as a consultant or financial advisor, are protected where that third party serves as either an agent or a "functional equivalent" of an employee for the company.  *See In re Morning Song Bird Food Litig.*, 2015 WL 12791473, at *6 (S.D. Cal. July 17, 2015).

Here, each organization identified by Plaintiffs was retained by Twitter as a consultant to assist in the provision of legal advice, including as follows:

**Goldman**: Twitter retained Goldman to provide information on shareholder activity to assist counsel in rendering legal advice about shareholder activism and investor communications, including proxy solicitations and securities regulations.  A working group was established in which lawyers from Twitter (Sean Edgett, Vijaya Gadde), and Wilson Sonsini were key members.

**Joele Frank**: Twitter retained Joele Frank to provide investor monitoring and communications information that Twitter's in-house and outside counsel used in its provision of legal advice regarding investor relations, SEC disclosures, and shareholder activism.

---

[22] The cover email to these withheld documents clearly reflects that Ms. Gadde had reviewed and provided legal advice regarding the underlying draft document.  *See* Pls.' Ex. 1.

**Sard:** Twitter retained Sard to provide advice on its public-facing disclosures, including earnings releases and investor communications. Sard worked with a team of Twitter executives, including lawyers Sean Edgett and Vijaya Gadde, on these issues. Sard's engagement letter with Twitter (Pls.' Ex. 8) shows that it was retained by and acting at Twitter counsel's direction.

Communications with these third parties do not break the attorney-client privilege. *See Schaeffer v. Gregory Village Partners, LP*, 78 F.Supp.3d 1198, 1203-04 (N.D. Cal. 2015) (public relations consultant who developed talking points to use with government officials met functional equivalent test); *Smith v. Unilife Corp.*, 2015 WL 667432, *3-4 (communications between company and non-lawyer consultants regarding draft SEC Form 10-K reports privileged under the functional equivalent doctrine); *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213, 219-20 (S.D.N.Y. 2000) (applying functional equivalent doctrine to PR consultant); *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc*., 326 F.R.D. 176, 182-83 (N.D. Ill. 2018) (functional equivalent doctrine applied to financial advisor who commented on draft agreements).[23]

### D.  Resolving this Dispute

For the foregoing reasons, this Court should deny Plaintiffs' motion. Defendants respectfully submit that given the severe consequence of compelled production of privileged documents, the Court should review any document before ordering its production. Accordingly, if this Court is inclined to compel the production of any Challenged Document, Defendants request the opportunity to submit those documents for *in camera* review (along with any additional evidence this Court deems necessary to further substantiate Defendants' privilege assertion). Defendants do not consider oral argument to be necessary to resolve this limited-in-scope dispute.

---

[23] *Fine v. ESPN, Inc.*, cited by Plaintiffs, is distinguishable because Sard was not retained to advise on market disclosures.  2015 WL 3447690 (N.D.N.Y. 2015).

Respectfully submitted,


ROBBINS GELLER RUDMAN & DOWD LLP

*By:*          */s/ Nathan R. Lindell*
Nathan R. Lindell (Bar No. 248668)


SIMPSON THACHER & BARTLETT LLP

*By:*          */s/ Alexis Coll-Very*
Alexis Coll-Very (Bar No. 212735)

cc: All counsel (via ECF)