# EXHIBIT B

In re Twitter Inc. Securities Litigation

Videotaped Deposition of

WAYNE GUAY

August 28, 2019

***CONFIDENTIAL***



www.aptusCR.com / 866.999.8310

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5   In re TWITTER INC. SECURITIES LITIGATION

 6   This Document Relates To:

 7   ALL ACTIONS

 8

 9   Case No. 3:16-cv-05314-JST (SK)

10   ------------------------------------------------

11

12         ** CONFIDENTIAL ** CONFIDENTIAL **

13

14             VIDEOTAPED DEPOSITION OF

15                 WAYNE R. GUAY

16               New York, New York

17                August 28, 2019

18

19

20

21

22

23   REPORTED BY:

24   Eileen Mulvenna, CSR/RMR/CRR

25   Job No. 10059450
```

**Wayne Guay**                                    **In re Twitter Inc. Securities Litigation**

1          VIDEOTAPED DEPOSITION of WAYNE R. GUAY,

2     Expert Witness on behalf of defendants in the

3     above-captioned matter, held at the offices of

4     Simpson Thacher & Bartlett, 425 Lexington Avenue,

5     New York, New York, beginning at 8:38 a.m. and

6     ending at 3:04 p.m. on August 28, 2019, before

7     Eileen Mulvenna, CSR/RMR/CRR, Certified Shorthand

8     Reporter, Registered Merit Reporter, Certified

9     Realtime Reporter, and Notary Public of the State of

10    New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Confidential**

```
 1   A P P E A R A N C E S:

 2

 3   Lead Counsel for Plaintiffs in the Class:

 4

 5   Robbins, Geller, Rudman & Dowd, LLP

 6   655 West Broadway, Suite 1900

 7   San Diego, California 92101

 8   (619) 231-1058

 9   By: Susannah Conn, Esq.

10       sconn@rgrdlaw.com

11       Heather Schlesier, Esq.

12       hschlesier@rgrdldaw.com

13

14   -and-

15

16   Motley Rice LLC

17   28 Bridgeside Boulevard

18   Pleasant, South Carolina 29464

19   By:   Greg Levin, Esq.

20       glevin@motleyrice.com

21

22

23

24

25
```

```
 1   A P P E A R A N C E S (Continued):

 2

 3   Attorneys for the Defendants and the Witness:

 4

 5   Simpson Thacher & Bartlett LLP

 6   425 Lexington Avenue

 7   New York, New York   10017

 8   (212) 455-2000

 9   By:   Jonathan K. Youngwood, Esq.

10         jyoungwood@stblaw.com

11

12   Also Present:

13

14   Daniel Ortega, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

**Page 4**

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1                    I N D E X

 2    WITNESS          EXAMINATION BY           PAGE

 3
      WAYNE R. GUAY
 4

 5                      MS. CONN                  8

 6                 E X H I B I T S

 7                                             PAGE

 8

 9    Exhibit 2     (Henderson) Previously       8

10                  marked

11    Exhibit 1     (Henderson) Previously      73

12                  marked

13    Exhibit 102   (Dejelo) Previously marked  77

14    Exhibit 309   (Costolo) Previously marked 80

15    Exhibit 1     No Bates numbers, Academy   83

16                  of Management Article

17    Exhibit 419   Previously marked           86

18    Exhibit 308   (Costolo) Previously marked 128

19    Exhibit 299   (Costolo) Previously marked 161

20    Exhibit 2     No Bates numbers, Journal   168

21                  of Financial Economics

22                  Article

23    Exhibit 93    (Rivinus) Previously marked 174

24    (Continued)

25
```

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1                    E X H I B I T S

 2    Exhibit 3     No Bates numbers,            179

 3                  Deposition Transcript of

 4                  Richard Costolo taken on

 5                  March 25, 2019

 6    Exhibit 4     Bates Nos.                   186

 7                  TWTR_SHEN_00082867 through

 8                  TWTR_SHEN_00082869, E-mail

 9                  Chain

10    Exhibit 5     No Bates numbers, Journal    195

11                  of Financial Reporting

12                  Article

13    Exhibit 6     No Bates numbers, Order      207

14                  Granting In Part and

15                  Denying In Part Defendants'

16                  Motion to Dismiss

17

18

19

20

21

22

23

24

25
```

1          THE VIDEOGRAPHER:  We're now on the

2     record.

3          Today's date is August 28, 2019, and

4     the time is 8:38 a.m.

5          This is the video deposition of

6     Wayne R. Guay in the matter of In Re Twitter,

7     Inc. Securities Litigation for the United

8     States District Court, Northern District of

9     California, San Francisco Division.

10          This video deposition is being held at

11     425 Lexington Avenue, New York, New York.

12          My name is Daniel Ortega of Aptus

13     Court Reporting.  I'm the legal videographer.

14          Will counsel please identify

15     yourselves for the record.

16          MS. CONN:  Susannah Conn, Robbins

17     Geller Rudman & Dowd, on behalf of plaintiffs

18     in the class.

19          MS. SCHLESIER:  Heather Schlesier on

20     behalf of the plaintiffs in the case.

21          MR. LEVIN:  Gregg Levin, L-E-V-I-N,

22     from Motley Rice also on behalf of the

23     plaintiffs in the class.

24          MR. YOUNGWOOD:  Jonathan Youngwood for

25     the witness and the defendants.

```
 1              THE VIDEOGRAPHER:  The court reporter
 2         today is Eileen Mulvenna, who will now swear
 3         in the witness.
 4    WAYNE R. GUAY,
 5       having been duly sworn by Eileen Mulvenna,
 6       a Notary Public of the State of New York,
 7       was examined and testified as follows:
 8    EXAMINATION
 9    BY MS. CONN:
10         Q.    Good morning --
11               Is it professor?
12         A.    Professor is fine.
13         Q.    -- professor.
14               And your last name is pronounced Guay?
15         A.    Guay, that's correct.
16         Q.    Good morning, Professor Guay.  Thank
17    you for being here this morning.  We were introduced
18    off the record, but, again, I'm Susannah Conn, and
19    I'm here on behalf of plaintiffs in this matter.
20               I'm going to hand you what's already
21    been marked as Henderson Exhibit 2 just so you have
22    it handy because, as you can imagine, we'll be
23    talking about this quite a bit this morning.
24         A.    Okay.
25               (Exhibit 2, Previously marked.)
```

Confidential

1    BY MS. CONN:

2         Q.    Before we get started, how many times

3    have you been deposed before?

4         A.    I don't know exactly.

5         Q.    More than once?

6         A.    Yes, more than once.

7         Q.    Are you familiar with the basic rules

8    of a deposition?

9         A.    Yes.

10        Q.    Okay.  So I'll forego those.  I'm sure

11   you've discussed them with your counsel.

12              I'll just remind you that you are

13   under oath, and that oath that you just swore is the

14   same oath that you would take if you were testifying

15   in a court of law.

16              Do you understand that?

17        A.    Yes.

18        Q.    Okay.  If you don't understand my

19   question, please let me know and I'll try to

20   rephrase it.

21        A.    Okay.

22        Q.    And if you need a break at any time,

23   let me know.

24        A.    Okay.

25        Q.    Is there any reason you cannot testify

1    fully and accurately today?

2           A.    No.

3           Q.    So you have in front of you Exhibit

4    Henderson 2.

5                 Is this the report that you prepared

6    in this case?

7           A.    Yes, it is.

8           Q.    Is there anything that you would like

9    to change or amend in your report before we start

10   discussing it?

11          A.    No.

12          Q.    So if I could have you turn to

13   paragraphs 1 and 2 of Henderson 2, your expert

14   report.

15          A.    Okay.

16          Q.    Are these paragraphs an accurate

17   description of your educational and professional

18   experience?

19          A.    Yes.

20          Q.    And Appendix A to your report is a

21   copy of your curriculum vitae; is that correct?

22          A.    Yes, that's correct.

23          Q.    Is this current?

24          A.    It's quite current, yes, certainly

25   within the last six months.

1      Q.      Okay.  So as far as you know, nothing

2   needs to be changed or updated in your curriculum

3   vitae?

4      A.      Nothing of any significance.

5      Q.      Okay.  So you are currently teaching

6   at the Wharton School of Business; is that correct?

7      A.      That's correct.

8      Q.      And you have a Ph.D. in accounting

9   from the University of Rochester?

10      A.      I do.

11      Q.      And also a master of science in

12   business administration from the same school; is

13   that correct?

14      A.      Correct.

15      Q.      I'd like to ask you about -- on the

16   last page here of your CV, you have -- under "Other

17   Professional Experience," you have a consulting

18   practice.

19      A.      Uh-huh.

20      Q.      Can you describe what that practice

21   is.

22      A.      Yes.  That practice would include work

23   like I've done in this matter, so expert testimony

24   in litigation matters, but it would also include

25   other projects I've worked on where I've consulted

**Confidential**

1  directly for corporations or been asked to do

2  certain types of research for corporations or for

3  organizations that they might like done.

4          **Q.     And when you've consulted directly for**

5  **corporations, has that involved advising**

6  **corporations on their Rule 10b5-1 plans?**

7          A.     Certainly executive -- certainly

8  advising on executive compensation matters generally

9  and corporate governance matters generally, but I

10 can't recall whether there would have been 10b5-1

11 issues there as well.

12         **Q.     You haven't been asked by any**

13 **corporation to help them structure their 10b5-1**

14 **plans?**

15         A.     No.

16         **Q.     Okay.  Are you an attorney, sir?**

17         A.     I am not.

18         **Q.     Do you have any legal training?**

19                MR. YOUNGWOOD:  Objection to form.

20                THE WITNESS:  No formal legal

21         training, no.

22 BY MS. CONN:

23         **Q.     Do you have informal legal training?**

24         A.     Well, I took some classes as an MBA

25 student in undergrad on law issues, but nothing

 1    beyond that.

 2          Q.      Okay.  And that was at the University

 3    of Rochester?

 4          A.      That would have been probably earlier

 5    than that.  It would have been in -- at either

 6    Northeastern University or even Clarkson University.

 7          Q.      Okay.  And -- but nothing since then?

 8          A.      No.

 9          Q.      Do you hold yourself out to be an

10    expert in the disclosures that are required by the

11    federal securities laws?

12                  MR. YOUNGWOOD:  Objection to form.

13                  THE WITNESS:  I'm not sure exactly

14          what you mean by that question.

15    BY MS. CONN:

16          Q.      Okay.  Do you consider yourself an

17    expert in federal securities matters?

18          A.      No.

19                  MR. YOUNGWOOD:  Objection to form.

20    BY MS. CONN:

21          Q.      Are you familiar with the term

22    "scienter"?

23          A.      Yes.

24          Q.      Do you understand what -- withdraw

25    that.

1          What do you understand the term

2     "scienter" to mean?

3          A.    I understand it broadly, from a

4     layperson's perspective, to mean motivations or

5     incentives to engage in certain types of behavior.

6          Q.    Do you know what the legal definition

7     of "scienter" is as that term is used in federal

8     securities cases?

9          A.    I do not.

10          Q.    Have you read any legal cases that

11     define "scienter" as that term is used in the

12     federal securities law?

13          A.    I probably have through these kinds of

14     litigation matters, but I can't recall specifically.

15          Q.    Have you -- have you read any jury

16     instructions that define "scienter" as that term is

17     used in the federal securities laws?

18          A.    Not that I recall.

19          Q.    If we could go back to your consulting

20     work, you said that consists of expert testimony in

21     matters such as this; is that right?

22          A.    That's correct.

23          Q.    How many times have you served as an

24     expert witness in a federal securities case?

25          A.    That I wouldn't be able to say

**Confidential**

 1  specifically, which jurisdiction my cases were in.

 2          Q.      Okay.  How many times have you served

 3  as an expert witness?

 4          A.      By --

 5              MR. YOUNGWOOD:  Objection to form.

 6              Are you asking him if we have some

 7      other deposition -- like report and testimony

 8      or -- because you're not asking about

 9      consulting, I'm assuming.  If we would just

10      define what you're asking.

11              MS. CONN:  Sure.  I think -- I think I

12      can ask how many times he's been retained as

13      an expert without encroaching on work product

14      so --

15              MR. YOUNGWOOD:  I'm fine with that if

16      he can separate it.  I'm also just trying

17      to --

18              MS. CONN:  Okay.

19              MR. YOUNGWOOD:  -- make sure he knows

20      how to answer the question.

21              MS. CONN:  Okay.

22              THE WITNESS:  So the question is?

23  BY MS. CONN:

24          Q.      How many times have you been retained

25  as an expert in a lawsuit?

**Confidential**

1       A.      I don't know precisely, but it would

2   be probably at least 25 or 30.

3       **Q.      Of those 25 to 30, you don't know how**

4   **many were securities cases; is that correct?**

5       A.      So class action lawsuits, is that what

6   you're asking, or something broader than that?

7       **Q.      Something arising under the federal**

8   **securities laws.**

9       A.      I wouldn't know the precise number,

10  no.

11      **Q.      What percentage of your income comes**

12  **from your consulting work?**

13              MR. YOUNGWOOD:  Objection to form.

14          It's vague as to time and -- objection to

15          form.

16              THE WITNESS:  Recently or over time

17          or --

18  BY MS. CONN:

19      **Q.      Let's say in the last five years.**

20      A.      Certainly varies from year to year

21  depending upon what I'm doing, but I would say maybe

22  a third, on average.

23      **Q.      How about this year?**

24      A.      This year's not over yet.  I've done a

25  bit more this year than I have in past years, so it

1    would be probably somewhat higher than that, maybe

2    40 percent or something this year.

3         Q.    Of the 25 to 30 times that you have

4    been retained as an expert in a lawsuit, how many

5    times were you retained by defendants?

6         A.    I don't know the precise number.

7         Q.    How many times have you been retained

8    by the Cooley law firm?

9         A.    By the --

10        Q.    Cooley.

11        A.    That I couldn't tell you.

12        Q.    How many times have you been retained

13   by Simpson Thacher?

14        A.    Couldn't tell you that either.

15        Q.    Have you ever worked with

16   Mr. Youngwood before?

17        A.    I have not.

18        Q.    Have you ever worked for Twitter

19   before?

20        A.    I have not.

21        Q.    Has your testimony ever been excluded

22   by any court that you're aware of?

23        A.    No.

24        Q.    Have you been retained in other

25   matters to opine on executives' insider trading?

```
 1          A.      Yes.

 2          Q.      How many times?

 3          A.      I don't know the precise number.

 4          Q.      Okay.  Let's take a look at Exhibit B

 5   to your report.

 6          A.      Exhibit B?

 7          Q.      I'm sorry.  Appendix B.

 8          A.      Appendix B.  Okay.

 9          Q.      This is a list of your expert

10   retentions and testimony within the last four years;

11   is that right?

12          A.      It is, yes.  I believe that's correct.

13          Q.      So let's just go through this.

14                  The Smilovits versus First Solar

15   matter --

16          A.      Okay.

17          Q.      -- did you offer an opinion about

18   executives' insider trading in that matter?

19          A.      Yes.

20          Q.      And were you testifying -- sorry.

21                  Were you offering an opinion on behalf

22   of defendants or plaintiffs?

23          A.      The defendants.

24          Q.      And was your opinion in that matter

25   that the executives' insider trading did not support
```

1   an inference of scienter?

2              MR. YOUNGWOOD:  Let me just -- I don't

3          want you to answer -- I don't know the exact

4          nature of these cases.  I don't know if there

5          are protective orders in place.  I think so

6          far counsel's questions have been at quite a

7          high level, but if you need to talk to me or

8          if you have a concern that you are

9          encroaching on a protective order or

10          confidentiality agreement, we don't -- no

11          one's asking you to do that.

12              THE WITNESS:  Okay.

13              MR. YOUNGWOOD:  But if you can answer

14          without doing that, go ahead.

15              THE WITNESS:  So certainly all of

16          these cases would be covered by

17          confidentiality agreements, and I'm not

18          sure -- I guess I'm generally comfortable

19          talking about some of the issues at a high

20          level, but the opinions I've -- specific

21          opinions I've rendered, I'm not comfortable

22          with that.

23   BY MS. CONN:

24          Q.    All right.  Let me ask you this:  This

25   is a summary of your expert retentions and

**Confidential**

1    testimony; correct?  That's what the title of the

2    document is.

3              A.     It is, yes.

4              Q.     So in each of these cases, did you

5    prepare an expert report?

6              A.     Okay.  Let's see.  Yes.

7              Q.     And to the best of your knowledge, was

8    that expert report provided to the opposing side in

9    those cases?

10             A.     Yes.

11                    MS. CONN:  So, Counsel, if a report

12             was exchanged, I don't think that we are --

13                    MR. YOUNGWOOD:  I think you can ask

14             him which side he worked for.  I don't have a

15             problem -- I didn't say it right.

16                    Which side he was associated with, I

17             don't have a problem with that.  I think

18             where I got a little uncomfortable -- but I

19             don't know the nature of the opinions or the

20             reports -- if you're asking him the substance

21             of the opinion he gave, that I think would be

22             covered by --

23                    MS. CONN:  I see.

24                    MR. YOUNGWOOD:  In this case, I think

25             it would be covered by a protective order.

```
 1              So I'm assuming it might be in those.  But if

 2         you want to say which side retained him or

 3         whatever --

 4              MS. CONN:  Okay.

 5              MR. YOUNGWOOD:  -- I have no -- I

 6         would think your protective order wouldn't

 7         preclude that.

 8              MS. CONN:  Okay.

 9    BY MS. CONN:

10         Q.    Well, then, let's just take the next

11    one, the Goldenberg and Sullivan versus Immunomedics

12    matter.

13         A.    Okay.

14         Q.    Did that opinion relate to executives'

15    insider trading?

16         A.    Insider trading -- certainly executive

17    compensation and stock grants and things like that,

18    but I don't know if there was insider trading issues

19    there.

20         Q.    Were you retained in that matter by

21    defendants or plaintiffs?

22         A.    The plaintiffs.

23         Q.    Did you testify in court --

24         A.    I testified --

25         Q.    -- in that matter?
```

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1          A.      -- in an arbitration.

 2          Q.      Were you deposed in that matter?

 3          A.      I don't believe there was a

 4   deposition.  I think it went right to the

 5   arbitration.

 6          Q.      Okay.  The next one on the list is

 7   In Re:  Think Finance LLC.

 8          A.      Uh-huh.

 9          Q.      Were you retained by defendants or

10   plaintiffs in that matter?

11          A.      That would have been the defendants.

12          Q.      Did your opinions -- did your opinions

13   in that matter relate to insider trading?

14          A.      No.

15          Q.      Were you deposed in that matter?

16          A.      Yes.

17          Q.      Did you testify at trial in that

18   matter?

19          A.      No.

20          Q.      The next one on the list is

21   Commonwealth of Pennsylvania versus Think Finance.

22          A.      Yes.

23          Q.      Were you -- well, is that related to

24   the one above it?

25          A.      Yes, it's the same matter.
```

Page 22

1       Q.      Okay.  So you were retained by

2    defendants in that matter; is that right?

3       A.      Yes.

4       Q.      And that opinion did not relate to

5    insider trading; is that correct?

6       A.      Correct.

7       Q.      The next one on the list is In Re:

8    ExamWorks Group?

9       A.      Uh-huh.  Yes.

10      Q.      Were you retained by defendants or

11   plaintiffs in that matter?

12      A.      That would have been the defendants.

13      Q.      And did that opinion relate to insider

14   trading?

15      A.      Related to executive compensation and

16   stock-related issues, but I don't recall there being

17   an insider trading issue there.

18      Q.      The next one on the list is Hussein

19   versus Quality Systems?

20      A.      Yes.

21      Q.      Were you retained by defendants or

22   plaintiffs in that matter?

23      A.      That one's a little tricky because I

24   started out being retained by the defendants, but by

25   the time we got to court, we were the plaintiffs.

1    So there were countersuits.  So I think the suits on

2    my side got thrown out and then there were

3    countersuits, so we ended up going in as a

4    plaintiff.

5         Q.    I see.

6               And did that matter -- did your

7    opinion in that matter relate to insider trading?

8         A.    Yes.

9         Q.    And then you have Snowden versus

10   UnitedHealth?

11        A.    Correct.

12        Q.    Were you retained by defendants or

13   plaintiffs in that matter?

14        A.    Defense.

15        Q.    Did the -- did your opinion in that

16   matter relate to insider trading?

17        A.    No.

18        Q.    Were you deposed in that matter?

19        A.    I was.

20        Q.    Did you testify at trial in that

21   matter?

22        A.    I testified at an arbitration.

23        Q.    How about Quality Systems; were you

24   deposed in that matter?

25        A.    Yes, I was.

Wayne Guay                          In re Twitter Inc. Securities Litigation

1      Q.      Did you testify at trial in that

2   matter?

3      A.      I did, yes.

4      Q.      Was it a jury trial?  Do you know?

5      A.      It was not.  Is that right?  No, I

6   don't believe it was.

7      Q.      I don't know if we went through this

8   because we sort of got into a conversation with

9   counsel.

10             In First Solar, did your opinion

11   relate to insider trading?

12     A.      It did, yes.

13     Q.      So at least insofar as we've been able

14   to discuss it from the cases on this list, the cases

15   in which your opinion related to insider trading you

16   were retained by defendants; is that correct?

17     A.      Well, for the First Solar case, that

18   is correct.  For the Quality Systems case, as we

19   talked about, when I testified at -- in court, my

20   recollection is we were the plaintiffs.

21     Q.      You were retained in that matter by

22   Quality Systems; is that correct?

23     A.      By Quality Systems, that's correct.

24     Q.      Okay.  Have you ever been retained by

25   a plaintiff to offer an opinion as to insider

Wayne Guay                                  In re Twitter Inc. Securities Litigation

```
 1   trading?

 2              MR. YOUNGWOOD:  Objection to form.

 3              THE WITNESS:  Yes, so we have

 4         discussed the Quality Systems case.  I mean,

 5         in that case we were the plaintiffs.  And,

 6         yes -- I can't recall exactly how many, but,

 7         yes, I have been retained by the plaintiffs

 8         in insider trading cases or in at least

 9         trading/executive compensation-related

10         matters.

11   BY MS. CONN:

12         Q.     Have you ever offered an opinion that

13   an executive's trading supported an inference of

14   scienter?

15              MR. YOUNGWOOD:  Objection to form.

16              THE WITNESS:  I can't recall using

17         those specific words or giving that specific

18         opinion, but, broadly, yes.

19   BY MS. CONN:

20         Q.     And when you say "broadly, yes," can

21   you explain what you mean.

22         A.     Simply broadly that the executive's

23   trading was -- I guess my opinion was inconsistent

24   with, you know, say, behavior that would be

25   consistent with corporate policies and things like
```

Page 26

**Confidential**

1    that.

2         **Q.     When were you retained in this case?**

3         A.     I believe I was retained in late June

4    or early July, shortly after I think Professor

5    Henderson filed his report.

6         **Q.     Do you know how your retention came**

7    **about?**

8              MR. YOUNGWOOD:  Objection to form.

9              THE WITNESS:  Yes.

10   BY MS. CONN:

11        **Q.     And how did your retention come about?**

12        A.     I was contacted by Analysis Group,

13   which is a litigation support firm.  And they

14   indicated, as I recall, that they had had

15   conversations with -- with the law firm that was

16   defending Twitter.  And then I had conversations

17   with them.

18        **Q.     Since the time you submitted your**

19   **report and Appendix B, have you prepared a report or**

20   **testified in any other case?**

21        A.     Say that again.  I'm sorry.

22        **Q.     We've talked about Appendix B, the**

23   **cases --**

24        A.     Yes.

25        **Q.     -- in which you've testified in the**

1    last four years.

2              Since you submitted this report on

3    August 7th, have you prepared a report or testified

4    in any other case?

5         A.    I have prepared -- I have prepared

6    other reports -- I have prepared at least one other

7    report, but I haven't given any testimony.

8         Q.    What case was that that you prepared a

9    report in?

10        A.    That was a case involving Apple.  I

11   don't remember the precise name of the case.

12        Q.    Is it a securities case?

13        A.    It is a securities case.

14        Q.    Does your opinion relate to insider

15   trading in that case?

16        A.    No, not that I recall.

17        Q.    Were you retained by defendants or

18   plaintiffs in that matter?

19        A.    Defendants.

20        Q.    When did you submit that report?

21        A.    That would have been sometime in

22   August, maybe.

23        Q.    Have you been deposed in that matter?

24        A.    I have not.

25        Q.    Do you own any Twitter stock today?

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1           A.      I do not.

 2           Q.      Have you ever owned Twitter stock?

 3           A.      No.   Certainly indirectly through

 4    mutual funds and things, but not directly.

 5           Q.      If you would turn to the next page,

 6    which is Appendix C to your report.

 7           A.      Okay.

 8           Q.      This appendix is titled, "Materials

 9    Considered," and it's a nine-page list of pleadings,

10    academic articles, public information, and documents

11    produced in the litigation; correct?

12           A.      Yes, lots of different things here.

13           Q.      Did you read all of the materials that

14    are on this list?

15           A.      I read many of them, I would say most

16    of them, but not each and every one.

17           Q.      Do you know which ones you did read

18    and which ones you didn't read?

19           A.      Not specifically.   I mean, the ones --

20    a number of the ones that I wouldn't have read in

21    detail would have been some of the SEC filings,

22    which are more for data collection purposes and

23    somewhat repetitive in terms of what they do.

24           Q.      Did you review all of the documents

25    identified as Bates stamped documents?
```

1      A.      I wouldn't be able to say for sure.

2    There's a lot here and there's not any description

3    of what they are, but certainly a lot of them.

4      **Q.      How did you select the documents then**

5    **to be included in this list?**

6      A.      Well, it would have been an iterative

7    process over the time I wrote -- I wrote the report

8    and was drafting the report.  So some of this would

9    have been materials that I brought forward, academic

10   literature that I was aware of or discovered through

11   doing some research.  Some of it would have been

12   documents provided by counsel that would be the

13   Bates stamped documents, obviously, depositions and

14   other sorts of things.  And some of it would have

15   been collected at my direction by Analysis Group,

16   some of the SEC filings and those sorts of things.

17     **Q.      So that's true of all the documents on**

18   **the list, not just the Bates stamped documents?**

19     A.      What is true of the --

20     **Q.      That it was an iterative process, some**

21   **of the documents identified by you, others**

22   **identified by counsel, others identified by Analysis**

23   **Group?**

24     A.      Yes.  I mean, obviously, I wouldn't

25   have had any of the documents that are Bates stamped

**Wayne Guay**                                    **In re Twitter Inc. Securities Litigation**

1   on my own, but the documents that are publicly

2   available, certainly some of those I was aware of.

3   Some of them I did my own research.  Some of them I

4   directed Analysis Group to do various research.  So

5   we pulled together these documents over time.

6          Q.     Okay.  Did you ask to see documents on

7   particular topics?

8          A.     Documents -- what kind of documents?

9          Q.     You said that some documents were

10  provided by counsel and some were collected by

11  Analysis Group at your direction; is that correct?

12         A.     That's correct.

13         Q.     And so did you ask to see documents on

14  particular topics?

15         A.     I would have, yes.

16         Q.     What topics?

17         A.     Well, it would have been topics

18  related to trading issues, related to corporate

19  policies, related to depositions and discussion of

20  the trades by various individuals, internal

21  discussions by e-mails with respect to trades by

22  certain individuals.  Those are examples.

23         Q.     Did you yourself have access to any

24  kind of database or repository of documents?

25         A.     Not of the private -- the company's

 1  documents.  I certainly have access to SEC filings

 2  and things like that.

 3      Q.    Okay.  But as far as documents

 4  produced in the litigation, you were not running

 5  your own searches through a document repository?

 6      A.    I was not.

 7      Q.    If you'll look at the list of Bates

 8  stamped documents, I notice there are roughly 250

 9  Bates stamped documents in this list; correct?

10      A.    Correct.

11      Q.    You cited approximately ten of those

12  in your report.

13          Were the remaining documents

14  irrelevant to your analysis?

15          MR. YOUNGWOOD:  Objection to form.

16          THE WITNESS:  I don't recall what's in

17      those remaining documents.  They would be

18      documents that I reviewed, but did not need

19      to rely on when writing my report.

20  BY MS. CONN:

21      Q.    Is there any information you

22  considered in preparing your report that is not on

23  this list?

24      A.    Certainly my background and

25  experience, I mean, broadly wouldn't be captured in

1    a document, but nothing that I can think of offhand.

2          Q.    Did you have any conversations or

3    correspondence directly with Mr. Costolo?

4          A.    I did not.

5          Q.    Did you have any conversations or

6    correspondence directly with Mr. Noto?

7          A.    No.

8          Q.    In the course of preparing your

9    report, did you have any conversations with any

10   current or former Twitter employee?

11         A.    No.

12         Q.    Did you ask for information about

13   Mr. Costolo's personal -- withdraw that.

14               Did you ask for information about

15   Mr. Costolo's compensation package?

16         A.    I mean, most of the compensation

17   package information I can see from SEC filings.  I

18   can't recall whether I asked for anything

19   supplemental to what I can see in the SEC filings.

20   There may have been.

21         Q.    Same question as to Mr. Noto's

22   compensation package.

23         A.    Same answer for Mr. Noto.

24         Q.    Did you ask to see any of

25   Mr. Costolo's personal financial records?

```
 1          A.      I can't recall whether I did or not.

 2          Q.      Would that be documented somewhere if

 3    you had?

 4          A.      I don't think so.  It probably would

 5    have been through a phone call.

 6          Q.      Did you ask to see any of Mr. Noto's

 7    personal financial records?

 8          A.      I don't recall.

 9          Q.      Now, you are billing for your time in

10    this matter at a rate of $925 an hour; is that

11    right?

12          A.      That's correct.

13          Q.      How many hours have you spent to date

14    on this matter?

15          A.      I don't know precisely, but somewhere

16    around maybe 120 or so.

17          Q.      How long did you spend preparing for

18    today's deposition?

19                  MR. YOUNGWOOD:  Objection to form.

20                  THE WITNESS:  Oh, maybe 30 hours,

21          something like that.

22    BY MS. CONN:

23          Q.      In addition to -- aside from preparing

24    for today's deposition, have you done any additional

25    work on this matter since you submitted your report,
```

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1    which is Henderson 2?

 2           A.      Any additional work?

 3           Q.      On this matter.

 4           A.      What do you mean by "additional work"?

 5           Q.      Have you been asked to prepare any

 6    additional materials?  Have you reviewed any

 7    additional documents?  Have you --

 8           A.      Nothing specific comes to mind, no.

 9           Q.      If you could turn to paragraph 7 of

10    your report.

11                   You indicate here that you were

12    assisted in this matter by staff at Analysis Group,

13    and you've mentioned them in your testimony already

14    today.

15                   Who or -- who or what is Analysis

16    Group?

17           A.      Analysis Group is a litigation support

18    firm.  They may do other things, but that's the

19    nature in which I know them.

20           Q.      Have you previously worked on other

21    legal matters through Analysis Group?

22           A.      I have.

23                   MR. YOUNGWOOD:  Objection to form.

24    BY MS. CONN:

25           Q.      I'm sorry.  Was that yes?
```

**Page 35**

```
 1            A.      Yes, I have.

 2            Q.      Who at Analysis Group was helping with

 3     your report?

 4            A.      There are a team of individuals that

 5     do.  Two people I've had the most interaction with

 6     are a woman named Ran Wei and David Glick.

 7            Q.      Can you -- withdraw that.

 8                    Can you describe Ms. Wei's

 9     qualifications?

10            A.      Yes.  She actually has a Ph.D. from

11     The Wharton School and would have graduated during

12     my time there.  I can't recall how well I knew her

13     when she was a Ph.D. student, but she has a Ph.D. in

14     insurance and risk management, I think.

15            Q.      Was she a student of yours?

16            A.      No.

17            Q.      And what about Mr. Glick; what are his

18     qualifications?

19            A.      I don't know all of his background.

20     He has a Ph.D. in economics.  It's from one of the

21     Ivy League institutions.  I think maybe from Brown,

22     but I'm not a hundred percent sure on that.

23            Q.      So when you say that a team of people

24     were assisting you from Analysis Group, were there

25     others besides Ms. Wei and Mr. Glick?
```

**Confidential**

```
 1          A.      Yes, they would have had other
 2   assistants that would have been collecting data and
 3   doing things that they would have been directing,
 4   but that I didn't have much direct contact with.
 5          Q.      So other than Ms. Wei and Mr. Glick,
 6   you don't know the qualifications of anyone at
 7   Analysis Group who was assisting with your report;
 8   is that fair to say?
 9          A.      I don't know their specific
10   backgrounds, no.
11          Q.      And as far as communicating directly
12   with Analysis Group in the course of preparing your
13   report, was that strictly with Ms. Wei and
14   Mr. Glick?
15          A.      Say that again.   I'm sorry.
16          Q.      As far as communicating directly with
17   Analysis Group, was that strictly with Ms. Guay --
18   sorry -- Wei or Mr. Glick?
19          A.      It wouldn't have been strictly.   There
20   would have been other people at Analysis Group on
21   certain phone calls from time to time that would
22   have chimed in if they had been collecting certain
23   data or doing certain types of analyses.
24          Q.      But you don't know their names?
25          A.      I can't recall them, no.
```

**Page 37**

1     Q.    How many hours has Analysis Group

2  billed in connection with your report in this

3  matter?

4     A.    I don't know.

5     Q.    Do you know the total dollar amount

6  Analysis Group has billed in connection with your

7  report?

8     A.    No.

9     Q.    Do you get any portion of their

10  compensation?

11     A.    I do not.

12     Q.    Do you know who pays Analysis Group?

13     A.    I don't know their compensation

14  arrangement, no.

15     Q.    It isn't you that's paying them; is

16  that right?

17     A.    No, that's certainly correct.

18     Q.    Do you have any kind of -- do you

19  receive any kind of compensation from Analysis

20  Group?

21     A.    No -- well, I mean -- let me just

22  clarify.  My invoices go through Analysis Group and

23  then Analysis Group -- I believe they send my

24  invoice on to the law firm or Twitter.  And then

25  when I get -- when I get payment for my invoices, it

**Confidential**

1    comes via Analysis Group, but that's just a -- I

2    think an expediency issue to get me compensated in a

3    timely manner.

4         **Q.    Okay.  If we could turn to paragraph 6**

5    **of your report, Henderson 2.**

6         A.    Okay.

7         **Q.    Paragraph 6 says, "I have been asked**

8    **by counsel for defendants to respond to Professor**

9    **Henderson's opinions and evaluate whether or not the**

10   **trading behavior of Mr. Costolo and Mr. Noto, as**

11   **well as other Twitter executives, during the class**

12   **period is inconsistent with an intent to deceive**

13   **investors or improperly profit off of material**

14   **non-public information."**

15              **Do you see that?**

16        A.    I do, yes.

17        **Q.    Is that a complete summary of your**

18   **assignment in this case?**

19        A.    Yes.  It's a complete summary of it,

20   yes.

21        **Q.    When you mention here "other Twitter**

22   **executives," who exactly are you referring to?**

23        A.    Well, Professor Henderson, in his

24   report, refers to other Twitter executives and does

25   some analysis of other Twitter executives, including

**Confidential**

1  Mr. Dorsey, Mr. Williams and other executives, and

2  Mr. Bain, and there are several others.

3          Q.      And when you write here "whether or

4  not the trading behavior is inconsistent with an

5  intent to deceive investors or improperly profit off

6  of material non-public information," is there a

7  difference in your mind between those two?

8                  MR. YOUNGWOOD:  Objection to form.

9                  THE WITNESS:  "Between those two"

10        being?

11  BY MS. CONN:

12          Q.      Sure.  Let me make it more clear.

13          Is there a difference in your mind

14  between an intent to deceive and improperly

15  profiting off of material non-public information?

16          A.      Well, they are -- they're potentially

17  two different things.  I mean, they're typically

18  related, but they're two similar different things.

19          Q.      In your mind, does an intent to

20  deceive require that the person personally profit

21  from their behavior?

22          A.      Well, as a matter of financial

23  economics and sort of my understanding of executive

24  incentives, I mean, typically executives, if they're

25  going to engage in behavior that deceives investors,

```
 1   there's some benefit that they expect to receive

 2   from it.

 3            Q.     Is that benefit financial?

 4            A.     Typically it is, yes.

 5            Q.     Turning ahead to Section III of your

 6   report, starting at paragraph 8 --

 7            A.     Okay.

 8            Q.     -- does this section summarize all of

 9   your opinions in this case?

10                   MR. YOUNGWOOD:  Objection to form.

11                   THE WITNESS:  It is a summary of my

12            opinions, yes.

13   BY MS. CONN:

14            Q.     Okay.  Do you plan to offer any

15   opinions in this case other than those set forth in

16   Section III of your report?

17            A.     I --

18                   MR. YOUNGWOOD:  Objection to form.

19                   THE WITNESS:  I haven't been asked to

20            at this time, no.

21   BY MS. CONN:

22            Q.     Paragraph 7 you have reserved the

23   right to update -- sorry.  Yes -- you reserve the

24   right to update your opinions if additional relevant

25   information becomes available; correct?
```

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1          A.      Correct.

 2          Q.      Do any of your opinions require

 3   updating as you sit here today?

 4          A.      No.

 5          Q.      In reaching your opinions as stated in

 6   paragraph 8 of Henderson 2, were you asked to make

 7   any assumptions?

 8          A.      Well, I've certainly stated in the

 9   report any assumptions that I would have made.

10   You're asking whether I was asked by counsel to make

11   certain assumptions?

12          Q.      Correct.

13          A.      Not that I can recall.

14          Q.      And then in paragraph 8, you state

15   that "the trading behaviors of Mr. Costolo, Mr. Noto

16   and other Twitter executives...are consistent with

17   and reflective of economically rational trading

18   behaviors of executives in newly public companies

19   based on diversification, liquidity and signaling

20   reasons."

21                  Do you see that?

22          A.      I do, yes.

23          Q.      Can you define "diversification" for

24   me, as you've used the term here.

25          A.      Yes.  So broadly speaking, in layman's
```

1    terms, not having all of your eggs in one basket.

2    So there's a large literature in financial economics

3    on the benefits of having multiple assets in your

4    portfolio that are not all perfectly correlated with

5    each other.  And that's generally what I'm talking

6    about here.

7         **Q.    Could you define for me "liquidity" as**

8    **you've used it here.**

9         A.    Yes.  So generally speaking, liquidity

10    would be having assets that would allow you to

11    consume other things or spend money in a fairly

12    timely manner.  So more liquid assets would be

13    assets like cash and liquid securities that would be

14    relatively easy to sell and use for consumption or

15    other purposes.

16         **Q.    And then "signaling reasons," what do**

17    **you mean by that term?**

18         A.    Yes.  So executives' trading behavior

19    is publicly observed by investors within two

20    business days of those trades.  So executives

21    recognize that their trades will be observed by

22    people outside the firm.  And there's a fair bit of

23    empirical evidence that that trading behavior can

24    signal information to investors.

25         **Q.    And then would you define, please, the**

1    term you've used here, "economically rational."

2            A.      Yes, so economically rational would be

3    based on a large literature in financial economics

4    and personal financial planning for the types of

5    motivations and the types of reasons why executives

6    might want to sell stock over time, recognizing the

7    large portion of their compensation comes in the

8    form of equity and recognizing there will be these

9    various incentives from diversification, liquidity

10   and signaling to sell stock or to trade in the

11   company's stock.

12           Q.      Is "economically rational" a term of

13   art?

14           A.      I wouldn't call it a term of art.  I

15   would say it doesn't have a specific definition, but

16   it's certainly a term that's used a lot in

17   economics, finance and accounting research.

18           Q.      Does it mean that the executive has

19   profited financially from a certain trading

20   behavior?

21           A.      "Economically rational" is broader

22   than that, so it's broader than just profiting off

23   of certain behavior.  It's certain behaviors that

24   will make -- broadly speaking, make the executive

25   better off.

1          Q.      Is it always self-interested?

2                  MR. YOUNGWOOD:  Objection to form.

3                  THE WITNESS:  Certainly in the context

4          I'm using it here, it is, but others may have

5          different definitions for that.

6    BY MS. CONN:

7          **Q.      So you've told me that economically**

8    **rational behavior is behavior that makes the**

9    **executive better off, but doesn't have a specific**

10   **definition.**

11         A.      Well, it certainly depends on the

12   context.  So "economically rational" can apply to a

13   wide array of topics.  It's not a term that's used

14   specifically for executive trading behavior.  It's

15   used to describe all sorts of actions that are taken

16   by not only executives, but individuals and all

17   types of people.  So it's a very, very, very broad

18   term.

19         **Q.      Nearly anything could fit in that**

20   **definition; is that what you're saying?**

21         A.      No, that is not what I'm saying.  I'm

22   saying that it applies to a lot of decisions that

23   individuals make in all sorts of settings.

24         **Q.      Is it subjective?**

25         A.      It has -- it has a lot of economic

```
 1    structure, but it doesn't have a precise definition
 2    in part because it depends on the context.
 3         Q.      When you say that the trading
 4    behaviors of the defendants "are consistent with and
 5    reflective of economically rational trading
 6    behaviors," are you using "economically rational" as
 7    non-fraudulent -- to mean non-fraudulent?
 8         A.      In the context that I'm using it,
 9    it's -- it's -- I'm using it as, yes, not being
10    fraudulent.
11         Q.      Do you believe it's possible for a
12    person with fraudulent intent to behave in an
13    economically irrational manner?
14         A.      I'm going to need that one back again.
15         Q.      Do you believe it's possible for a
16    person with fraudulent intent to behave in an
17    economically irrational manner?
18         A.      With fraudulent intent to behave in an
19    economically irrational behavior.  I mean, anybody
20    can behave in an economically irrational behavior,
21    but, again, it depends on the context.  So certainly
22    anything is possible.
23         Q.      Would you agree that whether a
24    person's trading behavior is economically rational
25    is not dispositive on the issue of what their intent
```

1  is?

2          A.    Well -- yeah, so the point that I'm

3  making here is, in the context of economically

4  rational, that the behavior that I observe is

5  consistent with what I would expect people to be

6  doing in the absence of any fraudulent activity.

7          Q.    Are you, in fact, opining on what

8  Mr. Costolo's intent was at any particular point in

9  time?

10              MR. YOUNGWOOD:  Objection to form.

11              THE WITNESS:  I don't know

12     Mr. Costolo's state of mind, no.

13  BY MS. CONN:

14          Q.    Are you, in fact, opining on

15  Mr. Noto's state of mind at any particular point in

16  time?

17          A.    No.

18          Q.    You say here that the trading

19  behaviors of Mr. Costolo and Mr. Noto and other

20  Twitter executives "cannot be used to support an

21  allegation of an intent to defraud."

22              Do you see that?

23          A.    I do.

24          Q.    Are you opining on the relevance of

25  this evidence?

 1          A.      Well, I'm not exactly sure what you

 2     mean by "relevance," but the -- to sort of reiterate

 3     the point I made a few minutes ago, that because

 4     their behavior is consistent with what I would

 5     expect these executives to be doing in the absence

 6     of the allegations to defraud, I don't see how one

 7     would then be able to use it in and of itself to

 8     support an allegation to defraud.

 9          **Q.      The trading -- so if I understand your**

10     **testimony, the trading behavior standing alone is,**

11     **in your opinion, not evidence of a fraudulent**

12     **intent?**

13          A.      Well, again, so my view is that it's

14     consistent with what I would expect to observe in a

15     world where there was no intent to defraud.  And so

16     in and of itself, I don't see how it can be used as

17     evidence in support of an intent to defraud.

18          **Q.      Is -- withdraw that.**

19                  **You are not -- withdraw that.**

20                  **Are you offering an opinion that**

21     **defendants did not act with an intent to defraud?**

22          A.      No, I can't offer that opinion.  I

23     didn't -- I didn't -- no.

24          **Q.      And are you -- are you offering an**

25     **opinion as to the inference the jury should draw**

**Confidential**

```
 1   from the defendants' trading behavior?
 2           A.      I mean, I'm certainly not telling the
 3   jury what inference to draw.  I mean, I'm providing
 4   some, I think, context in which to make decisions,
 5   but I can't tell the jury what to decide.
 6           Q.      Is it possible for someone with a
 7   fraudulent intent to also be acting in an
 8   economically rational manner?
 9           A.      Is it possible?  I mean, anything's
10   possible.
11           Q.      So someone with a fraudulent intent
12   can behave in an economically rational manner;
13   correct?
14           A.      I mean, it would depend on the
15   context.  It would depend on what the cost and
16   benefits are of the different behaviors.  I mean,
17   I'd have to put it in context.
18           Q.      Well, if I understand what your
19   testimony is, fraudulent -- a fraudulent -- someone
20   acting with fraudulent intent is not always acting
21   in an economically rational manner.
22                   MR. YOUNGWOOD:  Objection to form.
23                   THE WITNESS:  Are they always acting
24           in an economically rational manner?  I mean,
25           again, it would depend on context, but you
```

**Confidential**

```
1              could certainly come up with a scenario where

2              an intent to defraud was not economically

3              rational.

4    BY MS. CONN:

5         Q.      And when this matter -- when this

6    matter proceeds to trial, who do you understand will

7    decide whether or not the defendants acted with

8    fraudulent intent?

9              MR. YOUNGWOOD:  Objection to form.

10              THE WITNESS:  I would assume the

11         court, the judge and the jury.

12              MS. CONN:  It's been a little less

13         than an hour, but why don't we take a break

14         because I'm about to get into the detail of

15         his opinions.

16              MR. YOUNGWOOD:  Okay.

17              THE VIDEOGRAPHER:  The time right now

18         is 9:32 a.m. and we're off the record.

19              (Recess from the record.)

20              THE VIDEOGRAPHER:  The time right now

21         is 9:45 a.m.  We're back on the record.

22    BY MS. CONN:

23         Q.      Welcome back, Professor Guay.  You

24    understand you're still under oath?

25         A.      Yes.
```

**Page 50**

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1          Q.      Okay.  So we were discussing the

2     summary of opinions at paragraph 8 of your report,

3     which is Exhibit Henderson 2.  Could you turn back

4     to that paragraph, please.

5          A.      Sure.

6          Q.      In the first bullet point here, you

7     write that "The observed timing and magnitude of

8     Mr. Costolo's transactions are consistent with

9     commonly observed patterns of executives in newly

10    public companies trading with the goal of

11    diversification and/or seeking to divest large and

12    concentrated portfolio holdings that have

13    accumulated as a result of pre-IPO equity

14    compensation or large onetime equity grants."

15              Do you see that?

16         A.      I do.

17         Q.      Is this an opinion that you intend to

18    offer at trial?

19         A.      If I'm asked to offer it, I would.

20         Q.      And which transactions are you

21    referring to here?

22         A.      Mr. Costolo's transactions between the

23    time of Twitter's IPO and the time of his retirement

24    or -- yeah, his stepping down as CEO.

25         Q.      Did you make any determination one way

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1    or the other whether those sales were actually for

2    diversification purposes?

3         A.     What do you mean by "determination"?

4         Q.     Well, I think you told me that you

5    didn't actually review his financial records; is

6    that right?

7         A.     I don't have his personal financial

8    records.  I can see a fair bit of his financial

9    information based on public documents.

10        Q.     So do you know whether or not those

11   trades were actually for purposes of

12   diversification?

13        A.     Well, unless he sold the stock and

14   immediately bought Twitter stock again, they were

15   for diversification.  Certainly they diversified his

16   portfolio, that I can say.

17        Q.     In the second bullet point, you write,

18   "Mr. Costolo's stock sales in the months prior to

19   the class period were not 'extraordinary' and did

20   not eliminate his incentive to sell more vested

21   shares during the class period.  This is confirmed

22   by my analysis of Mr. Costolo's transactions

23   relative to transactions of CEOs of comparable

24   firms."

25                    Do you see that?

1          A.      I do.

2          Q.      **Is this an opinion you intend to offer**

3   **at trial?**

4          A.      If I'm asked to offer it, I would.

5          Q.      **Are you referring here to**

6   **Mr. Costolo's sale of over $32 million worth of**

7   **Twitter stock?**

8          A.      His stock sales in the month prior to

9   the class period, yeah.  I don't recall the precise

10  dollar amount, but that's roughly correct.

11         Q.      **Okay.  Is it your understanding that**

12  **Professor Henderson has opined Mr. Costolo had no**

13  **incentive to sell in the months prior to the class**

14  **period?**

15         A.      Is it -- can I have that back again.

16         Q.      **Sure.**

17                 MS. CONN:  Would you read that back.

18                 (Record read.)

19                 THE WITNESS:  Had no incentive to sell

20            in the months prior to the class period.  I

21            think Professor Henderson, if I remember his

22            report correctly, opines that Mr. Costolo

23            would have some incentive to sell prior to

24            the class period.

25

**Page 53**

**Confidential**

1    BY MS. CONN:

2          Q.      Is an incentive to sell different than

3    a need to sell?

4                      MR. YOUNGWOOD:  Objection to form.

5                      THE WITNESS:  I'm not sure exactly

6            what you mean by "a need to sell."  I mean,

7            is it an emergency or -- I'm not sure what

8            you mean by "need."

9    BY MS. CONN:

10         Q.      Well, let me ask it this way:  Did you

11   make any determination whether or not $32 million

12   was sufficient to fund Mr. Costolo's consumption for

13   a six-month period?

14         A.      I do not know that, no.

15         Q.      You also say here that you arrived at

16   that conclusion based on a comparison of the trading

17   of CEOs of comparable firms to Mr. Costolo's

18   trading; correct?

19         A.      Correct.

20         Q.      And is that analysis or comparison

21   something you intend to present at trial?

22         A.      If I'm asked to, I would.

23         Q.      In the third bullet point, you say,

24   "Professor Henderson's characterization of the stock

25   sales of 'other Twitter insiders' as 'extraordinary'

1    is misleading."

2                    Do you see that?

3         A.    I do.

4         Q.    Is that an opinion you intend to offer

5    at trial?

6         A.    If I'm asked to offer it, I would.

7         Q.    And, again, who are the "other Twitter

8    insiders" that you're referring to here?

9         A.    Well, this is Professor Henderson's

10   term.  And I think it's a little bit confounded in

11   the sense that -- that the "other Twitter" -- I

12   mean, I think what he's talking about is a broader

13   group of Twitter executives than Mr. Costolo and

14   Mr. Noto and some of the other ones that he talked

15   about in his report.

16                    But as I recall, he actually includes

17   the trades of those executives in with his

18   "other...insiders," so I'm not sure it's strictly

19   "other...insiders" -- "Twitter insiders," but I

20   think that's what he means by that.

21        Q.    Okay.  It's your understanding that

22   that's the aggregate sold by Twitter employees

23   during that period; is that --

24        A.    Yes, I think if the "other" term -- if

25   the "other" word wasn't in there, it would be a more

Wayne Guay                    **In re Twitter Inc. Securities Litigation**

1  accurate description.

2      Q.    Okay.  Do you disagree that, in

3  aggregate, Twitter insiders sold $450 million in

4  stock during the time frame Professor Henderson was

5  looking at?

6            MR. YOUNGWOOD:  Objection to form.

7            THE WITNESS:  I'm not sure what time

8         frame -- are you talking -- what time frame

9         are you referring to there?

10  BY MS. CONN:

11      Q.    Well, do you disagree with the numbers

12  that Professor Henderson reported for aggregate

13  insider sales?

14      A.    Yes, so I -- my understanding -- I

15  think I understand that -- the database he used to

16  get those numbers, and I haven't independently

17  verified whether those numbers are correct or not.

18      Q.    You don't know one way or the other?

19      A.    I have not analyzed -- my

20  understanding -- my recollection is that we tried to

21  verify his numbers using his database, but that we

22  didn't try to independently recreate those numbers

23  based on SEC filings.

24      Q.    When you say "his database," what are

25  you referring to?

1     A.    I believe, if I remember correctly,

2  that either in Professor Henderson's report or his

3  backup support, he indicates where he gets those

4  trades.  So I don't think he's going out and

5  collecting all the Form 4s or all those executives

6  for months and months.  I think he's using a

7  database -- or a website, if I remember correctly,

8  that summarizes sales for all kinds of companies.

9     **Q.    The fourth bullet point here in**

10 **paragraph 8 is that the cancellation of Rule 10b5-1**

11 **plans by Twitter executives "was not 'suspicious'."**

12           **Is that an opinion you intend to offer**

13 **at trial?**

14    A.    If I'm asked to offer it, I would.

15    **Q.    And what do you mean by "suspicious"?**

16    A.    Well, that is Professor -- I think

17 Professor Henderson's term, "suspicious."  So he had

18 various parts of his report where he referred to, I

19 think, if I remember correctly, any cancellation of

20 a Rule 10b-5 trading plan is inherently suspicious,

21 and I'm responding to that opinion.

22    **Q.    Are you using the word "suspicious"**

23 **the same way Professor Henderson used it?**

24    A.    I'm not sure exactly how he's used it,

25 but, I mean -- I guess broadly, yes.  Yes, I think

**Confidential**

1    broadly we're probably using it in the same way.

2         Q.    Okay.  So I'll ask you again.

3               In what way are you using that term?

4         A.    So this would be, again, I think

5    related to the earlier opinions we've talked about

6    where the cancellation of this -- the 10b5-1 trading

7    plans by the Twitter executives during the class

8    period, at least in my opinion, is consistent with

9    what I would expect executives to do from a -- in

10   this sense, in this signaling respect, was

11   consistent with what I would expect them to do given

12   the situation at the time and, therefore, the 10b5-1

13   plan cancellation is not inherently suspicious.

14        Q.    Is whether or not the cancellations

15   were suspicious something that is context-dependent?

16              MR. YOUNGWOOD:  Objection to form.

17              THE WITNESS:  Whether -- this is a

18         general statement outside -- hypothetical

19         outside -- outside of this matter or --

20   BY MS. CONN:

21        Q.    Well, you said it was what you

22   expected the executives to do given the situation at

23   the time.  So I'm just asking you -- you testified

24   that it was consistent with what you would have

25   expected the executives to do "given the situation

1    at the time."

2                So I'm just asking you, does that mean

3    it depends on the context?

4         A.    It can, yes.

5         Q.    And did it depend on the context in

6    your -- for purposes of your opinion here?

7         A.    Yes.  Well, based on my understanding

8    of the situation in terms of -- and I get into this

9    in my report, but the media scrutiny and the

10   situation with these executives and their concerns

11   about the perception of their trades from -- from

12   investors, so those are context-specific things that

13   I thought about when drawing this opinion.

14        Q.    In other words, you wanted more

15   information about what was behind the cancellations?

16        A.    Beyond just knowing they canceled

17   plans?

18        Q.    Correct.

19        A.    Yes, I investigated other things.

20        Q.    Okay.  You also say that the

21   cancellations were consistent with "Twitter

22   executives being cognizant, and concerned with, how

23   their actions were perceived by the public."

24                Do you see that?

25        A.    I do.

1          Q.      And is that an opinion you intend to

2    offer at trial?

3          A.      If I'm asked to, I would.

4          Q.      Do you intend to offer the opinion

5    that that is actually what -- sorry.  Withdraw that.

6                  Do you intend to offer an opinion

7    about whether Twitter executives were, in fact,

8    cognizant of, and concerned with, how their actions

9    were perceived by the public?

10         A.      Well, I mean, certainly there are

11   documents I read that indicated that they seemed to

12   be cognizant of this, but what was actually their

13   state of mind in making this decision, I don't know

14   that.

15         Q.      Okay.  You agree that you wouldn't be

16   able to offer an opinion on that; is that right?

17         A.      "On that" being?

18         Q.      Their state of mind.

19         A.      Yes, I would not do that.

20         Q.      You also write here that defendants

21   wanted to "maximize shareholder value by

22   demonstrating to the public that they believed in

23   the long-term value of the company."

24                 Is that an opinion you intend to offer

25   at trial?

1        A.      Well, I think it was -- I think you

2     maybe -- you added a few words there that I don't

3     use here.  You said the executives "wanted to

4     maximize shareholder value."

5               What I say here is it's consistent

6     with that.

7        Q.      **Consistent with the desire to maximize**

8     **shareholder value; is that fair?**

9        A.      Correct.

10       Q.      **Okay.  Is that an opinion you intend**

11    **to offer at trial?**

12       A.      If I'm asked to, I would.

13       Q.      **And as before, you wouldn't be able to**

14    **tell the jury that that, in fact, was in any**

15    **particular defendant's mind at the time; is that**

16    **right?**

17       A.      Correct.

18       Q.      **The fifth bullet point, you write that**

19    **"Mr. Costolo and Mr. Noto engaged in trading**

20    **behavior during the class period that is**

21    **inconsistent with plaintiffs' allegations that they**

22    **used allegedly material non-public information to**

23    **their benefit."**

24               **Do you see that?**

25       A.      I do.

Wayne Guay                          In re Twitter Inc. Securities Litigation

1       Q.      Is that an opinion you intend to offer

2   at trial?

3       A.      If I'm asked to, I would.

4       Q.      When you say "benefit," do you mean

5   personal financial benefit?

6       A.      In this context, that's what I'm

7   referring to.

8       Q.      Have you read the complaint in this

9   action?

10      A.      I have, yes.

11      Q.      Could you tell me where in the

12  complaint you found allegations that defendants used

13  material non-public information to their financial

14  benefit?

15      A.      Okay.  So let's be clear.  When I'm

16  talking about the "trading behavior," I'm talking

17  about the trading behavior and the financial benefit

18  from that.  I'm not referring to the plaintiffs'

19  allegations with that respect.

20              So when I'm talking about -- that the

21  trading behavior being to their financial detriment

22  during -- based -- if the plaintiffs' allegations

23  are correct.  So that's what I'm saying here.

24      Q.      Okay.  You've written here that the

25  trading behavior is "inconsistent with plaintiffs'

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1   allegations that they used allegedly material

2   non-public information to their benefit."

3                Do you see that?

4        A.    Correct.  So let me -- maybe I should

5   correct that prior statement.  "To their benefit,"

6   in this analysis, I'm talking about financial

7   benefit.  If the plaintiffs are talking about some

8   other kind of benefit, then that wasn't clear to me.

9        Q.    Is it your understanding, though, that

10   the plaintiffs have alleged that defendants used

11   material non-public information to their benefit?

12        A.    I mean, I don't know the plaintiffs'

13   state of mind either, but in these cases, generally,

14   when I've been involved, there has been some benefit

15   that the plaintiffs have alleged that the executives

16   received from the behavior.

17        Q.    But you've read the complaint;

18   correct?

19        A.    I have, yes.

20        Q.    So you know what the allegations are.

21        A.    I do, yes.

22        Q.    That doesn't require you to be inside

23   plaintiffs' state of mind; correct?

24        A.    Well, if the plaintiffs -- well, yeah,

25   if the plaintiffs are referring to something other

**Confidential**

1   than some -- if they're referring to some kind of a

2   benefit with which I'm not familiar, then I -- then

3   I'm not sure what that is.

4        **Q.    Is it your opinion that Mr. Costolo's**

5   **trading behavior is inconsistent with an allegation**

6   **of scienter?**

7                MR. YOUNGWOOD:  Objection to form.

8                THE WITNESS:  I mean, we talked about

9           scienter earlier.  I'm not an attorney, so --

10          I'm an economist, so my opinions relate to

11          economic behavior and economic incentives.

12  BY MS. CONN:

13       **Q.    Okay.  I think you told me before that**

14  **you're using "economically rational" and**

15  **"non-fraudulent" as equivalent terms in your report;**

16  **true?**

17       A.    Say that again.

18       **Q.    I said I think you testified already**

19  **that you're using "economically rational" and**

20  **"non-fraudulent" equivalently in your report?**

21       A.    That's correct, yes.  For my purposes,

22  yes.

23       **Q.    And your opinion is that Mr. Costolo's**

24  **trading behavior was economically rational; is that**

25  **fair?**

1    A.    It's consistent with what I would

2    expect someone that's economically rational to do.

3    **Q.    And your opinion is that Mr. Noto's**

4    **trading behavior was consistent with what you would**

5    **expect of an economically rational actor; is that**

6    **right?**

7    A.    Well, Mr. Costolo's behavior I

8    analyzed over a long period of time and lots of

9    different trading.  Mr. Noto's trading was just at a

10   particular point in time.  It was a purchase of

11   sales during the -- during the class period.

12         And I point out in my report two

13   different things.  I point out in my report how one

14   might interpret Mr. Noto's trading behavior in a

15   world where the plaintiffs' allegations were not

16   correct and how one might interpret his trading

17   behavior in a world where the plaintiffs'

18   allegations are correct.

19   **Q.    Is it your understanding that to**

20   **demonstrate scienter, plaintiffs must show that a**

21   **defendant personally benefited from the alleged**

22   **fraud?**

23   A.    I don't know the answer to that.

24   **Q.    Because you're not an attorney; is**

25   **that right?**

1          A.      Well, among other reasons, but, yeah,

2     I just don't know -- I don't know those legal

3     issues.

4          **Q.      So do you have any -- withdraw that.**

5               **Is it your understanding that to**

6     **demonstrate scienter, as that term is used in the**

7     **federal securities laws, plaintiffs are required to**

8     **show that defendants had a motive to commit the**

9     **fraud?**

10         A.      I mean, my understanding of those

11    issues are at a general level.  They're not at a

12    specific legal level.

13         **Q.      What is your general understanding,**

14    **sir?**

15         A.      About the -- what the plaintiffs are

16    required to do?  I mean, from my general experience,

17    the plaintiffs are -- part of these complaints is

18    generally to show that the executives had some

19    motive to engage in the behavior.

20         **Q.      Do you know whether the court before**

21    **whom this matter is pending has opined on whether**

22    **plaintiffs are required to show the defendants had a**

23    **motive to commit fraud?**

24         A.      I don't recall.

25               MR. YOUNGWOOD:  Objection.

**Confidential**

1    BY MS. CONN:

2         Q.    You've read the court's order and the

3    motion to dismiss; correct?

4         A.    I believe I have, yes.

5         Q.    The sixth bullet here is "Professor

6    Henderson's 'seven hallmarks of Rule 10b5-1 plans'

7    are invented by him and are arbitrary, unnecessary

8    conditions for Rule 10b5-1 plans, and do not appear

9    to be based on scientific criteria or empirical

10   research."

11              Do you see that?

12        A.    I do.

13        Q.    Is that an opinion you intend to offer

14   at trial?

15        A.    If I'm asked to, I would.

16        Q.    Has any court ever agreed with you on

17   that issue?

18              MR. YOUNGWOOD:  Objection to form.

19              THE WITNESS:  Have they agreed with me

20        that Professor Henderson's hallmarks are

21        invented by him?

22   BY MS. CONN:

23        Q.    And that they are arbitrary and

24   unnecessary conditions for a Rule 10b5-1 plan.

25        A.    Has any court agreed with me?  Not

**Page 67**

1    that I'm aware of.

2        Q.    Has any court ever disagreed with you?

3        A.    Not that I'm aware of.

4        Q.    So do these six bullet points

5    represent the opinions you are prepared to offer at

6    trial?

7        A.    Does it represent --

8        Q.    The opinions you are prepared to offer

9    at trial.

10       A.    It's a summary of those opinions, yes.

11       Q.    Do you intend to offer an opinion at

12   trial as to whether defendants are liable for

13   securities fraud?

14       A.    No.

15       Q.    Do you intend to offer an opinion

16   about -- at trial about Mr. Costolo's subjective

17   state of mind?

18       A.    No.

19       Q.    Do you intend to offer an opinion at

20   trial about Mr. Noto's subjective state of mind?

21       A.    No.

22       Q.    You don't know what the actual mental

23   state of either defendant was; correct?

24       A.    Correct.

25       Q.    I'm sorry.

 1                     Either individual defendant.

 2          A.    Correct.

 3          Q.    Do you intend to offer an opinion as

 4   to Mr. Costolo's credibility at trial?

 5          A.    No.

 6          Q.    Do you intend to offer an opinion as

 7   to Mr. Noto's credibility at trial?

 8          A.    No.

 9          Q.    Do you intend to offer an opinion as

10   to whether defendants' statements made during the

11   class periods were false or misleading?

12          A.    No.

13          Q.    Do you intend to offer an opinion at

14   trial as to whether defendants' statements made

15   during the class period were material?

16          A.    No.

17          Q.    Do you intend to offer an opinion at

18   trial as to causation?

19          A.    Causation of what?

20          Q.    Any injury or loss --

21                MR. YOUNGWOOD:   Objection to form.

22   BY MS. CONN:

23          Q.    -- to plaintiffs.

24          A.    No.

25          Q.    Do you intend to offer an opinion at

Wayne Guay                          In re Twitter Inc. Securities Litigation

```
 1   trial as to damages?

 2        A.    No.

 3        Q.    You have submitted a report in

 4   rebuttal to Professor Henderson; correct?

 5        A.    I have.

 6        Q.    Do you plan to offer a rebuttal to any

 7   opinions stated by plaintiffs' other experts?

 8        A.    No.

 9        Q.    Have you read the opinions of

10   defendants' other experts in this matter?

11        A.    I don't believe so, no.

12        Q.    If I give you the names, will that

13   refresh your recollection?

14        A.    It may.

15        Q.    Have you read Professor Gompers'

16   report in this matter?

17        A.    No.

18        Q.    Dr. Madansky's?

19        A.    No.

20        Q.    Mr. Dirk's?

21        A.    No.

22        Q.    Mr. Coates'?

23        A.    No.

24        Q.    Dr. Fader?

25        A.    No.
```

Page 70

1    Q.    Did you rely on any of defendants'

2    other experts in forming your opinions in this

3    matter?

4    A.    No.

5    Q.    All right.  Let's turn, please, to

6    paragraph 20 of your report.  Here in paragraph 20

7    you write, "Empirical evidence indicates that large

8    equity positions can create incentives for

9    executives to reduce firm risk in ad hoc ways and to

10   shy away from risky strategies and decisions that

11   would enhance firm value."

12         Do you see that?

13   A.    I do.

14   Q.    Can you explain what you mean by that

15   statement.

16   A.    Yes.  So providing executives with

17   equity compensation is a -- widely considered to be

18   a sound corporate governance practice and

19   compensation practices.  And the reason is to try to

20   tie the executives' wealth to shareholder value.

21         And you can have equity incentives

22   that are too low or too high.  So if they're too

23   low, the executive might not internalize the

24   shareholders' interest enough; and if they're too

25   high, the executives can become overly risk-averse,

**Confidential**

1  again for this diversification reason that they have

2  all of their eggs in one basket and might behave in

3  ways that are, again, counter to shareholders'

4  interests because they shy away from risk.

5      **Q.      And are you stating that as a general**

6  **proposition?**

7      A.      Yes.   I mean, it's based on a large

8  volume of empirical evidence and theoretical work as

9  well.

10      **Q.      And so would that also have been**

11  **applicable at Twitter in late 2014 and 2015?**

12      A.      It's a broad statement that applies to

13  executives and firms in general.

14      **Q.      You don't have any evidence or opinion**

15  **that it didn't apply at Twitter in that time period,**

16  **do you?**

17      A.      I don't have any evidence that it

18  didn't apply, no.

19      **Q.      Okay.  I want to ask you about**

20  **Mr. Noto's purchases of Twitter stock during the**

21  **class period.**

22          **Would you turn, please, to**

23  **paragraph 92 of your report.**

24      A.      Okay.

25      **Q.      So Mr. Noto purchased roughly 12,000**

**Page 72**

**Confidential**

1  shares of Twitter stock during the class period; is

2  that correct?

3          A.     About 13.3 thousand shares.

4          Q.     13.3.  Okay.

5                 And that was roughly 1 percent of his

6  total Twitter holdings at the time; is that right?

7          A.     I don't recall.

8          Q.     Let me show you Professor Henderson's

9  report, which has previously been marked as

10  Henderson 1.

11                 (Exhibit 1, Previously marked.)

12  BY MS. CONN:

13          Q.     Can you turn to page 44, please.

14          A.     Okay.

15          Q.     Do you see where Professor Henderson

16  reports that "Mr. Noto beneficially owned 1,379,963

17  shares of Twitter stock" at that time?

18          A.     I do see that.

19          Q.     And he cites to a Form 4 dated May 5,

20  2015.

21                 Do you see that?

22          A.     I do.

23          Q.     Do you have any reason to believe that

24  number is not accurate?

25          A.     I do.

1        Q.        You do?

2        A.        Well, I mean, I think it's misleading.

3        Q.        **Well, I'm just asking you if you have**

4    **any reason to believe that Mr. Noto did not**

5    **beneficially own 1,379,963 shares at the time.**

6        A.        Well, yeah, I don't have the proxy

7    statement in -- I don't have the proxy statement in

8    front of me, but most of those shares were unvested.

9        Q.        Okay.  Most of those --

10        A.        In fact, they all may have been on

11    that date.

12        Q.        -- 1.4 million shares?

13        A.        Most of those shares would have been

14    unvested and not saleable and not liquid.

15        Q.        **But you don't disagree that 13,000**

16    **shares is roughly 1 percent of his total holdings,**

17    **do you?**

18        A.        You're talking about the -- his liquid

19    holdings, his vested holdings?  You're including --

20        Q.        **Total holdings, sir.**

21        A.        -- unvested equity as well?

22        Q.        **Uh-huh.**

23        A.        We can do the math.  Let's see.  It

24    would be roughly 1 percent of his total holdings,

25    yes, again, including all the unvested equity.

**Page 74**

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1        Q.      You're not opining that an executive

2   who purchases the equivalent of 1 percent of his

3   total holdings is absolved of any fraudulent intent

4   by doing so, are you?

5        A.      As a general matter?

6               MR. YOUNGWOOD:   Objection to form.

7   BY MS. CONN:

8        Q.      Correct.

9        A.      This is a hypothetical or this is

10  just --

11       Q.      I'm just asking if you're opining that

12  a small purchase -- withdraw that -- a purchase of

13  any size absolves an executive of any fraudulent

14  intent they might have.

15       A.      I mean, as you worded it, I mean,

16  those would be two separate things.

17       Q.      You're not opining in this case that

18  to the extent Mr. Noto had a fraudulent intent, he's

19  absolved of that by making this purchase, are you?

20       A.      I mean, I assume we're using the word

21  "absolved" -- how are you using the word "absolved"?

22       Q.      It doesn't negate his intent.

23       A.      Again, go back to his state of mind, I

24  guess.  I don't know Mr. Noto's state of mind.

25       Q.      So in formulating your opinion that --

**Page 75**

**Confidential**

1    regarding Mr. Noto's lack of fraudulent intent based

2    on his share purchases during the class period, did

3    you consider whether he was actually in possession

4    of material non-public information at the time?

5          A.    No, so my analysis here is simply to

6    point out that if the plaintiffs' allegations are

7    correct, that purchasing shares would have cost him

8    financially.  That's what I've done and that's

9    essentially what I'm opining.

10         Q.    Okay.  So just to be clear, if

11   plaintiffs' allegations are correct that Mr. Noto

12   was acting with fraudulent intent, what -- that

13   share purchase would not negate his fraudulent

14   intent; correct?

15         A.    What I've done here in my analysis is

16   I've essentially said if the plaintiffs' allegations

17   are correct, the Twitter stock price was inflated

18   during the class period, that buying shares which

19   were twice his annual salary would have cost him a

20   fair bit of cash and lost profit by doing that.

21   That's what I've done.

22         Q.    But you're not saying that that

23   necessarily means he wasn't acting with fraudulent

24   intent.

25         A.    I'm saying it's inconsistent with the

**Page 76**

Wayne Guay                          In re Twitter Inc. Securities Litigation

 1  plaintiffs' allegations.

 2         Q.     Oh, I thought you assumed that the

 3  plaintiffs' allegations were true.

 4         A.     Well, if the plaintiffs' -- if the

 5  plaintiffs are -- if the plaintiffs' allegations are

 6  correct, this would have been costly.

 7         Q.     Would have been costly for Mr. Noto.

 8         A.     Would have been costly for Mr. Noto.

 9         Q.     And that's all?

10         A.     Primarily as a summary, yes, with

11  respect to that purchase.

12         Q.     I'd like to show you what's previously

13  been marked as Exhibit 102.

14                (Exhibit 102, Previously marked.)

15                MS. CONN:  For the record, Exhibit 102

16         is a March 10, 2015, e-mail between Anthony

17         Noto and Jeff Dejelo bearing Bates

18         TWTR_SHEN_00262575 through 2578.

19  BY MS. CONN:

20         Q.     Is this one of the documents you

21  reviewed in preparing your report, sir?

22                (Pause.)

23         A.     It doesn't look familiar.  Is it one

24  that I cite as a document considered?

25         Q.     No, it is not.

**Confidential**

1       A.    It's not?

2       Q.    **It is not.**

3       A.    I don't believe I've seen it.

4       Q.    **Would you look at the second page of**

5  **the e-mail, Bates page ending 2576, where Mr. Noto**

6  **tells whoever he is sending the e-mail to, "I get**

7  **this on a daily basis."**

8         **Do you see that?**

9       A.    Where are you again -- oh, I see.

10  "Check out the below.  I get this on a daily basis."

11       Q.    **Do you see that?**

12       A.    Okay.

13       Q.    **And then the attachment is a report of**

14  **key metrics.**

15         **Do you see that?**

16       A.    Okay.  Yeah.

17       Q.    **So in formulating your opinion that**

18  **Mr. Noto's purchases of stock sales during the class**

19  **period was inconsistent with an allegation of**

20  **fraudulent intent, did you consider that he had**

21  **direct knowledge of these key metrics?**

22         MR. YOUNGWOOD:  Objection to form;

23      foundation.

24         THE WITNESS:  So let me make sure I

25      understand the date of this e-mail.  So am I

```
 1            correct that this e-mail was sometime in
 2            March of 2015?
 3    BY MS. CONN:
 4            Q.      Uh-huh.
 5            A.      So that was two months before his
 6    purchases; is that correct?
 7            Q.      That is correct.
 8            A.      Okay.  So let me see what this says.
 9                    (Pause.)
10            A.      Okay.  What is the question?
11            Q.      The question is, in formulating your
12    opinion that Mr. Noto's purchases of stock sales
13    during the class period was inconsistent with an
14    allegation of fraudulent intent, did you consider
15    that he had direct knowledge of these key metrics?
16            A.      I don't know -- I mean, I don't know
17    what any of these things mean.
18            Q.      Does it affect your opinion one way or
19    the other that Mr. Noto received a daily report of
20    key metrics?
21                    MR. YOUNGWOOD:  Objection to form.
22                    THE WITNESS:  I mean -- yeah, I don't
23            know what any of these mean.  I assume there
24            are key metrics coming in to the executives
25            all the time.
```

1    BY MS. CONN:

2         Q.    Is that -- is that a no?

3         A.    Is it -- that this -- that, what,

4    knowing this wouldn't have influenced my opinion?

5         Q.    Correct.

6         A.    Yeah, because I don't know what this

7    means.

8         Q.    Okay.  I'd like to show you what has

9    previously been marked as Exhibit 309.

10             (Exhibit 309, Previously marked.)

11             MS. CONN:  Exhibit 309, for the

12        record, is a one-page e-mail from Dick

13        Costolo to Anthony Noto dated February 5th,

14        2015, bearing Bates TWTR_SHEN_00193273.

15   BY MS. CONN:

16        Q.    Is this a document that you considered

17   in formulating your report, sir?

18        A.    I recall reading this one, yes.

19        Q.    In formulating your opinion that

20   Mr. Noto's stock purchases during the class period

21   were inconsistent with an allegation of fraudulent

22   intent, did you consider that he told Mr. Costolo at

23   the start of the class period that they had bought

24   themselves some time?

25             MR. YOUNGWOOD:  Objection to form.

1            THE WITNESS:  Again, I don't know what
2        these things mean.  I mean, my analysis with
3        Mr. Noto's shares was pretty straightforward.
4        I mean, under the plaintiffs' allegations
5        Twitter's stock price is inflated.  And I
6        simply pointed out that by buying those
7        shares, that that was financially costly to
8        him.
9    BY MS. CONN:
10        Q.    **So this document is irrelevant to your**
11    **opinion; is that true?**
12            MR. YOUNGWOOD:  Objection to form.
13            THE WITNESS:  Irrelevant to that
14        opinion, yes, because that opinion doesn't
15        require any of these e-mails.  It's a
16        calculation.
17    BY MS. CONN:
18        Q.    **If you assume Mr. Noto was in**
19    **possession of negative material non-public**
20    **information at the time of his purchases, does that**
21    **change your opinion at all?**
22        A.    No, I -- well, my opinion is in a
23    world where the plaintiffs' allegations are correct
24    and Twitter's stock price is inflated, which is I
25    think what you're asking, my calculations simply

1  show that it was financially costly to purchase

2  shares at an inflated stock price.

3          **Q.      And that is true whether or not he had**

4  **a fraudulent intent; is that what you're saying?**

5          A.      Well, again, I'm not opining on his

6  state of mind.  I'm taking the plaintiffs'

7  allegations as being correct for a moment in saying

8  Twitter's stock price was inflated, would he have

9  suffered financially from buying shares at an

10  inflated stock price.

11          **Q.      Do you have any opinion as to why**

12  **Mr. Noto did not sell shares during the class**

13  **period?**

14          A.      Well, I mean, I know his -- some of

15  the situation -- I know the situation related to his

16  stock.  And I think all of it was unvested at the

17  beginning of the class period, so it wouldn't have

18  been saleable.  Some of it vested during the class

19  period.

20          **Q.      Are you aware of whether Mr. Noto had**

21  **a 10b5-1 plan during the class period?**

22          A.      I'm pretty sure that I know he did

23  not.

24          **Q.      Would that have affected his ability**

25  **to sell Twitter shares during the class period?**

```
 1          A.      Would what have affected it?

 2          Q.      The fact that he did not have a

 3   Rule 10b5-1 plan in place.

 4          A.      Well, my understanding is Twitter had

 5   a policy that required trades by these types of

 6   executives be through a 10b5-1 plan and that they

 7   also required it to be set up a quarter before the

 8   trades took place.  So we'd have to think about the

 9   timing of when he might have set up a plan and when

10   it might have made its first trades.

11          Q.      I'd like to show you what -- I do not

12   believe this has been marked yet, so we will mark it

13   Guay Exhibit 1.

14                  (Guay Exhibit 1, No Bates numbers,

15          Academy of Management Article, marked for

16          identification.)

17                  MS. CONN:  For the record, Exhibit

18          Guay 1 is an article from the Academy of

19          Management titled, "Is CEO Pay Too High and

20          Are Incentives Too Low?  A Wealth-Based

21          Contracting Framework."

22                  THE WITNESS:  That's correct.

23   BY MS. CONN:

24          Q.      You're familiar with this document,

25   are you not?
```

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1          A.      I am.

 2          Q.      In fact, you're the author of this

 3   document or one of them?

 4          A.      One of them.

 5          Q.      So you've previously written with

 6   respect to executive trading -- let me find it.

 7   Page 13 of the article.  The page numbers are there

 8   at the top -- the top of the page.

 9                  You've written about something called

10   relative risk aversion; is that correct?

11          A.      Relative risk aversion, yes, I'm

12   familiar with that.

13          Q.      Okay.  And you say here on page 13,

14   the paragraph starting, "Although outsiders to the

15   firm can observe from proxy disclosures how much

16   wealth CEOs have invested in the firm" --

17                  Do you see where I'm reading?

18          A.      Yes, I do.

19          Q.      -- "the...total wealth cannot be

20   directly observed."

21                  Is that still a statement you agree

22   with today?

23          A.      Yes.  I mean, certainly by --

24   certainly based on public information, you wouldn't

25   be able to do that.
```

1    Q.    So did you do any analysis here of

2  Mr. Noto's total wealth relative to his purchases of

3  Twitter stock during the class period?

4    A.    No.  That wasn't necessary to draw the

5  opinions that I drew about his trades.

6    Q.    And why was that unnecessary, sir?

7    A.    Because, again, I mean, what I did

8  with respect to Mr. Noto's trades is simply a

9  calculation that says under the plaintiffs' --

10  assuming the plaintiffs' allegations are correct and

11  Twitter's stock price is inflated, what were the

12  financial losses that Mr. Noto would have suffered

13  by buying shares at inflated price.

14    Q.    Do you know how long he held those

15  3,000 shares that he bought during the class period?

16    A.    I know he held them I believe at

17  least -- well, I do know he held them until at least

18  the end of class period.  Beyond that I'm not sure.

19  I haven't analyzed it.

20    Q.    You don't know whether he actually

21  suffered a loss on the purchase of those shares; is

22  that correct?

23    A.    Well, in terms of -- in terms of

24  realized, yeah, I don't know.

25    Q.    Have you looked at any case law

**Confidential**

1   regarding executives who buy shares at inflated

2   prices?

3          A.     Have I looked at any case law?  Maybe

4   through my work as an expert, I've seen cases with

5   respect to that, but I can't -- couldn't point you

6   to anything off the top of my head.

7          Q.     And you don't know what legal

8   significance an executive's purchases of shares at

9   inflated prices has; is that true?

10         A.     Say that again.

11         Q.     You don't know what legal significance

12  it has if an executive purchases shares at inflated

13  prices; correct?

14         A.     No.

15         Q.     I'd like to show you -- we were

16  discussing this just a minute ago.  It's already

17  been marked as Exhibit 419.

18                (Exhibit 419, Previously marked.)

19                MS. CONN:  For the record, Exhibit 419

20         is Twitter's insider trading policy.  It

21         bears Bates Nos. TWTR_SHEN_00329986 through

22         29986_0007.

23  BY MS. CONN:

24         Q.     Would you take a look at Exhibit 419,

25  please.

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1          A.      Okay.

2          Q.      That is a document you reviewed in

3    preparing your report; is that correct?

4          A.      It is.

5          Q.      And I think you discuss this policy a

6    bit in your report, but would you turn, please, to

7    page 3 of the document.   It's got a Bates number

8    ending 003.

9          A.      Okay.   I have it.

10         Q.      Is it your understanding, sir, that,

11   pursuant to this policy, Twitter executives were

12   required to trade under a 10b5-1 plan?

13         A.      Yes, that's my understanding.   At

14   least the senior executives were.

15         Q.      When you say "at least the senior

16   executives," is there a reason you don't think this

17   applied to all Twitter employees?

18         A.      Let me just double-check.   Sometimes

19   these things apply to --

20         Q.      Sure.

21         A.      -- certain --

22         Q.      Take your time and read the document.

23                 (Pause.)

24         A.      So my reading here would seem to

25   suggest that it applies to everybody at Twitter.

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1    Maybe there's some other document there that would

2    exempt some lower-level employees, but...

3          Q.    At the very least, even if it only

4    applied to Section 16 officers, that would include

5    Mr. Costolo; right?

6          A.    That's correct.

7          Q.    And it would also include Mr. Noto?

8          A.    Yes.

9          Q.    Would it include Mr. Dorsey, who was

10   the chairman of the board at the time?

11         A.    It would, yes.

12         Q.    Would it include Mr. Bain?

13         A.    I believe so, yes.

14         Q.    And would it include Ms. Gadde?

15         A.    I believe so, yes.

16         Q.    So would you agree, sir, that by

17   canceling their Rule 10b5-1 plans, those individuals

18   were prohibited from trading in Twitter securities

19   during the class period?

20              MR. YOUNGWOOD:  Objection to form.

21              THE WITNESS:  Well, they were -- I

22         mean, I don't know as if those two things are

23         correct.  Certainly when they canceled the

24         plan, they would no longer be trading under

25         that plan.  They could have other plans in

1              place.  They could set up new plans.  But

2              certainly when that plan was canceled, they

3              wouldn't be trading under that plan anymore.

4    BY MS. CONN:

5         **Q.    Okay.  To make it more simple, you**

6    **agree that without a Rule 10b5-1 plan in place,**

7    **those individuals could not trade in Twitter**

8    **securities?**

9         A.    Based on this insider trading policy,

10   that's my understanding.

11              (Pause.)

12        **Q.    Could you turn, please, to**

13   **paragraph 30 of your report.**

14        A.    Okay.

15        **Q.    You write here that "the SEC has**

16   **stated explicitly that canceling a Rule 10b5-1 plan**

17   **by itself does not result in liability under**

18   **Section 10(b) and Rule 10b5-1."**

19              **Do you see that?**

20        A.    I do.

21        **Q.    What do you mean by the phrase "by**

22   **itself"?**

23        A.    Simply that the -- that the fact that

24   the -- the fact that the plan is canceled does

25   not -- I mean, I think it's -- I think it's clear

1   here.  I mean, based on no other information.

2         Q.     Are there other facts and

3   circumstances that might make a cancellation

4   manipulative?

5         A.     It's possible.

6         Q.     Do you want to give me any examples?

7         A.     Not as I sit here, no.

8         Q.     You can't think of any examples in

9   which an executive who canceled a Rule 10b5-1 plan

10  might be doing that as a manipulative act?

11        A.     I think you'd need to put more

12  structure on "manipulative."

13        Q.     Do you believe that Rule 10b5-1 plans

14  can be abused?

15        A.     Well, you can construct scenarios

16  where -- where one could argue that they can be

17  abused.  And there's some -- there is some empirical

18  evidence out there that tries to get at some of

19  that.

20        Q.     What's the empirical evidence that

21  you're thinking of?

22        A.     Well, I mean, the research -- Alan

23  Jagolinzer has a paper that's published -- in

24  Management Science, it's published.  But, yeah, it's

25  not so much that the plans are -- I forget the

**Confidential**

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1   wording of your question.  It's not so much the
 2   plans are being used to engage in fraudulent
 3   activity, but that setting up a plan doesn't mean
 4   that it's some kind of bulletproof, you know,
 5   defense against some allegations.
 6        Q.      So you agree with Professor
 7   Henderson's statement that "it is important not to
 8   treat Rule 10b5-1 trading plans as a carte blanche,
 9   get-out-of-jail-free card."
10             MR. YOUNGWOOD:  Objection to form.
11             THE WITNESS:  I don't know if I'd word
12        it that way, but certainly you can construct
13        scenarios where a 10b5-1 plan is put in
14        place, but an executive is still trading on
15        material non-public information.
16   BY MS. CONN:
17        Q.      And you agree with the SEC's statement
18   that scienter remains a necessary element for
19   liability under Section 10(b) of the Exchange Act
20   and Rule 10b-5 thereunder, and Rule 10b5-1 does not
21   change that?
22        A.      I'm not familiar with that -- that
23   language.  Maybe I've read it at some point, but --
24        Q.      I'll represent to you it was in some
25   of the materials you considered.
```

**Page 91**

**Wayne Guay**                                    **In re Twitter Inc. Securities Litigation**

1          A.      Okay.

2          **Q.      So do you disagree with that**

3    **statement?**

4          A.      I have no reason to disagree.  I have

5    no information that would allow me to disagree.

6          **Q.      Did you do anything to determine**

7    **whether Mr. Costolo was in possession of material**

8    **non-public information when he instituted his**

9    **Rule 10b5-1 plans?**

10         A.      No, that's not something that I would

11   be -- would be asked to or be able to do.

12         **Q.      Did you assume he was not in**

13   **possession of material non-public information at**

14   **that time?**

15         A.      Well, as I talked about -- I mean, I

16   have sort of two scenarios that I look at in my

17   report.  I look at some scenarios where the

18   plaintiffs' allegations are not correct, and then I

19   look at the behavior and see if it's consistent with

20   what I would expect in that world.  And then I look

21   at some scenarios where plaintiffs' allegations are

22   correct and see whether it's consistent or

23   inconsistent with that.

24         **Q.      Okay.  But just to be clear, I'm**

25   **asking you about when he set up the plan, not when**

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1    he canceled the plan.

2           A.      Right.

3           Q.      You understand that happened before

4    the class period; is that right?

5           A.      It did, yes.

6           Q.      So is it fair to say you also did not

7    do anything to determine whether Mr. Costolo was in

8    possession of material non-public information when

9    he sold his stock?

10          A.      That is not something that I would be

11   asked to do or would be able to do.

12          Q.      Did you assume he was not in

13   possession of material non-public information at the

14   time?

15          A.      Again, I consider a -- scenarios where

16   the plaintiffs' allegations are or are not correct.

17          Q.      And same question with regard to when

18   he canceled his plan.

19                  Did you do anything to determine

20   whether Mr. Costolo was in possession of material

21   non-public information when he canceled his plan?

22          A.      Same answer.

23          Q.      Did you do anything to determine

24   whether any other Twitter executive who traded in

25   Twitter securities during the class period was in

**Confidential**

 1    possession of material non-public information?

 2          A.     Same answer.

 3          Q.     **Same answer being you were not asked**

 4    **to do that and you --**

 5          A.     I wasn't asked to do it and I wouldn't

 6    be able to do it.

 7          Q.     **When you say you're not able to do**

 8    **that, can you explain why.**

 9          A.     Yes, so that's, as I understand it, a

10    key issue, in this case and in most of these

11    litigations, is that there's an allegation that

12    there's material non-public information that the

13    executives have during the class period.  And it

14    requires an analysis of what's material, what's

15    non-public, what the entire mosaic is.  And figuring

16    that out presumably is going to be the job of the

17    judge and jury.

18          Q.     **In any event, it would be beyond your**

19    **expertise; is that fair to say?**

20                 MR. YOUNGWOOD:  Objection to form.

21                 THE WITNESS:  Yes, certainly in this

22          context.

23    BY MS. CONN:

24          Q.     **And is it fair to say you also did not**

25    **do anything to determine whether any other Twitter**

**Page 94**

**Confidential**

1   executive who canceled a Rule 10b5-1 plan during the

2   class period was in possession of material

3   non-public information at the time of the

4   cancellation?

5          A.    Yes, that's not something I was asked

6   to do.

7          Q.    In paragraph 31 of your report --

8          A.    31, yep.

9          Q.    Before we get there, your opinions

10  regarding the 10b5-1 plans being -- not being

11  suspicious, is that informed at all by your own

12  academic research and experience?

13         A.    Certainly, yes.  I mean, I'm familiar

14  with literature on 10b5-1 trading plans.  I'm

15  familiar with lots of literature on executive

16  trading.  I've written papers on executive trading,

17  so, yeah.

18         Q.    Let's go to paragraph 31.  You write

19  that if, after initiating a Rule 10b5-1 plan -- I'm

20  paraphrasing just a bit here -- an insider becomes

21  aware of material non-public information, "there is

22  no requirement that the individual halt the sale of

23  shares or the 10b5-1 plan."

24               Do you see that?

25         A.    Let me see --

**Page 95**

1        Q.      It's about three lines down from the

2   bottom.

3        A.      I see.

4                (Pause.)

5        A.      Yes, I do see it.

6        Q.      So do you agree that Mr. Costolo was

7   not required to cancel his 10b5-1 plan in

8   February 2015?

9                MR. YOUNGWOOD:  Objection to form.

10               THE WITNESS:  Certainly not within the

11          context of the SEC's requirements with

12          respect to the 10b5-1 plans.

13  BY MS. CONN:

14       Q.      And was the same also true of the

15  other executives who canceled their plans in

16  February 2015?

17       A.      Well, I mean, here I'm making the

18  simple point that the whole point of a 10b5-1 plan

19  is that if you set it up at a period when you don't

20  have material non-public information and then you

21  set up an automated plan where you're not making any

22  further decisions, then there's no -- the whole

23  point of that is that it can just carry out the

24  trades.  And even if you do come into possession of

25  material non-public information, the trades simply

**Page 96**

**Confidential**

1    execute because they were pre-established prior to

2    having material non-public information.  So that's

3    the whole point of the 10b5-1 trading plan.

4         **Q.    Do you believe if the executive came**

5    **into possession of material non-public information,**

6    **he might have an incentive to cancel his plan?**

7         A.    Well, I don't know -- there certainly

8    can be an incentive.  There can be reasons why the

9    executive would want to cancel a plan at different

10   points in time.

11        **Q.    And Twitter's -- so going back to the**

12   **question about whether Mr. Costolo and the other**

13   **executives were required to cancel their plans in**

14   **February 2015, was that required under Twitter's**

15   **insider trading policy, as far as you understand it?**

16        A.    Not as far as I understand, no.

17             MS. CONN:  Can we take a quick break.

18             MR. YOUNGWOOD:  Sure.

19             MS. CONN:  We've been going about an

20        hour.

21             THE VIDEOGRAPHER:  The time right now

22        is 10:48 a.m.  We're off the record.

23             (Recess from the record.)

24             THE VIDEOGRAPHER:  This marks the

25        beginning of Media No. 2.  The time right now

 1          is 11:02 a.m.  We're back on the record.

 2   BY MS. CONN:

 3          Q.     Professor Guay, welcome back from our

 4   break.  You understand that you're still under oath?

 5          A.     Yes.

 6          Q.     I'd like to direct your attention,

 7   please, to paragraph 41 of your report, which is

 8   Henderson Exhibit 2.

 9          A.     Okay.

10          Q.     In paragraph 41, you write that the

11   lack of stock sales by the individual defendants

12   "(as well as the lack of arguments that the

13   individual defendants received any other financial

14   benefits from the alleged fraud through bonuses or

15   other forms of compensation) shows that the

16   individual defendants received no financial profit

17   from the fraud plaintiffs allege in this case."

18                 Do you see where I'm reading from?

19          A.     I do, yes.

20          Q.     And that is an opinion you intend to

21   offer at trial if asked to do so?

22          A.     Yes.

23          Q.     What do you mean by "financial

24   benefit" in this context?

25          A.     So in this context, it would be -- I

**Confidential**

```
 1   mean, I think pretty straightforward.  I mean, it
 2   would be benefits from stock sales, from bonus
 3   payments, from other sorts of financial compensation
 4   or gains that they might have received during the
 5   class period.
 6        Q.     So it's monetary?
 7        A.     I'm referring to financial benefits as
 8   monetary, yes.
 9        Q.     Do you think that executives keeping
10   their jobs is a benefit?
11        A.     Well, it's certainly -- yeah, I mean,
12   executives often want to keep their jobs, yes, so
13   that's something that they would probably value in
14   many cases.
15        Q.     Do you think that keeping Twitter's
16   stock at a high price was a benefit to the
17   executives?
18        A.     Well, that's a harder question to
19   answer.  You have to -- you'd need more context in
20   terms of how they would have benefited from that.
21        Q.     Do you think it's a benefit to
22   executives to preserve their reputations?
23        A.     Well, as a general matter.  I mean,
24   executives would generally care about their
25   reputations, yes.
```

**Page 99**

1    Q.    How about preserving the reputation of

2  the firm; is that a benefit?

3    A.    Well, it could be to the extent that

4  that makes them -- certainly you could think about

5  ways that that makes them better off.

6    Q.    Do you think that receiving financial

7  profit from an alleged fraud is the legal standard?

8         MR. YOUNGWOOD:  Objection to form.

9         MS. CONN:  Let me ask a different

10        question.

11  BY MS. CONN:

12    Q.    Do you think that receiving a

13  financial profit from an alleged fraud is a legal

14  requirement to proving securities fraud?

15    A.    I don't know.

16    Q.    Are you opining that plaintiffs cannot

17  demonstrate scienter because defendants received no

18  financial profit from the alleged fraud?

19    A.    No, I'm not making any -- giving any

20  opinion about that beyond what's in my report.

21    Q.    You note here that there are no

22  arguments that the individual defendants received

23  any financial benefits from the alleged fraud.

24         Are you opining there is no evidence

25  that they received a financial benefit from the

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1   fraud?
 2                 MR. YOUNGWOOD:  Objection to form.
 3                 THE WITNESS:  I don't believe I've
 4         seen any evidence, but there may be some that
 5         I haven't seen.
 6   BY MS. CONN:
 7         Q.     I guess what I'm trying to understand
 8   in this paragraph is when you refer to "the lack of
 9   arguments," are you referring to plaintiffs'
10   allegations?
11         A.     Well, Professor Henderson's report and
12   plaintiffs' allegations with respect to the -- what
13   I have here, the financial benefits.
14         Q.     And where you write here "The absence
15   of stock sales during the class period," neither
16   individual defendant had a Rule 10b5-1 plan in place
17   during the class period; is that correct?
18         A.     Say that again.
19         Q.     Neither Mr. Costolo, nor Mr. Noto had
20   a Rule 10b5-1 plan in place during the class period;
21   is that correct?
22         A.     Mr. Costolo did.  Mr. Noto did not.
23         Q.     Mr. Costolo canceled his Rule 10b5-1
24   plan in early February 2015; is that correct?
25         A.     That is correct.
```

1          Q.       And did not enter into a new plan

2     during the class period; is that correct?

3          A.       Yes, let me just make sure on the

4     dates here as to whether the cancellation -- are you

5     suggesting the cancellation of the plan was outside

6     of the class period?

7          Q.       To be fair, I think it was a few days

8     into the class period.

9          A.       I believe that's correct.

10         Q.       But aside from those few days, as far

11    as you're aware, Mr. Costolo did not have a

12    Rule 10b5-1 plan in place during the class period;

13    is that right?

14         A.       Yes, so he set up a 10b5-1 plan

15    several months earlier and had some trades executing

16    in that plan.  And then there were more trades that

17    were to be executed during the class period.  And

18    when he canceled shortly into the class period, he

19    didn't set up another 10b5-1 plan.

20         Q.       And as a matter of Twitter's policy,

21    that effectively made it impossible for him to sell

22    shares; is that true?

23                  MR. YOUNGWOOD:  Objection to form.

24                  THE WITNESS:  Well, I mean, he

25         could -- I mean, the fact that he didn't set

**Confidential**

1          up another 10b5-1 plan would prevent him from

2          selling shares.  He could have set up another

3          10b5-1 plan, but he didn't.

4    BY MS. CONN:

5          Q.     And the same is true of Mr. Noto;

6    correct?  He could not sell his Twitter shares

7    because he did not have a Rule 10b5-1 plan in place?

8          A.     That's my understanding of the insider

9    trading policy.

10          Q.     Paragraph 42 you go on to say that "In

11    spite of those facts, Professor Henderson opines

12    that a lack of stock sales cannot be used to infer

13    'a lack of scienter'."

14               And then later in that same paragraph,

15    you also write, "In spite of a lack of financial

16    benefits obtained from stock sales, the trading

17    behavior at issue could still be consistent with an

18    intent to defraud."

19               That's Professor Henderson's opinion.

20          A.     Right.

21          Q.     Are you equating "scienter" with a

22    financial motive here?

23          A.     Professor Henderson uses the word

24    "lack of scienter," I believe.

25          Q.     Right.

1          I'm asking, when you say in spite of

2   the lack of evidence of a financial profit,

3   Professor Henderson opines that a lack of stock

4   sales cannot be used to infer a lack of scienter.

5          Are you equating "scienter" with

6   financial motive?

7       A.    Let me just read this carefully.

8       Q.    Sure.

9          (Pause.)

10      A.    I mean, the two sentences we've read,

11  I'm just summarizing Professor Henderson's opinion.

12  I haven't given any of my opinions in those two

13  sentences.

14      Q.    I'm wondering what the significance of

15  the phrase "in spite of those facts" or "in spite of

16  a lack of financial benefits" means, as you've used

17  it here.

18      A.    I'm simply pointing out as -- I made

19  this point in paragraph 41 that I'm not aware of any

20  financial benefits that were obtained from stock

21  sales.  I'm pointing out that, in spite of that

22  fact, Professor Henderson draws the inference that

23  he does.

24      Q.    And you're not aware of the legal

25  significance of the fact that defendants received no

**Confidential**

1    financial profit from their fraud is; correct?

2         A.    What the legal significance is?

3         Q.    Correct.

4         A.    I'm not sure exactly what you're

5    asking, but I don't think I know what the legal

6    significance is.

7         Q.    You go on to say, in that same

8    paragraph, paragraph 42, of your report, that the

9    trading -- "observed trading patterns of the

10   individual defendants are consistent with and

11   reflective of economically rational trading

12   behavior."

13              Do you see that?

14        A.    I do.

15        Q.    It's true Mr. Costolo did not sell

16   during the class period; correct?

17        A.    Correct.

18        Q.    And he did not make a financial profit

19   as a result of that; correct?

20        A.    Well, yeah.  With no trades, there

21   wouldn't be any financial profit or loss.

22        Q.    And Mr. Noto also purchased shares

23   during the class period; correct?

24        A.    Well, let me be clear.  When my -- the

25   analysis I do of Professor -- of Mr. Costolo's

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1  trades within the class period -- the point that I'm

2  making in that analysis is that in a world where

3  plaintiffs' allegations are correct, his failure to

4  trade or the cancellation of his plan caused him to

5  suffer financial losses.  So in the world where the

6  plaintiffs' allegations are correct, then not

7  trading made him worse off than if he had let those

8  plans continue.

9            Here I'm talking about just generally,

10  for the individual defendants, when I look at their

11  trading patterns over time, they're consistent with

12  what I would expect in a world where plaintiffs'

13  allegations are not correct.

14      **Q.      So if I'm understanding what you're**

15  **saying, if plaintiffs' allegations are not correct,**

16  **the individual defendant's trading behavior can be**

17  **explained as economically rational?**

18      A.      In my opinion, in a world where the

19  plaintiffs' allegations are not correct, the trading

20  behavior is what I would expect from executives that

21  are trading for those reasons, yes.

22      **Q.      And, yet, if plaintiffs' allegations**

23  **are correct, then Mr. Costolo's, at a minimum,**

24  **trading behavior, in your words, made him worse off**

25  **and would not be economically rational?**

1        A.        Well, during the class period, I make

2    the point that if he had let his -- if he had let

3    his 10b5-1 plan continue to sell shares and the

4    plaintiffs' allegations are correct, the Twitter

5    stock price is inflated, then by canceling the plan,

6    he's foregoing the sales at a higher stock price

7    than he would otherwise get in the plaintiffs' world

8    when the stock price eventually drops.

9        **Q.        And that, in your opinion, is**

10    **economically irrational; true?**

11        A.        No, I did not say that.  He's

12    foregoing -- he's foregoing financial profits.  And

13    that's the -- that's what I draw -- and that would

14    be inconsistent with the plaintiffs' allegations of

15    trying to benefit from -- from that -- from their

16    allegations.

17        **Q.        You are -- you're pointing out that**

18    **he, Mr. Costolo, by canceling those trades, gave up**

19    **some potential profits.**

20        A.        If the plaintiffs' allegations are

21    correct, he could have let those trades go through

22    at a higher stock price than the stock price at the

23    end of the class period.

24        **Q.        Do you know, in fact, what the stock**

25    **price was at the time of those scheduled trades?**

**Confidential**

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1    A.    Do I know -- it's knowable.  The

2    10b5-1 plan -- the trades during the class period

3    would generally be at higher prices than the

4    trade -- the stock price during the class period

5    would generally be at a higher price than the stock

6    price at the end of the class period.  I actually

7    compute those differences in my report.

8    **Q.    What I'm trying to get at is, whether**

9    **or not the plaintiffs' allegations are correct,**

10   **Mr. Costolo -- we know just from looking at**

11   **historical stock prices that Mr. Costolo could have**

12   **sold those shares at a certain price on a certain**

13   **day; correct?**

14   A.    I mean, he -- I'm not sure exactly

15   what you're asking, but he set up a 10b5-1 plan -- I

16   think it was in August of 2014, and there was a

17   schedule of trades.  And we know what that schedule

18   of trades was.  When you schedule trades, you

19   don't -- you can't always necessarily execute those

20   trades on those days.  It depends on what's going on

21   in the market, but the trades would have been

22   expected to execute over that period of time.

23            And my point is a simple one, that by

24   allowing the plan to continue, he would have sold

25   those shares at a higher price relative to what the

1    price was at the end of the class period than if he

2    had canceled that plan.

3         **Q.    And that's true whether or not**

4    **plaintiffs' allegations are true; correct?  We know**

5    **that just from looking at the historical stock**

6    **prices.**

7         A.    Well, yes, so that's just true based

8    on the stock prices.  The inference of it being

9    inconsistent with the plaintiffs' allegations would

10   be that, by doing that, he had some foregone

11   profits, yes.

12        **Q.    And that's an inference that you've**

13   **drawn from that set of facts; true?**

14        A.    Yes.

15        **Q.    If you look, please, at paragraph 46**

16   **of your report.**

17        A.    Okay.

18        **Q.    You start out by saying, "It is**

19   **economically rational and unsurprising that**

20   **Mr. Costolo sold stock in the period after Twitter's**

21   **IPO in light of his low cash-based and high**

22   **equity-based compensation."**

23             **Do you see that?**

24        A.    I do.

25        **Q.    What do you mean by "unsurprising"?**

1          A.     Not unexpected.

2          Q.     **From whose perspective?**

3          A.     Mine.

4          Q.     **You go on to say, in that same**

5    **paragraph on the next page, page 25, "given his high**

6    **concentration of holdings in Twitter stock and**

7    **options and relatively low salary compared to his**

8    **equity holdings, Mr. Costolo had a strong economic**

9    **incentive to sell Twitter stock in the period after**

10   **Twitter's IPO."**

11         A.     I see that.

12         Q.     **He continued to have a strong economic**

13   **incentive to sell Twitter stock during the class**

14   **period; correct?**

15         A.     Are you reading now from somewhere

16   or --

17         Q.     **No, I'm just asking you.**

18         A.     So what was the question again?

19         Q.     **Sure.  Let me break it down a little**

20   **bit.**

21                **So you've stated here, in**

22   **paragraph 46, that Mr. Costolo had a "high**

23   **concentration of holdings in Twitter stock and**

24   **options and [a] relatively low salary compared to**

25   **his equity holdings"; correct?**

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1          A.      Correct.

2          Q.      Because of those two factors, he had

3    what you call "a strong economic incentive to sell

4    Twitter stock" --

5          A.      Correct.

6          Q.      -- is that correct?

7          A.      Uh-huh.

8          Q.      And that was true in the period after

9    Twitter's IPO?

10         A.      Correct.

11         Q.      And it was also true during the class

12   period; correct?

13         A.      Yes.  So by the class period, he had

14   sold a relatively small percentage of his portfolio,

15   but he had retained some 90 percent of the -- of his

16   Twitter stock holdings as of the class period.

17         Q.      He sold -- prior to the class period,

18   he sold about $32 million in stock; correct?

19         A.      Yes, I think it was about 9 percent of

20   his stock, so something like that, yes.

21         Q.      And that was, in your words,

22   relatively small?

23         A.      It's a relatively small proportion,

24   9 percent.

25         Q.      Do you have a threshold for what

1    constitutes a small percentage of someone's

2    portfolio?

3         A.    I mean, I don't have a specific

4    number, but 90 -- having -- holding 90 percent of

5    the stock that you started with at the time that you

6    started to diversify is still a very high

7    concentration, certainly much higher than one

8    would -- one would, you know, like to have based on

9    principles of financial economics and personal

10    financial planning.

11         Q.    And that was 9 percent of his total

12    holdings; is that right?

13         A.    Yes.

14         Q.    Not 9 percent of his vested.

15         A.    That was -- let me just make sure that

16    we have got the right numbers here.

17              (Pause.)

18         A.    So that would be based on vested plus

19    vestings that occurred during the period, yes.  So

20    it would strip out stuff that just never vested.

21         Q.    In paragraph 48, you discuss Twitter's

22    post-IPO lockup period.  And then towards the middle

23    of the paragraph, you reference an 8-K filing on

24    April 14, 2014 --

25         A.    Correct.

Wayne Guay                              In re Twitter Inc. Securities Litigation

1          Q.       -- that represented that "Jack Dorsey

2    and Evan Williams, cofounders of Twitter, and our

3    chief executive officer, Richard Costolo, have

4    informed us that they have no current plans to sell

5    any of their shares of Twitter...stock."

6                   Do you see that?

7          A.       I do.

8          Q.       Is that -- to your understanding, was

9    that a binding commitment not to sell Twitter stock?

10         A.       I'm not aware of any binding

11   commitment.  It is a public disclosure in an SEC

12   filing, which does carry some weight.

13         Q.       It is not a legally binding

14   commitment; would you agree?

15         A.       I'm not aware of a legal binding

16   commitment, no.

17         Q.       If you'd skip ahead to paragraphs 54

18   and 55 of your report.

19         A.       Okay.

20         Q.       You write here -- well, you're taking

21   issue here, fair to say, with Professor Henderson's

22   statement that Mr. Costolo's sales prior to the

23   class period were a deviation from his sales during

24   the months leading up to Analyst Day?

25         A.       Yes.  He calls it a clear deviation

**Confidential**

1    from the lack of sales.

2        Q.    Do you understand that Mr. -- or

3    Professor Henderson has made a correction to this

4    section of his report?

5        A.    I was -- I think I briefly heard that

6    when I was prepping here, but I don't know exactly

7    what his correction was.

8        Q.    So I believe he changed "36 months" to

9    "6 months leading up to Analyst Day."

10            Does that correction change your

11   opinion at all?

12       A.    What --

13            MR. YOUNGWOOD:  Objection to form.

14            THE WITNESS:  I actually don't know

15        what his full opinion is now.  Just changing

16        that number -- he's changed the number, but

17        no other analysis and no other -- that's it,

18        that's the full extent of the change?

19   BY MS. CONN:

20       Q.    Yes.

21       A.    So it was like a typo?

22       Q.    Yes.

23       A.    Wow.  Let's see.  I need to think

24   about this.

25            (Pause.)

1          Q.      By the way, did you read his

2     deposition transcript?

3          A.      No.

4          Q.      Did you ask to see it?

5          A.      I knew that he was being deposed.  I

6     would have -- I would have -- I would have read it

7     if it was provided to me, but it wasn't.

8          Q.      But you didn't ask for it.

9          A.      I didn't ask for it.

10          Yes, I mean, my opinion wouldn't

11     change here.  It's still a very misleading thing for

12     him to say given that, in the six months prior to

13     Analyst Day, that's essentially from the lockup

14     period through the end of the -- through the end of

15     the class period.  I don't know when his period ends

16     now.

17          But clearly my argument still holds

18     that this was coming out of an IPO.  And a CEO with

19     a concentrated position with illiquid securities

20     would be expected to sell during that period.  So

21     there's nothing that that would change about my

22     opinion.

23          Q.      Is it fair to say that you take issue

24     with Professor Henderson drawing inferences from a

25     period during which Mr. Costolo, quote, "either

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1   could not, or would not -- or had committed not to,

 2   sell"?

 3           A.     Yes, what Professor Henderson seems to

 4   ignore is that this -- the key fact of this case is

 5   that Twitter had just undergone an IPO.  And that is

 6   a very different setting than the typical CEO.  And

 7   certainly in Mr. Costolo's case, if you're going to

 8   analyze his behavior over time, that's a fact that

 9   is very important.

10           Q.     Is it important to your analysis that

11   Mr. Costolo, quote, "either could not, or had

12   committed not to, sell stock" during any of that

13   period?

14           A.     Well, it's important in the sense that

15   it informs my opinion about -- about Mr. Costolo's

16   expected trading behavior.

17           Q.     Do you agree that -- would you agree

18   that you can't draw an inference about a state of

19   mind one way or the other during a period when a

20   person is prohibited from trading?

21           A.     I'm not trying to draw opinions about

22   states of mind here.

23           Q.     So you have no opinion on that one way

24   or the other?

25           A.     On Mr. Costolo's state of mind?
```

**Page 116**

1      Q.      No, on the more general proposition

2   that during a period when someone is prevented from

3   trading, that affects what inferences you can draw

4   about their state of mind.

5      A.      About their state of mind.  I just

6   don't understand that question.

7      Q.      Okay.  Do you agree that Mr. Costolo's

8   trading behavior before the class period was

9   different from his trading behavior during the class

10  period?

11     A.      I don't know what you mean by

12  "different," but he didn't trade during the class

13  period and he didn't trade in the first year or so

14  after the IPO.  And then he traded a few months in

15  late 2014, when all of his trades occurred.  So, I

16  mean, I talk about all of that in my report and sort

17  of why I would expect that behavior to have

18  occurred.

19     Q.      Setting aside whether it's consistent

20  with your expectations, you agree that Mr. Costolo

21  sold more stock in the months before the class

22  period than he did during the class period; correct?

23     A.      During the class period, he sold zero.

24  And in the months leading up to, he -- he had some

25  sales.

1    **Q.    He sold $32 million worth of stock;**
2    **correct?**
3        A.    I think he sold, yes, about 9 percent
4    of his portfolio.
5        **Q.    Those are just facts; right?  Those**
6    **are just numbers?**
7        A.    They are indeed numbers.
8        **Q.    And you don't disagree with those**
9    **numbers, do you?**
10       A.    No, I computed -- the 9.2 percent is
11   my own computation.
12       **Q.    By the way, when Mr. Costolo and**
13   **others announced that they would not sell stock**
14   **following -- for some period of months after the IPO**
15   **lockup closed, was that an economically rational**
16   **decision?**
17       A.    Well, I mean, I understand -- it's
18   certainly not surprising that executives might do
19   that.  So, you know, again, this gets back to the
20   signaling arguments that we were talking about a
21   little bit earlier on, the way to show your
22   confidence and strength of the company might be to
23   tell investors that you're willing to continue
24   holding shares even after some of the other
25   executives might be selling their shares.

1        Q.      Even if that means foregoing financial

2    profits.

3        A.      Well, I don't know what you mean by

4    "financial profits."  I'm not aware of any -- any

5    allegations that Mr. Costolo or anyone else had

6    material non-public information following the lockup

7    period.

8              So the foregoing profits part we were

9    talking about before stems from an assumption that

10   the stock is mispriced.  So under the plaintiffs'

11   allegations, the stock is mispriced at a certain

12   point in time.  I don't know of any allegations that

13   the stock was mispriced following the lockup period.

14       Q.      Okay.  And just to be clear, I'm using

15   "financial profit" in the same way that you've been

16   using it in your report here.

17       A.      I can appreciate that.

18       Q.      So I don't know that I got an answer

19   to the question about whether the agreement to hold

20   shares post IPO lockup was an economically rational

21   decision, in your opinion.

22       A.      Well, it's consistent with -- with

23   rational economic behavior.  If an executive's

24   intention is to try to send a signal of a founder --

25   here we have some founders doing the same thing --

1   if the founders' and CEO's intention is to try to

2   signal to investors their confidence in the company,

3   one way to do that would be to commit not to sell

4   shares.  And there have been lots of executives over

5   time who have committed to not selling shares and

6   have done it publicly to send that kind of signal.

7         **Q.     So is that a yes?**

8         A.     It is a, yes, it's consistent.  I

9   think it's consistent with rational economic

10  behavior.

11        **Q.     In paragraph 56 of your report,**

12  **Exhibit Henderson 2 --**

13        A.     5-6?

14        **Q.     5-6.**

15        A.     Yep.

16        **Q.     -- you write, "Professor Henderson**

17  **provides no evidence for the claim that sales prior**

18  **to the class period provided a cushion for**

19  **Mr. Costolo's consumption needs."**

20               **Do you see that?**

21        A.     I do.

22        **Q.     You didn't review Mr. Costolo's**

23  **personal financial records from that time period,**

24  **did you?**

25        A.     I did not.

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1          Q.      So you don't know what other assets he
2     held at the time?
3          A.      I don't know specifically -- no, I
4     don't know what other assets he held.
5          Q.      And did you review any documents
6     regarding what Mr. Costolo knew at the time about
7     Twitter's user growth?
8          A.      No, not -- nothing specific.
9          Q.      You do note that, at the time of the
10    IPO, Mr. Costolo was earning $130,000 a year;
11    correct?
12         A.      No, I don't think that's right.  I
13    think -- well, I mean, if you're talking about his
14    salary, that is correct.
15         Q.      Yes, his salary.
16                 His cash salary; is that correct?
17         A.      Yes.
18         Q.      So you don't think it's a reasonable
19    conclusion that a sale of $32 million worth of stock
20    for someone who's earning $130,000 in cash would
21    provide you a substantial cushion for consumption?
22         A.      My point here is I don't know if it
23    does, but Professor Henderson doesn't provide any
24    evidence of that.
25         Q.      You also say, in paragraph 56, that

1    "Professor Henderson gives almost exclusive

2    prominence to the consumption motivation, ignoring

3    that Mr. Costolo's trading pattern was motivated by

4    other economically rational reasons."

5              Do you see that?

6         A.    Yes.

7         Q.    You don't actually know what

8    Mr. Costolo's trades were motivated by, do you?

9         A.    I mean, I don't know, again,

10   Mr. Costolo's state of mind, but I do understand

11   what economically rational reasons for sales would

12   be.

13        Q.    But you didn't speak to Mr. Costolo,

14   did you?

15        A.    I did not.

16        Q.    You didn't review his personal

17   financial records?

18        A.    I did not.

19        Q.    You don't know actually how diverse

20   his portfolio was at the time?

21        A.    Not specifically, but unless he had --

22   unless he was a billionaire outside of Twitter, he

23   was not well diversified.

24        Q.    Do you have any reason to believe that

25   the need for diversification was urgent?

1        A.        Well, the need for diversification --

2    I mean, one doesn't typically describe the need for

3    diversification as urgent.   I mean, if you have a

4    poorly diversified portfolio, you would generally

5    like to diversify it.   So there's generally no

6    notion of urgency there.

7        **Q.        And your conclusion that**

8    **"Mr. Costolo's trading pattern was motivated by**

9    **other economically rational reasons, such as**

10   **diversification," is that simply based on your**

11   **understanding of what an economically rational**

12   **executive would do?**

13       A.        Well, here I'm simply pointing out

14   that Professor Henderson, as I say, gives almost

15   exclusive prominence to the consumption motivation

16   and that he ignores these other alternatives for

17   trading behavior, like diversification, liquidity

18   and signaling.

19       **Q.        Right.**

20           **And you criticize Professor Henderson**

21   **for not having any evidence regarding consumption**

22   **needs.**

23           **Did you have any evidence regarding**

24   **Mr. Costolo's need for diversification?**

25       A.        Well, generally, yes.   As we've just

**Confidential**

1   discussed, his cash compensation was very low.  He

2   held upwards of $300-plus million of Twitter stock

3   that was essentially locked up for a substantial

4   period of time.  So you have an executive with a

5   substantial amount of firm-specific equity.

6           And like I said, unless he had a

7   billion dollars in outside wealth that had nothing

8   to do with Twitter, he was not well diversified.

9       **Q.    You're essentially making the same**

10  **analysis that Professor Henderson has made here.**

11      A.    No.

12      **Q.    You are examining what's publicly**

13  **available about Mr. Costolo's portfolio and income**

14  **and compensation package and coming to a conclusion**

15  **about what motivated his trading.**

16      A.    Well, if that's what you're talking

17  about, I mean, that we're looking at the public

18  information, yes.  So I'm thinking about multiple

19  motivations, consumption, diversification, signaling

20  and liquidity.

21          Professor Henderson, although he

22  clearly recognizes diversification as a motivation

23  and discusses it in detail in his report, when he

24  then gets to Mr. Costolo and his trading before the

25  class period, he focuses exclusively on his

**Page 124**

1  consumption issue without considering the other

2  issues.  And I just think that that's not right.

3     **Q.     When you say you're thinking about**

4  **multiple motivations for Mr. Costolo's trades -- and**

5  **you identify a few here, but, again, you don't --**

6  **you don't know actually what his reasons for trading**

7  **were, do you?**

8     A.    I mean, I know what I saw in his

9  deposition and what he talked about and what the --

10  I think Twitter actually even released some public

11  disclosures about his trading behavior and some of

12  the reasons behind it, but beyond that, I don't

13  know.

14     **Q.     Okay.  So when you say in your report**

15  **here that his trading pattern "was motivated" by**

16  **those factors, is that a correct statement?**

17     A.    Well, essentially what I'm saying here

18  is, again, as I've indicated -- I mean, when I do

19  this analysis, I consider multiple reasons.

20  Professor Henderson starts out by giving at least

21  lip service to multiple reasons, but then once it

22  comes to analyzing Mr. Costolo's trading behavior,

23  he focuses exclusively on consumption.  And that's

24  my point.

25     **Q.     I want to stop you there.  I**

**Confidential**

1   understand that's your criticism of Professor

2   Henderson.

3           I'm just asking you, do you, in fact,

4   know what motivated these trades when you say they

5   were motivated by other economically rational

6   reasons, or are you speculating?

7       A.    When you say "was motivated," are you

8   talking about paragraph 56?

9       Q.    I am.

10      A.    In paragraph 56, I'm clearly rebutting

11  Professor Henderson.  So I'm clearly saying that

12  Professor Henderson has talked about multiple

13  reasons, and then he focuses on consumption.  And

14  I'm saying you need to focus on some of these other

15  things as well, because they're still there and they

16  can still easily be there during the class period

17  and after the trading.

18          In the final sentence there, I say,

19  "Diversification...appears to have been a motivating

20  factor for Mr. Costolo's sales," so --

21      Q.    It would be fairer to say that

22  Mr. Costolo's trading pattern may have been

23  motivated by other economically rational reasons;

24  wouldn't you agree?

25      A.    My point here --

```
 1                    MR. YOUNGWOOD:  Objection to form.
 2                    THE WITNESS:  Yeah, I don't want to be
 3            argumentative, but I'm clearly, in
 4            paragraph 56, focused on Professor Henderson
 5            and what Professor Henderson didn't do that
 6            he should have done.  And that's the point
 7            that I'm trying to make, and I think that's
 8            clear in this paragraph.
 9   BY MS. CONN:
10            Q.    When you say
11   "Diversification...appears to have been a motivating
12   factor for Mr. Costolo's sales," are you basing that
13   on anything other than what Twitter reported to the
14   press after Mr. Costolo came under scrutiny for
15   selling his stock?
16            A.    Yes.
17            Q.    What are you basing that on?
18            A.    I'm basing it on what I just talked
19   about a few minutes ago:  The fact that Mr. Costolo
20   had a relatively low salary; he had substantial
21   equity in Twitter that had been locked up for many
22   months, even years prior to the IPO and then even a
23   period after that; and that he had some $300-plus
24   million in equity, he sold a very small percentage
25   of that, less than 10 percent; and unless he had a
```

**Confidential**

1  billion dollars in wealth outside of Twitter,

2  diversification would have been a perfectly

3  reasonable motivation for those trades.

4  **Q.    The same factors that you just**

5  **identified would also support consumption as a**

6  **motivation for those trades; would you agree?**

7  A.    Well, consumption would be --

8  consumption would be -- consumption would be a

9  motivation until you had sold enough stock to

10  satisfy your consumption needs, and then the

11  consumption needs may not continue, but

12  diversification needs and some of these other

13  reasons may still be there -- would still be there.

14  **Q.    I think you told me earlier that in**

15  **formulating your opinions about what motivated**

16  **Mr. Costolo's trading prior to the class period, you**

17  **did not review any documents regarding what**

18  **knowledge he had about Twitter's business operations**

19  **at the time; correct?**

20  A.    Yes -- you know, yeah, nothing

21  specific.  Certainly not with that intended purpose.

22  **Q.    I'd like to show you what's previously**

23  **been marked as Exhibit 308.**

24           (Exhibit 308, Previously marked.)

25           MS. CONN:  For the record, Exhibit 308

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1          is a December 28, 2014, e-mail between Dick

2          Costolo and Peter Fenton bearing Bates

3          TWTR_SHEN_00248325 through I think 326,

4          although the Bates number has been cut off on

5          the second page.  I apologize for that.

6   BY MS. CONN:

7          Q.      **Is this a document that you considered**

8   **in formulating your report?**

9          A.      I mean, I do recall reading some

10  e-mails from Christmastime or the holiday time.  I

11  can't recall if it's this one specifically.

12                 Is this one that I've cited?

13         Q.      **Yes, it actually is in your list of**

14  **materials considered.**

15         A.      Well, then, maybe this is one I've

16  seen.

17         Q.      **Do you know who Peter Fenton is?**

18         A.      Let me just refresh my memory on this.

19         Q.      **Sure.**

20                 (Pause.)

21         A.      I can't recall exactly who Peter

22  Fenton is.

23         Q.      **Okay.  I'll represent to you that**

24  **Mr. Fenton is a member of Twitter's board of**

25  **directors, or was at the time of this e-mail.**

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1          A.      Okay.

2          Q.      Is this e-mail in which Mr. Costolo

3     tells one of Twitter's directors that, quote, "it

4     ████████████████████████████████████████████████

5     █████████████████████████████████████████

6     expects to have his "feet held to the fire...when we

7     announce in February."

8               Do you see those statements?

9          A.      I don't see the "February" thing.

10    Where's that?

11         Q.      It's the paragraph that starts, "Of

12    course, it's the user number we all expect to have

13    our feet held to the fire about when we announce in

14    February."

15         A.      Okay.

16         Q.      Is this e-mail in which Mr. Costolo is

17    making these representations to one of Twitter's

18    directors relevant to your opinion about his

19    motivations for trading prior to the class period?

20         A.      I mean, I'll note this is in December.

21    There's a lot of information in here.  I don't know

22    how this fits into the overall information mix.  I

23    mean, there's discussions about disappointing

24    things, things they're trying to do to make things

25    better.  There's lots of information here.  I don't

1     know how to put this in context.

2          Q.     Okay.  If you assume that Mr. Costolo

3     knew of negative trends in user growth and user

4     engagement at the time of his sales, does that

5     change your opinion?

6          A.     No, there's always, you know,

7     disappointing things, favorable things.  There's

8     lots of -- there's a big mix of information about

9     companies all the time.  So an e-mail like this

10    doesn't help me at all.

11         Q.     Well, I'm not asking you just about

12    the e-mail itself.  I'm asking you to assume that

13    Mr. Costolo knew negative trends in user growth and

14    user engagement.

15         A.     I have no way to put that in the

16    overall context of the organization.  So I don't

17    know how important that is.  I don't know if other

18    things were going on that might have swamped that

19    bad news on the positive side.  I just have no idea.

20         Q.     So it doesn't change your opinion.

21         A.     Definitely not.

22         Q.     If you'll look, please, at

23    paragraph 57 of your report.

24                (Pause.)

25         A.     Okay.

Wayne Guay

In re Twitter Inc. Securities Litigation

1      Q.      And you write here, towards the end of

2  the paragraph at the top of the page 32,

3  Mr. Costolo's "decision not to sell during the class

4  period appears to have been motivated at least in

5  part by other factors."

6              Do you see where I'm reading from?

7      A.      Let me just read this paragraph.

8      Q.      Sure.

9              (Pause.)

10     A.      Okay.

11     Q.      Do you see that statement that I just

12  read?

13     A.      Yes.

14     Q.      Now, again, Mr. Costolo had canceled

15  his Rule 10b5-1 plan; correct?

16     A.      A few days into the class period, yes.

17     Q.      And, therefore, he could not sell

18  under Twitter's insider trading policy during the

19  class period; is that correct?

20     A.      Not unless he had put in another plan,

21  but we've talked about that.

22     Q.      So when you refer here to his

23  "decision not to sell," what are you referring to?

24     A.      It means that he canceled his plan

25  during -- he set up a plan in August and then,

1  during the class period, he canceled the plan.

2  Professor Henderson -- well, here I'm saying

3  Professor Henderson has argued that he didn't need

4  to trade during the class period, I guess because he

5  didn't have consumption needs.  And my point here is

6  simply that there may have been other factors beyond

7  consumption needs for why Mr. Costolo didn't sell.

8          Q.    So the answer to my question, what are

9  you referring to when you talk about his decision

10  not to sell, is that you're talking about his

11  decision to cancel his plan?

12         A.    During the class period, yes.

13         Q.    Okay.  As with the other sales that

14  we've discussed today or trading that we've

15  discussed today, you're not able to say what, in

16  fact, was in Mr. Costolo's head at the time he

17  canceled his plan; is that true?

18         A.    True.  Correct.

19         Q.    And even if you could, Mr. Costolo

20  will be present at trial; right?

21              MR. YOUNGWOOD:  Objection to form.

22              THE WITNESS:  I have no idea.

23  BY MS. CONN:

24         Q.    You would expect that if he is present

25  in the courtroom, he'll testify; correct?

```
 1                    MR. YOUNGWOOD:  Objection to form.

 2                    THE WITNESS:  I don't know the answer

 3          to that.

 4   BY MS. CONN:

 5          Q.     Can you think of any reason why the

 6   jury would need to hear from you what was in

 7   Mr. Costolo's head?

 8                    MR. YOUNGWOOD:  Objection to form.

 9                    THE WITNESS:  I'm not sure what you're

10          asking.  I mean, I don't know what the jury

11          needs to hear.

12   BY MS. CONN:

13          Q.     Okay.  Well -- I mean, my point here

14   is, in paragraph 57, you've made some -- you've

15   speculated a bit about what could have motivated

16   Mr. Costolo's cancellation of his 10b5-1 plan;

17   correct?

18          A.     I haven't speculated.  Based on the

19   information that I've seen regarding discussions

20   about canceling these plans and the pressures from

21   the investment community and all the other things

22   we've talked about, I've laid out some possibilities

23   that would be reasonable possibilities that are not

24   consistent with the plaintiffs' allegations for why

25   we might have seen this trading behavior.
```

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1         Q.      "Reasonable possibilities" meaning
 2   they may or may not be true.
 3         A.      I don't know with certainty why
 4   they -- why they did what they did at any point in
 5   time.
 6         Q.      Okay.  And -- withdraw that.
 7               I'm trying to find where it starts.
 8               You go on to discuss in your report
 9   Professor Henderson's analysis of Mr. Costolo's
10   trades relative to other CEOs.  I believe that
11   starts at paragraph 58 and continues on for several
12   paragraphs.
13         A.      Okay.  Yes.
14         Q.      And then, in paragraph 67, you offer
15   what you describe as "a more relevant analysis."
16               Do you see that?
17         A.      Yes.
18         Q.      To conduct that analysis, you selected
19   a group of companies and compared the trading
20   behavior of their CEOs with Mr. Costolo's trading
21   behavior; correct?
22         A.      I did, yes.
23         Q.      And that was also the methodology
24   employed by Professor Henderson, wasn't it?
25         A.      No.
```

1          MR. YOUNGWOOD:  Objection to form.

2    BY MS. CONN:

3          **Q.     Oh.  In what way was it different?**

4          A.     We used a very, very different method

5    for selecting and filtering to find the comparable

6    CEOs.  And Professor Henderson didn't even -- I

7    don't even know what method he followed because the

8    method he described in the report would not have

9    given rise to his -- to his sample group, so --

10         **Q.     Okay.**

11         A.     -- I have no idea what Professor

12   Henderson did.

13         **Q.     Well, what you're arguing with in your**

14   **report is the particular selection Professor**

15   **Henderson made; isn't that right?**

16         A.     It's all about the particular

17   selection.  I mean, that's the whole point of

18   picking a peer group.

19         **Q.     Okay.  So taking it back a step from**

20   **what the peer group was, you'd agree that both you**

21   **and Professor Henderson chose a peer group and then**

22   **analyzed Mr. Costolo's trading behavior relative to**

23   **the peer group that you selected?**

24         A.     Yes.  And I wouldn't call Professor

25   Henderson's analysis peers.  He picked some firms to

**Confidential**

1    compare Mr. Costolo to, but I wouldn't call them

2    peers.

3         Q.    Okay.  But setting aside that semantic

4    point --

5         A.    It's not semantic.

6         Q.    -- it's still a group of companies by

7    which he made a comparison; correct?

8              MR. YOUNGWOOD:  Objection to form.

9              THE WITNESS:  It is not semantic.

10   BY MS. CONN:

11        Q.    Okay.  I'm not trying to argue with

12   you, sir.

13        A.    Okay.

14        Q.    But I asked you if Professor Henderson

15   chose a peer group and analyzed Mr. Costolo's

16   trading behavior relative to that peer group and

17   that you did the same thing.

18              Your answer was "I wouldn't call them

19   peers."  I'm just trying to get an answer to my

20   question.

21        A.    Okay.  I wouldn't call them peers.

22        Q.    So how about an answer to -- a

23   yes-or-no answer to this question:  Professor

24   Henderson chose a group of companies and compared

25   the trading behavior of their CEOs to Mr. Costolo's,

1   and you also chose a group of companies and compared

2   their trading -- the trading behavior of their CEOs

3   to Mr. Costolo's; is that fair to say?

4          A.    That's fair, yes.

5          Q.    Okay.  You also made some subjective

6   decisions about whether companies that matched your

7   criteria should be included in your analysis; isn't

8   that right?

9          A.    Can you point me to what you're

10  referring to?

11         Q.    Yes.  It's Footnote 126 on page 38.

12                (Pause.)

13         Q.    In Footnote 126, you seem to be

14  acknowledging that you excluded a company that fit

15  your prespecified parameters since the CEO resigned

16  one month after the company's IPO and may have had

17  unconventional trading patterns.

18                Do you see that?

19         A.    Right.

20         Q.    So even though you had a defined set

21  of criteria, you also made a decision that certain

22  companies within those criteria should not be

23  included in your sample.

24         A.    I did.  And I clearly discuss those in

25  and footnoted those in my report, where Professor

**Confidential**

1    Henderson did not.

2          Q.      Okay.  Did you -- you told me you had

3    not read his deposition; right?

4          A.      I have not.

5          Q.      So you selected companies based on --

6    one of the factors you considered was whether they

7    had an IPO close in time to Twitter's IPO; is that

8    right?

9          A.      Yes.

10          Q.      Why would the random chance that these

11    companies IPO'd at the same time as Twitter make

12    them peers of Twitter?

13                    MR. YOUNGWOOD:  Objection to form.

14                    THE WITNESS:  What do you mean by

15          "random"?

16    BY MS. CONN:

17          Q.      Meaning that they just so happened to

18    IPO in a particular time frame.

19          A.      Well, that certainly is not the first

20    criteria.  The first criteria was to select firms in

21    the same industry code as Twitter.  So among a set

22    of firms that are deemed by the government,

23    actually, to be in the same industry as Twitter,

24    then I -- once I have that group, then I look for

25    the similar kinds of tech companies that went public

**Page 139**

1    in a window around Twitter's.

2         **Q.      How many of the companies that you**

3    **selected are social media companies?**

4         A.    I -- I don't know precisely.  I mean,

5    they're based on the Standard Industrial

6    Classification code that is in the same industry

7    code as Twitter.

8         **Q.      How many of the companies you selected**

9    **are actually considered by Twitter to be its peers?**

10             MR. YOUNGWOOD:  Objection to form.

11             THE WITNESS:  Well -- yeah, you know,

12             this isn't -- I'm not selecting a peer group

13             based on what kind of products compete with

14             each other or social media products that

15             compete with each other.  I'm selecting a

16             group of peers that I believe would be

17             appropriate for looking at the trading

18             behavior of the CEO.

19    BY MS. CONN:

20         **Q.      And to use your words in paragraph 67,**

21    **you believe that your selection of comparator**

22    **companies is more "reasonable" --**

23         A.    Yes.

24         **Q.      -- than Professor Henderson's; is that**

25    **true?**

1          A.      Yes, Professor Henderson used, I would

2     call, an ad hoc approach that doesn't even follow

3     what he disclosed in his report.  And I'm using an

4     approach that's much more scientific and more

5     consistent with what a researcher -- an empirical

6     researcher would do in my field, accounting and

7     finance.

8          **Q.      Would you agree that there is some**

9     **degree of arbitrariness in your selection criteria?**

10               MR. YOUNGWOOD:  Objection to form.

11               THE WITNESS:  No, I don't think

12          there's any arbitrariness at all.

13     BY MS. CONN:

14          **Q.      Fair to say that you disagree with the**

15     **selection of companies that Professor Henderson**

16     **made?**

17          A.      I disagree with his approach.  So the

18     companies fall out of the approach.  So when the

19     approach is flawed, then the comparator group will

20     be flawed.

21          **Q.      And when you say "approach," do you**

22     **mean his -- his criteria?**

23          A.      Well, I mean everything.  So I mean

24     the going and finding a list of tech companies from

25     a random magazine or website or what have you, then

Wayne Guay                                In re Twitter Inc. Securities Litigation

```
 1   putting in some criteria that ignores whether --
 2   whether he's looking at trading behavior following
 3   an IPO.  And then, in a very ad hoc way, including
 4   and excluding certain CEOs inexplicably in his
 5   analysis based on his own criteria.
 6        Q.     Do you know Professor Henderson, by
 7   the way?
 8        A.     Not personally.
 9        Q.     Let's turn to paragraph 71 in your
10   report, Exhibit Henderson 2.
11        A.     Okay.
12        Q.     In this and the following two
13   paragraphs, you criticize Professor Henderson --
14   withdraw that.
15             In this and the following two
16   paragraphs, you criticize Professor Henderson's
17   characterization of stock sales by Twitter insiders.
18             Is that a fair summary?
19        A.     Yes, I'm -- yes, I'm critiquing his --
20   yeah, his analysis of the full group of Twitter
21   executives and their trades over a relatively long
22   time frame.
23        Q.     And I think that we established
24   earlier in the deposition that this is the aggregate
25   trading by Twitter insiders during the class period;
```

Page 142

**Confidential**

1    is that right -- or during that period that he

2    analyzed?

3         A.      That's my understanding, yes.

4         Q.      Do you disagree that -- withdraw that.

5                 I don't want to ask a double negative.

6                 Do you agree that Twitter insiders

7    sold more stock in the period from Analyst Day to

8    the end of the class period than in the other

9    periods Professor Henderson analyzed?

10                MR. YOUNGWOOD:  Objection to form.

11                THE WITNESS:  Well, I mean -- you

12           know, I'm not sure exactly what you're asking

13           there.  I mean, Professor Henderson looks at

14           it on a monthly basis.  So, you know, I think

15           if -- simply answering your question, I think

16           there would have been more sales sold in the

17           later period than between Analyst Day and the

18           class period.  So I think that's -- I don't

19           think that's the question you want the answer

20           to.

21    BY MS. CONN:

22         Q.      Okay.  I'm looking at paragraph 71.

23         A.      Okay.

24         Q.      And I understand, sir, that you have

25    some disputes with Professor Henderson's

1    characterization here, but do you disagree with his

2    conclusions that Twitter insiders over -- I'm sorry.

3              Take a look at paragraph 71, second

4    line from the bottom of page 41.

5         A.    Okay.

6         Q.    You quote Professor Henderson as

7    saying Twitter insiders "sold 1.2 million shares per

8    month and $50 million per month, or about 1.8 times

9    and 2.4 times the average share and dollar amount,

10   respectively," from -- as compared to 2014 through

11   2019.

12        A.    Okay.

13        Q.    Do you disagree with his numbers here?

14        A.    No.  So I didn't -- I didn't

15   independently verify the number -- all the trades

16   during this long time period, but my understanding

17   is, based on the website that he used to come up

18   with these numbers, those are the numbers that get

19   spit out.

20        Q.    And do you disagree -- going up a

21   couple lines in that same paragraph, do you disagree

22   with the conclusion that "two of the top three

23   biggest months of sales by dollar volume (and four

24   of the top ten biggest months in terms of stock

25   volume) over a 61-month period" occurred in that

1    Analyst-Day-to-class-period time frame?

2          A.    Yeah, I don't dispute with the

3    numbers.  I dispute the relevance of his -- of his

4    analysis of those numbers.

5          **Q.    Okay.  You say here, at the top of**

6    **page 42, "Professor Henderson relies solely on a**

7    **mechanical analysis of stock sales data to make this**

8    **claim, [and] ignores relevant economic**

9    **circumstances, ignores documentation that discusses**

10   **the motivations behind the timing of 'other Twitter**

11   **insiders' stock sales, and fails to recognize**

12   **particular circumstances that explain the sales."**

13               **I won't read the rest of the sentence.**

14               **What "economic circumstances" are you**

15   **referring to here?**

16         A.    So we've been discussing a lot of

17   those today.  So keep in mind that his trades here

18   in this analysis include Mr. Costolo, they include

19   the founders, they include Mr. Noto and the other

20   executives that we have been talking about.

21               So those executives have a lot of the

22   shares, so their shares are going to be, in all

23   likelihood -- their trading behavior is going to be

24   heavily influencing this.  So in some sense, this

25   analysis Professor Henderson is doing is just going

1    to kind of be mirroring what we've been talking

2    about all along.

3              So the economic circumstances are that

4    there was an IPO, there was a lockup period, you had

5    founders and the CEO that had committed to not

6    selling shares -- publicly committed to not selling

7    shares for some number of months.

8              And so then in and around Analyst Day

9    through the class period, you would expect to see a

10   lot more trading in that time period for all the

11   reasons we've discussed than you would in 2018,

12   which is several years after the IPO.

13             So Professor Henderson, by simply

14   looking at what the trading behavior looks like in

15   2017 and '18 and '19 and saying it's different than

16   the trading behavior that happened right after

17   the -- right after the IPO, that's not surprising.

18   We've talked a lot about why you would expect to see

19   more trading coming after the IPO and the lockup

20   period.  So it's the same set of arguments that

21   we've been talking about today.

22        **Q.     Is there a different time period that**

23   **you think would be appropriate for such an analysis?**

24        A.     Well, the analysis -- I mean, to

25   compare -- well, couple of things.

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1              To compare the trading behavior
 2   following an IPO and following a lockup period to a
 3   random time period, I don't see how that's useful.
 4              The analysis we were talking about a
 5   few minutes ago where you compare the trading
 6   behavior following an IPO and a lockup period to
 7   other executives that are also experiencing an IPO
 8   and a lockup period, that's more of an
 9   apples-to-apples comparison.
10              So anything -- any kind of analysis
11   that strips out the expected trading behavior around
12   an IPO and sort of takes that out of the equation is
13   not going to be very useful here.
14        Q.    So when you say, also in this
15   sentence, that Professor Henderson "fails to
16   recognize particular circumstances that explain the
17   sales during the period of Analyst Day [to the]
18   class period," is that something different?  Are you
19   referring to something different there or what we've
20   just discussed?
21        A.    No, mainly the same thing, so the IPO,
22   the lockup period, all the other things we've been
23   talking about.
24        Q.    You also say that Professor Henderson
25   ignored relevant documentation.
```

Page 147

Wayne Guay                                      In re Twitter Inc. Securities Litigation

```
 1                 Did you review documents regarding
 2    whether the trading individuals had material
 3    non-public information at the time of their sales?
 4         A.    No.  I mean, again, keep in mind,
 5    these Twitter insiders are including Mr. Costolo,
 6    Mr. Dorsey, Mr. Williams.  So they're including all
 7    the same executives we've been talking about.
 8                 So I guess my answer is the same as
 9    the earlier answer.  I haven't studied what material
10    non-public information they might have had.
11         Q.    Okay.  In paragraph 74, you discuss
12    the cancellation of the 10b5-1 plans, and you state
13    that, quote, "There are multiple reasons why a
14    corporate executive" might cancel a trading plan,
15    and then you list four possibilities.
16                 Do you see that?
17         A.    I do, yes.
18         Q.    Did you see any evidence that any of
19    these reasons was present at Twitter -- withdraw
20    that.  Let me ask it a little bit better.
21                 Did you see any evidence that any of
22    the four possible reasons for canceling a plan was,
23    in fact, in play at Twitter during the class period?
24         A.    Not specifically, no.
25                 MS. CONN:  Can we go off the record
```

1    for a minute.

2            THE VIDEOGRAPHER:  The time right now

3    is 12:12 p.m.  We are off the record.

4            (Luncheon recess from the record.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          A F T E R N O O N    S E S S I O N

2                    THE VIDEOGRAPHER:  This marks the

3          beginning of Media No. 3.  The time right now

4          is 12:55 p.m.  We're back on the record.

5     WAYNE R. GUAY,

6          having been previously sworn, resumed the

7          stand and testified further as follows:

8     EXAMINATION (Cont'd.)

9     BY MS. CONN:

10         Q.    Welcome back, Professor Guay.  You

11    understand that you're still under oath after our

12    lunch break?

13         A.    Yes.

14         Q.    If I could redirect you back to

15    paragraph 71 of your report, which is Henderson

16    Exhibit 2.

17         A.    Okay.

18         Q.    I want to ask you about your statement

19    here at the top of page 42 that Professor Henderson

20    "ignores documentation that discusses the

21    motivations behind the timing of 'other...insiders'

22    stock sales."

23                    Do you see that?

24         A.    I do.

25         Q.    And your footnote here references two

**Confidential**

1    documents; is that true?

2          A.      Let's see.

3                  (Pause.)

4          A.      Yeah.

5          **Q.      Are those the only documents that you**

6    **saw that discussed the motivations behind other**

7    **Twitter insiders' stock sales?**

8          A.      No, those are just a couple of

9    examples.

10         **Q.      As you sit here today, can you think**

11   **of other documents that reference or discuss the**

12   **motivations of other Twitter insiders' stock sales?**

13         A.      Well, I mean, yeah, we talked about

14   some of the -- I think we talked about -- maybe we

15   haven't, but, yeah, I reference some documents in

16   here that discusses communications between

17   executives regarding cancellation of their 10b5-1

18   plans.  There may be some other documents that talk

19   about putting the 10b5-1 plans in place prior to the

20   class period.

21         **Q.      Are all of those documents that you**

22   **have in mind right now in your list of materials**

23   **considered?**

24         A.      Certainly the ones that I have in mind

25   would be ones that I've seen, yes.

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1          Q.      You'd agree that the documents in your

2    list of materials considered are not the complete

3    universe of documents in this litigation; correct?

4          A.      I understand that, yes.

5          Q.      And the documents you reviewed -- or

6    the documents listed on your materials considered

7    list, were those provided to you by counsel?

8          A.      Some were.  We talked about that

9    earlier.  The Bates stamped ones would be.

10         Q.      Okay.

11         A.      Some of the other ones.

12         Q.      Sure.

13                 And the Bates stamped documents on

14   that list of materials considered, those were

15   selected for your review by counsel; correct?

16         A.      Selected for my review by counsel?

17   Some of them may have been documents -- some of them

18   may be documents where I requested documents on

19   certain topics.  Some of them may have been ones

20   that they selected because they thought it would be

21   relevant to my analysis.

22         Q.      Let's turn back to paragraph -- I

23   think we were at paragraph 75 of your report.

24         A.      Okay.

25         Q.      Here in paragraph 75 of your report,

**Confidential**

1  Henderson Exhibit 2, you disagree with Professor

2  Henderson's statement that the cancellations of

3  Rule 10b5-1 plans by certain Twitter insiders were

4  "suspicious"; is that correct?

5      A.    That are "inherently 'suspicious'."

6      Q.    Okay.  Is it your opinion that the

7  cancellation of a Rule 10b5-1 plan is never

8  consistent with an intent to defraud?

9      A.    I mean, again, you can probably

10  construct hypotheticals where that -- where it could

11  be.

12      Q.    So you would agree that there are

13  circumstances under which the cancellation of a

14  Rule 10b5-1 plan is consistent with an intent to

15  defraud?

16      A.    Well, the cancellation per se -- I

17  mean, I don't know if the cancellation per se would

18  be consistent with an intent to defraud because I'm

19  not sure the cancellation per se would harm

20  investors in any way.

21          So maybe I'm not quite sure what your

22  question is, I guess.

23      Q.    Right.

24          I'm just -- and I think we discussed

25  earlier -- you know, we were talking about

1   Rule 10b5-1 plan cancellations and what the -- what

2   you had meant earlier in your report when you talked

3   about them "by itself" is not a violation of

4   Rule 10b-5 -- or 10b5-1, excuse me.  I think you

5   told me you meant by "by itself" without any other

6   contextual information; is that correct?

7           A.      Yes, in gen- -- yes.  In general, that

8   would be what I mean, yes.

9           Q.      And so that's sort of the distinction

10  you're making right now, correct, that the 10b5-1

11  cancellation, without any other contextual

12  information, may or may not be consistent with an

13  intent to defraud?

14          A.      Yes, inherently -- it's not inherently

15  suspicious.  So without any other context, canceling

16  a plan, in my mind, is not suspicious.

17          Q.      But if you had other context, aside

18  from just the cancellation itself, that other

19  contextual information may support an inference --

20  or it may support an intent to defraud; correct?

21          A.      Well, I haven't seen any evidence of

22  that in this case, but could you construct a

23  hypothetical?  I mean, anything's possible, I

24  suppose.

25          Q.      For example, would you want to know

**Confidential**

1    what the executive knew about the company's business

2    when he entered into his plan?

3         A.    So a minute ago, you're talking about

4    cancellations.  Now you're talking about entering

5    into the plan?

6         Q.    Uh-huh.

7         A.    So certainly the 10b5-1 plans -- the

8    SEC requirements are they have to enter into those

9    plans when they're not in possession of material

10   non-public information.  So that's one of the

11   requirements of the 10b5-1 plan.

12        Q.    Would you want to know that

13   executive's prior trading history?

14        A.    Would I want to know for what purpose?

15        Q.    For purposes of formulating an opinion

16   about whether the cancellation was consistent with

17   an intent to defraud.

18        A.    I mean, again, I haven't been asked to

19   determine whether the cancellation was consistent

20   with an intent to defraud.  We talked about what

21   I've done.  So I guess you're now talking about --

22   I'm not sure what you're talking about.

23        Q.    To go back, the original question was,

24   are there circumstances under which the cancellation

25   of a 10b5-1 plan could be consistent with the intent

**Confidential**

1    to defraud?

2                And I think your answer was, without

3    any other contextual information --

4         A.    Right.

5         Q.    -- no.

6                So now I'm trying to --

7         A.    I see.

8         Q.    -- ascertain, what contextual

9    information would you want.

10        A.    I haven't given that a thought.

11        Q.    Okay.  As you sit here today, can you

12   say whether the executive's prior trading history

13   might be relevant to that analysis?

14        A.    To the analysis of whether the

15   cancellation of a 10b5-1 plan was consistent with an

16   intent to defraud?  I mean, again, I don't have any

17   real context to put that in.

18        Q.    How about what the executive knew when

19   he canceled his plan?

20        A.    I mean, if one was -- you know, if --

21   I mean, again, I would need to -- I would need to

22   have more context.

23        Q.    Same answer with respect to what

24   information was in the public domain at the time, at

25   the time of the cancellation, to be clear?

Page 156

1    A.    I mean -- yeah, I mean -- yeah,

2  again -- yeah, if you want to study something,

3  getting some information about it would be probably

4  a reasonable thing to do, but I'm not aware that

5  Professor Henderson has provided any of that

6  information.

7    Q.    And would you also consider what the

8  stock price was doing at the time of the

9  cancellation for that analysis?

10   A.    What it was doing?

11   Q.    Uh-huh.

12   A.    What does that mean?

13   Q.    Was it up, was it down, flat?

14   A.    Relative to what?

15   Q.    To prior prices.

16   A.    I can't see how that would be

17  relevant, but, I mean, maybe you could construct a

18  story where it would be relevant.

19   Q.    If the executive is in possession of

20  material non-public information at the time he

21  cancels his Rule 25 -- I'm sorry -- Rule 10b5-1

22  plan, is that relevant to whether the cancellation

23  is suspicious?

24   A.    Say that again.

25   Q.    Fair enough.  I kind of garbled that

1    question.

2             If the executive is in possession of

3    material non-public information at the time he

4    cancels his plan, is that relevant to whether the

5    cancellation is suspicious?

6         A.    Again, it would depend on the context.

7         Q.    When you say "it would depend on the

8    context," what other information would you want to

9    know?

10        A.    Well, I mean, none of this relates to

11   the stuff that I've been asked to do in this case

12   really, so I'm just trying to understand what --

13   you're asking me to think about what analysis I

14   would do in a very generic hypothetical setting.

15            So, I mean, I'm trying to be helpful,

16   but without more context -- if you want to ask me

17   something specific to what I did or something

18   specific to this case, I might be able to give you a

19   better answer.

20        Q.    Well, in this case, you disagree that

21   the cancellation of the 10b5-1 plans by Mr. Costolo

22   and other executives was inherently suspicious;

23   correct?

24        A.    Correct.

25        Q.    And in formulating that opinion, did

1   you consider what those executives knew at the time

2   they entered into their plans?

3         A.    To some extent, yes.

4         Q.    Did you see any evidence that they --

5   withdraw that.

6               Did you consider what information

7   those executives knew when they canceled their

8   plans?

9         A.    To some extent, yes.

10        Q.    When you say "to some extent," what

11  are you referring to?

12        A.    Well, I mean, as I talk about in my

13  report, my understanding of the discussions among

14  the executives around the time of the cancellation

15  of the plans is that they were sensitive to the fact

16  that outside investors were looking at their trades

17  and might be misperceiving what those trades meant.

18              And so -- which is a perfectly

19  reasonable thing to do.  And being cognizant of

20  that, they decided to cancel their plans so that

21  they didn't send the wrong signal to the market.

22        Q.    I think my question's a little bit

23  different.

24        A.    Okay.

25        Q.    Did you consider whether they had

1    material non-public information about Twitter's

2    business at the time they canceled their plans?

3         A.    Okay.  That wasn't the question,

4    though, but this is a new question.

5         Q.    **That is the new question.**

6         A.    Okay.  Did I -- no, I didn't consider

7    that.

8         Q.    **Did you consider --**

9         A.    Well, I didn't analyze that.

10         Q.    **What's the difference?  What's the**

11    **distinction in your mind?**

12         A.    Well, considering it would seem to

13    imply that I know it does or doesn't exist and that

14    I chose to ignore it.

15         Q.    **Okay.**

16         A.    I simply don't know if it existed.

17         Q.    **You don't know one way or the other?**

18         A.    No.  Again, I've analyzed the

19    situation both under the assumption the plaintiffs'

20    allegations are correct that they had material

21    non-public information and in a scenario where their

22    allegations are not correct.

23         Q.    **And did you -- did you analyze whether**

24    **the -- withdraw that.**

25                **Did you analyze what information was**

1    in the public domain at the time the executives

2    canceled their plans?

3         A.    To some extent, yes.

4         Q.    And is that -- are you referring to

5    the same information that was in your prior answer,

6    the sensitivity to the public scrutiny?

7         A.    Yes, the -- the sensitivity that the

8    sales may be sending the wrong signal to the market.

9         Q.    You said you didn't analyze whether

10   Mr. Costolo was in possession of material non-public

11   information at the time of the cancellation; is that

12   correct?

13        A.    No -- I did not do that.

14        Q.    Okay.  I'd like to show you what's

15   previously been marked as Exhibit 299.

16             (Exhibit 299, Previously marked.)

17   BY MS. CONN:

18        Q.    Is this -- well, I'll represent to you

19   this is one of the documents in the list of

20   materials you considered, sir.

21             MS. CONN:  And for the record,

22             Exhibit 299 is a -- an October 16, 2014,

23             e-mail from Dick Costolo to the Twitter

24             board, bearing Bates TWTR_SHEN_00249151

25             through 52.

**Confidential**

1   BY MS. CONN:

2        Q.      Do you recall reviewing this document

3   in the course of preparing your report?

4              (Pause.)

5        A.      Vaguely, I guess, but not -- not

6   specifically.  It doesn't -- I don't think it has

7   much to do with the trading behavior that I

8   analyzed.

9        Q.      Would you take a look, please, at the

10  third paragraph down in the e-mail.

11       A.      Okay.

12       Q.      Where Mr. Costolo tells the board,

13  Twitter's board of directors, "We simply won't be

14  able to grow the business at the pace we'd like if

15  we don't start adding more healthy users to the

16  platform who use us on a more regular basis."

17              Do you see that?

18       A.      I do.

19       Q.      That e-mail to the board was not

20  relevant to your analysis of Mr. Costolo's trading

21  behavior; is that your testimony?

22       A.      I'll note that -- this e-mail is

23  outside of the class period, so it's several months

24  prior to the class period.  But I'm not sure why it

25  would be relevant.  I mean, as we've talked about, I

**Confidential**

1   don't know what any of these things -- I don't know

2   the context of any of these things.  I don't know if

3   this is -- if these are good things or bad things.

4   I don't know how many of these things were still

5   outstanding issues at the time of the start of the

6   class period relative to October.  So I have no way

7   of assessing how this might have affected his

8   trading behavior.

9         Q.      Did you ask for documents related to

10   what Mr. Costolo knew about Twitter's business near

11   the time of the cancellation in February 2015?

12         A.      What he knew about the business?

13         Q.      Uh-huh.

14         A.      No, I'm not sure how that would have

15   been relevant.

16         Q.      Did you ask for documents reflecting

17   any material non-public information Mr. Costolo had

18   at the time of his cancellation?

19         A.      I wouldn't even know how to formulate

20   that request.  Presumably that's one of the key

21   issues for the jury to decide.

22         Q.      Do you know how this document came to

23   be in your stack of documents you considered?

24         A.      Not -- no, not -- not directly, no.

25         Q.      You don't know one way or another

1    whether it's one that counsel selected for you?

2              A.    I'm not sure.

3                    MR. YOUNGWOOD:  Objection to form.

4                    THE WITNESS:  I'm not sure whether it

5              was related to a request that I put in for

6              certain types of documents or whether it was

7              related to something they thought might be

8              relevant.  I just don't recall.

9    BY MS. CONN:

10             Q.    Okay.  And if, in fact, plaintiffs'

11   allegation that Mr. Costolo had -- was in possession

12   of material non-public information at the time of

13   his -- at the time he canceled his 10b5-1 plan is

14   proven true, would you still maintain that the

15   cancellation was not suspicious?

16                   MR. YOUNGWOOD:  Objection to form.

17                   THE WITNESS:  I mean, you know, the

18             key point -- my -- I'm responding to

19             Professor Henderson's report, and I'm saying

20             it's not inherently suspicious based on the

21             evidence that Professor Henderson's provided,

22             which is none.

23                   And so we've talked about it.  I

24             analyzed Mr. Costolo's trading behavior

25             during the class period, Mr. Noto's trading

Wayne Guay                          In re Twitter Inc. Securities Litigation

```
 1            behavior during the class period.  And I make
 2            some pretty straightforward statements about
 3            the profitability -- or the financial gains
 4            or losses of those trades under a scenario
 5            where the plaintiffs' allegations are true.
 6            So there's certainly nothing in my opinion
 7            that would change.
 8   BY MS. CONN:
 9            Q.    So just so I'm clear, are you offering
10   the opinion that the cancellations were not
11   suspicious, or you're simply saying that Professor
12   Henderson has not shown that they were suspicious?
13            A.    Well, I'm offering the -- maybe three
14   things; one, that they're not inherently suspicious
15   without any additional information; two, that
16   Professor Henderson doesn't provide any evidence
17   that I've seen that they're suspicious; and, three,
18   after looking at some of the facts of the case and
19   some of the issues surrounding what I saw in terms
20   of discussions among the executives for why they
21   canceled the plans, those reasons seemed perfectly
22   reasonable to me.  And, in fact, they seem perfectly
23   reasonable to Professor Henderson as well, and he
24   says as much in his report.
25            Q.    Did you -- in reaching your opinion
```

1   that the coordinated cancellation of the Rule 10b5-1

2   plans by Twitter's chairman, CEO, general counsel,

3   and VP of sales in February 2015 was not inherently

4   suspicious, were you asked to assume that the

5   defendants were canceling their plans in response to

6   negative media scrutiny?

7           A.      You need to break that one down.

8           Q.      Sure.

9           A.      I don't remember using the word

10  "coordinated," would be one thing, but...

11          Q.      No, that's my word.

12          A.      Okay.

13          Q.      So -- but I think you've offered the

14  opinion that the cancellation of the 10b5-1 plans by

15  a number of executives that we've named -- or that

16  Professor Henderson has named in his report and that

17  we've discussed today -- I think you've offered the

18  opinion that those cancellations were not inherently

19  suspicious; true?

20          A.      They're not inherently suspicious,

21  yes.  Simply canceling a plan doesn't mean there's

22  anything suspicious.

23          Q.      And in reaching your conclusion or

24  opinion that those cancellations were not inherently

25  suspicious, were you asked to assume that the

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1    cancellations were in response to negative media

2    scrutiny?

3           A.     No, I don't even need to really know

4    anything about the Twitter case to make that -- to

5    say that canceling a 10b5-1 plan is not inherently

6    suspicious is simply a general statement that if we

7    see a cancellation without any other context, we

8    can't simply assume it's suspicious.

9                 So Professor Henderson seems to think

10   he can draw that inference without any facts.  I

11   don't agree with that.  And then when I look at some

12   of the facts surrounding what the executives were

13   talking about at the time they canceled their plans,

14   Professor Henderson and I both agree that their

15   story is a reasonable one.

16          Q.     But did you assume one way or the

17   other that the cancellations were, in fact,

18   motivated by negative media scrutiny?

19          A.     Well, no.  The explanation as I

20   understand it -- or at least the e-mails I've seen

21   for the executives discussing the cancellation of

22   the plans were surrounding concerns about the media

23   scrutiny.  And knowing what I know about executive

24   trading, knowing what I know about the public signal

25   it sends to investors, both I and Professor

1   Henderson opine that it's a reasonable explanation

2   for that behavior.

3          Professor Henderson goes on to say he

4   thinks it could be something else, but we both agree

5   that their -- what we've seen is a reasonable

6   explanation.

7          **Q.      And setting aside whether or not it's**

8   **a reasonable explanation, you're not saying --**

9   **you're not offering the opinion that that was, in**

10  **fact, the motivation for the cancellation.**

11         A.      No, it's consistent with, but I'm

12  not -- again, we've talked about the state of mind.

13  I don't know what their state of mind was.

14         **Q.      Okay.  I'd like to show you what we'll**

15  **mark as Guay Exhibit 2.**

16              (Guay Exhibit 2, Journal of Financial

17              Economics Article, marked for

18              identification.)

19              MS. CONN:  Which for the record is a

20              Journal of Financial Economics article

21              entitled, "The Power of the Pen and Executive

22              Compensation."

23  BY MS. CONN:

24         **Q.      You're familiar with this document,**

25  **Professor?**

Wayne Guay                    In re Twitter Inc. Securities Litigation

1          A.      Yes, I am.

2          Q.      You are one of the coauthors of this

3     article; is that true?

4          A.      I am.

5          Q.      And in this article, you've opined

6     that negative media attention does not -- based on

7     your own empirical research, negative media

8     attention does not result in a change in executive

9     compensation; is that correct?

10         A.      Yeah, I wouldn't -- we don't typically

11    say -- refer to it as "opined," but I think we've

12    done some empirical work.  And can you point me to

13    the specific thing that you're reading.

14         Q.      Sure.  It's on page 2 of the article.

15         A.      Okay.

16         Q.      There's a paragraph about halfway down

17    the page --

18         A.      Okay.

19         Q.      -- that states, "We find little

20    support for the hypothesis that the press serves as

21    a catalyst or change agent for CEO compensation

22    practices.  Specifically" --

23         A.      Right, I see that.

24         Q.      It goes on to say, "Thus, our results

25    do not corroborate recent evidence that the media

**Confidential**

1    exerts an important influence on corporate

2    governance choices."

3            A.      Uh-huh.

4            Q.      Is that still a statement you agree

5    with today?

6            A.      Certainly, based on the evidence we

7    had when we wrote this paper.  I mean -- yeah.

8            Q.      But you believe that the media did

9    exert an influence over Twitter's compensation

10   practices?

11           A.      Well, so just to break it down a

12   little bit, I mean, I wasn't analyzing Twitter's

13   compensation practices.  So what this paper does

14   is -- let me just -- I'll briefly explain what it

15   does.

16                   The idea was that -- the point of the

17   paper is that CEO compensation, and in particular

18   sort of media coverage of excessive CEO

19   compensation, had become very popular at the time --

20   it's still quite popular.  So there have been

21   arguments that people have made that one of the

22   things that can keep CEO compensation in check is

23   when the media gets after executives for excessive

24   pay.

25                   So what we study in this paper is if a

Wayne Guay                          In re Twitter Inc. Securities Litigation

```
 1    CEO attracts more attention from the media with
 2    respect to their compensation, do you see the board
 3    and the CEO change their behavior with respect to
 4    the level of compensation.  And we don't find much
 5    evidence of that.
 6              And the reason we put forward and the
 7    one that I actually believe is that because -- I
 8    think that the board and the CEO typically believe
 9    that they're contracting appropriately over the
10    compensation.  So just because the media is after
11    them doesn't mean that they necessarily need to make
12    some change.
13              And if you want to draw an analogy to
14    the Twitter situation there, I mean, these
15    executives -- as I saw it, there was some debate
16    over should the media be interpreting our sales in
17    such a way, they shouldn't, but they do, and so then
18    what are we going to do?  Should we cancel the plans
19    or not?  And that was the debate that I saw in those
20    e-mails.
21              So this paper doesn't speak directly
22    to the issues in the Twitter case, but there are
23    some analogies that can be made.
24         Q.    Is the avoidance as you were just
25    describing, the avoidance of negative public
```

**Confidential**

1   scrutiny, in your opinion, a legitimate reason to

2   cancel a 10b5-1 plan?

3          A.     Well, it certainly can be.  I mean, as

4   I've discussed in my report, I mean, executives and

5   the board are typically concerned with the signals

6   they send to investors.  And so there's a variety of

7   different ways that they send signals.

8                 And if they perceive that the -- that

9   investors are getting the wrong idea about what's

10  going on, then they might try to send a signal that

11  conveys better information.  So that's a very common

12  thing to do.

13         Q.     I think both you and Professor

14  Henderson are in agreement that there's nothing

15  inherently nefarious about canceling 10b5-1 plans in

16  response to media attention; would you think that's

17  fair to say?

18         A.     Yes, I think that's the -- well,

19  Professor Henderson calls them inherently suspicious

20  to cancel plans.  So I think he -- I'm not sure he

21  would agree with that statement that you've just

22  made, but I certainly don't think there's anything

23  inherently nefarious or suspicious about

24  canceling -- canceling a 10b5-1 plan.

25         Q.     Right.

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1           And my question is specifically on the

2    basis that you want to avoid public -- negative

3    public attention.

4           That's a non-fraudulent reason to

5    cancel a plan; correct?

6       A.    Yes, certainly they are going to be

7    concerned with how the press and investors are

8    thinking about the company.

9       Q.    In fact, canceling the -- Twitter

10   executives canceling of their 10b5-1 plans provided

11   them an opportunity for favorable media coverage;

12   would you agree?

13              MR. YOUNGWOOD:   Objection to form.

14              THE WITNESS:   Well, favorable in the

15         sense that they -- they may have believed

16         that they were correcting a misperception on

17         the part of the media.   So favorable in the

18         sense that it gets them back to the correct

19         inference.

20   BY MS. CONN:

21      Q.    Okay.  And would you agree that

22   that -- that desire to correct the media's

23   misperception, as you called it, is an economically

24   rational act?

25      A.    It can be, but keep in mind we're not

1   just talking about the media here.  We're also

2   talking about the media as sort of a mouthpiece of

3   investors.  So at the end of the day, they might

4   care about media, but they care as much about

5   investors.

6          **Q.     And that's economically rational, that**

7   **concern.**

8          A.     It can be.  It can be because it

9   can -- it can -- it can, you know, influence how

10  investors think about the company, and that can

11  create problems.

12         **Q.     I'd like to show you what's previously**

13  **been marked as Exhibit 93.**

14                 (Exhibit 93, Previously marked.)

15                 MS. CONN:  For the record, Exhibit 93

16         is an April 22, 2015, e-mail between Jim

17         Prosser and Vijaya Gadde bearing Bates

18         TWTR_SHEN_00326991 to 6993.

19  BY MS. CONN:

20         **Q.     Is this one of the documents you**

21  **considered in preparing your report?**

22         A.     I believe so.  I know I've seen this

23  article.  And it might have been embedded in an

24  e-mail, so --

25         **Q.     Okay.  I think actually it is on your**

**Page 174**

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1    list of materials considered.

 2           A.    Okay.

 3           Q.    And you recollect reviewing it at some

 4    point; is that right?

 5           A.    Yep.

 6           Q.    Would you look at the second page of

 7    the e-mail, the one ending Bates 6992.

 8           A.    Okay.

 9           Q.    Do you see here an e-mail from Jim

10    Prosser?

11           A.    I do at the bottom, yep.

12           Q.    He writes about -- some questions

13    about -- some questions from someone who had been,

14    quote, tipped off, unquote, that "our C-level execs

15    all canceled their plans."

16                 Do you see that?

17           A.    Yes.  I'm just reading it here, so...

18                 (Pause.)

19           A.    Okay.

20           Q.    Do you see here where Mr. Prosser

21    says, "Told him an outside observer would indeed see

22    that past regular stock sales that were happening

23    are no longer happening, and that the cause of that

24    would either be a plan cancellation or plan

25    expiration (decline to say which it was)"?
```

**Page 175**

1          A.      I do, yes.

2          **Q.      Can you think of any reason why**

3   **Twitter wouldn't just let the public know that it**

4   **was canceling -- the executives had canceled their**

5   **10b5-1 plans?**

6          A.      Well, I mean, my understanding here is

7    that Twitter's general policy at this time was that,

8    in the SEC filings, when there were trades that were

9    made, they disclosed that those were made pursuant

10   to a 10b5-1 plan.  But I don't believe that they

11   were a company that disclosed the details of the

12   plan ex ante, at the time the plan was entered into,

13   the length of plan and so forth.

14              And so my understanding of what's

15   going on here is that -- I'm not sure who Dan

16   Primack is.  I assume he might be someone in the

17   media, but it sounds like he got some tip that all

18   the executives were canceling the plans and

19   essentially that, based on public information,

20   somebody would be able to infer that, with the

21   trades stopping, that there was either a plan

22   cancellation or plan expiration.

23              It seems like a sort of a statement of

24   factual issues related to what an outside observer

25   would be able to see.

1          So your question was?

2          Q.      Yeah, let me ask a more targeted

3     question.

4                  I think you've agreed with me that in

5     the face of the negative media scrutiny that some

6     Twitter executives were getting for their trades,

7     the cancellation of the plans could have been an

8     opportunity for positive public relations, positive

9     statement to the public.  I think we actually just

10    talked about that a moment ago.

11         A.      Yeah, so selling of shares can send a

12    negative signal to the market, buying shares can

13    send a positive signal to the market, and the

14    executives are cognizant of the signaling effects of

15    the trades.

16         Q.      Given that, was it -- did Twitter have

17    an opportunity here to tell the public, our

18    executives are canceling their plans as a way of

19    signaling the market?

20                 MR. YOUNGWOOD:  Objection to form.

21                 THE WITNESS:  I mean, it's possible

22         they could have done that.

23    BY MS. CONN:

24         Q.      And so, in your opinion, was it

25    economically rational for them to bypass that

**Confidential**

1    **opportunity and decline to comment on whether the**

2    **cessation in trading was the result of cancellation**

3    **or simple plan expiration?**

4         A.    I mean, it depends on the -- you know,

5    it depends on what they were trying to accomplish.

6    So companies are typically concerned with setting a

7    precedent, so they have to think about what the

8    precedent they'd be setting was.  Whether -- an

9    inference of it being a plan cancellation or a plan

10   expiration, whether there would be any real

11   difference in that.

12        I mean, the fact that executives have

13   stopped selling sends a signal, whether there's any

14   differential benefit from making an additional

15   public disclosure.  There would be a lot of things

16   that they would think about here.

17        **Q.    Let's take a look at paragraph 79 of**

18   **your report, please.  So in paragraph 79, midway**

19   **into that paragraph, you appear to be criticizing**

20   **Professor Henderson for not accepting Mr. Costolo's**

21   **explanation for the plan cancellations.**

22        **Do you see where I'm reading from?**

23        A.    Let me just read this paragraph.

24        **Q.    Uh-huh.**

25        (Pause.)

**Page 178**

1          A.      Okay.  Yep.

2          **Q.      Okay.  What was Mr. Costolo's**

3   **explanation for canceling his Rule 10b5-1 plan?**

4          A.      My recollection is that there's some

5   discussion in the deposition about him recalling

6   something about the media scrutiny that we were just

7   talking about.

8          **Q.      His sworn testimony was actually that**

9   **he did not recall why he canceled his plan; isn't**

10  **that true?**

11         A.      Well --

12                 MR. YOUNGWOOD:  Objection to form.

13                 THE WITNESS:  Yeah, I mean, I don't

14         recall exactly, but I recall it coming up

15         maybe more than once in the -- in the

16         deposition and him perhaps not remembering

17         all the specifics, but recognizing that some

18         of the plan cancellations had been a function

19         of media scrutiny or investor scrutiny.

20  BY MS. CONN:

21         **Q.      I'd like to show you what we're**

22  **marking as Exhibit Guay 3.**

23                 (Guay Exhibit 3, No Bates numbers,

24         Deposition Transcript of Richard Costolo

25         taken on March 25, 2019, marked for

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1          identification.)
 2               MS. CONN:  For the record, Exhibit
 3          Guay 3 is the transcript of the deposition of
 4          Richard Costolo taken in this matter on
 5          March 25th, 2019.
 6   BY MS. CONN:
 7          Q.    Sir, you reviewed this deposition
 8   transcript in preparing your report; is that true?
 9          A.    I did.
10          Q.    I'd like to direct your attention to
11   page 325 of this deposition transcript.
12          A.    Okay.
13          Q.    Starting at Line 7.
14          A.    Okay.  Which page again, 3 --
15          Q.    325.
16          A.    Uh-huh.  Okay.
17          Q.    Starting on line 7, do you see the
18   question, "Why did you cancel your August 1, 2014,
19   plan on February 12th, 2015?"
20          A.    Okay.
21          Q.    "Answer:  I don't recall why I
22   canceled this specific plan."
23          A.    Okay.
24          Q.    It goes on to say, "I think as I can
25   recall every instance, plans were created or
```

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1    canceled based on consultations with the general

2    counsel, the rest of the leadership team, and

3    sometimes, but not always, the board."

4         A.    Okay.

5         Q.    "Question:  Can you tell me a single

6    factor that went into your determination to cancel

7    your August 1, 2014, trading plan on February 12,

8    2015?

9              "Answer:  I don't recall a specific

10   factor that went into these.  They were almost

11   always...based on conversations with the general

12   counsel and the rest of the leadership team, and

13   those sometimes included the board, but I don't

14   remember any specific, explicit factor that went

15   into this."

16             Do you see that?

17        A.    I do.

18        Q.    You read that testimony in preparing

19   your report?

20        A.    I did.

21        Q.    So isn't it true that Mr. Costolo did

22   not have an explanation for why he canceled his

23   plan?

24        A.    Well, can we also look at the part of

25   the deposition that I cite in my report?  So in

Wayne Guay                                    **In re Twitter Inc. Securities Litigation**

1    Footnote 157, where I'm actually talking about

2    Mr. Costolo's cancellation, so that would be

3    page 303.  And so this is related to the plan that

4    was canceled in April.

5         **Q.        Uh-huh.**

6         A.        And where he talks -- where he says,

7    "I don't recall" -- so this is starting on line 13.

8                   "So why did you cancel your plan on

9    April -- your plans on April 11th, 2014?

10                  "I don't recall the specific reason

11   for the canceling of these plans.  I do recall from

12   time to time having conversations with our general

13   counsel that -- that the media, specifically, the

14   financial media, didn't distinguish between sales

15   that were made as part of trading plans and sales

16   that were made -- just made -- just made on a whim.

17   So one of my concerns the -- one of the concerns

18   that was expressed as part of these discussions is

19   that people think -- just think you're selling on a

20   whim in the media when you're selling as part of a

21   plan."

22                  And then, "I don't recall, however,

23   whether that specific discussion is what drove these

24   cancellations."

25                  So clearly he remembered issues

**Confidential**

1  related to the media.  And then, at least based on

2  my reading of the other record, the discussions

3  between Mr. Noto and other executives -- I think

4  putting all of that together at the time of these

5  plan cancellations at the start of the class

6  period -- at least it seems to me like that's a

7  reasonable explanation, at least in general, for the

8  cancellation of the plans.

9              And at least Professor Henderson and

10  the plaintiffs, I think, believe that it was a

11  coordinated cancellation, so presumably

12  Mr. Costolo's reasons were very similar to the other

13  executives'.

14       **Q.    The passage you read from**

15  **Mr. Costolo's deposition is referring to a**

16  **different -- cancellation of a different plan;**

17  **correct?**

18       A.    That's correct.

19       **Q.    And Mr. Costolo, you would agree, was**

20  **asked several times during his deposition what**

21  **motivated the cancellation of the plan in**

22  **February 2015?**

23       A.    He was asked in his deposition, yes.

24       **Q.    And at no time was he able to testify**

25  **with certainty as to why he canceled that plan;**

**Confidential**

1  true?

2       A.     From his deposition, yes.  And --

3  yeah.  So I mean...

4       **Q.     So is it fair to say you assumed based**

5  **on a conversation -- based on testimony about a**

6  **different cancellation and some e-mails you saw,**

7  **that Mr. Costolo canceled his plan in response to**

8  **negative media scrutiny?**

9       A.     Yes, so I assume that based on, yes,

10  Mr. Costolo's discussion of being -- canceling plans

11  because of media scrutiny as well as the other

12  executives canceling plans because of the media

13  scrutiny -- that the media scrutiny was, I assume,

14  one of the reasons for Mr. Costolo's cancellation of

15  his plan in the beginning of the class period.

16      **Q.     And given that Mr. Costolo himself**

17  **could not explain why he canceled his plan in**

18  **February 2015 and that you haven't had any**

19  **conversations with him directly, isn't it just**

20  **speculation on your part that he canceled his plan**

21  **as a result of media scrutiny?**

22      A.     Well --

23            MR. YOUNGWOOD:  Objection to form.

24            THE WITNESS:  -- you know, is it

25       possible that there was another reason?  It's

```
 1              possible.  I mean, the plaintiffs don't seem
 2              to think so in their allegations about
 3              coordinated plans.  Professor Henderson
 4              believes it was a coordinated plan.
 5                   So I don't think the coordination
 6              issue here is really in dispute to some
 7              extent, at least in the sense that they
 8              communicated about this between themselves.
 9   BY MS. CONN:
10         Q.    Just to be clear, Professor, is your
11   answer to my question yes?
12         A.    What was the question again?
13         Q.    Isn't it speculation on your part that
14   he canceled his plan as a result of media scrutiny?
15              MR. YOUNGWOOD:  Objection to form.
16              THE WITNESS:  Is there a possibility
17         that there were other factors that went into
18         it?  There's a possibility.
19   BY MS. CONN:
20         Q.    Did you see any evidence that
21   Mr. Costolo was ever concerned about the proximity
22   of his trades to the disclosure of negative
23   information about the company?
24              MR. YOUNGWOOD:  Objection to form.
25              THE WITNESS:  Not that I can recall
```

**Confidential**

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
1           seeing -- certainly not in Professor
2           Henderson's report.  I don't see anything --
3           I don't recall seeing anything.
4   BY MS. CONN:
5           Q.      I'd like to show you what we're
6   marking as Guay Exhibit 4.
7                   (Guay Exhibit 4, Bates Nos.
8           TWTR_SHEN_00082867 through
9           TWTR_SHEN_00082869, E-mail Chain, marked for
10          identification.)
11                  MS. CONN:  For the record, Guay
12          Exhibit 4 is a May 25, 2015, e-mail from Dick
13          Costolo to Nancy Nauheimer,
14          N-A-U-H-E-I-M-E-R, bearing Bates
15          TWTR_SHEN_00082867 through 82869.
16  BY MS. CONN:
17          Q.      Professor, I'll represent to you that
18  this document is included in your list of materials
19  considered.
20                  Do you recall reviewing this document
21  in the course of preparing your report?
22          A.      Let me take a look here.
23          Q.      Sure.
24                  (Pause.)
25          A.      This is going to take me a few
```

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1   minutes.
 2          Q.      Sure.  Take your time.
 3                  (Pause.)
 4          A.      Can I just ask, are there multiple
 5   e-mails here or is it all part of one big, long
 6   e-mail -- two e-mails, I guess, maybe?
 7          Q.      I think it is two e-mails.
 8          A.      Okay.
 9                  (Pause.)
10          A.      Okay.
11          Q.      I'd like to just direct your attention
12   to the top of the document, the first page of the
13   document, Mr. Costolo's e-mail --
14          A.      Okay.
15          Q.      -- where he tells Nancy Nauheimer,
16   "I'd like my first sales date to be September 1.
17   That gets us out of the way of the next earnings
18   call and although we don't have any material
19   non-public information right now, there's a 50/50
20   chance that something happens in earnings that
21   impacts the stock in some way and then it looks
22   like, 'oh, he set up that plan KNOWING that xyz was
23   happening'."
24                  Do you see that?
25          A.      Okay.
```

Wayne Guay                          In re Twitter Inc. Securities Litigation

1        Q.     Is that an indication to you that

2   Mr. Costolo was aware of -- withdraw that.

3               Is that an indication to you that

4   Mr. Costolo was sensitive to the timing of his

5   trades relative to the release of negative

6   information about the company?

7        A.     No, there's nothing in here about

8   negative information.

9        Q.     What do you mean when you say "there's

10  nothing in here about negative information"?

11              MR. YOUNGWOOD:  Objection to form.

12              THE WITNESS:  I don't see anything in

13       here about negative information.

14  BY MS. CONN:

15       Q.     His e-mail is addressing the

16  possibility of -- well, his e-mail relates to

17  information about the company -- previously

18  undisclosed information about the company; would you

19  agree with that?

20       A.     No.

21       Q.     Why not?

22       A.     He says he doesn't have any material

23  non-public information.  He says, "there's a 50/50

24  chance that something happens in earnings."  That

25  doesn't sound like he even knows what that could be,

**Confidential**

```
 1   but it's some risk -- certainly there's some risk
 2   that there might be something in earnings that
 3   impacts the stock price in some way.
 4              And so, you know, is this saying that
 5   he's sensitive to the timing of his trades and, you
 6   know, the perception that maybe investors might have
 7   about the timing of certain trades?  Yes.  But it
 8   doesn't tell me -- there's nothing in here about
 9   anything that he knows or any bad news or anything
10   like that.
11       Q.    Okay.  I think maybe we just missed
12   each other with the question.  That's really what I
13   was getting to, is that he's sensitive to the timing
14   of his trades and the perception that investors may
15   have.
16       A.    Yes, that's true of all executives.
17       Q.    Let's go to paragraph 80 of your
18   report.
19       A.    Okay.
20       Q.    You write that "Professor Henderson
21   provides no facts to support this claim, nor does he
22   provide any academic literature that identifies an
23   actual practice of executives timing cancellations
24   of their 10b5-1 plans to distance themselves from
25   the public release of negative material
```

Wayne Guay                      In re Twitter Inc. Securities Litigation

1   information."

2               Do you see that?

3        A.     I do.

4        Q.     But you agreed with me earlier in your

5   deposition that an executive who is in possession of

6   negative material non-public information may have an

7   incentive to cancel a plan; is that right?

8        A.     I don't recall that.  To cancel a plan

9   or to let it go through?

10       Q.     To cancel.

11       A.     I don't recall that.

12       Q.     You don't recall agreeing with me on

13  that point?

14       A.     No.  I mean, cancel -- Professor

15  Henderson agrees with this as well, that if you want

16  to earn normal returns from your 10b5-1 plan in the

17  face of pending negative information, you allow the

18  trades to go through.  You don't cancel it.  So that

19  would be inconsistent with trying to take advantage

20  of your material non-public information.

21       Q.     Do you agree that avoiding negative

22  publicity could be worth more than the potential

23  gains from trades executed when the executive is

24  aware of negative material non-public information?

25       A.     I mean, it would certainly --

Page 190

Wayne Guay                        In re Twitter Inc. Securities Litigation

```
 1   Professor Henderson's provided no evidence of that.
 2   I've seen no evidence of that in this case.  Is it
 3   possible?  Anything's possible.
 4        Q.     Well, you say you've seen no evidence
 5   of that in this case, but isn't it true that
 6   Mr. Costolo's -- you've also opined that
 7   Mr. Costolo's cancellations of his trades, if
 8   plaintiffs' allegations are true, cost him profits.
 9        A.     Yes, that's true.  But your question
10   was could something else outweigh those lost
11   profits.  And I haven't seen any evidence of that,
12   and Professor Henderson certainly hasn't provided
13   any evidence of that.
14        Q.     Do you have any evidence that
15   Mr. Costolo knew precisely when negative information
16   would be released to the market about Twitter's
17   business?
18        A.     I don't know whether he had such
19   information, and I don't know if he knew when it was
20   going to be released.  I've seen no evidence of
21   that.  Professor Henderson has provided no support
22   for that.
23        Q.     Going on to paragraph 81, you write,
24   "Just as importantly, Professor Henderson fails to
25   articulate how his unsubstantiated conjecture about
```

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1   the purpose of the 10b5-1 plan cancellations

2   benefited Twitter's executives (i.e., how the

3   cancellations of Twitter executives' trading plans

4   were motivated by potential financial gain from

5   using alleged material non-public information)."

6          A.     I see that.

7          Q.     Do you see that?

8          A.     Yes, I do.

9          Q.     Do you believe that Professor

10  Henderson was required to show that defendants were

11  motivated by potential financial gain?

12         A.     I mean, all I can see is what's in his

13  report and what he was asked to do, but certainly,

14  in his opinions, he tries to opine on potential

15  explanations for these cancellations for which he

16  provides no support.

17         Q.     And you don't know the legal

18  significance of Professor Henderson's -- let me

19  withdraw that.

20                You don't know the legal significance

21  of the fact that Professor Henderson did not

22  identify a financial motive on the part of the

23  individual defendants; is that true?

24         A.     I'm not sure he provided any motive,

25  whether it's financial or otherwise.  I mean, I

1    didn't see any support for any motive.

2           Q.      And do you know the legal significance

3    of that?

4           A.      No.

5           Q.      Economically rational behavior is not

6    always the course of the -- the course of conduct

7    that results in the greatest personal profit for the

8    executive; would you agree with that?

9           A.      Say that again.

10          Q.      Yes.

11                  Economically rational behavior is

12   not -- does not always mean the course of conduct

13   that results in the greatest personal profit for the

14   executive; would you agree with that?

15                  MR. YOUNGWOOD:  Objection to form.

16                  THE WITNESS:  I mean, you know,

17          certainly doesn't always have to.  It's

18          certainly possible that it doesn't.  I

19          mean --

20   BY MS. CONN:

21          Q.      I mean --

22          A.      It might not be economically rational

23   to play the lottery, but if you win, you make money.

24          Q.      Well, as an example from this case,

25   you, I think, agree that it might be economically

**Confidential**

1    **rational for executives to refrain from trading in**

2    **order to send a positive signal to the market even**

3    **if that means giving up financial gains.**

4         A.    Well, I'm not sure what the financial

5    gains are that you're talking about.  So when I talk

6    about financial gains in my report, it's -- I'm

7    talking about in the world -- in a world where the

8    plaintiffs' allegations are correct, where the stock

9    is mispriced.

10        So if we're assuming we're in a world

11   where the stock is mispriced and you know that, then

12   not selling stock when you have the opportunity to

13   do it foregoes some profit you could have made and

14   buying stock when you didn't have to incurs some

15   loss.

16        But if we're in the other world, where

17   the plaintiffs' allegations are not correct and the

18   stock is fairly valued, then canceling the plan

19   doesn't provide a direct financial benefit, although

20   they do have to forego the diversification that they

21   were trying to achieve or some of those other

22   personal objectives.

23        **Q.    You've previously written that a**

24   **manager's incentive is to maximize the market's**

25   **assessment of the value of the firm; is that**

Confidential

1    correct?

2         A.    Well, maybe you can point me to

3    something so --

4         Q.    Sure.

5               I'll hand you what we're marking as

6    Guay Exhibit 5.

7                    (Guay Exhibit 5, No Bates numbers,

8           Journal of Financial Reporting Article,

9           marked for identification.)

10                   MS. CONN:  For the record, Guay

11          Exhibit 5 is an article from the Journal of

12          Financial Reporting titled Conservative

13          Disclosure, by Wayne Guay and Robert --

14   BY MS. CONN:

15        Q.    Verrecchia, am I saying that right?

16        A.    You are.

17        Q.    Okay.  You're familiar with this

18   document; correct?

19        A.    I am, yes.

20        Q.    You are one of the coauthors of this

21   article?

22        A.    I am.

23        Q.    If you would turn to page 75 of the

24   article.  The page numbers are at the top.

25        A.    Uh-huh.

1    **Q.    About midway through the page, do you**

2    **see the sentence that reads, "The manager's**

3    **incentive is to maximize the market's assessment of**

4    **the value of the firm"?**

5        A.    Right.

6    **Q.    "If the manager is informed, she**

7    **maximizes assessments by acting strategically with**

8    **regard to disclosing versus withholding her**

9    **knowledge of firm value."**

10       A.    Okay.

11   **Q.    Is that a statement you stand by**

12   **today?**

13       A.    Well, so I just -- probably a little

14   bit of clarification for what that actually means.

15   So in this section -- if you look at the first

16   sentence there of that section that says -- so the

17   top of the page, "Conventions in the Literature."

18   **Q.    Uh-huh.**

19       A.    Then you see, "As the basis of our

20   analysis we extend Jung and Kwon (1988; hereafter,

21   JK)."

22           So that's a prior theory paper that

23   we're building on.  So the sentence you wrote [sic]

24   comes from a paragraph that starts with "In JK, the

25   manager does" such and such.  So here what we're

**Confidential**

1  describing is what that other paper does.  So we're

2  not taking this on as our view or our opinion.

3  We're simply describing what those other authors do

4  in their model.

5      Q.    Well, what about the statement on

6  page 76 under "Disclosure Policy Choice"?

7      A.    Okay.

8      Q.    You say, "The discretionary disclosure

9  literature is based on the notion that the manager

10  behaves strategically, which is to say in her own

11  self-interest."

12            Is that a conclusion that you're

13  reaching in this paper or, again, are you just

14  summarizing some other person's written work?

15      A.    I'm summarizing the literature.

16      Q.    How about on page 82?

17      A.    Okay.

18      Q.    You say, "The intuition that underlies

19  the benefit of conservative disclosure is

20  straightforward.  In the absence of any mandatory

21  disclosure requirements, strategic behavior compels

22  a manager to disclose voluntarily high realizations

23  and withhold low realizations."

24      A.    Uh-huh.

25      Q.    Is that a conclusion you've made in

1    this paper, or are you simply summarizing someone

2    else's written work?

3          A.    No, this is something that comes out

4    of the model that we have.  So we have a model.  And

5    a model is just a stripped-down version of the

6    world, so it doesn't describe any particular

7    managers or any particular behaviors.

8              So based on the assumptions that we

9    have in that model, the results we get stem -- we

10   make an assumption in this paper that managers

11   behave strategically in a certain way.

12             So this is a little bit different

13   paper.  This is a theoretical paper where we make

14   assumptions and then, based on those assumptions, we

15   try to figure out how the world might work.  Whereas

16   the other -- some of the other papers are empirical

17   papers where we actually try to test to see how the

18   world works.

19             So this one is just -- we make some

20   assumptions and, based on those assumptions, out pop

21   some results, but we're not trying to describe

22   necessarily what a manager in any particular

23   circumstance would do.

24        Q.    Going back to paragraph 81 of your

25   report.

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
1              A.      Okay.

2              Q.      We've spoken a little bit about what

3      you mean by "potential financial gains" in this

4      paragraph and in this report.

5                      Do you agree that whether or not the

6      Twitter executives' cancellations of their plans

7      resulted in any financial gain, that does not end

8      the inquiry as to their state of mind?

9              A.      Well, again, I'm not opining on their

10     state of mind.  So I've given some opinions on the

11     cancellation -- the delayed stock sales or canceling

12     the plans and what the financial cost of that would

13     be, but I'm not trying to opine on their state of

14     mind.

15             Q.      And you don't know the legal

16     significance of the fact that they did or did not

17     make financial gains on the question of their state

18     of mind?

19             A.      I don't.

20                     MS. CONN:  We've been on the record a

21             little more than an hour.  Can we take a

22             short break?

23                     MR. YOUNGWOOD:  Sure.

24                     THE VIDEOGRAPHER:  The time now is

25             2:02 p.m.  We are off the record.
```

Page 199

```
 1                     (Recess from the record.)
 2                     THE VIDEOGRAPHER:  This marks the
 3           beginning of Media No. 4.  The time right now
 4           is 2:17 p.m.  We're back on the record.
 5   BY MS. CONN:
 6           Q.     Welcome back, Professor.  You
 7   understand that you're still under oath?
 8           A.     Yes.
 9           Q.     So we were discussing your report,
10   paragraphs 81 -- actually, I'd like to direct your
11   attention now to paragraph 83.
12           A.     Okay.
13           Q.     You state, in paragraph 83, that
14   "Professor Henderson's research does not support his
15   opinions in this matter."
16                  Do you see where I'm reading from?
17           A.     "Professor Henderson's research does
18   not support" -- yes, that's correct.
19           Q.     And when you refer to "Professor
20   Henderson's research," are you referring to the
21   study he coauthored with Alan Jagolinzer?
22           A.     Yes.
23           Q.     Jagolinzer is someone that you've
24   cited frequently in your own published work; is that
25   true?
```

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1        A.      I'm sure I have cited him, yes.

2        Q.      **In fact, I think you referenced him**

3    **earlier today in the deposition.**

4        A.      That's probably right.

5        Q.      **Have you read that study?**

6        A.      I have.

7        Q.      **And you're aware, then, that it's**

8    **based on Jagolinzer and Henderson reviewing**

9    **thousands of 10b5-1 plans; true?**

10       A.      I don't recall --

11               MR. YOUNGWOOD:  Objection to form.

12               THE WITNESS:  I don't recall how many

13       10b5-1 plans they can see in that -- in that,

14       10b5-1 plans are voluntary disclosures.  So

15       they make some assumptions in that paper

16       about what is a 10b5-1 plan, even though they

17       can't observe them.  So I'd have to see the

18       paper to know how many of those plans they

19       can actually see.

20   BY MS. CONN:

21       Q.      **How many Rule 10b5-1 plans have you**

22   **reviewed in the course of your work?**

23       A.      Hundreds.

24       Q.      **Have you ever advised a company on**

25   **structuring an executive's 10b5-1 plans?**

Wayne Guay                          In re Twitter Inc. Securities Litigation

```
 1        A.      No.
 2        Q.      Have you ever provided consultation to
 3   an industry group about how to structure 10b5-1
 4   plans?
 5        A.      Broadly speaking, yes.
 6        Q.      Can you explain what you mean by that.
 7        A.      Yes.  I've given public talks to
 8   industry groups or practitioner groups and law firm
 9   round tables where they've invited in executives and
10   board members from companies where I've been asked
11   to give speeches about issues related to executive
12   compensation, stock option exercises, stock sales,
13   insider trading, 10b5-1 plans, those sorts of
14   things.
15        Q.      Any of those talks specifically about
16   Rule 10b5-1, or has that just been part of a broader
17   discussion about executive compensation?
18        A.      The whole talk wouldn't have been
19   about 10b5-1.  I spent 15, 20 minutes on it or
20   something.
21        Q.      Did you -- prior to submitting your
22   report in this matter, were you already familiar
23   with Henderson and Jagolinzer's study?
24        A.      In this matter?  Yes, I had run into
25   that study in previous litigation matters.
```

Confidential

1    Q.    Did you re-review it for purposes of

2  formulating your opinions in this matter?

3    A.    Yes.

4    Q.    Would you agree with me that Professor

5  Henderson and Dr. Jagolinzer come to the conclusion

6  that Rule 10b5-1 plans can be manipulated?

7              MR. YOUNGWOOD:  Objection to form.

8              THE WITNESS:  I don't know about the

9         language.  I think my recollection -- and

10        this is I think more based on the earlier

11        work by Alan Jagolinzer by himself, but the

12        finding in that prior paper is that it's

13        possible to -- may be possible to generate

14        abnormal returns even using a 10b5-1 plan.

15  BY MS. CONN:

16    Q.    Is the -- withdraw that.

17              When you say that "Professor

18  Henderson's research does not support his opinions

19  in this matter," is the crux of that criticism that

20  Professor Henderson's and Dr. Jagolinzer's study

21  analyzed trades under 10b5-1 plans and not

22  cancellations of those plans?

23    A.    No, that's not really it.

24    Q.    Okay.  I'm referring to paragraph 86

25  where you say, "Neither of the above scenarios apply

1   to Twitter executives in this matter."

2          A.     Yes.  Yeah, that's correct.

3          **Q.     And when you refer to "above**

4   **scenarios," you're referring to -- you're referring**

5   **to trading the plan, correct, based on paragraph 85?**

6          A.     No.  I mean, the point I'm making

7   about Professor Henderson's research is that the --

8   in his paper and the Jagolinzer original paper,

9   which is published in a peer-reviewed journal --

10  Professor Henderson's report -- paper is not

11  published in a peer-reviewed journal.

12              But in that earlier paper, the idea is

13  that executives may be able to generate abnormal

14  returns using 10b5-1 plans, and there may be a

15  strategy whereby a combination of either allowing

16  the plan to trade sometimes and canceling the plan

17  can generate abnormal returns.

18              And the point that I'm making in my

19  report is that the scenario that's conjectured by

20  Jagolinzer, and then later by Professor Henderson

21  and Jagolinzer, is precisely the opposite scenario.

22              So the way that they are argue in

23  their papers that an executive can earn abnormal

24  returns and -- is exactly the opposite scenario as

25  what we see in the Twitter case.  In fact, in the

**Confidential**

1  Twitter case, what the executives did would have

2  earned negative abnormal returns.  So it's exactly

3  the opposite.

4         And I don't know -- I just don't know

5  whether Professor Henderson didn't realize that or

6  does realize that, but that certainly does not

7  apply.

8         MS. CONN:  Just for the court

9     reporter's benefit --

10         MR. YOUNGWOOD:  Jagolinzer?

11         MS. CONN:  -- I'm giving her the

12     spelling of Jagolinzer.

13  BY MS. CONN:

14     **Q.     To your knowledge, has anyone ever**

15  **done an empirical study of using Rule 10b5-1**

16  **cancellations as a way of manipulating the rule?**

17     A.     Well, not in -- not as directly as you

18  state it, but underlying some of -- the

19  interpretation that the authors of some of the

20  papers that you've been talking about -- the

21  interpretation they make of their findings is that

22  the abnormal returns from these plans are generated

23  by, again, a combination of canceling strategically

24  and allowing certain plans to continue.

25         But the plans that are canceled are

Wayne Guay                              In re Twitter Inc. Securities Litigation

1    precisely the opposite types of plans as the Twitter

2    case.  And the -- the scenarios in which they would

3    allow the trades to go through are precisely what we

4    see in the Twitter case, but in the Twitter case,

5    they canceled when they would have earned abnormal

6    returns by letting the sales go through.

7          Q.     I see.

8          A.     I think Footnote 166 in my report is a

9    very easy way to see that.  It just pulls an example

10   that Professor Henderson uses in his paper.  And if

11   you just read through it carefully, as I note at the

12   end of that footnote, you'll see that the scenario

13   he conjectures here is exactly the opposite of what

14   happened in the Twitter case.

15         Q.     I'd like to direct your attention to

16   page 53 of your report.

17         A.     53.  Okay.

18         Q.     I'm actually looking at the heading

19   here, Heading C.  You write here that, "Mr. Costolo

20   and Mr. Noto engaged in trading behavior during the

21   class period that is inconsistent with plaintiffs'

22   allegations that they used allegedly material

23   non-public information to their benefit."

24         A.     Uh-huh.

25         Q.     Is that your understanding of

1    plaintiffs' allegations in this matter?

2         A.    Broadly, yes.

3         Q.    And is that based on your reading of

4    the complaint?

5         A.    I mean, broadly, yes.

6         Q.    I may have asked you this.

7              Did you read the court's order on the

8    motion to dismiss?

9         A.    I think I did.

10        Q.    It is in your list of materials

11   considered.

12        A.    I think I did.

13        Q.    I'm handing you what we'll mark as

14   Exhibit Guay 6.

15             (Guay Exhibit 6, No Bates numbers,

16        Order Granting In Part and Denying In Part

17        Defendants' Motion to Dismiss, marked for

18        identification.)

19             THE WITNESS:  Okay.

20   BY MS. CONN:

21        Q.    Does this document look familiar to

22   you, sir?

23             (Pause.)

24        A.    Yes, I think I read this at some

25   point.

Confidential

```
 1          Q.     You may have read it in a different
 2    format --
 3          A.     Okay.
 4          Q.     -- single-spaced, double-column
 5    format.
 6          A.     I don't know.  Okay.
 7          Q.     But in any event, I'll represent to
 8    you that this is the court's order denying --
 9    granting in part and denying in part defendants'
10    motion to dismiss.
11                 I'd like to direct your attention to
12    page 40 of the order.
13          A.     Okay.
14          Q.     The bottom paragraph there --
15          A.     Okay.
16          Q.     -- says, "Defendants also emphasize
17    the 'absence of allegations of relevant stock sales'
18    during the class period.  However, as plaintiff
19    [sic] notes, their complaint does not rely on
20    allegations of an improper financial motive to
21    demonstrate scienter, nor does it reference stock
22    sales.  Rather, plaintiff's [sic] claim that
23    defendants were motivated by an attempt to live up
24    to the overly optimistic promises made at Analyst
25    Day."
```

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1              Did you read that paragraph before you

2    prepared your report, sir?

3         A.    I would think I did.

4         Q.    If, in fact, the court has accurately

5    summarized plaintiffs' allegations and is correct

6    that their complaint does not rely on allegations of

7    an improper financial motive to demonstrate

8    scienter, what is the relevance of your opinion?

9              MR. YOUNGWOOD:  Objection to form.  He

10        wrote a rebuttal report to your expert.

11   BY MS. CONN:

12        Q.    Go ahead.

13             MR. YOUNGWOOD:  I think it calls for a

14        legal conclusion.  Objection.

15             THE WITNESS:  What is the relevance of

16        my opinion?

17   BY MS. CONN:

18        Q.    Uh-huh.

19        A.    So I was asked to essentially -- I

20   think we talked about this when I discussed my

21   assignment.  So I was asked -- going back to

22   paragraph 6, "I've been asked by counsel for

23   defendants to respond to Professor Henderson's

24   opinions and evaluate whether or not the trading

25   behavior of Mr. Costolo and Mr. Noto, as well as

1    other Twitter executives, during the class period is

2    inconsistent with an intent to deceive investors or

3    improperly profit off of material non-public

4    information."

5                    So my analysis in this section shows

6    that by canceling -- assuming the plaintiffs'

7    allegations are correct and Twitter's stock price

8    was inflated during the class period, Mr. Costolo's

9    cancellation of the plans was financially costly and

10   Mr. Noto's purchase of shares was financially

11   costly, and so that's what I was asked to do.

12       **Q.    All right.  I'm simply asking because**

13   **you've characterized in your report plaintiffs'**

14   **allegations that defendants used allegedly material**

15   **non-public information to their benefit.  So if that**

16   **is not, in fact, plaintiffs' allegation, what is --**

17   **what exactly are you opining on here?**

18                    MR. YOUNGWOOD:  Objection to form.

19                    THE WITNESS:  I mean, I think my

20           opinion is clear.  I mean, I've given the

21           opinion -- I've analyzed what I was asked to

22           analyze, and I drew an opinion.  And if that

23           opinion turns out not to be relevant to

24           certain issues in the case, so be it.

25                    But my understanding is that

```
 1              plaintiffs are alleging that somehow

 2              Mr. Costolo and Mr. Noto received some

 3              benefit from this material non-public

 4              information.

 5    BY MS. CONN:

 6         Q.      Did you write --

 7         A.      If that's not part of the allegation,

 8    then so be it, but I was still asked to do this

 9    analysis, and I've done it.

10         Q.      Did you write your report?

11         A.      Did I write my report?

12         Q.      Uh-huh.

13         A.      I certainly wrote -- I wrote -- I

14    wrote much of it, but it was certainly an iterative

15    process.  I received assistance from Analysis Group

16    at my direction.

17         Q.      Did you receive assistance from

18    counsel?

19              MR. YOUNGWOOD:  Objection to form.

20              THE WITNESS:  I mean, drafts were

21         provided to counsel, and they would have

22         provided feedback at various points in time.

23    BY MS. CONN:

24         Q.      When you say you wrote "much" of your

25    report, can you quantify that at all?
```

1       A.     Well, certainly, all the words in this

2    final document are mine.  I mean, some of the parts

3    of the -- some of the parts would have been more

4    efficient for me to draft.  Some of the parts would

5    have been more efficient for Analysis Group to take

6    the first crack at drafting.

7             And then iteratively, over time, I

8    would edit, make comments, they would make comments,

9    and sort of evolve from there.  But everything in

10   here is my opinion.

11      **Q.     Just going back briefly to the**

12   **discussion about Analysis Group.**

13           **So it sounds like their -- I'm trying**

14   **to understand their role in preparing your report.**

15      A.     Uh-huh.

16      **Q.     Is it true that they conducted some**

17   **research for -- to support your report?**

18      A.     Yes, at my direction.  I mean, we

19   would -- I would -- we would discuss, for example,

20   you know, how to construct a peer group for

21   Mr. Costolo.  And then I would direct them to go

22   identify, you know -- go pull the documents and to

23   structure the peer group in a way that I have asked

24   them to and to then tabulate the trading behavior

25   that they observe.  And then I would take a look at

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1    it and consider what opinions I can draw from that.
 2         Q.      When you say "tabulate the trading
 3    behavior," so were they also running some
 4    calculations?
 5         A.      Yes.  So they would collect data, run
 6    the calculations.  They would provide me with access
 7    to the spreadsheets, the underlying documents so
 8    that I could sort of look through them and sort of
 9    check to make sure I understood exactly what they
10    were doing.
11         Q.      Did they also search for and collect
12    documents for you?
13         A.      They did.
14         Q.      Do you know if Analysis Group had
15    access to a database of documents or some kind of
16    document repository?
17         A.      I don't know the answer to that.
18         Q.      Then based on your testimony a moment
19    ago, it sounds like Analysis Group also had some
20    role in drafting at least portions of your report?
21         A.      Yes, certainly the exhibits -- some of
22    the exhibits, some of the sections that are more
23    sort of numerical, to take a crack at just putting
24    in the descriptive evidence and that sort of thing.
25         Q.      If we could turn to those exhibits now
```

1    that you referenced them.

2                        Exhibit 1 to your report.

3          A.      Okay.

4          Q.      Did you prepare this or did Analysis

5    Group prepare it -- withdraw that.

6                        Who prepared this exhibit?

7                        MR. YOUNGWOOD:   Objection to form.

8                        THE WITNESS:   This is just a stock

9          price chart.   So this is something they would

10         have -- they would have put together.   I

11         mean, at the start of all these cases, I pull

12         down the raw data myself to look at the stock

13         price path, but they would have constructed

14         this exhibit.

15   BY MS. CONN:

16         Q.      If you turn to the next exhibit, which

17   is 2a.

18         A.      Uh-huh.

19         Q.      Who prepared this exhibit?

20         A.      So certainly they would have -- they

21   would have drafted this exhibit, and then I would

22   have provided feedback and sort of looked at some of

23   the underlying documents.

24         Q.      And is your answer the same with the

25   rest of the subexhibits under Tab 2, so Exhibit 2b,

1    Exhibit 2c?

2         A.    Yes, so all of the exhibits they would

3    have taken the first crack at.  It's very data

4    labor-intensive.  So they would have taken --

5    taken -- put together the first draft.  And then I

6    would have provided feedback on format and what goes

7    in the exhibit, how to structure it to make it

8    clearer, that sort of thing.

9         Q.    In that prior answer, you just said

10    "all of the exhibits."  So are we now talking about

11    also Exhibits 3, 4, 5 and 6?

12         A.    Yes.

13         Q.    Was there anything else that Analysis

14    Group did in preparing your report and the attached

15    exhibits?

16         A.    Anything else?  You know, they

17    certainly helped compile -- certainly helped with

18    compiling the list of materials considered, you

19    know, keeping track of all of that, and ensuring

20    that everything's sort of referenced and footnoted

21    correctly.  So, you know, just a lot of -- sort of,

22    you know -- yeah, just making sure the report was

23    in -- was in good shape in terms of dotting the Is

24    and crossing the Ts.

25         Q.    If I'm understanding you correctly,

Wayne Guay                                    In re Twitter Inc. Securities Litigation

1    **you personally were not running any searches for**
2    **documents; is that right?**
3            A.        Personally not running searches for
4    documents?  None of the -- none of the documents
5    specific to this case.
6            **Q.        The Bates stamped documents.**
7            A.        None of the Bates stamped documents,
8    no.
9            **Q.        You don't know whether or not anyone**
10   **at Analysis Group was running searches for --**
11   **through the Bates stamped documents.**
12           A.        I just don't know, no.
13           **Q.        So it's fair to say you don't know**
14   **exactly what parameters might have been used to**
15   **locate the documents in your -- the Bates stamped**
16   **documents in your materials considered list.**
17           A.        What I don't know is whether they had
18   just a massive database of documents that they could
19   sift through themselves when I asked for things or
20   whether they had to go to counsel and say, can we
21   get the documents that address this or that issue.
22           **Q.        And did you have the -- you reviewed**
23   **some of the deposition transcripts; is that right?**
24           A.        I did, yes.
25           **Q.        Did you have those in hard copy?  Or**

1    how were those organized for you?

2          A.      They would -- just about everything

3    was provided to me electronically.

4          **Q.      And the transcripts you reviewed, did**

5    **they have the exhibits attached?**

6          A.      That I can't recall.  I think we did,

7    yeah -- well, attached -- I think, yeah.  So when I

8    received the transcripts, they came electronically.

9    And I think there were subfolders that contained

10   exhibits.  Yep, I think so.

11         **Q.      I want to go back to this idea of**

12   **economically rational behavior.**

13         A.      Did you say "economically rational" or

14   "irrational"?

15         **Q.      "Rational."**

16                 **It's a phrase that you've used several**

17   **times in your report and in your testimony here**

18   **today.**

19         A.      Uh-huh.

20         **Q.      Is it economically rational for**

21   **executives to delay bad news from reaching the**

22   **market?**

23         A.      Is it --

24                 MR. YOUNGWOOD:  Objection to form.

25                 THE WITNESS:  Is it economically

**Confidential**

```
 1          rational?  I mean, there's no blanket
 2          statement there of it is or it isn't.  I
 3          mean, all of these things would be
 4          case-specific.
 5   BY MS. CONN:
 6          Q.    It would depend on the context; is
 7   that your --
 8          A.    It certainly can depend on the
 9   context.  You need to think about what the issues
10   are, what the costs and benefits are.
11          Q.    Can we go back to -- I forget which
12   exhibit it is.  It's your Corrective Disclosure
13   article.
14          A.    Oh, Conservative Disclosure?
15          Q.    I'm sorry.  Conservative Disclosure.
16          A.    Okay.
17          Q.    Page 85 of that article, which -- what
18   exhibit number is that?
19          A.    Okay.
20          MS. CONN:  Which, for the record, just
21          so it's clear when we have the transcript, is
22          Exhibit 5, Guay Exhibit 5.
23   BY MS. CONN:
24          Q.    I'd like to point your attention on
25   page 85 to your statement here in the third full
```

1    paragraph down.

2          A.      Okay.

3          Q.      "If left to make their own reporting

4    decisions, managers will withhold bad news ex-post

5    due to the manager-shareholder conflict, and firm

6    value will be lower because shareholders are unable

7    to efficiently remove poorly performing managers in

8    a timely manner."

9                  Do you see that?

10         A.      Right.

11         Q.      Is that a statement that you and your

12   coauthors made, or are you summarizing someone

13   else's written work?

14         A.      This is just -- this is coming out of

15   the model.  So we're not giving any opinions here on

16   what managers necessarily do and don't, but we have

17   a model here where we make some assumptions about

18   managers' incentives to withhold bad news in certain

19   contexts.  And then we say, if these assumptions are

20   correct, then one might expect the accounting rules

21   to be structured in a certain way.  And then people

22   can go off and test the implications of what we have

23   here.

24         Q.      As long as we're looking here at Guay

25   Exhibit 5, your Conservative Disclosure article, we

**Confidential**

1    spoke about this earlier and you clarified that some

2    of the statements that I've read here are a summary

3    of other work; is that true?

4          A.     Some are, yep.

5          Q.     To the extent you included them here

6    in your written article, is it fair to say that you

7    agreed with those propositions?

8          A.     No.  I mean, that's -- that's not

9    really how this works.  So we -- you know, you can

10   cite things in the literature that you don't agree

11   with.  Not that we necessarily don't agree with

12   them, but simply having it in a paper like this

13   doesn't mean that we're giving some opinion or

14   drawing some inference.

15               MS. CONN:  I know we just took a

16         break, but I think I'm --

17               MR. YOUNGWOOD:  Sure.

18               MS. CONN:  I just want to go through

19         my outline and not make your witness sit here

20         while I do that.

21               MR. YOUNGWOOD:  Take a break.

22               THE VIDEOGRAPHER:  The time now is

23         2:46 p.m.  We're off the record.

24               (Recess from the record.)

25               THE VIDEOGRAPHER:  The time right now

Wayne Guay                                    In re Twitter Inc. Securities Litigation

```
 1          is 3 p.m.  We're back on the record.
 2   BY MS. CONN:
 3          Q.    Welcome back, Professor Guay.  You
 4   understand you're still under oath?
 5          A.    I do.
 6          Q.    I have just a few more questions for
 7   you.
 8                First, we went through quite a list
 9   earlier this morning about topics that you are and
10   are not opining on.  I won't revisit those, but I do
11   want to add to that list.
12                Are you offering any opinion on the
13   relevance of any evidence?
14                MR. YOUNGWOOD:  Objection to form.
15                THE WITNESS:  The relevance to the
16          court?
17   BY MS. CONN:
18          Q.    Yes.
19          A.    No.
20          Q.    Are you offering an opinion on the
21   credibility of any witness?
22          A.    No.
23          Q.    If I could have you turn back to your
24   curriculum vitae, which is Appendix A to your
25   report.
```

Wayne Guay                          In re Twitter Inc. Securities Litigation

```
 1          A.      Uh-huh.
 2          Q.      You are currently teaching at Wharton
 3   School of Business; is that correct?
 4          A.      That is correct.
 5          Q.      And what subjects do you teach at
 6   Wharton?
 7          A.      I teach a variety.  I teach a course
 8   on corporate valuation.  I teach a course -- I teach
 9   an introductory accounting course to the MBA
10   students.  And I teach -- I teach a Ph.D. course on
11   corporate governance and executive compensation to
12   the Ph.D. students.
13          Q.      Do you teach any courses on securities
14   regulation?
15          A.      No.
16          Q.      Have you ever?
17          A.      No.
18          Q.      Have you ever spoken to anyone at the
19   SEC on the topic of Rule 10b5-1 plans?
20          A.      It's possible, but I can't recall
21   specific discussions.
22          Q.      And more specifically, have you ever
23   spoken to anyone at the SEC on the topic of the
24   termination of a Rule 10b5-1 plan?
25          A.      Not that I recall.
```

Page 222

Confidential

1        MS. CONN:  I think that's all we have

2   subject to redirect, if you have questions.

3        MR. YOUNGWOOD:  Why don't we just take

4   a minute or two.

5        MS. CONN:  Sure.

6        THE VIDEOGRAPHER:  The time now is

7   3:02 p.m. and we are off the record.

8        (Recess from the record.)

9        THE VIDEOGRAPHER:  The time right now

10  is 3:03 p.m.  We're back on the record.

11       MR. YOUNGWOOD:  I have no questions.

12       MS. CONN:  Professor Guay, I want to

13  thank you again for your time today.

14       THE WITNESS:  Thank you.

15       MS. CONN:  Nothing further from us.

16       MR. YOUNGWOOD:  You marked a few

17  exhibits that weren't themselves marked

18  confidential, so we probably should designate

19  the transcript confidential.

20       MS. CONN:  That's fine.  Just to be

21  clear, we reserve our rights if the

22  transcript is used later, but that's fine for

23  now.

24       MR. YOUNGWOOD:  Yeah.

25       THE VIDEOGRAPHER:  The time right now

1    is 3:04 p.m.  We're off the record.

2          (Examination concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF NEW YORK                )

2                                     ss:

3    COUNTY OF WESTCHESTER            )

4

5           I, EILEEN MULVENNA, CSR/RMR/CRR, a
     Certified Court Reporter, Registered Merit Reporter,
6    Certified Realtime Reporter, and Notary Public in
     and for the State of New York, do hereby certify:
7

8           That I reported the taking of the
     deposition of the witness, WAYNE R. GUAY,
9    commencing on the 28th day of August, 2019, at the
     hour of 8:38 a.m.;
10

11          That prior to being examined, the witness
     was duly sworn by me to testify to the truth, the
12   whole truth, and nothing but the truth;

13          That I thereafter transcribed my said
     shorthand notes into typewriting and that the
14   typewritten transcript of said deposition is a
     complete, true and accurate transcription of my
15   said shorthand notes taken down at said time, and
     that a request has been made to review the
16   transcript.

17          I further certify that I am not a relative
     or employee of an attorney or counsel of any of the
18   parties, nor a relative or employee of any attorney
     or counsel involved in said action, nor a person
19   financially interested in the action.

20          IN WITNESS WHEREOF, I have hereunto
     set my signature this 9th day of August, 2019.

21

22   _____

23          EILEEN MULVENNA, CSR/RMR/CRR

24

25

1    DECLARATION UNDER PENALTY OF PERJURY

2   Case Name: In re Twitter Inc. Securities Litigation

3   Date of Deposition: 08/28/2019

4   Job No.: 10059450

5

6        I, WAYNE GUAY, hereby certify

7   under penalty of perjury under the laws of the State of

8   _____ that the foregoing is true and correct.

9            Executed this _____ day of

10  _____, 2019, at _____.

11

12

13            _____

14                    WAYNE GUAY

15

16  NOTARIZATION (If Required)

17  State of _____

18  County of _____

19  Subscribed and sworn to (or affirmed) before me on

20  this _____ day of _____, 20__,

21  by_____,    proved to me on the

22  basis of satisfactory evidence to be the person

23  who appeared before me.

24  Signature: _____ (Seal)

25

```
1    DEPOSITION ERRATA SHEET

2    Case Name: In re Twitter Inc. Securities Litigation
     Name of Witness: Wayne Guay
3    Date of Deposition: 08/28/2019
     Job No.: 10059450
4    Reason Codes:  1. To clarify the record.
                    2. To conform to the facts.
5                   3. To correct transcription errors.

6    Page _____ Line _____ Reason _____

7    From _____ to _____

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24   Page _____ Line _____ Reason _____

25   From _____ to _____
```

```
 1   DEPOSITION ERRATA SHEET

 2   Page _____ Line _____ Reason _____

 3   From _____ to _____

 4   Page _____ Line _____ Reason _____

 5   From _____ to _____

 6   Page _____ Line _____ Reason _____

 7   From _____ to _____

 8   Page _____ Line _____ Reason _____

 9   From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   _____ Subject to the above changes, I certify that the
             transcript is true and correct
23   _____ No changes have been made. I certify that the
             transcript  is true and correct.

24

25          _____
                          WAYNE GUAY
```

Confidential

**Wayne Guay**                                              In re Twitter Inc. Securities Litigation

---

**$**

---

**$130,000** 121:10,20

**$300-plus** 124:2
   127:23

**$32** 53:6 54:11
   111:18 118:1 121:19

**$450** 56:3

**$50** 144:8

**$925** 34:10

---

**0**

---

**003** 87:8

---

**1**

---

**1** 10:13 73:5,10,11
   74:16,24 75:2 83:13,
   14,18 180:18 181:7
   187:16 214:2

**1,379,963** 73:16 74:5

**1.2** 144:7

**1.4** 74:12

**1.8** 144:8

**10** 77:16 127:25

**10(b)** 89:18 91:19

**102** 77:13,14,15

**10:48** 97:22

**10b-5** 57:20 91:20
   154:4

**10b5-1** 12:6,10,13
   57:10 58:6,12 67:6,
   8,24 82:21 83:3,6
   87:12 88:17 89:6,16,
   18 90:9,13 91:8,13,
   20 92:9 95:1,10,14,

19,23 96:7,12,18
97:3 101:16,20,23
102:12,14,19 103:1,
3,7 107:3 108:2,15
132:15 134:16
148:12 151:17,19
153:3,7,14 154:1,4,
10 155:7,11,25
156:15 157:21
158:21 164:13
166:1,14 167:5
172:2,15,24 173:10
176:5,10 179:3
189:24 190:16 192:1
201:9,13,14,16,21,
25 202:3,13,16,19
203:6,14,21 204:14
205:15 222:19,24

**11:02** 98:1

**11th** 182:9

**12** 181:7

**12,000** 72:25

**120** 34:16

**126** 138:11,13

**12:12** 149:3

**12:55** 150:4

**12th** 180:19

**13** 84:7,13 182:7

**13,000** 74:15

**13.3** 73:3,4

**14** 112:24

**15** 202:19

**157** 182:1

**16** 88:4 161:22

**166** 206:8

**18** 146:15

**19** 146:15

**1988** 196:20

---

**2**

---

**2** 8:21,25 10:4,13
   35:1 39:5 42:6 51:3
   97:25 98:8 120:12
   142:10 150:16 153:1
   168:15,16 169:14
   214:25

**2.4** 144:9

**20** 71:6 202:19

**2014** 72:11 108:16
   112:24 117:15 129:1
   144:10 161:22
   180:18 181:7 182:9

**2015** 72:11 73:20
   77:16 79:2 80:14
   96:8,16 97:14
   101:24 163:11 166:3
   174:16 180:19 181:8
   183:22 184:18
   186:12

**2017** 146:15

**2018** 146:11

**2019** 7:3 144:11
   179:25 180:5

**22** 174:16

**25** 16:2,3 17:3 110:5
   157:21 179:25
   186:12

**250** 32:8

**2576** 78:5

**2578** 77:18

**25th** 180:5

**28** 7:3 129:1

**299** 161:15,16,22

**29986_0007** 86:22

**2:02** 199:25

**2:17** 200:4

**2:46** 220:23

**2a** 214:17

**2b** 214:25

**2c** 215:1

---

**3**

---

**3** 87:7 150:3 179:22,
   23 180:3,14 215:11
   221:1

**3,000** 85:15

**30** 16:2,3 17:3 34:20
   89:13

**303** 182:3

**308** 128:23,24,25

**309** 80:9,10,11

**31** 95:7,8,18

**32** 132:2

**325** 180:11,15

**326** 129:3

**36** 114:8

**38** 138:11

**3:02** 223:7

**3:03** 223:10

---

**4**

---

**4** 73:19 186:6,7,12
   200:3 215:11

**40** 17:2 208:12

**41** 98:7,10 104:19
   144:4

**419** 86:17,18,19,24

**Confidential**

Wayne Guay

In re Twitter Inc. Securities Litigation

**42** 103:10 105:8
145:6 150:19

**425** 7:11

**44** 73:13

**46** 109:15 110:22

**48** 112:21

**4s** 57:5

---

**5**

**5** 73:19 195:6,7,11
215:11 218:22
219:25

**5-6** 120:13,14

**50/50** 187:19 188:23

**52** 161:25

**53** 206:16,17

**54** 113:17

**55** 113:18

**56** 120:11 121:25
126:8,10 127:4

**57** 131:23 134:14

**58** 135:11

**5th** 80:13

---

**6**

**6** 39:4,7 114:9
207:14,15 209:22
215:11

**61-month** 144:25

**67** 135:14 140:20

**6992** 175:7

**6993** 174:18

---

**7**

**7** 35:9 41:22 180:13,
17

**71** 142:9 143:22
144:3 150:15

**74** 148:11

**75** 152:23,25 195:23

**76** 197:6

**79** 178:17,18

**7th** 28:3

---

**8**

**8** 41:6 42:6,14 51:2
57:10

**8-K** 112:23

**80** 189:17

**81** 191:23 198:24
200:10

**82** 197:16

**82869** 186:15

**83** 200:11,13

**85** 204:5 218:17,25

**86** 203:24

**8:38** 7:4

---

**9**

**9** 111:19,24 112:11,
14 118:3

**9.2** 118:10

**90** 111:15 112:4

**92** 72:23

**93** 174:13,14,15

**9:32** 50:18

**9:45** 50:21

---

**A**

**a.m.** 7:4 50:18,21
97:22 98:1

**ability** 82:24

**able** 14:25 25:13 30:1
48:7 60:16 61:13
84:25 92:11 93:11
94:6,7 133:15
158:18 162:14
176:20,25 183:24
204:13

**abnormal** 203:14
204:13,17,23 205:2,
22 206:5

**absence** 47:6 48:5
101:14 197:20
208:17

**absolved** 75:3,19,21

**absolves** 75:13

**abused** 90:14,17

**academic** 29:10 30:9
95:12 189:22

**Academy** 83:15,18

**accepting** 178:20

**access** 31:23 32:1
213:6,15

**accomplish** 178:5

**accounting** 11:8
44:17 141:6 219:20
222:9

**accumulated** 51:13

**accurate** 10:16 56:1
73:24

**accurately** 10:1 209:4

**achieve** 194:21

**acknowledging**
138:14

**act** 48:21 90:10 91:19
173:24

**acted** 50:7

**acting** 49:7,20,23
76:12,23 196:7

**action** 16:5 62:9

**actions** 45:15 59:23
60:8

**activity** 47:6 91:3

**actor** 65:5

**actual** 68:22 189:23

**ad** 71:9 141:2 142:3

**add** 221:11

**added** 61:2

**adding** 162:15

**addition** 34:23

**additional** 34:24
35:2,4,6,7 41:24
165:15 178:14

**address** 216:21

**addressing** 188:15

**administration** 11:12

**advantage** 190:19

**advised** 201:24

**advising** 12:5,8

**affect** 79:18

**agent** 169:21

**aggregate** 55:22
56:3,12 142:24

**ago** 48:3 86:16
127:19 147:5 155:3

177:10 213:19

**agree** 46:23 60:15
84:21 88:16 89:6
91:6,17 96:6 113:14
116:17 117:7,20
126:24 128:6 136:20
141:8 143:6 152:1
153:12 167:11,14
168:4 170:4 172:21
173:12,21 183:19
188:19 190:21
193:8,14,25 199:5
203:4 220:10,11

**agreed** 67:16,19,25
177:4 190:4 220:7

**agreeing** 190:12

**agreement** 19:10
119:19 172:14

**agreements** 19:17

**agrees** 190:15

**ahead** 19:14 41:5
113:17 209:12

**Alan** 90:22 200:21
203:11

**allegation** 47:21 48:8
64:5 78:19 79:14
80:21 94:11 164:11
210:16 211:7

**allegations** 48:6
61:21 62:12,19,22
63:1,20 65:15,18
76:6,11,16 77:1,3,5
81:4,23 82:7 85:10
91:5 92:18,21 93:16
101:10,12 106:3,6,
13,15,19,22 107:4,
14,16,20 108:9
109:4,9 119:5,11,12
134:24 160:20,22
165:5 185:2 191:8
194:8,17 206:22

207:1 208:17,20
209:5,6 210:7,14

**allege** 98:17

**alleged** 63:10,15
65:21 98:14 100:7,
13,18,23 192:5

**allegedly** 61:22 63:1
206:22 210:14

**alleging** 211:1

**allow** 43:10 92:5
190:17 206:3

**allowing** 108:24
204:15 205:24

**alternatives** 123:16

**always...based**
181:11

**amend** 10:9

**amount** 38:5 53:10
124:5 144:9

**analogies** 171:23

**analogy** 171:13

**analyses** 37:23

**analysis** 27:12 30:15,
22 31:4,11 32:14
35:12,15,17,21 36:2,
24 37:7,12,17,20
38:1,6,12,19,22,23
39:1,25 52:22 54:20
63:6 76:5,15 81:2
85:1 94:14 105:25
106:2 114:17 116:10
124:10 125:19
135:9,15,18 136:25
138:7 142:5,20
145:4,7,18,25
146:23,24 147:4,10
152:21 156:13,14
157:9 158:13 162:20
196:20 210:5 211:9,
15 212:5,12 213:14,

19 214:4 215:13
216:10

**Analyst** 113:24 114:9
115:13 143:7,17
146:8 147:17 208:24

**Analyst-day-to-class-
period** 145:1

**analyze** 116:8 160:9,
23,25 161:9 210:22

**analyzed** 56:19 65:8
85:19 136:22 137:15
143:2,9 160:18
162:8 164:24 203:21
210:21

**analyzing** 125:22
170:12

**and/or** 51:11

**announce** 130:7,13

**announced** 118:13

**annual** 76:19

**answer** 15:20 19:3,13
33:23 65:23 93:22
94:2,3 99:19 119:18
133:8 134:2 137:18,
19,22,23 143:19
148:8,9 156:2,23
158:19 161:5 180:21
181:9 185:11 213:17
214:24 215:9

**answering** 143:15

**ante** 176:12

**Anthony** 77:16 80:13

**anybody** 46:19

**anymore** 89:3

**anything's** 49:9
154:23 191:3

**apologize** 129:5

**appear** 67:8 178:19

**appears** 132:4

**appendix** 10:20 18:7,
8 27:19,22 29:6,8
221:24

**Apple** 28:10

**apples-to-apples**
147:9

**applicable** 72:11

**applied** 87:17 88:4

**applies** 45:22 72:12
87:25

**apply** 45:12 72:15,18
87:19 203:25 205:7

**appreciate** 119:17

**approach** 141:2,4,17,
18,19,21

**appropriate** 140:17
146:23

**appropriately** 171:9

**approximately** 32:11

**April** 112:24 174:16
182:4,9

**Aptus** 7:12

**arbitrariness** 141:9,
12

**arbitrary** 67:7,23

**arbitration** 22:1,5
24:22

**argue** 90:16 137:11
204:22

**argued** 133:3

**arguing** 136:13

**argument** 115:17

**argumentative** 127:3

**arguments** 98:12
100:22 101:9 118:20

146:20 170:21

**arising** 16:7

**arrangement** 38:14

**array** 45:13

**arrived** 54:15

**art** 44:13,14

**article** 83:15,18 84:7
168:17,20 169:3,5,
14 174:23 195:8,11,
21,24 218:13,17
219:25 220:6

**articles** 29:10

**articulate** 191:25

**ascertain** 156:8

**aside** 34:23 102:10
117:19 137:3 154:17
168:7

**asked** 12:1,12 33:18
35:5 39:7 41:19
42:6,10 51:19 53:4
54:22 55:6 57:14
60:3 61:12 62:3
67:15 92:11 93:11
94:3,5 95:5 98:21
137:14 155:18
158:11 166:4,25
183:20,23 192:13
202:10 207:6
209:19,21,22
210:11,21 211:8
212:23 216:19

**asking** 15:6,8,10 16:6
19:11 20:20 42:10
58:23 59:2 74:3
75:11 81:25 92:25
104:1 105:5 108:15
110:17 126:3
131:11,12 134:10
143:12 158:13
210:12

**assessing** 163:7

**assessment** 194:25
196:3

**assessments** 196:7

**assets** 43:3,10,12,13
121:1,4

**assignment** 39:18
209:21

**assistance** 211:15,17

**assistants** 37:2

**assisted** 35:12

**assisting** 36:24 37:7

**associated** 20:16

**assume** 50:10 75:20
79:23 81:18 92:12
93:12 131:2,12
166:4,25 167:8,16
176:16 184:9,13

**assumed** 77:2 184:4

**assuming** 15:9 21:1
85:10 194:10 210:6

**assumption** 119:9
160:19 198:10

**assumptions** 42:7,9,
11 198:8,14,20
201:15 219:17,19

**attached** 215:14
217:5,7

**attachment** 78:13

**attempt** 208:23

**attention** 98:6 169:6,
8 171:1 172:16
173:3 180:10 187:11
200:11 206:15
208:11 218:24

**attorney** 12:16 64:9
65:24

**attracts** 171:1

**August** 7:3 28:3,22
108:16 132:25
180:18 181:7

**author** 84:2

**authors** 197:3 205:19

**automated** 96:21

**available** 31:2 41:25
124:13

**Avenue** 7:11

**average** 16:22 144:9

**aversion** 84:10,11

**avoid** 173:2

**avoidance** 171:24,25

**avoiding** 190:21

**aware** 17:22 30:10
31:2 68:1,3 82:20
95:21 102:11
104:19,24 113:10,15
119:4 157:4 188:2
190:24 201:7

---

**B**

**back** 14:19 46:14
50:21,23 51:3 53:15,
17 75:23 97:11 98:1,
3 118:19 136:19
150:4,10,14 152:22
155:23 173:18
198:24 200:4,6
209:21 212:11
217:11 218:11
221:1,3,23 223:10

**background** 32:24
36:19

**backgrounds** 37:10

**backup** 57:3

**bad** 131:19 163:3
189:9 217:21 219:4,
18

**Bain** 40:2 88:12

**based** 42:19 44:3
52:9 54:16 56:23
59:7 62:22 67:9 72:7
76:1 84:24 89:9 90:1
109:7 112:8,18
123:10 134:18 139:5
140:5,13 142:5
144:17 164:20 169:6
170:6 176:19 181:1
183:1 184:4,5,9
197:9 198:8,14,20
201:8 203:10 204:5
207:3 213:18

**basic** 9:7

**basing** 127:12,17,18

**basis** 78:7,10 143:14
162:16 173:2 196:19

**basket** 43:1 72:2

**Bates** 29:25 30:13,18,
25 32:7,9 77:17 78:5
80:14 83:14 86:21
87:7 129:2,4 152:9,
13 161:24 174:17
175:7 179:23 186:7,
14 195:7 207:15
216:6,7,11,15

**bearing** 77:17 80:14
129:2 161:24 174:17
186:14

**bears** 86:21

**beginning** 82:17
97:25 150:3 184:15
200:3

**behalf** 7:17,20,22
8:19 18:21

**behave** 46:12,16,18,

20 49:12 72:2
198:11

**behaves** 197:10

**behavior** 14:5 26:24
39:10 40:4,21,25
43:18,23 44:20,23
45:8,14 46:19,20,24
47:4 48:4,10 49:1
61:20 62:16,17,21,
25 63:16 64:5,11,24
65:4,7,14,17 66:19
92:19 103:17 105:12
106:16,20,24 116:8,
16 117:8,9,17
119:23 120:10
123:17 125:11,22
134:25 135:20,21
136:22 137:16,25
138:2 140:18 142:2
145:23 146:14,16
147:1,6,11 162:7,21
163:8 164:24 165:1
168:2 171:3 193:5,
11 197:21 206:20
209:25 212:24 213:3
217:12

**behaviors** 42:15,18
44:23 46:4,6 47:19
49:16 198:7

**believe** 18:12 22:3
25:6 27:3 38:23
46:11,15 57:1 67:4
70:11 73:23 74:4
78:3 83:12 85:16
88:13,15 90:13 97:4
101:3 102:9 103:24
114:8 122:24 135:10
140:16,21 170:8
171:7,8 174:22
176:10 183:10 192:9

**believed** 60:22
173:15

**believes** 185:4

**beneficially** 73:16
74:5

**benefit** 41:1,3 61:23
62:4,5,14,17 63:2,5,
7,8,11,14 64:2 98:24
99:10,16,21 100:2,
25 107:15 178:14
194:19 197:19 205:9
206:23 210:15 211:3

**benefited** 65:21
99:20 192:2

**benefits** 43:3 49:16
98:14 99:2,7 100:23
101:13 103:16
104:16,20 218:10

**best** 20:7

**better** 44:25 45:9
100:5 130:25 148:20
158:19 172:11

**beyond** 13:1 59:16
85:18 94:18 100:20
125:12 133:6

**big** 131:8 187:5

**biggest** 144:23,24

**billed** 38:2,6

**billing** 34:9

**billion** 124:7 128:1

**billionaire** 122:22

**binding** 113:9,10,13,
15

**bit** 8:23 16:25 43:22
52:8 55:10 76:20
87:6 95:20 110:20
118:21 134:15
148:20 159:22
170:12 196:14
198:12 199:2

**blanche** 91:8

**blanket** 218:1

**board** 88:10 129:24
161:24 162:12,13,19
171:2,8 172:5 181:3,
13 202:10

**bonus** 99:2

**bonuses** 98:14

**bottom** 96:2 144:4
175:11 208:14

**bought** 52:14 80:23
85:15

**break** 9:22 50:13
97:17 98:4 110:19
150:12 166:7 170:11
199:22 220:16,21

**briefly** 114:5 170:14
212:11

**broad** 45:17 72:12

**broader** 16:6 44:21,
22 55:12 202:16

**broadly** 14:3 26:18,
20,22 32:25 42:25
44:24 57:25 58:1
202:5 207:2,5

**brought** 30:9

**Brown** 36:21

**building** 196:23

**bullet** 51:6 52:17
54:23 57:9 61:18
67:5 68:4

**bulletproof** 91:4

**business** 11:6,12
43:20 128:18 155:1
160:2 162:14
163:10,12 191:17
222:3

**buy** 86:1

**buying** 76:18 81:6
82:9 85:13 177:12
194:14

**bypass** 177:25

---

**C**

**C-LEVEL** 175:14

**calculation** 81:16
85:9

**calculations** 81:25
213:4,6

**California** 7:9

**call** 34:5 44:14 111:3
136:24 137:1,18,21
141:2 187:18

**called** 84:9 173:23

**calls** 37:21 113:25
172:19 209:13

**cancel** 96:7 97:6,9,13
133:11 148:14
159:20 171:18
172:2,20 173:5
180:18 181:6 182:8
190:7,8,10,14,18

**canceled** 59:16 88:23
89:2,24 90:9 93:1,
18,21 95:1 96:15
101:23 102:18 109:2
132:14,24 133:1,17
156:19 159:7 160:2
161:2 164:13 165:21
167:13 175:15 176:4
179:9 180:22 181:1,
22 182:4 183:25
184:7,17,20 185:14
205:25 206:5

**canceling** 88:17
89:16 107:5,18
134:20 148:22
154:15 166:5,21

Wayne Guay                                          In re Twitter Inc. Securities Litigation

167:5 172:15,24
173:9,10 176:4,18
177:18 179:3 182:11
184:10,12 194:18
199:11 204:16
205:23 210:6

**cancellation** 57:10,19
58:6,13 90:3 95:4
102:4,5 106:4
134:16 148:12
151:17 153:7,13,16,
17,19 154:11,18
155:16,19,24
156:15,25 157:9,22
158:5,21 159:14
161:11 163:11,18
164:15 166:1,14
167:7,21 168:10
175:24 176:22 177:7
178:2,9 182:2 183:8,
11,16,21 184:6,14
199:11 210:9

**cancellations** 58:14
59:15,21 153:2
154:1 155:4 165:10
166:18,24 167:1,17
178:21 179:18
182:24 183:5 189:23
191:7 192:1,3,15
199:6 203:22 205:16

**cancels** 157:21 158:4

**captured** 32:25

**card** 91:9

**care** 99:24 174:4

**carefully** 104:7
206:11

**carry** 96:23 113:12

**carte** 91:8

**case** 7:20 10:6 14:24
20:24 25:17,18 26:4,
5 27:2,20 28:4,8,10,

11,12,13,15 39:18
41:9,15 75:17 85:25
86:3 94:10 98:17
116:4,7 154:22
158:11,18,20 165:18
167:4 171:22 191:2,
5 193:24 204:25
205:1 206:2,4,14
210:24 216:5

**case-specific** 218:4

**cases** 14:8,10 15:1
16:4 19:4,16 20:4,9
25:14 26:8 27:23
63:13 86:4 99:14
214:11

**cash** 43:13 76:20
121:16,20 124:1

**cash-based** 109:21

**catalyst** 169:21

**causation** 69:18,19

**cause** 175:23

**caused** 106:4

**CEO** 51:24 83:19
115:18 116:6 138:15
140:18 146:5 166:2
169:21 170:17,18,22
171:1,3,8

**CEO's** 120:1

**CEOS** 52:23 54:17
84:16 135:10,20
136:6 137:25 138:2
142:4

**certain** 12:2 14:5
31:22 37:21,22,23
42:11 44:19,23
87:21 108:12 119:11
138:21 142:4 152:19
153:3 164:6 189:7
198:11 205:24
210:24 219:18,21

**certainly** 10:24 12:7
16:20 19:15 21:16
29:3 30:3 31:2 32:1,
24 38:17 42:8 44:16
45:3,11 46:21 49:2
50:1 52:15 60:10
84:23,24 88:23 89:2
91:12 94:21 95:13
96:10 97:7 99:11
100:4 112:7 116:7
118:18 128:21
139:19 151:24 155:7
165:6 170:6 172:3,
22 173:6 186:1
189:1 190:25 191:12
192:13 193:17,18
205:6 211:13,14
212:1 213:21 214:20
215:17 218:8

**certainty** 135:3
183:25

**cessation** 178:2

**Chain** 186:9

**chairman** 88:10
166:2

**chance** 139:10
187:20 188:24

**change** 10:9 81:21
91:21 114:10,18
115:11,21 131:5,20
165:7 169:8,21
171:3,12

**changed** 11:2 114:8,
16

**changing** 114:15

**characterization**
54:24 142:17 144:1

**characterized** 210:13

**chart** 214:9

**check** 78:10 170:22

213:9

**chief** 113:3

**chimed** 37:22

**Choice** 197:6

**choices** 170:2

**chose** 136:21 137:15,
24 138:1 160:14

**Christmastime**
129:10

**circumstance** 198:23

**circumstances** 90:3
145:9,12,14 146:3
147:16 153:13
155:24

**cite** 77:24 181:25
220:10

**cited** 32:11 129:12
200:24 201:1

**cites** 73:19

**claim** 120:17 145:8
189:21 208:22

**clarification** 196:14

**clarified** 220:1

**clarify** 38:22

**Clarkson** 13:6

**class** 7:18,23 16:5
39:11 52:19,21 53:9,
13,20,24 58:7 61:20
65:11 69:11,15
72:21 73:1 76:2,18
78:18 79:13 80:20,
23 82:12,17,18,21,
25 85:3,15,18 88:19
93:4,25 94:13 95:2
99:5 101:15,17,20
102:2,6,8,12,17,18
105:16,23 106:1
107:1,23 108:2,4,6

**Confidential**

Wayne Guay

In re Twitter Inc. Securities Litigation

109:1 110:13
111:11,13,16,17
113:23 115:15
117:8,9,12,21,22,23
120:18 124:25
126:16 128:16
130:19 132:3,16,19
133:1,4,12 142:25
143:8,18 146:9
147:18 148:23
151:20 162:23,24
163:6 164:25 165:1
183:5 184:15 206:21
208:18 210:1,8

**classes** 12:24

**Classification** 140:6

**clear** 40:12 62:15
63:8 76:10 89:25
92:24 105:24 113:25
119:14 127:8 156:25
165:9 185:10 210:20
218:21 223:21

**clearer** 215:8

**clearly** 115:17 124:22
126:10,11 127:3
138:24 182:25

**close** 139:7

**closed** 118:15

**Coates'** 70:22

**coauthored** 200:21

**coauthors** 169:2
195:20 219:12

**code** 139:21 140:6,7

**cofounders** 113:2

**cognizant** 59:22 60:8,
12 159:19 177:14

**collect** 213:5,11

**collected** 30:15 31:10

**collecting** 37:2,22
57:5

**collection** 29:22

**combination** 204:15
205:23

**come** 27:11 50:1
96:24 144:17 203:5

**comes** 16:11 35:8
39:1 44:7 125:22
196:24 198:3

**comfortable** 19:18,21

**coming** 79:24 115:18
124:14 146:19
179:14 219:14

**comment** 178:1

**comments** 212:8

**commit** 66:8,23 120:3

**commitment** 113:9,
11,14,16

**committed** 116:1,12
120:5 146:5,6

**common** 172:11

**commonly** 51:9

**Commonwealth**
22:21

**communicated** 185:8

**communicating**
37:11,16

**communications**
151:16

**community** 134:21

**companies** 42:18
51:10 57:8 131:9
135:19 137:6,24
138:1,6,22 139:5,11,
25 140:2,3,8,22
141:15,18,24 178:6

202:10

**company** 60:23
118:22 120:2 138:14
173:8 174:10 176:11
185:23 188:6,17,18
201:24

**company's** 31:25
44:11 138:16 155:1

**comparable** 52:23
54:17 136:5

**comparator** 140:21
141:19

**compare** 137:1
146:25 147:1,5

**compared** 110:7,24
135:19 137:24 138:1
144:10

**comparison** 54:16,20
137:7 147:9

**compels** 197:21

**compensated** 39:2

**compensation** 12:8
21:17 23:15 33:15,
16,22 38:10,13,19
44:7 51:14 71:17,19
98:15 99:3 109:22
124:1,14 168:22
169:9,21 170:9,13,
17,19,22 171:2,4,10
202:12,17 222:11

**compensation-
related** 26:9

**compete** 140:13,15

**compile** 215:17

**compiling** 215:18

**complaint** 62:8,12
63:17 207:4 208:19
209:6

**complaints** 66:17

**complete** 39:17,19
152:2

**computation** 118:11

**compute** 108:7

**computed** 118:10

**concentrated** 51:12
115:19

**concentration** 110:6,
23 112:7

**concern** 19:8 174:7

**concerned** 59:22
60:8 172:5 173:7
178:6 185:21

**concerns** 59:10
167:22 182:17

**conclusion** 54:16
121:19 123:7 124:14
144:22 166:23
197:12,25 203:5
209:14

**conclusions** 144:2

**conditions** 67:8,24

**conduct** 135:18
193:6,12

**conducted** 212:16

**confidence** 118:22
120:2

**confidential** 223:18,
19

**confidentiality** 19:10,
17

**confirmed** 52:21

**conflict** 219:5

**confounded** 55:10

**conjecture** 191:25

conjectured 204:19

conjectures 206:13

Conn 7:16 8:9,18 9:1 12:22 13:15,20 15:11,18,21,23 16:18 19:23 20:11, 23 21:4,8,9 26:11,19 27:10 32:20 34:22 35:24 40:11 41:13, 21 45:6 47:13 50:4, 12,22 53:17 54:1,9 56:10 58:20 64:12 67:1,22 69:22 73:12 75:7 77:15,19 79:3 80:1,11,15 81:9,17 83:17,23 86:19,23 89:4 91:16 94:23 96:13 97:17,19 98:2 100:9,11 101:6 103:4 114:19 127:9 128:25 129:6 133:23 134:4,12 136:2 137:10 139:16 140:19 141:13 143:21 148:25 150:9 161:17,21 162:1 164:9 165:8 168:19, 23 173:20 174:15,19 177:23 179:20 180:2,6 185:9,19 186:4,11,16 188:14 193:20 195:10,14 199:20 200:5 201:20 203:15 205:8,11,13 207:20 209:11,17 211:5,23 214:15 218:5,20,23 220:15, 18 221:2,17 223:1,5, 12,15,20

connection 38:2,6

conservative 195:12 197:19 218:14,15 219:25

consider 13:16 76:3 78:20 79:14 80:22 93:15 125:19 157:7 159:1,6,25 160:6,8 213:1

considered 29:9 32:22 71:17 77:24 80:16 91:25 129:7, 14 139:6 140:9 151:23 152:2,6,14 161:20 163:23 174:21 175:1 186:19 207:11 215:18 216:16

considering 125:1 160:12

consistent 26:25 42:16 46:4 47:5 48:4,14 51:8 58:8, 11,24 59:21 61:5,7 65:1,4 92:19,22 103:17 105:10 106:11 117:19 119:22 120:8,9 134:24 141:5 153:8, 14,18 154:12 155:16,19,25 156:15 168:11

consists 14:20

constitutes 112:1

construct 90:15 91:12 153:10 154:22 157:17 212:20

constructed 214:13

consultation 202:2

consultations 181:1

consulted 11:25 12:4

consulting 11:17 14:19 15:9 16:12

consume 43:11

consumption 43:14 54:12 120:19 121:21 122:2 123:15,21 124:19 125:1,23 126:13 128:5,7,8,10, 11 133:5,7

Cont'd 150:8

contact 37:4

contacted 27:12

contained 217:9

context 45:3,12 46:2, 8,21 47:3 49:4,15, 17,25 59:3,5 62:6 94:22 96:11 98:24, 25 99:19 131:1,16 154:15,17 156:17,22 158:6,8,16 163:2 167:7 218:6,9

context-dependent 58:15

context-specific 59:12

contexts 219:19

contextual 154:6,11, 19 156:3,8

continue 106:8 107:3 108:24 118:23 128:11 205:24

continued 110:12

continues 135:11

contracting 83:21 171:9

Conventions 196:17

conversation 25:8 184:5

conversations 27:15, 16 33:2,5,9 181:11 182:12 184:19

conveys 172:11

Cooley 17:8,10

coordinated 166:1,10 183:11 185:3,4

coordination 185:5

copy 10:21 216:25

corporate 12:9 26:25 31:18 71:18 148:14 170:1 222:8,11

corporation 12:13

corporations 12:1,2, 5,6

correct 8:15 10:21,22 11:6,7,13,14 14:22 16:4 18:12 20:1 23:5,6 24:11 25:16, 18,22,23 29:11 31:11,12 32:9,10 34:12 38:17 41:25 42:1,12 49:13 53:10 54:18,19 56:17 59:18 61:9,17 62:23 63:4,5,18,23 64:21 65:16,18 67:3 68:23, 24 69:2 70:4 73:2 75:8 76:7,11,14,17 77:6 79:1,6,7 80:5 81:23 82:7 83:22 84:10 85:10,22 86:13 87:3 88:6,23 92:18,22 93:16 101:17,21,24,25 102:2,9 103:6 105:1, 3,16,17,19,23 106:3, 6,13,15,19,23 109:4, 21 108:9,13 109:4 110:14,25 111:1,5,6, 10,12,18 112:25 117:22 118:2 121:11,14,16 125:16 128:19 132:15,19 133:18,25 134:17

**Confidential**

Wayne Guay

In re Twitter Inc. Securities Litigation

135:21 137:7 152:3, 15 153:4 154:6,10, 20 158:23,24 160:20,22 161:12 169:9 173:5,18,22 183:17,18 194:8,17 195:1,18 200:18 204:2,5 209:5 210:7 219:20 222:3,4

**correcting** 173:16

**correction** 114:3,7,10

**Corrective** 218:12

**correctly** 53:22 57:1, 7,19 215:21,25

**correlated** 43:4

**correspondence** 33:3,6

**corroborate** 169:25

**cost** 49:15 76:7,19 191:8 199:12

**costly** 77:6,7,8 81:7 82:1 210:9,11

**Costolo** 33:3 39:10 42:15 47:19 53:12, 22 55:13 61:19 80:13,22 88:5 92:7 93:7,20 96:6 97:12 101:19,22,23 102:11 105:15 107:18 108:10,11 109:20 110:8,22 113:3 115:25 116:11 117:20 118:12 119:5 121:6,10 122:13 124:24 127:14,19 129:2 130:2,16 131:2,13 132:14 133:7,19 137:1 145:18 148:5 158:21 161:10,23 162:12 163:10,17 164:11

179:24 180:4 181:21 183:19 184:7,16 185:21 186:13 188:2,4 191:15 206:19 209:25 211:2 212:21

**Costolo's** 33:13,15, 25 47:8,12 51:8,22 52:18,22 53:6 54:12, 17 64:4,23 65:7 68:16 69:4 105:25 106:23 113:22 116:7,15,25 117:7 120:19,22 122:3,8, 10 123:8,24 124:13 125:4,22 126:20,22 127:12 128:16 132:3 133:16 134:7,16 135:9,20 136:22 137:15,25 138:3 162:20 164:24 178:20 179:2 182:2 183:12,15 184:10,14 187:13 191:6,7 210:8

**costs** 218:10

**counsel** 7:14 9:11 20:11 25:9 30:12,22 31:10 39:8 42:10 152:7,15,16 164:1 166:2 181:2,12 182:13 209:22 211:18,21 216:20

**counsel's** 19:6

**counter** 72:3

**countersuits** 24:1,3

**couple** 144:21 146:25 151:8

**course** 33:8 37:12 130:12 162:3 186:21 193:6,12 201:22 222:7,8,9,10

**courses** 222:13

**court** 7:8,13 8:1 9:15 17:22 21:23 23:25 25:19 50:11 66:20 67:16,25 68:2 205:8 209:4 221:16

**court's** 67:2 207:7 208:8

**courtroom** 133:25

**coverage** 170:18 173:11

**covered** 19:16 20:22, 25

**crack** 212:6 213:23 215:3

**create** 71:8 174:11

**created** 180:25

**credibility** 69:4,7 221:21

**criteria** 67:9 138:7, 21,22 139:20 141:9, 22 142:1,5

**criticism** 126:1 203:19

**criticize** 123:20 142:13,16

**criticizing** 178:19

**critiquing** 142:19

**crossing** 215:24

**crux** 203:19

**current** 10:23,24 33:10 113:4

**currently** 11:5 222:2

**curriculum** 10:21 11:2 221:24

**cushion** 120:18 121:21

**cut** 129:4

**CV** 11:16

___

**D**

**daily** 78:7,10 79:19

**damages** 70:1

**Dan** 176:15

**Daniel** 7:12

**data** 29:22 37:2,23 145:7 213:5 214:12 215:3

**database** 31:24 56:15,21,24 57:7 213:15 216:18

**date** 7:3 34:13 74:11 78:25 187:16

**dated** 73:19 80:13

**dates** 102:4

**David** 36:6

**day** 108:13 113:24 114:9 115:13 143:7, 17 146:8 147:17 174:3 208:25

**days** 43:20 102:7,10 108:20 132:16

**debate** 171:15,19

**deceive** 39:12 40:5, 14,20 210:2

**deceives** 40:25

**December** 129:1 130:20

**decide** 49:5 50:7 163:21

**decided** 159:20

**decision** 60:13 118:16 119:21

Wayne Guay

In re Twitter Inc. Securities Litigation

132:3,23 133:9,11
138:21

**decisions** 45:22 49:4
71:10 96:22 138:6
219:4

**decline** 175:25 178:1

**deemed** 139:22

**defendant** 65:21
68:23 69:1 101:16

**defendant's** 61:15
106:16

**defendants** 7:25 17:5
18:22,23 21:21 22:9,
11 23:2,10,12,21,24
24:12 25:16 28:17,
19 39:8 46:4 48:21
50:7 60:20 62:12
63:10 66:8,22 68:12
98:11,13,16 100:17,
22 104:25 105:10
106:10 166:5
192:10,23 208:16,23
209:23 210:14

**defendants'** 49:1
69:10,14 70:10 71:1
207:17 208:9

**defending** 27:16

**defense** 24:14 91:5

**define** 14:11,16 15:10
42:23 43:7,25

**defined** 138:20

**Definitely** 131:21

**definition** 14:6 44:15
45:10,20 46:1

**definitions** 45:5

**defraud** 47:21 48:6,8,
15,17,21 50:2
103:18 153:8,15,18
154:13,20 155:17,20

156:1,16

**degree** 141:9

**Dejelo** 77:17

**delay** 217:21

**delayed** 199:11

**demonstrate** 65:20
66:6 100:17 208:21
209:7

**demonstrating** 60:22

**denying** 207:16
208:8,9

**depend** 49:14,15,25
59:5 158:6,7 218:6,8

**depending** 16:21

**depends** 45:11 46:2,
21 59:3 108:20
178:4,5

**deposed** 9:3 22:2,15
24:18,24 28:23
115:5

**deposition** 7:5,10 9:8
15:7 22:4 34:18,24
115:2 125:9 139:3
142:24 179:5,16,24
180:3,7,11 181:25
183:15,20,23 184:2
190:5 201:3 216:23

**depositions** 30:13
31:19

**describe** 11:20 36:8
45:15 123:2 135:15
198:6,21

**described** 136:8

**describing** 171:25
197:1,3

**description** 10:17
30:2 56:1

**descriptive** 213:24

**designate** 223:18

**desire** 61:7 173:22

**detail** 29:21 50:14
124:23

**details** 176:11

**determination** 51:25
52:3 54:11 181:6

**determine** 92:6 93:7,
19,23 94:25 155:19

**detriment** 62:21

**deviation** 113:23,25

**Dick** 80:12 129:1
161:23 186:12

**difference** 40:7,13
160:10 178:11

**differences** 108:7

**different** 29:12 40:17,
18 45:5 49:16 54:2
65:9,13 97:9 100:9
116:6 117:9,12
136:3,4 146:15,22
147:18,19 159:23
172:7 183:16 184:6
198:12 208:1

**differential** 178:14

**direct** 37:4 78:21
79:15 98:6 180:10
187:11 194:19
200:10 206:15
208:11 212:21

**directed** 31:4

**directing** 37:3

**direction** 30:15 31:11
211:16 212:18

**directly** 12:1,4 29:4
33:3,6 37:11,16
84:20 163:24 171:21
184:19 205:17

**directors** 129:25
130:3,18 162:13

**Dirk's** 70:20

**disagree** 56:2,11
74:15 92:2,4,5 118:8
141:14,17 143:4
144:1,13,20,21
153:1 158:20

**disagreed** 68:2

**disappointing** 130:23
131:7

**disclose** 197:22

**disclosed** 141:3
176:9,11

**disclosing** 196:8

**disclosure** 113:11
178:15 185:22
195:13 197:6,8,19,
21 218:12,14,15
219:25

**disclosures** 13:10
84:15 125:11 201:14

**discovered** 30:10

**discretionary** 197:8

**discuss** 25:14 87:5
112:21 135:8 138:24
148:11 151:11
212:19

**discussed** 9:11 26:4
124:1 133:14,15
146:11 147:20 151:6
153:24 166:17 172:4
209:20

**discusses** 124:23
145:9 150:20 151:16

**discussing** 10:10
51:1 86:16 145:16
167:21 200:9

Confidential

Wayne Guay                                              In re Twitter Inc. Securities Litigation

**discussion** 31:19
179:5 182:23 184:10
202:17 212:12

**discussions** 31:21
130:23 134:19
159:13 165:20
182:18 183:2 222:21

**dismiss** 67:3 207:8,
17 208:10

**dispositive** 46:25

**dispute** 145:2,3 185:6

**disputes** 143:25

**distance** 189:24

**distinction** 154:9
160:11

**distinguish** 182:14

**District** 7:8

**diverse** 122:19

**diversification** 42:19,
23 44:9 51:11 52:2,
12,15 72:1 122:25
123:1,3,10,17,24
124:19,22 128:2,12
194:20

**Diversification...
appears** 126:19
127:11

**diversified** 52:15
122:23 123:4 124:8

**diversify** 112:6 123:5

**divest** 51:11

**Division** 7:9

**document** 20:2 32:5
33:1 77:24 80:16
81:10 83:24 84:3
87:2,7,22 88:1 129:7
162:2 163:22 168:24
186:18,20 187:12,13

195:18 207:21 212:2
213:16

**documentation** 145:9
147:25 150:20

**documented** 34:2

**documents** 29:10,24,
25 30:4,12,13,17,18,
21,25 31:1,5,6,8,9,
13,24 32:1,3,8,9,13,
17,18 35:7 52:9
60:11 77:20 121:5
128:17 148:1 151:1,
5,11,15,18,21 152:1,
3,5,6,13,17,18
161:19 163:9,16,23
164:6 174:20 212:22
213:7,12,15 214:23
216:2,4,6,7,11,15,
16,18,21

**doing** 16:21 19:14
30:11 37:3,23 47:6
48:5 75:4 76:20
90:10 109:10 119:25
145:25 157:8,10
213:10

**dollar** 38:5 53:10
144:9,23

**dollars** 124:7 128:1

**domain** 156:24 161:1

**Dorsey** 40:1 88:9
113:1 148:6

**dotting** 215:23

**double** 143:5

**double-check** 87:18

**double-column** 208:4

**Dowd** 7:17

**Dr** 70:18,24 203:5,20

**draft** 212:4 215:5

**drafted** 214:21

**drafting** 30:8 212:6
213:20

**drafts** 211:20

**draw** 48:25 49:3 85:4
107:13 116:18,21
117:3 167:10 171:13
213:1

**drawing** 59:13 115:24
220:14

**drawn** 109:13

**draws** 104:22

**drew** 85:5 210:22

**drops** 107:8

**drove** 182:23

**due** 219:5

**duly** 8:5

─────────────

**E**

**e-mail** 77:16 78:5,6,
25 79:1 80:12 129:1,
25 130:2,16 131:9,
12 161:23 162:10,
19,22 174:16,24
175:7,9 186:9,12
187:6,13 188:15,16

**e-mails** 31:21 81:15
129:10 167:20
171:20 184:6 187:5,
6,7

**earlier** 13:4 58:5 64:9
102:15 118:21
128:14 142:24 148:9
152:9 153:25 154:2
190:4 201:3 203:10
204:12 220:1 221:9

**early** 27:4 101:24

**drafted** 214:21

**earn** 190:16 204:23

**earned** 205:2 206:5

**earning** 121:10,20

**earnings** 187:17,20
188:24 189:2

**easily** 126:16

**easy** 43:14 206:9

**economic** 45:25
64:11 110:8,12
111:3 119:23 120:9
145:8,14 146:3

**economically** 42:17
44:1,2,12,21 45:7,12
46:5,6,13,17,19,20,
24 47:3 49:8,12,21,
24 50:2 64:14,19,24
65:2,5 105:11
106:17,25 107:10
109:19 118:15
119:20 122:4,11
123:9,11 126:5,23
173:23 174:6 177:25
193:5,11,22,25
217:12,13,20,25

**economics** 36:20
40:23 43:2 44:3,17
112:9 168:17,20

**economist** 64:10

**edit** 212:8

**educational** 10:17

**effectively** 102:21

**effects** 177:14

**efficient** 212:4,5

**efficiently** 219:7

**eggs** 43:1 72:2

**Eileen** 8:2,5

**either** 13:5 17:14 57:2
63:13 68:23 69:1

115:25 116:11
175:24 176:21
204:15

**electronically** 217:3,
8

**element** 91:18

**eliminate** 52:20

**else's** 198:2 219:13

**embedded** 174:23

**emergency** 54:7

**emphasize** 208:16

**empirical** 43:23 67:9
71:7 72:8 90:17,20
141:5 169:7,12
198:16 205:15

**employed** 135:24

**employee** 33:10

**employees** 55:22
87:17 88:2

**encroaching** 15:13
19:9

**ended** 24:3

**ends** 115:15

**engage** 14:5 40:25
66:19 91:2

**engaged** 61:19
206:20

**engagement** 131:4,
14

**enhance** 71:11

**ensuring** 215:19

**enter** 102:1 155:8

**entered** 155:2 159:2
176:12

**entering** 155:4

**entire** 94:15

**entitled** 168:21

**equating** 103:21
104:5

**equation** 147:12

**equity** 44:8 51:13,14
71:8,17,21 74:21,25
110:8,25 124:5
127:21,24

**equity-based** 109:22

**equivalent** 64:15 75:2

**equivalently** 64:20

**essentially** 76:9,16
115:13 124:3,9
125:17 176:19
209:19

**established** 142:23

**evaluate** 39:9 209:24

**Evan** 113:2

**event** 94:18 208:7

**eventually** 107:8

**everybody** 87:25

**everything's** 215:20

**evidence** 43:23 47:25
48:11,17 71:7 72:8,
14,17 90:18,20
100:24 101:4 104:2
120:17 121:24
123:21,23 148:18,21
154:21 159:4 164:21
165:16 169:25 170:6
171:5 185:20 191:1,
2,4,11,13,14,20
213:24 221:13

**evolve** 212:9

**ex** 176:12

**ex-post** 219:4

**exact** 19:3

**exactly** 9:4 13:13
26:6 39:22 48:1 54:5
57:24 105:4 108:14
114:6 129:21 143:12
179:14 204:24 205:2
206:13 210:17 213:9
216:14

**EXAMINATION** 8:8
150:8

**examined** 8:7

**examining** 124:12

**example** 154:25
193:24 206:9 212:19

**examples** 31:22 90:6,
8 151:9

**Examworks** 23:8

**excessive** 170:18,23

**Exchange** 91:19

**exchanged** 20:12

**excluded** 17:21
138:14

**excluding** 142:4

**exclusive** 122:1
123:15

**exclusively** 124:25
125:23

**excuse** 154:4

**execs** 175:14

**execute** 97:1 108:19,
22

**executed** 102:17
190:23

**executing** 102:15

**executive** 12:7,8
21:16 23:15 40:23
44:18,24 45:9,14
71:23 75:1,13 84:6

86:12 90:9 91:14
93:24 95:1,15,16
97:4,9 113:3 123:12
124:4 148:14 155:1
156:18 157:19 158:2
167:23 168:21 169:8
190:5,23 193:8,14
202:11,17 204:23
222:11

**executive's** 26:13,22
86:8 119:23 155:13
156:12 201:25

**executives** 39:11,22,
24,25 40:1,24 42:18
43:20 44:5 45:16
47:20 48:5 51:9
55:13,17 57:5,11
58:7,9,22,25 59:10,
22 60:7 61:3 63:15
66:18 71:9,16,25
72:13 79:24 83:6
86:1 87:11,14,16
94:13 96:15 97:13
99:9,12,17,22,24
106:20 118:18,25
120:4 142:21
145:20,21 147:7
148:7 151:17 158:22
159:1,7,14 161:1
165:20 166:15
167:12,21 170:23
171:15 172:4 173:10
176:4,18 177:6,14,
18 178:12 183:3
184:12 189:16,23
192:2 194:1 202:9
204:1,13 205:1
210:1 217:21

**executives'** 17:25
18:18,25 21:14
43:18 71:20 183:13
192:3 199:6

**executives...are**
42:16

exempt 88:2

exercises 202:12

exert 170:9

exerts 170:1

exhibit 8:21,25 10:3
18:4,6 51:3 73:11
77:13,14,15 80:9,10,
11 83:13,14,17
86:17,18,19,24 98:8
120:12 128:23,24,25
142:10 150:16 153:1
161:15,16,22
168:15,16 174:13,
14,15 179:22,23
180:2 186:6,7,12
195:6,7,11 207:14,
15 214:2,6,14,16,19,
21,25 215:1,7
218:12,18,22 219:25

exhibits 213:21,22,25
215:2,10,11,15
217:5,10 223:17

exist 160:13

existed 160:16

expect 41:1 47:5
48:5,14 58:9,11
65:2,5 92:20 106:12,
20 117:17 130:12
133:24 146:9,18
219:20

expectations 117:20

expected 58:22,25
108:22 115:20
116:16 147:11

expects 130:6

expediency 39:2

experience 10:18
11:17 32:25 66:16
95:12

experiencing 147:7

expert 10:13 11:23
13:10,17 14:20,24
15:3,13,25 17:4 18:9
19:25 20:5,8 86:4
209:10

expertise 94:19

experts 70:7,10 71:2

expiration 175:25
176:22 178:3,10

explain 26:21 71:14
94:8 145:12 147:16
170:14 184:17 202:6

explained 106:17

explanation 167:19
168:1,6,8 178:21
179:3 181:22 183:7

explanations 192:15

explicit 181:14

explicitly 89:16

expressed 182:18

extend 196:20

extent 75:18 100:3
114:18 159:3,9,10
161:3 185:7 220:5

extraordinary 52:19
54:25

---

**F**

face 177:5 190:17

fact 47:7,14 60:7
61:14 74:10 83:2
84:2 89:23,24
102:25 104:22,25
107:24 116:4,8
126:3 127:19 133:16
148:23 159:15
164:10 165:22

167:17 168:10 173:9
178:12 192:21
199:16 201:2 204:25
209:4 210:16

factor 126:20 127:12
181:6,10,14

factors 111:2 125:16
128:4 132:5 133:6
139:6 185:17

facts 90:2 103:11
104:15 109:13 118:5
165:18 167:10,12
189:21

factual 176:24

Fader 70:24

fails 145:11 147:15
191:24

failure 106:3

fair 37:8 43:22 52:8
61:8 64:25 76:20
93:6 94:19,24 102:7
113:21 115:23
138:3,4 141:14
142:18 157:25
172:17 184:4 216:13
220:6

fairer 126:21

fairly 43:11 194:18

fall 141:18

false 69:11

familiar 9:7 13:21
64:2 77:23 83:24
84:12 91:22 95:13,
15 168:24 195:17
202:22 207:21

far 11:1 19:6 32:3
37:11,16 97:15,16
102:10

favorable 131:7

173:11,14,17

February 80:13 96:8,
16 97:14 101:24
130:7,9,14 163:11
166:3 180:19 181:7
183:22 184:18

federal 13:11,17 14:7,
12,17,24 16:7 66:7

feedback 211:22
214:22 215:6

feet 130:6,13

Fenton 129:2,17,22,
24

field 141:6

fifth 61:18

figure 198:15

figuring 94:15

filed 27:5

filing 112:23 113:12

filings 29:21 30:16
32:1 33:17,19 56:23
176:8

filtering 136:5

final 126:18 212:2

finance 22:7,21 44:17
141:7

financial 33:25 34:7
40:22 41:3 43:2
44:3,4 52:5,7,8 62:5,
13,17,21 63:6 85:12
98:13,16,23 99:3,7
100:6,13,18,23,25
101:13 103:15,22
104:2,6,16,20 105:1,
18,21 106:5 107:12
112:9,10 119:1,4,15
120:23 122:17 165:3
168:16,20 182:14
192:4,11,22,25

Confidential

Wayne Guay

In re Twitter Inc. Securities Litigation

194:3,4,6,19 195:8, 12 199:3,7,12,17 208:20 209:7

**financially** 44:19 76:8 81:7 82:1,9 210:9,10

**find** 84:6 135:7 136:5 169:19 171:4

**finding** 141:24 203:12

**findings** 205:21

**fine** 8:12 15:15 223:20,22

**fire** 130:13

**fire...when** 130:6

**firm** 17:8 27:13,15 35:18 38:24 43:22 71:9,11 84:15,16 100:2 194:25 196:4, 9 202:8 219:5

**firm-specific** 124:5

**firms** 52:24 54:17 72:13 136:25 139:20,22

**first** 18:14 25:10,17 51:6 83:10 117:13 139:19,20 187:12,16 196:15 212:6 215:3, 5 221:8

**fit** 45:19 138:14

**fits** 130:22

**five** 16:19

**flat** 157:13

**flawed** 141:19,20

**focus** 126:14

**focused** 127:4

**focuses** 124:25 125:23 126:13

**follow** 141:2

**followed** 136:7

**following** 118:14 119:6,13 142:2,12, 15 147:2,6

**follows** 8:7 150:7

**footnote** 138:11,13 150:25 182:1 206:8, 12

**footnoted** 138:25 215:20

**forego** 9:10 194:20

**foregoes** 194:13

**foregoing** 107:6,12 119:1,8

**foregone** 109:10

**forget** 90:25 218:11

**form** 12:19 13:12,19 15:5 16:13,15 26:2, 15 27:8 32:15 34:19 35:23 40:8 41:10,18 44:8 45:2 47:10 49:22 50:9 54:4 56:6 57:5 58:16 64:7 67:18 69:21 73:19 75:6 78:22 79:21 80:25 81:12 88:20 91:10 94:20 96:9 100:8 101:2 102:23 114:13 127:1 133:21 134:1,8 136:1 137:8 139:13 140:10 141:10 143:10 164:3,16 173:13 177:20 179:12 184:23 185:15,24 188:11 193:15 201:11 203:7 209:9 210:18 211:19 214:7 217:24 221:14

**formal** 12:20

**format** 208:2,5 215:6

**former** 33:10

**forming** 71:2

**forms** 98:15

**formulate** 163:19

**formulating** 75:25 78:17 79:11 80:17, 19 128:15 129:8 155:15 158:25 203:2

**forth** 41:15 176:13

**forward** 30:9 171:6

**found** 62:12

**foundation** 78:23

**founder** 119:24

**founders** 119:25 145:19 146:5

**founders'** 120:1

**four** 18:10 28:1 144:23 148:15,22

**fourth** 57:9

**frame** 56:4,8 139:18 142:22 145:1

**Framework** 83:21

**Francisco** 7:9

**fraud** 65:22 66:9,23 68:13 98:14,17 100:7,13,14,18,23 101:1 105:1

**fraudulent** 46:10,12, 16,18 47:6 48:11 49:7,11,19,20 50:8 75:3,13,18 76:1,12, 13,23 78:20 79:14 80:21 82:4 91:2

**frequently** 200:24

**front** 10:3 74:8

**full** 114:15,18 142:20 218:25

**fully** 10:1

**function** 179:18

**fund** 54:12

**funds** 29:4

**further** 96:22 150:7 223:15

**G**

**Gadde** 88:14 174:17

**gain** 192:4,11 199:7

**gains** 99:4 165:3 190:23 194:3,5,6 199:3,17

**garbled** 157:25

**Geller** 7:17

**gen-** 154:7

**general** 58:18 66:11, 13,16 72:5,13 75:5 99:23 117:1 154:7 166:2 167:6 176:7 181:1,11 182:12 183:7

**generally** 12:8,9 19:18 43:5,9 63:13 66:18 99:24 106:9 108:3,5 123:4,5,25

**generate** 203:13 204:13,17

**generated** 205:22

**generic** 158:14

**get-out-of-jail-free** 91:9

**getting** 157:3 172:9

Confidential

Wayne Guay                                    In re Twitter Inc. Securities Litigation

177:6 189:13

**give** 70:12 90:6
158:18 202:11

**given** 28:7 58:11,22,
25 104:12 110:5
115:12 136:9 156:10
177:16 184:16
199:10 202:7 210:20

**gives** 122:1 123:14

**giving** 26:17 100:19
125:20 194:3 205:11
219:15 220:13

**Glick** 36:6,17,25 37:5,
14,18

**go** 14:19 18:13 19:14
38:22 75:23 95:18
103:10 105:7 107:21
110:4 135:8 148:25
155:23 189:17
190:9,18 206:3,6
209:12 212:21,22
216:20 217:11
218:11 219:22
220:18

**goal** 51:10

**goes** 168:3 169:24
180:24 215:6

**going** 8:20 24:3 40:25
46:14 57:4 94:16
97:11,19 108:20
116:7 130:4 131:18
141:24 144:20
145:22,23,25 147:13
171:18 172:10 173:6
176:15 186:25
191:20,23 198:24
209:21 212:11

**Goldenberg** 21:11

**Gompers'** 70:15

**good** 8:10,16 163:3

215:23

**governance** 12:9
71:18 170:2 222:11

**government** 139:22

**graduated** 36:11

**granting** 207:16
208:9

**grants** 21:17 51:14

**greatest** 193:7,13

**Gregg** 7:21

**group** 23:8 27:12
30:15,23 31:4,11
35:12,16,17,21 36:2,
24 37:7,12,17,20
38:1,6,12,20,22,23
39:1 55:13 135:19
136:9,18,20,21,23
137:6,15,16,24
138:1 139:24
140:12,16 141:19
142:20 202:3 211:15
212:5,12,20,23
213:14,19 214:5
215:14 216:10

**groups** 202:8

**grow** 162:14

**growth** 121:7 130:5
131:3,13

**guay** 7:6 8:4,14,15,16
37:17 50:23 83:13,
14,18 98:3 150:5,10
168:15,16 179:22,23
180:3 186:6,7,11
195:6,7,10,13
207:14,15 218:22
219:24 221:3 223:12

**guess** 19:18 26:23
57:25 75:24 101:7
133:4 148:8 153:22
155:21 162:5 187:6

**H**

**halfway** 169:16

**hallmarks** 67:6,20

**halt** 95:22

**hand** 8:20 195:5

**handing** 207:13

**handy** 8:22

**happened** 93:3
139:17 146:16
206:14

**happening** 175:22,23

**happening'** 187:23

**happens** 187:20
188:24

**hard** 216:25

**harder** 99:18

**harm** 153:19

**he'll** 133:25

**head** 86:6 133:16
134:7

**heading** 206:18,19

**healthy** 162:15

**hear** 134:6,11

**heard** 114:5

**Heather** 7:19

**heavily** 145:24

**held** 7:10 85:14,16,17
121:2,4 124:2 130:6,
13

**help** 12:13 131:10

**helped** 215:17

**helpful** 158:15

**helping** 36:2

**Henderson** 8:21 10:4,
13 27:5 35:1 39:5,23
42:6 51:3 53:12,21
56:4,12 57:23 70:4
73:10,15 98:8
103:11,23 104:3,22
114:3 115:24 116:3
120:12,16 121:23
122:1 123:14,20
124:10,21 125:20
126:2,11,12 127:4,5
133:2,3 135:24
136:6,12,15,21
137:14,24 139:1
141:1,15 142:6,10,
13 143:9,13 144:6
145:6,25 146:13
147:15,24 150:15,19
153:1 157:5 165:12,
16,23 166:16 167:9,
14 168:1,3 172:14,
19 178:20 183:9
185:3 189:20 190:15
191:12,21,24
192:10,21 201:8
202:23 203:5 204:20
205:5 206:10

**Henderson's** 39:9
54:24 55:9 57:2,17
67:6,20 73:8 91:7
101:11 103:19
104:11 113:21 135:9
136:25 140:24
142:16 143:25 153:2
164:19,21 186:2
191:1 192:18
200:14,17,20
203:18,20 204:7,10
209:23

**high** 19:7,19 71:22,25
83:19 99:16 109:21
110:5,22 112:6
197:22

**higher** 17:1 107:6,22

Confidential

**Wayne Guay**

In re Twitter Inc. Securities Litigation

108:3,5,25 112:7

**historical** 108:11
109:5

**history** 155:13
156:12

**hoc** 71:9 141:2 142:3

**hold** 13:9 119:19

**holding** 112:4 118:24

**holdings** 51:12 73:6
74:16,19,20,24 75:3
110:6,8,23,25
111:16 112:12

**holds** 115:17

**holiday** 129:10

**hour** 34:10 50:13
97:20 199:21

**hours** 34:13,20 38:1

**hundred** 36:22

**Hundreds** 201:23

**Hussein** 23:18

**hypothesis** 169:20

**hypothetical** 58:18
75:9 154:23 158:14

**hypotheticals** 153:10

---

**I**

**i.e** 192:2

**idea** 131:19 133:22
136:11 170:16 172:9
204:12 217:11

**identification** 83:16
168:18 180:1 186:10
195:9 207:18

**identified** 29:25
30:21,22 128:5

**identifies** 189:22

**identify** 7:14 125:5
192:22 212:22

**ignore** 116:4 160:14

**ignored** 147:25

**ignores** 123:16 142:1
145:8,9 150:20

**ignoring** 122:2

**III** 41:5,16

**illiquid** 115:19

**imagine** 8:22

**immediately** 52:14

**Immunomedics**
21:11

**impacts** 187:21 189:3

**implications** 219:22

**imply** 160:13

**important** 91:7 116:9,
10,14 131:17 170:1

**importantly** 191:24

**impossible** 102:21

**improper** 208:20
209:7

**improperly** 39:13
40:5,14 210:3

**incentive** 52:20
53:13,19,23 54:2
97:6,8 110:9,13
111:3 190:7 194:24
196:3

**incentives** 14:5 40:24
44:9 64:11 71:8,21
83:20 219:18

**include** 11:22,24
88:4,7,9,12,14
145:18,19

**included** 30:5 138:7,
23 181:13 186:18
220:5

**includes** 55:16

**including** 39:25
74:19,25 142:3
148:5,6

**income** 16:11 124:13

**inconsistent** 26:23
39:12 40:4 61:21
62:25 64:5 76:25
78:19 79:13 80:21
92:23 107:14 109:9
190:19 206:21 210:2

**incurs** 194:14

**independently** 56:16,
22 144:15

**indicate** 35:11

**indicated** 27:14 60:11
125:18

**indicates** 57:3 71:7

**indication** 188:1,3

**indirectly** 29:3

**individual** 69:1 95:22
98:11,13,16 100:22
101:16 105:10
106:10,16 192:23

**individuals** 31:20,22
36:4 45:16,23 88:17
89:7 148:2

**Industrial** 140:5

**industry** 139:21,23
140:6 202:3,8

**inexplicably** 142:4

**infer** 103:12 104:4
176:20

**inference** 19:1 26:13
48:25 49:3 104:22

109:8,12 116:18
154:19 167:10
173:19 178:9 220:14

**inferences** 115:24
117:3

**inflated** 76:17 81:5,24
82:2,8,10 85:11,13
86:1,9,12 107:5
210:8

**influence** 170:1,9
174:9

**influenced** 80:4

**influencing** 145:24

**informal** 12:23

**information** 29:10
32:21 33:12,14,17
39:14 40:6,15 41:25
43:24 52:9 59:15
61:22 62:13 63:2,11
76:4 81:20 84:24
90:1 91:15 92:5,8,13
93:8,13,21 94:1,12
95:3,21 96:20,25
97:2,5 119:6 124:18
130:21,22,25 131:8
134:19 148:3,10
154:6,12,19 155:10
156:3,9,24 157:3,6,
20 158:3,8 159:6
160:1,21,25 161:5,
11 163:17 164:12
165:15 172:11
176:19 185:23
187:19 188:6,8,10,
13,17,18,23 190:1,6,
17,20,24 191:15,19
192:5 206:23 210:4,
15 211:4

**informed** 95:11 113:4
196:6

**informs** 116:15

**Confidential**

Wayne Guay

In re Twitter Inc. Securities Litigation

**inherently** 57:20
58:13 153:5 154:14
158:22 164:20
165:14 166:3,18,20,
24 167:5 172:15,19,
23

**initiating** 95:19

**injury** 69:20

**inquiry** 199:8

**inside** 63:22

**insider** 17:25 18:18,
25 21:15,16,18
22:13 23:5,13,17
24:7,16 25:11,15,25
26:8 28:14 56:13
86:20 89:9 95:20
97:15 103:8 132:18
202:13

**insiders** 54:25 55:8,
19 56:3 142:17,25
143:6 144:2,7 148:5
153:3

**insiders'** 145:11
151:7,12

**insofar** 25:13

**instance** 180:25

**instituted** 92:8

**institutions** 36:21

**instructions** 14:16

**insurance** 36:14

**intend** 51:17 53:2
54:21 55:4 57:12
60:1,4,6,24 61:10
62:1 67:13 68:11,15,
19 69:3,6,9,13,17,25
98:20

**intended** 128:21

**intent** 39:12 40:5,14,
19 46:12,16,18,25

47:8,21 48:12,15,17,
21 49:7,11,20 50:2,8
75:3,14,18,22 76:1,
12,14,24 78:20
79:14 80:22 82:4
103:18 153:8,14,18
154:13,20 155:17,
20,25 156:16 210:2

**intention** 119:24
120:1

**interaction** 36:5

**interest** 71:24

**interests** 72:4

**internal** 31:20

**internalize** 71:23

**interpret** 65:14,16

**interpretation**
205:19,21

**interpreting** 171:16

**introduced** 8:17

**introductory** 222:9

**intuition** 197:18

**invented** 67:7,21

**invested** 84:16

**investigated** 59:19

**investment** 134:21

**investor** 179:19

**investors** 39:13 40:5,
25 43:19,24 59:12
118:23 120:2 153:20
159:16 167:25
172:6,9 173:7 174:3,
5,10 189:6,14 210:2

**invited** 202:9

**invoice** 38:24

**invoices** 38:22,25

**involved** 12:5 63:14

**involving** 28:10

**IPO** 51:23 109:21
110:10 111:9 115:18
116:5 117:14 118:14
119:20 121:10
127:22 138:16
139:7,18 142:3
146:4,12,17,19
147:2,6,7,12,21

**IPO'D** 139:11

**irrational** 46:13,17,
19,20 107:10 217:14

**irrelevant** 32:14
81:10,13

**issue** 23:17 39:2
46:25 67:17 94:10
103:17 113:21
115:23 125:1 185:6
216:21

**issues** 12:11,25
19:19 21:18 23:16
31:18 66:3,11 125:2
163:5,21 165:19
171:22 176:24
182:25 202:11
210:24 218:9

**iterative** 30:6,20
211:14

**iteratively** 212:7

**Ivy** 36:21

**J**

**Jack** 113:1

**Jagolinzer** 90:23
200:21,23 201:8
203:5,11 204:8,20,
21 205:10,12

**Jagolinzer's** 202:23
203:20

**Jeff** 77:17

**Jim** 174:16 175:9

**JK** 196:21,24

**job** 94:16

**jobs** 99:10,12

**Jonathan** 7:24

**journal** 168:16,20
195:8,11 204:9,11

**judge** 50:11 94:17

**July** 27:4

**June** 27:3

**Jung** 196:20

**jurisdiction** 15:1

**jury** 14:15 25:4 48:25
49:3,5 50:11 61:14
94:17 134:6,10
163:21

**K**

**keep** 99:12 145:17
148:4 170:22 173:25

**keeping** 99:9,15
215:19

**key** 78:14,21 79:15,
20,24 94:10 116:4
163:20 164:18

**kind** 31:8,24 38:18,19
63:8 64:1 91:4 120:6
140:13 146:1 147:10
157:25 213:15

**kinds** 14:13 57:8
139:25

**knew** 36:12 115:5
121:6 131:3,13

**Index: inherently–knew**

Wayne Guay                                                    In re Twitter Inc. Securities Litigation

155:1 156:18 159:1,
7 163:10,12 191:15,
19

**know** 9:4,19,23 11:1
14:6 16:1,3,9 17:6
18:3 19:3,4 20:19
21:18 25:4,7 26:24
27:6 29:17 34:15
35:19 36:19 37:6,9,
24 38:4,5,12,13
47:11 52:10 54:14
56:18 60:13 63:12,
20 65:23 66:2,20
68:22 75:24 79:16,
23 80:6 81:1 82:14,
15,22 85:14,16,17,
20,24 86:7,11 88:22
91:4,11 97:7 100:15
105:5 107:24 108:1,
10,17 109:4 112:8
114:6,14 115:15
117:11 118:19
119:3,12,18 121:1,3,
4,22 122:7,9,19
125:6,8,13 126:4
128:20 129:17
130:21 131:1,6,17
134:2,10 135:3
136:7 140:4,11
142:6 143:12,14
153:17,25 154:25
155:12,14 156:20
158:9 160:13,16,17
163:1,2,4,19,22,25
164:17 167:3,23,24
168:13 174:9,22
176:3 178:4 184:24
189:4,6 191:18,19
192:17,20 193:2,16
194:11 199:15
201:18 203:8 205:4
208:6 212:20,22
213:14,17 215:16,
19,21,22 216:9,12,
13,17 220:9,15

**knowable** 108:1

**knowing** 59:16 80:4
167:23,24 187:22

**knowledge** 20:7
78:21 79:15 128:18
196:9 205:14

**knows** 15:19 188:25
189:9

**Kwon** 196:20

---

**L**

**L-E-V-I-N** 7:21

**labor-intensive** 215:4

**lack** 76:1 98:11,12
101:8 103:12,13,15,
24 104:2,3,4,16
114:1

**laid** 134:22

**language** 91:23 203:9

**large** 43:2 44:3,7
51:11,14 71:7 72:7

**late** 27:3 72:11
117:15

**law** 9:15 12:25 14:12
17:8 27:15 38:24
85:25 86:3 202:8

**laws** 13:11 14:17 16:8
66:7

**lawsuit** 15:25 17:4

**lawsuits** 16:5

**layman's** 42:25

**layperson's** 14:4

**leadership** 181:2,12

**leading** 113:24 114:9
117:24

**League** 36:21

**left** 219:3

**legal** 7:13 12:18,20,
23 14:6,10 35:21
66:2,12 86:7,11
100:7,13 104:24
105:2,5 113:15
192:17,20 193:2
199:15 209:14

**legally** 113:13

**legitimate** 172:1

**length** 176:13

**let's** 16:19 18:4,13
20:6 21:10 62:15
71:5 74:23 95:18
114:23 142:9 151:2
152:22 178:17
189:17

**letting** 206:6

**level** 19:7,20 66:11,
12 171:4

**Levin** 7:21

**Lexington** 7:11

**liability** 89:17 91:19

**liable** 68:12

**light** 109:21

**likelihood** 145:23

**line** 144:4 180:13,17
182:7

**lines** 96:1 144:21

**lip** 125:21

**liquid** 43:12,13 74:14,
18

**liquidity** 42:19 43:7,9
44:9 123:17 124:20

**list** 18:9 22:6,20 23:7,
18 25:14 29:9,14
30:5,18 32:7,9,23

129:13 141:24
148:15 151:22
152:2,7,14 161:19
175:1 186:18 207:10
215:18 216:16
221:8,11

**listed** 152:6

**literature** 30:10 43:2
44:3 95:14,15
189:22 196:17
197:9,15 220:10

**litigation** 7:7 11:24
14:14 27:13 29:11
32:4 35:17 152:3
202:25

**litigations** 94:11

**little** 20:18 23:23
50:12 55:10 110:19
118:21 148:20
159:22 169:19
170:12 196:13
198:12 199:2,21

**live** 208:23

**LLC** 22:7

**locate** 216:15

**locked** 124:3 127:21

**lockup** 112:22 115:13
118:15 119:6,13,20
146:4,19 147:2,6,8,
22

**long** 34:17 65:8 85:14
142:21 144:16 187:5
219:24

**long-term** 60:23

**longer** 88:24 175:23

**look** 18:4 32:7 77:23
78:4 86:24 92:16,17,
19,20 106:10 109:15
130:4 131:22 139:24
144:3 162:9 167:11

Confidential

Wayne Guay

In re Twitter Inc. Securities Litigation

175:6 178:17 181:24 186:22 196:15 207:21 212:25 213:8 214:12

**looked** 85:25 86:3 214:22

**looking** 56:5 108:10 109:5 124:17 140:17 142:2 143:22 146:14 159:16 165:18 206:18 219:24

**looks** 143:13 146:14 187:21

**loss** 69:20 85:21 105:21 194:15

**losses** 85:12 106:5 165:4

**lost** 76:20 191:10

**lot** 30:2,3 44:16 45:22,25 130:21 145:16,21 146:10,18 178:15 215:21

**lots** 29:12 65:8 95:15 120:4 130:25 131:8

**lottery** 193:23

**low** 71:22,23 83:20 109:21 110:7,24 124:1 127:20 130:5 197:23

**lower** 219:6

**lower-level** 88:2

**lunch** 150:12

**luncheon** 149:4

---

**M**

**Madansky's** 70:18

**magazine** 141:25

**magnitude** 51:7

**maintain** 164:14

**making** 47:3 60:13 75:19 96:17,21 100:19 106:2 124:9 130:17 154:10 178:14 204:6,18 215:22

**management** 36:14 83:15,19 90:24

**manager** 196:6,25 197:9,22 198:22

**manager's** 194:24 196:2

**manager-shareholder** 219:5

**managers** 198:7,10 219:4,7,16

**managers'** 219:18

**mandatory** 197:20

**manipulated** 203:6

**manipulating** 205:16

**manipulative** 90:4, 10,12

**manner** 39:3 43:12 46:13,17 49:8,12,21, 24 219:8

**March** 77:16 79:2 179:25 180:5

**mark** 83:12 168:15 207:13

**marked** 8:21,25 73:9, 11 77:13,14 80:9,10 83:12,15 86:17,18 128:23,24 161:15,16 168:17 174:13,14 179:25 186:9 195:9 207:17 223:16,17

**market** 108:21 159:21 161:8 177:12,13,19 191:16 194:2 217:22

**market's** 194:24 196:3

**marking** 179:22 186:6 195:5

**marks** 97:24 150:2 200:2

**massive** 216:18

**master** 11:11

**matched** 138:6

**material** 39:13 40:6, 15 61:22 62:13 63:1, 11 69:15 76:4 81:19 91:15 92:7,13 93:8, 13,20 94:1,12,14 95:2,21 96:20,25 97:2,5 119:6 148:2,9 155:9 157:20 158:3 160:1,20 161:10 163:17 164:12 187:18 188:22 189:25 190:6,20,24 192:5 206:22 210:3, 14 211:3

**materials** 29:8,13 30:9 35:6 91:25 129:14 151:22 152:2,6,14 161:20 175:1 186:18 207:10 215:18 216:16

**math** 74:23

**matter** 7:6 8:19 11:23 18:15,18,24 21:12, 20,25 22:2,10,13,15, 18,25 23:2,11,22 24:6,7,13,16,18,21, 24 25:2,21 28:18,23 34:10,14,25 35:3,12 38:3 40:22 50:5,6

58:19 66:21 70:10, 16 71:3 75:5 99:23 102:20 180:4 200:15 202:22,24 203:2,19 204:1 207:1

**matters** 11:24 12:8,9 13:17 14:14,21 17:25 26:10 35:21 202:25

**maximize** 60:21 61:4, 7 194:24 196:3

**maximizes** 196:7

**MBA** 12:24 222:9

**mean** 13:14 14:2,4 26:4,21 29:19 30:24 32:25 33:16 35:4 38:21 40:17,24 43:17 44:18 46:7,19 48:2 49:2,3,9,14,16, 24 52:3 54:6,8 55:12 57:15,25 59:2 60:10 62:4 63:12 64:8 66:10,16 71:14 72:7 74:2 75:15,20 79:16, 17,22,23 81:2,4 82:14 84:23 85:7 88:22 89:21,25 90:1, 22 91:3 92:15 95:13 96:17 98:23 99:1,11, 23 102:24,25 104:10 108:14 109:25 112:3 115:10 117:11,16 118:17 119:3 121:13 122:9 123:2,3 124:17 125:8,18 129:9 130:20,23 134:10,13 136:17 139:14 140:4 141:22,23 143:11,13 146:24 148:4 151:13 153:9,17 154:8,23 155:18 156:16,20,21 157:1,12,17 158:10,

Confidential

**Wayne Guay**                                              In re Twitter Inc. Securities Litigation

15 159:12 162:25
164:17 166:21
170:7,12 171:11,14
172:3,4 176:6
177:21 178:4,12
179:13 184:3 185:1
188:9 190:14,25
192:12,25 193:12,
16,19,21 199:3
202:6 204:6 207:5
210:19,20 211:20
212:2,18 214:11
218:1,3 220:8,13

**meaning** 135:1
139:17

**means** 55:20 76:23
80:7 104:16 119:1
132:24 194:3 196:14

**meant** 154:2,5 159:17

**mechanical** 145:7

**media** 59:9 97:25
140:3,14 150:3
166:6 167:1,18,22
169:6,7,25 170:8,18,
23 171:1,10,16
172:16 173:11,17
174:1,2,4 176:17
177:5 179:6,19
182:13,14,20 183:1
184:8,11,12,13,21
185:14 200:3

**media's** 173:22

**member** 129:24

**members** 202:10

**memory** 129:18

**mental** 68:22

**mention** 39:21

**mentioned** 35:13

**method** 136:4,7,8

**methodology** 135:23

**metrics** 78:14,21
79:15,20,24

**middle** 112:22

**midway** 178:18 196:1

**million** 53:6 54:11
56:3 74:12 111:18
118:1 121:19 124:2
127:24 144:7,8

**mind** 35:8 40:7,13,19
47:12,15 60:13,18
61:15 63:13,23
68:17,20 75:23,24
82:6 116:19,22,25
117:4,5 122:10
145:17 148:4
151:22,24 154:16
160:11 168:12,13
173:25 199:8,10,14,
18

**mine** 110:3 212:2

**minimum** 106:23

**minute** 86:16 149:1
155:3 223:4

**minutes** 48:3 127:19
147:5 187:1 202:19

**mirroring** 146:1

**misleading** 55:1
69:11 74:2 115:11

**misperceiving**
159:17

**misperception**
173:16,23

**mispriced** 119:10,11,
13 194:9,11

**missed** 189:11

**mix** 130:22 131:8

**model** 197:4 198:4,5,

9 219:15,17

**moment** 82:7 177:10
213:18

**monetary** 99:6,8

**money** 43:11 193:23

**month** 53:8 138:16
144:8

**monthly** 143:14

**months** 10:25 52:18
53:13,20 57:6 79:5
102:15 113:24
114:8,9 115:12
117:14,21,24 118:14
127:22 144:23,24
146:7 162:23

**morning** 8:10,16,17,
23 221:9

**mosaic** 94:15

**motion** 67:3 207:8,17
208:10

**motivated** 122:3,8
123:8 124:15 125:15
126:4,5,7,23 128:15
132:4 134:15 167:18
183:21 192:4,11
208:23

**motivating** 126:19
127:11

**motivation** 122:2
123:15 124:22
128:3,6,9 168:10

**motivations** 14:4
44:5 124:19 125:4
130:19 145:10
150:21 151:6,12

**motive** 66:8,19,23
103:22 104:6
192:22,24 193:1
208:20 209:7

**Motley** 7:22

**mouthpiece** 174:2

**multiple** 43:3 124:18
125:4,19,21 126:12
148:13 187:4

**Mulvenna** 8:2,5

**mutual** 29:4

**N**

**N-A-U-H-E-I-M-E-R**
186:14

**name** 7:12 8:14 28:11

**named** 36:6 166:15,
16

**names** 37:24 70:12

**Nancy** 186:13 187:15

**nature** 19:4 20:19
35:19

**Nauheimer** 186:13
187:15

**near** 163:10

**Nearly** 45:19

**necessarily** 76:23
108:19 171:11
198:22 219:16
220:11

**necessary** 85:4 91:18

**need** 9:22 19:7 32:18
46:14 54:3,6,8 90:11
99:19 114:23 122:25
123:1,2,24 126:14
133:3 134:6 156:21
166:7 167:3 171:11
218:9

**needs** 11:2 120:19
123:22 128:10,11,12
133:5,7 134:11

Index: meaning–needs

**Confidential**

Wayne Guay

In re Twitter Inc. Securities Litigation

**nefarious** 172:15,23

**negate** 75:22 76:13

**negative** 81:19 131:3, 13 143:5 166:6 167:1,18 169:6,7 171:25 173:2 177:5, 12 184:8 185:22 188:5,8,10,13 189:25 190:6,17,21, 24 191:15 205:2

**neither** 101:15,19 203:25

**never** 112:20 153:7

**new** 7:11 8:6 89:1 102:1 160:4,5

**newly** 42:18 51:9

**news** 131:19 189:9 217:21 219:4,18

**nine-page** 29:9

**non-fraudulent** 46:7 64:15,20 173:4

**non-public** 39:14 40:6,15 61:22 62:13 63:2,11 76:4 81:19 91:15 92:8,13 93:8, 13,21 94:1,12,15 95:3,21 96:20,25 97:2,5 119:6 148:3, 10 155:10 157:20 158:3 160:1,21 161:10 163:17 164:12 187:19 188:23 190:6,20,24 192:5 206:23 210:3, 15 211:3

**normal** 190:16

**Northeastern** 13:6

**Northern** 7:8

**Nos** 86:21 186:7

**Notary** 8:6

**note** 100:21 121:9 130:20 162:22 206:11

**notes** 208:19

**notice** 32:8

**notion** 123:6 197:9

**Noto** 33:6,23 39:10 42:15 47:19 55:14 61:19 72:25 73:16 74:4 75:18 76:11 77:7,8,17 78:5 79:19 80:13 81:18 82:12, 20 85:12 88:7 101:19,22 103:5 105:22 145:19 183:3 206:20 209:25 211:2

**Noto's** 33:21 34:6 47:15 65:3,9,14 68:20 69:7 72:20 75:24 76:1 78:18 79:12 80:20 81:3 85:2,8 164:25 210:10

**number** 16:9 17:6 18:3 29:20 73:24 87:7 112:4 114:16 129:4 130:12 144:15 146:7 166:15 218:18

**numbers** 56:11,16, 17,21,22 83:14 84:7 112:16 118:6,7,9 144:13,18 145:3,4 179:23 195:7,24 207:15

**numerical** 213:23

---

**O**

---

**oath** 9:13,14 50:24 98:4 150:11 200:7

221:4

**objection** 12:19 13:12,19 15:5 16:13, 14 26:2,15 27:8 32:15 34:19 35:23 40:8 41:10,18 45:2 47:10 49:22 50:9 54:4 56:6 58:16 64:7 66:25 67:18 69:21 75:6 78:22 79:21 80:25 81:12 88:20 91:10 94:20 96:9 100:8 101:2 102:23 114:13 127:1 133:21 134:1,8 136:1 137:8 139:13 140:10 141:10 143:10 164:3,16 173:13 177:20 179:12 184:23 185:15,24 188:11 193:15 201:11 203:7 209:9, 14 210:18 211:19 214:7 217:24 221:14

**objectives** 194:22

**observe** 47:4 48:14 84:15 201:17 212:25

**observed** 43:19,21 51:7,9 84:20 105:9

**observer** 175:21 176:24

**obtained** 103:16 104:20

**obviously** 30:13,24

**occurred** 112:19 117:15,18 144:25

**October** 161:22 163:6

**offer** 18:17 25:25 41:14 48:22 51:18, 19 53:2,4 55:4,6 57:12,14 60:2,4,6,

16,24 61:11 62:1 67:13 68:5,8,11,15, 19 69:3,6,9,13,17,25 70:6 98:21 135:14

**offered** 26:12 166:13, 17

**offering** 18:21 48:20, 24 165:9,13 168:9 221:12,20

**offhand** 33:1

**officer** 113:3

**officers** 88:4

**oh** 34:20 77:2 78:9 136:3 187:22 218:14

**Okay** 8:24 9:10,18,21, 24 10:15 11:1,5 12:16 13:2,7,16 15:2,18,21 18:4,8,16 19:12 20:6 21:4,8,13 22:6 23:1 25:24 29:7 31:6 32:3 39:4,6 41:7,14 50:16 51:1 53:11 55:21 56:2 58:2 59:20 60:15 61:10 62:15,24 64:13 72:19,24 73:4, 14 74:9 76:10 78:12, 16 79:8,10 80:8 84:13 87:1,9 89:5,14 92:1,24 98:9 109:17 113:19 117:7 119:14 125:14 129:23 130:1,15 131:2,25 132:10 133:13 134:13 135:6,13 136:10,19 137:3,11, 13,21 138:5 139:2 142:11 143:22,23 144:5,12 145:5 148:11 150:17 152:10,24 153:6 156:11 159:24

160:3,6,15 161:14
162:11 164:10
166:12 168:14
169:15,18 173:21
174:25 175:2,8,19
179:1,2 180:12,14,
16,20,23 181:4
187:8,10,14,25
189:11,19 195:17
196:10 197:7,17
199:1 200:12 203:24
206:17 207:19
208:3,6,13,15 214:3
218:16,19 219:2

once 9:5,6 125:21
139:24 179:15

one's 19:11 23:23

one-page 80:12

ones 29:17,18,19,20
55:14 151:24,25
152:9,11,19

onetime 51:14

operations 128:18

opine 17:25 168:1
192:14 199:13

opined 53:12 66:21
169:5,11 191:6

opines 53:22 103:11
104:3

opining 47:7,14,24
75:1,11,17 76:9 82:5
100:16,24 199:9
210:17 221:10

opinion 18:17,21,24
20:21 21:14 23:4,13
24:7,15 25:10,15,25
26:12,18,23 28:14
48:11,20,22,25
51:17 53:2 55:4
57:12,21 58:8 59:6,
13 60:1,4,6,16,24

61:10 62:1 64:4,23
65:3 67:13 68:11,15,
19 69:3,6,9,13,17,25
72:14 75:25 78:17
79:12,18 80:4,19
81:11,14,21,22
82:11 98:20 100:20
103:19 104:11
106:18 107:9
114:11,15 115:10,22
116:15,23 119:21
130:18 131:5,20
153:6 155:15 158:25
165:6,10,25 166:14,
18,24 168:9 172:1
177:24 197:2 209:8,
16 210:20,21,22,23
212:10 220:13
221:12,20

opinions 19:20,21
20:19 22:12 39:9
41:9,12,15,24 42:2,5
50:15 51:2 58:5
64:10 68:5,8,10
70:7,9 71:2 85:5
95:9 104:12 116:21
128:15 192:14
199:10 200:15
203:2,18 209:24
213:1 219:15

opportunity 173:11
177:8,17 178:1
194:12

opposing 20:8

opposite 204:21,24
205:3 206:1,13

optimistic 208:24

option 202:12

options 110:7,24

order 19:9 20:25 21:6
67:2 194:2 207:7,16
208:8,12

orders 19:5

organization 131:16

organizations 12:3

organized 217:1

original 155:23 204:8

Ortega 7:12

other...insiders
55:18,19 150:21

outline 220:19

outside 43:22 58:18,
19 102:5 122:22
124:7 128:1 159:16
162:23 175:21
176:24

outsiders 84:14

outstanding 163:5

outweigh 191:10

overall 130:22 131:16

overly 71:25 208:24

owned 29:2 73:16


P


p.m. 149:3 150:4
199:25 200:4 220:23
221:1 223:7,10

pace 162:14

package 33:15,17,22
124:14

page 11:16 29:5
73:13 78:4,5 84:7,8,
13 87:7 110:5 129:5
132:2 138:11 144:4
145:6 150:19
169:14,17 175:6
180:11,14 182:3
187:12 195:23,24
196:1,17 197:6,16

206:16 208:12
218:17,25

paper 90:23 170:7,13,
17,25 171:21 196:22
197:1,13 198:1,10,
13 201:15,18 203:12
204:8,10,12 206:10
220:12

papers 95:16 198:16,
17 204:23 205:20

paragraph 35:9 39:4,
7 41:6,22 42:6,14
51:2,4 57:10 71:6
72:23 84:14 89:13
95:7,18 98:7,10
101:8 103:10,14
104:19 105:8 109:15
110:5,22 112:21,23
120:11 121:25
126:8,10 127:4,8
130:11 131:23
132:2,7 134:14
135:11,14 140:20
142:9 143:22 144:3,
21 148:11 150:15
152:22,23,25 162:10
169:16 178:17,18,
19,23 189:17 191:23
196:24 198:24 199:4
200:11,13 203:24
204:5 208:14 209:1,
22 219:1

paragraphs 10:13,16
113:17 135:12
142:13,16 200:10

parameters 138:15
216:14

paraphrasing 95:20

part 46:2 66:17 119:8
132:5 173:17 181:24
182:15,18,20 184:20
185:13 187:5 192:22

Confidential

**Wayne Guay**

202:16 207:16 208:9 211:7

**particular** 31:7,14 47:8,15 61:15 65:10 136:14,16 139:18 145:12 147:16 170:17 198:6,7,22

**parts** 57:18 212:2,3,4

**passage** 183:14

**path** 214:13

**pattern** 122:3 123:8 125:15 126:22

**patterns** 51:9 105:9 106:11 138:17

**Pause** 77:22 79:9 87:23 89:11 96:4 104:9 112:17 114:25 129:20 131:24 132:9 138:12 151:3 162:4 175:18 178:25 186:24 187:3,9 207:23

**pay** 83:19 170:24

**paying** 38:15

**payment** 38:25

**payments** 99:3

**pays** 38:12

**peer** 136:18,20,21,23 137:15,16 140:12 212:20,23

**peer-reviewed** 204:9, 11

**peers** 136:25 137:2, 19,21 139:12 140:9, 16

**Pen** 168:21

**pending** 66:21 190:17

**Pennsylvania** 22:21

**people** 36:5,23 37:20 43:22 45:17 47:5 170:21 182:19 219:21

**perceive** 172:8

**perceived** 59:23 60:9

**percent** 17:2 36:22 73:5 74:16,24 75:2 111:15,19,24 112:4, 11,14 118:3,10 127:25

**percentage** 16:11 111:14 112:1 127:24

**perception** 59:11 189:6,14

**perfectly** 43:4 128:2 159:18 165:21,22

**performing** 219:7

**period** 39:12 52:19, 21 53:9,14,20,24 54:13 55:23 58:8 61:20 65:8,11 69:15 72:15,21 73:1 76:2, 18 78:19 79:13 80:20,23 82:13,17, 19,21,25 85:3,15,18 88:19 93:4,25 94:13 95:2 96:19 99:5 101:15,17,20 102:2, 6,8,12,17,18 105:16, 23 106:1 107:1,23 108:2,4,6,22 109:1, 20 110:9,14 111:8, 12,13,16,17 112:19, 22 113:23 115:14, 15,20,25 116:13,19 117:2,8,10,13,22,23 118:14 119:7,13 120:18,23 124:4,25 126:16 127:23 128:16 130:19

132:4,16,19 133:1,4, 12 142:25 143:1,7,8, 17,18 144:16,25 146:4,9,10,20,22 147:2,3,6,8,17,18,22 148:23 151:20 162:23,24 163:6 164:25 165:1 183:6 184:15 206:21 208:18 210:1,8

**periods** 69:11 143:9

**person** 40:20 46:12, 16 116:20

**person's** 46:24 197:14

**personal** 33:13,25 34:7 44:4 52:7 62:5 112:9 120:23 122:16 193:7,13 194:22

**personally** 40:20 65:21 142:8 216:1,3

**perspective** 14:4 110:2

**Peter** 129:2,17,21

**Ph.d.** 11:8 36:10,13, 20 222:10,12

**phone** 34:5 37:21

**phrase** 89:21 104:15 217:16

**picked** 136:25

**picking** 136:18

**place** 19:5 83:3,8 89:1,6 91:14 101:16, 20 102:12 103:7 151:19

**plaintiff** 24:4 25:25 208:18

**plaintiff's** 208:22

**plaintiffs** 7:17,20,23 8:19 18:22 21:21,22 22:10 23:11,22,25 24:13 25:20 26:5,7 28:18 63:7,10,15,24, 25 65:20 66:7,15,17, 22 69:23 77:5 98:17 100:16 183:10 185:1 211:1

**plaintiffs'** 61:21 62:18,22,25 63:12, 23 65:15,17 70:7 76:6,11,16 77:1,3,4, 5 81:4,23 82:6 85:9, 10 92:18,21 93:16 101:9,12 106:3,6,12, 15,19,22 107:4,7,14, 20 108:9 109:4,9 119:10 134:24 160:19 164:10 165:5 191:8 194:8,17 206:21 207:1 209:5 210:6,13,16

**plan** 41:14 57:20 58:13 67:24 70:6 82:21 83:3,6,9 87:12 88:24,25 89:2,3,6, 16,24 90:9 91:3,13 92:25 93:1,18,21 95:1,19,23 96:7,18, 21 97:3,6,9 101:16, 20,24 102:1,5,12,14, 16,19 103:1,3,7 106:4 107:3,5 108:2, 15,24 109:2 132:15, 20,24,25 133:1,11, 17 134:16 148:14,22 153:7,14 154:1,16 155:2,5,11,25 156:15,19 157:22 158:4 164:13 166:21 167:5 172:2,24 173:5 175:24 176:10,12,13,21,22

Wayne Guay

178:3,9,21 179:3,9, 18 180:19,22 181:7, 23 182:3,8,21 183:5, 16,21,25 184:7,15, 17,20 185:4,14 187:22 190:7,8,16 192:1 194:18 201:16 203:14 204:5,16 222:24

**planning** 44:4 112:10

**plans** 12:6,14 57:11 58:7 59:17 67:6,8 88:17,25 89:1 90:13, 25 91:2,8 92:9 95:10,14 96:12,15 97:13 106:8 113:4 134:20 148:12 151:18,19 153:3 155:7,9 158:21 159:2,8,15,20 160:2 161:2 165:21 166:2, 5,14 167:13,22 171:18 172:15,20 173:10 175:15 176:5,18 177:7,18 180:25 182:9,11,15 183:8 184:10,12 185:3 189:24 192:3 199:6,12 201:9,13, 14,18,21,25 202:4, 13 203:6,21,22 204:14 205:22,24,25 206:1 210:9 222:19

**platform** 162:16

**play** 148:23 193:23

**pleadings** 29:9

**please** 7:14 9:19 43:25 51:4 71:5 72:22 73:13 86:25 87:6 89:12 98:7 109:15 131:22 162:9 178:18

**plus** 112:18

**point** 47:2,8,15 48:3 51:6 52:17 54:23 57:9 61:18 65:10,12, 13 76:6 86:5 91:23 96:18,23 97:3 104:19 106:1 107:2 108:23 119:12 121:22 125:24 126:25 127:6 133:5 134:13 135:4 136:17 137:4 138:9 164:18 169:12 170:16 175:4 190:13 195:2 204:6, 18 207:25 218:24

**pointed** 81:6

**pointing** 104:18,21 107:17 123:13

**points** 68:4 97:10 211:22

**policies** 26:25 31:19

**policy** 83:5 86:20 87:5,11 89:9 97:15 102:20 103:9 132:18 176:7 197:6

**poorly** 123:4 219:7

**pop** 198:20

**popular** 170:19,20

**portfolio** 43:4 51:12 52:16 111:14 112:2 118:4 122:20 123:4 124:13

**portion** 38:9 44:7

**portions** 213:20

**position** 115:19

**positions** 71:8

**positive** 131:19 177:8,13 194:2

**possession** 76:3 81:19 92:7,13 93:8, 13,20 94:1 95:2 96:24 97:5 155:9 157:19 158:2 161:10 164:11 190:5

**possibilities** 134:22, 23 135:1 148:15

**possibility** 185:16,18 188:16

**possible** 46:11,15,22 49:6,9,10 90:5 148:22 154:23 177:21 184:25 185:1 191:3 193:18 203:13 222:20

**post** 119:20

**post-ipo** 112:22

**potential** 107:19 190:22 192:4,11,14 199:3

**potentially** 40:16

**Power** 168:21

**practice** 11:18,20,22 71:18 189:23

**practices** 71:19 169:22 170:10,13

**practitioner** 202:8

**pre-established** 97:1

**pre-ipo** 51:13

**precedent** 178:7,8

**precise** 16:9 17:6 18:3 28:11 46:1 53:9

**precisely** 16:1 34:15 140:4 191:15 204:21 206:1,3

**preclude** 21:7

**prepare** 20:5 35:5

214:4,5

**prepared** 10:5 27:19 28:3,5,6,8 68:5,8 209:2 214:6,19

**preparing** 32:22 33:8 34:17,23 37:12 77:21 87:3 162:3 174:21 180:8 181:18 186:21 212:14 215:14

**prepping** 114:6

**present** 54:21 133:20,24 148:19

**preserve** 99:22

**preserving** 100:1

**prespecified** 138:15

**press** 127:14 169:20 173:7

**pressures** 134:20

**presumably** 94:16 163:20 183:11

**pretty** 81:3 82:22 99:1 165:2

**prevent** 103:1

**prevented** 117:2

**previous** 202:25

**previously** 8:25 35:20 73:9,11 77:12, 14 80:9,10 84:5 86:18 128:22,24 150:6 161:15,16 174:12,14 188:17 194:23

**price** 76:17 81:5,24 82:2,8,10 85:11,13 99:16 107:5,6,8,22, 25 108:4,5,6,12,25 109:1 157:8 189:3 210:7 214:9,13

Wayne Guay                                                    In re Twitter Inc. Securities Litigation

**prices** 86:2,9,13
108:3,11 109:6,8
157:15

**Primack** 176:16

**Primarily** 77:10

**principles** 112:9

**prior** 52:18 53:8,13,
20,23 63:5 97:1
111:17 113:22
115:12 120:17
127:22 128:16
130:19 151:19
155:13 156:12
157:15 161:5 162:24
196:22 202:21
203:12 215:9

**private** 31:25

**probably** 13:4 14:13
16:2 17:1 34:4 58:1
99:13 153:9 157:3
196:13 201:4 223:18

**problem** 20:15,17

**problems** 174:11

**proceeds** 50:6

**process** 30:7,20
211:15

**produced** 29:11 32:4

**product** 15:13

**products** 140:13,14

**professional** 10:17
11:17

**professor** 8:11,12,13,
16 27:4 39:8,23
50:23 53:12,21
54:24 55:9 56:4,12
57:2,16,17,23 67:5,
20 70:4,15 73:8,15
91:6 98:3 101:11
103:11,19,23 104:3,

11,22 105:25 113:21
114:3 115:24 116:3
120:16 121:23 122:1
123:14,20 124:10,21
125:20 126:1,11,12
127:4,5 133:2,3
135:9,24 136:6,11,
14,21,24 137:14,23
138:25 140:24
141:1,15 142:6,13,
16 143:9,13,25
144:6 145:6,25
146:13 147:15,24
150:10,19 153:1
157:5 164:19,21
165:11,16,23 166:16
167:9,14,25 168:3,
25 172:13,19 178:20
183:9 185:3,10
186:1,17 189:20
190:14 191:1,12,21,
24 192:9,18,21
200:6,14,17,19
203:4,17,20 204:7,
10,20 205:5 206:10
209:23 221:3 223:12

**profit** 39:13 40:5,20
76:20 98:16 100:7,
13,18 104:2 105:1,
18,21 119:15 193:7,
13 194:13 210:3

**profitability** 165:3

**profited** 44:19

**profiting** 40:15 44:22

**profits** 107:12,19
109:11 119:2,4,8
191:8,11

**prohibited** 88:18
116:20

**projects** 11:25

**prominence** 122:2
123:15

**promises** 208:24

**pronounced** 8:14

**proportion** 111:23

**proposition** 72:6
117:1

**propositions** 220:7

**Prosser** 174:17
175:10,20

**protective** 19:5,9
20:25 21:6

**proven** 164:14

**provide** 121:21,23
165:16 189:22
194:19 213:6

**provided** 20:8 30:12
31:10 115:7 120:18
152:7 157:5 164:21
173:10 191:1,12,21
192:24 202:2
211:21,22 214:22
215:6 217:3

**provides** 120:17
189:21 192:16

**providing** 49:3 71:16

**proving** 100:14

**proximity** 185:21

**proxy** 74:6,7 84:15

**public** 8:6 29:10
42:18 51:10 52:9
59:23 60:9,22 84:24
113:11 124:17
125:10 139:25
156:24 161:1,6
167:24 171:25
173:2,3 176:3,19
177:8,9,17 178:15
189:25 202:7

**publicity** 190:22

**publicly** 31:1 43:19
120:6 124:12 146:6

**published** 90:23,24
200:24 204:9,11

**pull** 212:22 214:11

**pulled** 31:5

**pulls** 206:9

**purchase** 65:10
75:12,19 76:13
77:11 82:1 85:21
210:10

**purchased** 72:25
105:22

**purchases** 72:20
75:2 76:2 78:18
79:6,12 80:20 81:20
85:2 86:8,12

**purchasing** 76:7

**purpose** 128:21
155:14 192:1

**purposes** 29:22
43:15 52:2,11 59:6
64:21 155:15 203:1

**pursuant** 87:11 176:9

**put** 49:17 90:11 91:13
131:1,15 132:20
156:17 164:5 171:6
214:10 215:5

**putting** 142:1 151:19
183:4 213:23

---

**Q**

**qualifications** 36:9,
18 37:6

**Quality** 23:19 24:23
25:18,22,23 26:4

**quantify** 211:25

Confidential

Wayne Guay                                              In re Twitter Inc. Securities Litigation

**quarter** 83:7 130:5

**question** 9:19 13:14
15:20,22 33:21
79:10,11 91:1 93:17
97:12 99:18 100:10
110:18 117:6 119:19
133:8 137:20,23
143:15,19 153:22
155:23 158:1 160:3,
4,5 173:1 177:1,3
180:18 181:5
185:11,12 189:12
191:9 199:17

**question's** 159:22

**questions** 19:6
175:12,13 221:6
223:2,11

**quick** 97:17

**quite** 8:23 10:24 19:6
153:21 170:20 221:8

**quote** 115:25 116:11
130:3 144:6 148:13
175:14

---

**R**

---

**Ran** 36:6

**random** 139:10,15
141:25 147:3

**rate** 34:10

**rational** 42:17 44:1,2,
12,21 45:8,12 46:5,
6,24 47:4 49:8,12,
21,24 50:3 64:14,19,
24 65:2,5 105:11
106:17,25 109:19
118:15 119:20,23
120:9 122:4,11
123:9,11 126:5,23
173:24 174:6 177:25
193:5,11,22 194:1

217:12,13,15,20
218:1

**raw** 214:12

**re-review** 203:1

**reaching** 42:5 165:25
166:23 197:13
217:21

**read** 14:10,15 29:13,
15,17,18,20 53:17,
18 60:11 62:8 63:17
67:2 70:9,15 87:22
91:23 104:7,10
115:1,6 132:7,12
139:3 145:13 178:23
181:18 183:14 201:5
206:11 207:7,24
208:1 209:1 220:2

**reading** 80:18 84:17
87:24 98:18 110:15
129:9 132:6 169:13
175:17 178:22 183:2
200:16 207:3

**reads** 196:2

**real** 156:17 178:10

**realizations** 197:22,
23

**realize** 205:5,6

**realized** 85:24

**really** 158:12 167:3
185:6 189:12 203:23
220:9

**reason** 9:25 71:19
72:1 73:23 74:4
87:16 92:4 122:24
134:5 171:6 172:1
173:4 176:2 182:10
184:25

**reasonable** 121:18
128:3 134:23 135:1
140:22 157:4 159:19

165:22,23 167:15
168:1,5,8 183:7

**reasons** 42:20 43:16
44:5 66:1 97:8
106:21 122:4,11
123:9 125:6,12,19,
21 126:6,13,23
128:13 146:11
148:13,19,22 165:21
183:12 184:14

**rebuttal** 70:4,6
209:10

**rebutting** 126:10

**recall** 12:10 14:14,18
23:16 26:6,16 27:14
28:16 32:16 33:18
34:1,8 36:12 37:25
42:13 53:9 55:16
66:24 73:7 80:18
129:9,11,21 162:2
164:8 179:9,14
180:21,25 181:9
182:7,10,11,22
185:25 186:3,20
190:8,11,12 201:10,
12 217:6 222:20,25

**recalling** 179:5

**receive** 38:19 41:1
211:17

**received** 63:16 79:19
98:13,16 99:4
100:17,22,25 104:25
211:2,15 217:8

**receiving** 100:6,12

**recess** 50:19 97:23
149:4 200:1 220:24
223:8

**recognize** 43:21
145:11 147:16

**recognizes** 124:22

**recognizing** 44:6,8
179:17

**recollect** 175:3

**recollection** 25:20
56:20 70:13 179:4
203:9

**record** 7:2,15 8:18
50:18,19,21 53:18
77:15 80:12 83:17
86:19 97:22,23 98:1
128:25 148:25
149:3,4 150:4
161:21 168:19
174:15 180:2 183:2
186:11 195:10
199:20,25 200:1,4
218:20 220:23,24
221:1 223:7,8,10

**records** 33:25 34:7
52:5,8 120:23
122:17

**recreate** 56:22

**redirect** 150:14 223:2

**reduce** 71:9

**refer** 101:8 132:22
169:11 200:19 204:3

**reference** 112:23
151:11,15 208:21

**referenced** 201:2
214:1 215:20

**references** 150:25

**referred** 57:18

**referring** 39:22 51:21
53:5 55:8 56:9,25
62:7,18 63:25 64:1
99:7 101:9 132:23
133:9 138:10 145:15
147:19 159:11 161:4
183:15 200:20
203:24 204:4

Confidential

**Wayne Guay**                                    In re Twitter Inc. Securities Litigation

**refers** 39:24

**reflecting** 163:16

**reflective** 42:17 46:5
105:11

**refrain** 194:1

**refresh** 70:13 129:18

**regard** 93:17 196:8

**regarding** 76:1 86:1
95:10 121:6 123:21,
23 128:17 134:19
148:1 151:17

**regular** 162:16
175:22

**regulation** 222:14

**reiterate** 48:2

**relate** 21:14 22:13
23:4,13 24:7,16
25:11 28:14 64:10

**related** 22:23 23:15
25:15 31:18,19
40:18 58:5 82:15
163:9 164:5,7
176:24 182:3 183:1
202:11

**relates** 158:10 188:16

**relations** 177:8

**relative** 52:23 84:10,
11 85:2 108:25
135:10 136:22
137:16 157:14 163:6
188:5

**relatively** 43:14
110:7,24 111:14,22,
23 127:20 142:21

**release** 188:5 189:25

**released** 125:10
191:16,20

**relevance** 47:24 48:2

145:3 209:8,15
221:13,15

**relevant** 41:24 130:18
135:15 145:8 147:25
152:21 156:13
157:17,18,22 158:4
162:20,25 163:15
164:8 208:17 210:23

**relies** 145:6

**rely** 32:19 71:1
208:19 209:6

**remaining** 32:13,17

**remains** 91:18

**remember** 28:11
53:21 57:1,7,19
166:9 181:14

**remembered** 182:25

**remembering** 179:16

**remind** 9:12

**remove** 219:7

**rendered** 19:21

**repetitive** 29:23

**rephrase** 9:20

**report** 10:5,9,14,20
15:7 18:5 20:5,8,11
27:5,19 28:2,3,7,9,
20 29:6 30:7,8
32:12,19,22 33:9
34:25 35:10 36:3
37:7,13 38:2,7 39:5,
24 41:6,16 42:9 51:2
53:22 55:15 57:2,18
59:9 64:15,20 65:12,
13 70:3,16 71:6
72:23 73:9 77:21
78:13 79:19 80:17
87:3,6 89:13 92:17
95:7 98:7 100:20
101:11 105:8 108:7
109:16 113:18 114:4

117:16 119:16
120:11 124:23
125:14 129:8 131:23
135:8 136:8,14
138:25 141:3 142:10
150:15 152:23,25
154:2 159:13 162:3
164:19 165:24
166:16 172:4 174:21
178:18 180:8
181:19,25 186:2,21
189:18 192:13 194:6
198:25 199:4 200:9
202:22 204:10,19
206:8,16 209:2,10
210:13 211:10,11,25
212:14,17 213:20
214:2 215:14,22
217:17 221:25

**reported** 56:12
127:13

**reporter** 8:1

**reporter's** 205:9

**reporting** 7:13 195:8,
12 219:3

**reports** 20:20 28:6
73:16

**repository** 31:24 32:5
213:16

**represent** 68:5,7
91:24 129:23 161:18
186:17 208:7

**representations**
130:17

**represented** 113:1

**reputation** 100:1

**reputations** 99:22,25

**request** 163:20 164:5

**requested** 152:18

**require** 40:20 42:2
63:22 81:15

**required** 13:10 66:7,
16,22 83:5,7 87:12
96:7 97:13,14
192:10

**requirement** 95:22
100:14

**requirements** 96:11
155:8,11 197:21

**requires** 94:14

**research** 12:2 30:11
31:3,4 44:17 67:10
90:22 95:12 169:7
200:14,17,20 203:18
204:7 212:17

**researcher** 141:5,6

**reserve** 41:23 223:21

**reserved** 41:22

**resigned** 138:15

**respect** 31:21 58:10
62:19 77:11 84:6
85:8 86:5 96:12
101:12 156:23
171:2,3

**respectively** 144:10

**respond** 39:8 209:23

**responding** 57:21
164:18

**response** 166:5
167:1 172:16 184:7

**rest** 145:13 181:2,12
214:25

**result** 51:13 89:17
105:19 169:8 178:2
184:21 185:14

**resulted** 199:7

**results** 169:24 193:7,

Confidential

**Wayne Guay**                                         In re Twitter Inc. Securities Litigation

13 198:9,21

**resumed** 150:6

**retained** 15:12,24
17:4,5,7,12,24 21:2,
20 22:9 23:1,10,21,
24 24:12 25:16,21,
24 26:7 27:2,3 28:17
111:15

**retention** 27:6,11

**retentions** 18:10
19:25

**retirement** 51:23

**returns** 190:16
203:14 204:14,17,24
205:2,22 206:6

**review** 29:24 52:5
120:22 121:5 122:16
128:17 148:1
152:15,16

**reviewed** 32:18 35:6
77:21 87:2 152:5
180:7 201:22 216:22
217:4

**reviewing** 162:2
175:3 186:20 201:8

**revisit** 221:10

**Rice** 7:22

**Richard** 113:3 179:24
180:4

**right** 14:21 18:11
19:24 20:15 22:4
23:2 25:5 34:11
38:16 41:23,24
50:17,20 52:6 60:16
61:16 65:6,25 71:5
73:6 88:5 93:2,4
97:21,25 102:13
103:20,25 112:12,16
118:5 121:12 123:19
125:2 133:20 136:15

138:8,19 139:3,8
143:1 146:16,17
149:2 150:3 151:22
153:23 154:10 156:4
169:23 172:25 175:4
187:19 190:7 195:15
196:5 200:3 201:4
210:12 216:2,23
219:10 220:25
223:9,25

**rights** 223:21

**rise** 136:9

**risk** 36:14 71:9 72:4
84:10,11 189:1

**risk-averse** 71:25

**risky** 71:10

**Robbins** 7:16

**Robert** 195:13

**Rochester** 11:9 13:3

**role** 212:14 213:20

**roughly** 32:8 53:10
72:25 73:5 74:16,24

**round** 202:9

**Rudman** 7:17

**rule** 12:6 57:10,20
67:6,8,24 83:3 88:17
89:6,16,18 90:9,13
91:8,20 92:9 95:1,19
101:16,20,23 102:12
103:7 132:15 153:3,
7,14 154:1,4 157:21
166:1 179:3 201:21
202:16 203:6
205:15,16 222:19,24

**rules** 9:7 219:20

**run** 202:24 213:5

**running** 32:4 213:3
216:1,3,10

**S**

**salary** 76:19 110:7,24
121:14,15,16 127:20

**sale** 53:6 95:22
121:19

**saleable** 74:14 82:18

**sales** 52:1,18 53:8
54:25 56:13 57:8
65:11 78:18 79:12
98:11 99:2 101:15
103:12,16 104:4,21
107:6 113:22,23
114:1 117:25 120:17
122:11 126:20
127:12 131:4 133:13
142:17 143:16
144:23 145:7,11,12
147:17 148:3 150:22
151:7,12 161:8
166:3 171:16 175:22
182:14,15 187:16
199:11 202:12 206:6
208:17,22

**sample** 136:9 138:23

**San** 7:9

**satisfy** 128:10

**saw** 125:8 151:6
165:19 171:15,19
184:6

**saying** 45:20,21,22
62:23 76:22,25 82:4,
7 106:15 109:18
125:17 126:11,14
133:2 144:7 146:15
164:19 165:11 168:8
189:4 195:15

**says** 39:7 79:8 85:9
130:5 165:24 175:21
182:6 188:22,23

196:16 208:16

**scenario** 50:1 160:21
165:4 204:19,21,24
206:12

**scenarios** 90:15
91:13 92:16,17,21
93:15 203:25 204:4
206:2

**schedule** 108:17,18

**scheduled** 107:25

**Schlesier** 7:19

**school** 11:6,12 36:11
222:3

**science** 11:11 90:24

**scienter** 13:22 14:2,7,
11,16 19:1 26:14
64:6,9 65:20 66:6
91:18 100:17
103:21,24 104:4,5
208:21 209:8

**scienter'** 103:13

**scientific** 67:9 141:4

**scrutiny** 59:9 127:14
161:6 166:6 167:2,
18,23 172:1 177:5
179:6,19 184:8,11,
13,21 185:14

**se** 153:16,17,19

**search** 213:11

**searches** 32:5 216:1,
3,10

**SEC** 29:21 30:16 32:1
33:17,19 56:23
89:15 113:11 155:8
176:8 222:19,23

**SEC's** 91:17 96:11

**second** 52:17 78:4
129:5 144:3 175:6

**Confidential**

Wayne Guay

In re Twitter Inc. Securities Litigation

**section** 41:5,8,16 88:4 89:18 91:19 114:4 196:15,16 210:5

**sections** 213:22

**securities** 7:7 13:11, 17 14:8,12,17,24 16:4,8 28:12,13 43:13 66:7 68:13 88:18 89:8 93:25 100:14 115:19 222:13

**see** 20:6,23 24:5 31:6,13 33:17,19,24 34:6 39:15 42:21 47:22 48:6,16 51:15 52:8,25 55:2 59:24 61:24 63:3 67:11 71:12 73:15,18,21 74:23 78:8,9,11,15 79:8 84:17 89:19 92:19,22 95:24,25 96:3,5 98:18 105:13 109:23 110:11 113:6 114:23 115:4 120:20 122:5 130:8,9 132:6, 11 135:16 138:18 146:9,18 147:3 148:16,18,21 150:23 151:2 156:7 157:16 159:4 162:17 167:7 169:23 171:2 175:9, 16,20,21 176:25 178:22 180:17 181:16 185:20 186:2 187:24 188:12 190:2 192:6,7,12 193:1 196:2,19 198:17 200:16 201:13,17,19 204:25 206:4,7,9,12 219:9

**seeing** 186:1,3

**seeking** 51:11

**seen** 78:3 86:4 101:4, 5 129:16 134:19,25 151:25 154:21 165:17 167:20 168:5 174:22 191:2,4,11, 20

**select** 30:4 139:20

**selected** 135:18 136:23 139:5 140:3, 8 152:15,16,20 164:1

**selecting** 136:5 140:12,15

**selection** 136:14,17 140:21 141:9,15

**self-interest** 197:11

**self-interested** 45:1

**sell** 43:14 44:6,10 52:20 53:13,19,23 54:2,3,6 82:12,25 102:21 103:6 105:15 107:3 110:9,13 111:3 113:4,9 115:20 116:2,12 118:13 120:3 132:3, 17,23 133:7,10

**selling** 103:2 118:25 120:5 127:15 146:6 177:11 178:13 182:19,20 194:12

**semantic** 137:3,5,9

**send** 38:23 119:24 120:6 159:21 172:6, 7,10 177:11,13 194:2

**sending** 78:6 161:8

**sends** 167:25 178:13

**senior** 87:14,15

**sense** 55:11 58:10 116:14 145:24

173:15,18 185:7

**sensitive** 159:15 188:4 189:5,13

**sensitivity** 161:6,7

**sentence** 126:18 145:13 147:15 196:2,16,23

**sentences** 104:10,13

**separate** 15:16 75:16

**September** 187:16

**served** 14:23 15:2

**serves** 169:20

**service** 125:21

**set** 41:15 83:7,9 89:1 92:25 96:19,21 102:14,19,25 103:2 108:15 109:13 132:25 138:20 139:21 146:20 187:22

**setting** 91:3 116:6 117:19 137:3 158:14 168:7 178:6,8

**settings** 45:23

**seven** 67:6

**shape** 215:23

**share** 76:2,13 144:9

**shareholder** 60:21 61:4,8 71:20

**shareholders** 219:6

**shareholders'** 71:24 72:3

**shares** 52:21 73:1,3, 17 74:5,8,12,13,16 76:7,18 81:3,7 82:2, 9,12,25 85:13,15,21 86:1,8,12 95:23

102:22 103:2,6 105:22 107:3 108:12,25 113:5 118:24,25 119:20 120:4,5 144:7 145:22 146:6,7 177:11,12 210:10

**short** 199:22

**shortly** 27:4 102:18

**show** 65:20 66:8,18, 22 73:8 77:12 80:8 82:1 83:11 86:15 118:21 128:22 161:14 168:14 174:12 179:21 186:5 192:10

**shown** 165:12

**shows** 98:15 210:5

**shy** 71:10 72:4

**sic** 196:23 208:19,22

**side** 20:8,14,16 21:2 24:2 131:19

**sift** 216:19

**signal** 43:24 119:24 120:2,6 159:21 161:8 167:24 172:10 177:12,13 178:13 194:2

**signaling** 42:19 43:16 44:10 58:10 118:20 123:18 124:19 177:14,19

**signals** 172:5,7

**significance** 11:4 86:8,11 104:14,25 105:2,6 192:18,20 193:2 199:16

**similar** 40:18 139:25 183:12

Confidential

**Wayne Guay**                                                   **In re Twitter Inc. Securities Litigation**

**simple** 89:5 96:18 108:23 178:3

**simply** 26:22 76:5 81:6,25 85:8 89:23 96:25 104:18 123:10,13 133:6 143:15 146:13 160:16 162:13 165:11 166:21 167:6,8 197:3 198:1 210:12 220:12

**Simpson** 17:13

**single** 181:5

**single-spaced** 208:4

**sir** 12:16 66:14 74:20 77:21 80:17 85:6 87:10 88:16 137:12 143:24 161:20 180:7 207:22 209:2

**sit** 42:3 90:7 151:10 156:11 220:19

**situation** 58:12,22,25 59:8,10 82:15 160:19 171:14

**six** 10:25 68:4 115:12

**six-month** 54:13

**sixth** 67:5

**size** 75:13

**skip** 113:17

**small** 75:12 111:14, 22,23 112:1 127:24

**Smilovits** 18:14

**Snowden** 24:9

**social** 140:3,14

**Solar** 18:14 25:10,17

**sold** 52:13 55:22 56:3 93:9 108:12,24 109:20 111:14,17,18

117:21,23 118:1,3 127:24 128:9 143:7, 16 144:7

**solely** 145:6

**somebody** 176:20

**someone's** 112:1

**somewhat** 17:1 29:23

**sorry** 18:7,20 27:21 35:25 37:15,18 41:23 60:5 68:25 144:2 157:21 218:15

**sort** 25:8 40:23 48:2 92:16 117:16 147:12 154:9 170:18 174:2 176:23 212:9 213:8, 23,24 214:22 215:8, 20,21

**sorts** 30:14,16 45:15, 23 99:3 202:13

**sound** 71:18 188:25

**sounds** 176:17 212:13 213:19

**speak** 122:13 171:21

**speaking** 42:25 43:9 44:24 202:5

**specific** 19:20 26:17 35:8 37:9 44:15 45:9 66:12 112:3 121:8 128:21 158:17,18 169:13 180:22 181:9,14 182:10,23 216:5 222:21

**specifically** 14:14 15:1 29:19 45:14 121:3 122:21 129:11 148:24 162:6 169:22 173:1 182:13 202:15 222:22

**specifics** 179:17

**speculated** 134:15,18

**speculating** 126:6

**speculation** 184:20 185:13

**speeches** 202:11

**spelling** 205:12

**spend** 34:17 43:11

**spent** 34:13 202:19

**spit** 144:19

**spite** 103:11,15 104:1,15,21

**spoke** 220:1

**spoken** 199:2 222:18, 23

**spreadsheets** 213:7

**stack** 163:23

**staff** 35:12

**stamped** 29:25 30:13, 18,25 32:8,9 152:9, 13 216:6,7,11,15

**stand** 150:7 196:11

**standard** 100:7 140:5

**standing** 48:10

**start** 10:9 80:23 109:18 162:15 163:5 183:5 214:11

**started** 9:2 23:24 112:5,6

**starting** 41:6 84:14 180:13,17 182:7

**starts** 125:20 130:11 135:7,11 196:24

**state** 8:6 42:14 47:12, 15 60:13,18 63:13, 23 68:17,20,23 75:23,24 82:6

116:18,25 117:4,5 122:10 148:12 168:12,13 199:8,10, 13,17 200:13 205:18

**stated** 42:5,8 70:7 89:16 110:21

**statement** 58:18 63:5 71:15 72:12 74:7 84:21 91:7,17 92:3 113:22 125:16 132:11 150:18 153:2 167:6 170:4 172:21 176:23 177:9 196:11 197:5 218:2,25 219:11

**statements** 69:10,14 130:8 165:2 220:2

**states** 7:8 116:22 169:19

**stating** 72:5

**stem** 198:9

**stems** 119:9

**step** 136:19

**stepping** 51:24

**stock** 21:17 28:25 29:2 44:6,10,11 52:13,14,18 53:7,8 54:24 56:4 72:20 73:1,17 76:17 78:18 79:12 80:20 81:5,24 82:2,8,10,16 85:3,11 93:9 98:11 99:2,16 101:15 103:12,16 104:3,20 107:5,6,8, 22,24 108:4,5,11 109:5,8,20 110:6,9, 13,23 111:4,16,18, 20 112:5 113:9 116:12 117:21 118:1,13 119:10,11, 13 121:19 124:2

Confidential

**Wayne Guay**                                              In re Twitter Inc. Securities Litigation

127:15 128:9 142:17
143:7 144:24 145:7,
11 150:22 151:7,12
157:8 175:22 187:21
189:3 194:8,11,12,
14,18 199:11 202:12
208:17,21 210:7
214:8,12

**stock-related** 23:16

**stop** 125:25

**stopped** 178:13

**stopping** 176:21

**story** 157:18 167:15

**straightforward** 81:3
99:1 165:2 197:20

**strategic** 197:21

**strategically** 196:7
197:10 198:11
205:23

**strategies** 71:10

**strategy** 204:15

**strength** 118:22

**strictly** 37:13,17,19
55:18

**strip** 112:20

**stripped-down** 198:5

**strips** 147:11

**strong** 110:8,12
111:3

**structure** 12:13 46:1
90:12 202:3 212:23
215:7

**structured** 219:21

**structuring** 201:25

**student** 12:25 36:13,
15

**students** 222:10,12

**studied** 148:9

**study** 157:2 170:25
200:21 201:5
202:23,25 203:20
205:15

**stuff** 112:20 158:11

**subexhibits** 214:25

**subfolders** 217:9

**subject** 223:2

**subjective** 45:24
68:16,20 138:5

**subjects** 222:5

**submit** 28:20

**submitted** 27:18 28:2
34:25 70:3

**submitting** 202:21

**substance** 20:20

**substantial** 121:21
124:3,5 127:20

**suffer** 106:5

**suffered** 82:9 85:12,
21

**sufficient** 54:12

**suggest** 87:25

**suggesting** 102:5

**suits** 24:1

**Sullivan** 21:11

**summarize** 41:8

**summarized** 209:5

**summarizes** 57:8

**summarizing** 104:11
197:14,15 198:1
219:12

**summary** 19:25

39:17,19 41:11 51:2
68:10 77:10 142:18
220:2

**supplemental** 33:19

**support** 18:25 27:13
35:17 47:20 48:8,17
57:3 128:5 154:19,
20 169:20 189:21
191:21 192:16 193:1
200:14,18 203:18
212:17

**supported** 26:13

**suppose** 154:24

**sure** 9:10 13:13
15:11,19 19:18 30:1
36:22 40:12 48:1
51:5 53:16 54:5,7
55:18 56:7 57:24
64:3 78:24 82:22
85:18 87:20 97:18
102:3 104:8 105:4
108:14 110:19
112:15 129:19 132:8
134:9 143:12 152:12
153:19,21 155:22
162:24 163:14
164:2,4 166:8
169:14 172:20
176:15 186:23 187:2
192:24 194:4 195:4
199:23 201:1 213:9
215:22 220:17 223:5

**surprising** 118:18
146:17

**surrounding** 165:19
167:12,22

**Susannah** 7:16 8:18

**suspicious** 57:15,17,
20,22 58:13,15
95:11 153:4 154:15,
16 157:23 158:5,22
164:15,20 165:11,

12,14,17 166:4,19,
20,22,25 167:6,8
172:19,23

**suspicious'** 57:11
153:5

**swamped** 131:18

**swear** 8:2

**swore** 9:13

**sworn** 8:5 150:6
179:8

**Systems** 23:19 24:23
25:18,22,23 26:4

---

**T**

**Tab** 214:25

**tables** 202:9

**tabulate** 212:24 213:2

**take** 9:14 18:4 21:10
50:13 86:24 87:22
97:17 115:23 144:3
162:9 178:17
186:22,25 187:2
190:19 199:21
212:5,25 213:23
220:21 223:3

**taken** 45:15 179:25
180:4 215:3,4,5

**takes** 147:12

**talk** 19:7 117:16
133:9 151:18 159:12
194:5 202:18

**talked** 25:19 27:22
55:14 58:5 64:8
92:15 125:9 126:12
127:18 132:21
134:22 146:18
151:13,14 152:8
154:2 155:20 162:25

**Confidential**

Wayne Guay

In re Twitter Inc. Securities Litigation

164:23 168:12
177:10 209:20

**talking** 8:23 19:19
43:5 55:12 56:8
62:16,20 63:6,7
74:18 106:9 118:20
119:9 121:13 124:16
126:8 133:10 145:20
146:1,21 147:4,23
148:7 153:25 155:3,
4,21,22 167:13
174:1,2 179:7 182:1
194:5,7 205:20
215:10

**talks** 182:6 202:7,15

**targeted** 177:2

**teach** 222:5,7,8,10,13

**teaching** 11:5 222:2

**team** 36:4,23 181:2,
12

**tech** 139:25 141:24

**tell** 17:11,14 49:5
61:14 62:11 118:23
177:17 181:5 189:8

**telling** 49:2

**tells** 78:6 130:3
162:12 187:15

**ten** 32:11 144:24

**term** 13:21 14:1,7,11,
16 42:24 43:17 44:1,
12,14,16 45:13,18
55:10,24 57:17 58:3
66:6

**termination** 222:24

**terms** 29:23 43:1 59:8
64:15 85:23 99:20
144:24 165:19
215:23

**test** 198:17 219:22

**testified** 8:7 21:24
24:22 25:19 27:20,
25 28:3 58:23 64:18
150:7

**testify** 9:25 21:23
22:17 24:20 25:1
133:25 183:24

**testifying** 9:14 18:20

**testimony** 11:23
14:20 15:7 17:21
18:10 20:1 28:7
35:13 48:10 49:19
162:21 179:8 181:18
184:5 213:18 217:17

**Thacher** 17:13

**thank** 8:16 223:13,14

**the...total** 84:19

**theoretical** 72:8
198:13

**theory** 196:22

**thereunder** 91:20

**they'd** 178:8

**thing** 115:11 119:25
130:9 137:17 147:21
157:4 159:19 166:10
169:13 172:12
213:24 215:8

**things** 21:17 26:25
29:4,12 30:14,16
32:2 35:18 37:3
40:17,18 43:11
59:12,19 65:13
75:16 79:17 81:2
87:19 88:22 126:15
130:24 131:7,18
134:21 146:25
147:22 163:1,2,3,4
165:14 170:22
178:15 202:14
216:19 218:3 220:10

**think** 15:11 19:5
20:12,13,17,21,24
21:6 22:4,7,21 24:1
27:4 33:1 34:4
36:14,21 39:2 49:4
52:4 53:21 55:10,12,
20,24 56:15 57:4,6,
16,19,25 58:4 61:1
64:13,18 74:2 81:25
82:16 83:8 87:5,16
89:25 90:8,11 99:1,
9,15,21 100:4,6,12
102:7 105:5 108:16
111:19 114:5,23
118:3 120:9 121:12,
13,18 125:2,10
127:7 128:14 129:3
134:5 141:11 142:23
143:14,15,18,19
146:23 151:10,14
152:23 153:24 154:4
156:2 158:13 159:22
162:6 166:13,17
167:9 169:11 171:8
172:13,16,18,20,22
174:10,25 176:2
177:4,9 178:7,16
180:24 182:19
183:3,10 185:2,5
187:7 189:11 193:25
201:2 203:9,10
206:8 207:9,12,24
209:3,13,20 210:19
217:6,7,9,10 218:9
220:16 223:1

**thinking** 90:21
124:18 125:3 173:8

**thinks** 168:4

**third** 16:22 54:23
162:10 218:25

**thought** 59:13 77:2
152:20 156:10 164:7

**thousand** 73:3

**thousands** 201:9

**three** 96:1 144:22
165:13,17

**threshold** 111:25

**thrown** 24:2

**tie** 71:20

**time** 7:4 9:22 16:14,
16 23:25 27:18 30:7
31:5 34:9 36:12
37:21 41:20 44:6
47:9,16 50:17,20
51:23 56:4,7,8
58:12,23 59:1 61:15
65:8,10 72:15 73:6,
17 74:5 76:4 79:25
80:24 81:20 87:22
88:10 92:14 93:14
95:3 97:10,21,25
106:11 107:25
108:22 112:5 116:8
119:12 120:5,23
121:2,6,9 122:20
124:4 128:19
129:10,25 131:4,9
133:16 135:5 139:7,
11,18 142:22 144:16
145:1 146:10,22
147:3 148:3 149:2
150:3 156:24,25
157:8,20 158:3
159:1,14 160:2
161:1,11 163:5,11,
18 164:12,13 167:13
170:19 176:7,12
182:12 183:4,24
187:2 199:24 200:3
211:22 212:7
220:22,25 223:6,9,
13,25

**timely** 39:3 43:12
219:8

**times** 9:2 14:23 15:2,

Confidential

**Wayne Guay**                                                                In re Twitter Inc. Securities Litigation

12,24 17:3,5,7,12
18:2 144:8,9 183:20
217:17

**timing** 51:7 83:9
145:10 150:21 188:4
189:5,7,13,23

**tip** 176:17

**tipped** 175:14

**title** 20:1

**titled** 29:8 83:19
195:12

**today** 8:2 10:1 28:25
35:14 42:3 84:22
133:14,15 145:17
146:21 151:10
156:11 166:17 170:5
196:12 201:3 217:18
223:13

**today's** 7:3 34:18,24

**told** 45:7 52:4 64:13
80:22 128:14 139:2
154:5 175:21

**top** 84:8 86:6 132:2
144:22,24 145:5
150:19 187:12
195:24 196:17

**topic** 222:19,23

**topics** 31:7,14,16,17
45:13 152:19 221:9

**total** 38:5 73:6 74:16,
20,24 75:3 85:2
112:11

**track** 215:19

**trade** 44:10 87:12
89:7 106:4 108:4
117:12,13 133:4
204:16

**traded** 93:24 117:14

**trades** 31:20,21
43:20,21 52:11
55:17 57:4 59:11
83:5,8,10 85:5,8
96:24,25 102:15,16
105:20 106:1
107:18,21,25 108:2,
17,18,20,21 117:15
122:8 125:4 126:4
128:3,6 135:10
142:21 144:15
145:17 159:16,17
165:4 176:8,21
177:6,15 185:22
188:5 189:5,7,14
190:18,23 191:7
203:21 206:3

**trading** 17:25 18:18,
25 21:15,16,18
22:13 23:5,14,17
24:7,16 25:11,15
26:1,8,13,23 28:15
31:18 39:10 40:4
42:15,17 43:18,23
44:19 45:14 46:3,5,
24 47:18 48:9,10
49:1 51:10 54:16,18
57:20 58:6 61:19
62:16,17,21,25 64:5,
24 65:4,9,14,16 84:6
86:20 88:18,24 89:3,
9 91:8,14 95:14,16
97:3,15 103:9,16
105:9,11 106:7,11,
16,19,21,24 116:16,
20 117:3,8,9 122:3
123:8,17 124:15,24
125:6,11,15,22
126:17,22 128:16
130:19 132:18
133:14 134:25
135:19,20 136:22
137:16,25 138:2,17
140:17 142:2,25
145:23 146:10,14,

16,19 147:1,5,11
148:2,14 155:13
156:12 162:7,20
163:8 164:24,25
167:24 178:2 181:7
182:15 192:3 194:1
202:13 204:5 206:20
209:24 212:24 213:2

**trading/executive**
26:9

**training** 12:18,21,23

**transactions** 51:8,20,
22 52:22,23

**transcript** 115:2
179:24 180:3,8,11
218:21 223:19,22

**transcripts** 216:23
217:4,8

**treat** 91:8

**trends** 131:3,13

**trial** 22:17 24:20 25:1,
4 50:6 51:18 53:3
54:21 55:5 57:13
60:2,25 61:11 62:2
67:14 68:6,9,12,16,
20 69:4,7,14,18 70:1
98:21 133:20

**tricky** 23:23

**tried** 56:20

**tries** 90:18 192:14

**true** 30:17,19 64:16
77:3 81:11 82:3 86:9
96:14 102:22 103:5
105:15 107:10
109:3,4,7,13 111:8,
11 133:17,18 135:2
140:25 151:1 164:14
165:5 166:19 169:3
179:10 180:8 181:21
184:1 189:16 191:5,

8,9 192:23 200:25
201:9 212:16 220:3

**try** 9:19 56:22 71:19
119:24 120:1 172:10
198:15,17

**trying** 15:16 101:7
107:15 108:8 116:21
127:7 130:24 135:7
137:11,19 156:6
158:12,15 178:5
190:19 194:21
198:21 199:13
212:13

**Ts** 215:24

**turn** 10:12 29:5 35:9
39:4 51:3 71:5 72:22
73:13 87:6 89:12
142:9 152:22 195:23
213:25 214:16
221:23

**Turning** 41:5

**turns** 210:23

**twice** 76:19

**Twitter** 7:6 17:18
27:16 28:25 29:2
33:10 38:24 39:11,
21,24,25 42:16
47:20 52:14 53:7
54:25 55:7,11,13,19,
22 56:3 57:11 58:7
59:21 60:7 72:11,15,
20 73:1,6,17 76:17
82:25 83:4 85:3
87:11,17,25 88:18
89:7 93:24,25 94:25
103:6 107:4 110:6,9,
13,23 111:4,16
113:2,9 116:5
122:22 124:2,8
125:10 127:13,21
128:1 139:11,12,21,
23 140:7,9 142:17,

**Confidential**

Wayne Guay

In re Twitter Inc. Securities Litigation

20,25 143:6 144:2,7
145:10 148:5,19,23
151:7,12 153:3
161:23 167:4
171:14,22 173:9
176:3 177:6,16
192:3 199:6 204:1,
25 205:1 206:1,4,14
210:1

**Twitter's** 51:23 81:5,
24 82:8 85:11 86:20
97:11,14 99:15
102:20 109:20
110:10 111:9 112:21
121:7 128:18 129:24
130:3,17 132:18
139:7 140:1 160:1
162:13 163:10 166:2
170:9,12 176:7
191:16 192:2 210:7

**Twitter...stock.** 113:5

**two** 36:5 40:7,9,17,18
43:19 65:12 75:16
79:5 88:22 92:16
104:10,12 111:2
142:12,15 144:22
150:25 165:15
187:6,7 223:4

**TWTR_SHEN_
00082867** 186:8,15

**TWTR_SHEN_
00082869** 186:9

**TWTR_SHEN_
00193273** 80:14

**TWTR_SHEN_
00248325** 129:3

**TWTR_SHEN_
00249151** 161:24

**TWTR_SHEN_
00262575** 77:18

**TWTR_SHEN_
00326991** 174:18

**TWTR_SHEN_
00329986** 86:21

**types** 12:2 14:5 37:23
44:4,5 45:17 83:5
164:6 206:1

**typical** 116:6

**typically** 40:17,24
41:4 123:2 169:10
171:8 172:5 178:6

**typo** 114:21

**U**

**Uh-huh** 11:19 22:8
23:9 74:22 79:4
111:7 155:6 157:11
163:13 170:3 178:24
180:16 182:5 195:25
196:18 197:24
206:24 209:18
211:12 212:15
214:18 217:19 222:1

**unable** 219:6

**uncomfortable** 20:18

**unconventional**
138:17

**undergone** 116:5

**undergrad** 12:25

**underlies** 197:18

**underlying** 205:18
213:7 214:23

**understand** 9:16,18
13:24 14:1,3 48:9
49:18 50:6,24 56:15
78:25 93:3 94:9
97:15,16 98:4 101:7
114:2 117:6 118:17

122:10 126:1 143:24
150:11 152:4 158:12
167:20 200:7 212:14
221:4

**understanding** 40:23
53:11 55:21 56:14,
20 59:7 63:9 65:19
66:5,10,13 83:4
87:10,13 89:10
103:8 106:14 113:8
123:11 143:3 144:16
159:13 176:6,14
206:25 210:25
215:25

**understood** 213:9

**undisclosed** 188:18

**unexpected** 110:1

**United** 7:7

**Unitedhealth** 24:10

**universe** 152:3

**University** 11:9 13:2,
6

**unnecessary** 67:7,24
85:6

**unquote** 175:14

**unsubstantiated**
191:25

**unsurprising** 109:19,
25

**unvested** 74:8,14,21,
25 82:16

**update** 41:23,24

**updated** 11:2

**updating** 42:3

**upwards** 124:2

**urgency** 123:6

**urgent** 122:25 123:3

**use** 43:14 48:7 61:3
140:20 162:16

**useful** 147:3,13

**user** 121:7 130:5,12
131:3,13,14

**users** 162:15

**uses** 103:23 206:10

**V**

**vague** 16:14

**Vaguely** 162:5

**valuation** 222:8

**value** 60:21,23 61:4,8
71:11,20 99:13
194:25 196:4,9
219:6

**valued** 194:18

**varies** 16:20

**variety** 172:6 222:7

**various** 31:4,20 44:9
57:18 211:22

**verified** 56:17

**verify** 56:21 144:15

**Verrecchia** 195:15

**version** 198:5

**versus** 18:14 21:11
22:21 23:19 24:9
196:8

**vested** 52:20 74:19
82:18 112:14,18,20

**vestings** 112:19

**video** 7:5,10

**videographer** 7:1,13
8:1 50:17,20 97:21,
24 149:2 150:2
199:24 200:2

Confidential

**Wayne Guay**

In re Twitter Inc. Securities Litigation

220:22,25 223:6,9,
25

**view** 48:13 197:2

**Vijaya** 174:17

**violation** 154:3

**vitae** 10:21 11:3
221:24

**volume** 72:8 144:23,
25

**voluntarily** 197:22

**voluntary** 201:14

**VP** 166:3

---

**W**

**want** 19:3 21:2 44:6
72:19 90:6 97:9
99:12 125:25 127:2
143:5,19 150:18
154:25 155:12,14
156:9 157:2 158:8,
16 171:13 173:2
190:15 217:11
220:18 221:11
223:12

**wanted** 59:14 60:21
61:3

**wasn't** 55:25 63:8
76:23 85:4 94:5
115:7 135:24 160:3
170:12

**way** 51:25 54:10
56:18 57:23 58:1,3
79:18 91:12 115:1
116:19,23 118:12,21
119:15 120:3 131:15
136:3 142:3,7
153:20 160:17
163:6,25 167:16
171:17 177:18

187:17,21 189:3
198:11 204:22
205:16 206:9 212:23
219:21

**Wayne** 7:6 8:4 150:5
195:13

**ways** 71:9 72:3 100:5
172:7

**we'll** 8:22 168:14
207:13

**we're** 7:1 50:18,21
58:1 75:20 97:22
98:1 124:17 150:4
173:25 174:1 179:21
186:5 194:10,16
195:5 196:23,25
197:1,3 198:21
200:4 219:15,24
220:13,23 221:1
223:10

**we've** 25:13 27:22
58:5 97:19 104:10
123:25 132:21
133:14 134:22
145:16 146:1,11,18,
21 147:19,22 148:7
162:25 164:23
166:15,17 168:5,12
169:11 199:2,20

**wealth** 71:20 84:16,
19 85:2 124:7 128:1

**Wealth-based** 83:20

**website** 57:7 141:25
144:17

**Wei** 36:6,25 37:5,13,
18

**Wei's** 36:8

**weight** 113:12

**welcome** 50:23 98:3
150:10 200:6 221:3

**went** 22:4 25:7
139:25 181:6,10,14
185:17 221:8

**weren't** 223:17

**Wharton** 11:6 36:11
222:2,6

**whim** 182:16,20

**wide** 45:13

**widely** 71:17

**Williams** 40:1 113:2
148:6

**willing** 118:23

**win** 193:23

**window** 140:1

**withdraw** 13:24 33:13
36:7 48:18,19 60:5
66:4 75:12 135:6
142:14 143:4 148:19
159:5 160:24 188:2
192:19 203:16 214:5

**withhold** 197:23
219:4,18

**withholding** 196:8

**witness** 7:25 8:3
12:20 13:13 14:24
15:3,22 16:16 19:12,
15 26:3,16 27:9
32:16 34:20 40:9
41:11,19 45:3 47:11
49:23 50:10 53:19
54:5 56:7 58:17 64:8
67:19 78:24 79:22
81:1,13 83:22 88:21
91:11 94:21 96:10
101:3 102:24 114:14
127:2 133:22 134:2,
9 137:9 139:14
140:11 141:11
143:11 164:4,17
173:14 177:21

179:13 184:24
185:16,25 188:12
193:16 201:12 203:8
207:19 209:15
210:19 211:20 214:8
217:25 220:19
221:15,21 223:14

**woman** 36:6

**wondering** 104:14

**word** 55:25 57:22
75:20,21 91:11
103:23 166:9,11

**worded** 75:15

**wording** 91:1

**words** 26:17 59:14
61:2 106:24 111:21
140:20 212:1

**work** 11:22 14:20
15:13 16:12 34:25
35:2,4 72:8 86:4
169:12 197:14
198:2,15 200:24
201:22 203:11
219:13 220:3

**worked** 11:25 17:15,
18 20:14 35:20

**works** 198:18 220:9

**world** 48:15 65:15,17
81:23 92:20 106:2,5,
12,18 107:7 194:7,
10,16 198:6,15,18

**worse** 106:7,24

**worth** 53:6 118:1
121:19 190:22

**wouldn't** 14:25 16:9
21:6 29:20 30:1,24
32:25 37:19 44:14
60:15 61:13 80:4
82:17 84:24 89:3
94:5 105:21 115:10

Wayne Guay

**Confidential**

In re Twitter Inc. Securities Litigation

126:24 136:24
137:1,18,21 163:19
169:10 176:3 202:18

**Wow** 114:23

**write** 40:3 51:7 52:17
60:20 61:18 71:7
89:15 95:18 98:10
101:14 103:15
113:20 120:16 132:1
189:20 191:23
206:19 211:6,10,11

**writes** 175:12

**writing** 32:19

**written** 62:24 84:5,9
95:16 194:23 197:14
198:2 219:13 220:6

**wrong** 159:21 161:8
172:9

**wrote** 30:7 170:7
196:23 209:10
211:13,14,24

---

**X**

---

**xyz** 187:22

---

**Y**

---

**yeah** 47:2 51:24 53:9
63:24 66:1 74:6
78:16 79:22 80:6
85:24 90:24 95:17
99:11 105:20 127:2
128:20 140:11
142:20 145:2 151:4,
13,15 157:1,2
169:10 170:7 177:2,
11 179:13 184:3
204:2 215:22 217:7
223:24

**year** 16:20,23,25 17:2

117:13 121:10

**year's** 16:24

**years** 16:19,25 18:10
28:1 127:22 146:12

**yep** 95:8 120:15
175:5,11 179:1
217:10 220:4

**yes-or-no** 137:23

**York** 7:11 8:6

**Youngwood** 7:24
12:19 13:12,19 15:5,
15,19 16:13 17:16
19:2,13 20:13,24
21:5 26:2,15 27:8
32:15 34:19 35:23
40:8 41:10,18 45:2
47:10 49:22 50:9,16
54:4 56:6 58:16 64:7
66:25 67:18 69:21
75:6 78:22 79:21
80:25 81:12 88:20
91:10 94:20 96:9
97:18 100:8 101:2
102:23 114:13 127:1
133:21 134:1,8
136:1 137:8 139:13
140:10 141:10
143:10 164:3,16
173:13 177:20
179:12 184:23
185:15,24 188:11
193:15 199:23
201:11 203:7 205:10
209:9,13 210:18
211:19 214:7 217:24
220:17,21 221:14
223:3,11,16,24

---

**Z**

---

**zero** 117:23