UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re TWITTER, INC. SECURITIES LITIGATION | Case No. 16-cv-05314-JST |
| This Document Relates to: ALL ACTIONS | **ORDER DENYING MOTION FOR SUMMARY JUDGMENT** ECF No. 314-4 |

In this securities class action, Defendants move for summary judgment as to both claims in the operative complaint. The Court will deny the motion.[1]

## I.       BACKGROUND AND PROCEDURAL HISTORY

This is a securities class action against Twitter, Inc., a social media company, and two of its officers, Richard Costolo and Anthony Noto, for alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. Costolo was the Chief Executive Officer ("CEO") of Twitter until July 1, 2015. Noto was Twitter's Chief Financial Officer ("CFO") during all relevant times.

The gravamen of the operative complaint, ECF No. 81, is that Defendants made misleading statements that caused the price of Twitter stock to trade at artificially high prices during the Class Period, which ranges from February 6, 2015, to July 28, 2015. Plaintiffs allege that Defendants misled investors during the Class Period by making public statements that did not reflect the actual state of Twitter's user engagement, which is relevant to evaluating Twitter's

---

[1] The parties' motions to exclude certain expert testimony under Federal Rule of Evidence 702 will be resolved in a separate order.

United States District Court
Northern District of California

potential user growth and financial performance.  Plaintiffs aver that Defendants omitted

information from the challenged statements that would have provided investors with the necessary

context to evaluate Twitter as an investment.  This included information pertaining to Twitter's

daily active users ("DAU") and the ratio of DAU to monthly active users ("MAU")

("DAU/MAU"), which are metrics that measure user engagement or frequency of use.  Plaintiffs

allege that persons who purchased Twitter stock during the Class Period suffered economic losses

when the price of Twitter stock declined as a result of two sets of corrective disclosures that

revealed the problems with user engagement, and potentially with user growth, that the challenged

statements had concealed.

On October 16, 2017, the Court granted in part and denied in part Defendants' motion to

dismiss.[2]  ECF No. 113.  In relevant part, the Court denied the motion as to the theory that

Defendants' omission of information about DAU and DAU/MAU rendered Defendants'

statements about user growth and user engagement misleading.[3]  *Id.* at 24-28.  The Court also

denied the motion with respect to the theory that Defendants' affirmative statements about

DAU/MAU and ad engagement were misleading.  *Id.* at 30-32.

On July 17, 2018, the Court granted the motion for class certification under Rules 23(a)

and (b)(3) filed by Lead Plaintiff KBC Asset Management NV ("KBC").  The Court certified the

following class: "all persons and entities that, during the period from February 6, 2015, through

July 28, 2015, inclusive [], purchased or otherwise acquired shares of the publicly traded common

stock of Twitter, Inc. [], and were damaged thereby."[4]  ECF No. 181 at 16.  In the same order, the

---

[2] The Court granted the motion with respect to the theory that Defendants made misleading statements about MAU trends by failing to disclose that such trends were based on low-quality users.  ECF No. 113 at 32-34.

[3] Defendants argue that Plaintiffs have changed "the theory of their case" by proceeding at summary judgment based on the "untested theory" that Defendants' statements were misleading by virtue of Defendants' omission of DAU/MAU information from such statements.  ECF No. 396-4 at 1-2 & n.2.  The Court disagrees.  One of the theories that survived Defendants' motion to dismiss was the theory that Defendants' statements about MAU growth were misleading because Defendants failed to disclose "companion DAU data" and information that the "DAU to MAU ratio" was declining.  *See* ECF No. 113 at 24-26.

[4] Excluded from the Class are Defendants; members of the Individual Defendants' immediate families; Twitter's subsidiaries and affiliates; any person who is or was an officer or director of Twitter during the Class Period; any entity in which any Defendant has a controlling interest; and

United States District Court
Northern District of California

1   Court appointed KBC and National Elevator Industry Pension Fund as co-class representatives,

2   and the law firms Motley Rice LLC and Robbins Geller Rudman & Dowd LLP as co-class

3   counsel.  *Id.* at 16-17.

4          Defendants' present motion for summary judgment follows.

5   **II.     REQUESTS FOR JUDICIAL NOTICE**

6          Before turning to the substance of Defendants' motion for summary judgment, the Court

7   first addresses the parties' requests for judicial notice.

8          "The court may judicially notice a fact that is not subject to reasonable dispute because it:

9   (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and

10  readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid.

11  201(b).  The Court "must take judicial notice if a party requests it and the court is supplied with

12  the necessary information."  Fed. R. Evid. 201(c)(2).

13         First, Defendants request that the Court take judicial notice of certain documents that fall

14  within the following categories: (1) analyst reports; (2) Defendants' filings with the Securities and

15  Exchange Commission ("SEC"); (3) four "tweets" by the "verified Selerity Twitter account"; and

16  (4) Twitter's press releases, metrics and financials published on Twitter's website, and transcripts

17  of Twitter's earnings calls.  ECF No. 355.

18         Plaintiffs oppose the request (1) to the extent that Defendants ask the Court to take notice

19  of the truth of the matters asserted in the documents at issue; and (2) to the extent that Defendants

20  request that the Court take judicial notice of the four tweets, which Plaintiffs argue were published

21  by a private non-party and therefore do not have the indicia of accuracy required for judicial

22  notice.  *See* ECF No. 399.

23         Because their authenticity and accuracy is not disputed, the Court will take judicial notice

24  of the analyst reports; Defendants' filings with the SEC; and Twitter's press releases, publicly

25  disseminated metrics and financials, and transcripts of earnings calls.  Courts routinely take

26

27  _____

28  the legal representatives, heirs, successors and assigns of any such excluded person or entity.  ECF
    No. 181 at 16 n.7.

United States District Court
Northern District of California

1  judicial notice of these types of documents to determine what information was available to the

2  market.  *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th

3  Cir. 2008) (holding that the district court properly took judicial notice of publicly available

4  financial documents and SEC filings); *Von Saher v. Norton Simon Museum of Art at Pasadena*,

5  592 F.3d 954, 960 (9th Cir. 2009) (holding that courts "may take judicial notice of publications

6  introduced to indicate what was in the public realm at the time, not whether the contents of those

7  articles were in fact true") (citation and internal quotation marks omitted).  Because the truth of

8  the matters asserted in these documents is subject to reasonable dispute, however, the Court takes

9  judicial notice only of the statements contained therein, but not for the purpose of determining the

10  truth of those statements.  *Shaev v. Baker*, No. 16-CV-05541-JST, 2017 WL 1735573, at *7 (N.D.

11  Cal. May 4, 2017) (citing *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1254 (N.D. Cal.

12  2008)).

13         With regard to the disputed tweets, the Court agrees with those courts that have held that

14  "judicial notice is proper because the existence of the publicly-available articles and tweets cannot

15  reasonably be questioned."  *See, e.g.*, *Unsworth v. Musk*, No. 19-MC-80224-JSC, 2019 WL

16  5550060, at *4 (N.D. Cal. Oct. 28, 2019) (citing *Von Saher*, 592 F.3d at 960); *Olson v. California*,

17  No. 19-CV-10956-DMG (RAOx), 2020 WL 905572, at *4 (C.D. Cal. Feb. 10, 2020) (taking

18  judicial notice of tweets referred to in the complaint and moving papers on the ground that "those

19  documents' existence cannot reasonably be disputed") (citation omitted).  The Court takes judicial

20  notice of the tweets solely "to indicate what was in the public realm at the time," but not for the

21  purpose of determining whether the contents of those tweets "were in fact true."  *Von Saher*, 592

22  F.3d at 960 (citation and internal quotation marks omitted).

23         Second, Plaintiffs request that the Court take judicial notice of documents that fall within

24  the following categories: (1) analyst reports; (2) news articles; (3) and SEC filings.  Plaintiffs

25  request that the Court take judicial notice of the existence and content of these documents, but not

26  for the truth of the matters asserted therein.  ECF No. 369.  Defendants do not oppose Plaintiffs'

27  request.  ECF No. 400.

28         Because their authenticity and accuracy is not disputed, and because, as noted above,

courts routinely take judicial notice of these types of documents, the Court will take judicial notice of the analyst reports, news articles, and SEC filings cited by Plaintiffs, but not for the truth of the matters asserted therein.

### III.    UNIDISPUTED FACTS

#### A.    Before the Class Period

Twitter has publicly stated that its success and financial performance depend, at least in part, on the size and engagement of its user base.  *See, e.g.*, ECF No. 370-5 at 26 (Twitter's November 4, 2013, Amended Form S-1 Registration Statement stating that "[t]he size of our user base and our users' level of engagement are critical to our success" and "[o]ur financial performance has been and will continue to be significantly determined by our success in growing the number of users and increasing their overall level of engagement on our platform as well as the number of ad engagements").  User growth depends in part on user engagement, because users who are more engaged are less likely to "churn" (i.e., stop using the platform).  *See* ECF No. 362-6 at 4, 10 (Akash Garg, a senior member of Twitter's growth team, testifying during his deposition that more engaged users are less likely to churn and that daily active use "is certainly a prerequisite for healthy MAU growth").

When Twitter first became a public company, it disclosed "Key Metrics" that it used to measure user growth and user engagement.  ECF No. 370-5 at 75-76.  These included MAU (monthly active users), "a measure of the size of [Twitter's] active user base," and Timeline Views and Timeline Views per MAU, "measures of user engagement."  *Id.*

In 2014, Twitter established a Metrics Task Force to evaluate all of Twitter's metrics and decide what metrics it would use internally and externally.  ECF No. 362-10 at 2.  In September 2014, the Metrics Task Force decided to stop reporting Timeline Views and worked on finding a replacement metric.  ECF No. 362-11 at 8-9.

On November 12, 2014, Twitter held an "Analyst Day," during which management discussed products, strategy, and new services.  *See generally* ECF No. 371-2 (Transcript of Analyst Day).  At that event, Twitter announced its "operational goal of building the world's largest daily audience."  *Id.* at 5, 6, 8.  A Twitter representative stated that, although Twitter

5

United States District Court
Northern District of California

1   previously had not "focused on DAU . . . if we're going to be the largest daily audience in the

2   world, that has to change." *Id.* at 105.

3         At Analyst Day, Noto presented a "financial overview," during which he discussed eight

4   "major growth drivers" for revenue, which included both DAU and DAU/MAU.  *Id.* at 91, 94, 96.

5   With respect to DAU/MAU, Noto stated that the "year-to-date DAU to MAU ratio for our top 20

6   markets" is 48%.  *Id.* at 91.  Noto described DAU/MAU as a "frequency" metric and the "best

7   way to quantify the impact of engagement."  *Id.* at 94.  Noto also stated that the top 20 markets

8   "account for 80% of our users and 90% of our revenue," and that Twitter could generate an

9   additional $500 million in annual revenue by increasing its DAU/MAU from 48% to 51%.  *Id.*

10  With respect to MAU, Noto stated that Twitter was positioned to "grow [MAU] by 2x," from 284

11  million, *id.* at 91, to over 550 million in the intermediate term, *id.* at 96.  Noto also announced that

12  Twitter would no longer disclose Timeline Views because that measure had become "less and less

13  relevant of a metric." *Id.* at 109.

14        After Analyst Day, internal Twitter emails state that dashboards for DAU, DAU/MAU,

15  and MAU would be created to provide daily updates of those metrics for Noto and others, and that

16  regular meetings would be held to discuss metrics, including DAU/MAU.  *See, e.g.*, ECF No. 362-

17  23 (email stating that metrics dashboard for Noto would include DAU/MAU); ECF No. 363-19

18  (email stating that CFO dashboard would be updated daily); ECF No. 362-24 (email to Noto and

19  others attaching detailed user metrics slides); ECF No. 363-20 (email stating that weekly meetings

20  to discuss user retention and related metrics, which included DAU/MAU, would be held); ECF

21  No. 363-21 (email to Noto and others containing "Monthly Metrics Review" for Q1 2015,

22  including DAU/MAU trends).

23        Before earnings calls with investors, internal "earnings binders" with "detailed information

24  about financial and operational performance in the quarter" would be prepared and distributed to

25  top executives, including Noto.  ECF No. 371-15 at 4-5 (Krista Bessinger deposition testimony).

26  The binders contained detailed information and analysis about DAU, MAU, DAU/MAU.  *See*

27  *generally* ECF Nos. 362-15 and 362-38 (earnings binders for Q4 2014 and Q1 2015).

28  / / /

**B.     During the Class Period**

On February 5, 2015, Twitter issued a press release and held its quarterly earnings call with investors and analysts to report results for the fourth quarter of 2014 (Q4 2014).  ECF No. 371-18.  The earnings binder for this earnings call stated that Twitter's DAU/MAU for its top 20 markets had fallen to 44.4%.  ECF No. 362-15 at 178.  The binder also included "Key Takeaways on Users," which stated that "DAUs growth continues to stall" and "DAU/MAU continues to trend lower."  *Id.* at 171.  A separate chart in the earnings binder showed that DAU/MAU had declined throughout 2014 in all of Twitter's top 5 markets and 19 of its top 20 markets.  *Id.* at 80-81.

During the February 5 earnings call, Noto stated that Twitter's more mature markets had a "very high DAU to MAU, 50% plus" and a lower rate in emerging markets, and that they "all migrate up to a higher rate over time."  ECF No. 371-18 at 9.  Twitter also disclosed average MAUs of 288 million for Q4 2014, which meant that its net MAU additions during Q4 amounted to only 4 million, which was less than expected.  *Id.* at 7.  Noto stated, however, that "[t]he user numbers we saw in January, again, indicate that our MAU trend is already turned around."  *Id.* at 2.

After the earnings call, analysts reported that Twitter's "[e]ngagement is improving," ECF No. 371-21 at 2, "slower MAU growth is more than offset by improvements in engagement," ECF No. 371-22 at 2, and "MAU Growth about to Pick Up as Engagement Rate Improves," ECF No. 371-23 at 2.

On April 28, 2015, Twitter made disclosures with respect to its performance in Q1 2015. It disclosed that its MAU was 302 million, up from 288 million in the previous quarter.  ECF No. 371-27 at 3.  Twitter also revealed that it would be reducing its revenue guidance for the rest of FY2015.  *Id.* at 4.  During the earnings call on April 28, Noto stated that the trend for MAU growth for Q2 2015 was "not similar to Q1" and MAU "visibility is actually limited."  ECF No. 371-28 at 12.  Noto also stated that DAU to MAU ratios in the quarter were "similar" by market relative to Analyst Day.  *Id.* at 20.  The earnings binder prepared before the April 28 earnings call, however, stated that that DAU/MAU for the top 20 markets had fallen to 44.3% from the 48%

1   reported at Analyst Day.  ECF No. 362-38 at 139.

2       Twitter's stock price declined on April 28 and April 29, 2015.  ECF No. 352-10 ¶¶ 137-

3   141.

4       On July 28, 2015, Twitter issued results for Q2 2015 and held an earnings call, during

5   which Noto revealed that Twitter's DAU/MAU for the top 20 markets had fallen to 44%, and that

6   Twitter did "not expect to see sustained meaningful growth in MAUs" for "a considerable period

7   of time."  ECF No. 371-32 at 7.

8       Twitter's stock price declined for several days following the July 28, 2015, earnings call.

9   ECF No. 352-10 ¶¶ 142-151.

10  **IV.  JURISDICTION**

11      The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

12  **V.  LEGAL STANDARD**

13      Summary judgment is properly granted when no genuine and disputed issues of material

14  fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant

15  is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477

16  U.S. 317, 322-23 (1986).

17      Material facts that would preclude entry of summary judgment are those which, under

18  applicable substantive law, may affect the outcome of the case.  The substantive law will identify

19  which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

20      Where the moving party does not bear the burden of proof on an issue at trial, the moving

21  party may discharge its burden of production by either of two methods:  the moving party may

22  produce evidence negating an essential element of the non-moving party's case, or, after suitable

23  discovery, the moving party may show that the non-moving party does not have enough evidence

24  of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

25  *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

26      If the moving party discharges its burden by showing an absence of evidence to support an

27  essential element of a claim or defense, it is not required to produce evidence showing the absence

28  of a material fact on such issues, or to support its motion with evidence negating the non-moving

United States District Court
Northern District of California

party's claim. *Id.*; *see also Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan*, 929 F.2d at 1409. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The court is not required "to scour the record in search of a genuine issue of triable fact," *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citations omitted), and it may limit its review to the documents submitted for purposes of summary judgment and those parts of the record specifically referenced therein. *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the non-moving party must introduce some significant probative evidence tending to support the complaint." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted).

## VI.   DISCUSSION

### A.   Section 10(b) and Rule 10-b5 claim

The Securities and Exchange Act of 1934 "was designed to protect investors against manipulation of stock prices." *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988). The Supreme Court "repeatedly has described the fundamental purpose of the Act as implementing a philosophy of full disclosure." *Id.* (citations and internal quotation marks omitted).

Section 10(b) of the Securities Exchange Act of 1934 declares it unlawful to "use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary." 15 U.S.C. § 78j(b). There is an "implied [ ] private cause of action" in Section 10(b). *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).

"SEC Rule 10b-5 implements [Section 10(b)] by making it unlawful to . . . 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b–5).

United States District Court
Northern District of California

1       "Thus, to prevail on a claim for violations of either Section 10(b) or Rule 10b-5, a plaintiff

2  must prove six elements: '(1) a material misrepresentation or omission by the defendant; (2)

3  scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a

4  security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

5  causation.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051-52 (9th Cir. 2014) (quoting

6  *Matrixx Initiatives*, 563 U.S. at 37-38).

7       Defendants move for summary judgment, arguing that Plaintiffs do not have evidence to

8  establish any of the following elements for a claim under § 10(b) and Rule 10b-5: (1) that

9  Defendants made a false or misleading statement during the Class Period; (2) that Defendants

10  acted with scienter; and (3) that Defendants' alleged fraud was a substantial cause of the Twitter

11  stock-price declines on April 28 and 29 and from July 29 to August 3, 2015.

12       After carefully reviewing the evidence cited by the parties, the Court concludes that

13  Plaintiffs have shown that genuine disputes of material fact preclude the entry of summary

14  judgment in Defendants' favor.

15              **1.**       **Material misrepresentation or omission**

16       The first element of a claim under § 10(b) and Rule 10b-5 requires a plaintiff to show that

17  the defendant made a statement that was "*misleading* as to a *material* fact." *Basic*, 485 U.S. at

18  238 (emphasis in the original). This materiality requirement is satisfied when there is "a

19  substantial likelihood that the disclosure of the omitted fact would have been viewed by the

20  reasonable investor as having significantly altered the total mix of information made available."

21  *Id.* at 231-232 (citation and internal quotation marks omitted). In other words, "materiality

22  depends on the significance the reasonable investor would place on the withheld or misrepresented

23  information." *Id.* at 240. The determination of materiality requires a "fact-specific inquiry." *Id.*

24       The purpose of the materiality requirement is "to filter out essentially useless information

25  that a reasonable investor would not consider significant, even as part of a larger mix of factors to

26  consider in making his investment decision." *Basic*, 485 U.S. at 234 (citations and internal

27  quotation marks omitted). Thus, the "securities laws do not create an affirmative duty to disclose

28  any and all material information. Instead, companies can control what they have to disclose under

United States District Court
Northern District of California

these provisions by controlling what they say to the market.  But once defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016) (internal citations and quotation marks omitted) (alterations in the original).

"In considering whether summary judgment on the issue is appropriate, [courts] must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality.  The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.  Only if the established omissions are so obviously important to an investor that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law by summary judgment." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (citation and internal quotation marks omitted). [5]

Here, Plaintiffs "may defeat summary judgment only by showing a genuine issue of fact with regard to a particular statement by the defendant corporation or its insiders." *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6, 1991) (citation and internal quotation marks omitted).  Plaintiffs can do so by "demonstrat[ing] that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." *Id.*

Plaintiffs argue that a genuine dispute exists with respect to whether three statements that Defendants made on February 5, 2015, and one statement they made on April 28, 2015, were misleading.  The Court examines each challenged statement, in turn.

/ / /

---

[5] The materiality standards set forth in *TSC Industries* were "adopt[ed], for the § 10(b) and Rule 10b-5 context" by the Supreme Court in *Basic Inc*., 485 U.S. at 249.

United States District Court
Northern District of California

### a.     February 5, 2015, challenged statements

On February 5, 2015, during the earnings call for Q4 2014, Noto stated that "[i]n our more mature markets, we have very high DAU to MAU, 50% plus."[6]  ECF No. 371-18 at 9.  Plaintiffs argue that this statement was misleading because Defendants failed to disclose that the data in the Q4 2014 earnings binder showed that Twitter's DAU/MAU for its top 20 markets had declined to 44.4% from the 48% that Defendants reported at Analyst Day.  *See* ECF No. 362-15 at 178.

The Court concludes that Plaintiffs have shown that a genuine dispute exists as to whether this challenged statement was misleading.  At Analyst Day, Noto stated that the "year-to-date DAU to MAU ratio for our top 20 markets" is 48%.  ECF No. 371-2 at 91.  Noto also stated that the top 20 markets "account for 80% of our users and 90% of our revenue."  *Id.* at 94.  Further, Noto stated that there was a relationship between DAU/MAU and revenue, namely that an increase of 3% from 48% to 51% in the DAU/MAU for the top 20 markets would lead to an increase in revenue of $500 million per year.  *Id.*  In light of these Analyst Day statements, an investor reasonably could have interpreted Noto's February 5 "50% plus" statement, which referred to "mature" markets, as being about the DAU/MAU of the top 20 markets, because the top 20 markets had the vast majority of Twitter's users and accounted for the vast majority of Twitter's revenue.  Further, in the absence of a disclosure of the then-current DAU/MAU for the top 20 markets (44.4%), the "50% plus" statement could have suggested to a reasonable investor, falsely, that the DAU/MAU for the top 20 markets had actually *increased* since Analyst Day (48%).  In light of the relationship between DAU/MAU and revenue disclosed at Analyst Day, this suggested positive trend in DAU/MAU could have impacted a reasonable investor's assessment of Twitter.  Based on the foregoing, a reasonable jury could conclude that the disclosure of the omitted DAU/MAU data for the top 20 markets (which showed a *downward* trend in DAU/MAU)

---

[6] The statement in question is in the following portion of the earnings call: "Additionally, on the consumer side, many companies use DAU to MAU.  And while that is a long term goal of ours to become a daily product, today we have great variance in DAU to MAU across geographies.  In our more mature markets we have very high DAU to MAU, 50% plus, and in emerging markets we have very low DAU to MAU at 20% range.  They all migrate up to a higher rate over time."  ECF No. 371-18 at 9.

would have been perceived by a reasonable investor as having altered the total mix of information available with respect to Twitter, because that omitted data was relevant to evaluating Twitter's future potential revenue. *Schueneman*, 840 F.3d at 705-06 ("[O]nce defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.") (citation and internal quotation marks omitted).

None of Defendants' arguments warrants a different conclusion. First, Defendants argue that the Court already rejected any claims premised on alleged fraud arising from the "50% plus" statement. ECF No. 396-4 at 9. Defendants misread the Court's prior rulings, however. In its order granting in part and denying in part Defendants' motion to dismiss, the Court *denied* the motion with respect to the theory that the February 5 "50% plus" statement was misleading in the absence of disclosures of specific data showing that user engagement was in fact "flat or declining." *See* ECF No. 113 at 27-28. In other words, the Court found that the omission of specific information regarding user engagement metrics raised the inference that the February 5 "50% plus" statement was misleading. *Id.* Accordingly, the Court's prior rulings do not preclude Plaintiffs from challenging at this juncture the "50% plus" statement on the basis that the statement is misleading in the absence of user engagement disclosures, which would include DAU/MAU data.

Defendants next argue that the "50% plus" statement was accurate and, therefore, not misleading as a matter of law. Defendants point to facts showing that three out of the top 20 markets had a DAU/MAU of 50% or higher. *See* ECF No. 314 at 24-25. While Defendants are correct that three[7] out of the top 20 markets had a DAU/MAU of 50% or more, that does not mean that the challenged statement is not misleading as a matter of law. A reasonable jury could conclude that the "50% plus" statement, which did not specify the "mature" markets it referred to[8],

---

[7] The earnings binder states that one of Twitter's top 20 markets, Japan, had a DAU/MAU above 50%, and two other top 20 markets, Spain and Saudi Arabia, had a DAU/MAU at exactly 50%. ECF No. 362-15 at 80-81. The remaining 17 of the top 20 markets had a DAU/MAU at below 50%. *Id.*

[8] Defendants argue that Noto testified at his deposition that by "mature markets" he meant those

was misleading in light of Defendant's omission of (1) the declining DAU/MAU trend across all top 20 markets, which, as mentioned above, accounted for the vast majority of Twitter's users and revenue, ECF No. 362-15 at 178; (2) the fact that 17 out the top 20 markets had a DAU/MAU of *less* than 50%, *id.*; and (3) the fact that 19 out of the top 20 markets had a DAU/MAU that had fallen over the prior year, ECF No. 362-15 at 80-81.

The second statement that Plaintiffs challenge as misleading is the following:

> In our more mature markets we have very high DAU to MAU, 50% plus, and in emerging markets we have very low DAU to MAU at 20% range. *They all migrate up to a higher rate over time.*

ECF No. 371-18 at 9. Plaintiffs contend that "they all migrate up to a higher rate over time" was misleading because the Q4 2014 earnings binder shows that, over the prior four quarters, the DAU/MAU had fallen in 19 of Twitter's top 20 markets and it declined from 42% to 38% for the "Rest of the World" collectively. ECF No. 362-15 at 80-81. Further, the DAU/MAU for emerging markets had declined throughout 2014. ECF No. 363-9 at 6.

The Court concludes that Plaintiffs have shown that a genuine dispute exists with respect to whether the challenged statement is misleading. As Plaintiffs point out, the Q4 2014 earnings binder shows various declining trends that contradict the positive trend conveyed by the statement "they all migrate up over time." The binder shows a declining trend for DAU/MAU of the top 20 markets collectively, a declining trend for 19 of the top 20 markets individually, and a declining trend for the DAU/MAU for the rest of the world, collectively. ECF No. 362-15 at 80-81. Further, Twitter data shows that DAU/MAU had declined for emerging markets throughout 2014. ECF No. 363-9 at 6. A reasonable jury could conclude that a disclosure of these omitted downward trends would have altered the total mix of information available in the eyes of a reasonable investor, because, as discussed above, Twitter had previously disclosed the existence of a relationship between DAU/MAU and revenue.

Defendants suggest that the "they all migrate up" statement refers exclusively to emerging

---

individual markets that had a DAU/MAU of 50% or more. *See* ECF No. 348-12 at 325-27. This testimony does not alter the conclusion that a genuine dispute exists as to whether the challenged statement was misleading.

United States District Court
Northern District of California

markets, and not mature markets, and argue that the statement is accurate because Twitter data shows that emerging markets' DAU/MAU "typically" or "generally" migrated up over time. *See* ECF No. 314-4 at 25. This is insufficient to show that the challenged statement is not misleading as a matter of law. A reasonable jury could interpret the statement in question as referring to the DAU/MAU of mature markets *or* to the DAU/MAU of emerging markets, or *both* (particularly given that the statement expressly referred to "all" markets). Defendants have not even tried to show how or why "they all migrate up" would not be misleading to the extent that a reasonable investor interpreted it as referring to the DAU/MAU of more mature markets, which, as noted above, were overwhelmingly migrating down, not up. Further, with respect to emerging markets, Defendants state only that emerging markets "generally" migrate up over time, but Defendants do not explain how this notion squares with the downward trends discussed above for markets outside of the top 20.

The third statement that Plaintiffs challenge as misleading is one that Costolo made after disclosing that the number net MAUs for Q4 2014 was 4 million, which was lower than expected:

> Importantly, I want to highlight that the user numbers we saw in January of this year indicate that *our MAU trend has already turned around*, and our Q1 trend is likely to be back in the range of absolute net adds that we saw during the first three quarters of 2014.

ECF No. 371-18 at 5 (emphasis added).

Plaintiffs argue that "our MAU trend has already turned around" suggested a positive trend in MAU growth and was misleading because Defendants omitted the declining DAU/MAU trends discussed above.

The Court agrees. Because it was made after disclosing lower-than-expected MAU growth for Q4 2014, a reasonable jury could conclude that the challenged statement suggested a recovery from disappointing MAU growth in Q4 2014 and an upward trend in MAU growth. A reasonable jury could further conclude that Defendants' omission of the declining DAU/MAU trends discussed above, which cut against the notion of positive MAU growth, rendered the challenged statement misleading, because the disclosure of the omitted declining DAU/MAU trends would have altered the total mix of available information in the eyes of a reasonable investor.

15

United States District Court
Northern District of California

1    Twitter has publicly stated that its success and financial performance depend, at least in

2 part, on the size and engagement of its user base. *See, e.g.*, ECF No. 370-5 at 26 (Twitter's

3 November 4, 2013, Amended Form S-1 Registration Statement stating that "[t]he size of our user

4 base and our users' level of engagement are critical to our success" and "[o]ur financial

5 performance has been and will continue to be significantly determined by our success in growing

6 the number of users and increasing their overall level of engagement on our platform as well as the

7 number of ad engagements"). User growth depends in part on user engagement, because users

8 who are more engaged are less likely to "churn" (i.e., stop using the platform). *See* ECF No. 362-

9 6 at 4, 10 (Akash Garg, a senior member of Twitter's growth team, testifying during his deposition

10 that more engaged users are less likely to churn and that daily active use "is certainly a

11 prerequisite for healthy MAU growth"); ECF No. 413-21 at 2 (email from Costolo to Twitter's

12 board stating that "[w]e simply won't be able to grow the business at the pace we'd like if we

13 don't start adding more healthy users to the platform who use us on a more regular basis in the

14 way our healthiest core users do, almost daily"). Market participants wrote about the existence of

15 a relationship between user engagement, user growth, and Twitter's performance. *See, e.g.*, ECF

16 No. 372-4 at 5 (analyst report stating that "retaining and engaging existing users is also extremely

17 important to Twitter's future growth"); ECF No. 437-1 at 31-33. Based on the foregoing, a

18 reasonable jury could conclude that declining trends in user engagement, as shown by

19 DAU/MAU, which Noto touted as the "best way to quantify the impact of engagement," ECF No.

20 371-2 at 94, would have been material to a reasonable investor, because such declining trends

21 suggested that Twitter's future user growth and financial performance would stall or decline.

22    Defendants argue that the challenged statement was not misleading because the MAU

23 numbers that Defendants reported during the February 5 earnings call were accurate. *See* ECF No.

24 314-4 at 20-21. This argument is unavailing because Plaintiffs are not challenging the accuracy of

25 the MAU numbers reported; instead, they challenge the phrase "our MAU trend has already turned

26 around." As discussed above, a reasonable jury could find that, based on the context in which it

27 was made, the challenged statement conveyed a positive MAU trend, and that, in order to avoid

28 misleading investors, Defendants were required to disclose the declining DAU/MAU trends

discussed above, which cut against the implied positive MAU trend.  *See Schueneman*, 840 F.3d

698 at 705-706 ("'[O]nce defendants cho[o]se to tout' positive information to the market, 'they

[were] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse

information that cut[] against the positive information.").  Further, even if the MAU numbers

reported on February 5 were accurate, as Defendants contend, that would not preclude a finding

that a statement containing or surrounded by the accurate MAU numbers was misleading.  *In re*

*Convergent*, 948 F.2d at 512 ("Some statements, although literally accurate, can become, through

their context and manner of presentation, devices which mislead investors.  For that reason, the

disclosure required by the securities laws is measured not by literal truth, but by the ability of the

material to accurately inform rather than mislead prospective buyers.").

Defendants next argue that Plaintiffs cannot show that the challenged statement suggested

a positive trend in MAU growth, because Twitter had disclosed a declining trend in MAU growth

in its Form 10-K for fiscal year 2014, and because some analysts reported that Twitter's MAU

growth was declining.  *See* ECF No. 354-1 at 8 (10-K); ECF No. 344-5 (BMO report); ECF No.

344-6 (Wunderlich report); ECF No. 344-7 (Stifel report).  This argument is not persuasive

because it fails to acknowledge that Noto uttered the challenged statement after discussing lower-

than-expected MAU growth for Q4 2014; based on that context, the phrase "turned around" could

be reasonably interpreted as suggesting a *positive* MAU trend.[9]  Further, at least some analysts

interpreted the challenged statement as "suggest[ing] that MAU will grow" over the next quarter.

*See* ECF No. 371-23 at 2 (FB analyst report dated February 7, 2015, produced by Defendants in

litigation).

Defendants next contend that the omission of the declining DAU/MAU trends did not

render the challenged statement misleading, because churn was not increasing during the Class

---

[9] This distinguishes the facts here from the facts in the cases upon which Defendants rely to support the proposition that the challenged statement is not actionable.  *See, e.g.*, *Reinschmidt v. Zillow, Inc.*, No. C12-2084 RSM, 2014 WL 5343668, at *1 (W.D. Wash. Oct. 20, 2014) (dismissing a Section 10(b) claim because the plaintiff failed to allege any affirmative statement by the defendant that could be interpreted as misleading in light of the defendants' other disclosures); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 195-97 (D. Conn. 2014) (same); *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1055-58 (N.D. Cal. 2019) (same).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Period.  Defendants argue that, without proof of an actual increase in churn, Plaintiffs' materiality

2  theory falls apart, because declining DAU/MAU would not have rendered MAU growth

3  implausible if the DAU/MAU decline was not accompanied by increased churn.  *See* ECF No.

4  396-4 at 11-12.  This argument misses the point.  Plaintiffs need not show an actual increase in

5  churn in order to show that a genuine dispute for the jury exists with respect to whether the

6  challenged statement was misleading.[10]  Plaintiffs' materiality theory requires only that relevant

7  market participants have understood that there was a relationship between user engagement and

8  Twitter's user growth and financial success.  Plaintiffs have pointed to evidence from which a

9  reasonable jury could conclude that market participants understood this relationship.  *See, e.g.*,

10  ECF No. 370-5 at 26; ECF No. 372-4 at 5; ECF No. 437-1 at 31-33.

11          Finally, Defendants point to the phrase that came after the challenged statement, namely

12  that "our Q1 trend is likely to be back in the range of absolute net adds that we saw during the first

13  three quarters of 2014," and argue that such language is forward-looking and brings the challenged

14  statement within the safe harbor provision of the Private Securities Litigation Reform Act

15  ("PSLRA"), 15 U.S.C. § 78u-5(c)(1)(A)(i).  The Court disagrees.

16          "The PSLRA's safe harbor is designed to protect companies and their officials from suit

17  when optimistic projections of growth in revenues and earnings are not borne out by events.  But

18  the safe harbor is not designed to protect companies and their officials when they knowingly make

19  a materially false or misleading statement about current or past facts.  Nor is the safe harbor

20  designed to protect them when they make a materially false or misleading statement about current

21  or past facts, and combine that statement with a forward-looking statement.*"  In re Quality Sys.,

22  Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).

23          Here, the aspect of the statement that Defendants challenge is the statement that "our MAU

24  trend has already turned around," which is not forward-looking.  Defendants have not cited any

25  authority showing that language similar to "has already turned around" has been interpreted as

26

27  [10] Plaintiffs have nevertheless pointed to evidence showing that the churn rate increased during the
relevant time period.  *See, e.g.*, ECF No. 367-17 at 27 (showing that churn rate increased from

28  .77% to .80% from January to July 2015).

1    forward-looking by any court.  Further, the fact that "has already turned around" was followed by

2    a forecast of future growth does not convert the challenged statement into a forward-looking

3    statement.  *See id.* at 1141 ("We hold that a defendant may not transform non-forward-looking

4    statements into forward-looking statements that are protected by the safe harbor provisions of the

5    PSLRA by combining non-forward-looking statements about past or current facts with forward-

6    looking statements about projected revenues and earnings.").

7        In sum, a genuine dispute exists with respect to whether three statements made by

8    Defendants during the February 5, 2015, earnings call were misleading.

9                    **b.      April 28, 2015, challenged statement**

10       During an earnings call for Q1 2015 held on April 28, 2015, Noto stated in response to a

11   question about engagement:

12           In terms of engagement metrics, there's a lot of different metrics
             that we look at internally.  There's not one metric for engagement.
13           And so I can give you a sense of some of them and quite frankly, we
             would like to be able to give you more visibility on this, but there's
14           just a number of different measurements.  DAU is one measurement
             of engagement.  We talked about that at Analyst Day.  It's a
15           measurement that is dependent by market and you could have a mix
             shift so that could be a little bit misleading, but *DAU to MAU ratios*
16           *in the quarter were similar to what they were by market relative to*
             *Analyst Day.*
17

18   ECF No. 371-28 at 20 (emphasis added).

19       Plaintiffs argue that the statement "DAU to MAU ratios in the quarter were similar to what

20   they were by market relative to Analyst Day" is misleading because, according to the earnings

21   binder for Q1 2015, the DAU/MAU for the top 20 markets had fallen to 44.3%, from 48% at

22   Analyst Day, and "continue[d] to go down at a linear pace."  ECF No. 362-38 at 139.  Plaintiffs

23   also note that, from Q3 2014 through Q1 2015, DAU/MAU had fallen in 15 of Twitter's top 20

24   markets, including all of its top 5 markets.  *Id.* at 69-79.

25       Defendants do not dispute that the DAU/MAU ratios just described declined since Analyst

26   Day.  Defendants argue, however, that Noto's use of the word "similar" in the challenged

27   statement was not misleading as a matter of law because any declines in DAU/MAU since Analyst

28

United States District Court
Northern District of California

Day were not significant.[11]  *See* ECF No. 314-4 at 25-26.

The Court concludes that a genuine dispute exists with respect to whether the challenged statement was misleading.  Plaintiffs argue, and Defendants do not dispute, that the only DAU/MAU ratio reported at Analyst Day was the one for the top 20 markets, collectively, which was 48% at that time.  As a result, a reasonable jury could conclude that Noto's April 28 comparison of DAU/MAU relative to Analyst Day necessarily referred to the DAU/MAU of the top 20 markets.  A reasonable jury could further conclude that, in the eyes of a reasonable investor, the DAU/MAU as of April 28 was not "similar" to the 48% DAU/MAU reported at Analyst Day, and that the disclosure of the omitted DAU/MAU for the top 20 markets of 44.3% would have altered the total mix of information available.  This is so because, per Defendants' own statements at Analyst Day, an increase in the DAU/MAU ratio from 48% to 51% (an increase of 3%) could generate an additional $500 million in annual revenue.  ECF No. 371-2 at 94.  In light of that disclosed relationship between DAU/MAU and revenue, a jury could conclude that a reasonable investor would consider a decline of 3.7% in the DAU/MAU ratio to be significant.

## 2.  Scienter

"To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter[.]"  *Matrixx Initiatives*, 563 U.S. at 48 (citation and internal quotation marks omitted).  Scienter is "a mental state that not only covers "intent to deceive, manipulate, or defraud," but also "deliberate recklessness[.]"  *Schueneman*, 840 F.3d at 705 (internal citations omitted).  "[D]eliberate recklessness is an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Id.* (citation and internal quotation marks omitted).  "Scienter can be established by direct or circumstantial evidence."  *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (citation omitted).

---

[11] The authorities upon which Defendants rely for the proposition that the DAU/MAU declines were not significant enough to be actionable are inapposite.  In none of the cited cases did the plaintiff challenge, like Plaintiffs do here, a statement by the defendant indicating that the current level of a particular metric was similar to a level previously disclosed by the defendant.

United States District Court
Northern District of California

1      "Generally, scienter should not be resolved by summary judgment."  *Id.* at 1489-90.

2              Cases where intent is a primary issue generally are inappropriate for
       summary judgment unless all reasonable inferences that could be
3              drawn from the evidence defeat the plaintiff's claim. . . . However,
       in opposing a motion for summary judgment the plaintiff must
4              present significant probative evidence relevant to the issue of intent,
       e.g. the time, place or nature of the alleged fraudulent activities;
5              mere conclusory allegations are insufficient to require the motion for
       summary judgment be denied.

6

7      *Id.* (citation and internal quotation marks omitted).  "Thus, summary judgment on the scienter

8      issue is appropriate *only* where there is no rational basis in the record for concluding that any of

9      the challenged statements was made with requisite scienter."  *Id.* at 1490 (citation and internal

10     quotation marks omitted) (emphasis in the original).

11             Plaintiffs contend that a genuine dispute exists with respect to whether Defendants acted

12     with scienter when making each of the challenged statements.  Plaintiffs point to evidence

13     showing that Defendants were aware of the declining DAU/MAU trends discussed above and that

14     such trends would have been material to investors.

15             The Court concludes that a genuine dispute exists as to whether Defendants acted with

16     scienter in making the challenged statements.[12]  As discussed above, Defendants failed to disclose

17     declining trends in DAU/MAU when making the challenged statements.  Plaintiffs have pointed to

18     sufficient evidence based on which a reasonable jury could conclude that Defendants were aware

19     of such declining DAU/MAU trends.  *See, e.g*., ECF Nos. 362-15 and 362-38 (earnings binders for

20     Q4 2014 and Q1 2015, which were disseminated to Noto and top executives before earnings calls

21     and contained detailed information about DAU/MAU); ECF No. 362-23 (email stating that

22     metrics dashboard for Noto would include DAU/MAU); ECF No. 363-19 (email stating that CFO

23     dashboard would be updated daily); ECF No. 362-24 (email to Noto and others attaching detailed

24     user metrics slides); ECF No. 363-20 (email stating that weekly meetings to discuss user retention

25

26     [12] Because a genuine dispute exists as to whether Costolo and Noto acted with scienter, the same
       is true as to Twitter.  *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir.
27     2015) ("The scienter of the senior controlling officers of a corporation may be attributed to the
       corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those
28     senior officials were acting within the scope of their apparent authority.").

United States District Court
Northern District of California

and related metrics, which included DAU/MAU, would be held); ECF No. 363-21 (email to Noto and others containing "Monthly Metrics Review" for Q1 2015, including DAU/MAU trends); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement.").

Additionally, Plaintiffs have pointed to evidence from which a reasonable jury could conclude that Defendants should have known that the omitted DAU/MAU information would have been material to investors. Per Defendants' own statements at Analyst Day, the market was aware that an increase in the DAU/MAU ratio from 48% to 51% (an increase of 3%) could generate an additional $500 million in annual revenue. ECF No. 371-2 at 94. In light of that disclosure, and Defendants' awareness of the DAU/MAU declining trends, a reasonable jury could conclude that Defendants should have known that the market would attach significance to the omitted DAU/MAU information, and that the danger of misleading investors by omitting such information from the challenged statements was "obvious." *See S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010) ("When the defendant is aware of the facts that made the statement misleading, he cannot ignore the facts and plead ignorance of the risk.") (citation and internal quotation marks omitted).

Defendants argue that Plaintiffs have not pointed to evidence showing that they intended to mislead investors. This argument is unavailing, because deliberative recklessness is sufficient to find scienter. Based on the evidence discussed above, a reasonable jury could conclude that Defendants were, at the very least, deliberatively reckless in failing to disclose the declining DAU/MAU trends, and thus acted with the requisite scienter.

Defendants next argue that their failure to disclose DAU/MAU information was justified because Twitter was not ready to disclose it. As support, Defendants point to evidence of internal debate at Twitter about which user metrics to disclose after Twitter stopped disclosing Timeline Views, as well as "quality control" issues with respect to DAU. *See* ECF No. 314-4 at 27-28; ECF No. 396-4 at 15. This argument is unpersuasive because it ignores that Defendants *did* disclose

specific DAU/MAU data at Analyst Day, as discussed above.  *See, e.g.*, ECF No. 371-2 at 91 (Noto states at Analyst Day that the "year-to-date DAU to MAU ratio for our top 20 markets" is 48%).  In light of the Analyst Day disclosure, a reasonable jury could find that Defendants' omission of DAU/MAU information on February 5 and April 28 was not justified on the basis that Twitter was not ready to disclose that kind of data.

Defendants also attempt to justify their failure to disclose DAU/MAU data on the ground that disclosing it would have been inconsistent with Twitter's "total audience" strategy, which aimed to increase Twitter's "reach," as opposed to user engagement (or "frequency").[13]  *See* ECF No. 314-4 at 26-27.  Plaintiffs have pointed to evidence that contradicts this argument.  At Analyst Day, Defendants repeatedly mentioned their goal of building the largest "daily audience" and the need to grow their base of "healthy" users who were more engaged and used Twitter more frequently.  ECF No. 371-2 at 5, 20.  Further, Noto described DAU/MAU as a "major growth driver" of revenue, ECF No. 371-2 at 91, and as a "frequency" metric and the "best way to quantify the impact of engagement," *id.* at 94.  Noto also disclosed DAU/MAU at Analyst Day (48%).  *Id.*  Based on this evidence, a reasonable jury could conclude that the disclosure of DAU/MAU, a "frequency" metric, would not have been inconsistent with Twitter's corporate strategies.

Defendants also argue that they did not believe the challenge statements to be misleading.  But that self-serving assertion is unavailing.  As the Ninth Circuit has noted, "[i]f such a self-serving assertion could be viewed as controlling, there would never be a successful prosecution or claim for fraud."  *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1095 (9th Cir. 2010).  As discussed above, there is sufficient evidence for a jury to conclude that Defendants acted with scienter.

---

[13] In that vein, Defendants also argue that Twitter's goal was for "DAU/MAU to decline" and not increase.  ECF No. 396-4 at 16.  The relevance of this argument is unclear.  In any event, the record contradicts Defendants' assertion; it shows that Twitter experienced a declining trend in DAU/MAU and its goal was to flatten (i.e., slow or stop) the DAU/MAU decline and to increase both DAU and MAU.  *See, e.g.*, ECF No. 356-12 at 3, 6 (presentation titled "Audience Goals 2015" stating that goals were to increase DAU and MAU year-over-year and to "target[] flat DAU/MAU," which was the best-case scenario for DAU/MAU in light of its declining trends).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Defendants next argue that their actions are inconsistent with scienter because they

2   disclosed "bad news" with respect to other metrics, such as decreases in ad engagements, and

3   because Twitter has acted in an "honest and candid manner" with respect to its required S-1

4   disclosures and in communications with the SEC.[14]  ECF No. No. 314-4 at 28.  These arguments

5   ignore the evidence discussed above, which supports a finding of scienter.  It is for the jury to

6   weigh that evidence against the evidence to which Defendants now point, which is, at best,

7   tangential to the challenged statements and issues in this litigation

8   Finally, Defendants argue that Costolo and Noto's lack of sales of Twitter stock during the

9   Class Period is inconsistent with scienter.  But the absence of stock sales by Costolo and Noto is

10   insufficient to show a lack of scienter as a matter of law.  *See No. 84 Employer-Teamster Joint*

11   *Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter

12   can be established even if the officers who made the misleading statements did not sell stock

13   during the class period. . . . In other words, the lack of stock sales by a defendant is not dispositive

14   as to scienter.").

15   **3.     Loss causation**

16   The Securities Exchange Act of 1934 defines "loss causation" "as the plaintiff's 'burden of

17   proving that the act or omission of the defendant alleged to violate this chapter caused the loss for

18   which the plaintiff seeks to recover damages.'"  *Mineworkers' Pension Scheme v. First Solar Inc.*,

19   881 F.3d 750, 753 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2741, 204 L. Ed. 2d 1131 (2019)

20   (quoting 15 U.S.C. § 78u-4(b)(4)).  "This inquiry requires no more than the familiar test for

21   proximate cause.  To prove loss causation, plaintiffs need only show a causal connection between

22   the fraud and the loss, by tracing the loss back to the very facts about which the defendant lied[.]

23   Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where

24   the alleged fraud is not necessarily revealed prior to the economic loss."  *Id.* (internal citations and

25

26   [14] The fact that the SEC failed to take any adverse action with respect to Twitter's written
disclosures has no bearing on the question of whether the challenged statements here were
27   misleading.  *See* 15 U.S.C. § 78z (providing that action or inaction by the SEC shall not be
"deemed a finding by such authority that [a] statement or report is true and accurate on its face or
28   that it is not false or misleading").

quotation marks omitted).  "[L]oss causation is a 'context-dependent' inquiry as there are an 'infinite variety' of ways for a tort to cause a loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).  "Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.*

"A plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in value in order to establish loss causation." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (citation and internal quotation marks omitted).  "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement but will play a role in determining recoverable damages." *Id.* (citation and internal quotation marks omitted).

Here, the parties do not dispute that two sets of declines of Twitter's stock price occurred; the first on April 28 and April 29, 2015, and the second from July 29 through August 3, 2015.

The parties disagree that a genuine dispute exists as to whether the declines have a causal link to the challenged statements.  The Court addresses each set of declines, in turn.

### a.        April 28 and April 29 declines

On April 28, 2015, Twitter made disclosures with respect to its performance in Q1 2015. It disclosed that its MAU was 302 million, up from 288 million in the previous quarter.  ECF No. 371-27 at 3.  Twitter also revealed that it would be reducing its revenue guidance for the rest of FY2015.  *Id.* at 4.  During an earnings call on April 28, Defendants stated that, although Twitter had met its MAU projections for 1Q 2015, there were some "headwinds" and Twitter's "visibility is actually limited as it relates to Q2 MAU," MAU is off to a "slow start" and "the trend [in MAU growth] is not similar to Q1."  ECF No. 371-28 at 12.

Plaintiffs contend that a genuine dispute exists with respect to whether the declines of Twitter's stock price on April 28, 2015, and April 29, 2015, were caused by partial revelations on April 28 of the problems with user growth that the challenged statements had concealed.  Plaintiffs argue that the challenged statements, which are discussed in more detail above, concealed problems with user engagement and user growth, and that the April 28 disclosures regarding

25

United States District Court
Northern District of California

revised FY 2015 revenue guidance and poor MAU visibility constituted a partial disclosure of such problems, which, in turn, caused the price of Twitter stock to decline.  The April 28 disclosures partially revealed problems with respect to user growth by announcing that there were some "headwinds" with respect to MAU.  That said, Defendants' statement on April 28 that DAU/MAU was "similar" to what it was on Analyst Day served to keep concealed problems with user engagement, as well as the potential impact that such problems could have on user growth and revenue.

Plaintiffs contend that the analysis conducted by their expert, Dr. Steven Feinstein, shows that $8.97 of the decline on April 28 and all $3.96 of the decline on April 29 were caused by the April 28 disclosures regarding reduced MAU visibility and reduced revenue guidance, because such disclosures dissipated some of the price inflation that had been created by the challenged statements.  *See, e.g.*, ECF No. 352-10 ¶¶ 8-12, 120-137, 140-141.  Plaintiffs also point to analyst reports published after the April 28 disclosures, in which analysts stated that they had reduced their revenue estimates for Twitter because of concerns about weaker engagement, lack disclosure of engagement metrics, and audience growth issues.  *See, e.g.*, ECF No. 372-9 at 2 (Morgan Stanley report dated April 29, 2015, stating that "[w]e are cutting our revenue estimates by 6% for the full year [2015] on lower user and weaker engagement assumptions"); ECF No. 372-10 (Rosenblatt report dated April 29, 2015, stating that "[u]ser growth lackluster at best in the near term" and "[l]ack of 'usage' metrics (TLVs discontinued) suggests audience growth issues" as "key reasons for our rating downgrade on the stock").  Plaintiffs further point to internal Twitter documents showing that Twitter's revenue estimates for FY2015 were based in part on metrics such as DAU/MAU.  *See, e.g.*, ECF No. 363-26 at 2 (email written by Jeff Dejelo stating FY2015 revenue guidance and noting that the "bottom-end of the range" is based on the "metrics driven model" and further noting that one reason for that estimate is that "DAU growth is relatively flat consistent with historicals"); ECF No. 363-27 at 26-27 (identifying MAU and DAU/MAU as inputs to the "Revenue Metrics Model" and "DAU/MAU declining" as one of the "Key Risks" with respect to FY2015 revenue); ECF No. 371-25 at 9 (Jeff Dejelo deposition testimony

1    confirming that DAU/MAU was a factor in calculating revenue for FY2015 based on revenue

2    metrics model).[15]

3            The Court concludes that there is a genuine dispute with respect to whether a causal

4    connection exists between the Twitter stock-price declines of April 28 and 29 and the challenged

5    statements of February 5 and April 28, which are discussed at length in the previous section.

6    Based on Dr. Feinstein's analysis and opinions, and the other evidence cited above, a reasonable

7    jury could conclude (1) that the April 28 disclosures about MAU growth and revenue guidance

8    constituted partially corrective disclosures that revealed, to some extent, problems with user

9    growth that the challenged statements of February 5 and April 28 had concealed, and (2) that

10   market participants reacted accordingly based on market perception of a connection between user

11   growth, user engagement, and revenue.  Based on this evidence, a reasonable jury could conclude

12   that the stock declines of April 28 and 29 were proximately caused by the challenged statements of

13   February 5 and April 28.

14           Defendants have not shown that the issue of loss causation can be resolved as a matter of

15   law with respect to the stock declines of April 28 and April 29.  Defendants argue that Dr.

16   Feinstein's opinions are unreliable and therefore are insufficient to preclude the entry of summary

17   judgment because Dr. Feinstein failed to explain his methodology, failed to consider confounding

18   variables, and assumed causal connections.[16]  The Court concluded in a separate order, however,

19   that Dr. Feinstein's opinions are not subject to exclusion based on these arguments.  *See* ECF No.

20   421.  Further, Dr. Feinstein did consider confounding factors and excluded the impact of factors

21   unrelated to the challenged statements from his stock-price decline estimates.[17]  *See, e.g.*, ECF

22   _____

23   [15] Defendants point to other portions of Dejelo's deposition testimony where Dejelo testified that
     he did not recall using DAU/MAU to estimate revenue. ECF No. 396-4 at 22.  Defendants do not

24   dispute, however, that the portions of Dejelo's deposition testimony cited by Plaintiffs show that
     Dejelo admitted that DAU/MAU was a factor in calculating revenue based on the metrics model.

25   [16] Defendants make the same arguments with respect to Dr. Feinstein's opinion that the Twitter

26   stock-price declines from July 29 to August 3 were caused by the challenged statements.  The
     Court rejects those arguments for the same reasons stated in this paragraph.

27   [17] Defendants argue that Dr. Feinstein was incorrect in attributing $2.54 of the decline on April 28
     to Defendants' alleged fraud.  ECF No. 314-4 at 34.  The question of how much of the decline can

28   be attributed to the challenged statements, as opposed to other factors, is a factual question for the
     jury.  *See In re Daou Sys., Inc.*, 411 F.3d at 1025 ("[A]s long as the misrepresentation is one

No. 352-10 ¶¶ 120-137.  It is for the jury to weigh Dr. Feinstein's opinions.

Defendants next argue that the revised revenue guidance[18] was caused by matters unrelated to problems with user growth and user engagement, such as issues relating to advertising revenue, and for that reason, Plaintiffs cannot establish a causal connection between the challenged statements and the stock-price declines of April 28 and 29.  ECF No. 314-4 at 32-33.  To survive summary judgement, however, Plaintiffs need only point to evidence supporting a reasonable finding that the challenged statements were *one* substantial cause for the stock-price declines.  *In re Daou Sys., Inc.*, 411 F.3d at 1025 ( "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement but will play a role in determining recoverable damages.") (citation and internal quotation marks omitted).  Plaintiffs have done that by pointing to the evidence discussed above.

### b.    July 29 through August 3 declines

On July 28, 2015, Twitter issued results for Q2 2015 and held an earnings call.  ECF No. 272-15.  During that call, Noto revealed that Twitter's DAU/MAU ratio for the top 20 markets had fallen to 44% from the 48% reported at Analyst Day, and that Twitter did "not expect to see sustained meaningful growth in MAUs" for "a considerable period of time."  ECF No. 371-32 at 7.

The Court concludes that Plaintiffs have shown that a genuine dispute exists as to whether the declines of Twitter's stock price from July 29 to August 3, 2015, were caused by the challenged statements.  Plaintiff point to the testimony of Dr. Feinstein, who concluded that Twitter's stock suffered a company-specific decline of $5.40 per share on July 29 and a decline of $7.41 from July 29 to August 3, 2015.  *See, e.g.*, ECF No. 352-10 ¶¶ 8-12, 142-151.  Dr. Feinstein

---

substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement but will play a role in determining recoverable damages.").

[18] Defendants argue, in passing, that Plaintiffs' theory of loss causation with respect to the April 28 disclosures was not alleged in the operative complaint.  The Court disagrees.  The operative complaint expressly refers to the revised revenue guidance for FY 2015 as one of the disclosures that caused the price of Twitter stock to decline.  *See, e.g.*, ECF No. 81 ¶¶ 135-36.

1    further concluded that a causal connection exists between these declines and the challenged

2    statements, because the July 28 disclosures revealed problems with user engagement and user

3    growth that the challenged statements had concealed.  *Id.*  Plaintiffs also point to analyst reports

4    stating that the problems with user engagement and user growth revealed on July 28 affected their

5    evaluation of Twitter as an investment.  *See, e.g.*, ECF No. 371-33 at 2, 4 (RBC Capital Markets

6    Report of July 29, 2015, stating that "[u]ser growth is vanishing and engagement is declining" and

7    that "the takeaway here appears to be that both [u]ser growth AND [e]ngagement have hit walls");

8    ECF No. 372-16 at 2 (SunTrust report of July 29, 2015, stating that "Users, Daily Engagement,

9    and Ad Demand Disappoint"); *see also* ECF No. 437-1 at 102-05.

10           Defendants argue that Plaintiffs cannot establish loss causation because the corrective

11   disclosures on July 28 were the materialization of a previously-disclosed risk, namely the

12   disclosure on April 28 that Twitter was experiencing MAU "headwinds," that the company was

13   "off to a slow start in April," and that visibility as to MAU is "limited."  ECF No. 314-4 at 33-34.

14   This argument is unpersuasive because it does not take into account that the July 28 disclosures

15   revealed, for the first time, a decline in DAU/MAU; DAU/MAU declines were not disclosed on

16   April 28.  As discussed above, Plaintiffs have pointed to sufficient evidence for a reasonable jury

17   to conclude that the declining trend in DAU/MAU, as well as the impact that that declining trend

18   could have on user growth and revenue, were concealed by the challenged statements of February

19   5 and April 28.  Accordingly, a genuine dispute exists as to whether the declines following the

20   July 28 disclosures were caused by the disclosure of the DAU/MAU declining trends and the

21   potential impact of such trends on user growth and revenue that the challenged statements had

22   concealed.[19]  *See Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 500 (S.D.N.Y. 2018)

23

24   ───────────────────
     [19] This distinguishes the facts here from those in the cases upon which Defendants rely for the
     proposition that they are entitled to summary judgment on the issue of loss causation.  *See, e.g.*,

25   *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, Cal., 730 F.3d 1111, 1121 (9th
     Cir. 2013) (affirming summary judgment in favor of defendant on § 10(b) claim because plaintiff

26   failed to establish any link between loss and the alleged fraud); *Nguyen*, 297 F. Supp. at 491
     (dismissing securities fraud claim because plaintiff failed to allege sufficient facts to suggest that

27   defendants had concealed a risk of loss); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir.
     1996) (dismissing securities fraud claim because plaintiffs' own allegations conceded that losses

28   could have been caused by factors other than the alleged fraud).

("[W]here the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, a plaintiff may plead that it is the materialization of the undisclosed condition or event that causes the loss.").

Defendants next argue that Plaintiffs cannot claim any damages for stock-price declines after July 29 because Twitter did not make any new disclosures after July 28.  ECF No. 314-4 at 34.  However, the question of which losses can be attributed to the July 28 disclosures is a "fact-specific inquiry" for the jury.  *See No. 84 Employer-Teamster*, 320 F.3d at 934 (holding that there is no "bright-line rule assuming that the stock price will instantly react" to corrective disclosures and noting that such a determination is "fact-specific").

### B.  Section 20(a) claim

"Section 20(a) of the Securities Exchange Act of 1934 provides for liability of a 'controlling person.'"  *In re NVIDIA Corp. Sec. Litig*., 768 F.3d 1046, 1052 (9th Cir. 2014) (quoting 15 U.S.C. § 78t(a)).  "To establish a cause of action under this provision, a plaintiff must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b–5, and then show that the defendant exercised actual power over the primary violator."  *Id.* (citation omitted).

Defendants argue that Plaintiffs' claim under § 20(a) fails because it is "entirely derivative of their 10(b) and 10b5 claims."  ECF No. 314-4 at 29 n.23.

Because the Court has concluded that Defendants have not shown that they are entitled to summary judgment with respect to the § 10(b) claim, Defendants' summary judgment motion with respect to the § 20(a) claim likewise fails.

## VII.   CONCLUSION

For the reasons stated above, the Court denies Defendants' motion for summary judgment. Within seven days of the date this order is filed, any party may move to seal any portion of this order by filing an administrative motion to seal that complies with applicable local rules and this Court's standing orders.  The moving party must identify with specificity (by page number and line number) the portions of the order it seeks to seal, and it must demonstrate compelling reasons for sealing each portion.  *See Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir.

2006) (holding that "compelling reasons" standard applies to judicial records related to a dispositive motion even if the motion or its attachments were previously filed under seal).

      **IT IS SO ORDERED.**

Dated:  April 17, 2020



                           JON S. TIGAR
                       United States District Judge

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28