COOLEY LLP
STEPHEN C. NEAL (170085)
(nealsc@cooley.com)
JOHN C. DWYER (136533)
(dwyerjc@cooley.com)
JESSICA VALENZUELA SANTAMARIA (220934)
(jvs@cooley.com)
BRETT DE JARNETTE (292919)
(bdejarnette@cooley.com)
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone:    (650) 843-5000
Facsimile:    (650) 849-7400

KATHLEEN GOODHART (165659)
(kgoodhart@cooley.com)
AARTI REDDY (274889)
(areddy@cooley.com)
LAURA ELLIOTT (286702)
(lelliott@cooley.com)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone:    (415) 693-2000
Facsimile:    (415) 693-2222

Attorneys for Defendants TWITTER, INC.,
RICHARD COSTOLO, and ANTHONY NOTO

SIMPSON THACHER & BARTLETT LLP
JAMES G. KREISSMAN (206740)
(jkreissman@stblaw.com)
2475 Hanover Street
Palo Alto, CA 94304
Telephone:    (650) 251-5000
Facsimile:    (650) 251-5002

JONATHAN K. YOUNGWOOD
(admitted *pro hac vice*)
(jyoungwood@stblaw.com)
JANET A. GOCHMAN
(admitted *pro hac vice*)
(jgochman@stblaw.com)
JOHN ROBINSON
(admitted *pro hac vice*)
(jrobinson@stblaw.com)
425 Lexington Avenue
New York, NY 10017
Telephone:    (212) 455-2000
Facsimile:    (212) 455-2502

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| In re TWITTER, INC. SECURITIES LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No.  4:16-cv-05314-JST (SK)<br><br>(Consolidated with 4:16-cv-05439-JST)<br><br>**CLASS ACTION**<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTIONS *IN LIMINE***<br><br>DATE:              June 2-3, 2020<br>TIME:              9:00 a.m.<br>COURTROOM:  6, 2nd Floor<br>JUDGE:           Hon. Jon S. Tigar<br>TRIAL DATE:   June 22, 2020 |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ......................................................................................... 1

I.      INTRODUCTION.............................................................................................................. 1

II.     MOTION *IN LIMINE* NO. 1 – TO EXCLUDE NICK BILTON'S *VANITY FAIR* ARTICLE AND HIS TESTIMONY AS A WITNESS ............................................. 2

        A.      The Inflammatory *Vanity Fair* Article............................................................ 3

        B.      Mr. Bilton's Testimony..................................................................................... 8

III.    MOTION *IN LIMINE* NO. 2 – TO EXCLUDE EVIDENCE AND ARGUMENT REGARDING TWITTER'S POST-CLASS PERIOD DISCLOSURE OF, OR STATEMENTS CONCERNING DAU, mDAU AND OTHER DAU-RELATED USER METRICS ............................................................................................................... 10

IV.     MOTION *IN LIMINE*  NO. 3 – TO EXCLUDE EVIDENCE AND ARGUMENT CONCERNING POST CLASS PERIOD THIRD PARTY METRICS ........................... 17

V.      MOTION *IN LIMINE*  NO. 4 – TO EXCLUDE EVIDENCE OR ARGUMENT CONCERNING THE COMPANY'S CURRENT FINANCIAL CONDITION, CASH ON HAND, LIABILITY INSURANCE, OR ABILITY TO PAY LARGE JUDGMENTS ................................................................................................................. 21

VI.     MOTION *IN LIMINE* NO. 5 – TO EXCLUDE EVIDENCE OR ARGUMENT CONCERNING THE INDIVIDUAL DEFENDANTS' FINANCIAL CONDITION, NET WORTH, INCLUDING OWNERSHIP OF TWITTER STOCK, COMPENSATION, ABILITY TO PAY, LIABILITY INSURANCE OR INDEMNIFICATION ................................................................................................. 24

VII.    MOTION *IN LIMINE* NO. 6 – TO PRECLUDE PLAINTIFFS FROM PRESENTING EVIDENCE AND ARGUMENT CONCERNING THEORIES OF LIABILITY THAT THE COURT REJECTED IN ITS RULING ON DEFENDANTS' MOTION TO DISMISS........................................................................ 25

VIII.   MOTION *IN LIMINE* NO. 7 – TO PRECLUDE THE IMPUTATION OF THE STATE OF MIND OF ANY NON-DEFENDANT WITNESSES TO THE COMPANY................................................................................................................... 29

IX.     MOTION *IN LIMINE* NO. 8 – TO EXCLUDE EVIDENCE AND ARGUMENT CONCERNING PRE-CLASS PERIOD STOCK SALES BY THE INDIVIDUAL DEFENDANTS AND STOCK SALES BY AND COMPENSATION OF NON-DEFENDANT TWITTER EXECUTIVES AT ANY TIME....................................... 32

        A.      Individual Defendants ..................................................................................... 33

        B.      Non-Defendant Twitter Executives .................................................................. 34

X.      MOTION *IN LIMINE* NO. 9 – TO PRECLUDE PLAINTIFFS' PROFFERED EXPERT JAN DAWSON FROM TESTIFYING AS A FACT WITNESS.................... 36

XI.     MOTION *IN LIMINE* NO. 10 – TO PRECLUDE PLAINTIFFS FROM CALLING KRISTA BESSINGER TO TESTIFY LIVE REGARDING RULE

**30(B)(6) TOPICS**............................................................................................................... **38**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams Labs., Inc. v. Jacobs En'g Co.*,
761 F.2d 1218 (7th Cir. 1985) ................................................................. 25

*Armbrester v. City of Berkeley*,
No. 16-CV-04615-JCS, 2018 WL 2865324 (N.D. Cal. June 11, 2018) ....................... 24

*Asetek Danmark A/S v. CMI USA, Inc.*,
No. 13-cv-00457-JST, 2014 WL 12644295 (N.D. Cal. Nov. 19, 2014)....................... 16

*Baker v. SeaWorld Entertainment, Inc.*,
No. 14-cv-2129-MMA (AGS), 2020 WL 241441 (S.D. Cal. Jan. 16,
2020) ........................................................................................ 29

*Braun Builders, Inc. v. Kancherlapalli*,
No. 09-11534-BC, 2010 WL 1981008 (E.D. Mich. May 18, 2010)........................... 16

*Brazos River Auth. v. GE Ionics, Inc.*,
469 F.3d 416 (5th Cir.2006) ................................................................. 39

*Brown v. InnerWorkings, Inc.*,
No. SACV 18-00832-CJC(KESx), 2019 WL 4187385 (C.D. Cal. Mar.
27, 2019) .................................................................................... 14

*Brown v. Kavanaugh*,
No. 1:08–cv–01764–LJO–BAM PC, 2013 WL 1819796 (E.D. Cal.
Apr. 30, 2013)............................................................................... 27

*Browning v. Amyris, Inc.*,
13–cv–02209–WHO, 2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ......................... 35

*Burke v. City of Santa Monica*,
No. CV 09–02259 MMM (PLAx), 2011 WL 13213593 (C.D. Cal. Jan.
10, 2011) .................................................................................... 37

*Campbell Indus. V. M/V Gemini*,
619 F.2d 24 (9th Cir. 1980) .................................................................. 1

*Carden v. Westinghouse Elec. Corp.*,
850 F.2d 996 (3d Cir.1988)................................................................... 9

*Cedeck v. Hamiltonian Fed. Sav. And Loan Ass'n*,
551 F.2d 1136 (8th Cir. 1977) ............................................................ 5, 9

*Clark v. Thomas*,
No. 2:09–cv–02272–JAD–GWF, 2014 WL 2573738 (D. Nev. June 6,
2014) ........................................................................................ 2

*Cooper v. Montgomery County, Ohio*,
No. 3:13-cv-272, 2018 WL 272523 (S.D. Ohio Jan. 2, 2018)................................ 28

*Darbeevision, Inc. v. C&A Mktg.*,
No. 18-cv-0725 AG (SSx), 2019 WL 2902697 (C.D. Cal. Jan. 28,
2019) ................................................................................................................. 40

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ........................................................................................... 38

*Dietz v. Bouldi*,
136 S. Ct. 1885 (2016) ......................................................................................... 1

*Eisenstadt v. Allen*,
113 F.3d 1240, 1997 WL 211313 (9th Cir. 1997) .............................................. 5

*Escobar v. Airbus Helicopter SAS*,
No. 13-cv-00598 HG-RLP, 2016 WL 5897554 (D. Haw. Oct. 7, 2016) ........... 23

*Fallon v. Potter*,
No. 04–526–JJB, 2008 WL 5395984 (M.D. La. Dec. 23, 2008) ........................ 28

*Five Star Gourmet Foods, Inc. v. Fresh Express, Inc.*,
No. 19-CV-05611-PJH, 2020 WL 513287 (N.D. Cal. Jan. 31, 2020) ................. 30

*Fogleman v. County of Los Angeles*,
No. CV 10–6793 GAF (SHx), 2012 WL 13005832 (C.D. Cal. July 25,
2012) ................................................................................................................. 22

*Geddes v. United Fin. Grp.*,
559 F.2d 557 (9th Cir. 1977) .............................................................................. 22

*Glazer Capital Management, LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ................................................................... 30, 31, 32

*Green v. Baca*,
226 F.R.D. 624 (C.D. Cal. 2005) ...................................................................... 4, 5

*Hart v. RCI Hosp. Holdings, Inc.*,
90 F. Supp. 3d 250 (S.D.N.Y. 2015) .................................................................. 15

*Herskowitz v. Nutri/Sys., Inc.*,
857 F.2d 179 (3d Cir. 1988) ............................................................................... 14

*Herwick v. Budget Rent A Car System Inc.*,
No. CV 10–00409 SJO (PLAx), 2011 WL 13213626 (C.D. Cal. Mar.
22, 2011) ................................................................................................. 21, 22, 23

*Higgins v. Hicks Co.*
756 F2d 681 (8th Cir. 1985) ............................................................................... 22

*Hsu v. Puma Biotech., Inc.*,
No. 15-cv-00865 (SHKx), Dkt. 614 at 5 ............................................................ 12

*Humboldt Baykeeper v. Union Pac. R. Co.*,
No. C 06-02560 JSW, 2010 WL 2179900 (N.D. Cal. May 27, 2010) .................. 9

*Hunt v. Cnty. of Orange*,

No. 07-cv-00705 MMM, 2009 WL 10702539 (C.D. Cal. Oct. 7, 2009)......................................... 23

*In re Apple Comp. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ........................................................................................... 33, 34

*In re ChinaCast Education Corp. Sec. Litig.*,
809 F.3d 471 (9th Cir. 2015) .............................................................................................. 30, 32

*In re Copper Mountain Sec. Litig.*,
311 F. Supp. 2d 857 (N.D. Cal. 2004) ..................................................................................... 13

*In re Cypress Semiconductor Sec. Litig.*,
891 F. Supp. 1369 (N.D. Cal. 1995) ..................................................................................... 4, 5

*In re Glob. Health Scis.*,
No. SA CV 04-1486 TJH, 2007 WL 4591679 (C.D. Cal. Aug. 21,
2007) ...................................................................................................................................... 22, 24

*In re Homestore.com Inc. Sec. Litig.*,
No. CV 01–11115 RSWL (CWx), 2011 WL 291176 (C.D. Cal. Jan.
25, 2011) ...................................................................................................................................... 21

*In re Infineon Techs. AG Sec. Litig.*,
No. C 04-04156 JW, 2008 WL 11333700 (N.D. Cal. Jan. 25, 2008).......................................... 30

*In re Maxwell Techs. Inc. Sec. Litig.*,
18 F. Supp. 3d 1023 (S.D. Cal. 2014) ....................................................................................... 34

*In re Remec Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010) ..................................................................................... 11

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ....................................................................................................... 33

*In re Vantive Corp. Sec. Litig.*,
110 F. Supp. 2d 1209 (N.D. Cal. 2000) ..................................................................................... 14

*In re Versant Object Technology Corp.*,
No. C 98-00299 CW, 2001 WL 34065027 (N.D. Cal. Dec. 4, 2001).......................................... 35

*Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.*,
No. 8:12-CV-691-T-24-MAP, 2014 WL 4983912 (M.D. Fla. Oct. 6,
2014) ...................................................................................................................................... 39

*Janus Capital Group, Inc. v. First Derivative Traders*,
564 U.S. 135 (2011).................................................................................................................... 29

*Kaseberg v. Conaco, LLC*,
No. 15-CV-1637 JLS (MSB), 2019 WL 1641161 (S.D. Cal. Apr. 16,
2019) .......................................................................................................................................... 1

*La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*,
622 F.3d 471 (6th Cir. 2010) ....................................................................................................... 13

*Larez v. City of Los Angeles*,

946 F.2d 630 (9th Cir. 1991) ........................................................................ 4, 5, 6, 7

*Larez v. Holcomb*,
16 F.3d 1513 (9th Cir. 1994) ................................................................................ 25

*Lister v. Hyatt Corp.*,
No. C18-0961JLR, 2020 WL 419454  (W.D. Wash. Jan. 24, 2020). ..................... 38

*Logan v. Trucks For You, Inc.*,
No. CV-01-07350 CAS(BQRX), 2002 WL 34453503 (C.D. Cal. May
21, 2002) ............................................................................................................... 22

*Luce v. United States*,
469 U.S. 38 (1984) .............................................................................................. 1, 2

*Makor Issues & Rights, Ltd. V. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ................................................................................ 31

*Matrixx Initiatives v. Siracusano*,
563 U.S. 27 (2011) ................................................................................................ 34

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) .............................................................................. 13

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) .............................................................................. 33

*Milham v. United Air Lines, Inc.*,
No. CV 00-5065-GAF (MANx), 2001 WL 36097433 (C.D. Cal. May
4, 2001) ................................................................................................................ 22

*Morgan v. AXT, Inc.*,
2005 WL 2347125 (N.D. Cal. Sept. 23, 2005) ..................................................... 14

*N. Nat. Gas Co. v. L.D. Drilling, Inc.*,
No. 08-1405-JTM, 2019 WL 5291179 (D. Kan. Oct. 18, 2019) .............................. 2

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W.
Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ................................................................................ 34

*Plevy v. Haggerty*,
38 F.Supp.2d 816 (C.D. Cal. 1998) ...................................................................... 35

*Puma Biotech., Inc.*,
No. 15-cv-00865 (SHKx), Dkt. 614 at 5................................................................ 14

*Sabre International Security v. Torres Advanced Enterprise Solutions,
LLC*,
72 F. Supp. 3d 131 (D.D.C. 2014) ................................................................... 39, 40

*Saenz v. Reeves*,
No. 1:09–cv–00057–BAM PC, 2013 WL 2481733 (E.D. Cal. June 10,
2013) ..................................................................................................................... 27

*Schleicher v. Wendt*,
  618 F.3d 679 (7th Cir. 2010) ................................................................ 11

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ................................................................ 18

*Shepard v. Quillen*,
  No. 1:09–cv–00809–BAM (PC), 2013 WL 978201 (E.D. Cal. Mar. 12,
  2013) ....................................................................................................... 27

*Smilovits v. First Solar, Inc.*,
  No. CV12-0555-PHX-DGC, 2019 WL 6698199 (D. Ariz. Dec. 9,
  2019) ................................................................................................. 24, 25

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ................................................................ 31

*Spin Master Ltd. V. Zobmondo Entertainm't, LLC*,
  No. 06-cv-3459 ABC (PLAx), 2012 WL 8134012 (C.D. Cal. Apr. 27,
  2012) ....................................................................................................... 36

*Stewart v. Wachowski*,
  574 F. Supp. 2d 1074 (C.D. Cal. 2005) ................................................... 3

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
  531 F.3d 190 (2d Cir. 2008) ............................................................ 31, 35

*U.S. Football League v. Nat'l Football League*,
  No. 84-cv-7484 (PKL), 1986 WL 5803 (S.D.N.Y. May 16, 1986) ...... 4, 5

*Unicolors, Inc. v. Urban Outfitters, Inc.*,
  No. CV 14-01029 SJO (VBKx), 2015 WL 12758841 (C.D. Cal. Feb.
  23, 2015) ................................................................................................. 23

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*,
  982 F.2d 363 (9th Cir. 1992) .................................................................. 1

*Union Pump Co. v. Centrifugal Tech. Inc.*,
  404 F. App'x 899 (5th Cir. 2010) .................................................... 38, 39

*United States v. Bonds*,
  608 F.3d 495 (9th Cir. 2010) .................................................................. 5

*United States v. Figueroa-Lopez*,
  25 F.3d 1241 (9th Cir. 1997) ................................................................ 37

*United States v. Freeman*,
  498 F.3d 893 (9th Cir. 2007) ............................................... 8, 9, 36, 37

*United States v. Hayat*,
  2:05-cr-0240 GEB DB, 2017 WL 6728639 (E.D. Cal. Feb 27, 2017) ........ 8

*United States v. Heller*,
  551 F.3d 1108 (9th Cir. 2009) ................................................................ 1

*United States v. Sine*,
493 F.3d 1021 (9th Cir. 2007) ............................................................................ 34

*United States v. Sleugh*,
No. 14-cr-00168-YGR-2, 2015 WL 3866270 (N.D.N.Y. June 22,
2015) ...................................................................................................................... 2

*United States v. Tokash*,
282 F.3d 962 (7th Cir. 2002) ................................................................................. 2

*Whittenberg v. Werner Enters. Inc.*,
561 F.3d 1122 (10th Cir. 2009) ........................................................................... 25

**Federal Rules**

Federal Rule of Civil Procedure 30(b)(6) ................................................................. 40

Federal Rule of Civil Procedure 32(a)(3) ................................................................. 38

Federal Rule of Evidence 401 ......................................................................... 22, 27

Federal Rule of Evidence 402 ................................................................................. 34

Federal Rule of Evidence 403 ......................................................................... passim

Federal Rule of Evidence 602 ................................................................................. 40

Federal Rule of Evidence 701 ............................................................................ 8, 37

Federal Rule of Evidence 702 ................................................................................. 37

Federal Rule of Evidence 801 .............................................................................. 4, 9

Federal Rule of Evidence 805 ................................................................................... 4

Federal Rule of Evidence 807 .............................................................................. 5, 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 2, 2020 at 9:00 a.m. in Courtroom 6, 2nd Floor of the above-entitled Court, Defendants Twitter, Inc. ("Twitter" or the "Company"), Richard Costolo and Anthony Noto ("Defendants") will and hereby do move *in limine* for an Order precluding Plaintiffs from introducing evidence, testimony, and argument regarding the matters set forth below.  These Motions *in Limine* are based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the materials cited therein, the pleadings and papers on file in this matter, oral argument, and other materials or arguments as may be presented.

**STATEMENT OF RELIEF SOUGHT**

Defendants seek an order precluding Plaintiffs from introducing evidence and/or argument as set forth below in each of the ten Motions *in Limine*.

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the Court should preclude the evidence and arguments that are the subjects of each Motion *in Limine* in order to streamline the trial and settle evidentiary disputes in advance pursuant to Federal Rules of Evidence 401, 402, 403, 602, 701, 801, 802, or as otherwise discussed below.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

This Court has inherent authority to manage its trials and to entertain and grant motions *in limine*.  *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *see also Dietz v. Bouldi*, 136 S. Ct. 1885, 1891 (2016); *Kaseberg v. Conaco, LLC*, No. 15-CV-1637 JLS (MSB), 2019 WL 1641161, at *2 (S.D. Cal. Apr. 16, 2019).  "A motion *in limine* is a procedural mechanism to limit in advance testimony or evidence in a particular area."  *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009).  The Court is "vested with broad discretion to make . . . evidentiary rulings conducive to the conduct of a fair and orderly trial."  *Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980) (citations omitted); *see also Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992).  Motions *in limine* "streamline trials and settle evidentiary disputes in advance, so that trials are not interrupted mid-course for the consideration of lengthy and complex evidentiary issues."

1   *United States v. Sleugh*, No. 14-cr-00168-YGR-2, 2015 WL 3866270, at *1 (N.D.N.Y. June 22, 2015)

2   (quoting *United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002)).

3        The Court may grant a motion *in limine* to "exclude anticipated prejudicial evidence before the

4   evidence is actually offered." *Luce*, 469 U.S. at 40 n.2. Such "[p]retrial consideration avoids the futile

5   attempt to 'unring the bell' when jurors see or hear inadmissible evidence, even when it is stricken

6   from the record." *Clark v. Thomas*, No. 2:09–cv–02272–JAD–GWF, 2014 WL 2573738, at *1 (D.

7   Nev. June 6, 2014); *N. Nat. Gas Co. v. L.D. Drilling, Inc.*, No. 08-1405-JTM, 2019 WL 5291179, at

8   *5 (D. Kan. Oct. 18, 2019) ("[A] court will always be in better position to judge context during trial,

9   but the whole point of a motion *in limine* is that by the time you have that context, irrelevant or

10   prejudicial evidence will already have been presented."). For the reasons that follow, the Court should

11   enter an order precluding the introduction of the evidence described in Defendants' Motions *in Limine*

12   Nos. 1 –10.

13

14   **II.   MOTION *IN LIMINE* NO. 1 – TO EXCLUDE NICK BILTON'S *VANITY FAIR*
     ARTICLE AND HIS TESTIMONY AS A WITNESS**[1]

15        Plaintiffs seek to introduce at trial a post-Class Period[1] article titled "Twitter is Betting

16   Everything on Jack Dorsey. Will It Work?," which was published on June 1, 2016 in *Vanity Fair*.

17   Declaration of Jonathan K. Youngwood, Ex. 1[2] (Pls' Prop. Ex. 816).[3]  Plaintiffs also seek to call live

18   at trial the author of that article, Nick Bilton, who was never deposed in this case. Ex. 2 at 3 (Pls'

19   Preliminary Trial Witness List). Plaintiffs explain that Mr. Bilton will testify, among other things,

20   about his "[i]nterviews and communications while researching Twitter" and "[t]he subjects relating to

21   Twitter about which [he] has researched or wrote, including MAU, user growth, and user

22   engagement." *Id.* at 3. Both Mr. Bilton's anticipated testimony and his 2016 *Vanity Fair* article

23   predominantly consist of hearsay and are unduly prejudicial. They should be excluded.

24

25

26   [1] The "Class Period" is the period of February 6, 2015 to July 28, 2015.
     [2] Unless otherwise noted, "Ex." refers to an Exhibit from the Declaration of Jonathan K.
27   Youngwood.
     [3] There are two copies of the June 1, 2016 *Vanity Fair* article on Plaintiffs' proposed exhibit list.
28   Because Plaintiffs' Proposed Exhibit 816 is more legible, Defendants cite to that exhibit, attached
     hereto as Exhibit 1, throughout this motion.

### A.    The Inflammatory *Vanity Fair* Article

The *Vanity Fair* article that Plaintiffs intend to introduce at trial is a sensationalized account of a transitional period at Twitter, which followed Mr. Costolo's departure from the Company and took place, in part, after the close of the Class Period.  The article is replete with prejudicial allegations about the Company and its current and former executives.  For example, the article asserts that "[f]rom the moment [Twitter] was born, 10 years ago, it has existed in a near-constant state of chaos."  Ex. 1 at 2.  The article states that the Company "has always been engulfed in madness," *id.* at 4, and refers to Jack Dorsey, Twitter's CEO, as "charming in person," but "a bully behind the scenes," *id.* at 7.  In addition to these unsupported, irrelevant accusations and credibility determinations reserved for the jury, the article contains numerous statements by third parties, some of which are attributed to known individuals and others of which are not.  For example, the article states, without attribution, that during a "tempestuous discussion" between Mr. Dorsey and his staff following Mr. Costolo's departure, Gabriel Stricker, Twitter's then-director of communications, said, "We have zero credibility with Wall Street right now," and "'We have to come clean' about the Company's stagnant growth numbers." *Id.* at 5.  At another point in the article, Mr. Bilton claims that he was "told by people close to the company" that Twitter occasionally "faked" its user numbers by sending emails to inactive users in order to prompt them to log in to the platform.  *Id.* at 7.  Notably, neither of these claims has any basis in fact and, despite being afforded every opportunity to develop them during discovery, Plaintiffs have discovered and can offer no admissible evidence in support of Mr. Bilton's accusations.  *See* Ex. 3 (Stricker Dep. 233:19–234:11 (testifying that he does not remember saying "We have zero credibility with Wall Street right now")); Ex. 4 (Dorsey Dep. 236:8–237:12 (testifying, after being asked about the reported conversation with Stricker, "I don't recall ever having that conversation")), (237:14–24 (testifying that he did not believe Costolo or Noto faked the user numbers)).

Instead, Plaintiffs evidently intend to introduce Mr. Bilton's *Vanity Fair* article itself, for the truth of the matters asserted therein.  The article is hearsay and should be excluded from the trial.  "Generally, newspaper articles are considered hearsay under Rule 801(c) when offered for the truth of the matter asserted."  *Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1090 (C.D. Cal. 2005).  It is for this reason that "courts rarely allow newspaper articles into evidence to prove the truth of the

1    statements contained therein," and, in fact, "it is not uncommon for a trial court to summarily reject

2    newspaper articles as obvious hearsay." *U.S. Football League v. Nat'l Football League*, No. 84-cv-

3    7484 (PKL), 1986 WL 5803, at *1 (S.D.N.Y. May 16, 1986).   Moreover, statements by third parties

4    that are repeated in newspaper articles typically pose a "double hearsay" problem, as both the

5    statements themselves and the "reporters' transcriptions [of those statements] are out-of-court

6    statements." *Larez v. City of Los Angeles*, 946 F.2d 630, 642 (9th Cir. 1991); *see also Green v. Baca*,

7    226 F.R.D. 624, 638 (C.D. Cal. 2005) ("To the extent plaintiff intends to offer the articles for the truth

8    of the matter asserted, they clearly constitute hearsay. Moreover, to the extent the articles quote

9    statements by other individuals, and those statements are offered for the truth of the matter asserted,

10   they constitute double hearsay."); *see* Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by

11   the rule against hearsay if each part of the combined statements conforms with an exception to the

12   rule.").   Mr. Bilton's *Vanity Fair* article thus presents layers of hearsay and, since Plaintiffs rely on it

13   for its truth, this hearsay evidence should be excluded.

14          Plaintiffs may argue that some of the hearsay statements contained in the *Vanity Fair* article

15   are admissible as statements by a party-opponent.   *See* Fed. R. Evid. 801(d)(2).   They are not.   Each

16   out-of-court statement reported in Mr. Bilton's article contains multiple layers of hearsay, each one of

17   which must fall within a hearsay exception in order for the underlying statement itself to be admissible.

18   *See* Fed. R. Evid. 805.   For example, Mr. Bilton's article contains the following quotation: "'We have

19   zero credibility with Wall Street right now,' Gabriel Stricker, the director of communications, said in

20   a meeting with Dorsey and top managers.   'We have to come clean' about the company's stagnant

21   growth numbers." Ex. 1 at 5.   Mr. Bilton did not witness the supposed exchange and does not state in

22   the article that he ever interviewed Mr. Stricker.   Although the underlying statement attributed to Mr.

23   Stricker could in other circumstances qualify as a statement "made by the party's agent or employee

24   on a matter within the scope of that relationship and while it existed," Fed. R. Evid. 801(d)(2)(D), that

25   statement is embedded within a further layer of hearsay—Mr. Bilton's assertion, based on unspecified

26   sourcing that may not be first-hand, that Mr. Stricker made the comments he attributes to him.   *See*

27   *Larez*, 946 F.2d at 642 (recognizing that the admissibility of a news article's repetition of statements

28   made by another "hinged on two out-of-court statements: (1) Gates's actual statements and (2) their

DEFTS' MOTIONS *IN LIMINE*
Case No.  4:16-CV-05314-JST

later repetition by reporters."); *In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1374 (N.D. Cal. 1995) (excluding newspaper and magazine articles, which attributed statements to defendant's executives, in part because they were "out of court statements offered to prove the truth of the matters asserted, i.e. that Rodgers made certain statements."). This layer of hearsay is an out-of-court statement, offered for its truth, to which no hearsay exception applies. In fact, it is a particularly problematic and unreliable out-of-court statement, since Mr. Bilton did not himself witness Mr. Stricker's alleged comments, does not say whether he interviewed him for the article, and does not disclose the source of the information that formed the basis for his reporting. *See Cedeck v. Hamiltonian Fed. Sav. And Loan Ass'n*, 551 F.2d 1136, 1138 (8th Cir. 1977) ("That part of Murphy's statement which contains a reiteration of what someone told him is not admissible as an admission by party-opponent since the author of the statement is unknown."); *Lehman v. Maricopa Cnty. Comm. Coll. Dist.*, No. CV 11–00579–PHX–FJM, 2012 WL 3638715, at *4 (D. Ariz. Aug. 24, 2012) ("Even assuming Skinner's statement to plaintiff is admissible, the statements to Skinner by unidentified MCCCD employees are inadmissible hearsay.")

Courts that have considered whether to admit such assertions from newspaper or magazine articles into evidence, despite the fact that they are hearsay, have analyzed whether such articles fall within the catch-all residual exception in Federal Rule of Evidence 807. *See, e.g., Larez*, 946 F.2d at 643; *Green*, 226 F.R.D. at 638–39; *Nat'l Football League*, 1986 WL 5803, at *2–3. This exception is designed for "exceptional circumstances," *United States v. Bonds*, 608 F.3d 495, 500 (9th Cir. 2010), and applies to hearsay statements that are both "supported by sufficient guarantees of trustworthiness" and "more probative on the point for which [they are] offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807. Neither of these requirements is met as to the *Vanity Fair* article, or any testimony regarding it.

First, as to any "guarantees of trustworthiness," numerous courts have recognized that "[u]nsupported newspaper articles usually provide no evidence of the reporter's perception, memory or sincerity and, therefore, lack circumstantial guarantees of trustworthiness." *Eisenstadt v. Allen*, 113 F.3d 1240, 1997 WL 211313, at *2 (9th Cir. 1997) (memorandum); *see also Cypress Semiconductor*, 891 F. Supp. at 1374 ("Most courts, however, have held that newspaper and magazine articles will

rarely fit the bill."); *Nat'l Football League*, 1986 WL 5803, at *2 (noting that newspaper articles "are often challenged by interested parties as inaccurate, and could be the subject of wide-spread abuse if admitted into evidence under the residual hearsay exceptions in any but the most extraordinary circumstances."). Plaintiffs cannot offer any evidence that tends to bolster the trustworthiness of the article sought to be introduced here. *See Larez*, 946 F.2d at 643 (finding that "extraordinary circumstances" existed to find that an article contained sufficient guarantees of trustworthiness because "three independent newspapers attributed the same quotations to Gates, a known declarant who testified at trial"). Not a single witness corroborated the allegations in the article, and the evidence in the record contradicts much of Mr. Bilton's reporting, including his assertion that Mr. Stricker made the above-discussed comment about the Company's "credibility with Wall Street," his claim that Mr. Stricker was fired after threatening to quit, and his claim that Twitter intentionally "faked" its user numbers by sending email notifications to inactive users. *See* Ex. 3 (Stricker Dep. 233:19–234:11 (testifying that he does not remember saying "[w]e have zero credibility with Wall Street right now")), 235:14–22 ( "No, that's not how I remember it. No. . . I don't remember ever threatening to quit"); 237:22–23 ("I don't ever remember saying that [Twitter] needed to be more transparent"); Ex. 4 (Dorsey Dep. 236:8–237:12 (testifying, after being asked about the reported conversation with Stricker, "I don't recall ever having that conversation")); 237:14-24 (testifying that he did not believe Costolo or Noto faked the user numbers).

Moreover, far from containing the requisite "sufficient guarantees of trustworthiness," there are actually specific reasons to doubt the trustworthiness of the *Vanity Fair* article. The article, for one, relies on unidentified informants, vaguely attributing prejudicial accusations to "people close to the company." Ex. 1 at 7. In addition, the article employs a hyperbolic and overtly negative tone, variously describing individuals at Twitter as "bullies" and comparing their business decisions to "murders." *Id.* at 7, 4. Finally, Mr. Bilton has repeatedly capitalized on his baseless reporting about Twitter, apparently making a career out of authoring sensationalized accounts of the inner-workings of the Company and Mr. Dorsey in particular. In addition to the article that is the subject of this motion, Mr. Bilton wrote a book (published in 2013) titled *Hatching Twitter: A True Story of Money, Power, Friendship, and Betrayal*, and just weeks ago authored yet another article published in *Vanity*

*Fair*, titled "In the Coronavirus Era, the Force is Still with Jack Dorsey."  Ex. 5.  Among other accusations, this article contains the noteworthy claim that Twitter is "the most tumultuous and absurd company in the history of technology."  *Id.* at 9.  All this suggests that the article Plaintiffs seek to introduce has "been written from a biased point of view," *Larez*, 946 F.2d at 643 (quotation marks omitted), and that it certainly does not contain the sort of "guarantees of trustworthiness" meriting admissibility under Rule 807.

Second, the *Vanity Fair* article also is not "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."  Fed. R. Evid. 807.  More probative evidence of any methods Twitter may have employed to measure user engagement, or of any statements Twitter employees may or may not have made that are relevant to the issues to be tried in this case, can easily be obtained through the documents and testimony of the individuals who were actually part of the conversations and events Mr. Bilton purported to recreate.  Numerous Company employees, including Mr. Stricker and Mr. Dorsey, will be witnesses at trial, and can offer competent testimony without any need to introduce into evidence the hearsay statements from a biased and unreliable magazine article.

Finally, the article (and any testimony regarding it) should be excluded in its entirety for the independent reason that its probative value is substantially outweighed by the danger of unfair prejudice.  Fed. R. Evid. 403.  As explained above, the article contains numerous false and irrelevant accusations against Twitter and its executives.  For example, the article asserts that Twitter "faked" its user numbers by "send[ing] [] e-mails to inactive users who [hadn't] been on the service in a few months, informing them there [was] a problem with their username or account, which [led] people to log in to fix the situation."  Ex. 1 at 7.  This allegation (which, as explained above, is both false and based on a hearsay statement from an unidentified declarant) is irrelevant—pertaining to a theory that the Court rejected at the motion to dismiss stage.  *See* MTD Order at 34 (rejecting claim that positive statements about MAU were affirmatively misleading because they may have been in part driven by fake or low-quality users because Twitter never claimed growth was mostly organic and the Company disclose the existence of low quality users including fake or spam accounts).  The statement also is highly prejudicial, suggesting that because Twitter has been accused of lying about its user numbers

on other occasions, it must also be liable for the alleged misstatements at issue in this case.  In addition to this prejudicial (and irrelevant) statement, the article contains the baseless claims that Twitter has been in a state of "constant turmoil," "has always been engulfed in madness," and states that various executive expulsions were "were committed with the same behind-the-scenes planning and mastery" as "murders."  Ex. 1 at 4.  Statements like these would very likely unfairly prejudice the jury against Defendants and risk the possibility that the jury would reach a verdict based on its feelings about the Company, rather than based on the evidence pertaining to Defendants' liability under Sections 10(b) and 20(a) of the Exchange Act.  The article is thus unduly prejudicial, in addition to being unreliable hearsay, and should be excluded in full.

### B.    Mr. Bilton's Testimony

In addition to excluding the *Vanity Fair* article, the Court should preclude its author, Mr. Bilton, from testifying at trial.  Plaintiffs indicate that they intend to call Mr. Bilton to testify as a fact witness about his "interviews and communications while researching or writing about Twitter," as well as the "subjects relating to Twitter about which [Mr. Bilton] has researched or wrote, including MAU, user growth, and user engagement."  Ex. 2 at 2.  His testimony will undoubtedly consist almost entirely of (a) improper lay witness testimony and (b) inadmissible hearsay.  It should be precluded.

A lay witness must confine his testimony to matters "rationally based on the witness's perception."  Fed. R. Evid. 701.  Thus, a lay witness is not "allowed to testify based on hearsay information, [or] to couch his observations as generalized opinions rather than as firsthand knowledge."  *United States v. Freeman*, 498 F.3d 893, 904 (9th Cir. 2007) (ellipses and internal quotation marks omitted).  Consistent with these well-established limitations on the scope of lay witness testimony, courts exclude witnesses from testifying at trial if their only proposed relevant testimony is based on inadmissible hearsay or information obtained from third parties.  *See United States v. Hayat*, 2:05-cr-0240 GEB DB, 2017 WL 6728639, at *2–3 (E.D. Cal. Feb 27, 2017) (granting motion to exclude the testimony of a journalist on the grounds that he neither qualified as an expert nor had any "relevant, admissible testimony as a non-expert witness" in light of the impermissibility of non-expert "rel[iance] on third-party information as a basis for their opinions.").

This is precisely the type of testimony that Mr. Bilton intends to offer.  Plaintiffs state that Mr.

Bilton will testify about his "interviews and communications" about Twitter, as well as the "subjects relating to Twitter about which he has researched or wrote." The latter category of testimony consists entirely of Bilton's "generalized opinions," not his firsthand knowledge. *Freeman*, 498 F.3d at 904. As to the former category, the vast majority (if not all) of Mr. Bilton's testimony about his interviews concerning Twitter will be inadmissible hearsay. This is because, first, statements made by unidentified declarants (Mr. Bilton's unnamed sources) are classic hearsay, which—even if made by unnamed Twitter employees—will not fall within the hearsay exception for statements by a party-opponent. *See Carden v. Westinghouse Elec. Corp.,* 850 F.2d 996, 1003 (3d Cir.1988) (statement by unidentified person not admissible as an admission by party-opponent because "the author of the statement is unknown") (quoting *Cedeck*, 551 F.2d at 1138); *Lehman*, 2012 WL 3638715, at *4 ("[T]he statements to Skinner by unidentified [] employees [of the defendant] are inadmissible hearsay."); Fed. R. Evid. 801(d)(2). Second, even if Mr. Bilton were to identify his sources and testify to statements made by named Twitter employees, to be admissible, Plaintiffs would need to establish that those statements were made by employees "within the scope of [the employment] relationship and while it existed"—something that, given the nature of the article, Plaintiffs are unlikely to be able to do. Fed. R. Evid. 801(d)(2)(D); *Carden*, 850 F.2d at 1003 (noting the "heavy burden which rests on the proponent of the evidence to satisfy evidentiary and trustworthiness requirements.").

If Plaintiffs wanted to offer Mr. Bilton's generalized opinions and hearsay testimony in evidence, they should have disclosed Mr. Bilton as an expert and explained how Mr. Bilton's proposed testimony meets the requirements of Rule 702. They did neither of those things. Instead, they seek to avoid the reliability requirements of Rule 702 and offer "an expert in lay witness clothing.'" *Humboldt Baykeeper v. Union Pac. R. Co.,* No. C 06-02560 JSW, 2010 WL 2179900, at *1 (N.D. Cal. May 27, 2010). Mr. Bilton is a third party journalist who has extensively researched and written about Twitter (and, as explained above, has a notable bias against the Company), and there is a substantial risk that the jury, viewing him improperly as an expert, could give his testimony undue weight. Mr. Bilton should be precluded from testifying at trial.

1

2

### III.   MOTION *IN LIMINE* NO. 2 – TO EXCLUDE EVIDENCE AND ARGUMENT REGARDING TWITTER'S POST-CLASS PERIOD DISCLOSURE OF, OR STATEMENTS CONCERNING DAU, mDAU AND OTHER DAU-RELATED USER METRICS

3

4

Plaintiffs' proposed exhibit list includes over 100 exhibits created after the end of the Class

5

Period in this action (July 28, 2015).  Certain of these exhibits, or portions of these exhibits, pertain to

6

the Class Period or reflect Class Period data.  Such documents (or the portions of such documents that

7

pertain to the Class Period) are <u>not</u> the subject of this motion *in limine*.[4]   However, Plaintiffs' exhibit

8

list includes multiple documents concerning Twitter's post-Class Period disclosure of DAU or DAU-

9

related user metrics, that have nothing to do with the Company's decision-making process regarding

10

whether to disclose DAU during the Class Period, some of which were created and concern disclosures

11

years after the Class Period ended.  This includes documents relating to the percent change in daily

12

active users ("DAU"), a metric that was first disclosed by Twitter in October 2016, fifteen months

13

after the end of the Class Period, as well as Twitter's absolute monetizable daily active users

14

("mDAU")—defined as Twitter users who logged in and accessed Twitter on any given day through

15

Twitter.com or Twitter applications that are able to show ads (*i.e.*, generate revenue)—which was first

16

disclosed in February 2019, three and a half years after the end of the Class Period.  *See, e.g.,* Ex. 6

17

(excerpt of Twitter Form 10-K filed on 2/21/19) at 5.  For example, Plaintiffs seek to introduce the

18

following:

19

20

- **SEC Filings From 2017 and 2019.**  Plaintiffs' proposed exhibit list includes several SEC filings and other documents in which Twitter disclosed metrics related to DAU and mDAU after the end of the Class Period. *See, e.g.,* Ex. 7 (Pls' Prop. Ex. 703) (excerpt of Twitter Form 10-Q for Q1 2019), filed on April 30, 2019, over three and a half years after the Class Period,  and  Ex. 8 (Pls' Prop. Ex. 730) (excerpt of Twitter Form 10-K for 2016), filed on February 27, 2017, over a year and a half after the Class Period;

21

22

23

- **Statements Made By Defendants About DAU**. Plaintiffs seek to admit post-Class Period documents—including a video clip of Mr. Costolo on CNBC from July 27, 2017 regarding Twitter's 2017 earnings (two years after the Class Period) as well as Mr. Noto's February 10, 2016 statement that "[t]he one engagement metric that we look at holistically is daily active users"—which include the Individual Defendants'

24

25

26

27

28

---

[4] For example, Plaintiffs' exhibit list includes analyst reports, articles, and emails from immediately after the close of the Class Period that pertain to the Class Period. *See e.g.,* Ex. 9 (Pls' Prop. Ex. 758, Topeka Capital Markets analyst report dated 8/3/2015); Ex. 10 (Pls' Prop. Ex. 97, email dated 7/31/2015 from Krista Bessinger to Adam Bain, CC'ing David Rivinus and Sierra Lord re: earnings message map + prep for Deutsche Bank).

Defts' Motions *in Limine*
Case No.  4:16-CV-05314-JST

then-contemporaneous views of DAU.  *See, e.g.,* Ex. 11 (Pls' Prop. Ex. 983) (July 27, 2017 video clip of Defendant Costolo on CNBC about Twitter's 2017 earnings); and Ex. [12 at 7 (Pls' Prop. Ex. 370) (Transcript of Q4 2015 earnings call, dated February 10, 2016). *See also* Ex. 13 (Pls' Prop. Ex. 229) (February 2016 email thread re: "consolidating thinking on 'single unifying metric(s)'" and discussing DAU as basis of revenue model); Ex. 14 (Pls' Prop Ex. 848) (July 27, 2017 Tweet); Ex. 15 at 3 (Pls' Prop. Ex. 369) (December 8, 2015 statement by Mr. Noto that "ultimately the thing we have found that probably is the best encapsulation of engagement is DAU,")

- **2017 Correspondence With The SEC.**  Plaintiffs' proposed exhibit list includes a series of letters, dated March, April, May, and June of 2017—nearly *two years* after the Class Period—between the SEC's Division of Corporation Finance and Twitter regarding Twitter's 2016 reporting of user metrics.  *See* Exs. 16–19 (Letters between Twitter and the SEC dated, March 31, 2017, April 28, 2017, May 10, 2017 and June 2, 2017) (Pls' Prop. Exs. 968, 969, 971 and 972).  This correspondence reflects certain of the Company's post Class Period views regarding user metrics at the time, not during the Class Period.  Ex. 19 (Pls' Prop. Ex. 972).  *See also* Ex. 17 at 6 (Pls' Prop. Ex. 969) ("[t]he Company ***currently*** believes the actual percentage changes in ad engagements and MAU, and percentage changes in DAU, are the material metrics to promote understanding of the performance of the Company's platform against its current strategy.") (emphasis added).

- **Post-Class Period News Articles Discussing Twitter's Metrics**.  Plaintiffs' proposed exhibit list includes a number of articles, as well as videos, from many months or even years after the Class Period that includes references to Twitter's user metrics.  *See* Ex. 20 (Pls' Prop, Ex. 849) (December 2, 2017 Motley Fool article "One Third of Twitter Users Abandon it Every Year" ); Ex. 21 (Pls' Prop. Ex. 984) (Sept. 3, 2015 video clip of Robert Peck on CNBC).

Each of these categories of post-Class Period documents is of no relevance to the issues to be decided by the jury and each is potentially highly prejudicial—inviting the improper inference that, just because a particular fact may have been true years after the close of the Class Period, it must also have been true at the time that the conduct Plaintiffs challenge took place.  That over a year after the Class Period (in October 2016) Twitter began to disclose in SEC filings the percentage change in DAU (and subsequently, in 2019, three and a half years later, the actual or absolute mDAU), or discussed the use of DAU in public statements, internally, or in correspondence with the SEC many months or years after the close of the Class Period, says nothing about whether the omission of DAU during the Class Period rendered the statements at issue misleading and constituted securities fraud.  *See e.g., In re Remec Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1217 (S.D. Cal. 2010) (explaining that misleading statements "must be evaluated at the time [they are] made and not by hindsight"); *Schleicher v. Wendt*, 618 F.3d 679, 684 (7th Cir. 2010) ("[f]raud depends on the state of events when a statement is made, not on what happens later").  This is especially true given the changing circumstances in play here,

including Twitter's change in corporate strategy and change in leadership.  As multiple witnesses have testified, when Jack Dorsey became interim CEO, and then CEO, of Twitter (in June and October 2015 respectively), the Company shifted its strategy from a focus on reach (measured by monthly active users "MAU" and logged out audience) to a focus on frequency (measured by DAU).  *See* Ex. 4 (Dorsey Dep. at 40:22-41:2); Ex. 22 (Messinger Dep. at 164:12-165:16); Ex. 23 (Noto Dep. Vol. 1 at 57:24-61:13, 63:2-9, 90:15-23).  Given this fundamental change in Twitter's strategic focus under the leadership of Mr. Dorsey, post-Class Period statements regarding the usefulness of DAU (and the utility of disclosing DAU), should not be admissible under Federal Rules of Evidence 402 and 403.[5] *See, e.g., Hsu v. Puma Biotech., Inc.,* No. 15-cv-00865 (SHKx), Dkt. 614 at 5 (granting plaintiffs' motion in limine to "exclude evidence of post-Class Period events, results, or outcomes"); *Negrete*, 2013 WL 6535164, at \*16 (excluding post-Class Period evidence because the minimal relevance was substantially outweighed by the danger of prejudice and confusion).

The lack of relevance of post-Class Period statements (and danger of prejudice and confusion) is further supported by the fact that the viability and usefulness of DAU or mDAU as user metrics evolved in the intervening time between the Class Period statements and the post-Class Period evidence Plaintiffs now seek to introduce.  Twitter was, prior to and during the Class Period, engaged in an internal debate over which metrics to use and disclose on a going-forward basis in light of the corporate strategy at that time.  Notes from an internal Twitter "metrics task force" that met in the second half of 2014 and into 2015 reveal that, while DAU was considered as a *potential* "replacement engagement metric" to Timeline Views ("TLVs") for use "likely in Q-2 2015," the metric was viewed as "problematic," because it lacked "the same quality controls as MAUs."  Ex. 24 at

---

[5] To the extent Plaintiffs wish to reference Defendants' voluntary, post-Class Period disclosures of DAU-related metrics to suggest that disclosure of DAU during the Class Period would have made Plaintiffs' alleged harm less likely to occur, the post-Class Period disclosures should also be excluded under Federal Rule of Evidence 407.  *See* Fed. R. Evid. 407 ("When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction."); *see also Negrete v. Allianz Life Ins. Co. of N. Am.*, 2013 WL 6535164, at \*17–18 (C.D. Cal. Dec. 9, 2013) (holding that revisions to marketing brochures were voluntary, subsequent remedial measures and therefore inadmissible under Rule 407); *Cf. Welgus v. TriNet Grp., Inc.*, 15-cv-03625-BLF, 2017 WL 6466264, at \*8 (N.D. Cal. Dec. 18, 2017) ("if the law viewed a company's editing or removal of language from an SEC filing as a tacit admission that the language was false when made, "no public company would ever remove disclosures from its filings.").

DEFTS' MOTIONS *IN LIMINE*
Case No.  4:16-CV-05314-JST

TWTR_SHEN_00333383_0006 (Pls' Prop. Ex. 247 a 6); Ex. 23 at 370:7–373:5 (Noto Dep. dated 4/30/19) (explaining that DAU was not a "hardened" metric like MAU and lacked the "spam and other key controls" in place that MAU had for public disclosure). The same notes similarly reflect that DAU would be a challenging metric to disclose because a shift to focus on DAU (and not just MAU) would require "coordination across company." Ex. 8 (Pls' Prop. Ex. 730 at 46). Moreover, when, in February 2019 (three and a half years after the Class Period), Twitter disclosed for the first time an absolute (versus percentage change) DAU number, it disclosed  mDAU—a distinct subset of DAUs—not DAU and noted that it was not standardized and should not be used for comparative purposes.  Ex. 25 (Twitter Q4 2018 earnings release, dated 2/7/19).

Thus, in light of the evolving nature and usefulness of DAU as a metric, as well as the shift in strategic focus and leadership at the Company, what Defendants said about DAU after the Class Period has little (if any) bearing on whether the prior omission of a different, undeveloped version of that metric was misleading during the Class Period.  This conclusion is entirely consistent with well-established law which, recognizing the fact that circumstances bearing on the truth or falsity of a particular statement and whether that statement was made with intent to deceive may evolve over time, holds that "the securities law approach[es] matters from an ex ante perspective."  *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868 (N.D. Cal. 2004).  Courts routinely reject improper attempts to argue that, merely because an individual or entity made statements suggesting the existence of a particular fact or state of mind after a class period, those statements are sufficient to support an inference of falsity or scienter during a class period.  *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 n.12 (9th Cir. 2008) (post-class period documents listing "internal reforms" were insufficient to allege scienter, in part because plaintiffs did not allege any corroborating details to indicate that the defendants "were aware of the fraud during the Class Period."); *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 484–85 (6th Cir. 2010) (rejecting the use of post-class period statements to bolster intra-class period allegations of scienter and falsity, and in doing so noted that plaintiffs' attempt to "bolster a strong scienter inference" by pointing to a post-class period statement made in April 2003—the same month as the end of the class period—was improper); *Brown v. InnerWorkings, Inc.*, No. SACV 18-00832-CJC(KESx), 2019 WL 4187385, at *4 (C.D. Cal. Mar.

27, 2019) ("[T]o the extent Plaintiff refers to statements Defendants made outside the Class Period, they are not relevant to determining whether Defendants acted with scienter when making the alleged prior misstatements."); *Morgan v. AXT, Inc.*, No. C 04-4362 MJJ, 2005 WL 2347125, at *12 (N.D. Cal. Sept. 23, 2005) ("The fact that the Company admitted, after the Class Period, that it had failed to follow testing requirements on "certain shipments," is insufficient to raise a strong inference that Defendants knew, at the time the quality statements were made, that the statements were false or misleading."); *In re Vantive Corp. Sec. Litig.*, 110 F. Supp. 2d 1209, 1217 n.14 (N.D. Cal. 2000) ("[E]vents occurring after the alleged class period do not show that the representations made during the class period were false when made, plaintiffs must point to particular contemporaneous facts that establish the falsity of the statement at the time it was made.").

Although it is true, as this Court has noted, that under certain circumstances out-of-Class Period statements may "shed light on the 'truth or falsity of Class Period statements,'" MTD Order at 19, their exclusion is nonetheless proper when any probative value is outweighed by the "prejudice arising from use of events long after [the alleged misstatements] to cast light on the defendants' earlier intention."[6] *Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 188 (3d Cir. 1988) (affirming exclusion of evidence of post-merger performance proffered for the purpose of proving management's pre-merger intentions in securities fraud case); Fed. R. Evid. 403. Thus, when post-class period evidence is unlikely to shed light on any element of plaintiffs' claims, but highly likely to cause confusion or to prejudice the jury against defendants, courts exclude it from trial. *See Puma Biotech., Inc.*, No. 15-cv-00865 (SHKx), Dkt. 614 at 5 (granting plaintiffs' motion *in limine* to "exclude evidence of post-Class Period events, results, or outcomes"); *Negrete*, 2013 WL 6535164, at *16 (excluding post-Class Period evidence because although "[data] outside the Class Period may be minimally relevant for the

---

[6] At the motion to dismiss stage, this Court drew on one of Defendants' post-Class Period statements to analyze whether Plaintiffs had adequately pleaded scienter, see MTD Order at 36 (mentioning, as part of its holistic analysis of the evidence, Defendants' post-Class Period statement that DAU was the "best encapsulation of engagement") the Court was not tasked at that stage with weighing the probative value of such statements against the significant danger of unfair prejudice that will result from their inclusion at a jury trial. As explained above, Defendants' post-Class Period statements—including the "best encapsulation," statement, which was made many months after the close of the Class Period, in December 2015—are highly prejudicial, because they invite the jury to, improperly, evaluate Defendants' statements from an *ex post* perspective, after the significance and usefulness of the metric had changed.

reasons enumerated by plaintiffs, the Court [found] that minimal relevance to be substantially outweighed by the danger of prejudice and confusion of the issues"); *Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 277–78 (S.D.N.Y. 2015) (excluding post-Class Period data because "[a]llegations concerning after-the-fact events [were] immaterial to [defendants'] state of mind" and did not "speak to defendants' state of mind at the relevant time for the issues to be tried—the class period").

Here, Defendants' post-Class Period disclosures and statements about DAU and mDAU have minimal (if any) probative value, but are highly likely to unduly prejudice Defendants. As the metrics task force notes demonstrate, *see supra* 12–13, there was an internal debate at Twitter regarding the usefulness of DAU metrics, which ultimately evolved over time and after the change in leadership and strategic vision of the Company. Given this, such post-Class Period evidence is not relevant to the question of whether the omission of some former version of DAU was misleading in the first half of 2015. On the other hand, presenting this post-Class Period evidence to the jury would result in significant and undue prejudice for Defendants. If presented, for example, with evidence that, *in 2017* (nearly 2 years after the Class Period)*,* Twitter believed, in addition to the percentage changes in ad engagements and MAU, that percentage changes in DAU was a "material metric[] to promote understanding of the performance of the Company's platform against its current strategy," *see* Ex. 17 at 6 (Pls' Prop. Ex. 969),  the jury might improperly assume that Twitter viewed DAU as a material metric to understand performance of Twitter's platform in February and April of 2015, when the challenged statements were made. As explained above, however, the reality in early 2015 was very different than it was in 2017. The jury will be presented with evidence regarding changes to the Company's corporate strategy and leadership, as well as the measurement, usefulness, and relative importance of DAU during the Class Period, including that DAU was considered "problematic," lacked "the same quality controls as MAUs," and required challenging "coordination across company" in order to implement and disclose. It would thus be highly prejudicial to show these post-Class Period statements to the jury, which would far exceed any probative value that the statements could contribute to the trial.

In addition to the substantial risk that the jury could improperly assume that what may have

been true years after the Class Period was also true in February and April of 2015, certain of the post-Class Period documents regarding Twitter's user metrics should be excluded for separate and independent reasons.  First, with respect to the 2017 SEC correspondence, to the extent Plaintiffs rely on these documents to support their claim that the omission of DAU—two years earlier—was materially misleading, this correspondence, in addition to being irrelevant, is also highly prejudicial because a jury could (wrongly) infer that the Company engaged in wrongdoing in 2015, merely because it was in contact with the SEC in 2017.  *See Braun Builders, Inc. v. Kancherlapalli*, No. 09-11534-BC, 2010 WL 1981008, at *6 (E.D. Mich. May 18, 2010) (excluding evidence of a Medicaid fraud investigation "[b]ecause there is no evidence that the government has any interest in [defendant's] business beyond asking questions and the allegations are potentially inflammatory").  Furthermore, in the April 20, 2020 *Daubert* Order ("Daubert Order"), this Court recognized that, "the relevance of evidence or argument relating to the SEC's actions or inaction with respect to Defendants is substantially outweighed by the danger that it will confuse the jury or unduly consume their time, and the Court will exclude it." Daubert Order at 16.

Second, with respect to the post-Class Period news articles and video clips regarding Twitter's DAU disclosures, these documents constitute inadmissible hearsay, and in some instances, double hearsay.  *Asetek Danmark A/S v. CMI USA, Inc.*, No. 13-cv-00457-JST, 2014 WL 12644295, at *2 (N.D. Cal. Nov. 19, 2014) ("Statements reported in magazine articles and newspapers are hearsay if offered to prove the truth of the matter asserted."); *Larez,* 946 F.2d at 642 (recognizing that the admissibility of a news article's repetition of statements made by another "hinged on two out-of-court statements," the subject's actual statements "and their later repetition by reporters.").  They also are unduly prejudicial, as they are highly speculative and draw unwarranted comparisons to third party user metrics.  *See, e.g.*, Ex. 20 (Pls' Prop. Ex. 849) (speculating, in December of 2017, that "[p]oor user retention is undoubtedly a big reason for Twitter's lagging user growth" and comparing the Company's MAU growth to that of Facebook and Instagram); Ex. 21 (Pls' Prop. Ex. 984) (video clip of Robert Peck appearing on CNBC, speculating on Twitter's growth needs in light of its post-Class Period statements about user engagement and comparing its user metrics to "fundamentals, as defined by Facebook").

1
2

IV.   **MOTION *IN LIMINE* NO. 3 – TO EXCLUDE EVIDENCE AND ARGUMENT CONCERNING POST CLASS PERIOD THIRD PARTY METRICS**

3          Plaintiffs seek to introduce evidence and argument concerning the use and reporting of various

4   metrics by third party social media companies.  Their proposed exhibit list contains both third party

5   documents from prior to and during the Class Period (*i.e.,* Facebook SEC filings that disclosed DAU)

6   as well as third party documents from *after* the Class Period.  This motion *in limine* does <u>not</u> seek to

7   exclude the pre- or intra-Class Period Facebook disclosure documents, but instead pertains only to

8   documents concerning *post*-Class Period third party metric disclosures (some of which occurred years

9   after the Class Period, including by companies that were not even public during the Class Period). In

10  this category, Plaintiffs seek to introduce, for example:

11      • **SEC Filings By Third Party Companies**. These include filings by companies in 2019,
12        such as Facebook and Snapchat (a company that was not public during the Class Period),
          reflecting those companies' post-Class Period disclosure of DAU.  *See, e.g.,* Exs. 26–27
13        (Pls' Prop. Exs., 974 and 975); and

14      • **News Articles About Third Party Companies.** Plaintiffs' proposed exhibit list also
15        includes news articles—some of which were written three or four years after the Class
          Period—reporting on the daily active users of companies like Instagram (a company that
16        has never gone public), Snapchat, and TikTok (also not a public company).  *See, e.g.,* Ex.
          28 (Pls' Prop. Exs. 850) (reporting that, in June of 2018, Instagram had nearly twice as
17        many daily active users as Snapchat), Ex. 29 (Pls' Prop. Ex. 851) (reporting on the Tik
          Tik's monthly and daily active user metrics as compared to Facebook and Instagram as of
18        September 2018)); *see also* Exs. 30–32 (Pls' Prop. Exs. 847, 852, 853).[7]

19         These exhibits, concerning the post-Class Period user metrics of third parties, should be

20  excluded because they are irrelevant.  Plaintiffs apparently seek to introduce evidence from 2016 and

21  later to prove that DAU was a standard industry metric that should have been reported by Twitter

22  during the Class Period.  *See e.g*., Pls' Opp. to Defs' Mot. to Dismiss at 13 ("DAU is a standard

23  industry metric that represents exactly what its name implies (daily active users) and is reported by

24  most of Twitter's social-media peers, including Facebook and Snapchat.").

25         First, and significantly, other social media platforms' metrics—whether it is LinkedIn's

26

27  ────────────────────
[7] Additionally, as discussed above, the post-Class Period news articles are inadmissible hearsay or
28  double hearsay and should be excluded for this independent reason. *See* s*upra* at 3–4.

reporting "page views," Yelp's reporting "number of reviews," or Facebook and Snapchat reporting their respective versions of "DAU"—are not relevant to determining whether Twitter's omission of DAU during the Class Period was misleading.  That in 2018 Snapchat disclosed a metric it called DAU, has nothing to do with whether Twitter's statements to the market were misleading due to the omission of a different metric that it also called DAU during the first half of 2015.  The securities laws do not measure the adequacy of disclosures by a comparison to purported peer companies and, if Plaintiffs are permitted to rely on such third party evidence it will improperly ascribe a relevance to disclosures made by other companies after, and in some cases years after, the Class Period, that is not permitted by the law.  Indeed, as this Court recognized, "'securities laws do not create an affirmative duty to disclose any and all material information.  Instead, companies can control what they have to disclose under these provisions by controlling what they say to the market.'"  April 17, 2020 Summary Judgment Decision ("SJ Decision") at 10–11 (citing *Schueneman v. Arena Pharm., Inc*., 840 F.3d 698, 705-06 (9th Cir. 2016)).

Second, during the Class Period, only Facebook disclosed DAU (which as discussed below, was <u>not</u> the same DAU metric that Twitter later disclosed); none of the other cited companies disclosed DAU during the Class Period.  Nonetheless, in a misleading manner, which is sure to confuse a jury, Plaintiffs have often compared Twitter's in-Class Period disclosures to other social media companies' post-Class Period disclosures. *See* Consolidated Amended Complaint (the "Complaint" or "Compl.") ¶ 124 (chart showing total user and user engagement metrics reported by other social media/networking companies based, in part, on post Class Period data).  Given this cross-time/apples to oranges comparison, any conceivable probative value of such evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," and thus it should be excluded.  Fed. R. Evid. 403.

Third, the fact that Twitter's platform differs from those of other social media companies in important respects also risks substantial jury confusion and prejudice to Twitter.  Although Twitter, Facebook, Instagram, TikTok and others are all broadly referred to as "social media platforms," the products these companies offer are in reality substantively different from Twitter, with corresponding differences in the way each company's users interact with the platform and how each company

measures and monetizes those interactions.  Plaintiffs ignore multiple factors, including that the various so-called "peer" social media platforms either were not public during the Class Period or offered very different products and services, both from each other and from Twitter, and reported a variety of different operational metrics as applicable to their respective business models.  *Compare* Ex. 33 at 5–6 (Twitter Form 10-K filed 2/29/16) (Pls' Prop. Ex. 728) *with* Ex. 34 at 9, 24 (Snapchat Form 10-Q filed 5/11/17).

Twitter, for example, is a public platform with the goal 'to give everyone the power to create and share ideas and information instantly and without barriers.'"  Ex. 35 (excerpt of Twitter 10-K for period ending December 31, 2014, filed March 2, 2015) at 5.  Consistent with this purpose, and in contrast to the other social media companies, which are private platforms, Twitter reaches a large audience of "logged-out" users, who access Tweets in the public domain.  *See* Ex. 36 at 259:4 –261:5 (Costolo Dep.) ("[T]he interesting challenge that was going on is that there were multiple ways of seeing and understanding Twitter and viewing tweets and engaging with tweets and interacting with them. . . and there was only one way of seeing and engaging with content on Facebook . . . .").  The importance of DAU to a company that makes its content available only to users who log into the platform is necessarily quite different than the significance of that metric to a company, like Twitter, whose reach extends well beyond the users who actually log in to the platform on a daily or monthly basis.  Similarly, Twitter (unlike other social media platforms) earned revenue during the Class Period when users *interacted* with an advertisement (*i.e.*, retweeted, favorited, replied to it or clicked on it), not when they merely viewed it.  Ex. 37 at ¶ 7 (Expert Rebuttal Report of Michele Madansky).  It follows that, given this difference in revenue-generating engagement, the metric "ad engagements" (which Twitter disclosed during the Class Period) would be more meaningful to Twitter's investors than the same might have been to investors in another social media platform that earned money based on advertising impressions (*i.e.*, views) alone.

In addition, to the extent other social media companies did report something called DAU after the Class Period, the definition of what constitutes a "daily active user" varied between companies. *Compare* Ex. 38 at 33 (Facebook Form 10-K filed 1/28/16) *with* Ex. 34 at 4 (Snapchat Form 10-Q filed 5/11/17).  Facebook, for instance, defined a daily active user as "a registered Facebook user who

logged in and visited Facebook through our website or a mobile device, used our Messenger app, or took an action to share content or activity with his or her Facebook friends or connections via a third-party website or application that is integrated with Facebook, on a given day," s*ee* Ex. 38 at 33 (Facebook Form 10-K filed 1/28/16), whereas, for example, Snapchat defined a DAU as a "registered Snapchat user who open the Snapchat application at least once during a defined 24-hour period." *See* Ex. 34 at 4 (Snapchat Form 10-Q filed 5/11/17).   In contrast, at Twitter, there was not a single consistent definition of how to measure DAU throughout the Class Period. Ex. 8 (Pls.' Ex. 730 at 46).

Allowing Plaintiffs to introduce evidence regarding post-Class Period third party user metrics would inevitably invite prejudicial cross-Class Period comparisons, as well as competing evidence and testimony into a host of irrelevant side issues, including whether other companies are truly "peers" of Twitter, whether a Facebook DAU is the same as a Twitter DAU (and how the two metrics were calculated as well as how the Twitter metric evolved), or whether other user engagement metrics reported by, for instance, LinkedIn and Yelp were meaningfully similar to Twitter DAU.  Moreover, introducing third party metrics into this trial would suggest to the jury that Twitter should have disclosed DAU (and is liable for not disclosing it) simply because other companies (*e.g*., Facebook) disclosed DAU during the Class Period, or even after the Class Period.[8]  Twitter is under no obligation, however, to disclose what Facebook disclosed and, under the federal securities laws, the adequacy of Twitter's disclosures is not determined by the disclosures that Facebook, LinkedIn, Yelp, Google or any other social media company may or may not have made.  Even if such evidence had some probative value, it is far outweighed by the substantial risk of prejudice, confusion of issues, and waste of time that will result from its introduction.  *See* Fed. R. Evid. 403.

Finally, to the extent Plaintiffs intend to rely on post-Class Period third party user metrics to cross-examine Defendants' expert Martin Dirks that, too, would be improper.  Mr. Dirks' expert opinion concerns Twitter's in-Class Period disclosures of user metrics, not the post-Class Period

---

[8] In fact, in the April 20, 2020 *Daubert* Order, the Court confirmed that the standards for disclosure in SEC filings under Regulation S-K differ from the standard for disclosure under Section 10(b) and thus evidence regarding what the SEC required vis-à-vis Twitter's own disclosures was only minimally relevant and would be excluded.  *Daubert* Order at 16.  Given this ruling, Plaintiffs cannot credibly argue that evidence regarding third party disclosures made *after* the Class Period, which they intend to introduce to demonstrate that Twitters' disclosures were deficient by failing to meet a so-called industry standard, should be permitted.

metrics disclosures of third party social media companies.  In fact, throughout his expert report, Dirks expressly limits his expert opinions to the Class Period, and to Twitter specifically.  *See, e.g.,* Ex. 39 Expert Rep. of Dirks ¶ 32 ("[I]n my opinion a reasonable investor would not view additional disclosures *by Twitter* of quarterly average DAU and DAU/MAU ratio *during the Class Period* as having significantly altered the 'total mix' of information available to him or her[.]") (emphasis added); ¶ 53 (discussing "the process by which I and, in my opinion, other reasonable investors would have assessed *Twitter during the Class Period*") (emphasis added); ¶ 108 ("Based on my experience and expertise, had Twitter disclosed the DAU values during the Class Period, it would only have improved a reasonable investor's perception of user engagement and potentially his or her willingness to buy Twitter's stock.").  Dirks does not, as Plaintiffs have suggested, categorically opine that DAU and the DAU/MAU ratio were not, at any time, significant to the reasonable investors of any social media company.

## V.    MOTION *IN LIMINE*  NO. 4 – TO EXCLUDE EVIDENCE OR ARGUMENT CONCERNING THE COMPANY'S CURRENT FINANCIAL CONDITION, CASH ON HAND, LIABILITY INSURANCE, OR ABILITY TO PAY LARGE JUDGMENTS

Plaintiffs may attempt to introduce evidence and argument concerning the Company's current financial condition, cash on hand, liability insurance, or ability to pay large judgments.  This evidence is both irrelevant and highly prejudicial, because of its strong tendency to suggest that the Company has "deep pockets" and should therefore be held liable (and required to pay a large sum in damages) for the alleged misstatements.  *See Herwick v. Budget Rent A Car System Inc*., No. CV 10–00409 SJO (PLAx), 2011 WL 13213626, at *7 (C.D. Cal. Mar. 22, 2011) ("If the jury were allowed to hear about Budget's wealth or profits, the jury may assume Budget has deep pockets and improperly determine the outcome of the trial based on those sentiments rather than the facts of the case.").  It is no surprise that such evidence is routinely excluded from jury trials.  *See, e.g., In re Homestore.com Inc. Sec. Litig*., No. CV 01–11115 RSWL (CWx), 2011 WL 291176, at *1 (C.D. Cal. Jan. 25, 2011) (granting motion *in limine* to exclude reference to party's financial condition because "[e]vidence of a party's financial condition is generally not relevant and can be unduly prejudicial as it can distract the jury from the real issues in the case."); *see also In re Glob. Health Scis*., No. SA CV 04-1486 TJH, 2007

WL 4591679, at *3 (C.D. Cal. Aug. 21, 2007) (granting motion *in limine* to exclude evidence of defendant's "wealth or financial condition"); *Higgins v. Hicks Co*., 756 F.2d 681, 684 (8th Cir. 1985) (holding that evidence of liability insurance was properly excluded as irrelevant).

Here, evidence of Twitter's current financial condition or ability to pay a judgment has no bearing on any issues pertaining to liability and, since punitive damages are not at issue, is further "inadmissible as evidence in determining the amount of compensatory damages to be awarded."[9] *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977); *Logan v. Trucks For You, Inc.*, No. CV-01-07350 CAS(BQRX), 2002 WL 34453503, at *1 (C.D. Cal. May 21, 2002) (finding "defendant's net worth" and "financial condition" irrelevant where punitive damages were not at issue).  Because such evidence thus has no "tendency to make a fact more or less probable than it would be without the evidence," it must be excluded.  Fed. R. Evid. 401; *see also Milham v. United Air Lines, Inc*., No. CV 00-5065-GAF (MANx), 2001 WL 36097433 at *4 (C.D. Cal. May 4, 2001) (granting motion *in limine* to preclude evidence of defendant's financial condition because it was not relevant to any issue); *Herwick*, 2011 WL 13213626, at *7 ("Evidence of Budget's wealth and international status is [] not relevant to Plaintiffs' remaining . . . claim because it does not make it more or less probable"); *Fogleman v. County of Los Angeles*, No. CV 10–6793 GAF (SHx), 2012 WL 13005832, at *8 (C.D. Cal. July 25, 2012) (granting motion *in limine* to exclude evidence of defendant's ability to pay a judgment because it was not relevant).

Moreover, any possible probative value of Twitter's current financial condition or ability to pay a judgment is substantially outweighed by the significant danger of unfair prejudice that will result if Plaintiffs are permitted to discuss the Company's current financial condition in the presence of the jury.  *See Geddes*, 559 F.2d at 560 ("the ability of a defendant to pay the necessary damages injects into the damage determination a foreign, diverting, and distracting issue which may effectuate a prejudicial result.").  "If the jury were allowed to hear about [defendant's] wealth or profits, the jury

---

[9] Defendants do not seek to exclude evidence of financial information that is directly relevant to the lawsuit (such as the financial information revealed by the Company in the alleged corrective disclosure), to the extent that information is used to attempt to prove or disprove Plaintiffs' claims, and not to show Defendants' ability to pay. This motion *in limine* pertains to evidence or argument concerning the Company's current financial condition or ability to pay a judgment (*e.g,*, Plaintiffs should be precluded from painting Twitter as a large company with lots of assets, cash on hand, and deep pockets).

1    may assume [defendant] has deep pockets and improperly determine the outcome of the trial based on

2    those sentiments rather than the facts of the case." *Herwick,* 2011 WL 13213626, at *7 ("Additionally,

3    the jury may award more in damages to Plaintiffs than proven at trial."); *see also Unicolors, Inc. v.*

4    *Urban Outfitters, Inc*., No. CV 14-01029 SJO (VBKx), 2015 WL 12758841, at *7 (C.D. Cal. Feb. 23,

5    2015) (granting motion *in limine* to exclude all evidence or argument concerning defendants' financial

6    condition because "any probative value . . . is outweighed by its prejudicial effect").  Accordingly, the

7    Court should exclude evidence and argument concerning the Company's current financial condition,

8    cash on hand, liability insurance, or ability to pay large judgments.

9         Plaintiffs may argue that exclusion of the Company's current financial condition should be

10   contingent on an accompanying preclusion of any reference to potential aggregate damages or

11   contextualization of Plaintiffs' purported per-share damages figure.  *See* 4/29/20 Joint Submission

12   ("Pls' Motion in Limine 5: To Exclude Evidence or Argument Concerning Aggregate Damages

13   Suffered by the Class Members").  That, however, would not be a correct, or fair, result.  Evidence of

14   the Company's current financial condition is not somehow made more relevant, or less prejudicial, if

15   the jury is informed that, because this is a class action, the total damages amount will be higher than

16   the per-share damages figure Plaintiffs will present.  In recognition of the highly prejudicial nature of

17   evidence concerning a defendant's financial condition, juries are routinely asked to determine total

18   compensatory damages (and are presented evidence concerning the amount at stake in an action),

19   without also being informed of the defendants' ability to pay.  *See, e.g., Hunt v. Cnty. of Orange*, No.

20   07-cv-00705 MMM, 2009 WL 10702539, at *3 (C.D. Cal. Oct. 7, 2009) (granting motion *in limine* to

21   exclude evidence of defendants' financial condition "in connection with the jury's determination of

22   the amount of compensatory damages."); *Escobar v. Airbus Helicopter SAS*, No. 13-cv-00598 HG-

23   RLP, 2016 WL 5897554, at * (D. Haw. Oct. 7, 2016) ("During the liability and compensatory damages

24   phase of the trial, Plaintiff is precluded from introducing evidence or reference to [defendant's] size,

25   financial condition, solvency, or ability to pay a verdict or satisfy a judgment.").  Evidence of Twitter's

26   current financial condition should thus be excluded, irrespective of whether Plaintiffs' motion to

27   preclude evidence and argument concerning aggregate damages is admitted or denied.

28

1

2  **VI.     MOTION *IN LIMINE* NO. 5 – TO EXCLUDE EVIDENCE OR ARGUMENT**
       **CONCERNING THE INDIVIDUAL DEFENDANTS' FINANCIAL CONDITION,**
3      **NET WORTH, INCLUDING OWNERSHIP OF TWITTER STOCK,**
       **COMPENSATION, ABILITY TO PAY, LIABILITY INSURANCE OR**
4      **INDEMNIFICATION**

5          Plaintiffs should be precluded from presenting evidence or argument concerning the Individual

6  Defendants' financial condition, net worth, including ownership of Twitter stock, compensation,

7  ability to pay, liability insurance or indemnification.  As explained above, such evidence is irrelevant

8  to Defendants' liability for securities fraud and could only serve the improper purpose of conveying

9  to the jury that Defendants amassed their wealth at least in part from the alleged fraud and should be

10 held liable because of their wealth.  *See, e.g., In re Homestore.com, Inc.*, 2011 WL 291176, at *1

11 (granting motion to exclude evidence of plaintiffs' financial condition, because "[e]vidence of a party's

12 financial condition is generally not relevant and can be unduly prejudicial, as it can distract the jury

13 from the real issues in the case"); *In re Glob. Health Scis.*, No. SA CV 04-1486 TJH, 2007 WL

14 4591679, at *3 (C.D. Cal. Aug. 21, 2007) (granting motion in limine to exclude evidence of

15 defendant's "wealth or financial condition"); *Fogleman,* 2012 WL 13005832, at *8 (granting motion

16 to exclude evidence of indemnification and defendant's ability to pay); *Armbrester v. City of Berkeley*,

17 No. 16-CV-04615-JCS, 2018 WL 2865324, at *1 (N.D. Cal. June 11, 2018) (granted motion to exclude

18 evidence of indemnification).

19         Although evidence related to a defendant's wealth has, under certain circumstances, been

20 considered relevant for the limited purpose of presenting a theory of improper financial motive, *see*

21 *Smilovits v. First Solar, Inc.*, No. CV12-0555-PHX-DGC, 2019 WL 6698199, at *14 (D. Ariz. Dec.

22 9, 2019), here Plaintiffs have repeatedly disclaimed reliance on any such theory.  *See* MTD Order at

23 41 ("Plaintiff's theory of the case is that Defendants felt pressure to live up to the targets announced

24 at Analyst Day, *not* that they sought personal financial gain.").  Moreover, when courts have admitted

25 evidence of financial condition for the limited purpose of establishing financial motive, they have

26 carefully carved out the admissible evidence (i.e., sums received from improper stock sales during the

27 class period) from "other evidence of Defendants' wealth, such as their net worth or lifestyle," which

28 "would present a risk of unfair prejudice that would outweigh its marginal relevance." *Smilovits v.*

*First Solar*, 2019 WL 6698199, at *14.  This is because, as court after court has recognized, "[c]omments on the wealth of a party have repeatedly and unequivocally been held highly prejudicial, and often alone have warranted reversal."  *Whittenberg v. Werner Enters. Inc.*, 561 F.3d 1122, 1130 n.1 (10th Cir. 2009); *see also Larez v. Holcomb*, 16 F.3d 1513, 1518 (9th Cir. 1994) ("It has long been the rule in our courts that evidence of insurance or other indemnification is not admissible on the issue of damages" and "has been almost universally held that the receipt of such evidence constitutes prejudicial error sufficient to require reversal"); *Adams Labs., Inc. v. Jacobs En'g Co.*, 761 F.2d 1218, 1226 (7th Cir. 1985) ("Courts have held that appealing to the sympathy of jurors through references to the relative wealth of the defendants in contrast to the relative poverty of the plaintiffs is improper and may be cause for reversal.").  The Court should adhere to these well-established precedents and exclude all evidence or argument concerning the Individual Defendants' net worth (including stock ownership), compensation, financial condition, ability to pay, liability insurance or indemnification.

## VII.    MOTION *IN LIMINE* NO. 6 – TO PRECLUDE PLAINTIFFS FROM PRESENTING EVIDENCE AND ARGUMENT CONCERNING THEORIES OF LIABILITY THAT THE COURT REJECTED IN ITS RULING ON DEFENDANTS' MOTION TO DISMISS

Plaintiffs should be precluded from presenting evidence and argument concerning theories of liability or claims that this Court rejected in its October 16, 2017 Order on Defs' Mot. to Dismiss (the "MTD Order").  Such theories or claims, which were dismissed from this case (and not re-pled), are not relevant to the narrowed case going to trial and any conceivable probative value would be "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [or] wasting time."  Fed. R. Evid. 403.

In the MTD Order, the Court, *inter alia,* dismissed Plaintiffs' affirmative misrepresentation claims based on Defendants' statements regarding timeline views, the DAU/MAU ratio, and MAU made during Twitter's February 5, 2015 earnings call (including, as discussed below, a statement about a 3% increase in timeline views, a statement that, "in our more mature markets, we have a very high DAU to MAU, 50% plus" (the "50% plus statement"), and two similar statements that Twitter's "MAU trend has already turned around"), finding that the statements at issue were not affirmatively false or misleading "in and of themselves" (as opposed to Plaintiffs' omission theory which survived

the motion to dismiss). MTD Order at 28.  The Court also found statements regarding new product initiatives to be non-actionable puffery.  *Id.* at 34 fn. 34.  The Court, however, allowed the case to proceed on Plaintiffs' omissions theory as to the February 5, 2015 ad engagement, TLV, DAU/MAU ratio and MAU statements as well as to one alleged affirmative misrepresentation regarding DAU/MAU made by Mr. Noto during Twitter's earnings call on April 28, 2015 ("DAU to MAU ratios in the quarter were similar to what they were" at Analyst Day").  *Id.*  at 29–30.  On September 13, 2019, following the completion of discovery, Defendants moved for Summary Judgment on each of the surviving omission claims (based on the February 5, 2015 statements) and the one affirmative misrepresentation claim (based on an April 28, 2015 statement).  The Court issued its decision on April 17, 2020, denying Defendants' Motion for Summary Judgment.  In doing so, the Court held that a genuine issue of material fact was raised as to Plaintiffs' omissions claims regarding three statements made on February 5, 2015—(i) the 50% plus statement; (ii) a statement that "[t]hey all migrate up to a higher rate over time" in reference to DAU/MAU in certain markets, and (iii) a statement that "our MAU trend has already turned around"—and Plaintiffs' affirmative misrepresentation claim in connection with the DAU to MAU ratios "were similar" statement made on April 28, 2015.  SJ Decision at 19.

Thus, although the Court allowed certain claims to go forward on the pleadings (and, subsequently, denied the Motion for Summary Judgment) there were several theories or claims that were outright rejected by the Court at the motion to dismiss stage and are no longer part of the case. These include the following holdings by the Court:

1.  There is no affirmative duty to disclose DAU metrics and specifically that "[SEC Regulation S-K] do[es] not create an affirmative duty to disclose" key operating metrics like DAU.  MTD Order at 21, fn. 20.  *See also Daubert* Order at 16 (excluding testimony by Plaintiffs' expert Jason Flemmons that "any SEC rule or regulation requires the disclosure of any metric at issue in this case, in SEC filings or otherwise" because such testimony "would amount to an impermissible legal conclusion").

2.  The February 5, 2015 50% plus statement was not "false in and of [itself]" (MTD Order at 28-29) (although the Court denied the motion to dismiss with respect to this statement based on "the omission of DAU metrics.").  *Id*. at 27–28; *see* SJ Decision at 13.

3.  The February 5, 2015 statement that TLVs per MAU were up 3% in Q4 2014 compared to Q4 2013 also, like the 50% plus statement, was not "false in and of [itself]." MTD Order at 28-29.

1  Defendants note that this statement as well as the February 5, 2015 statement that ad
2  engagements over the same period were up by 70% were not addressed by the Court's
   Summary Judgment Decision and are the subject of Defendants' Motion for Clarification, ECF
3  No. 493.

4.  The February 5, 2015 statements that January MAU trends had "already turned around" were
4   not affirmatively false (although Plaintiffs omission claims on these same statements survived
5   the motion to dismiss).  MTD Order at 26, 34–35, 41.  Among other things, the reason these
    statements were not false was because Twitter disclosed the existence of "low-quality" users
6   and the fact that some users were "robot accounts."  *See also* SJ Decision at 2 fn. 2 ("The Court
7   granted the motion [to dismiss] with respect to the theory that Defendants made misleading
    statements about MAU trends by failing to disclose that such trends were based on low-quality
8   users.").

9  5.  "Plaintiff's theory of the case is that Defendants felt pressure to live up to the targets announced
10     at Analyst Day, not that they sought personal financial gain."  MTD Order at 40 – 41.

11 6.  In addition to the theories and claims referenced above, the Court also held that (i) statements
12     made on February 5 and April 28 regarding "a number of different ways that we measure
       engagement" or "there's a lot of different metrics that we look at internally were not actionable
13     even though Twitter had plausibly alleged that "DAU was in fact Twitter's main user
       engagement metric." Id. at 22–23; (ii) Defendants' April 28 statements about the success of
14     certain new product initiatives in driving user engagement were "non-actionable puffery."
       MTD Order 30–31; and (iii) testimony of the Confidential Witnesses ("CW") did not support
15     scienter of the Individual Defendants because the allegations in the Complaint do not show
       any CW had personal knowledge of the Individual Defendants' state of mind.  *Id*. at 39–40.

16     Plaintiffs should be precluded from presenting evidence or argument concerning theories of

17 liability dismissed by this Court because they are irrelevant to the remaining claims.  Fed. R. Evid.

18 401; *see also Brown v. Kavanaugh,* No. 1:08–cv–01764–LJO–BAM PC, 2013 WL 1819796, at *2

19 (E.D. Cal. Apr. 30, 2013) (holding that "[m]atters pled and dismissed in this case are not relevant to

20 Plaintiff's remaining claims.");  *Saenz v. Reeves,* No. 1:09–cv–00057–BAM PC, 2013 WL 2481733,

21 at *5 (E.D. Cal. June 10, 2013) ("In the pretrial order, the Court expressly stated that Plaintiff may not

22 revive any dismissed claims at trial.  Matters pled and dismissed in this case are not relevant to

23 Plaintiff's remaining claims.");  *Shepard v. Quillen*, No. 1:09–cv–00809–BAM (PC), 2013 WL

24 978201, at *4 (E.D. Cal. Mar. 12, 2013) (granting Defendant's motion in limine to preclude evidence

25 relating to dismissed party or dismissed claims).

26     Additionally, allowing Plaintiffs to present evidence and arguments on dismissed claims would

27 mislead the jury and cause confusion over what claims, theories, or statements are still at issue.  *See*

28

DEFTS' MOTIONS *IN LIMINE*
Case No.  4:16-CV-05314-JST

*Fallon v. Potter*, No. 04–526–JJB, 2008 WL 5395984, at *2 (M.D. La. Dec. 23, 2008) (granting motion *in limine* to exclude evidence and testimony regarding dismissed and abandoned claims because they would "potentially confuse and prejudice the jury."); *Cooper v. Montgomery County,* No. 3:13-cv-272, 2018 WL 272523, at *2-3 (S.D. Ohio Jan. 2, 2018) (granting motion *in limine* to preclude evidence related to dismissed claims because "[n]ot only is such evidence irrelevant to the one remaining claim, but its probative value would be substantially outweighed by the danger of unfair prejudice and confusion of the issues.").

Moreover, admission of this evidence and argument would be confusing to the jury and would cause substantial unnecessary delay.  If Plaintiffs were allowed to present evidence and arguments on dismissed theories of liability, Defendants would be forced to present evidence and argument rebutting these theories.  For instance, in their Complaint, Plaintiffs alleged that the SEC's MD&A disclosure rules, specifically SEC Release 33-8350 (which provides interpretative guidance on Item 303 of Regulation S-K), required Defendants to disclose key internal metrics including DAU.  Compl. ¶ 112.  To support this assertion, both Plaintiffs referred to Twitter's April/May 2015 correspondence with the SEC, in which the SEC asked Twitter to describe the "alternative metric(s) you anticipate presenting in future filings to explain trends in user engagement" and referred Twitter to "Section III.B of SEC Release 33-8350." *Id.* ¶¶ 113–119.  In the motion to dismiss decision, the Court rejected these allegations both because Item 303 cannot serve as the basis for a Section 10(b) claim in the Ninth Circuit and because the SEC disclosure rules (Regulation S-K, 17 C.F.R. § 229, and SEC Release 33-8350) referred to by Plaintiffs "do not create an affirmative duty to disclose." Subsequently, in the *Daubert* Order the Court also excluded testimony by Mr. Flemmons on the same subject as "impermissible legal conclusion."  MTD Order at 21 n.20; *Daubert* Order at 16.  Given the clear holding of the Court (and consistent *Daubert* Order), Plaintiffs should not be permitted to present such evidence or argument at trial.  If they were to, it would necessitate Defendant presenting their own evidence in rebuttal, leading to undue delay as the case is sidetracked into a debate over whether the SEC disclosure rules required the disclosure of DAU, even though this very issue has already been definitively determined by the Court.

## VIII.   MOTION *IN LIMINE* NO. 7 – TO PRECLUDE THE IMPUTATION OF THE STATE OF MIND OF ANY NON-DEFENDANT WITNESSES TO THE COMPANY

Plaintiffs may elicit testimony from certain non-defendant witnesses regarding their knowledge about the challenged statements and may attempt to argue or suggest to the jury that the state of mind of *any* senior controlling officer at Twitter can be imputed to the Company for the purpose of establishing the Company's scienter.   Plaintiffs' witness list, for instance, states that Plaintiffs intend to examine virtually every Twitter fact witness about "the witness's state of mind," Ex. 2 at 2–9, and Plaintiffs' proposed jury instructions state the following about scienter as to the Company: "Defendant Twitter, Inc., which can only act through its employees, officers, or directors, acted knowingly if either of the individual defendants *or any senior controlling officer of Twitter* acted knowingly and within their scope of authority." (emphasis added).   That is not the law.   Under *Janus Capital Group, Inc. v. First Derivative Traders*, "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."   564 U.S. 135, 142 (2011)*; see also Baker v. SeaWorld Entertainment, Inc.*, No. 14-cv-2129-MMA (AGS), 2020 WL 241441, at *3 (S.D. Cal. Jan. 16, 2020) (granting motion *in limine* to preclude the imputation to SeaWorld of the state of mind of Fred Jacobs, the company's vice president of corporate communications—even though Mr. Jacobs actually issued the very statement in question—because, for purposes of *Janus,* he was not "the maker," *i.e*., the person with "ultimate authority" over the statement).[10]

Here, Mr. Costolo and Mr. Noto (who are also, respectively, the CEO and CFO) made the statements at issue and it is their mental states that matter for the purpose of establishing scienter as to Twitter.   As such, it would be improper to impute to the Company the state of mind of other, non-defendant Twitter executives (or other employees), who could not possibly be the "makers" of the statements under *Janus*.   At most, other Twitter executives may have assisted in the preparations of the relevant statements.   But the notion that such a person could be considered the statements' "maker" was flatly rejected by the Supreme Court in *Janus* and must also be rejected here.   564 U.S. at 142

---

[10] Defendants do *not* seek to exclude testimony by non-defendants regarding their knowledge of the challenged statements, but rather to preclude the imputation of the mental states of witnesses other than the Individual Defendants to the Company, just as the Court did in the *SeaWorld* case.

1    ("One who prepares or publishes a statement on behalf of another is not its maker.").

2            Common law principles of agency, which courts routinely look to for guidance when assessing

3    entity liability under § 10(b) and Rule 10b-5, also support precluding the imputation of any non-

4    defendant's state of mind to Twitter  *See In re ChinaCast Education Corp. Sec. Litig.*, 809 F.3d 471,

5    475 (9th Cir. 2015) ("Because the Securities Exchange Act and accompanying regulations do not

6    contain any explicit instructions on when an employee's acts and intent are to be imputed as those of

7    the company, courts have looked to agency principles for guidance.").  Under those principles, while

8    "it is fundamental that an employer is liable for the torts of his employee committed while acting in

9    the scope of his employment," *id.* at 476, "for claims of fraud, respondeat superior does not apply 'if

10   one agent makes a statement, believing it to be true, while another agent knows facts that falsify the

11   other agent's statement.'"  *Five Star Gourmet Foods, Inc. v. Fresh Express, Inc.*, No. 19-CV-05611-

12   PJH, 2020 WL 513287, at *5 (N.D. Cal. Jan. 31, 2020).  This is because "[i]n such a scenario, no agent

13   of the company has committed fraud because liability for fraud requires that the defendant made a

14   material misstatement with an intent to deceive."  *Id.*

15           Consistent with this principle, courts have rejected the argument that establishing the scienter

16   of an individual who was himself not responsible for the making of the challenged statement suffices

17   to establish scienter as to a defendant corporation.  *See, e.g, Five Star Gourmet Foods, Inc.*, 2020 WL

18   513287, at *5 ("Plaintiffs fail to allege that the only person who made an adequately-alleged statement

19   (Pereira) acted with scienter or intent to defraud."); *In re Infineon Techs. AG Sec. Litig.*, No. C 04-

20   04156 JW, 2008 WL 11333700, at *8 (N.D. Cal. Jan. 25, 2008) ("For purposes of determining whether

21   a statement made by the corporation was made by it with the requisite Rule 10(b) scienter," a court

22   should look "to the state of mind of the individual corporate official or officials who make or issue the

23   statement.").  The Ninth Circuit's decision in *Glazer Capital Management, LP v. Magistri*, is a good

24   example.  549 F.3d 736, 744 (9th Cir. 2008).  In that case, the plaintiff alleged that a company and its

25   CEO, Sergio Magistri, violated §10(b) and Rule 10b-5 by claiming in a merger agreement that the

26   company was "in compliance in all material respects with all laws," even though several months later

27   it disclosed that "an internal investigation had revealed possible violations of the [Foreign Corrupt

28   Practices Act]."  *Id.* at 740.  The court considered whether the plaintiff "was required to plead scienter

30

as to Magistri [who had signed the merger agreement] as an individual" in order to plead scienter as to the company.  *Id.* at 743.  After rejecting plaintiff's theory of "collective scienter," which would hold the company as a whole responsible for the statements contained in the merger agreement, *id.*, the Court affirmed the district court's denial of plaintiff's request to amend his complaint to plead scienter as to a different company executive (the company's "former senior vice president for sales and marketing[.]").[11]  *Id.* at 745.  The Court explained, "[P]laintiff was required to plead individual scienter with respect to Magistri because Magistri was responsible for actually making the statements in the merger agreement.  As the district court correctly held in denying the motion, the fact that [plaintiff] could have shown that a *different* executive knew about the FCPA violations would do nothing to resuscitate [plaintiff's] claims."  *Id.*

The same is true here.  As explained above, Mr. Costolo and Mr. Noto were not only the speakers of the challenged statements, they were also, respectively, the CEO and CFO.  If Plaintiffs are unable to establish the requisite state of mind as to Mr. Costolo and Mr. Noto, then—as in *Glazer*— any showing that some other executive thought that the statements were misleading would "do nothing to resuscitate [Plaintiffs'] claims."  *Id.*  This reasoning makes perfect sense—although another executive could have had a particular understanding about one of the challenged statements, that

---

[11] As explained *infra* at 35, any theory of "collective scienter" must fail, both because the Ninth Circuit has never adopted such a theory (although it has opined that "in certain circumstances, some form of collective scienter *pleading* might be appropriate," *Glazer*, 549 F.3d at 744), and because, even in circuits where "collective scienter" has been adopted, its application has been limited to the pleading context.  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008) (approving of the use of collective scienter for *pleading* purposes, but affirming that "[t]o prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation."); *Makor Issues & Rights, Ltd. V. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008) ("To establish corporate liability for a violation of Rule 10b–5 requires "'look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'").  Notably, other circuits have rejected the theory of collective scienter, even at the pleading stage.  *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) ("For purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.").

executive may not have been privy to the information or knowledge that formed the basis for the statements. Any testimony concerning a non-defendant's state of mind with respect to the challenged statements must therefore not be imputed to the Company.

Plaintiffs may rely on an isolated sentence from *In re ChinaCast Education Corporation Securities Litigation* to support their contention that the mental state of *any* senior controlling officer can be imputed to Twitter for the purpose of establishing scienter as to Twitter. 809 F.3d at 476 ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority."). This sentence does not support the overbroad proposition that Plaintiffs espouse. *ChinaCast* addressed the question of whether the scienter of a CEO—who actually made, and was responsible for, the allegedly misleading statements at issue— could be imputed to the company, even if the CEO behaved in ways that were adverse to the company's interests. *Id.* at 473. The Circuit used the above-quoted language on which Plaintiffs rely to reaffirm the basic principle that "[i]n the context of Rule 10b-5, . . . a corporation is responsible for a corporate officer's fraud." *Id.* at 476; *see also* SJ Decision at 21 n.12 (citing the above-quoted language from *ChinaCast* for the correct proposition that "[b]ecause a genuine dispute exists as to whether Costolo and Noto acted with scienter, the same is true as to Twitter.") It did not, however, assert (let alone hold) that the scienter of a non-defendant officer, who did not make the allegedly misleading statements at issue, could be imputed to the company for the purpose of establishing the company's liability. That question was not raised in *ChinaCast*, and, as explained above, where it has been raised in other cases, it has been rejected by the Ninth Circuit. *See Glazer*, 549 F.3d at 745.

## IX.    MOTION *IN LIMINE* NO. 8 – TO EXCLUDE EVIDENCE AND ARGUMENT CONCERNING PRE-CLASS PERIOD STOCK SALES BY THE INDIVIDUAL DEFENDANTS AND STOCK SALES BY AND COMPENSATION OF NON-DEFENDANT TWITTER EXECUTIVES AT ANY TIME

Plaintiffs seek to introduce numerous exhibits concerning the pre-Class Period stock sales of the Individual Defendants, as well as the pre-, during, and post-Class Period stock sales and compensation of non-defendant Twitter employees. This evidence is irrelevant to Plaintiffs' theory of the case, which is that "Defendants felt pressure to live up to the targets announced at Analyst Day,

*not* that they sought personal financial gain."  MTD Order at 41.  It is also unduly prejudicial, cumbersome, and likely to confuse the jury.  It should be excluded.

### A.     Individual Defendants

Plaintiffs' allegations in this case are premised on a familiar theory: that Defendants' false or misleading statements caused Twitter's stock to become artificially inflated during the Class Period, resulting in a consequent drop in the stock price (and loss to the class) upon the revelation of the truth. Compl. ¶¶ 17, 134–38.  As such, stock sales by defendants *during the Class Period* may support an inference of scienter.  This is because, logically, "the period between the allegedly fraudulent statements and the subsequent public disclosure . . . is the period during which [defendants] would have benefitted from any allegedly fraudulent statements[.]"  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884–85 (9th Cir. 2012).  By contrast, as confirmed by both precedent and common sense, the sale of stock *prior* to the start of the Class Period—before any fraudulent statement could have inflated the stock price—is not indicative of any improper financial motive.  *See In re Apple Comp. Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) ("Large sales of stock *before* the class period are inconsistent with plaintiffs' theory that defendants attempted to drive up the price of Apple stock *during* the class period."); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (absence of class period stock sales supports the inference that "there was no insider information from which to benefit").

Here, notably, neither Individual Defendant sold stock during the Class Period, and Mr. Noto, in fact, purchased it.[12]  The Class Period stock sales of the Individual Defendants thus do not support an inference of scienter—and Plaintiffs have never alleged that they do.  *See* MTD Order at 40 (the Complaint "does not rely on allegations of improper financial motive to demonstrate scienter . . . .").  Nevertheless, Plaintiffs seek to introduce at trial numerous exhibits concerning the Individual Defendants' *pre-Class Period* trading behaviors, such as pre-Class Period Form 4s and 10b5-1 plans and cancelation letters.  *See, e.g.,* Ex. 40 (Pls' Prop. Exs. 689) (Defendant Form 4).  This evidence is

---

[12]   The only exception were certain routine and mandatory sales of stock by Mr. Costolo for tax purposes, which have no bearing on scienter. *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) ("[C]redible and wholly innocent explanations for stock sales, ranging from long-standing programs of periodic divestment, to the need to free cash to meet matured tax liabilities, if unrebutted, are sufficient to defeat any inference of bad faith.") (internal citations omitted).

highly prejudicial, and irrelevant to whether Defendants acted with scienter during the Class Period, especially since Plaintiffs do not rely on a theory of improper financial motive. *See In re Apple Comp. Sec. Litig.*, 886 F.2d at 1117 ("Large sales of stock *before* the class period are inconsistent with plaintiffs' theory that defendants attempted to drive up the price of Apple stock *during* the Class Period.").

To the extent that Plaintiffs offer such evidence to rebut Defendants' contention that the *absence* of Class Period stock sales cuts against scienter, that, too, is improper. Defendants are entitled to point out the absence of evidence on a relevant issue without opening the door to cumbersome, inadmissible evidence that is irrelevant to any of Plaintiffs' actual allegations. *See United States v. Sine*, 493 F.3d 1021, 1037–38 (9th Cir. 2007). Although the "lack of stock sales by a defendant is not dispositive to scienter," *see No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003); SJ Decision at 24, it is still *relevant* to the inquiry. *See Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 48 (2011) ("The absence of a motive allegation, though relevant, is not dispositive."); *In re Maxwell Techs. Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1044 (S.D. Cal. 2014) ("The fact that there were no stock sales during this period can be interpreted to support an inference that [defendants] were unaware of this misconduct.") Evidence pertaining to it is, accordingly, admissible at trial. *See* Fed. R. Evid. 402. By contrast, and as explained above, the Individual Defendants' pre-Class Period trading behaviors are, in the absence of Class Period stock sales, not relevant and, accordingly, inadmissible. Indeed, Plaintiffs do not allege that Twitter's stock was artificially inflated prior to the Class Period, and evidence regarding their pre-Class Period sales would invite a time consuming (and confusing) side-show into, for instance, Mr. Costolo's motivations for purchasing stock at a time when Plaintiffs do not contend any misrepresentations had been made.

### B. Non-Defendant Twitter Executives

In addition to evidence concerning the Individual Defendants' pre-Class Period stock sales, Plaintiffs also seek to introduce numerous exhibits concerning the stock sales and compensation of non-defendant Twitter employees. *See, e.g.,* Exs. 41–42 (Pls' Prop. Exs. 292–93) (emails concerning the stock sales of Alex Roetter and Kevin Weil); Exs. 43–44 (Pls' Prop. Exs. 373, 883)) (non-defendant Form 4s). Plaintiffs' witness list also indicates that they intend to examine non-Defendant employees

regarding their compensation. *See* Ex. 2 at 2, 4–10.  This evidence is irrelevant to whether the Individual Defendants acted with scienter and should be excluded.  *See, e.g., Browning v. Amyris, Inc.*, 13–cv–02209–WHO, 2014 WL 1285175, at *17 n.5 (N.D. Cal. Mar. 24, 2014) ("Because the plaintiffs do not explain how stock sales by non-defendants relate to the issue of whether the defendants acted with scienter, there is no need to consider such stock sales."); *In re Versant Object Technology Corp.*, No. C 98-00299 CW, 2001 WL 34065027, at *5 (N.D. Cal. Dec. 4, 2001) ("Plaintiffs include the sales of non-Defendant Pulkownik, which are irrelevant to alleging scienter against the named Defendants."); *Plevy v. Haggerty*, 38 F.Supp.2d 816, 834 n.12 (C.D. Cal. 1998) ("It is unclear to the Court why Plaintiffs included sales by unnamed insiders. Their transactions are irrelevant to alleging scienter against the five named Defendants.").

To the extent Plaintiffs intend to introduce evidence of non-defendant stock sales and compensation to establish scienter as to the Company, that, too, is improper.  As explained above, since the non-defendant Twitter employees did not make any of the challenged statements, their mental states cannot be imputed to the Company.  *See supra*, at 29–30.  Moreover, any attempt to establish the "collective scienter" of the Company, as opposed to the scienter of a specific individual who acted on the Company's behalf, would be improper and contrary to law because the collective scienter doctrine only applies at the pleadings phase.  *See Glazer,* 549 F.3d at 744 (acknowledging that the Ninth Circuit "ha[s] not previously adopted a theory of collective scienter," though "in certain circumstances, some form of collective scienter *pleading* might be appropriate") (emphasis added); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008) (approving of the use of collective scienter for *pleading* purposes, but affirming that "[t]o prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation.").

Finally, even if the stock sales of non-defendants or their compensation (which is far removed from the facts in question) were somehow marginally relevant, their inclusion would cause unfair prejudice, confusion, and substantial unnecessary delay. Fed. R. Evid. 403.  Plaintiffs propose introducing at least 30 Form 4s, each of which identify numerous trades, from six non-defendants,

including Vijaya Gadde, an attorney who is not on either Parties' witness lists, and numerous other exhibits concerning the stock sales and compensation of non-parties through testimony. If presented with such evidence, there is a real danger that "the jury might unduly emphasize it to impute general wrongdoing to [Defendants], justifying its exclusion under Rule 403." *Spin Master Ltd. V. Zobmondo Entertainm't, LLC*, No. 06-cv-3459 ABC (PLAx), 2012 WL 8134012, at *13 (C.D. Cal. Apr. 27, 2012). Moreover, if these exhibits are introduced at trial, Defendants will be required to contextualize and explain them to prevent the jury from drawing undue adverse inferences against Defendants. This would inject substantial length and unnecessary confusion into the trial—all to resolve an issue that is not relevant. All evidence or argument concerning non-defendant stock sales and compensation should therefore be excluded.

## X.     MOTION *IN LIMINE* NO. 9 – TO PRECLUDE PLAINTIFFS' PROFFERED EXPERT JAN DAWSON FROM TESTIFYING AS A FACT WITNESS

Plaintiffs seek to call Jan Dawson, the Founder of Jackdaw Research, to testify at trial as both a fact witness and an expert witness. Ex. 2 at 3, 8 (Pls' Prelim. Trial Witness List). As a fact witness, Mr. Dawson apparently intends to testify about his "experience as a technology analyst" and his "research and analyst coverage of Twitter and other social media companies before and during the Class period, including the relevance of information regarding user growth, user engagement, and related metrics." *Id.* at 3. As an expert witness, Mr. Dawson intends to testify as to "the subject matters set forth in his expert rebuttal report," *id.*, which are likewise based on his "career as an industry analyst," including as an analyst who tracked Twitter, and similarly concern the relevance of various metrics of engagement during the Class Period. Ex. 45 at 2 (Dawson Expert Rebuttal Report). There is little, if any, apparent difference between Dawson's anticipated testimony as a fact witness and his proposed testimony as an expert.

Permitting Mr. Dawson to testify as both a fact witness and an expert witness regarding the identical or nearly identical subject matter would cause needless confusion and unfair prejudice, as it would imbue his fact witness testimony with "unmerited credibility." *United States v. Freeman*, 498 F.3d 893, 903 (9th Cir. 2007). Although there is no categorical rule barring a witness from testifying as both a fact witness and an expert witness, the Ninth Circuit has recognized that the admission of

such testimony can be accompanied by significant "dangers." *Freeman*, 498 F.3d at 902. Most importantly, "by qualifying as an 'expert,' the witness attains unmerited credibility when testifying about factual matters from first-hand knowledge." *Id.* at 903. Any "lack of clarity regarding [the witness's] dual roles [thus] create[s] a risk that there [will be] an imprimatur of scientific or technical validity to the entirety of his testimony." *Id.*; *see also Burke v. City of Santa Monica*, No. CV 09–02259 MMM (PLAx), 2011 WL 13213593, at *20 (C.D. Cal. Jan. 10, 2011). In addition, a "blurred distinction between [a witness's] expert and lay testimony may allow[] [the witness] to rely upon and convey inadmissible hearsay evidence." *Id.* at 904 ("Once [the witness] stopped testifying as an expert and began providing lay testimony, he was no longer 'allowed ... to testify based on hearsay information, and to couch his observations as generalized 'opinions' rather than as firsthand knowledge.'"). In this case, where there is substantial overlap between the witness's purported expert testimony and his proposed testimony as a fact witness, the risks of confusion and prejudice are particularly acute. Mr. Dawson should thus be precluded from testifying as a fact witness at trial.

Furthermore, under Rule 701, a lay witness may testify in the form of an opinion only if that opinion is "rationally based on the witness's perception," "helpful," and "not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. "The purpose of this limitation is 'to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.'" *Humboldt Baykeeper,* 2010 WL 2179900, at *1 (quoting Fed. R. Evid. 701 Advisory Committee Notes (2000 Amendment)); *see* Fed. R. Evid. 702 (setting forth reliability requirements for "a witness who is qualified as an expert by knowledge, skill, experience, training, or education"). Thus, if a witness's opinion testimony is "properly characterized as testimony based on [his] perceptions, education, training, and experience . . . [i]t requires precisely the type of 'specialized knowledge' [that is] . . . governed by Rule 702." *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997).

Here, Mr. Dawson plans to testify as a fact witness about his "research and analyst coverage" of Twitter and other social media companies, as well as about his opinion on the "relevance of information regarding user growth, user engagement, and related metrics." This testimony would be based not on any first-hand knowledge of Twitter's operations (he has none), but rather on his

education, training, and experience as an industry analyst.  *See* Ex. 45 at 2–3 (Dawson Expert Rebuttal Report) (describing experience and qualifications).   As this Court confirmed in its denial of Defendants' motion to exclude Mr. Dawson's testimony pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993), this is expert testimony, subject to the requirements of Rule 702.  Dkt. 482 at 8.  Plaintiffs should not be permitted to offer the *same exact* witness to testify about the *same exact* topics, only this time styled as a lay witness, rather than as an expert.  Mr. Dawson's proposed fact witness testimony is improper and should be excluded.

## XI.   MOTION *IN LIMINE* NO. 10 – TO PRECLUDE PLAINTIFFS FROM CALLING KRISTA BESSINGER TO TESTIFY LIVE REGARDING RULE 30(B)(6) TOPICS

Plaintiffs' preliminary witness list indicates that Krista Bessinger, Twitter's Senior Director of Investor Relations during the Class Period, will be called to testify about numerous topics, including "[t]he subject matters addressed in [her] Rule 30(b)(6) deposition."  Ex. 2 at 1–2 (Pls' Prelim. Witness List).  This is improper.  Plaintiffs have already designated 292 pages of Ms. Bessinger's 30(b)(6) deposition testimony and are entitled to play those portions of the videotaped deposition (provided the specific passages are not otherwise objectionable).  *See* Fed. R. Civ. P. 32(a)(3).  It is not clear why Plaintiffs intend to *also* examine Ms. Bessinger regarding the same topics as a live witness. Regardless, when it comes to her testimony live at trial, "Federal Rule of Evidence 602 limits the scope of a witness's testimony to matters that are within his or her *personal knowledge*."  *Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 907 (5th Cir. 2010) (per curiam) (emphasis added).

In light of Rule 602, courts have limited corporate designees to testifying to matters within their personal knowledge, and not the broader knowledge of the corporation.[13]  For instance, in *Union Pump Co. v. Centrifugal Technology Inc.*, the Fifth Circuit considered a challenge to the district court's admission of testimony from plaintiff's corporative representative, Mike Bixler, about "numerous matters that were hearsay and not within his personal knowledge."  404 F. App'x at 907.  The plaintiff argued that its representative was "permitted to testify to matters that, although they were not within

---

[13] "[T]he case authority is split on the issue of whether a corporate designee may testify concerning matters outside of his or her personal knowledge at trial," and there is "no authoritative ruling from the Ninth Circuit on this issue," *Lister v. Hyatt Corp.*, No. C18-0961JLR, 2020 WL 419454, at *2 (W.D. Wash. Jan. 24, 2020).

his own personal knowledge, were within the knowledge of the corporation because Bixler was designated as Union Pump's corporate representative." *Id.* The Court rejected this argument (though it concluded that any error was harmless). It explained that although "Federal Rule of Civil Procedure 30(b)(6) allows corporate representatives to testify to matters within the corporation's knowledge during deposition, and Rule 32(a)(3) permits an adverse party to use that deposition testimony during trial . . . a corporative representative may not testify to matters outside his own personal knowledge 'to the extent that information [is] hearsay not falling within one of the authorized exceptions.'" *Id.* (emphasis omitted) (quoting *Brazos River Auth. v. GE Ionics, Inc.,* 469 F.3d 416, 435 (5th Cir.2006)). Other courts have reached the same, or similar, conclusions. *See Sabre International Security v. Torres Advanced Enterprise Solutions*, *LLC*, 72 F. Supp. 3d 131, 146 (D.D.C. 2014) (granting motion *in limine* to preclude the trial testimony of a corporate designee, and noting that "Rule 30(b)(6) pertains to corporate depositions for purposes of discovery. . . . It does not govern the admissibility of testimonial evidence at trial") (internal citation omitted); *Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.,* No. 8:12-CV-691-T-24-MAP, 2014 WL 4983912, at *4 (M.D. Fla. Oct. 6, 2014) ("Rule 30(b)(6) does not eliminate Rule 602's personal knowledge requirement.").

Plaintiffs rely on *Brazos River Authority v. GE Ionics, Inc.* to argue that a corporate representative should be permitted to testify live at trial to matters "within the corporate knowledge of the organization." 469 F.3d 416, 432 (5th Cir. 2006). The reasoning of that case, however, was in part based on the concern that, although Rule 32 permits an adverse party to use the deposition of a 30(b)(6) witness at trial, "district courts are reluctant to allow the reading into evidence of the rule 30(b)(6) deposition if the witness is available to testify at trial." *Id.* at 434. Here, the Court can avoid the result that concerned the Fifth Circuit—that district courts would permit neither the reading of the 30(b)(6) deposition nor live testimony on 30(b)(6) topics—by permitting the introduction of Bessinger's 30(b)(6) videotaped deposition testimony, as Rule 32 contemplates. This result avoids the unfairness considered in *Brazos River*, while upholding the personal knowledge requirement of Federal Rule of Evidence 602, which was emphasized by *Union Pump.*, 404 F. App'x at 907 ("Federal Rule of Evidence 602 limits the scope of a witness's testimony to matters that are within his or her *personal knowledge*.") (emphasis added).

1    Restricting the scope of corporative representative testimony to matters within the

2    representative's personal knowledge is, moreover, consistent with the purpose of scope of Federal

3    Rule of Civil Procedure 30(b)(6).  "The discovery device created by Rule 30(b)(6) was intended to

4    assist both sides in the deposition process."  *Darbeevision, Inc. v. C&A Mktg.*, No. 18-cv-0725 AG

5    (SSx), 2019 WL 2902697, at *6 (C.D. Cal. Jan. 28, 2019).  By curbing "a technique known as

6    'bandying,' in which each witness in turn disclaims knowledge of facts that are known to other persons

7    in the organization," the Rule was intended to aid the process of discovery.  *Id.*  It was not, however,

8    intended to alter the Federal Rules of Evidence, which govern the permissibility of a witness's

9    testimony at trial.  *See Sabre Int'l Sec.*, 72 F. Supp. 3d at 146.  Under those Rules, it is fundamental

10   that, unless the witness has been designated as an expert, "[a] witness may testify to a matter only if

11   evidence is introduced sufficient to support a finding that the witness has personal knowledge of the

12   matter." Fed. R. Evid. 602.  Requiring Ms. Bessinger to testify live about matters outside her personal

13   knowledge, but within the knowledge of the corporation, would run afoul of this important limitation.

14   Finally, allowing this testimony would also be needlessly time-consuming and confusing, as it would

15   require the Court to police the proper scope of Ms. Bessinger's corporate representative testimony

16   (which should be restricted to the 30(b)(6) topics on which she testified in deposition) in the presence

17   of the jury.  The Court should thus restrict Ms. Bessinger to testifying to matters within her personal

18   knowledge, and preclude any live testimony about Rule 30(b)(6) topics.

19      .

20

21

22

23

24

25

26

27

28

1 | Dated: May 7, 2020

SIMPSON THACHER & BARTLETT LLP

By  /s/ Jonathan K. Youngwood
      JONATHAN K. YOUNGWOOD

James G. Kreissman
2475 Hanover Street
Palo Alto, California  94304
Telephone: (650) 251-5000
Facsimile:  (650) 251-5002

Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
John Robinson *(pro hac vice)*
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone:     (212) 455-2000
Facsimile:     (212) 455-2502

COOLEY LLP

Stephen C. Neal
John C. Dwyer
Jessica Valenzuela Santamaria
Brett De Jarnette
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone:     (650) 843-5000
Facsimile:     (650) 849-7400

COOLEY LLP
Kathleen Goodhart
Aarti Reddy
Laura Elliot
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone:     (415) 693-2000
Facsimile:     (415) 693-2222

*Attorneys for Defendants Twitter Inc., Richard
Costolo, and Anthony Noto.*