COOLEY LLP
JOHN C. DWYER (136533)
(dwyerjc@cooley.com)
JESSICA VALENZUELA SANTAMARIA (220934)
(jvs@cooley.com)
BRETT DE JARNETTE (292919)
(bdejarnette@cooley.com)
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone:   (650) 843-5000
Facsimile:   (650) 849-7400

KATHLEEN GOODHART (165659)
(kgoodhart@cooley.com)
AARTI REDDY (274889)
(areddy@cooley.com)
LAURA ELLIOTT (286702)
(lelliott@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Telephone:   (415) 693-2000
Facsimile:   (415) 693-2222

SIMPSON THACHER & BARTLETT LLP
JAMES G. KREISSMAN (206740)
jkreissman@stblaw.com
2475 Hanover Street
Palo Alto, CA  94304
Telephone:   (650) 251-5000
Facsimile:   (650) 251-5002

JONATHAN K. YOUNGWOOD
(admitted *pro hac vice*)
jyoungwood@stblaw.com
JANET A. GOCHMAN
(admitted pro hac vice)
(jgochman@stblaw.com)
JOHN A. ROBINSON
(admitted *pro hac vice*)
(jrobinson@stblaw.com)
425 Lexington Avenue
New York, NY  10017
Telephone:   (212) 455-2000
Facsimile:   (212) 455-2502

Attorneys for Defendants
TWITTER, INC., RICHARD COSTOLO and ANTHONY NOTO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re TWITTER, INC. SECURITIES LITIGATION | Case No.  4:16-cv-05314-JST (SK) |
| | (Consolidated with 4:16-cv-05439-JST) |
| This Document Relates to: | **CLASS ACTION** |
| ALL ACTIONS | **POSITION STATEMENT IN SUPPORT OF DEFENDANTS' PROPOSED VERDICT FORM** |

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

POSITION STATEMENT ISO
DEFS. PROPOSED VERDICT FORM
Case No.  4:16-CV-05314-JST

1    Defendants submit this position statement in support of their proposed verdict form (Exhibit

2    A), as requested by the Court at the June 21, 2021 pre-trial conference.  Defendants' proposed verdict

3    form is consistent with governing law and verdict forms used by District Courts within California and

4    ensures that the jury will make the decisions necessary to determine liability and damages under

5    Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  In contrast, Plaintiffs' proposed

6    verdict form fails to include questions the jury must answer in determining liability, presents the

7    challenged statements without their necessary context; and is unduly suggestive, divesting the jury of

8    its independent judgment.

9    Specifically, the parties' competing verdict forms differ on seven fundamental points:

10   (1) whether the verdict form should separately ask about each essential element of Plaintiffs' Section

11   10(b) claims, (2) whether the verdict form should present each challenged statement in context,

12   (3) whether the jury's determination as to liability should exclude unpled and dismissed theories,

13   (4) whether it would be improper to find Twitter liable if the individual defendants are not found liable,

14   (5) whether the jury should separately determine inflation and the stock price declines allegedly caused

15   by the challenged statements to determine damages, (6) whether damages should be capped to prevent

16   an absurd result inconsistent with applicable law, and (7) whether the verdict form should exclude a

17   prejudicial question prompting the jury to adopt Plaintiffs' damages model.  The answer to each

18   question is yes, as reflected in Defendants' proposed verdict form, for the reasons set forth below.[1]

19       **A.  The Jury Should Decide Each Element of Plaintiff's Section 10(b) Claims**

20       Plaintiffs' proposed verdict form fails to include separate questions as to whether Plaintiffs

21   have met their burden of proof as to the elements of falsity, materiality, scienter, reliance, and loss

22   causation.  While the jury will receive instructions defining these elements, Defendants' proposed

---

[1] As requested by the Court, attached to this statement are five verdict forms used in prior securities fraud cases, including four issued by California District Courts: *In re Homestore.com, Inc. Sec. Litig.*, Case No. 01-CV-11115 RSWL (CWx), ECF No. 1423 (C.D. Cal., Feb. 24, 2011) (Exhibit B); *In re JDS Uniphase Corp. Sec. Litig.*, Case No. C-02-1486-CW, ECF No. 1883 (N.D. Cal., Nov. 27, 2007) (Exhibit C); *Hsu v. Puma Biotech. et al.*, Case No. 15-cv-00865-DOC-SHK, ECF No. 718 (C.D. Cal., Feb. 4, 2019) (Exhibit D); *In re Clarent Corp. Sec. Litig.*, Case No. C 01-03361 CRB, ECF No. 475 (N.D. Cal. Feb. 16, 2005) (Exhibit E); *In re Apollo Group Sec. Litig.*, Case No. CV 04-2147-PHX-JAT, ECF No. 490 (D. Ariz., Jan. 16, 2008) (Exhibit F).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1.

POSITION STATEMENT ISO
DEFS. PROPOSED VERDICT FORM
Case No.  4:16-CV-05314-JST

form ensures that the jury separately determines each of these essential elements before finding liability. Such an approach is appropriate because Section 10(b) jury instructions are lengthy, this case involves complicated fraud claims, and the jury may face difficulty keeping track of the elements they are charged with determining. Indeed, each of the four attached verdict forms issued by California Courts in Section 10(b) cases asked the jury to make separate determinations for independent elements of the plaintiffs' claims. (*See* Exs. B-E); *see also Heck v. Triche*, 775 F.3d 265, 270 (5th Cir. 2014) ("The verdict form—in 'yes or no' format—asked the jury whether each of the five elements of a Rule 10b–5 claim were met . . ."). None of those forms asked in a conclusory fashion whether "Plaintiffs proved the Rule 10b-5 Claim," as Plaintiffs' proposed verdict form does here. (*Id.*)

**B.  The Verdict Form Should Identify the Surrounding Context for Each Statement**

The question of whether a statement is false or misleading must be determined by the surrounding context. *See In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991) (noting that "statements cannot be analyzed in complete isolation" to determine their materiality); *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("The central issue . . . is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mislead [*sic*] a reasonable investor . . . "). For example, in *Puma*, the Court issued a verdict form with the surrounding context of each statement in an appendix over plaintiff's objection (Ex. D) and explained its reasoning: allegedly "False statements have to be viewed in context and in follow-up statements, and I can imagine that follow-up statements help provide context for the actual false statements." *Puma*, Tr. of Proceedings (Day 8) at 50:5-9, 52:2-13, ECF No. 768 (Feb. 4, 2019) (rejecting argument that providing the earnings call transcripts to the jury would be sufficient to provide surrounding context). The surrounding context for each statement should be provided in the verdict form (or at the very least, an appendix to the form).

**C.  The Jury Should Not Be Permitted to Find Liability Based on Unpled or Dismissed Theories**

Plaintiffs' proposed verdict form would allow the jury to conclude that any of the challenged statements were *either* false *or* misleading. (*See also* ECF No. 585, Disputed Closing Jury Instruction No. 16.) However, as set forth in the Court's order on Defendants' motion to dismiss: Plaintiffs may

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2.

POSITION STATEMENT ISO
DEFS. PROPOSED VERDICT FORM
Case No.  4:16-CV-05314-JST

1   only pursue an omission theory as to the two February 5, 2015 statements.  That is, Plaintiffs will only

2   establish the first element of a fraud claim as to the February statements if the jury finds them to be

3   materially misleading because Defendants omitted DAU or DAU/MAU data.  Further, as Plaintiffs

4   have never pled the April 28, 2015 statement was misleading by omission, they will only establish the

5   first element of a fraud claim as to that statement if the jury finds it to be false.  Defendants' proposed

6   verdict form asks the jury these questions, so as to prevent a finding of liability based on a dismissed

7   theory or an unpled theory.  Plaintiffs' form invites that error.

### D.   The Verdict Form Should Not Include an Erroneous Note That Twitter Can Be Found Liable Even if the Individual Defendants Are Not Found Liable

10   Plaintiffs' verdict form contains an asterisk noting that in determining liability for any

11   challenged statement, "*it is possible to check 'Yes' for Twitter without checking 'Yes' for either

12   Richard Costolo or Anthony Noto.*"  (Plaintiffs' Proposed Verdict Form at 1.)  As explained in the jury

13   instructions, Twitter can only be held liable based on the conduct and state of mind of Mr. Costolo

14   and Mr. Noto, who made each of the statements at issue.  (ECF No. 585, Disputed Closing Jury

15   Instruction Nos. 14, 19.)  Further, Plaintiffs' position is untenable and could lead to absurd results.

16   For example, the jury could determine that none of the three statements were false or misleading with

17   respect to Mr. Costolo or Mr. Noto, who made the statements, but one or more of the statements were

18   false or misleading with respect to Twitter.  *Cement & Concrete Workers Dist. Council Pension Fund

19   v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128 (N.D. Cal. 2013) (dismissing claims against company

20   because materiality and scienter were not proven as to the individuals).  This is nonsensical.

### E.   The Jury Should Be Required to Find Both Inflation and Stock Price Declines Caused by Alleged Fraud in Deciding Damages

23   Plaintiffs' "Table A" regarding damages ignores that under clear Supreme Court authority,

24   Plaintiffs must prove **both** that the stock price was inflated because of the challenged statements, and

25   that the stock price later declined as a result of the alleged misrepresentation or omissions.[2]  *See, e.g.,

26   Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011) (internal quotations omitted)

---

[2] This issue is also the subject of disputed Closing Jury Instruction No. 22.  (*See* ECF No 585.)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3.

POSITION STATEMENT ISO
DEFS. PROPOSED VERDICT FORM
Case No.  4:16-CV-05314-JST

("a plaintiff [must] show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss" and "the fact that a stock's price on the date of purchase was inflated because of a misrepresentation does not necessarily mean that the misstatement is the cause of a later decline in value."); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) ("at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value"); *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 (9th Cir. 2020) ("to prove loss causation by relying on one or more corrective disclosures, a plaintiff must show that: (1) a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements; and (2) disclosure of the truth caused the company's stock price to decline and the inflation attributable to the misstatements to dissipate."); *Ray v. Citigroup Global Mkts., Inc.,* 482 F.3d 991, 995 (7th Cir. 2007) ("[P]laintiffs must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception.").

Without requiring the jury to determine that the alleged fraud caused both (1) an inflated stock price at the time the statements were made, and (2) a stock price decline following an alleged corrective disclosure, the jury could award damages that are not permissible under the law.  As the Supreme Court recently recognized in *Goldman Sachs v. Arkansas Ret. Sys*, No. 20-222-2c83 (June 21, 2021), inflation cannot always be inferred from a stock price decline: the "inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure."  *Id*. at 8.  Defendants submit that is the case here, and their proposed verdict form ensures the jury evaluates whether there is such a "mismatch."

Notably, this District in *JDS Uniphase* (Ex. C) also applied the same principle and asked jurors to assess stock price inflation and any subsequent stock price decline separately in the verdict form. (*See* Ex. C (verdict form required jury to separately determine both inflation and reduction of that inflation due to alleged fraud).)  The Central District of California in *Homestore* (Ex. B) similarly required the jury to find the "loss" caused by the alleged corrective disclosures and then to separately determine how much of that loss was attributable to each challenged statement.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4.

POSITION STATEMENT ISO
DEFS. PROPOSED VERDICT FORM
Case No.  4:16-CV-05314-JST

**F.  The Verdict Form Should Not Prompt the Jury to Accept Plaintiffs' Damages Model**

Plaintiffs propose that the jury either check a box agreeing with "Plaintiffs' per share damages quantification," or else fill in over 100 boxes for "loss per share per day" in "Table A."  Not only is Plaintiffs' proposal overly suggestive in favor of their preferred outcome, but it prejudices Defendants by making it easier for the jury to select Plaintiffs' damages quantification.  In contrast, Defendants' form requires the jury to write in amounts in less than one page.  Indeed, the jury has an obligation to weigh the evidence and make an independent determination with respect to damages.  *See Imaginal Systematic, LLC v. Leggett & Platt, Inc.*, 2012 WL 12884903, at *3 (C.D. Cal. 2012) ("the jury is free to weigh the evidence, assess the credibility of witnesses, and make an ultimate determination regarding damages").  "Steering the jury toward the evidence that Plaintiffs favor would improperly usurp the role of the jury to fairly and impartially weigh the evidence within the bounds of the law as instructed by the Court." *Id.*  Providing the jury with an option to simply adopt an exhibit to Plaintiffs' expert's report would divest the jury of its obligation.  *See, O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1076 (N.D. Cal. 2005), *amended sub nom. O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070 (N.D. Cal. 2006), *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007) (overturning verdict because jury accepted flawed expert damages analysis.).

**G.  The Verdict Form Should Cap Damages**

Plaintiffs' form does not cap damages, whereas Defendants' form—like the form used in *Puma*—does.  (*See* Ex. D ("The damages per share cannot exceed $40.96").)  Plaintiffs' damages expert Dr. Steven Feinstein opines that damages are $20.34 per share.  (ECF No. 375-4.)  However, Plaintiffs' verdict form provides no cap on the amount of damages that the jury can award, meaning that it could award more damages than the maximum amount Plaintiffs themselves contend they suffered.  Similarly, the jury could theoretically award more damages per share than Twitter's stock price even declined following the alleged corrective disclosures, which would be an absurd result inconsistent with Plaintiffs' own proffered evidence.  *Desert Trailer Systems, Inc. v. Childress*, 2017 WL 3115300, at *1 (C.D. Cal. Feb. 27, 2017) (rejecting request to amend judgment to dismiss one defendant but not others because it could lead to an absurd result).

For the reasons stated herein, the Court should adopt Defendants' proposed verdict form.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5.

POSITION STATEMENT ISO
DEFS. PROPOSED VERDICT FORM
Case No.  4:16-CV-05314-JST

1   Dated:    June 28, 2021                    COOLEY LLP

2

3                                             _/s/ Kathleen Goodhart_
                                              Kathleen Goodhart
4
                                              Attorneys for Defendants
5                                             Twitter, Inc., Richard Costolo and Anthony Noto

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   252556691

27

28

# EXHIBIT A

[Defendants' Proposed Verdict Form]

COOLEY LLP
JOHN C. DWYER (136533)
(dwyerjc@cooley.com)
JESSICA VALENZUELA SANTAMARIA (220934)
(jvs@cooley.com)
BRETT DE JARNETTE (292919)
(bdejarnette@cooley.com)
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone:    (650) 843-5000
Facsimile:    (650) 849-7400

KATHLEEN GOODHART (165659)
(kgoodhart@cooley.com)
AARTI REDDY (274889)
(areddy@cooley.com)
LAURA ELLIOTT (286702)
(lelliott@cooley.com)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone:    (415) 693-2000
Facsimile:    (415) 693-2222

SIMPSON THACHER & BARTLETT LLP
JAMES G. KREISSMAN (206740)
jkreissman@stblaw.com
2475 Hanover Street
Palo Alto, CA  94304
Telephone:    (650) 251-5000
Facsimile:    (650) 251-5002

JONATHAN K. YOUNGWOOD
(admitted *pro hac vice*)
jyoungwood@stblaw.com
JANET A. GOCHMAN
(admitted pro hac vice)
(jgochman@stblaw.com)
JOHN A. ROBINSON
(admitted *pro hac vice*)
(jrobinson@stblaw.com)
425 Lexington Avenue
New York, NY  10017
Telephone:    (212) 455-2000
Facsimile:    (212) 455-2502

Attorneys for Defendants
TWITTER, INC., RICHARD COSTOLO and ANTHONY NOTO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re TWITTER, INC. SECURITIES LITIGATION | Case No.  4:16-cv-05314-JST (SK) |
| | (Consolidated with 4:16-cv-05439-JST) |
| This Document Relates to: | **CLASS ACTION** |
| ALL ACTIONS | **[DEFENDANTS' PROPOSED] VERDICT FORM** |

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

[DEFENDANTS' PROPOSED]
VERDICT FORM
Case No.  4:16-CV-05314-JST

# I. STATEMENTS & CAUSATION

**A. February 5, 2015 Earnings Call (by Richard Costolo):** "The user numbers we saw in January, again, indicate that <u>our MAU trend is already turned around</u> and that Q1 trend is likely to be back in the range of absolute net adds that we saw during the first three quarters of 2014. So we're in a great place there and again I would stress that it's seasonality, return to organic growth, and product initiatives all taken together."

    1. Did Plaintiffs prove that the underlined statement was materially misleading because Defendants did not disclose DAU or DAU/MAU ratio data?

        Answer: Yes \_\_\_ No \_\_\_**If yes, answer Question 2. If no, STOP and proceed to Question 4.**

    2. Did Plaintiffs prove that Richard Costolo acted with scienter in making the underlined statement?

        Answer: Yes \_\_\_ No \_\_\_ **If yes, answer Question 3. If no, STOP and proceed to Question 4.**

    3. Did Plaintiffs prove that the omission of DAU or DAU/MAU ratio data from the underlined statement was a substantial factor in causing damage to Plaintiffs?

        Answer: Yes \_\_\_ No \_\_\_

**Proceed to Question 4.**

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1.

[DEFENDANTS' PROPOSED]
VERDICT FORM
Case No. 4:16-CV-05314-JST

**B. February 5, 2015 Earnings Call (by Anthony Noto):** "More broadly, as we think about engagement, there are a number of different ways that we measure engagement. There's no one perfect way. When it comes to advertising, it's going to be click-through rate, and it's actually different by each format. A mobile app download click-through rate is very different than a regular promoted tweet. That could be either retweeted or favorited as a measurement of payment. Additionally, on the consumer side, many companies use DAU to MAU. And while that is a long term goal of ours to become a daily product, today we have great variance in DAU to MAU across geographies. **In our more mature markets we have very high DAU to MAU, 50% plus**, and in emerging markets we have very low DAU to MAU at 20% range. **They all migrate up to a higher rate over time.** And so, as we sort of get to a point where we have a metric that's going to really reflect what we're trying to do, we'll share that with you. But at this point, there's a number of them that we look at and no one metric to share."

4. Did Plaintiffs prove that the underlined statements were materially misleading because Defendants did not disclose DAU or DAU/MAU ratio data?

Answer: Yes ___ No ___ **If yes, answer Question 5. If no, STOP and proceed to Question 7.**

5. Did Plaintiffs prove that Anthony Noto acted with scienter in making the underlined statements?

Answer: Yes ___ No ___ **If yes, answer Question 6. If no, STOP and proceed to Question 7.**

6. Did Plaintiffs prove that the omission of DAU or DAU/MAU ratio data from the underlined statements was a substantial factor in causing damage to Plaintiffs?

Answer: Yes ___ No ___

**Proceed to Question 7.**

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2.

[DEFENDANTS' PROPOSED]
VERDICT FORM
Case No. 4:16-CV-05314-JST

**C. April 28, 2015 Earnings Call (by Anthony Noto):** "In terms of engagement metrics, there's a lot of different metrics that we look at internally. There's not one metric for engagement. And so I can give you a sense of some of them and quite frankly, we would like to be able to give you more visibility on this, but there's just a number of different measurements. DAU is one measurement of engagement. We talked about that at Analyst Day. It's a measurement that is dependent by market and you could have a mix shift so that could be a little bit misleading, but **DAU to MAU ratios in the quarter were similar to what they were by market relative to Analyst Day**. Other engagement metrics that we look at are tweets per day, favorites and re-tweets, direct messages, searches. Our number of searches actually accelerated on a year-over-year basis in the quarter. Direct messages also accelerated on a year-over-year basis in the quarter. Favorite and re-tweets had strong growth and we had growth in tweets per day as well. So, those metrics all were generally positive."

7.  Did Plaintiffs prove that the underlined statement contained a misrepresentation of a material fact that was false when made?

     Answer: Yes ___ No ___  **If yes, answer Question 8. If no, STOP and follow the instructions below Question 9.**

8.  Did Plaintiffs prove that Anthony Noto acted with scienter in making the underlined statement?

     Answer: Yes ___ No ___  **If yes, answer Question 9. If no, STOP and follow the instructions below Question 9.**

9.  Did Plaintiffs prove that the alleged misrepresentation in the underlined statement was a substantial factor in causing damage to Plaintiffs?

     Answer: Yes ___ No ___

**If you answered "Yes" to Questions 3, 6, or 9, proceed to Question 10.**

**Otherwise, proceed to Section V.**

Cooley LLP
Attorneys At Law
San Francisco

3.

[Defendants' Proposed]
Verdict Form
Case No. 4:16-CV-05314-JST

## II. RELIANCE

10. Did Plaintiffs prove that Twitter's stock traded on an active open market on which investors reasonably relied as an accurate reflection of the current market value of the stock?

   Answer: Yes ___ No ___ **If yes, answer Question 11. If no, STOP and proceed to Section V.**

## III. CONTROLLING PERSON LIABILITY

11. Did Plaintiffs prove that Richard Costolo controlled Anthony Noto with regard to any underlined statement for which you answered yes in Questions 6 or 9?

   Answer: Yes ___ No ___ **If yes, answer Question 12. If no, STOP and proceed to Question 13.**

12. Do you find that Richard Costolo acted in good faith with regard to any underlined statement for which you answered yes in Questions 6 or 9?

   Answer: Yes ___ No ___

13. Did Plaintiffs prove that Twitter controlled Anthony Noto with regard to any underlined statement for which you answered yes in Questions 6 or 9?

   Answer: Yes ___ No ___ **If yes, answer Question 14. If no, STOP and proceed to Question 15.**

14. Do you find that Twitter acted in good faith with regard to any underlined statement for which you answered yes in Questions 6 or 9?

   Answer: Yes ___ No ___

15. Do you find that Anthony Noto controlled Richard Costolo with regard to any underlined statement for which you answered yes in Question 3?

   Answer: Yes ___ No ___ **If yes, answer Question 16. If no, STOP and proceed to Question 17.**

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4.

[DEFENDANTS' PROPOSED]
VERDICT FORM
Case No. 4:16-CV-05314-JST

16. Do you find that Anthony Noto acted in good faith with regard to any underlined statement for which you answered yes in Question 3?

    Answer: Yes ___ No ___

17. Do you find that Twitter controlled Richard Costolo with regard to any underlined statement for which you answered yes in Question 3?

    Answer: Yes___ No ___ **If yes, answer Question 18. If no, STOP and proceed to Question 19.**

18. Do you find that Twitter acted in good faith with regard to any underlined statement for which you answered yes in Question 3?

    Answer: Yes ___ No ___

**Proceed to Section IV.**

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

[DEFENDANTS' PROPOSED]
VERDICT FORM
Case No. 4:16-CV-05314-JST

### IV. DAMAGES

19. What is the amount of the share price decline on the following dates that Plaintiffs proved was caused by the alleged material misrepresentations or omissions, if any. (Total amount cannot exceed $20.34.)

| Date | Share Price Decline per Share |
|------|-------------------------------|
| April 28, 2015 | A. $___.__ |
| April 29, 2015 | B. $___.__ |
| July 29, 2015 | C. $___.__ |
| July 31, 2015 | D. $___.__ |
| August 3, 2015 | E. $___.__ |

**If you entered a dollar amount for any date in Question 19 answer Question 20. Otherwise, proceed to Section V.**

20. What is the amount of artificial inflation of Twitter stock, if any, for each date range below that Plaintiffs proved was caused by the alleged material misrepresentations or omissions.

| Date | Inflation per Share |
|------|---------------------|
| February 6, 2015 – April 27, 2015 | $___.__ (Cannot exceed sum of A through E in Question 19) |
| April 28, 2015 | $___.__ (Cannot exceed sum of B through E in Question 19) |
| April 29, 2015 – July 28, 2015 | $___.__ (Cannot exceed sum of C through E in Question 19) |
| July 29, 2015- July 30, 2015 | $___.__ (Cannot exceed sum of D through E in Question 19) |
| July 31, 2015 | $___.__ (Cannot exceed E in Question 19) |

**Proceed to Section V.**

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

[DEFENDANTS' PROPOSED]
VERDICT FORM
Case No. 4:16-CV-05314-JST

**V. RETURN OF VERDICT**

Signed this ____ day of _____, 2021.


Presiding Juror: _____


Dated: June 14, 2021                    COOLEY LLP


                                        By: */s/ Kathleen Goodhart*
                                             Kathleen Goodhart

                                        Attorneys for Defendants
                                        TWITTER, INC., RICHARD COSTOLO and
                                        ANTHONY NOTO

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# EXHIBIT B

[*In re Homestore.com, Inc. Sec. Litig*
Case No. 01-CV-11115 RSWL (CWx)
ECF No. 1423 (C.D. Cal., Feb. 24, 2011)
Verdict Form]

**ORIGINAL**

FILED
CLERK, U.S. DISTRICT COURT

FEB 24 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                    WESTERN DIVISION

11

12   In re HOMESTORE.COM, INC.              CASE NO. 01-CV-11115 RSWL (CWx)

13   Securities Litigation,                 REDACTED

14                                          **SPECIAL VERDICT FORM AND
                                            QUESTIONS FOR THE JURY**
15

16   This Document Relates to:

17   All Actions

18

19

20

21

22

23       We, the jury in the above-captioned case, find this Special Verdict based on the

24   following questions submitted to us:

25

26

27

28

## A. SECTION 10(B) CLAIM

1. For each challenged document listed in the chart below, was there an untrue statement of material fact, or an omission of material fact necessary under the circumstances to keep the statements that were made from being misleading (as defined in the instructions)?

| STATEMENT | YES | NO |
|---|---|---|
| 1. 3/7/00 Homestore and Budget Press Release (Exhibit 2063) | | X |
| 2. 3/10/00 SEC Form 10-K FY 1999 (Exhibit 2098) | | X |
| 3. 5/3/00 Homestore Press Release: Reports Record Quarterly Operating Results for 1st Quarter 2000 (Exhibit 2065) | | X |
| 4. 5/15/00 SEC Form 10-Q Q1 FY 2000 (Exhibit 2099) | | X |
| 5. 7/19/00 Homestore Press Release: Reports 252% Growth in Second Quarter Revenue (Exhibit 2068) | | X |
| 6. 8/4/00 SEC Form 10-Q Q2 FY 2000 (Exhibit 2100) | | X |
| 7. 10/19/00 Homestore Press Release: Reports Net Income Cash Profitability (Exhibit 2070) | | X |
| 8. 10/27/00 Homestore Press Release: Homestore Agrees to Acquire Move.com from Cendant Corp. (Exhibit 2082) | | X |
| 9. 11/14/00 SEC Form 10-Q Q3 FY 2000 (Exhibit 2101) | | X |
| 10. 1/11/01 Homestore Press Release: Shareholders Approve Acquisition of Cendant Corp's Move.com (Exhibit 2071) | | X |
| 11. 1/25/01 Homestore Press Release: Homestore Reports Revenue Growth (Exhibit 2073) | X | |
| 12. 3/30/01 SEC Form 10-K FY 2000 (Exhibit 2102) | X | |
| 13. 4/25/01 Homestore Press Release: Homestore Reports Strong and Steady 1st Quarter Growth; Cash Profitability, Strong Revenue Growth Mark Record Performance (Exhibit 2077) | X | |
| 14. 5/15/01 SEC Form 10-Q Q1 FY 2001 (Exhibit 2104) | X | |
| 15. 7/25/01 Homestore Press Release: Reports Eighth Consecutive Quarter of Strong Results (Exhibit 2078) | X | |
| 16. 8/14/01 SEC Form 10-Q Q2 FY 2001 (Exhibit 2105) | X | |
| 17. 9/6/01 Homestore Press Release: Homestore Announces Closing of iPlace Acquisition-Reaffirms Third Quarter Projections (Exhibit 2079) | X | |
| 18. 10/3/01 Homestore Press Release: Estimates Third Quarter Results (Exhibit 2080) | X | |
| 19. 10/25/01 Homestore Press Release: Homestore Announces Organizational Realignment, Cost Reduction Plan (Exhibit 2081) | | X |
| 20. 11/1/01 Homestore Press Release: Homestore Reports Third Quarter Results (Exhibit 2083) | X | |
| 21. 11/14/01 SEC Form 10-Q Q3 FY 2001 (Exhibit 2106) | X | |
| 22. 12/6/01 Homestore Press Release: Homestore Announces Resignation of its Chief Financial Officer (Exhibit 2084) | | X |

→ **IF YOU ANSWERED "YES" FOR ANY STATEMENT, PLEASE PROCEED TO QUESTION 2. IF YOU ANSWERED "NO" AS TO ALL STATEMENTS, PLEASE SIGN AND RETURN THIS FORM TO THE CLERK**

2. For each statement that you answered "YES" in Question 1, was the challenged statement a forward-looking statement as defined in the instructions and, if so, was it accompanied by meaningful cautionary statements (as defined in the instructions)?

| STATEMENT | FORWARD-LOOKING? | | ACCOMPANIED BY CAUTIONARY STATEMENTS? | |
|---|---|---|---|---|
| | YES | NO | YES | NO |
| 1. 3/7/00 Homestore and Budget Press Release (Exhibit 2063) | | | | |
| 2. 3/10/00 SEC Form 10-K FY 1999 (Exhibit 2098) | | | | |
| 3. 5/3/00 Homestore Press Release: Reports Record Quarterly Operating Results for 1st Quarter 2000 (Exhibit 2065) | | | | |
| 4. 5/15/00 SEC Form 10-Q Q1 FY 2000 (Exhibit 2099) | | | | |
| 5. 7/19/00 Homestore Press Release: Reports 252% Growth in Second Quarter Revenue (Exhibit 2068) | | | | |
| 6. 8/4/00 SEC Form 10-Q Q2 FY 2000 (Exhibit 2100) | | | | |
| 7. 10/19/00 Homestore Press Release: Reports Net Income Cash Profitability (Exhibit 2070) | | | | |
| 8. 10/27/00 Homestore Press Release: Homestore Agrees to Acquire Move.com from Cendant Corp. (Exhibit 2082) | | | | |
| 9. 11/14/00 SEC Form 10-Q Q3 FY 2000 (Exhibit 2101) | | | | |
| 10. 1/11/01 Homestore Press Release: Shareholders Approve Acquisition of Cendant Corp's Move.com (Exhibit 2071) | | | | |
| 11. 1/25/01 Homestore Press Release: Homestore Reports Revenue Growth (Exhibit 2073) | X | | | X |
| 12. 3/30/01 SEC Form 10-K FY 2000 (Exhibit 2102) | X | | X | |
| 13. 4/25/01 Homestore Press Release: Homestore Reports Strong and Steady 1st Quarter Growth; Cash Profitability, Strong Revenue Growth Mark Record Performance (Exhibit 2077) | X | | | X |
| 14. 5/15/01 SEC Form 10-Q Q1 FY 2001 (Exhibit 2104) | X | | | X |
| 15. 7/25/01 Homestore Press Release: Reports Eighth Consecutive Quarter of Strong Results (Exhibit 2078) | X | | | X |
| 16. 8/14/01 SEC Form 10-Q Q2 FY 2001 (Exhibit 2105) | X | | | X |

3

| STATEMENT | FORWARD-LOOKING? | | ACCOMPANIED BY CAUTIONARY STATEMENTS? | |
|---|---|---|---|---|
| | YES | NO | YES | NO |
| 17. 9/6/01 Homestore Press Release: Homestore Announces Closing of iPlace Acquisition-Reaffirms Third Quarter Projections (Exhibit 2079) | X | | | X |
| 18. 10/3/01 Homestore Press Release: Estimates Third Quarter Results (Exhibit 2080) | X | | | X |
| 19. 10/25/01 Homestore Press Release: Homestore Announces Organizational Realignment, Cost Reduction Plan (Exhibit 2081) | | | | |
| 20. 11/1/01 Homestore Press Release: Homestore Reports Third Quarter Results (Exhibit 2083) | X | | X | |
| 21. 11/14/01 SEC Form 10-Q Q3 FY 2001 (Exhibit 2106) | X | | | X |
| 22. 12/6/01 Homestore Press Release: Homestore Announces Resignation of its Chief Financial Officer (Exhibit 2084) | | | | |

→ **IF YOU ANSWERED "NO" TO EITHER QUESTION FOR ANY STATEMENT, PLEASE PROCEED TO QUESTION 3. IF YOU ANSWERED "YES" TO BOTH QUESTIONS AS TO ALL STATEMENTS, PLEASE SIGN AND RETURN THIS FORM TO THE CLERK.**

    **3.** Do you find that the Defendant, Stuart Wolff, made or was substantially involved in the preparation of the challenged statement (as defined in the instructions)?

| STATEMENT | YES | NO |
|---|---|---|
| 1. 3/7/00 Homestore and Budget Press Release (Exhibit 2063) | | |
| 2. 3/10/00 SEC Form 10-K FY 1999 (Exhibit 2098) | | |
| 3. 5/3/00 Homestore Press Release: Reports Record Quarterly Operating Results for 1st Quarter 2000 (Exhibit 2065) | | |
| 4. 5/15/00 SEC Form 10-Q Q1 FY 2000 (Exhibit 2099) | | |
| 5. 7/19/00 Homestore Press Release: Reports 252% Growth in Second Quarter Revenue (Exhibit 2068) | | |
| 6. 8/4/00 SEC Form 10-Q Q2 FY 2000 (Exhibit 2100) | | |
| 7. 10/19/00 Homestore Press Release: Reports Net Income Cash Profitability (Exhibit 2070) | | |
| 8. 10/27/00 Homestore Press Release: Homestore Agrees to Acquire Move.com from Cendant Corp. (Exhibit 2082) | | |
| 9. 11/14/00 SEC Form 10-Q Q3 FY 2000 (Exhibit 2101) | | |
| 10. 1/11/01 Homestore Press Release: Shareholders Approve Acquisition of Cendant Corp's Move.com (Exhibit 2071) | | |
| 11. 1/25/01 Homestore Press Release: Homestore Reports Revenue Growth (Exhibit 2073) | X | |
| 12. 3/30/01 SEC Form 10-K FY 2000 (Exhibit 2102) | | X |

4

| STATEMENT | YES | NO |
|---|---|---|
| 13. 4/25/01 Homestore Press Release: Homestore Reports Strong and Steady 1st Quarter Growth; Cash Profitability, Strong Revenue Growth Mark Record Performance (Exhibit 2077) | X | |
| 14. 5/15/01 SEC Form 10-Q Q1 FY 2001 (Exhibit 2104) | | X |
| 15. 7/25/01 Homestore Press Release: Reports Eighth Consecutive Quarter of Strong Results (Exhibit 2078) | X | |
| 16. 8/14/01 SEC Form 10-Q Q2 FY 2001 (Exhibit 2105) | | X |
| 17. 9/6/01 Homestore Press Release: Homestore Announces Closing of iPlace Acquisition-Reaffirms Third Quarter Projections (Exhibit 2079) | X | |
| 18. 10/3/01 Homestore Press Release: Estimates Third Quarter Results (Exhibit 2080) | X | |
| 19. 10/25/01 Homestore Press Release: Homestore Announces Organizational Realignment, Cost Reduction Plan (Exhibit 2081) | | |
| 20. 11/1/01 Homestore Press Release: Homestore Reports Third Quarter Results (Exhibit 2083) | | |
| 21. 11/14/01 SEC Form 10-Q Q3 FY 2001 (Exhibit 2106) | | X |
| 22. 12/6/01 Homestore Press Release: Homestore Announces Resignation of its Chief Financial Officer (Exhibit 2084) | | |

→ **PLEASE PROCEED TO QUESTION NO. 4.**

4. For each challenged statement for which you answered "YES" in response to **both** Questions 1 and 3, do you find that Stuart Wolff made the statement knowing that it was materially false or with reckless disregard that the statement was materially false (as defined in the instructions)? If you find that he did not act knowingly or recklessly with respect to the statement, mark "NEITHER."

| STATEMENT | KNOWINGLY | RECKLESSLY | NEITHER |
|---|---|---|---|
| 1. 3/7/00 Homestore and Budget Press Release (Exhibit 2063) | | | |
| 2. 3/10/00 SEC Form 10-K FY 1999 (Exhibit 2098) | | | |
| 3. 5/3/00 Homestore Press Release: Reports Record Quarterly Operating Results for 1st Quarter 2000 (Exhibit 2065) | | | |
| 4. 5/15/00 SEC Form 10-Q Q1 FY 2000 (Exhibit 2099) | | | |
| 5. 7/19/00 Homestore Press Release: Reports 252% Growth in Second Quarter Revenue (Exhibit 2068) | | | |
| 6. 8/4/00 SEC Form 10-Q Q2 FY 2000 (Exhibit 2100) | | | |
| 7. 10/19/00 Homestore Press Release: Reports Net Income Cash Profitability (Exhibit 2070) | | | |

| | STATEMENT | KNOWINGLY | RECKLESSLY | NEITHER |
|---|---|---|---|---|
| 2 / 3 | 8. 10/27/00 Homestore Press Release: Homestore Agrees to Acquire Move.com from Cendant Corp. (Exhibit 2082) | | | |
| 4 | 9. 11/14/00 SEC Form 10-Q Q3 FY 2000 (Exhibit 2101) | | | |
| 5 | 10. 1/11/01 Homestore Press Release: Shareholders Approve Acquisition of Cendant Corp's Move.com (Exhibit 2071) | | | |
| 6 / 7 | 11. 1/25/01 Homestore Press Release: Homestore Reports Revenue Growth (Exhibit 2073) | | ✕ | |
| 8 | 12. 3/30/01 SEC Form 10-K FY 2000 (Exhibit 2102) | | | |
| 9 / 10 | 13. 4/25/01 Homestore Press Release: Homestore Reports Strong and Steady 1st Quarter Growth; Cash Profitability, Strong Revenue Growth Mark Record Performance (Exhibit 2077) | | ✕ | |
| 11 | 14. 5/15/01 SEC Form 10-Q Q1 FY 2001 (Exhibit 2104) | | | |
| 12 / 13 | 15. 7/25/01 Homestore Press Release: Reports Eighth Consecutive Quarter of Strong Results (Exhibit 2078) | | ✕ | |
| 14 | 16. 8/14/01 SEC Form 10-Q Q2 FY 2001 (Exhibit 2105) | | | |
| 15 / 16 | 17. 9/6/01 Homestore Press Release: Homestore Announces Closing of iPlace Acquisition-Reaffirms Third Quarter Projections (Exhibit 2079) | ✕ | | |
| 17 | 18. 10/3/01 Homestore Press Release: Estimates Third Quarter Results (Exhibit 2080) | ✕ | | |
| 18 / 19 | 19. 10/25/01 Homestore Press Release: Homestore Announces Organizational Realignment, Cost Reduction Plan (Exhibit 2081) | | | |
| 20 / 21 | 20. 11/1/01 Homestore Press Release: Homestore Reports Third Quarter Results (Exhibit 2083) | | | |
| 22 | 21. 11/14/01 SEC Form 10-Q Q3 FY 2001 (Exhibit 2106) | | | |
| 23 | 22. 12/6/01 Homestore Press Release: Homestore Announces Resignation of its Chief Financial Officer (Exhibit 2084) | | | |

→ **PLEASE PROCEED TO QUESTION NO. 5.**

6

5.     For each challenged statement, at the time the statement was made, did Homestore's stock trade on an active, open market upon which investors reasonably relied as an accurate reflection of the current market value of the stock?

| STATEMENT | YES | NO |
|---|---|---|
| 1. 3/7/00 Homestore and Budget Press Release (Exhibit 2063) | X | |
| 2. 3/10/00 SEC Form 10-K FY 1999 (Exhibit 2098) | X | |
| 3. 5/3/00 Homestore Press Release: Reports Record Quarterly Operating Results for 1st Quarter 2000 (Exhibit 2065) | X | |
| 4. 5/15/00 SEC Form 10-Q Q1 FY 2000 (Exhibit 2099) | X | |
| 5. 7/19/00 Homestore Press Release: Reports 252% Growth in Second Quarter Revenue (Exhibit 2068) | X | |
| 6. 8/4/00 SEC Form 10-Q Q2 FY 2000 (Exhibit 2100) | X | |
| 7. 10/19/00 Homestore Press Release: Reports Net Income Cash Profitability (Exhibit 2070) | X | |
| 8. 10/27/00 Homestore Press Release: Homestore Agrees to Acquire Move.com from Cendant Corp. (Exhibit 2082) | X | |
| 9. 11/14/00 SEC Form 10-Q Q3 FY 2000 (Exhibit 2101) | X | |
| 10. 1/11/01 Homestore Press Release: Shareholders Approve Acquisition of Cendant Corp's Move.com (Exhibit 2071) | X | |
| 11. 1/25/01 Homestore Press Release: Homestore Reports Revenue Growth (Exhibit 2073) | X | |
| 12. 3/30/01 SEC Form 10-K FY 2000 (Exhibit 2102) | X | |
| 13. 4/25/01 Homestore Press Release: Homestore Reports Strong and Steady 1st Quarter Growth; Cash Profitability, Strong Revenue Growth Mark Record Performance (Exhibit 2077) | X | |
| 14. 5/15/01 SEC Form 10-Q Q1 FY 2001 (Exhibit 2104) | X | |
| 15. 7/25/01 Homestore Press Release: Reports Eighth Consecutive Quarter of Strong Results (Exhibit 2078) | X | |
| 16. 8/14/01 SEC Form 10-Q Q2 FY 2001 (Exhibit 2105) | X | |
| 17. 9/6/01 Homestore Press Release: Homestore Announces Closing of iPlace Acquisition-Reaffirms Third Quarter Projections (Exhibit 2079) | X | |
| 18. 10/3/01 Homestore Press Release: Estimates Third Quarter Results (Exhibit 2080) | X | |
| 19. 10/25/01 Homestore Press Release: Homestore Announces Organizational Realignment, Cost Reduction Plan (Exhibit 2081) | X | |
| 20. 11/1/01 Homestore Press Release: Homestore Reports Third Quarter Results (Exhibit 2083) | X | |
| 21. 11/14/01 SEC Form 10-Q Q3 FY 2001 (Exhibit 2106) | X | |
| 22. 12/6/01 Homestore Press Release: Homestore Announces Resignation of its Chief Financial Officer (Exhibit 2084) | X | |

→ **IF YOU ANSWERED "YES" FOR ANY STATEMENT, PLEASE PROCEED TO QUESTION 6. IF YOU ANSWERED "NO" AS TO ALL STATEMENTS, PLEASE SIGN AND RETURN THIS FORM TO THE CLERK**

7

**B.**    <u>SECTION 20(A) CLAIM</u>

6.    For each challenged statement for which you answered "NO" in response to Question 3, do you find that the person who made the statement did so knowingly or recklessly with respect to the material falsity of the statement (as defined in the instructions)?

| STATEMENT | YES | NO |
|---|---|---|
| 1. 3/7/00 Homestore and Budget Press Release (Exhibit 2063) | | |
| 2. 3/10/00 SEC Form 10-K FY 1999 (Exhibit 2098) | | |
| 3. 5/3/00 Homestore Press Release: Reports Record Quarterly Operating Results for 1st Quarter 2000 (Exhibit 2065) | | |
| 4. 5/15/00 SEC Form 10-Q Q1 FY 2000 (Exhibit 2099) | | |
| 5. 7/19/00 Homestore Press Release: Reports 252% Growth in Second Quarter Revenue (Exhibit 2068) | | |
| 6. 8/4/00 SEC Form 10-Q Q2 FY 2000 (Exhibit 2100) | | |
| 7. 10/19/00 Homestore Press Release: Reports Net Income Cash Profitability (Exhibit 2070) | | |
| 8. 10/27/00 Homestore Press Release: Homestore Agrees to Acquire Move.com from Cendant Corp. (Exhibit 2082) | | |
| 9. 11/14/00 SEC Form 10-Q Q3 FY 2000 (Exhibit 2101) | | |
| 10. 1/11/01 Homestore Press Release: Shareholders Approve Acquisition of Cendant Corp's Move.com (Exhibit 2071) | | |
| 11. 1/25/01 Homestore Press Release: Homestore Reports Revenue Growth (Exhibit 2073) | | |
| 12. 3/30/01 SEC Form 10-K FY 2000 (Exhibit 2102) | | ☒ |
| 13. 4/25/01 Homestore Press Release: Homestore Reports Strong and Steady 1st Quarter Growth; Cash Profitability, Strong Revenue Growth Mark Record Performance (Exhibit 2077) | | |
| 14. 5/15/01 SEC Form 10-Q Q1 FY 2001 (Exhibit 2104) | ☒ | Knowingly |
| 15. 7/25/01 Homestore Press Release: Reports Eighth Consecutive Quarter of Strong Results (Exhibit 2078) | | |
| 16. 8/14/01 SEC Form 10-Q Q2 FY 2001 (Exhibit 2105) | ☒ | Knowingly |
| 17. 9/6/01 Homestore Press Release: Homestore Announces Closing of iPlace Acquisition-Reaffirms Third Quarter Projections (Exhibit 2079) | | |
| 18. 10/3/01 Homestore Press Release: Estimates Third Quarter Results (Exhibit 2080) | | |
| 19. 10/25/01 Homestore Press Release: Homestore Announces Organizational Realignment, Cost Reduction Plan (Exhibit 2081) | | |
| 20. 11/1/01 Homestore Press Release: Homestore Reports Third Quarter Results (Exhibit 2083) | | |
| 21. 11/14/01 SEC Form 10-Q Q3 FY 2001 (Exhibit 2106) | ☒ | Knowingly |
| 22. 12/6/01 Homestore Press Release: Homestore Announces Resignation of its Chief Financial Officer (Exhibit 2084) | | |

→ **PLEASE PROCEED TO QUESTION NO. 7.**

8

7. For each challenged statement for which you answered "NO" in response to Question 3, do you find that the person who made the statement did so while acting in furtherance of his or her or its own interests at the expense of the Company?

| STATEMENT | YES | NO |
|---|---|---|
| 1. 3/7/00 Homestore and Budget Press Release (Exhibit 2063) | | |
| 2. 3/10/00 SEC Form 10-K FY 1999 (Exhibit 2098) | | |
| 3. 5/3/00 Homestore Press Release: Reports Record Quarterly Operating Results for 1st Quarter 2000 (Exhibit 2065) | | |
| 4. 5/15/00 SEC Form 10-Q Q1 FY 2000 (Exhibit 2099) | | |
| 5. 7/19/00 Homestore Press Release: Reports 252% Growth in Second Quarter Revenue (Exhibit 2068) | | |
| 6. 8/4/00 SEC Form 10-Q Q2 FY 2000 (Exhibit 2100) | | |
| 7. 10/19/00 Homestore Press Release: Reports Net Income Cash Profitability (Exhibit 2070) | | |
| 8. 10/27/00 Homestore Press Release: Homestore Agrees to Acquire Move.com from Cendant Corp. (Exhibit 2082) | | |
| 9. 11/14/00 SEC Form 10-Q Q3 FY 2000 (Exhibit 2101) | | |
| 10. 1/11/01 Homestore Press Release: Shareholders Approve Acquisition of Cendant Corp's Move.com (Exhibit 2071) | | |
| 11. 1/25/01 Homestore Press Release: Homestore Reports Revenue Growth (Exhibit 2073) | | |
| 12. 3/30/01 SEC Form 10-K FY 2000 (Exhibit 2102) | | ✕ |
| 13. 4/25/01 Homestore Press Release: Homestore Reports Strong and Steady 1st Quarter Growth; Cash Profitability, Strong Revenue Growth Mark Record Performance (Exhibit 2077) | | |
| 14. 5/15/01 SEC Form 10-Q Q1 FY 2001 (Exhibit 2104) | | ✕ |
| 15. 7/25/01 Homestore Press Release: Reports Eighth Consecutive Quarter of Strong Results (Exhibit 2078) | | |
| 16. 8/14/01 SEC Form 10-Q Q2 FY 2001 (Exhibit 2105) | | ✕ |
| 17. 9/6/01 Homestore Press Release: Homestore Announces Closing of iPlace Acquisition-Reaffirms Third Quarter Projections (Exhibit 2079) | | |
| 18. 10/3/01 Homestore Press Release: Estimates Third Quarter Results (Exhibit 2080) | | |
| 19. 10/25/01 Homestore Press Release: Homestore Announces Organizational Realignment, Cost Reduction Plan (Exhibit 2081) | | |
| 20. 11/1/01 Homestore Press Release: Homestore Reports Third Quarter Results (Exhibit 2083) | | |
| 21. 11/14/01 SEC Form 10-Q Q3 FY 2001 (Exhibit 2106) | | ✕ |
| 22. 12/6/01 Homestore Press Release: Homestore Announces Resignation of its Chief Financial Officer (Exhibit 2084) | | |

→ **PLEASE PROCEED TO QUESTION NO. 8.**

9

8. For each challenged statement for which you answered "NO" in response to Question 3, was Stuart Wolff a controlling person (as defined in the instructions) of the person making the statement?

| STATEMENT | YES | NO |
|---|---|---|
| 1. 3/7/00 Homestore and Budget Press Release (Exhibit 2063) | | |
| 2. 3/10/00 SEC Form 10-K FY 1999 (Exhibit 2098) | | |
| 3. 5/3/00 Homestore Press Release: Reports Record Quarterly Operating Results for 1st Quarter 2000 (Exhibit 2065) | | |
| 4. 5/15/00 SEC Form 10-Q Q1 FY 2000 (Exhibit 2099) | | |
| 5. 7/19/00 Homestore Press Release: Reports 252% Growth in Second Quarter Revenue (Exhibit 2068) | | |
| 6. 8/4/00 SEC Form 10-Q Q2 FY 2000 (Exhibit 2100) | | |
| 7. 10/19/00 Homestore Press Release: Reports Net Income Cash Profitability (Exhibit 2070) | | |
| 8. 10/27/00 Homestore Press Release: Homestore Agrees to Acquire Move.com from Cendant Corp. (Exhibit 2082) | | |
| 9. 11/14/00 SEC Form 10-Q Q3 FY 2000 (Exhibit 2101) | | |
| 10. 1/11/01 Homestore Press Release: Shareholders Approve Acquisition of Cendant Corp's Move.com (Exhibit 2071) | | |
| 11. 1/25/01 Homestore Press Release: Homestore Reports Revenue Growth (Exhibit 2073) | | |
| 12. 3/30/01 SEC Form 10-K FY 2000 (Exhibit 2102) | X | |
| 13. 4/25/01 Homestore Press Release: Homestore Reports Strong and Steady 1st Quarter Growth; Cash Profitability, Strong Revenue Growth Mark Record Performance (Exhibit 2077) | | |
| 14. 5/15/01 SEC Form 10-Q Q1 FY 2001 (Exhibit 2104) | X | |
| 15. 7/25/01 Homestore Press Release: Reports Eighth Consecutive Quarter of Strong Results (Exhibit 2078) | | |
| 16. 8/14/01 SEC Form 10-Q Q2 FY 2001 (Exhibit 2105) | X | |
| 17. 9/6/01 Homestore Press Release: Homestore Announces Closing of iPlace Acquisition-Reaffirms Third Quarter Projections (Exhibit 2079) | | |
| 18. 10/3/01 Homestore Press Release: Estimates Third Quarter Results (Exhibit 2080) | | |
| 19. 10/25/01 Homestore Press Release: Homestore Announces Organizational Realignment, Cost Reduction Plan (Exhibit 2081) | | |
| 20. 11/1/01 Homestore Press Release: Homestore Reports Third Quarter Results (Exhibit 2083) | | |
| 21. 11/14/01 SEC Form 10-Q Q3 FY 2001 (Exhibit 2106) | X | |
| 22. 12/6/01 Homestore Press Release: Homestore Announces Resignation of its Chief Financial Officer (Exhibit 2084) | | |

→ **PLEASE PROCEED TO QUESTION NO. 9.**

10

9. For each challenged statement for which you answered "YES" in response to Question 8, do you find that Stuart Wolff acted in good faith and did not directly or indirectly induce a Section 10(b) violation by the person making the statement (as defined in the instructions)?

| STATEMENT | YES | NO |
|---|---|---|
| 1. 3/7/00 Homestore and Budget Press Release (Exhibit 2063) | | |
| 2. 3/10/00 SEC Form 10-K FY 1999 (Exhibit 2098) | | |
| 3. 5/3/00 Homestore Press Release: Reports Record Quarterly Operating Results for 1st Quarter 2000 (Exhibit 2065) | | |
| 4. 5/15/00 SEC Form 10-Q Q1 FY 2000 (Exhibit 2099) | | |
| 5. 7/19/00 Homestore Press Release: Reports 252% Growth in Second Quarter Revenue (Exhibit 2068) | | |
| 6. 8/4/00 SEC Form 10-Q Q2 FY 2000 (Exhibit 2100) | | |
| 7. 10/19/00 Homestore Press Release: Reports Net Income Cash Profitability (Exhibit 2070) | | |
| 8. 10/27/00 Homestore Press Release: Homestore Agrees to Acquire Move.com from Cendant Corp. (Exhibit 2082) | | |
| 9. 11/14/00 SEC Form 10-Q Q3 FY 2000 (Exhibit 2101) | | |
| 10. 1/11/01 Homestore Press Release: Shareholders Approve Acquisition of Cendant Corp's Move.com (Exhibit 2071) | | |
| 11. 1/25/01 Homestore Press Release: Homestore Reports Revenue Growth (Exhibit 2073) | | |
| 12. 3/30/01 SEC Form 10-K FY 2000 (Exhibit 2102) | | X |
| 13. 4/25/01 Homestore Press Release: Homestore Reports Strong and Steady 1st Quarter Growth; Cash Profitability, Strong Revenue Growth Mark Record Performance (Exhibit 2077) | | |
| 14. 5/15/01 SEC Form 10-Q Q1 FY 2001 (Exhibit 2104) | | X |
| 15. 7/25/01 Homestore Press Release: Reports Eighth Consecutive Quarter of Strong Results (Exhibit 2078) | | |
| 16. 8/14/01 SEC Form 10-Q Q2 FY 2001 (Exhibit 2105) | | X |
| 17. 9/6/01 Homestore Press Release: Homestore Announces Closing of iPlace Acquisition-Reaffirms Third Quarter Projections (Exhibit 2079) | | |
| 18. 10/3/01 Homestore Press Release: Estimates Third Quarter Results (Exhibit 2080) | | |
| 19. 10/25/01 Homestore Press Release: Homestore Announces Organizational Realignment, Cost Reduction Plan (Exhibit 2081) | | |
| 20. 11/1/01 Homestore Press Release: Homestore Reports Third Quarter Results (Exhibit 2083) | | |
| 21. 11/14/01 SEC Form 10-Q Q3 FY 2001 (Exhibit 2106) | | X |
| 22. 12/6/01 Homestore Press Release: Homestore Announces Resignation of its Chief Financial Officer (Exhibit 2084) | | |

→ **PLEASE PROCEED TO QUESTION NO. 10**

11

## C. LOSS CAUSATION AND PROPORTIONATE RESPONSIBILITY

10. For each challenged statement for which you answered "YES" in response to Question 1, do you find that the untrue statement of material fact or omitted material fact you found in the challenged statement caused a loss to Plaintiffs?

| STATEMENT | YES | NO |
|---|---|---|
| 1. 3/7/00 Homestore and Budget Press Release (Exhibit 2063) | | |
| 2. 3/10/00 SEC Form 10-K FY 1999 (Exhibit 2098) | | |
| 3. 5/3/00 Homestore Press Release: Reports Record Quarterly Operating Results for 1st Quarter 2000 (Exhibit 2065) | | |
| 4. 5/15/00 SEC Form 10-Q Q1 FY 2000 (Exhibit 2099) | | |
| 5. 7/19/00 Homestore Press Release: Reports 252% Growth in Second Quarter Revenue (Exhibit 2068) | | |
| 6. 8/4/00 SEC Form 10-Q Q2 FY 2000 (Exhibit 2100) | | |
| 7. 10/19/00 Homestore Press Release: Reports Net Income Cash Profitability (Exhibit 2070) | | |
| 8. 10/27/00 Homestore Press Release: Homestore Agrees to Acquire Move.com from Cendant Corp.(Exhibit 2082) | | |
| 9. 11/14/00 SEC Form 10-Q Q3 FY 2000 (Exhibit 2101) | | |
| 10. 1/11/01 Homestore Press Release: Shareholders Approve Acquisition of Cendant Corp's Move.com (Exhibit 2071) | | |
| 11. 1/25/01 Homestore Press Release: Homestore Reports Revenue Growth (Exhibit 2073) | ✕ | |
| 12. 3/30/01 SEC Form 10-K FY 2000 (Exhibit 2102) | ✕ | |
| 13. 4/25/01 Homestore Press Release: Homestore Reports Strong and Steady 1st Quarter Growth; Cash Profitability, Strong Revenue Growth Mark Record Performance (Exhibit 2077) | ✕ | |
| 14. 5/15/01 SEC Form 10-Q Q1 FY 2001 (Exhibit 2104) | ✕ | |
| 15. 7/25/01 Homestore Press Release: Reports Eighth Consecutive Quarter of Strong Results (Exhibit 2078) | ✕ | |
| 16. 8/14/01 SEC Form 10-Q Q2 FY 2001 (Exhibit 2105) | ✕ | |
| 17. 9/6/01 Homestore Press Release: Homestore Announces Closing of iPlace Acquisition-Reaffirms Third Quarter Projection (Exhibit 2079) | ✕ | |
| 18. 10/3/01 Homestore Press Release: Estimates Third Quarter Results (Exhibit 2080) | ✕ | |
| 19. 10/25/01 Homestore Press Release: Homestore Announces Organizational Realignment, Cost Reduction Plan (Exhibit 2081) | | |
| 20. 11/1/01 Homestore Press Release: Homestore Reports Third Quarter Results (Exhibit 2083) | ✕ | |
| 21. 11/14/01 SEC Form 10-Q Q3 FY 2001 (Exhibit 2106) | ✕ | |
| 22. 12/6/01 Homestore Press Release: Homestore Announces Resignation of its Chief Financial Officer (Exhibit 2084) | | |

→ **PLEASE PROCEED TO QUESTION NO. 11.**

12

11.  For each person or entity identified in the table below, please state whether such person committed a securities violation which caused or contributed to any loss incurred by Plaintiffs with respect to the challenged statement, and if so, assign a percentage of responsibility for each such statement. The total of all percentages for a statement must add up to 100%.

| STATEMENT | Stuart Wolff | John Giesecke | Joe Shew | Peter Tafeen | John DeSimone | Pricewaterhouse (PwC) | Other Homestore Persons | AOL | Cendant | L-90 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.  3/7/00 Homestore and Budget Press Release (Exhibit 2063) | | | | | | | | | | |
| 2.  3/10/00 SEC Form 10-K FY 1999 (Exhibit 2098) | | | | | | | | | | |
| 3.  5/3/00 Homestore Press Release: Reports Record Quarterly Operating Results for 1st Quarter 2000 (Exhibit 2065) | | | | | | | | | | |
| 4.  5/15/00 SEC Form 10-Q Q1 FY 2000 (Exhibit 2099) | | | | | | | | | | |
| 5.  7/19/00 Homestore Press Release: Reports 252% Growth in Second Quarter Revenue (Exhibit 2068) | | | | | | | | | | |
| 6.  8/4/00 SEC Form 10-Q Q2 FY 2000 (Exhibit 2100) | | | | | | | | | | |
| 7.  10/19/00 Homestore Press Release: Reports Net Income Cash Profitability (Exhibit 2070) | | | | | | | | | | |
| 8.  10/27/00 Homestore Press Release: Homestore Agrees to Acquire Move.com from Cendant Corp. (Exhibit 2082) | | | | | | | | | | |
| 9.  11/14/00 SEC Form 10-Q Q3 FY 2000 (Exhibit 2101) | | | | | | | | | | |
| 10. 1/11/01 Homestore Press Release: Shareholders Approve Acquisition of Cendant Corp's Move.com (Exhibit 2071) | | | | | | | | | | |
| 11. 1/25/01 Homestore Press Release: Homestore Reports Revenue Growth (Exhibit 2073) | 70 | 5 | 0 | 25 | 0 | 0 | 0 | 0 | 0 | 0 |
| 12. 3/30/01 SEC Form 10-K FY 2000 (Exhibit 2102) | 50 | 30 | 15 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |

13

| STATEMENT | Stuart Wolff | John Giesecke | Joe Shew | Peter Tafeen | John DeSimone | Pricewaterhouse (PwC) | Other Homestore Persons | AOL | Cendant | L-90 |
|---|---|---|---|---|---|---|---|---|---|---|
| 13. 4/25/01 Homestore Press Release: Homestore Reports Strong and Steady 1st Quarter Growth; Cash Profitability, Strong Revenue Growth Mark Record Performance (Exhibit 2077) | 65 | 5 | 5 | 25 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14. 5/15/01 SEC Form 10-Q Q1 FY 2001 (Exhibit 2104) | 50 | 15 | 20 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| 15. 7/25/01 Homestore Press Release: Reports Eighth Consecutive Quarter of Strong Results (Exhibit 2078) | 60 | 15 | 5 | 20 | 0 | 0 | 0 | 0 | 0 | 0 |
| 16. 8/14/01 SEC Form 10-Q Q2 FY 2001 (Exhibit 2105) | 50 | 15 | 10 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| 17. 9/6/01 Homestore Press Release: Homestore Announces Closing of iPlace Acquisition-Reaffirms Third Quarter Projections (Exhibit 2079) | 65 | 5 | 5 | 25 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18. 10/3/01 Homestore Press Release: Estimates Third Quarter Results (Exhibit 2080) | 75 | 5 | 5 | 15 | 0 | 0 | 0 | 0 | 0 | 0 |
| 19. 10/25/01 Homestore Press Release: Homestore Announces Organizational Realignment, Cost Reduction Plan (Exhibit 2081) | | | | | | | | | | |
| 20. 11/1/01 Homestore Reports Third Quarter Results (Exhibit 2083) | 75 | 5 | 5 | 15 | 0 | 0 | 0 | 0 | 0 | 0 |
| 21. 11/14/01 SEC Form 10-Q Q3 FY 2001 (Exhibit 2106) | 50 | 25 | 20 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| 22. 12/6/01 Homestore Press Release: Homestore Announces Resignation of its Chief Financial Officer (Exhibit 2084) | | | | | | | | | | |

14

## D.   **DAMAGES**

If you answered "YES" to Question 10 for one or more of the challenged statements, please answer the following questions:

12.   If you find that the truth about the challenged statements was made generally known to the public by disclosures made on one or more of the following dates, for such date(s) determine the total per-share loss you find to have been caused by such disclosure(s):

   a.   October 3, 2001        $ .52

   b.   November 2, 2001     $ 2.71

   c.   December 6, 2001      $ 0

   d.   December 21, 2001    $ 1.14

13.   For each challenged statement for which you answered "YES" to Question 10, please determine that part of the total per-share dollar loss you found in response to Question 12 that was caused by each such statement (the total for all statements must not exceed the total per-share loss from Question 12).

| STATEMENT | AMOUNT PER SHARE ($   ) |
|---|---|
| 1.   3/7/00 Homestore and Budget Press Release (Exhibit 2063) | |
| 2.   3/10/00 SEC Form 10-K FY 1999 (Exhibit 2098) | |
| 3.   5/3/00 Homestore Press Release: Reports Record Quarterly Operating Results for 1st Quarter 2000 (Exhibit 2065) | |
| 4.   5/15/00 SEC Form 10-Q Q1 FY 2000 (Exhibit 2099) | |
| 5.   7/19/00 Homestore Press Release: Reports 252% Growth in Second Quarter Revenue (Exhibit 2068) | |
| 6.   8/4/00 SEC Form 10-Q Q2 FY 2000 (Exhibit 2100) | |
| 7.   10/19/00 Homestore Press Release: Reports Net Income Cash Profitability (Exhibit 2070) | |
| 8.   10/27/00 Homestore Press Release: Homestore Agrees to Acquire Move.com from Cendant Corp. (Exhibit 2082) | |
| 9.   11/14/00 SEC Form 10-Q Q3 FY 2000 (Exhibit 2101) | |
| 10.  1/11/01 Homestore Press Release: Shareholders Approve Acquisition of Cendant Corp's Move.com (Exhibit 2071) | |
| 11.  1/25/01 Homestore Press Release: Homestore Reports Revenue Growth (Exhibit 2073) | 0.2185 |
| 12.  3/30/01 SEC Form 10-K FY 2000 (Exhibit 2102) | 0.437 |

15

| STATEMENT | AMOUNT PER SHARE ($ ) |
|---|---|
| 13. 4/25/01 Homestore Press Release: Homestore Reports Strong and Steady 1st Quarter Growth; Cash Profitability, Strong Revenue Growth Mark Record Performance (Exhibit 2077) | 0.2185 |
| 14. 5/15/01 SEC Form 10-Q Q1 FY 2001 (Exhibit 2104) | 0.437 |
| 15. 7/25/01 Homestore Press Release: Reports Eighth Consecutive Quarter of Strong Results (Exhibit 2078) | 0.2185 |
| 16. 8/14/01 SEC Form 10-Q Q2 FY 2001 (Exhibit 2105) | 0.437 |
| 17. 9/6/01 Homestore Press Release: Homestore Announces Closing of iPlace Acquisition-Reaffirms Third Quarter Projections (Exhibit 2079) | 0.6555 |
| 18. 10/3/01 Homestore Press Release: Estimates Third Quarter Results (Exhibit 2080) | 0.6555 |
| 19. 10/25/01 Homestore Press Release: Homestore Announces Organizational Realignment, Cost Reduction Plan (Exhibit 2081) | |
| 20. 11/1/01 Homestore Press Release: Homestore Reports Third Quarter Results (Exhibit 2083) | 0.6555 |
| 21. 11/14/01 SEC Form 10-Q Q3 FY 2001 (Exhibit 2106) | 0.437 |
| 22. 12/6/01 Homestore Press Release: Homestore Announces Resignation of its Chief Financial Officer (Exhibit 2084) | |

**PLEASE SIGN AND DATE BELOW AND PROVIDE THIS VERDICT FORM TO THE CLERK.**

DATED: 2/24/<u>22</u>, 2011

Redacted by Court

**JURY FOREPERSON**

16

# EXHIBIT C

[In re JDS Uniphase Corp. Sec. Litig.
Case No. C-02-1486-CW
ECF No. 1883 (N.D. Cal., Nov. 27, 2007)
Verdict Form]

1
2
3
4
5
6
7
8
9

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re JDS UNIPHASE CORPORATION
SECURITIES LITIGATION

**FILED**

NOV 27 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

No. C 02-1486 CW

VERDICT QUESTIONS
FORM




10 ## Part A--Section 10(b) and Section 20 False or Misleading Statements Liability

11

12 Please answer the questions below for each of the statements on the
Table of Challenged Statements and indicate your unanimous answers
13 on the Verdict Table. If a box on the Verdict Table is blacked out
or already filled in, that means that the question does not apply
14 to the corresponding statement or that the parties have agreed to
an answer. Please skip any question that is blacked out or already
15 answered. A "yes" answer favors Plaintiffs; a "no" answer favors
Defendants.

16 1. Do you find that this challenged statement contains an untrue
statement of material fact, or omits a material fact necessary
17 under the circumstances to keep the statement that was made
from being misleading? Answer Yes or No.

18

**If you answered "Yes," please proceed to Question 2, and if**
19 **Question 2 is blacked out, please skip to Question 3. If you**
**answered "No," please return to Question 1 for the next statement.**

20
21 2. Do you find that the challenged statement was <u>not</u> accompanied
by meaningful cautionary statements as defined in the
instructions? Answer Yes or No.

22
23 **If you answered "Yes," please proceed to Question 3. If you**
**answered "No," please return to Question 1 for the next statement.**

24 3. Please enter "Yes" in the box representing any Individual
Defendant who you find was substantially involved in the
25 preparation of the challenged statement.

26 **If you identified any Individual Defendant, or if any Individual**
**Defendant was already marked, please proceed to Question 4a. If**
27 **you did not identify any Individual Defendant and no Individual**
**Defendant was already marked, please return to Question 1 for the**
28 **next statement.**

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

4a.   Do you find that any Individual Defendant who you found in Question 3 made or was responsible for the statement, or who the parties agree made the statement, did so with actual knowledge that the statement was materially false or misleading?  Answer Yes or No.

**If you answered "No" for any Individual Defendant identified in Question 4a, please answer Question 4b for that Individual Defendant.  Otherwise, skip to Question 5.**

4b.   Do you find that any Individual Defendant who you found in Question 3 made or was responsible for the statement, or who the parties agree made the statement, did so with deliberate recklessness?  Answer Yes or No.

**If you answered "Yes" to Question 4a or 4b for any Individual Defendant, please proceed to Question 5.  Otherwise, please return to Question 1 for the next statement.**

5.   Do you find that the untrue statement of material fact, or the omitted material fact, played a substantial part in causing a loss to Plaintiffs?  Answer Yes or No.

**If you answered "Yes," please proceed to Question 6.  If you answered "No," please return to Question 1 for the next statement.**

6.   Please enter "Yes" in the box representing any Individual Defendant who you find directly or indirectly controlled the person who made the challenged statement, directly or indirectly induced the person to make the statement, and did not act in good faith.

**Please return to Question 1 for the next statement.  When you have completed the chart for all statements, please review your answers recorded on the Verdict Table.  If you found for Plaintiff on any statement (i.e. if you answered "yes" in Column 5 for any statement), please proceed to Part B, Question 7.  Otherwise, please skip to Part D, Question 14.**

2

United States District Court

For the Northern District of California

**Part B--Section 10(b) and Section 20 False or Misleading Statements Damages**

7.   Which of these two methods do you find is the most accurate method for calculating damages in this case?

___  Dollar Inflation      ___  Percentage Inflation

**If you selected "Dollar Inflation," please complete Question 8.  If you selected "Percentage Inflation," please complete Question 9 on Page 5.  (Do not complete both tables.)**

8.   If you answered "Dollar Inflation," please complete the table, following the instructions below.

   a.   Please black out Column 2 for any date on which you do not find that the challenged statement(s) on that date caused a loss (i.e. for which you answered "No" in Column 5 of the Verdict Table).
   b.   Beginning with the first date that is not blacked out in Column 2, please enter the dollar amount by which you find the false or misleading statement(s) made on that date inflated the price of JDSU stock.
   c.   For this first row only, please copy the amount you entered in Column 2 into Column 4.
   d.   Proceed to the next row.  If Column 2 is not blacked out, enter the dollar amount by which you find the false or misleading statement(s) made on this date inflated the price of JDSU stock.  Enter, in Column 3, the amount, if any, by which you find that any corrective disclosures, since the date of the previous row, have reduced the inflation created by false or misleading statements.  Take the number from Column 4 in the previous row, add the number, if any, in Column 2, subtract the number, if any, in Column 3, and enter the result in Column 4.
   e.   Please continue to complete each row.

   **When you are finished, please skip to Part C, Question 10.**

3

## Dollar Inflation Table

| COLUMN 1 | COLUMN 1a | COLUMN 2 | COLUMN 3 | COLUMN 4 |
|---|---|---|---|---|
| Date | Price per share on this Date | Inflation created by false or misleading statement(s) on this date | Reduction in inflation due to corrective disclosures, if any, since previous date | Total inflation due to challenged statements on this date |
| 4/25/00 | $93.38 | $ | ■ | $ |
| 5/25/00 | $79.00 | ■ | $ | $ |
| 6/25/00 | $123.44 | ■ | $ | $ |
| 7/26/00 | $135.94 | $ | $ | $ |
| 8/25/00 | $125.31 | ■ | $ | $ |
| 9/1/00 | $123.81 | $ | $ | $ |
| 9/7/00 | $119.88 | $ | $ | $ |
| 10/26/00 | $74.44 | $ | $ | $ |
| 10/30/00 | $71.31 | $ | $ | $ |
| 11/14/00 | $75.63 | $ | $ | $ |
| 11/17/00 | $70.13 | $ | $ | $ |
| 12/20/00 | $46.00 | ■ | $ | $ |
| 1/25/01 | $55.19 | $ | $ | $ |
| 2/12/01 | $40.63 | $ | $ | $ |
| 2/13/01 | $38.50 | $ | $ | $ |
| 3/23/01 | $23.19 | $ | $ | $ |
| 4/24/01 | $20.82 | $ | $ | $ |
| 5/11/01 | $20.69 | $ | $ | $ |
| 6/15/01 | $12.44 | ■ | $ | $ |
| 7/26/01 | $9.47 | ■ | $ | $ |



4

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

9.   If you selected "Percentage Inflation" in Question 7 above, please complete the table, following the instructions below.

a.   Please black out Column 2 for any date on which you do not find that the challenged statement(s) on that date caused a loss (i.e. for which you answered "No" in Column 5 of the Verdict Table).

b.   Beginning with the first date that is not blacked out in Column 2, please enter the percent by which you find the false or misleading statement(s) made on that date inflated the price of JDSU stock.

c.   For this first row only, please copy the amount you entered in Column 2 into Column 4.

d.   Proceed to the next row.  If Column 2 is not blacked out, enter the percent by which you find that any false or misleading statement(s) made on this date inflated the price of JDSU stock.  Enter, in Column 3, the amount, if any, by which you find that any corrective disclosures, since the date of the previous row, have reduced the inflation created by false or misleading statements. Take the number from Column 4 in the previous row, add the number, if any, in Column 2, subtract the number, if any, in Column 3, and enter the result in Column 4.

e.   Please continue to complete each row.

**When you are finished, please proceed to Part C, Question 10.**

5

## Percentage Inflation Table

| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 |
|---|---|---|---|
| Date | Inflation created by false or misleading statement(s) on this date | Reduction in inflation due to corrective disclosures since previous date | Total inflation due to challenged statements on this date |
| 4/25/00 | % | ▮ | % |
| 5/25/00 | ▮ | % | % |
| 6/25/00 | ▮ | % | % |
| 7/26/00 | % | % | % |
| 8/25/00 | ▮ | % | % |
| 9/1/00 | % | % | % |
| 9/7/00 | % | % | % |
| 10/26/00 | % | % | % |
| 10/30/00 | % | % | % |
| 11/14/00 | % | % | % |
| 11/17/00 | % | % | % |
| 12/20/00 | ▮ | % | % |
| 1/25/01 | % | % | % |
| 2/12/01 | % | % | % |
| 2/13/01 | % | % | % |
| 3/23/01 | % | % | % |
| 4/24/01 | % | % | % |
| 5/11/01 | % | % | % |
| 6/15/01 | ▮ | % | % |
| 7/26/01 | ▮ | % | % |

6



United States District Court
For the Northern District of California

## Part C--Section 14(a) Misrepresentation in a Proxy Statement for Merger Liability & Damages

If you found in answer to Question 1 above that Statement 10 was materially false or misleading, please answer Question 10. Otherwise, please skip to Part D, Question 14.

10. Do you find that statement 10 was an essential link in the accomplishment of the JDS-SDL merger?

＿＿ Yes ＿✗＿ No

Please proceed to Question 11

11. Do you find that Defendant Straus failed to act with ordinary or reasonable care when he made statement 10?

＿＿ Yes ＿✗＿ No

Please proceed to Question 12.

12. Do you find that Defendant Muller failed to act with ordinary or reasonable care when he made statement 10?

＿＿ Yes ＿✗＿ No

If you have answered "Yes" to Question 10 and to either Question 11 and/or Question 12, please proceed to Question 13. Otherwise, please skip to Part D, Question 14.

13a. If you did not determine damages for Statement 10 on the Verdict Table, do you find that Statement 10 played a substantial part in causing a loss to Plaintiffs?

＿＿ Yes ＿✗＿ No

If you answered "Yes," please proceed to Question 13b. Otherwise, please skip to Part D, Question 14.

13b. What is the dollar amount or percentage amount that Statement 10 inflated the price of JDSU stock on February 13, 2001? Please answer only once, using the method you selected in response to Question 7.

$＿＿＿＿＿ or ＿＿＿＿＿%

Please proceed to Part D, Question 14.

7

**Part D--Section 20A Trading on Inside Information Liability & Damages**

14.  Do you find that one or more of the Individual Defendants made a decision to sell shares of JDSU stock using material, non-public information about the company?

| | | | |
|---|---|---|---|
| Defendant Abbe | Yes _____ | No | ✗ |
| Defendant Kalkhoven | Yes _____ | No | ✗ |
| Defendant Muller | Yes _____ | No | ✗ |
| Defendant Straus | Yes _____ | No | ✗ |

If you answered "Yes" as to any defendant, please proceed. Otherwise, sign, date and return your verdict.

If, in answer to Question 7, you selected "Dollar Inflation," please complete Question 15.  If you selected "Percentage Inflation," please skip to Question 16 on Page 12.  (Do not complete both tables.)

15.  If you selected "Dollar Inflation" in Question 7, please complete the table below for any Defendant who you found sold JDSU stock using material, non-public information.

   a.  Enter "Yes" in Column 2 for the date of any stock sale which you find the Individual Defendant made using material, non-public information about the company.
   b.  For every date on which you answered "Yes", please enter the dollar amount by which the price of JDSU stock was inflated because the public did not have this material information.

   Then sign, date and return your verdict.

8

# Dollar Inflation Tables

**Defendant Abbe**

| Column 1 | Column 1a | Column 2 | Column 3 |
|----------|-----------|----------|----------|
| Date | Market Price Per Share on Date | Used Material, Non-Public Information? | Dollar Inflation on Date of Sale |
| 8/1/00 | $116.87 | | $ |
| 8/11/00 | $117.75 | | $ |
| 2/26/01 | $32.63 | | $ |
| 2/27/01 | $27.81 | | $ |
| 2/28/01 | $26.75 | | $ |

**Defendant Kalkhoven**

| Column 1 | Column 1a | Column 2 | Column 3 |
|----------|-----------|----------|----------|
| Date | Market Price Per Share on Date | Used Material, Non-Public Information? | Dollar Inflation on Date of Sale |
| 5/22/00 | $85.31 | | $ |
| 5/24/00 | $83.50 | | $ |
| 7/31/00 | $118.16 | | $ |
| 8/4/00 | $115.94 | | $ |
| 8/7/00 | $121.19 | | $ |
| 8/21/00 | $124.38 | | $ |
| 8/22/00 | $124.50 | | $ |
| 8/31/00 | $124.48 | | $ |
| 9/1/00 | $123.81 | | $ |
| 9/7/00 | $119.88 | | $ |
| 9/12/00 | $103.19 | | $ |
| 9/13/00 | $104.81 | | $ |



United States District Court
For the Northern District of California

| 9/18/00 | $97.81 | | $ |
|---------|--------|---|---|
| 9/19/00 | $107.94 | | $ |
| 9/20/00 | $107.13 | | $ |
| 9/22/00 | $107.00 | | $ |
| 9/25/00 | $106.81 | | $ |
| 10/4/00 | $94.06 | | $ |
| 10/5/00 | $95.06 | | $ |
| 10/11/00 | $85.88 | | $ |
| 10/13/00 | $94.38 | | $ |
| 10/16/00 | $94.44 | | $ |
| 10/20/00 | $102.38 | | $ |
| 10/27/00 | $77.25 | | $ |
| 11/1/00 | $78.56 | | $ |
| 1/18/01 | $60.31 | | $ |

Defendant Muller

| Column 1 | Column 1a | Column 2 | Column 3 |
|----------|-----------|----------|----------|
| Date | Market Price Per Share on Date | Used Material, Non-Public Information? | Dollar Inflation on Date of Sale |
| 5/22/00 | $85.31 | | $ |
| 5/30/00 | $91.38 | | $ |
| 7/31/00 | $118.13 | | $ |
| 8/1/00 | $116.88 | | $ |
| 8/2/00 | $112.63 | | $ |
| 8/4/00 | $115.94 | | $ |
| 8/7/00 | $121.19 | | $ |
| 8/8/00 | $119.88 | | $ |
| 8/11/00 | $117.75 | | $ |
| 8/14/00 | $120.25 | | $ |

10

Defendant Straus

| Column 1 | Column 1a | Column 2 | Column 3 |
|----------|-----------|----------|----------|
| Date | Market Price Per Share on Date | Used Material, Non-Public Information? | Dollar Inflation on Date of Sale |
| 8/1/00 | $116.88 | | $ |
| 8/4/00 | $115.94 | | $ |
| 8/7/00 | $121.19 | | $ |
| * | $55.81 | 11/30/00 | 2/1/01    $ |
| * | $28.00 | 11/30/00 | 3/6/01    $ |

*You must determine whether Defendant Straus used material, non-public information on November 30, 2000 in deciding whether he is liable for insider trading based on these sales. However, the damages must be calculated as of the actual date of the sales.



11

16. If you selected "Percentage Inflation" in Question 7, please complete the table below for any Defendant who you found sold JDSU stock using material, non-public information.

   a.   Enter "Yes" in Column 2 for the date of any stock sale which you find the Individual Defendant made while using material, non-public information about the company.

   b.   For every date on which you answered "Yes", please enter the percentage by which the price of JDSU stock was inflated because the public did not have this material information.

**Then sign, date and return your verdict.**

# Percentage Inflation Tables

**Defendant Abbe**

| Column 1 | Column 2 | Column 3 |
|---|---|---|
| Date | Used Material, Non-Public Information? | Percentage Inflation on Date of Sale |
| 8/1/00 | | % |
| 8/11/00 | | % |
| 2/26/01 | | % |
| 2/27/01 | | % |
| 8/1/00 | | % |

**Defendant Kalkhoven**

| Date | Used Material, Non-Public Information? | Percentage Inflation on Date of Sale |
|---|---|---|
| 5/22/00 | | % |
| 5/24/00 | | % |
| 7/31/00 | | % |
| 8/4/00 | | % |
| 8/7/00 | | % |
| 8/21/00 | | % |
| 8/22/00 | | % |
| 8/31/00 | | % |
| 9/1/00 | | % |
| 9/7/00 | | % |
| 9/12/00 | | % |
| 9/13/00 | | % |
| 9/18/00 | | % |
| 9/19/00 | | % |
| 9/20/00 | | % |
| 9/22/00 | | % |

13

United States District Court
For the Northern District of California

| Date | Used Material, Non-Public Information? | Percentage Inflation on Date of Sale |
|---|---|---|
| 9/25/00 | | % |
| 10/4/00 | | % |
| 10/5/00 | | % |
| 10/11/00 | | % |
| 10/13/00 | | % |
| 10/16/00 | | % |
| 10/20/00 | | % |
| 10/27/00 | | % |
| 11/1/00 | | % |
| 1/18/01 | | % |

Defendant Muller

| Date | Used Material, Non-Public Information? | Percentage Inflation on Date of Sale |
|---|---|---|
| 5/22/00 | | % |
| 5/30/00 | | % |
| 7/31/00 | | % |
| 8/1/00 | | % |
| 8/2/00 | | % |
| 8/4/00 | | % |
| 8/7/00 | | % |
| 8/8/00 | | % |
| 8/11/00 | | % |
| 8/14/00 | | % |

14

Defendant Straus

| Date | Used Material, Non-Public Information? | Percentage Inflation on Date of Sale | |
|------|---------------------------------------|--------------------------------------|---|
| 8/1/00 | | | % |
| 8/4/00 | | | % |
| 8/7/00 | | | % |
| * | 11/30/00 | 2/1/01 | % |
| * | 11/30/00 | 3/6/01 | % |

*You must determine whether Defendant Straus used material, non-public information on November 30, in deciding whether he is liable for insider trading based on these sales. However, the damages must be calculated as of the actual date of the sales.

**Please sign, date and return this form.**

Dated:

_____
Jury Foreperson

11/27/07 . 1515 HRS .

**VERDICT TABLE**

| Statement | Quest. No. 1 Materially False or Misleading | Quest. No. 2 Lacks Cautionary Language | Quest. No. 3 Person(s) Making Statement — Abbe | Kalkhoven | Muller | Straus | Quest. No. 4a Actual Knowledge — Abbe | Kalkhoven | Muller | Straus | Quest. No. 4b Reckless Disregard — Abbe | Kalkhoven | Muller | Straus | Quest. No. 5 Caused Loss | Quest. No. 6 Controlling Person — Abbe | Kalkhoven | Muller | Straus |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Statement No. 1 "... the market is exceeding, you know, our ability to ramp up ...." | 1/2 0 NO | | | | | | | | | | | | | | | | | | |
| Statement No. 2 "In all of these markets, the demand for bandwidth technology and components remains incredibly strong, and I believe we will see this demand accelerated." | 1/2 0 NO | | | | | | | | | | | | | | | | | | |
| Statement No. 3 "Two-and-a-half-gigabit modulators continue to demonstrate strong growth...." | NO | | | Yes | Yes | Yes | | | | | | | | | | | | | |
| Statement No. 4 (Goodwill) JDSU's intangible assets at June 30, 2000, were $22.3 billion, including goodwill of $21.3 billion. | 1/2 NO | | | | Yes | Yes | | | | | | | | | | | | | |
| Statement No. 5 (Goodwill) JDSU's intangible assets, including goodwill, were $22.3 billion at June 30, 2000. | 1/2? NO | | | | Yes | Yes | | | | | | | | | | | | | |
| Statement No. 6 "... we still are ... capacity constrained." | NO | | Yes | | Yes | | | | | | | | | | | | | | |
| Statement No. 7 "These results reflect ... our substantial progress in expanding capacity to enable us to meet customer demand and serve the needs of our markets." | 1/2? NO | | | | Yes | | | | | | | | | | | | | | |
| Statement No. 8 (Goodwill) JDSU's intangible assets at June 30, 2000, were $22.3 billion, including goodwill of $21.3 billion. | 1/2 NO | | | | Yes | Yes | | | | | | | | | | | | | |
| Statement No. 9 (Goodwill) JDSU's goodwill was '21.1 billion]' at September 30, 2000. | 1/2 0 NO | | | | Yes | | | | | | | | | | | | | | |

| Statement | Quest. No. 1 Materially False or Misleading | Quest. No. 2 Lacks Cautionary Language | Quest. No. 3 Person(s) Making Statement — Abbe | Kalkhoven | Muller | Straus | Quest. No. 4a Actual Knowledge — Abbe | Kalkhoven | Muller | Straus | Quest. No. 4b Reckless Disregard — Abbe | Kalkhoven | Muller | Straus | Quest. No. 5 Caused Loss | Quest. No. 6 Controlling Person — Abbe | Kalkhoven | Muller | Straus |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Goodwill)* **Statement No. 10** — JDSU's intangible assets at June 30, 2000, were $22.3 billion, including goodwill of $21.3 billion. | 11/6 No | | | ■ | | | ■ | | | | | ■ | | | | | ■ | | |
| **Statement No. 11** — JDSU's goodwill was "$21.1 [billion]" at September 30, 2000. | No | | | ■ | | | ■ | | | | | ■ | | | | | ■ | | |
| **Statement No. 12** — "We don't expect lead times to come down in the near-term because our demand is so strong." | No | | | ■ | | | ■ | | | | ■ | ■ | | | | | ■ | | |
| **Statement No. 13** — "Our backlog . . . is enormous . . ." | No | Yes | | ■ | | | ■ | | | | ■ | ■ | | | | | ■ | | |
| **Statement No. 14** — "For the year, we expect earnings-per-share to be at 82 cents . . ." | 11/20 No | Yes | | ■ | Yes | | ■ | | | | | ■ | | | | | ■ | | |
| **Statement No. 15** — "We anticipate sales in the March quarter to be 7 percent to 10 percent above sales for the quarter ended December 30." | No | | | ■ | Yes | | ■ | | | | | ■ | | | | | ■ | | |
| *(Inventory)* **Statement No. 16** — JDSU's inventories balance at December 30, 2000, was "[$]493.9 [million]". | 11/20 No | | | ■ | | | ■ | | | | ■ | ■ | | | | | ■ | | |
| *(Goodwill)* **Statement No. 17** — JDSU's goodwill was "$21.1 [billion]" at September 30, 2000. | 11/29 No | | | ■ | Yes | Yes | ■ | | | | ■ | ■ | | | | | ■ | | |
| *(Inventory)* **Statement No. 18** — "The Company expects sales in the quarter ending March 31 to be at or slightly above $1 billion with earnings per share of $0.17." | 4/26 No | | | ■ | Yes | | ■ | | | | ■ | ■ | | | | ■ | ■ | | |
| *(Inventory)* **Statement No. 18** — JDSU's inventories balance was "[$]493.9 [million]" at December 30, 2000. | 11/20 No | | | ■ | Yes | | ■ | | | | ■ | ■ | | | | | ■ | | |
| *(Goodwill)* **Statement No. 19** — JDSU's goodwill was $21.2 billion at December 30, 2000. | 4/26 No | | | ■ | | | ■ | | | | ■ | ■ | | | | | ■ | | |

| Statement | Quest. No. 1 Materially False or Misleading | Quest. No. 2 Lacks Cautionary Language | Quest. No. 3 Person(s) Making Statement — Abbe | Kalkhoven | Muller | Strauss | Quest. No. 4a Actual Knowledge — Abbe | Kalkhoven | Muller | Strauss | Quest. No. 4b Reckless Disregard — Abbe | Kalkhoven | Muller | Strauss | Quest. No. 5 Caused Loss | Quest. No. 6 Controlling Person — Abbe | Kalkhoven | Muller | Strauss |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Goodwill)* **Statement No. 20** JDSU and SDL's combined *pro forma* intangible assets, including goodwill, were $60.2 billion at December 30, 2000. | N/A NO | | | | Yes | | | | | | | | | | | | | | |
| *(Inventory)* **Statement No. 21** JDSU's inventories balance was $493.9 million at December 30, 2000. | N/A NO | | | | Yes | | | | | | | | | | | | | | |
| *(Inventory)* **Statement No. 22** • "Our third quarter results . . . pro forma earnings of 14 cents per share." • "Pro forma gross margin was 48.6 percent of sales for the quarter." | N/A NO | | | | Yes | Yes | | | | | | | | | | | | | |
| *(Inventory)* **Statement No. 23** JDSU's gross profits were $425.9 million for the quarter ended March 31, 2001, and $1,251.0 million for the nine months ended March 31, 2001. | N/A NO | | | | Yes | | | | | | | | | | | | | | |
| *(Inventory)* **Statement No. 24** JDSU's inventories balance was "$1,672.9 [million]" at March 31, 2001. | N/A NO | | | | Yes | | | | | | | | | | | | | | |

THE JURY FIND UNAMOUSLY
FOND ME THAT ALL DEFENDANTS
IN FAVOR OF THE DEFENSE
DEFENDANT.
ON ALL COURTS. NO DAMAGES
FINANCIAL IS AWARDED. FINANCIAL

The jury find unamiously
in favor of the defense on all
Counts
Courts. No financial damages
awarded.

# EXHIBIT D

[*Hsu v. Puma Biotech. et al.*
Case No. 15-cv-00865-DOC-SHK
ECF No. 718 (C.D. Cal., Feb. 4, 2019)
Verdict Form]

**REDACTED**

**VERDICT FORM**

FILED

FEB 4, 2019

CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY    MKU
Deputy Clerk, U.S. District Court

1.    **MISREPRESENTATIONS AND OMISSIONS**
(Please refer to the statements in the attached Appendix.)

Did Plaintiffs prove that Defendants made materially false or misleading statements or omissions on July 22, 2014 regarding:

|  | *(circle either "yes" or "no" for each statement)* | |
|---|---|---|
| 1. Disease-Free Survival (DFS) Rates | (YES) | NO |
| 2. Grade 3+ Diarrhea Rate | YES | (NO) |
| 3. Kaplan-Meier (KM) Curves | YES | (NO) |
| 4. Discontinuation Rate Due to Adverse Events (AEs) | YES | (NO) |

IF YOU CIRCLED "YES" AT LEAST ONCE, PROCEED TO SECTION 2.
OTHERWISE, PROCEED TO SECTION 6.

2.    **KNOWINGLY**

Did Plaintiffs prove that Defendants acted knowingly in making the alleged false or misleading statements or omissions?  *(circle either "yes" or "no")*

(YES)        NO

IF YOU CIRCLED "YES," PROCEED TO SECTION 3.
OTHERWISE, PROCEED TO SECTION 6.

3.    **CAUSATION**

3.1    Did Plaintiffs prove that the disclosures on May 13, 2015 regarding the ExteNET trial DFS Rates and Grade 3+ Diarrhea Rate played a substantial part in causing the decline in Puma's stock price on May 14, 2015? *(circle either "yes" or "no")*

(YES)        NO

PROCEED TO QUESTION 3.2.

SACV 15-00865-AG
(SHKx)

HSINGCHING HSU, ET AL. V.

PUMA BIOTECHNOLOGY INC,

ET AL

**3.2** Did Plaintiffs prove that the disclosures on June 1, 2015 regarding the ExteNET trial KM Curves and Discontinuation Rate Due to Adverse Events played a substantial part in causing the decline in Puma's stock price on June 1-2, 2015? *(circle either "yes" or "no")*

YES     (NO)

IF YOU CIRCLED "YES" IN RESPONSE TO QUESTION 3.1 AND/OR QUESTION 3.2, PROCEED TO SECTION 4.
OTHERWISE, PROCEED TO SECTION 6.

---

**4.     DAMAGES**

Specify the amount of damages per share of Puma stock, if any, caused by the disclosures regarding the alleged false or misleading statements or omissions. *(For each date for which you answered "yes" in response to Questions 3.1 and 3.2, write in a dollar amount.)*

| Date | ($/share) |
|---|---|
| May 14, 2015 | $ _4.50_ (The damages per share cannot exceed $40.96) |
| June 1-2, 2015 | $____.____ (The damages per share cannot exceed $46.24) |

PROCEED TO SECTION 5.

---

**5.     REBUTTING THE PRESUMPTION OF RELIANCE**

**5.1** Did Defendants prove that Plaintiff Norfolk Pension Fund did not actually rely on the integrity of the market price of Puma's stock because it would have bought Puma stock at the same price it did, even if it had known of the alleged fraud? *(circle either "yes" or "no")*

YES     

PROCEED TO QUESTION 5.2.

**5.2** Did Defendants prove that the alleged false or misleading statements or omissions on July 22, 2014 did not affect the market price of Puma's stock? *(circle either "yes" or "no")*

YES     (NO)

PROCEED TO SECTION 6.

6.    **RETURN OF VERDICT**

SIGNED this _4_ day of _FEBRUARY_ , 2019.

PRESIDING JUROR: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

# APPENDIX OF ALLEGED FALSE AND MISLEADING STATEMENTS AND SURROUNDING TEXT

*(see Exhibit 103 for full transcript of the July 22, 2014 conference call)*

| No. | Subject | July 22, 2014 Statements |
|-----|---------|--------------------------|
| 1. | **Disease-Free Survival (DFS) Rates** | WERBER:   Congrats on this fantastically and, in many ways, unexpected data. So I have a ton of questions. Maybe I'll just take two, if you don't mind. One is, give us a little bit of a sense, what was the DFS on the control arm, first.   And then second, help us understand, what do you know about the safety profile?<br><br>AUERBACH: Okay. ***So in terms of the DFS of the placebo arm of the trial, it was in line with other reported trials. So it's in line with the Herceptin adjuvant studies.***  And then in terms of the safety profile, we haven't yet fully validated the safety database.  Our anticipation is the main AE we're going to see is what we've historically seen with neratinib, which is the diarrhea. And again, we would anticipate that the diarrhea rate, the grade 3 diarrhea rate, would be in line with the 29% to 30% that's been seen in the prior studies of neratinib as a monotherapy.<br><br> *       *       * <br>WERBER:  *You're thinking that, if I'm correct, the DFS is probably around mid to high 80s, around 86% or so in the control arm?*<br><br>AUERBACH:  *I would be comfortable with that number.*<br><br>WERBER:   *And one would imagine you probably had to show around 90% or 91%? Is that reasonable?*<br><br>AUERBACH:  *Yes. I think you can do a 33% improvement in DFS and come up with that calculation, given the numbers we gave.* |

| 2. | Grade 3+ Diarrhea Rate | AUERBACH (opening remarks): *From a safety perspective, the Company has not yet seen the safety results from the ExteNET trial for neratinib, as the data is still being validated.* Historically, the main adverse event that has been seen with neratinib has been a gastrointestinal adverse event, and more specifically, diarrhea. In previous studies performed prior to Puma licensing neratinib, grade 3 or higher diarrhea was seen in approximately 30% or more of the patients treated with neratinib. In these previous historical studies, the diarrhea was typically a first-cycle effect and was treated using a combination of anti-diarrheal agents, such as Imodium, which is also known generically as loperamide, dose interruptions, or dose reductions. |
|---|---|---|
| | | *     *     * |
| | | Prior to Puma licensing the drug, neratinib monotherapy was previously tested in two Phase II trials in patients with HER2-positive metastatic breast cancer, the results of which were published in European Journal of Cancer in December 2013 and the Journal of Clinical Oncology in 2010. *In those studies, grade 3 or higher diarrhea was seen in 29% and 30% of the patients, respectively.* |
| | | The ExteNET trial was started in April of 2009, prior to Puma licensing the drug in 2011. Neratinib was given as a monotherapy, and no prophylaxis to prevent neratinib-related diarrhea was used. *Therefore, the Company anticipates that the grade 3 diarrhea rates in the ExteNET trial are likely to be in line with what was previously published in the prior Phase II trials that were published in the European Journal of Cancer and the Journal of Clinical Oncology.* |
| | | As investors know, after licensing the drug, Puma began to look at using antidiarrheal agents, and specifically Imodium, prophylactically in order to reduce and potentially prevent the neratinib-related diarrhea. More specifically, the results of using both low doses and high doses of Imodium prophylactically have shown that using high doses of Imodium during the first 3 days of treatment and then tapering the Imodium dose down during the first cycle has resulted in much lower rates of grade 3 diarrhea. |

In all of its current ongoing studies. Puma is instituting the use of this high-dose Imodium in order to reduce the neratinib-related diarrhea. The results of this continues to demonstrate that the use of high-dose Imodium prophylaxis drops the grade 3 diarrhea rates considerably. We expect that the first clinical trial data utilizing this high-dose Imodium prophylaxis will be presented in the second half of 2014, and we believe that this will give investors much greater transparency into the success of this prophylaxis in reducing the grade 3 diarrhea with neratinib.

\* \* \*

WERBER: Congrats on this fantastically and, in many ways, unexpected data. So I have a ton of questions. Maybe I'll just take two, if you don't mind. One is, give us a little bit of a sense, what was the DFS on the control arm, first. And then second, help us understand, what do you know about the safety profile?

AUERBACH: Okay. So in terms of the DFS of the placebo arm of the trial, it was in line with other reported trials. So it's in line with the Herceptin adjuvant studies. And then in terms of the safety profile, we haven't yet fully validated the safety database. Our anticipation is the main AE we're going to see is what we've historically seen with neratinib, which is the diarrhea. *And again, we would anticipate that the diarrhea rate, the grade 3 diarrhea rate, would be in line with the 29% to 30% that's been seen in the prior studies of neratinib as a monotherapy.*

Now, again, they didn't use any prophylaxis. There was no Imodium prophylaxis used in the trial, because it was started before we had come up with that. In the current trial that we're doing, neratinib monotherapy, we've been very, very successful in being able to reduce the grade 3 diarrhea rates using the Imodium prophylaxis.

| 3. | Kaplan-Meier (KM) Curves | LIANG: Congratulations, Alan, and your team. So can you – *I assume you have seen the curves for the two arms.* Can you give us a sense as to whether the separation is widening over time? Or how would you describe the curve separation?<br><br>AUERBACH: *Yes*, thanks for that question, Howard. Okay, so the trial started in April of 2009, and this data cut is as of October 2013. So that's essentially the last patient was followed for 2 years. So from those numbers, you can see we have a lot of patients who have been in for much more than that 2-year cutoff. *If we look at the [Kaplan-Meier] curves going out beyond that, it looks like the curves are continuing to separate.*<br><br>*And to give a little more detail on that, if you look at the curves in the Herceptin adjuvant trials – so the HERA study, the BCIRG study, et cetera – the absolute difference in disease-free survival increases as you go out year over year. So, for instance, in the BCIRG trial, the DFS difference was 6% at 2 years and 7% at 3 years, then 8% at 4 years, et cetera, et cetera . . . .*<br><br>*We're seeing the same preliminary trend in the ExteNET trial, where the curves appear to be continuing to separate as you go out year over year, and the absolute DFS difference is increasing year over year as well.* |

| 4. | **Discontinuation Rate Due to Adverse Events (AEs)** | SCHMIDT:  Thanks.  And lastly, I think you probably do know the dropout rate from the trial.  Could you remind us of that?<br><br>AUERBACH:  Dropout rate due to side effects?<br><br>SCHMIDT:  Sure, or anything, if you have it.<br><br>AUERBACH:  *I don't have that. I apologize.  That's part of the stuff being validated, but we anticipate, typically in the neratinib studies – the legacy ones that were done before, when Pfizer was running it without any prophylaxis – it was usually in the 5% to 10% range was the dropout rate due to AEs. So we'd anticipate it's in that same vein.*<br><br> *        *        * <br>RODEN:  I just wanted to clarify an earlier answer to a question.  So you were asked about the dropout rate, and I think you wanted to defer to dropouts due to – discontinuations due to adverse events.  But can you just mention, or maybe I missed it, how many patients actually completed the year of therapy?  Or another way of saying it is how much missing data is there from the DFS analysis?<br><br>AUERBACH:  *Yes, so in terms of patients who dropped out due to AEs, like I said, historically with neratinib, that should be somewhere in the 5% to 10% range.*<br><br>RODEN:   Okay, but do you have a sense for dropouts for any reason across the study?<br><br>AUERBACH: *No*, the main one we would expect is due to AEs. And obviously, if they progressed or died. |

# EXHIBIT E

[In re Clarent Corp. Sec. Litig.
Case No. C 01-03361 CRB
ECF No. 475 (N.D. Cal. Feb. 16, 2005)
Verdict Form]

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re CLARENT CORPORATION        No. C 01-03361 CRB

SECURITIES LITIGATION

_____/

**VERDICT FORM AS TO JERRY CHANG'S LIABILITY**

Section 10(b) Claim Against Jerry Chang

**First Quarter 2000**

1.     Did Jerry Chang make an untrue statement of a material fact or omit a material fact necessary under the circumstances to keep the statements that were made from being misleading in Clarent's Quarterly Report on Form 10-Q or earnings release for first quarter 2000?

Yes _____     No _X_

IF YOU ANSWERED "YES," PLEASE PROCEED TO QUESTION 2. IF YOU ANSWERED "NO," PLEASE PROCEED TO QUESTION 5.

2.     Did Jerry Chang act either knowingly or recklessly in making the false statement or omission you found in answering Question 1?

Yes _____     No _____

IF YOU ANSWERED "YES," PLEASE PROCEED TO QUESTION 3. IF YOU ANSWERED "NO," PLEASE PROCEED TO QUESTION 5.

3.     Did Jerry Chang act knowingly or recklessly (choose one)?

Knowingly _____     Recklessly _____

PLEASE PROCEED TO QUESTION 4.

4.     Was the market price of Clarent stock inflated as a direct or a reasonably foreseeable result of the misstatement or omission you found in answering Question 1?

Yes _____     No _____

PLEASE PROCEED TO QUESTION 5.

**Second Quarter 2000**

5.     Did Jerry Chang make an untrue statement of a material fact or omit a material fact necessary under the circumstances to keep the statements that were made from being misleading in Clarent's

2

United States District Court

For the Northern District of California

1    Quarterly Report on Form 10-Q or earnings release for second quarter 2000?

2    Yes _____     No _X_

3    IF YOU ANSWERED "YES," PLEASE PROCEED TO QUESTION 6. IF YOU ANSWERED "NO,"

4    PLEASE PROCEED TO QUESTION 9.

5

6    6.     Did Jerry Chang act either knowingly or recklessly in making the false statement or omission you

7    found in answering Question 5?

8    Yes _____     No _____

9    IF YOU ANSWERED "YES," PLEASE PROCEED TO QUESTION 7. IF YOU ANSWERED "NO,"

10    PLEASE PROCEED TO QUESTION 9.

11

12    7.     Did Jerry Chang act knowingly or recklessly (choose one)?

13    Knowingly _____     Recklessly _____

14    PLEASE PROCEED TO QUESTION 8.

15

16    8.     Was the market price of Clarent stock inflated as a direct or a reasonably foreseeable result of

17    the misstatement or omission you found in answering Question 5?

18       Yes _____     No _____

19    PLEASE PROCEED TO QUESTION 9.

20

21    **Third Quarter 2000**

22    9.     Did Jerry Chang make an untrue statement of a material fact or omit a material fact necessary

23    under the circumstances to keep the statements that were made from being misleading in Clarent's

24    Quarterly Report on Form 10-Q or earnings release for third quarter 2000?

25    Yes _____     No _X_

26    IF YOU ANSWERED "YES," PLEASE PROCEED TO QUESTION 10. IF YOU ANSWERED "NO,"

27    PLEASE PROCEED TO QUESTION 13.

28

1    10.    Did Jerry Chang act either knowingly or recklessly in making the false statement or omission you

2    found in answering Question 9?

3    Yes _____    No _____

4    IF YOU ANSWERED "YES," PLEASE PROCEED TO QUESTION 11. IF YOU ANSWERED "NO,"

5    PLEASE PROCEED TO QUESTION 13.

6

7    11.    Did Jerry Chang act knowingly or recklessly (choose one)?

8    Knowingly _____    Recklessly _____

9    PLEASE PROCEED TO QUESTION 12.

10

11    12.    Was the market price of Clarent stock inflated as a direct or a reasonably foreseeable result of

12    the misstatement or omission you found in answering Question 9?

13    Yes _____    No _____

14    PLEASE PROCEED TO QUESTION 13.

15

16

17    **Fourth Quarter and Year-End 2000**

18    13.    Did Jerry Chang make an untrue statement of a material fact or omit a material fact necessary

19    under the circumstances to keep the statements that were made from being misleading in Clarent's

20    Annual Report on Form 10-K for 2000 or earnings release for fourth quarter and year-end 2000?

21    Yes _X_    No _____

22    IF YOU ANSWERED "YES," PLEASE PROCEED TO QUESTION 14. IF YOU ANSWERED "NO,"

23    PLEASE PROCEED TO QUESTION 17.

24

25    14.    Did Jerry Chang act either knowingly or recklessly in making the false statement or omission you

26    found in answering Question 13?

27    Yes _X_    No _____

28    IF YOU ANSWERED "YES," PLEASE PROCEED TO QUESTION 15. IF YOU ANSWERED "NO,"

United States District Court
For the Northern District of California

4

United States District Court

For the Northern District of California

1 │ PLEASE PROCEED TO QUESTION 17.

2

3 │ 15.   Did Jerry Chang act knowingly or recklessly (choose one)?

4 │ Knowingly _____   Recklessly _X_

5 │ PLEASE PROCEED TO QUESTION 16.

6

7 │ 16.   Was the market price of Clarent stock inflated as a direct or a reasonably foreseeable result of

8 │ the misstatement or omission you found in answering Question 13?

9 │       Yes _____   No _X_

10 │ PLEASE PROCEED TO QUESTION 17.

11

12 │ **First Quarter 2001**

13 │ 17.   Did Jerry Chang make an untrue statement of a material fact or omit a material fact necessary

14 │ under the circumstances to keep the statements that were made from being misleading in Clarent's

15 │ Quarterly Report on Form 10-Q or earnings release for first quarter 2001?

16 │ Yes _X_   No _____

17 │ IF YOU ANSWERED "YES," PLEASE PROCEED TO QUESTION 18. IF YOU ANSWERED "NO,"

18 │ PLEASE PROCEED TO QUESTION 21.

19

20 │ 18.   Did Jerry Chang act either knowingly or recklessly in making the false statement or omission you

21 │ found in answering Question 17?

22 │ Yes _X_   No _____

23 │ IF YOU ANSWERED "YES," PLEASE PROCEED TO QUESTION 19. IF YOU ANSWERED "NO,"

24 │ PLEASE PROCEED TO QUESTION 21.

25

26 │ 19.   Did Jerry Chang act knowingly or recklessly (choose one)?

27 │ Knowingly _____   Recklessly _X_

28 │ PLEASE PROCEED TO QUESTION 20.

20. Was the market price of Clarent stock inflated as a direct or a reasonably foreseeable result of the misstatement or omission you found in answering Question 17?

Yes _____    No _X_

PLEASE PROCEED TO QUESTION 21.

**Second Quarter 2001**

21. Did Jerry Chang make an untrue statement of a material fact or omit a material fact necessary under the circumstances to keep the statements that were made from being misleading in Clarent's Quarterly Report on Form 10-Q or earnings release for second quarter 2001?

Yes _X_    No _____

IF YOU ANSWERED "YES," PLEASE PROCEED TO QUESTION 22. IF YOU ANSWERED "NO," PLEASE SIGN AND DATE BELOW AND THEN PROCEED TO THE JURY VERDICT FORM AS TO ERNST & YOUNG. IF BOTH JURY VERDICT FORMS HAVE BEEN COMPLETED, PLEASE STOP, SIGN AND DATE BELOW, AND REPORT YOUR FINDINGS TO THE COURT.

22. Did Jerry Chang act either knowingly or recklessly in making the false statement or omission you found in answering Question 21?

Yes _X_    No _____

IF YOU ANSWERED "YES," PLEASE PROCEED TO QUESTION 23. IF YOU ANSWERED "NO," PLEASE SIGN AND DATE BELOW AND THEN PROCEED TO THE JURY VERDICT FORM AS TO ERNST & YOUNG. IF BOTH JURY VERDICT FORMS HAVE BEEN COMPLETED, PLEASE STOP, SIGN AND DATE BELOW, AND REPORT YOUR FINDINGS TO THE COURT.

23. Did Jerry Chang act knowingly or recklessly (choose one)?

Knowingly _X_    Recklessly _____

PLEASE PROCEED TO QUESTION 24.

United States District Court
For the Northern District of California

6

24. Was the market price of Clarent stock inflated as a direct or a reasonably foreseeable result of the misstatement or omission you found in answering Question 21?

Yes  X       No ____

PLEASE SIGN AND DATE BELOW AND THEN PROCEED TO THE JURY VERDICT FORM AS TO ERNST & YOUNG. IF BOTH JURY VERDICT FORMS HAVE BEEN COMPLETED, PLEASE STOP, SIGN AND DATE BELOW, AND REPORT YOUR FINDINGS TO THE COURT.

Dated: 2/16/05

Jury Foreperson

United States District Court
For the Northern District of California

7

# EXHIBIT F

[*In re Apollo Group Sec. Litig.*
Case No. CV 04-2147-PHX-JAT
ECF No. 490 (D. Ariz., Jan. 16, 2008)
Verdict Form]

FILED ☒   ___ LODGED
RECEIVED ___   ___ COPY

JAN 1 6 2008

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| In re Apollo Group Inc. Securities Litigation, | ) ) ) ) ) ) ) ) ) ) ) | Master File No. CV 04-2147-PHX-JAT (LEAD) CV 04-2204-PHX-JAT (Consolidated) CV 04-2334-PHX-JAT(Consolidated) **CLASS ACTION** **VERDICT FORM** |
|---|---|---|
| This Document Relates To: All Actions | | |

We, the jury, duly empaneled and sworn in the above-entitled case, upon our oaths, do hereby find as follows:

# SECTION 10(b) CLAIM AGAINST APOLLO

1. Did Apollo make an untrue statement of a material fact or omit a material fact necessary under the circumstances to keep the statements that were made from being misleading?

A)  The Press Release of Apollo Group, Inc., dated February 27, 2004:

Yes: _X_          No: ____

B)  The Analyst Conference on March 12, 2004:

Yes: _X_          No: ____

C)  The Form 10-Q dated April 13, 2004:

Yes: _X_          No: ____

D)  The Analyst Conference Call on June 24, 2004:

Yes: _X_          No: ____

E)  The Analyst Conference Call on August 25, 2004:

Yes: _X_          No: ____

F)  The Analyst Conference Call on September 7, 2004:

Yes: _X_          No: ____

If you answered all parts of Question 1 "no," leave Questions 2, 3, and 4 blank and proceed to Question 5.  If you answered Question 1 "yes" as to any statement, answer Question 2 as to that statement.  Do not answer Question 2 for any statement for which you answered Question 1 "no."

-1-

2.  For any statement as to which a "yes" answer was given in Question 1, did Apollo act knowingly or recklessly with respect to that misrepresentation or omission?

    A)    The Press Release of Apollo Group, Inc., dated February 27, 2004:

        Yes: ☒        No: _____

    B)    The Analyst Conference on March 12, 2004:

        Yes: ☒        No: _____

    C)    The Form 10-Q dated April 13, 2004:

        Yes: ☒        No: _____

    D)    The Analyst Conference Call on June 24, 2004:

        Yes: ☒        No: _____

    E)    The Analyst Conference Call on August 25, 2004:

        Yes: ☒        No: _____

    F)    The Analyst Conference Call on September 7, 2004:

        Yes: ☒        No: _____

If you answered Question 2 "no" as to all statements left over from Question 1, leave Questions 3 and 4 blank and proceed to Question 5.  If you answered Question 2 "yes" as to any statement, answer Question 3 as to that statement.  Do not answer Question 3 for any statement for which you answered Question 2 "no."

3.  For any statement as to which a "yes" answer was given in Question 2, more specifically, did Apollo act knowingly with respect to that misrepresentation or omission?

A)      The Press Release of Apollo Group, Inc., dated February 27, 2004:

Yes: X          No: ____

B)      The Analyst Conference on March 12, 2004:

Yes: X          No: ____

C)      The Form 10-Q dated April 13, 2004:

Yes: X          No: ____

D)      The Analyst Conference Call on June 24, 2004:

Yes: X          No: ____

E)      The Analyst Conference Call on August 25, 2004:

Yes: X          No: ____

F)      The Analyst Conference Call on September 7, 2004:

Yes: X          No: ____


Proceed to Question 4.

-3-

4.  For any statement as to which a "yes" answer was given in Question 2, did that misrepresentation or omission cause the plaintiff to suffer damages?  (By answering this question in the affirmative, you are finding that Apollo violated the securities laws.)

A)      The Press Release of Apollo Group, Inc., dated February 27, 2004:

Yes:  X          No: ____

B)      The Analyst Conference on March 12, 2004:

Yes:  X          No: ____

C)      The Form 10-Q dated April 13, 2004:

Yes:  X          No: ____

D)      The Analyst Conference Call on June 24, 2004:

Yes:  X          No: ____

E)      The Analyst Conference Call on August 25, 2004:

Yes:  X          No: ____

F)      The Analyst Conference Call on September 7, 2004:

Yes:  X          No: ____


Proceed to Question 5.

# SECTION 10(b) CLAIM AGAINST TODD NELSON

5. Did Todd Nelson make an untrue statement of a material fact or omit a material fact necessary under the circumstances to keep the statements that were made from being misleading?

A) The Press Release of Apollo Group, Inc., dated February 27, 2004:

Yes: X          No: ____

B) The Analyst Conference on March 12, 2004:

Yes: X          No: ____

C) The Form 10-Q dated April 13, 2004:

Yes: X          No: ____

D) The Analyst Conference Call on June 24, 2004:

Yes: X          No: ____

E) The Analyst Conference Call on August 25, 2004:

Yes: X          No: ____

F) The Analyst Conference Call on September 7, 2004

Yes: X          No: ____

If you answered all parts of Question 5 "no," leave Questions 6, 7, and 8 blank and proceed to Question 9. If you answered Question 5 "yes" as to any statement, answer Question 6 as to that statement. Do not answer Question 6 for any statement for which you answered Question 5 "no."

6. For any statement as to which a "yes" answer was given in Question 5, did Todd Nelson act knowingly or recklessly with respect to that misrepresentation or omission?

A)    The Press Release of Apollo Group, Inc., dated February 27, 2004:

Yes: X̲     No: ____

B)    The Analyst Conference on March 12, 2004:

Yes: X̲     No: ____

C)    The Form 10-Q dated April 13, 2004:

Yes: X̲     No: ____

D)    The Analyst Conference Call on June 24, 2004:

Yes: X̲     No: ____

E)    The Analyst Conference Call on August 25, 2004:

Yes: X̲     No: ____

F)    The Analyst Conference Call on September 7, 2004:

Yes: X̲     No: ____

If you answered Question 6 "no" as to all statements left over from Question 5, leave Question 7 and 8 blank and proceed to Question 9. If you answered Question 6 "yes" as to any statement, answer Question 7 as to that statement. Do not answer Question 7 for any statement for which you answered Question 6 "no."

7.  For any statement as to which a "yes" answer was given in Question 6, more specifically, did Todd Nelson act knowingly with respect to that misrepresentation or omission?

A)  The Press Release of Apollo Group, Inc., dated February 27, 2004:

Yes: X          No: ____

B)  The Analyst Conference on March 12, 2004:

Yes: X          No: ____

C)  The Form 10-Q dated April 13, 2004:

Yes: X          No: ____

D)  The Analyst Conference Call on June 24, 2004:

Yes: X          No: ____

E)  The Analyst Conference Call on August 25, 2004:

Yes: X          No: ____

F)  The Analyst Conference Call on September 7, 2004:

Yes: X          No: ____

Proceed to Question 8.

8.  For any statement as to which a "yes" answer was given in Question 6, did that misrepresentation or omission cause the plaintiff to suffer damages?  (By answering this question in the affirmative, you are finding that Todd Nelson violated the securities laws.)

A)   The Press Release of Apollo Group, Inc., dated February 27, 2004:

Yes: X            No: ____

B)   The Analyst Conference on March 12, 2004:

Yes: X            No: ____

C)   The Form 10-Q dated April 13, 2004:

Yes: X            No: ____

D)   The Analyst Conference Call on June 24, 2004:

Yes: X            No: ____

E)   The Analyst Conference Call on August 25, 2004:

Yes: X            No: ____

F)   The Analyst Conference Call on September 7, 2004:

Yes: X            No: ____


Proceed to Question 9.

## SECTION 10(b) CLAIM AGAINST KENDA GONZALES

9. Did Kenda Gonzales make an untrue statement of a material fact or omit a material fact necessary under the circumstances to keep the statements that were made from being misleading?

A)    The Press Release of Apollo Group, Inc., dated February 27, 2004:

Yes: X̶        No: ____

B)    The Form 10-Q dated April 13, 2004:

Yes: X̶        No: ____

If you answered all parts of Question 9 "no," leave Questions 10, 11, and 12 blank and proceed to Question 13.  If you answered Question 9 "yes" as to any statement, answer Question 10 as to that statement.  Do not answer Question 10 for any statement for which you answered Question 9 "no."

1        10.  For any statement as to which a "yes" answer was given in Question 9, did Kenda

2  Gonzales act knowingly or recklessly with respect to that misrepresentation or omission?

3      A)     The Press Release of Apollo Group, Inc., dated February 27, 2004:

4           Yes: X        No: \_\_\_\_

5      B)     The Form 10-Q dated April 13, 2004:

6           Yes: X        No: \_\_\_\_

7

8       If you answered Question 10 "no" as to all statements left over from Question 9, leave

9  Questions 11 and 12 blank and proceed to Question 13.  If you answered Question 10 "yes"

10  as to any statement, answer Question 11 as to that statement.  Do not answer Question 11 for

11  any statement for which you answered Question 10 "no."

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11.  For any statement as to which a "yes" answer was given in Question 10, more specifically, did Kenda Gonzales act knowingly with respect to that misrepresentation or omission?

A)      The Press Release of Apollo Group, Inc., dated February 27, 2004:

Yes: X         No: ____

B)      The Form 10-Q dated April 13, 2004:

Yes: X         No: ____


Proceed to Question 12.

12. For any statement as to which a "yes" answer was given in Question 10, did that misrepresentation or omission cause the plaintiff to suffer damages?  (By answering this question in the affirmative, you are finding that Kenda Gonzales violated the securities laws.)

A)    The Press Release of Apollo Group, Inc., dated February 27, 2004:

Yes: _X_         No: ____

B)    The Form 10-Q dated April 13, 2004:

Yes: _X_         No: ____


Proceed to Question 13.

**SECTION 20(a) CLAIM AGAINST TODD NELSON**

      **Answer Question 13 only if you answered Question 4 "yes." If you answered "no" to Question 4 or left it blank, leave Questions 13 and 14 blank and proceed to Question 15.**

      13. Did Todd Nelson possess, directly or indirectly, the actual power to direct or cause the direction of the management and policies of Apollo?

      Yes: ☒        No: _____

      Proceed to Question 14.

14. Did the defendants prove by a preponderance of the evidence both that Todd Nelson did not directly or indirectly induce Apollo's violation of the securities laws and that he acted in good faith as that term is defined in the jury instructions?

Yes: _____          No: X

Proceed to Question 15.

Answer Question 15 only if you answered Question 12 "yes."  If you answered "no" to Question 12 or left it blank, leave Questions 15 and 16 blank and proceed to Question 17.

15.  Did Todd Nelson possess, directly or indirectly, the actual power to direct Kenda Gonzales?

Yes: _X_          No: ____

Proceed to Question 16.

-15-

16.  Did the defendants prove by a preponderance of the evidence both that Todd Nelson did not directly or indirectly induce Kenda Gonzales's violation of the securities laws and that he acted in good faith as that term is defined in the jury instructions?

Yes: _____          No: _X_

Proceed to Question 17.

-16-

1      Answer Question 17 only if you answered "yes" to Questions 4, 8, or 12. **If you**

2 **answered "no" to each of these questions or left them blank, sign and return the verdict**

3 **form without answering any further questions.**

4

5      17.  Specify the total amount of damages per share that the plaintiff suffered as a

6 result of the misrepresentation(s) or omission(s):

7      $ _5.55_ per share

8

9      Proceed to Question 18.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                          -17-

18.   What is the percentage of responsibility for the plaintiff's loss that you assign to each defendant whom you found in answers to Questions 4, 8, and/or 12 to have violated the securities laws?   The total must add up to 100%.   In determining the percentage of responsibility for each such defendant, you must consider: (1) the nature of the conduct of each defendant found to have caused or contributed to the loss incurred by the plaintiff; and (2) the nature and extent of the causal relationship between the conduct of each defendant and the damages incurred by the plaintiff.

|                | Percentage |
| -------------- | ---------- |
| Apollo         | 60         |
| Todd Nelson    | 30         |
| Kenda Gonzales | 10         |
|                | = 100% Total |

Sign and return this form.

_____9_____
(Presiding Juror Number)

_____1/16/08_____
(Date)

-18-